1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    GOOGLE LLC,                          Case No.  20-cv-03845-EMC

8                    Plaintiff,

9         v.                             **ORDER GRANTING DEFENDANT'S**
                                         **MOTION TO DISMISS SECOND**
10   SONOS, INC.,                        **CAUSE OF ACTION**

11                   Defendant.          Docket No. 39

12

13

14        Plaintiff Google LLC has filed a patent infringement suit against Defendant Sonos, Inc.

15   The case involves five different patents but the pending motion to dismiss filed by Sonos

16   implicates one patent only – *i.e.*, the '489 patent.  Sonos moves to dismiss the cause of action

17   asserting infringement of the '489 patent on the ground that the invention at issue is patent

18   ineligible under 35 U.S.C. § 101.  According to Sonos, the '489 patent is unpatentable because it

19   simply claims an abstract idea as the invention.

20              **I.        FACTUAL & PROCEDURAL BACKGROUND**

21        The '489 patent is titled "Generating Media Content Availability Notification."

22        The invention "relates generally to determining if media content is available from different

23   content sources" and "notifying a user when the availability of the media content changes."  '489

24   patent, col. 1:13-16.

25        The background of the invention is described as follows:

26              In today's digital age, media content such as movies, video clips,
                television shows, music, etc., is becoming available from an ever-
27              increasing number of different content sources.  For example, the
                same movie may be shown in a movie theater, broadcast on
28              television, released on physical. Media (e.g., DVD, Blu-Ray VHS,

United States District Court
Northern District of California

United States District Court
Northern District of California

etc.), made available to certain entities (e.g., institutions, hospitals, airlines, etc.), or placed on an online source for download or streaming.  The timing of when media content is available from the different content sources can also differ.  For example, a movie may only be shown in a movie theater for a limited period of time, followed by a period of time in which it is available via on-demand television or online streaming, before being released for download or on a physical media format.  This increase in the number of different content sources, combined with the increase in disparate release schedules for media content, often leads to confusion among consumers.

'489 patent, col. 1:17-33.

Google asserts that Sonos infringes the '489 patent, including but not limited to claim 15.  *See* FAC ¶ 47 (alleging infringement of at least claim 15).  Claim 15 provides as follows:

15.  One or more non-transitory computer-readable media having instructions therein, the instructions being executable by one or more processors to execute a method comprising:

receiving, at the one or more processors, a selection of media content and content delivery preferences, wherein the content delivery preferences comprise a selection of a plurality of unique online content sources specified by a user interface and user account data for each of the plurality of unique online content sources;

requesting, over a network, content availability data from the plurality of unique online content sources based at least in part on the selection of media content and the user account data, wherein the content availability data indicates whether the selection of media content is available to a user account in the user account data;

receiving, at the one or more processors, the content availability data; and

using the content availability data to generate a notification for an electronic device, wherein the notification indicates that the selection of media content is available to at least one user account in the user account data from at least one of the plurality of unique online content sources.

'489 patent, claim 15; *see also* '489 patent, col. 16:20-22 & FIG. 5 (describing "a process for generating a media content availability notification," made of the steps of receiving, requesting, receiving, and using).

Google alleges that "[t]he '489 patent provides a number of solutions to [the] problem [identified above], improving Internet usage and associated search functionality by, among other

things, providing the ability to identify desired online media content availability without repeated user involvement and streamline its delivery in a preferred manner even from protected sources." FAC ¶ 42.  Google adds that the invention "offers a [solution to a] problem that is uniquely associated with the Internet and other large networks – *i.e.*, the ability to easily and efficiently access voluminous amounts of data that is geographically distributed, at different times, in different formats, with differing access restrictions."  FAC ¶ 42.  Finally, Google alleges that the '489 patent is different from the prior art because, *e.g.*, the prior art "failed to notify a user that selected media content had become available, and was instead limited to merely delivering media content to subscribers distributed across a number of geographic locations" and because the prior art "did not provide . . . a user's ability to specify a price threshold below which the user would desire to obtain that media content."  FAC ¶ 44.

## II.  **DISCUSSION**

A.   Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The

United States District Court
Northern District of California

3

United States District Court
Northern District of California

plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotation marks omitted).

B.   General Law on Patent Eligibility

Title 35 U.S.C. § 101 defines what is patent eligible. It provides as follows: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has held that § 101 "'contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable.'" *Genetic Techs. Ld. v. Merial L.L.C.*, 818 F.3d 1369, 1374 (Fed. Cir. 2016). "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." *Id.* "[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Mayo Collab. Servs. v. Prometheus Labs., Inc.,* 566 U.S. 66, 71 (2012).

On the other hand, "too broad an interpretation of [the above] exclusionary principle could eviscerate patent law. For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* "'[A]n *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection,'" but "to transform an unpatentable law of nature into a patent-eligible *application* of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Id.* at 71-72 (emphasis in original).

