Pages 1 - 36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

```
GOOGLE LLC,                   )
                              )
          Plaintiff,          )
                              )
   VS.                        )      NO. C 20-03845 EMC
                              )
SONOS, INC.,                  )
                              )
          Defendant.          )
_____)
```

San Francisco, California
Thursday, October 15, 2020

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiff:
                    QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                    191 N. Wacker Drive - Suite 2700
                    Chicago, Illinois  60606
               BY:  **DAVID A. NELSON, ATTORNEY AT LAW**


For Defendant:
                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California  94105
               BY:  **CLEMENT S. ROBERTS, ATTORNEY AT LAW**


Also Present:       **Patrick Weston**
                    **Senior Litigation Counsel - Google**




Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

| | |
|---|---|
| 1 | **Thursday - October 15, 2020**                          **1:50 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling Civil action 20-3845, Google LLC |
| 5 | vs. Sonos, Inc. |
| 6 | Counsel, please state your appearances for the record |
| 7 | beginning with plaintiffs. |
| 8 | **MR. NELSON:**  Good afternoon, Your Honor.  Dave Nelson |
| 9 | on behalf of plaintiff Google.  Also in the gallery with me, |
| 10 | virtual gallery, is Patrick Weston who's senior litigation |
| 11 | counsel with Google, Your Honor. |
| 12 | **THE COURT:**  All right.  Does Mr. Weston want to come |
| 13 | into the well, or is he okay -- well -- |
| 14 | **THE CLERK:**  I just promoted him, Your Honor. |
| 15 | **THE COURT:**  All right.  Thank you. |
| 16 | **MR. ROBERTS:**  Good morning, Your Honor.  This is -- |
| 17 | well, afternoon.  It's Clem Roberts from Orrick Herrington on |
| 18 | behalf of Sonos. |
| 19 | **THE COURT:**  All right.  Thank you, Mr. Roberts. |
| 20 | I just want to make sure I understand the patent here.  It |
| 21 | seems pretty simple, and I guess the idea is that if I'm a user |
| 22 | and I want to be able to be notified when, you know, any -- if |
| 23 | their content becomes available through various sources and |
| 24 | formats, take an example the new *Mulan* live action movie, it's |
| 25 | available only now through Disney+ but at some point it's going |

1   to become available through other means, I assume, whether it's

2   theaters, whether it's other streaming services, DVD, whatever;

3   and that this invention sets up a process whereby my

4   preferences can be registered and it will go out and sort of

5   hunt the various sources and look for availability and when

6   content availability becomes available that meets my stated

7   preferences, I'll get a notification.  Is that basically how it

8   works?

9           **MR. ROBERTS:**  Your Honor, this is Mr. Roberts.

10      I think that's a -- the claim is substantially broader

11  than that, and in particular you had said two things in there.

12  One is content becomes available, and if you look at exemplary

13  Claim 15, there is nothing about content becoming available in

14  the future.  It calls for requesting over a network content

15  availability data from a plurality of unique online content

16  sources and then you receive at the one or more processors the

17  content availability data.

18      There's no temporal act future based in the claim itself.

19  There's nothing about timing.  There's nothing positive or

20  negative about time.

21      And the other thing you said is preferences, and

22  preferences are discussed in the specification, discussed in

23  their brief; but there's nothing about preferences other than

24  content delivery preferences comprising a selection of

25  plurality of unique online content sources as specified by user

```
 1   interface.

 2        So the only thing the claim says the preferences comprise

 3   are a set of sources; right?  So there's nothing in the claim

 4   that requires, for example, ranking those sources one against

 5   another, or saying "I prefer it from this source rather than

 6   that source."  It just says "content delivery preferences

 7   comprising a selection of a plurality of unique online content

 8   sources and a user account data."  Those are the two pieces of

 9   information that have to be transmitted.

10        THE COURT:  All right.  But the gist of it -- I know

11   you want to get a jump on some of the issues here, but the gist

12   of it is I just want to make sure that's what I understand it

13   to be.  It basically serves as a, I don't know, call it

14   searching for data and finding availability of that data and

15   then giving replication.

16        MR. ROBERTS:  Yes, Your Honor, that's I think the gist

17   of it.  Again, though, you used the word "searching" and that's

18   a point of contention with us because it doesn't call for

19   searching.  It calls for requesting and then receiving it.  So

20   there's not actually a search that's performed.  There's a

21   request that goes out and then a response that comes back.

22        MR. NELSON:  So, Your Honor, if I may, this is Dave

23   Nelson on behalf of Google.

24        So your recitation -- your recitation, your understanding

25   of the claim in the context of the disclosure and the
```

1    specification I think is exactly right.  It's an architecture

2    that's provided that allows for those things.

3         So the question of whether or not future delivery would be

4    required by the claim, I think we would agree that it isn't

5    necessarily required by the claim; but the architecture and, in

6    fact, the patent at the beginning of the abstract as well as

7    the beginning of the summary of the invention talks about the

8    ability to bookmark content for when content becomes available

9    so those notifications would arrive when that content becomes

10   available.

11        It could be that it's immediately available based upon the

12   choices of the user preferences as well as the account data,

13   but it also could be that it's bookmarked for future delivery

14   and then the notification would come.  So I think Your Honor's

15   understanding in the context of that architecture and the

16   disclosure and the specification are exactly correct.