"Patent eligibility under 35 U.S.C. § 101 is a question of law . . . ." *Genetic Techs.*, 818 F.3d at 1373. The Federal Circuit has "repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *Id.* However, the Federal Circuit has also noted that there can be underlying factual questions to a § 101 inquiry – *e.g.*, "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018); *see also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d

United States District Court
Northern District of California

1   1121, 1128 (Fed. Cir. 2018) (noting that a court, in evaluating whether a patent has an inventive

2   concept for purposes of patent eligibility, considers whether the patent involves more than the

3   performance of well understood, routine, and conventional activities – which is a question of fact).

4   *See, e.g.*, *Berkheimer*, 881 F.3d at 1370 (stating that, "[a]t this stage of the case, . . . there is at least

5   a genuine issue of material fact in light of the specification regarding whether claims 4-7 archive

6   documents in an inventive manner that improves these aspects of the disclosed archival system[;]

7   [w]hether claims 4-7 perform well-understood, routine, and conventional activities to a skilled

8   artisan is a genuine issue of material fact making summary judgment inappropriate").

9           There is a two-step test for patent eligibility under § 101.

10          The test "distinguish[es] patents that claim laws of nature, natural
            phenomena, and abstract ideas from those that claim patent-eligible
11          applications of those concepts." As set forth [by the  Supreme
            Court] in *Alice* [*Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208
12          (2014)]:

13                  First, we determine whether the claims at issue are
                    *directed to* one of those patent-ineligible concepts.  If
14                  so, we then ask, what else is there in the claims
                    before us? . . . We have described step two of this
15                  analysis as a search for an *inventive concept – i.e.*, an
                    element or combination of elements that is sufficient
16                  to ensure that the patent in practice amounts to
                    significantly more than a patent upon the ineligible
17                  concept itself.

18   *Genetic Techs.*, 818 F.3d at 1374 (emphasis added).

19          With respect to step one, the Federal Circuit has emphasized that "'it is not enough to

20   merely identify a patent-ineligible concept underlying the claim; we must determine whether that

21   patent-ineligible concept is what the claim is "directed to."'"  *Thales Visionix, Inc. v. United

22   States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017).  In other words, what is the focus of the claim?  *See,

23   e.g.*, *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018) (asking "whether

24   'the focus of the claims' is on a 'specific asserted improvement in computer capabilities . . . , or,

25   instead, on a process that qualifies as an "abstract idea" for which computers are invoked merely

26   as a tool'"); *see also Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336,

27   1341 (Fed. Cir. 2013) (indicating that a court must "'identify and define whatever fundamental

28   concept appears wrapped up in the claim[s]'").

As for step two, the Federal Circuit has underscored that

> [t]he inventive concept . . . cannot be furnished by the unpatentable law of nature (or natural phenomenon or abstract idea) itself.  That is, . . . a claim directed to a newly discovered law of nature (or natural phenomenon or abstract idea) cannot rely on the novelty of that discovery for the inventive concept necessary for patent eligibility; instead, the application must provide something inventive, beyond mere "well-understood, routine, conventional activity."  "[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable."

*Genetic Techs.*, 818 F.3d at 1376.  In addition, "[t]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant post solution activity."  *Mayo*, 566 U.S. at 73 (internal quotation marks omitted).

C.       Burden of Proof Regarding Patent Eligibility

Although the parties seem to agree that Sonos has the burden of proving patent ineligibility, the parties disagree as to what is the exact burden of proof – *i.e.*, clear and convincing or something lesser (such as preponderance of the evidence).  Not surprisingly, Google argues for the higher burden of proof, and Sonos the lesser.

Prior to the Supreme Court's decision in *Alice* (issued in 2014), there was some Federal Circuit authority suggesting that patent eligibility should be shown by clear and convincing evidence – even at the pleading stage.  *See Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338 (Fed. Cir. 2013) (stating that "it will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter . . . because every issued patent is presumed to have been issued properly, absent clear and convincing evidence to the contrary"), *vacated by WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014) (vacating judgment and remanding for further consideration in slight of *Alice*).

But in the wake of *Alice*, a split of authority arose among district courts as to whether the clear-and-convincing standard applies, particularly when evaluating patent eligibility based on the pleadings only.