17        **THE COURT:**  Okay.  So what about this can't be done

18   more slowly, more tediously, by a human being using normal

19   search methods, inquiries, queries on the Internet?

20        **MR. NELSON:**  Well, I mean, you have a few things here.

21   So it's an improvement to a computer system.  I don't think

22   there's any requirement under the 101 law that necessarily

23   anything -- any improvement to a computer system would have to

24   be one that you couldn't do in a less efficient fashion before

25   the improvement.

1          So the improvement to the computer system here, I think,

2     is fruitful; right?  It allows you to select particular

3     content, media content or right or preferences, so that -- from

4     among a number of them.  So if we take examples, you know,

5     Your Honor picked an example where it may be available from

6     Disney or some other content sources.  Obviously the selection

7     from the user in the context of this system you would want to

8     select ones for which you have privileges; right?  It doesn't

9     do you any good to say "Is it available on Amazon?" if I don't

10    have any Amazon credentials so that I could get that.  So

11    that's one thing that the architecture allows.

12         Another thing that the architecture --

13         **THE COURT:**  Well, wait a minute on that.

14    You say there's no utility.  You know, when I talk into my

15    Comcast little device or my Amazon Prime, often it tells me,

16    "Yeah, so and so is available," but you've got to go to, you

17    know, HBO or Hulu or YouTube TV to which I may not be a

18    subscriber; but if I really want to see it, you know, then I

19    pay for it through a service I don't have, but it does tell me

20    where it's available.

21         **MR. NELSON:**  No, understood, Your Honor, and that I

22    think is consistent with what I was talking about.

23         What I mean is, if you would have that desire as a user,

24    you could make those selections; right?  So in your example, if

25    you decided, "Yes, if this becomes available on Hulu, I would

1  like to see it and I would be willing to pay for it," that

2  would be something that you could then select as opposed to,

3  you know, broadly or at least nondirectedly searching

4  everything that's potentially out there and getting back

5  significantly -- having to sift through significant potentially

6  helpful results.

7          **MR. ROBERTS:**  Your Honor --

8          **THE COURT:**  Well, all right, but the point is one can

9  get that information through a manual -- call it a manual

10  process but sort of semi-manual process.  Maybe not as

11  efficient, not as targeted, but you can.  If I want to, you

12  know, watch a rerun of *My Cousin Vinnie*, I just go on any, you

13  know, search engine and it will tell you if it's available

14  on -- you know, it's not hard to find.  Some of it's available

15  on paid services.  Some of it's available on regular broadcast

16  TVs, you know.  That's why I was asking.

17      I mean, if the basic function here is one that is

18  predominantly performed by humans, I think the law is pretty

19  clear that the fact that you can speed it up, make it more

20  efficient by use of computer just like, you know, fast

21  computing of numbers doesn't create a patentable subject.

22          **MR. NELSON:**  Well, I think I would -- we'd have to

23  break that down a little bit, but I think it's much more than

24  that, Your Honor, because it's an improvement in the

25  architecture that provides additional functionality to the user

1   that was not available in previous systems.

2        We saw that, you know, during the prosecution history.

3   There's some discussion of that about the improvements over the

4   prior art and the lack of any ability to receive notification

5   of some future availability as well as notification of the

6   availability based upon the search and the selected

7   preferences.

8        So that, for example, is a distinction between these prior

9   systems that existed and it's an improvement on the prior

10  network systems.  No one's suggesting that there was no ability

11  to search for media content in the past.  In fact, the patent

12  talks about in the background that there were such systems that

13  existed to search for media content in the past; but because

14  you have this problem arising where media content may become

15  available at disparate times from disparate sources, what you

16  would have is a situation where somebody would have to go and

17  independently repeat all of those things constantly --

18  right? -- including re-entering the user data, all of those

19  kinds of things, if you need to have credentials for the

20  particular content provider that you have.

21       So the system here is an improvement to that prior system.

22  We're not talking about an improvement to a manual process.

23  We're talking an improvement to an architecture that allows for

24  that type of content searching, notification, and delivery.

25       **MR. ROBERTS:**  Your Honor, may I respond?

**THE COURT:**  Yeah, but let me ask.  When you say improvement to the architecture, if you improve the actual computer functionality and performance, you know, using new algorithms and tables or locating certain filters in areas that have never been placed before so you get a whole different functionality, you know, those are the kinds of things that the courts that have drawn the line tend to be in favor of finding -- basically we're talking about the inventive concept step two of *Alice*.

But using a computer to do what you could normally do but doing it faster -- i.e., using a computer as a tool in aid of a process which focuses on abstract ideas to quote *Electric Power* -- what you just said, it still feels like the latter rather than the former to me.

**MR. NELSON:**  Well, so, for example, I think the facts of the case that you were just referring to, Your Honor, about the filtering content in *Bascom*, that was an improvement to a software architecture there so that you could have the filtering content set in multiple places; one, making it more efficient.  And, in fact, in the case themselves they talked about the fact that, yes, you could go out to each individual user computer and set those filtering -- set the filtering content the same way; but the architecture, including the software architecture that was at issue in *Bascom*, the court determined, well, this allows this to be done more efficiently

1  and provide this additional functionality.  So in that sense,

2  it's the same.

3       **THE COURT:**  Well, where -- part of that is -- you

4  know, part of this turns also on the degree of specificity.