Several courts have concluded that a heightened burden of proof

makes little sense in the context of a motion to dismiss or motion for judgment on the pleadings, and therefore declined to apply the clear and convincing evidence standard.  *See, e.g.*, *TNS Media Res., LLC v. Tivo Res. & Analytics, Inc.*, No. 11-CV-4039-SAS, 166 F. Supp. 3d 432 (S.D.N.Y. Feb. 22, 2016) ("Because no evidence outside the pleadings is considered in deciding a motion to dismiss or a motion for judgment on the pleadings, it makes little sense to apply a clear and convincing evidence standard – a burden of proof – to such motions.") (quotation marks and emphasis omitted); *Protegrity USA, Inc. v. Netskope, Inc.*, No. 15-CV-02515-YGR, 2015 U.S. Dist. LEXIS 142633 (N.D. Cal. Oct. 19, 2015) (same).  Other courts have applied the clear and convincing evidence standard to Section 101 challenges either without discussion, or because that standard is applied by the Federal Circuit in the context of other challenges to validity.  *See OpenTV, Inc. v. Apple Inc.*, No. 15-CV-02008-EJD, 2016 U.S. Dist. LEXIS 10445 (N.D. Cal. Jan. 28, 2016) (noting split of authority and collecting cases); *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 109 F. Supp. 3d 916, 932 & n.6 (W.D. Tex. 2015) (same); *c.f. Bascom Res., LLC v. LinkedIn, Inc.*, 77 F. Supp. 3d 940, 945 (N.D. Cal. 2015) (holding that "an alleged infringer asserting an invalidity defense pursuant to § 101 bears the burden of proving invalidity by clear and convincing evidence" in summary judgment context)."

*Papst Licensing GMBH & Co. v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1079 (N.D. Cal. 2016) (Koh, J.); *see also Huawei Techs. Co. v. Samsung Elecs. Co.*, No. 3:16-cv-02787-WHO, 2016 U.S. Dist. LEXIS 162039, at *20 (N.D. Cal. Nov. 21, 2016) (noting split of authority; ultimately concluding that "[i]t is not necessary to decide whether the heightened burden of proof applies here because defendants fail to establish the invalidity of the patents at issue, even by a preponderance of the evidence").

In February 2018, however, the Federal Circuit provided some limited guidance, noting that, at step two, an inventive concept means that there must be more than performance of well understood, routine, and conventional activities previously known to the industry.  "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact.  Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence."  *Berkheimer*, 881 F.3d at 1368.  Sonos seems to acknowledge *Berkheimer* but suggests that, unless factual questions are actually implicated at step two, the burden of proof should be something less than clear and convincing.  *See* Reply at 1-2 (recognizing that the Court might apply the clear-and-convincing standard "to subsidiary issues underlying the legal question").

United States District Court
Northern District of California

In the instant case, it is not necessary for the Court to opine as to what is the exact burden of proof here.  Even assuming that a heightened burden of proof such as clear and convincing evidence applies, Sonos has sufficiently established patent ineligibility.

D.    Patent Eligibility in the Computer Context

Where computers are involved (as in the instant case), patent eligibility is often contested because the Supreme Court has held that

> the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.  Stating an abstract idea "while adding the words 'apply it'" is not enough for patent eligibility.  Nor is limiting the use of an abstract idea "'to a particular technological environment.'"  Stating an abstract idea while adding the words "apply it with a computer" simply combines those two steps, with the same deficient result.  Thus, if a patent's recitation of a computer amounts to a mere instruction to "implemen[t]" an abstract idea "on . . . a computer," that addition cannot impart patent eligibility.  This conclusion accords with the pre-emption concern that undergirds our §101 jurisprudence.  Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of "additional featur[e]" that provides any "practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself."

*Alice*, 573 U.S. at 223-24; *cf. Bancorp Servs., L.L.C. v. Sun Life Ass. Co. of Canada*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (stating that "the fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter").

Not surprisingly, both parties have cited computer cases that go in their favor.  The main cases on which each party relies are discussed below.

1.    Sonos's Main Cases

a.    *Electric Power*

In *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), the patent at issue claimed, *inter alia*, "'[a] method of detecting events on an inter-connected electric power grid in real time over a wide area and automatically analyzing the events on the . . . grid.'"  *Id.* at 1351.  The steps that made up the method were: (1) receiving data from grid and non-grid sources, (2) detecting and analyzing events from that data, (3) displaying the results of that analysis, and (4) deriving an indicator of power grid vulnerability.  *See id.*

At step one, the Federal Circuit held that the patent was directed to or focused on an abstract idea.  It explained that:

- Information is an intangible, and so "collecting information, including when limited to a particular content (which does not change its character as information) [is] within the realm of abstract ideas";

- "[A]nalyzing information by steps people go through in their minds, or by mathematical algorithms, without more, [are] essentially mental processes within the abstract-idea category"; and

- "[P]resenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *Id.* at 1353-54.

The patent at issue reflected "a combination of [the above] abstract-idea processes." *Id.* at 1354.

At step two, the Federal Circuit found no inventive concept.  The court acknowledged that "a large portion of the lengthy claims is devoted to enumerating types of information and information sources available within the power-grid environment"; however, "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes." *Id.* at 1355.  The court then examined "*how* the desired result is achieved" to see if there was an inventive concept. *Id.* (emphasis in original).  The patent's "invocation of computers, networks, and displays" did not give rise to an inventive concept because the patent did not "require any nonconventional computer, network, or display components, or even a 'non-conventional and non-generic arrangement of known, conventional pieces'"; instead, the patent "merely call[ed] for performance of the claimed information collection, analysis, and display functions 'on a set of generic computer components' and display devices." *Id.*

The court distinguished the case under consideration from other cases where a computer-related patent had been found patent eligible.