5  The more specific that architecture change is, number one, you

6  get away from the preemption monopoly problem; two, it looks

7  more and more like a real inventive concept that's not trying

8  to preempt the field.

9       What is it here you say -- you use the words "software

10  architecture" but with respect to the notification -- right? --

11  "using content availability data from Claim 1 to generate the

12  notification for electronic device," what is that?  That seems

13  like a very broad concept.  I'm not sure there's a specific

14  architecture there that is very informative.

15       **MR. NELSON:**  Well, I mean, the patent has 18 columns

16  of description that talk about various interfaces, combination

17  of preferences, whether they be set on server side or on device

18  side, that would allow you, for example, with respect to the

19  notification to tie that notification to an indication from the

20  provider that the desired content is available -- right? -- and

21  then provide that notification in whatever form the user

22  preference is chosen, whether it be e-mail or text or what have

23  you.

24       So those types of options are provided in the

25  specification of the patent at, you know, various places

1    throughout that.  I'm not saying that that's the entirety of

2    it, but there is a --

3         **THE COURT:**  And how is that unconventional?  Because

4    normally you can't win on stage two just using a string of

5    conventional devices.  You've got to do something innovative

6    with it or unconventional.  Where is there -- what's

7    unconventional about these notification processes?

8         **MR. NELSON:**  Well, the prosecution history suggests

9    that; right?  That the -- so, for example, there was a system

10   that allowed a user to search and get content back, but there

11   was no ability to bookmark or provide for a notification once

12   content became available.  That's how that was distinguished.

13       So we have a situation there where there's been a

14   determination made that you do have these prior content

15   delivery search systems but they're lacking that capability and

16   that functionality, and that distinguished them in a new,

17   novel, and nonobvious way from the prior art.

18        **THE COURT:**  But what is it -- we're in 101, not 102,

19   but what is it that -- what is the process here that is

20   nonconventional?  Can you point me to something in one of the

21   columns and the specifications or figures that quotes something

22   that's somewhat unique about the generation of the notice, how

23   you get from availability to notice that's not using something

24   conventional?

25        **MR. NELSON:**  Well, it's the combination of those

1    elements, Your Honor.  So we have several of the cases -- you

2    know, *Bascom* is one, *Enfish* is another, *Aatrix* is another --

3    that talk about you have to look at the elements.  You can't

4    just look at the elements individually and say, "Oh, well, this

5    element could have been done in a conventional way.  This

6    element could have been done in a conventional way," and so on.

7    You have to look at the entirety of those things together and

8    what the improvements are over the existing system.

9        So the relevance of that discussion from the prosecution

10   history is to show that there was a search done in terms of how

11   things were done previously with respect to these content

12   delivery systems in prior art systems and nobody had this

13   combination of things where a user could go out, make

14   particular selections, and then receive an electronic

15   notification to a network device when that content became

16   available.

17       **THE COURT:**  I thought you would emphasize the

18   notification being one of the true innovations here that was

19   not available in prior art, which is why I asked you, well,

20   what about -- you know, what's important is the how part.  Is

21   the how part of notification under the '489 inventive or

22   innovative in any way?  Does it just use normal computer

23   processes or is there something different about how you trigger

24   notification here?

25       **MR. NELSON:**  Well, it's triggered when the content

1    becomes available.  So that's what's new and different, and

2    that's what was distinguished from the prior art systems.  So

3    that's one of the improvements from the prior art in the

4    combination of elements that are there.

5        And so I think that that's -- that's what it is that you

6    need to focus on as opposed to, well, is it doing

7    notification -- just notification of anything, Your Honor,

8    setting aside something that's triggered when content --

9    desired content becomes available and also for which the

10   user -- you know, based upon the user account data, there would

11   be accessibility -- right? -- to as well.

12       But the question isn't, well, do you -- it's was there --

13   were there prior art systems that used electronic notifications

14   to network devices under those criteria; not, oh, well, did --

15   was there an ability of network systems to provide notification

16   of events regardless of what those events were.

17            **THE COURT:**  All right.  Let me hear the response.

18            **MR. ROBERTS:**  A couple of things, Your Honor.

19       Proceeding in reverse order, when content becomes

20   available isn't in the claims.  The word "when" isn't there.

21   There's nothing about doing it when content becomes available.

22   It just says you request it and then you receive content

23   availability data.  There's no temporal link.

24       And I point out, too, that *Electric Power* --

25            **THE COURT:**  Is that not implied?  I mean, isn't it

```
 1   obvious that it has to be available at a particular time?
 2   Maybe it's a now.  Maybe it's not in the future, but --
 3        MR. ROBERTS:  My point is it's broader than that,
 4   Your Honor; that insofar as Mr. Nelson's contention is that the
 5   inventive concept is doing it when content becomes available,
 6   the claim doesn't have that limitation in it.  The content --
 7   it merely says that you receive content availability data.
 8   There's no temporal or ongoing or realtime limitation in these
 9   claims.
10        Second, there was a realtime limitation in Electric Power.
11   Electric Power specifically called for analyzing the data in
12   realtime.  So there was that temporal limitation in realtime,
13   and that was found to be an abstract idea.
14        Point number two is that abstract ideas cannot form the
15   basis for an inventive concept under step two.  And so
16   Mr. Nelson can't point to things like, oh, it's a notification
17   when the content becomes available because even if that were in
18   the claims, that in and of itself is an abstraction; and we
19   cited a bunch of cases that say very clearly that abstract
20   ideas cannot themselves become the basis for a step two
21   analysis.
22        Number three, it's not pointed out in the complaint as
23   being unconventional.  There are only three paragraphs in the
24   complaint, Your Honor, that deal potentially with this.  It's
25   paragraph 44, 45, and 46 -- sorry, excuse me -- 42, 43, and 44
```

1   of the first amended complaint.