> The claims at issue here do not require an arguably inventive device or technique for displaying information, unlike the claims at issue in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed.

> Cir. 2014) (at JMOL stage finding inventive concept in modification of conventional mechanics behind website display to produce dual-source integrated hybrid display).  Nor do the claims here require an arguably inventive distribution of functionality within a network, thus distinguishing the claims at issue from those in *Bascom*, 827 F.3d 1341 (at pleading stage finding sufficient inventive concept in "the installation of a filtering tool at a specific location, remote from the endusers, with customizable filtering features specific to each end user").  The claims in this case specify what information in the power-grid field it is desirable to gather, analyze, and display, including in "real time"; but they do not include any requirement for performing the claimed functions of gathering, analyzing, and displaying in real time by use of anything but entirely conventional, generic technology.

*Id.* at 1355-56.  Not surprisingly, Google has relied on both *DDR* and *Bascom* in arguing that the patent at issue in the instant case is patent eligible.

### b.  *Intellectual Ventures*

In *Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315 (Fed. Cir. 2017), the patent claimed, *inter alia*, a method for creating a database and an index to search the database.  *See id.* at 1326.  Per the patent, every record in a database is associated with one or more descriptive terms – *e.g.*, "a database record for a restaurant that serves Chinese food, accepts AMERICAN EXPRESS[,] and offers valet parking could be associated with the terms 'Chinese,' 'AMERICAN EXPRESS,' and 'valet parking.'"  *Id.*  The database index organizes this information using category tags (*e.g.*, cuisine, payment option, amenities) and domain tags (*e.g.*, restaurant).  "Each record in the database includes an index component that identifies the category and domain tags associated with that record."  *Id.*  "When the system receives a search request, a set of tags that corresponds to the request is somehow identified by the system.  And the system uses that set of tags to search for records that have an index component identifying the same set of tags."  *Id.*

At step one, the Federal Circuit held that the patent was directed to an abstract idea – "'creating an index and using that index to search for and retrieve data.'"  *Id.* at 1327.

> This type of activity, i.e., organizing and accessing records through the creation of an index-searchable database, includes longstanding conduct that existed well before the advent of computers and the Internet.  For example, a hard copy-based classification system (such as library-indexing system) employs a similar concept as the one recited by the '434 patent.

United States District Court
Northern District of California

*Id.* The court added that it had "previously held other patent claims ineligible for reciting similar abstract concepts that merely collect, classify, or otherwise filter data." *Id.*

At step two, the court held that there was no inventive concept that transformed the abstract idea above. The fact that the patent required generic computer implementation did not give rise to an inventive concept. *See id.* at 1328. Moreover, limitations that "recite routine computer functions, such as the sending and receiving information to execute the database search . . . are no more than the performance of well-understood, routine, [and] conventional activities previously known to the industry." *Id.* at 1329 (internal quotation marks omitted); *see also buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (noting that, under the patent, "a computer receives a request for a guarantee and transmits an offer of guarantee in return"; "[t]hat a computer receives and sends the information over a network – with no further specification – is not even arguably inventive").

    2.    Google's Main Cases

        a.    *Bascom*

In *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016), the patent at issue concerned the filtering of information received over the Internet. The prior art on filtering had drawbacks. For example, if a company put a filtering tool for Internet content on each local computer used by an employee, the tool could be subject to modification by employees (particularly if computer literate); also, it would be difficult and time consuming to install the filtering tool on each employee's local computer. Relocating the filtering tool to a local or remote server also had drawbacks; for example, a one-size-fits-all filter was not ideal because a single set of filtering criteria often was not appropriate for all end users. *See id.* at 1343-44.

The invention at issue was an improvement over the prior art because it provided individually customizable filtering at a remote server. *See id.* at 1344.

> To summarize, the ISP server receives a request to access a website, associates the request with a particular user, and identifies the requested website. The filtering tool then applies the filtering mechanism associated with the particular user to the requested website to determine whether the user associated with that request is allowed access to the website. The filtering tool returns either the content of the website to the user, or a message to the user indicating

11

that the request was denied.

*Id.* at 1345.

At step one, the Federal Circuit held that the patent at issue was directed to an abstract idea: "We agree with the district court that filtering content is an abstract idea because it is a longstanding, well-known method of organizing human behavior, similar to concepts previously found to be abstract" (*e.g.*, tracking financial transactions; collecting data, recognizing data, and storing; organizing information through mathematical correlations). *Id.* at 1348.

At step two, the court recognized that limitations such as "local client computer," "remote ISP server," and so forth were well known generic computer components. *See id.* But an inventive concept can arise from the ordered combination of such components.