2       And first I'll point out, Your Honor, that the word

3   "unconventional" doesn't appear in those paragraphs or anywhere

4   in the first amended complaint.  Neither does the word "novel"

5   or "novelty" or "conventional."  There's literally no

6   allegation in those paragraphs that this is unconventional.

7       And if you look at both *Aatrix* and *Cellspin*, both of those

8   cases say very clearly that the way a plaintiff can defeat a

9   motion such as ours is by making a clear and specific

10  allegation that a particular component is unconventional in the

11  complaint, and there's absolutely nothing like that.  There's

12  no allegation in this complaint.

13      And they made this first amended complaint when they had

14  our original motion in hand.  So they knew exactly what we were

15  arguing.  They had our full brief in front of them.  They

16  attempted to amend to overcome it and, yet, in overcoming it or

17  attempting to overcome they didn't make any allegation that any

18  specific component, much less the notice component, was

19  unconventional.

20      And if Your Honor were to look at paragraph 44 -- sorry --

21  42 to start with, the only thing that it says there that is

22  potentially relevant is it says that the -- I'll just read

23  (reading):

24          "The '489 patent provides a number of solutions to

25      this problem improving Internet usage and associated

1     search functionality by, among other things, providing the

2     ability to identify desired online media content

3     availability without repeated user involvement and

4     streamline its delivery in a preferred manner even from

5     protected sources."

6         Those are a set of advantages.  That's not an allegation

7     that any specific piece of this, much less some combination, is

8     novel.

9         **THE COURT:**  Isn't your opponent arguing that it is the

10    combination -- even if not any one particular piece is

11    conventional, it's the combination that's unconventional and

12    inventive?

13        **MR. ROBERTS:**  Yeah, he does say that, Your Honor, but

14    two points about that.

15        First, the combination is a combination of abstract ideas.

16    He has to point to something that is an implementation, that's

17    a novel implementation, which is why he keeps referencing the

18    word "architecture" and pointing to *Bascom*, but *Bascom* is an

19    excellent point of differentiation.

20        In *Bascom* the Court found that the specific remote

21    location of the server combined with functionality that had

22    previously only been available on a local computer was a novel

23    implementation.  So *Bascom* specifically included a novel

24    physical placement of the relevant server that was performing

25    the task.

1    There's no such structural architectural improvement here

2  and there's none that's alleged in the complaint.  Like, what

3  is it?  I think Your Honor asked the correct question which is:

4  What is it?  What element of this is improved?  And I think we

5  heard the admission that there's no specific element that's

6  there.  You just have to look at all of them together and

7  Gestalt taken together it's a novel invention.

8    And I don't think, Your Honor, if you look at these as an

9  ordered combination, that they add anything that's different

10  from looking at them individually; and if so, I'm not sure what

11  it is and it certainly isn't alleged as being unconventional.

12    Every claim that goes through prosecution is distinguished

13  from the prior art in some way, but the things that Mr. Nelson

14  points to in the file history as distinguishing the prior art

15  are the presence or absence of a notification, but that can't

16  help him because we have very clearly, among other places in

17  *Electric Power Group*, that notification is an abstract idea.

18    I mean, there wasn't notification in *Electric Power Group*,

19  and it said -- I mean, I can pull up the specific quote from

20  *Electric Power Group*, but it said that the notification

21  itself -- I'm quoting from *Electric Power Group* at page 1354

22  (reading):

23        "We have recognized that merely presenting the

24     results of abstract processes of collecting and analyzing

25     information without more (such as identifying a particular

1          tool for presentation) is abstract as an ancillary part of

2          such collection and analysis."

3      It's an abstract idea.  Even if they alleged in the

4   complaint, which they didn't, that this was unconventional,

5   it's an abstract idea and, therefore, it can't help them under

6   prong two.

7      And I'm just not seeing anything in paragraphs 42, 43, or

8   44.  I mean, 43 doesn't mean -- literally none of these

9   paragraphs say anything about that.  The only thing that they

10  say is -- in paragraph 42 is that, you know, this is a problem

11  unique to the Internet or other large networks, and that's

12  contradicted by Google's own statements in its own motion both

13  at page 6 and page 9 that this is a human-centric problem.

14      And it's contradicted by the specification of the patent

15  also, which says quite clearly that the local -- that the

16  network can be a local area network.  It doesn't need to be a

17  large or wide-area network at all.  And that's -- both of

18  that's -- I mean, that's at column 3, 24 through 30, and column

19  19, lines 40 through 46.  It mentions local area networks or

20  other networks in other places so the patent is very clear that

21  the networks envisioned by this invention are not big networks

22  or broad-area networks or even the Internet.

23          **THE COURT:**  Well, it does seem to me that there are a

24  lot of words you can take out of the *Electric Power* case, which

25  I do think is the most analogous here, but it does say that

1    their -- you know, just focusing on a combination of abstract

2    processes is not enough.