> In light of *Mayo* and *Alice*, it is of course now standard for a § 101 inquiry to consider whether various claim elements simply recite "well-understood, routine, conventional activit[ies]." The district court's analysis in this case, however, looks similar to an obviousness analysis under 35 U.S.C. § 103, except lacking an explanation of a reason to combine the limitations as claimed. The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. As is the case here, an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.
>
> The inventive concept described and claimed in the '606 patent is the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user. This design gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server. . . . On this limited record [the case had been decided by the lower court at the 12(b)(6) phase], this specific method of filtering Internet content cannot be said, as a matter of law, to have been conventional or generic.
>
> The claims do not merely recite the abstract idea of filtering content along with the requirement to perform it on the Internet, or to perform it on a set of generic computer components. Nor do the claims preempt all ways of filtering content on the Internet; rather, they recite a specific, discrete implementation of the abstract idea of filtering content. Filtering content on the Internet was already a known concept, and the patent describes how its particular arrangement of elements is a technical improvement over prior art ways of filtering such content.

*Id.* at 1349-50; *see also id.* at 1352 (noting the same).

1                 b.     *DDR*

2        In *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), the patent at

3 issue was

> directed to systems and methods of generating a composite web
> page that combines certain visual elements of a "host" website with
> content of a third-party merchant. For example, the generated
> composite webpage may combine the logo, background color, and
> fonts of the host website with product information from the
> merchant.

*Id.* at 1248.

       The Federal Circuit began its § 101 analysis by noting that,

> [i]n some instances, patent-ineligible abstract ideas are plainly
> identifiable and divisible from the generic computer limitations
> recited by the remainder of the claim. For example, the Supreme
> Court in *Alice* determined that the claims at issue "simply
> instruct[ed] the practitioner to implement the abstract idea of
> intermediated settlement on a generic computer." 134 S. Ct. at
> 2359. In *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir.
> Nov. 14, 2014), the claims merely recited the abstract idea of using
> advertising as a currency as applied to the particular technological
> environment of the Internet. In *buySAFE, Inc. v. Google, Inc.*, 765
> F.3d 1350, 1355 (Fed. Cir. 2014), the claims recited no more than
> using a computer to send and receive information over a network in
> order to implement the abstract idea of creating a "transaction
> performance guaranty." In *Accenture Global Servs., GmbH v.
> Guidewire Software, Inc.*, 728 F.3d 1336, 1344-45 (Fed. Cir. 2013),
> the claims merely recited "generalized software components
> arranged to implement an abstract concept [of generating insurance-
> policy-related tasks based on rules to be completed upon the
> occurrence of an event] on a computer." And in *Bancorp Servs.,
> L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278
> (Fed. Cir. 2012), the claims recited no more than the use of a
> computer "employed only for its most basic function, the
> performance of repetitive calculations," to implement the abstract
> idea of managing a stable-value protected life insurance policy.
> Under Supreme Court precedent, the above claims were recited too
> broadly and generically to be considered sufficiently specific and
> meaningful applications of their underlying abstract ideas. Although
> many of the claims recited various computer hardware elements,
> these claims in substance were directed to nothing more than the
> performance of an abstract business practice on the Internet or using
> a conventional computer.

*Id.* at 1256.

       Turning to step one, the court acknowledged that "identifying the precise nature of the

abstract idea is not as straightforward as in *Alice* or some of our other recent abstract idea cases."

United States District Court
Northern District of California

13

*Id.* at 1257.  But ultimately, the court stated, "under any of [the defendant's or the dissent's] characterizations [*e.g.*, making two web pages look the same], the . . . patent's claims satisfy . . . step two."  *Id.*  This was because the patent provided an improvement in computer technology. *See id.* (stating that "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks").

> In particular, the . . . patent's claims address the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after "clicking" on an advertisement and activating a hyperlink. . . .
>
> [Under the patent], upon the click of an advertisement for a third-party product displayed on a host's website, the visitor is no longer transported to the third party's website. Instead, the patent claims call for an "outsource provider" having a web server which directs the visitor to an automatically-generated hybrid web page that combines visual "look and feel" elements from the host website and product information from the third-party merchant's website related to the clicked advertisement.  In this way, rather than instantly losing visitors to the third-party's website, the host website can instead send its visitors to a web page on the outsource provider's server that 1) incorporates "look and feel" elements from the host website, and 2) provides visitors with the opportunity to purchase products from the third-party merchant without actually entering that merchant's website.

*Id.* at 1257-58.

The court acknowledged the dissent's contention that "the 'store within a store' concept, such as a warehouse store that contains a kiosk for selling a third-party partner's cruise vacation packages, is the pre-Internet analog" of the patent.  *Id.* at 1258.  But the court did not find the comparison apt because, although the "concept may have been well-known, by the relevant timeframe, that practice did not have to account for the ephemeral nature of an Internet 'location' or the near-instantaneous transport between these locations made possible by standard Internet communication protocols."  *Id.* (emphasizing that the brick-and-mortar context did not face the same issue).