3        If you don't have any particularly inventive technology

4    for performing these functions, the functions of collecting

5    content, displaying the results, you have to have some

6    inventive technology for performing those functions or, to

7    quote again, in assertedly inventive programs, something

8    specific and not just the general function of receiving

9    information -- you know, requesting information, receiving

10   information, and then notifying.  If there's something

11   inventive about the specific technology that is not general,

12   that's what I'm searching for, and I'm still not -- I'm having

13   trouble finding it.

14        **MR. ROBERTS:**  Yes.  I just mention, Your Honor, on

15   that same point *Two-Way Media* is very clear about that as well,

16   and at page 1337 of the *Two-Way Media* opinion, it talks about

17   how the claims in that case recited a method for routing

18   information using results-based functional language.  The claim

19   requires the functional results of converting, routing,

20   controlling, monitoring, and accumulating records but does not

21   sufficiently describe how to achieve these results in a

22   nonabstract way.

23        And I can't, looking at Claim 15, distinguish that because

24   it doesn't tell you how you receive, how you request in any

25   particular way.

1        I mean, and *Two-Way Media* even told you how you requested

2   it by saying that you broke it up into digital data packets

3   according to a network protocol.  This doesn't say that.  It

4   just says you send it out over a network.  There's no

5   specificity.

6        **THE COURT:**  Let me go back and give Mr. Nelson a

7   chance to respond.

8        The how is an important factor, it seems to me, when

9   you're getting into this, and -- because if you don't explain

10  the how, the risk of preemption is extraordinarily high.  And

11  I'm looking at the claim and -- you know, I understand what you

12  call the architecture -- the basic functionality of the device

13  is to, you know, send out a request, receive back information,

14  and depending on what it receives back, it then notifies.  But

15  how?  How?  There's no particular algorithm.  There's no --

16  how?  I guess that's my question.  How?

17       **MR. NELSON:**  Well, see, I think the problem here is

18  that you reduce -- in both situations, both Sonos and the

19  question the Court just asked, you're reducing -- eliminating

20  most of the language of the claim; right?  So it isn't just

21  receiving a selection.  It's specifically a selection of media

22  content and content delivery preferences where the delivery

23  preferences comprise -- include mean -- a selection of a

24  plurality of unique online content sources specified by user

25  interface and user account data for each of the plurality of

1    unique online content sources; right?

2        So it isn't just the selection of those.  It's your

3    account data that's associated with those because as the --

4        **THE COURT:**  Well, it says "selection process."  You

5    tell the device which content delivery preferences you have and

6    what the media content is.  So I --

7        **MR. NELSON:**  But you tell the device in a particular

8    way because the how is you tell it and provide your account

9    data so that all of those content provider services can

10   actually be accessed and make a determination as to whether you

11   as a user who specified these preferences --

12       **THE COURT:**  It doesn't sound particularly inventive.

13   I can tell you that.  I can tell you "I only want to limit it

14   to YouTube TV and tell me if you can find X, Y, and Z.  Come

15   back to me in 20 minutes and let me know what you find."  I

16   mean, what's inventive about that?

17       **MR. NELSON:**  What's inventive is we're talking about

18   in the context of an improvement of a network system so --

19       **THE COURT:**  It sounds like using a computer to perform

20   an abstract function, which is a classic example of what is not

21   an inventive process.

22       **MR. NELSON:**  Well, in *Bascom*, then, that should have

23   been found -- under that logic, *Bascom* should have been

24   found -- because it was using a computer to provide filtering

25   data to a number of online users -- right? -- you could have

1    and the patent itself said, well, you could have just placed

2    that filtering data at each of the local computers, but that

3    was an inefficient way to do it because it required you to go

4    in and update and those types of things.  So all you're doing

5    is providing an additional computer to do that.

6              THE COURT:  Well, and the court found it to be a

7    nonconventional, nongeneric arrangement of known pieces by

8    placing the filter in a different location in terms of the

9    server.  So --

10             MR. NELSON:  Correct.  Correct.  And that -- excuse

11   me, Your Honor.  I apologize.

12             THE COURT:  I'm trying to figure out what is novel,

13   nonconventional about Claim 1 or Claim 15, and I'm searching

14   for that.  I don't --

15             MR. NELSON:  Well, what's novel about that is that

16   there is no -- in these prior art systems, there were no --

17   there was no ability to go in and include account data, for

18   example, that could be used to determine access to particular

19   online content providers because that's part of what's taken

20   into account for the notification process.  There were no

21   abilities to select particular sources that could be bookmarked

22   for future selection or future searching.

23        Now, I understand counsel's argument that the claim itself

24   doesn't require that, but the point is the architecture allows

25   for that and the specification makes that clear.  That in and

1    of itself would be a claim construction issue that would need

2    to be resolved.  I don't think you can just say, "Well, it

3    doesn't -- that architecture is not provided."

4         In fact, Your Honor, as you started out here, described

5    your understanding of the invention with that in mind, the

6    ability to access and bookmark things that may become available

7    in the future.

8         And then the notification piece, once those things are

9    done, there would be a determination that that content is, in

10   fact, available that matches the preferences and matches the

11   user account data.  Then there would be a notification provided

12   to the user.  Those things in collection, just exactly like in

13   the *Bascom* case, provide for a much more efficient search

14   system for the user to receive and determine whether desired

15   content is available now or in the future.