The Federal Circuit admitted still that

> not all claims purporting to address Internet-centric challenges are eligible for patent.  For example, in our recently-decided *Ultramercial* opinion, the patentee argued that its claims were

14

"directed to a specific method of advertising and content distribution that was previously unknown and never employed on the Internet before." 2014 U.S. App. LEXIS 21633. But this alone could not render its claims patent-eligible. In particular, we found the claims to merely recite the abstract idea of "offering media content in exchange for viewing an advertisement," along with "routine additional steps such as updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet." 2014 U.S. App. LEXIS 21633.

The '399 patent's claims are different enough in substance from those in *Ultramercial* because they do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity). Unlike the claims in *Ultramercial*, the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result – a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink. Instead of the computer network operating in its normal, expected manner by sending the website visitor to the third-party website that appears to be connected with the clicked advertisement, the claimed system generates and directs the visitor to the above-described hybrid web page that presents product information from the third-party and visual "look and feel" elements from the host website. When the limitations of the '399 patent's asserted claims are taken together as an ordered combination, the claims recite an invention that is not merely the routine or conventional use of the Internet.

*Id.* at 1258-59 (emphasis added). *Compare Two-Way Media Ltd v. Comcast Cable Communs., LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (concluding there was "no inventive concept in the ordered combination of [the patent claim] limitations[;][t]he claim uses a conventional ordering of steps – first processing the data, then routing it, controlling it, and monitoring its reception – with conventional technology to achieve its desired result").

c. *Finjan*

In *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299 (Fed. Cir. 2018), the patent at issue was related to identification of and protection against malware. Specifically, the patent claimed, *inter alia*, a method of (1) receiving a downloadable (*i.e.*, an executable application program), (2) generating a security profile that identifies suspicious code in the received downloadable, and (3) linking the security profile to the downloadable before a web server makes the downloadable available to web clients. *See id.* at 1303.

The Federal Circuit acknowledged that, in a prior case, it had held that:

- virus screening, by itself, is well known and constitutes an abstract idea; and

15

- performing a virus scan on an intermediary computer (to ensure the files are scanned before they can reach a user's computer) is a conventional approach and therefore also abstract.

*See id.* at 1304. But the court nevertheless concluded at step one that the patent at issue was not directed to an abstract idea.

> The security profile must include the information about potentially hostile operations produced by a "behavior-based" virus scan. This operation is distinguished from traditional, "code-matching" virus scans that are limited to recognizing the presence of previously-identified viruses, typically by comparing the code in a downloadable to a database of known suspicious code. The question, then, is whether this behavior-based virus scan in the '844 patent constitutes an improvement in computer functionality. We think it does.
>
> The "behavior-based" approach to virus scanning was pioneered by Finjan and is disclosed in the '844 patent's specification. In contrast to traditional "code-matching" systems, which simply look for the presence of known viruses, "behavior-based" scans can analyze a downloadable's code and determine whether it performs potentially dangerous or unwanted operations – such as renaming or deleting files. Because security profiles communicate the granular information about potentially suspicious code made available by behavior-based scans, they can be used to protect against previously unknown viruses as well as "obfuscated code" – known viruses that have been cosmetically modified to avoid detection by code-matching virus scans.

*Id.* (emphasis added). The court added that "[t]he security profile approach also enables more flexible and nuanced virus filtering. After an inspector generates a security profile for a downloadable, a user's computer can determine whether to access that downloadable by reviewing its security profile according to the rules in whatever 'security *policy*' is associated with the user." *Id.* (emphasis in original). In short, the patent was "directed to a non-abstract improvement in computer functionality, rather than the abstract idea of computer security writ large." *Id.* at 1305.

The defendant protested that the patent at issue did not "sufficiently describe how to implement that idea." *Id.* The Federal Circuit did not dispute that "a result, even an innovative result, is not itself patentable," but, it held, here, "the claims recite more than a mere result. Instead, they recite specific steps – generating a security profile that identifies suspicious code and linking it to a downloadable – that accomplish the desired result." *Id.*

16

E.      Step One

Taking into account, *inter alia*, the above cases, the Court concludes that the '498 patent is not patent eligible.

As noted above, at step one, the Court must ask what the invention claimed in the patent is directed to – *i.e.*, what is its focus?  As Sonos asserts, the invention claimed in the '489 patent is directed to collecting information, analyzing it, and providing a notification.  *See* '489 patent, col. 1:13-16 ("The present disclosure relates generally to determining if media content is available from different content sources.  The present disclosure more specifically relates to notifying a user when the availability of the media content changes.").  Under *Electric Power*, therefore, the invention is directed to an abstract idea.  *Electric Power* clearly states that collecting information and analyzing it fall within the abstract idea category.  *See also Intellectual Ventures*, 850 F.3d at 1327 (holding that patent was directed to an abstract idea – *i.e.*, "'creating an index and using that index to search for and retrieve data'"; also taking note of "patent claims [held] ineligible for reciting similar abstract concepts that merely collect, classify, or otherwise filter data").  As for notification, it ultimately is no different from the presentation of the results of collecting and analyzing information – which *Electric Power* also deemed within the category of abstract ideas. *See Elec. Power*, 830 F.3d at 1353-54 (stating that mere presentation of results – without, *e.g.*, identification of a particular tool for presentation – "is abstract as an ancillary part of such collection and analysis");