16        And so it's the collection -- just as Your Honor read at

17   page 1350 of the *Bascom* opinion, it's the collection of

18   those -- of that architecture, the collection of those things

19   that are -- the information that's both collected, the

20   information that's stored, and the information that's used, and

21   how the notification is generated in response to the search

22   that's done that -- the combination of things is the

23   nonabstract.

24        It's a very specific set of information that's required

25   and responds -- or, excuse me -- notification generating in

1    response to a particular event.  It's not just a general send

2    out request and if you get something back, send it back --

3    right? -- which is largely how this is being described.

4          So, you know, I do think the *Bascom* case is relevant, but

5    I don't see that there's -- it's the combination of those

6    elements.  You don't have to show that any one particular

7    element is done in a way that would not be known.  Rather,

8    here, in particular the notification piece in these kind of

9    content delivery systems is done in response to a determination

10   that that content becomes available.  That in and of itself is

11   a new, novel, and not conventional -- unconventional way to do

12   things because we know there were prior art systems that did

13   that but lacked that piece.

14         So to me, the allegations in the complaint track very

15   closely what we see in *Aatrix* and the Federal Circuit's opinion

16   in *Aatrix* that lays out the problems with the prior art, talks

17   about the solution that's described, and here in paragraph 42

18   in detail you talk about the solution that architecture that I

19   described provided and then talks about the improvements over

20   the prior art.

21         And the Federal Circuit determined there those are factual

22   questions; right?  Those allegations are made.  Those are

23   factual questions that can't be resolved at this stage.  So it

24   seems to me that this falls based upon the allegations in the

25   complaint.

1        Now I know counsel says, "Well, you're just talking about

2   characterizations of the invention."  Well, the whole target

3   that counsel has put up is just counsel's characterization of

4   the invention.  There's nothing -- there's no allegations in a

5   complaint.  There's nothing there.  It's just lawyer argument

6   as to what the abstraction is, as well as the fact that these

7   things existed in previous systems because this is an

8   improvement to this computer system.  It's not a manual method

9   that occurred out there of which actually there's no evidence

10  at all that any of that stuff occurred in the -- that's all

11  theoretical.  It's --

12          **THE COURT:**  All right.

13          **MR. NELSON:**  Excuse me, Your Honor.  I'm sorry.

14          **THE COURT:**  All right.  Thank you.

15      Let me just -- I'll give you the last word, Mr. Roberts.

16  I'd like you to address -- and while you're at it, I'd like you

17  to address two things.

18      One is:  Should the Court await claim construction?  Is

19  something to be gained from claim construction?

20      And, two, what about the argument that, it's almost a 102

21  argument, but if you look at prior art, this hasn't been done

22  before?  Why doesn't that imply some degree of inventive

23  concept?

24          **MR. ROBERTS:**  Yes.  Thank you, Your Honor.

25      To address both of those things, the law, and we cited it

in our brief, is clear that the only time the court needs to
wait for a claim construction is where a party has come forward
with a specific claim construction and explain how it makes a
difference.

     And I point you to their opposition brief, which was their
opportunity to do that, and they do not propose a single claim
construction and they do not say how claim construction could
make any difference whatsoever.  That issue is squarely not
presented in their opposition.

     Mr. Nelson I understood to suggest, "Well, Your Honor, if
you were to interpret the claims as having some sort of
temporal limitation, then it would be novel"; but the temporal
limitation that he's talking about wouldn't make it because the
idea that you present information when it becomes available is
itself an abstract idea.  That was present in the realtime
monitoring going on in *Electric Power*.

     And to quote from *Electric Power*, quote (reading):

          "Information as such is an intangible.  Accordingly,
     we have treated collecting information, including when
     limited to particular content which does not change its
     character, as information as within the realm of abstract
     ideas."

     And so when Mr. Nelson said, and he said this in his last
response, that what's novel here is the, quote, "specific set
of information that is required," we know as a matter of law

 1   that that's not adequate.  The specific set of information

 2   cannot change the character of the claim as one directed to an

 3   abstract idea.  That's just basic law.  It's in *Electric Power*.

 4   It's in *Intellectual Ventures*.  It's in *Two-Way Media*.  It

 5   doesn't matter what the content of the information is.

 6        So I don't see Mr. Nelson as having provided even in

 7   argument a basis for saying that claim construction would

 8   change the nature of the invention such that it would impact

 9   either the step one or the step two analysis, and so I just

10   don't even know how claim construction could be relevant.

11        I point out, Your Honor --

12        **THE COURT:**  Although, to be fair, when you're talking

13   about the temporal limitation, the ability to give future

14   notification, that's just not content.  There's a timing

15   element there that's a different dimension.  It's a fourth

16   dimension.

17        **MR. ROBERTS:**  Sure, Your Honor, but taking --

18        **THE COURT:**  So that's kind of cheapening it a little

19   bit.

20        My question is:  Even if there were that temporal

21   limitation and the expanded ability to notify in the future,

22   why isn't that still an abstract function?  And I still have

23   trouble what's inventive, where is the how in how you do that

24   that narrows it in a way that in *Bascom* there was a how.  To me

25   that's the distinction in *Bascom*; there was a how.  They were

1   very specific about where you locate, you know, the server, the

2   filter.