Google contends that the '489 patent is not directed to an abstract idea because it addresses an Internet-centric problem.  *See, e.g.*, Opp'n at 1, 6-7.  In so arguing, Google seems to comparing the instant case to *DDR*.  But even in *DDR*, the Federal Circuit explicitly noted that "not all claims purporting to address Internet-centric challenges are eligible for patent."  *DDR*, 773 F.3d at 1258; *see also Mayo*, 566 U.S. at 73 (stating that "[t]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant post solution activity") (internal quotation marks omitted). Furthermore, *DDR* involved a patent which improved computer technology; here the '489 patent uses computer technology to perform a human function.  Indeed, Google's opposition brief

indicates that the '489 patent is ultimately directed to overcoming "humans' limitations in manually searching for media content."  Opp'n at 6.  Simply using a computer as a tool to perform a task more efficiently does not create patent eligibility.  *See Bancorp*, 687 F.3d at 1278 (stating that "the fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter").

The Court acknowledges that, in *Finjan*, the Federal Circuit was willing to stop the inquiry at step one, but, there, it was clear the invention claimed was an improvement in computer functionality.  Here, Google has not sufficiently explained how the '489 patent is an improvement in computer functionality.  Again, as noted above, Google is ultimately asserting that the '489 patent is an improvement over human limitations.  Notably, in the other two cases on which Google primarily relies – *i.e.*, *Bascom* and *DDR* – the Federal Circuit proceeded to step two.  *See, e.g.*, *DDR*, 773 F.3d at 1257 (at step one, acknowledging that "identifying the precise nature of the abstract idea is not as straightforward as in *Alice* or some of our other recent abstract idea cases" and therefore turning to step two to resolve the case).

F.    Step Two

At step two, the Court asks whether the patent at issue has an inventive concept.  The inventive concept (1) cannot be furnished by the unpatentable abstract idea and (2) must provide something beyond well understood, routine, conventional activity.

> The inventive concept . . . cannot be furnished by the unpatentable law of nature (or natural phenomenon or abstract idea) itself.  That is, . . . a claim directed to a newly discovered law of nature (or natural phenomenon or abstract idea) cannot rely on the novelty of that discovery for the inventive concept necessary for patent eligibility; instead, the application must provide something inventive, beyond mere "well-understood, routine, conventional activity."  "[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable."

*Genetic Techs.*, 818 F.3d at 1376.  In addition, "[t]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant post solution activity."  *Mayo*, 566 U.S. at 73 (internal quotation marks omitted).

United States District Court
Northern District of California

1    In its opposition, Google asserts two inventive concepts: (1) "targeted searching of

2    aggregated content" and (2) notification of when desired content becomes available.  Opp'n at 8-9;

3    *see also* Opp'n at 10 (asserting that "[t]he patent employs a specific tool (targeted searches based

4    on content delivery preferences) to provide a specific solution (an electronic notification that is

5    generated when content becomes available) to a specific problem (media content spread across

6    different sources in a network having different access rights and non-synchronized times of

7    availability)"); Opp'n at 13 (addressing why the invention is different from the prior art – the prior

8    art did not "disclose a method for selecting a plurality of unique online content sources specified

9    by a user interface device and user account data" nor did it disclose "using content availability

10   data to generate a notification").

11    But the targeted searching, *see, e.g.*, Opp'n at 9 (referring to using data fields such as

12   "unique online content sources, user account data, prioritization selection, pricing, and the

13   potential for identification of related content"), does not support an inventive concept in light of

14   *Electric Power*.  There, the Federal Circuit noted that "merely selecting information, by content or

15   source, for collection, analysis, and display does nothing significant to differentiate a process from

16   ordinary mental processes."  *Elec. Power*, 830 F.3d at 1355.  Nothing indicates that the target

17   searching taught by the '489 patent uses something other than routine, unconventional activity.

18   As for notification, as discussed above, it ultimately is no different from the mere presentation of

19   results which, under *Electric Power* again, falls under the category of abstract ideas.

20    Google protests still that the '489 patent has an inventive concept because it provides an

21   architecture for achieving the desired result.  But for an architecture to provide an inventive

22   concept beyond the unpatentable abstract idea, there must be sufficient specificity as to "*how* the

23   desired result is achieved."  *Id.* at 1355 (emphasis in original).  Specificity is important as it staves

24   off the potential monopolization of the basic tools of scientific and technological work.  *Cf.*

25   *Athena Diagnostics, Inc. v. Mayo Collaborative Servs.*, LLC, 927 F.3d 1333, 1341 (Fed. Cir.