3           **MR. ROBERTS:**  Yes, Your Honor.  And I would point out

4   that one of the analogies we gave the Court was this notion of

5   a research library, and you can imagine an undergraduate comes

6   to the research librarian and says, "I'm working on my thesis.

7   I need access to the following rare manuscript.  Here's my

8   credentials for this -- for the Harvard Widener Library.

9   Here's my credentials for the Boston Public Library.  Can you

10  help me find it?"  Right?

11          He says there's nothing about that that involves a

12  computer.  And the research librarian could go and ask the

13  Boston Public Library, "Hey, when this volume becomes

14  available, will you let me know so I can tell the student?"

15          There's nothing architectural about that.  There's no

16  specific how about that.  It's an abstract idea.  It's just

17  "Tell me when it becomes available."

18          And, again, in *Electric Power* it had realtime monitoring

19  in *Electric Power* that told you when it detected a condition.

20  So I don't see -- and *Electric Power* said, "No, that's an

21  abstract idea."  So I don't see how even reading that into the

22  claim, even if that were to be read into the claim, that would

23  change the direction of the claim.

24          And even if you read it into the claim, there's nothing

25  about how you would do that because even if you look at

1  Claim 15 and say, "Okay.  You know, I'm going to construe

2  something to say that, you know, there's some sort of temporal

3  limitation in here," there certainly isn't something that tells

4  you how you do that temporal limitation, how you detect when it

5  becomes available.

6      And I would submit that the detecting it when it becomes

7  available is absent from the claim, but certainly the second

8  order issue of how you would do that is entirely absent from

9  the claim.

10     Did I answer both of your questions, Your Honor?

11         **THE COURT:**  I believe so.  I can't remember what the

12  second one was, but I think you did in that process.

13     So I'm going to take the matter under submission and get

14  out a ruling hopefully soon.

15     I do want to address this dispute you have about discovery

16  and about the need for pinpoint citation to the source code.

17     I understand that normally the source code and various

18  things are produced under Rule 3-4 with the invalidity

19  contentions; but, as I understand it, Sonos has already

20  provided the source code in advance of its normal due deadline

21  under 3-4; is that correct?

22         **MR. ROBERTS:**  That's right, Your Honor.  The source

23  code is currently available in our San Francisco -- in our

24  Silicon Valley office.  We had a request last week whether we'd

25  be open to moving it to Boston.  We replied in the affirmative

1    that we would be able to.  We're also open to moving it to

2    Chicago, which is where Mr. Nelson is located, and we've

3    indicated that as well.

4         But, yes, anybody from Quinn Emanuel could drive over and

5    see the source code today if they wanted to.  It's on a

6    computer.  It's loaded.  There's no requirement.  We could make

7    it available in short order.

8         And we've also offered to allow them to use the experts --

9    the source code review experts they've been working with in the

10   ITC matter.  If they want to use those experts to review the

11   code, we've said we can approve those experts instantly.  I

12   don't think there's a problem with having the same experts look

13   at it in both places.  We trust them to obey both protective

14   orders.  That shouldn't be a problem.  So we don't -- we're not

15   exactly sure why they think there's such a hindrance, but it's

16   available today.

17        **THE COURT:**  All right.  And in the joint submission,

18   Google indicates that if the Court does decide to set a

19   deadline and decides specific source codes, that it be allowed

20   90 days to complete that obligation pursuant to when Sonos

21   completes its obligations pursuant to 3-4.

22        So that suggests that if there's -- 90 days would be

23   enough time.  If it's enough time from the normal delivery

24   point of 3-4, it should be enough time from the delivery point

25   of now it seems to me.  So I guess that's my question.  What's

1    the problem?  Why do we have to wait until December whatever it

2    is, the date that you're suggesting, for 3-4 disclosures?

3    December 7th.

4          MR. NELSON:  Well, 3-4 also gives us -- it's not just

5    the code, it's also all the technical documents, the flow

6    documents, the architectural documents to understand better

7    what it is the code.  Just to go in and look at the code

8    generally is not an efficient process.  So --

9          THE COURT:  You want the schematics, the flowcharts,

10   et cetera?

11         MR. NELSON:  Whatever the -- exactly.  There would be

12   a number of technical documents that would describe the

13   operation that would give us a better idea into which portions

14   of the code to be looking.