26   2019) (stating that, "[f]or there to be a patent eligible application of a natural law, there must be a

27   'discover[y]' and the claims must recite a specific application of that 'discovery' with established

28   utility" or, "[o]therwise, the natural law may be entirely preempted"; "[r]equiring a specific

application . . . prevents monopolization of the 'basic tools of scientific and technological work'"); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016) (stating that "the structure of the limited rules reflects a specific implementation"; "[b]y incorporating the specific features of the rules as claim limitations, claim 1 is limited to a specific process for automatically animating characters using particular information and techniques and does not preempt approaches that use rules of a different structure or different techniques").

In *Bascom*, for example, the desired result of filtering was achieved through a specific configuration, *i.e.*, installing a filtering tool at a specific location remote from end-users but with customizable filtering features specific to each end-user.  *See Bascom*, 827 F.3d at 1349-50.  Here, the '489 patent provides few specifics on how "receiving," "requesting," "receiving," and "using" is accomplished; while there is some reference to content selection, that is, as noted above, abstract in nature.  *Cf. Two-Way*, 874 F.3d at 1337 (at step one, noting that "[t]he claim requires the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way"); *see also Intellectual Ventures*, 850 F.3d at 1329 (noting that limitations that "recite routine computer functions, such as the sending and receiving information to execute the database search . . . are no more than the performance of well-understood, routine, [and] conventional activities previously known to the industry")  (internal quotation marks omitted).

G.   Premature

As a last ditch effort, Google argues that the Court should not resolve the patent eligibility issue at the 12(b)(6) phase and/or prior to claim construction – *i.e.*, it is premature to decide the patent eligibility issue now.

To the extent Google makes a claim construction argument, it is not convincing.  District courts have held that deferral of a § 101 analysis may be necessary "when a patentee identifies terms requiring construction and explains how resolution of construction disputes is material to resolving the § 101 challenge."  *KHN Sols. Inc. v. Vertisense Inc.*, No. 16-cv-00962-HSG, 2016 U.S. Dist. LEXIS 136147, at *5 (N.D. Cal. Sep. 30, 2016); *see also Bancorp*, 687 F.3d at 1273 (stating that "claim construction is not an inviolable prerequisite to a validity determination under

United States District Court
Northern District of California

§ 101," although "it will ordinarily be desirable – and often necessary – to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter").  However, Google has not adequately explained how patent eligibility in the instant case will turn on any specific claim construction; nor can the Court discern how it might be helpful here.  Google simply argues that Sonos fails to appreciate that "the '489 patent is directed to computing-network-specific problems" and that Sonos's analogy to human information gathering is not proper.  Opp'n at 17.

As for the 12(b)(6) argument, it is perhaps a stronger argument, but it ultimately lacks merit as well.  As noted above, "[p]atent eligibility under 35 U.S.C. § 101 is a question of law," such that, "in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion."  *Genetic Techs.*, 818 F.3d at 1373.  Admittedly, at step two, where a court evaluates whether there is an inventive concept, there may be a question of fact as to "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent."  *Berkheimer*, 881 F.3d at 1369; *see also Aatrix*, 882 F.3d at 1128 (noting that a court, in evaluating whether a patent has an inventive concept for purposes of patent eligibility, considers whether the patent involves more than the performance of well understood, routine, and conventional activities – which is a question of fact).  But here Google has presented no question of fact that needs to be resolved.  Notably, in *DDR* (webpages) and *Finjan* (virus screening), there was an improvement in the computer functionality.  *See, e.g.*, *DDR*, 773 F.3d at 1258-59 (noting that "the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result – a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink"); *Finjan*, 879 F.3d at 1304 (noting that the invention covered a behavior-based virus scan, which was different from the traditional code-matching virus scans limited to recognizing the presence of previously identified viruses).  In the instant case, the '489 patent does not lay claim to any improvement in computer functionality.  Even if the patent has elements that the prior art did not, *see* Opp'n at 13 (addressing why the invention is different from the prior art – the prior art did not "disclose a method for selecting a plurality of unique online content sources specified by a user interface device and user account data" nor did it disclose

United States District Court
Northern District of California

"using content availability data to generate a notification"), those differences are not about computer functionality.[1]

### III.       CONCLUSION

For the foregoing reasons, Sonos's motion to dismiss is granted.

This order disposes of Docket No. 39.


**IT IS SO ORDERED**.


Dated: November 2, 2020

_____
EDWARD M. CHEN
United States District Judge

---

[1] The Federal Circuit has cautioned that inventive concept (patent eligibility) should not be confused with novelty (patent validity).  *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) (stating that the party misstated the law by asserting that the patent claims contained an inventive concept "because they were not shown to have been anticipated by . . . or obvious over . . . the prior art"; even though "'the § 101 patent-eligibility inquiry and . . . the § 102 novelty inquiry might sometimes overlap,'" "a claim for a *new* abstract idea is still an abstract idea" and so "[t]he search for a § 101 inventive concept is thus distinct from demonstrating § 102 novelty").