15         And in terms of the ITC case, just so Your Honor is aware,

16   none of us are involved in the ITC case and we didn't have

17   access.  There's a very strict protective order that I'm sure

18   Your Honor is aware in the ITC, so we can't just simply go to

19   the ITC people and ask them, as well as the fact that our

20   belief is that the code that would be produced in the ITC, that

21   has to do with certain functionality relevant to the patents

22   that are asserted by Sonos there would not necessarily be

23   co-extensive with the code that would be produced here that

24   would be relevant to Google's patents as well, but --

25         THE COURT:  All right.  Let me point out, Mr. Roberts,

```
 1   what's the -- do you have any objection -- I don't know what
 2   else you need to produce, but whatever you would normally
 3   produce under 3-4, in addition to the source code --
 4   specifications, schematics, flowcharts, network formulas,
 5   et cetera -- do you have any problem producing those in advance
 6   to sort of start the clock, so to speak?
 7              MR. ROBERTS:  No, I don't have a problem producing
 8   them; but I will point out, Your Honor, that we've been talking
 9   about this for a month.  They didn't ever say they needed the
10   documents in order to understand the source code until the CMC.
11        Google in the ITC has itself represented that source code,
12   they said, quote, "is the best and most accurate source of
13   evidence of the operation of the accused products."  We've made
14   all of the source code available for the accused products, not
15   merely some portions of it.  We've told Mr. Nelson that he's
16   free to consult with his colleagues about it.
17        It's not true that nobody on the Quinn Emanuel team is in
18   both cases.  I believe Mr. Curran has made an appearance in
19   both cases.  We've told them that we don't have any objection
20   to them talking about it.
21        So, yes, we can produce technical documents if it's really
22   necessary; but, you know, it's been 30 days.  They haven't
23   bothered to send anybody out and now when we get to the CMC,
24   they say, "Oh, no.  We can't possibly understand the source
25   code for the first time until you give us all the technical
```

1    documents and so, therefore, we ought to get 90 days from that

2    date in the future."

3        And it's a delay game, I understand it; but if that's the

4    Court's preference, we certainly can do that.

5        **THE COURT:** Well, so let's do this:  I'd like you to

6    stipulate.  You know, you get the full disclosures that

7    normally would accompany under 3-4, and I will give -- and you

8    should stipulate then 90 days thereafter will be the due date.

9        **MR. ROBERTS:** So stipulated.

10        **THE COURT:** And so that will advance it a little bit.

11    You don't have to wait until December 4th.  That will advance

12    it a bit, but it still gives Google plenty of time.  So why

13    don't you do that.

14        I will adopt the scheduling that you have, which leads us

15    through claim construction.  The reply brief is in April, so

16    probably maybe three weeks after that would be a hearing date.

17        Maybe we can get a date now, Angie.  What's -- do you

18    have, like, a Tuesday three weeks after -- three Tuesdays after

19    the 12th of April?

20        **THE CLERK:** That would be May 4th, Your Honor, but

21    then we have a tutorial that's going to be scheduled for that

22    date as well.

23        **THE COURT:** All right.  If we do the week after?

24        **THE CLERK:** We have a pretrial conference that day and

25    then the 18th is also unavailable.

```
 1              THE COURT:  Let's go back to that May -- what was
 2     that?  May 12th?
 3              THE CLERK:  May 11th.
 4              THE COURT:  May 11th date?
 5              THE CLERK:  Yes.
 6              THE COURT:  Let's do that.  At what time?
 7              THE CLERK:  2:30.
 8              THE COURT:  And we can move that tutorial to the
 9     morning or do another -- it's easier to move the tutorial.
10         All right.  2:30 on the -- 2:30 you said?
11              THE CLERK:  Yes.
12              THE COURT:  On the 11th?  May 11th?
13              THE CLERK:  Yes, May 11th at 2:30.
14              THE COURT:  And then maybe two weeks before that for
15     tutorial around late April.
16              THE CLERK:  So May 11th was the claims construction?
17              THE COURT:  Yes.
18              THE CLERK:  Okay.
19              THE COURT:  And the tutorial for this case would be
20     two weeks before then --
21              THE CLERK:  Correct.
22              THE COURT:  -- late May.
23              THE CLERK:  Yes.  That would be April 27th and that
24     would work.
25              THE COURT:  All right.  And we'll have to change that
```

1   other tutorial, either move it to the morning or the day before

2   or something.

3        So I will get out a scheduling order that takes you

4   through claim construction in this case.

5              MR. ROBERTS:  Your Honor, what --

6              THE COURT:  Yeah.

7              MR. ROBERTS:  I apologize.  I didn't mean to

8   interrupt.

9              THE COURT:  Go ahead.

10              MR. ROBERTS:  Your Honor, just to be aware of, Google

11   filed a motion to consolidate this case with a declaratory

12   judgment action that it filed.  We intend to file an opposition

13   to that motion to consolidation.  That opposition is due

14   Monday.  I'm just saying that we intend to file an opposition.

15   Sometimes administrative motions are granted prior to an

16   opposition, and we think the opposition is important in this

17   case so we just would ask Your Honor to hold off on granting

18   that administrative motion until we have a chance to file our

19   opposition.

20              THE COURT:  All right.  Okay.  Thank you for the

21   notice.

22        You've got a mediation in October that also folds in the

23   ITC matter?

24              MR. ROBERTS:  Yes.

25              THE COURT:  Okay.  And that's private mediation, I

1    assume?

2              **MR. ROBERTS:**  Yes, in front of Judge Phillips.

3              **THE COURT:**  Okay.  Good.  Well, I wish you success and

4    productive session with Judge Phillips.

5         Otherwise I'll get out this order and -- I'll get out the

6    order on the motion pending.  I will get out the scheduling

7    order.  And I don't know if we need to see you before the

8    tutorial, which is in about six months.  Obviously if something

9    comes up, let me know, but otherwise I'm going to assume that

10   you-all can work matters out between now and then.  All right?

11             **MR. NELSON:**  Thank you, Your Honor.

12             **MR. ROBERTS:**  Thank you very much, Your Honor.

13             **THE COURT:**  Good luck in the mediation.

14             **MR. ROBERTS:**  Thank you.

15             **MR. NELSON:**  Thank you.

16                  (Proceedings adjourned at 2:42 p.m.)

17                            ---oOo---

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, December 18, 2020

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25