QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

David A. Nelson (*pro hac vice*)
davenelson@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone:    (312) 705-7400
Facsimile:    (312) 705-7401

*Attorneys for GOOGLE LLC*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE LLC,<br><br>            Plaintiff,<br><br>   v.<br><br>SONOS, INC.,<br><br>            Defendant. | Civil Action No. 3:20-CV-03845-EMC<br><br>**GOOGLE'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Judge: Hon. Edward M. Chen<br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................................1

II.  BACKGROUND ................................................................................................................1

    A.  U.S. Patent No. 7,899,187 ...................................................................................1

    B.  U.S. Patent No. 7,065,206 ...................................................................................2

    C.  U.S. Patent No. 10,140,375 .................................................................................2

    D.  U.S. Patent No. 10,229,586 .................................................................................3

III.  LEVEL OF ORDINARY SKILL IN THE ART ...............................................................3

IV.  LEGAL STANDARDS .....................................................................................................4

V.  ARGUMENT .....................................................................................................................5

    A.  "DOMAIN INFORMATION" ('187 PATENT CLAIMS 1, 3, 4, AND 10) .............5

    B.  "LOGIC CIRCUITRY FOR PROVIDING THE DOMAIN INFORMATION TO A KEY ISSUER" ('187 PATENT, CLAIM 10) .....................6

        1.  Courts have routinely found the term "circuit" should not be construed as a means-plus-function limitation. ..............................................6

        2.  Even if "logic circuit" is construed pursuant to § 112, ¶ 6, the '187 Patent discloses sufficient corresponding structure. ......................................7

            (a)  The "logic circuit" of Claim 10 performs a function that can be achieved using a general purpose microprocessor. .......................8

            (b)  The '187 Patent discloses an algorithm for "providing domain information" to a key issuer. .............................................10

    C.  "PRIVATE KEY" ('187 PATENT, CLAIMS 1 AND 10) ........................................10

    D.  "ESTIMATED NOISE LEVEL WHEN THERE IS NO DESIRED INPUT RECEIVED AT THE INPUT OF THE COMMUNICATION DEVICE ('206 PATENT, CLAIMS 3 AND 18). .....................................................................13

    E.  "COMBINED SEARCH RESULTS SET" / "THE COMBINED SEARCH RESULTS SET INCLUDING AT LEAST TWO OF: ONE OR MORE FAVORITE ITEMS FROM THE SET OF [FAVORITE ITEMS]/[BOOKMARKS] SYNCHRONIZED OF THE USER; ONE OR MORE SEARCH RESULTS FROM A FIRST GLOBAL INDEX; OR ONE OR MORE SEARCH RESULTS FROM A SECOND GLOBAL INDEX" ('375 PATENT, CLAIMS 1-11 AND 13-20). .....................................................14

        1.  The "Combined Search Results Set" Must Be The Combined Results Of At Least Two Different Types Of Searches. ...............................15

Case No. 3-20-cv-03845-EMC

GOOGLE'S OPENING CLAIM CONSTRUCTION BRIEF

        2.      The Patent Further Requires That The Results Set Include At Least Results From A Personalized Search ............................................................16

        3.      Sonos' Proposed Construction Ignores The Intrinsic Record......................18

   F.    "STORED [FOR THE USER] IN A CLIENT-SIDE STORAGE OF A CLIENT DEVICE" ('375 PATENT CLAIMS 1 AND 17-20) ................................18

   G.   PREAMBLES OF CLAIMS 1 and 15 ('586 PATENT, CLAIMS 1-5, 7-8, 15-16, 18, AND 20)................................................................................................20

   H.   "RESET ELEMENT" ('586 PATENT, CLAIMS 1-5, 7-12, 14-16, 18, AND 20)................................................................................................................22

   I.    "PREAMBLE PORTION" ('586 PATENT CLAIMS, 1-5, 7-12, 14-16, 18, AND 20) ................................................................................................................24

VI.    CONCLUSION ....................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
    616 F.3d 1283 (Fed. Cir. 2010) ................................................................................ 20

*Advanced Software Design Corp. v. Fiserv, Inc.*,
    641 F.3d 1368 (Fed. Cir. 2011) ................................................................................ 21

*Apex Inc. v. Raritan Computer, Inc.*,
    325 F.3d 1364 (Fed. Circ. 2003) ............................................................................ 6, 7

*Audionics Sys., Inc. v. AAMP of Fla., Inc.*,
    No. 12-cv-10763, 2013 WL 9602634 (C.D. Cal. Sept. 12, 2013) ...................................... 19

*Bondyopadhyay v. United States*,
    748 Fed. Appx. 301 (Fed. Cir. 2018) ........................................................................ 22

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
    749 F.3d 1349 (Fed. Cir. 2014) .................................................................................. 4

*Ch. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
    677 F.3d 1361 (Fed. Cir. 2012) ................................................................................ 18

*Continental Circuits LLC v. Intel Corp.*,
    915 F.3d 788 (Fed. Cir. 2019) .................................................................................... 4

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
    438 F.3d 1374 (Fed. Cir. 2006) ................................................................................ 23

*Deere & Co. v. Bush Hog, LLC*,
    703 F.3d 1349 (Fed. Cir. 2012) ................................................................................ 22

*e-LYNXX Corp. v. Innerworkings, Inc.*,
    No. 1:10-CV-2535, 2012 WL 4484921 (M.D. Pa. Sept. 27, 2012) .............................. 9, 10

*Finjan Inc. v. Sophos Inc., C.A. 14-cv-01197-WHO*,
    2015 WL 890621 (N.D. Cal. Mar. 2, 2015) .................................................................. 9

*Forest Labs., LLC v. Sigmapharm Labs., LLC*,
    918 F.3d 928 (Fed. Cir. 2019) .................................................................................. 16

*Freeny v. Murphy USA Inc.*,
    No. 2:13-CV-791-RSP, 2015 WL 294012 (E.D. Tex. Jan. 21, 2015) ................................ 9

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) .................................................................................. 9

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys, Inc.*,
    381 F.3d 1111, 1120 (Fed. Cir. 2004) ...................................................................... 23

*Intellicheck Mobilisa, Inc. v. Honeywell Int'l Inc., C.A. C16-0341JLR*,
    2017 WL 6550700 (W.D. Wash. Dec. 21, 2017) .......................................................... 7

-iii-

*Interwoven, Inc. v. Vertical Computer Sys. Inc.*,
   Case No. C 10-4645 RS, 2011 WL 6936186 (N.D. Cal. Dec. 30, 2011)............................ 19

*Linear Tech. Cor. v. Impala Linear Corp.*,
   379 F.3d 1311 (Fed. Cir. 2004) .................................................................................. 6

*LYNXX Corp. v. Innerworkings, Inc.*,
   No. 1:10-CV-2535, 2012 WL 4484921 (M.D. Pa. Sept. 27, 2012) .............................. 9, 10

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995),
   *aff'd*, 517 U.S. 370 (1996) ........................................................................................ 4

*Omega Eng., Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) .................................................................................. 19

*Ormco Corp. v. Align Tech., Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007) .................................................................................. 13

*Pacing Techs, LLC v. Garmin Intern., Inc.*,
   778 F.3d 1021 (Fed. Cir. 2015) .................................................................................. 17

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................................ 4, 5, 25

*Poly-America, L.P. v. API Indus, Inc.*,
   839 F.3d 1131 (Fed. Cir. 2016) .................................................................................. 17

*RevoLaze LLC v. J.C. Penney Company, Inc.*,
   No. 2:19-cv-00043-JRG, 2020 WL 697891 (E.D. Tex. 2020) .................................... 13

*Saffran v. Johnson & Johnson*,
   712 F.3d 549 (Fed. Cir. 2013) ................................................................................... 23

*Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*,
   962 F.3d 1362 (Fed. Cir. 2020) ........................................................................... 20, 22

*Tate Access Floors, Inc. v. Maxcess Tech., Inc.*,
   222 F.3d 958 (Fed. Cir. 2000) ................................................................................... 17

*Technology Licensing Corp. v. Blackmagic Design Pty Ltd.*,
   CA C 13-05184 SBA, 2016 WL 8902602 (N.D. Cal. Nov. 23, 2016)........................... 6, 7

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015)................................................................................................. 5

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012)........................................................................... 19, 24

*Trustees of Columbia Univ. v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016) .................................................................................. 15

*UltimatePointer, L.L.C. v. Nintendo Co.*,
   816 F.3d 816 (Fed. Cir. 2016) ............................................................................. 16, 17

-iv-

*Virnetx, Inc. v. Cisco Sys., Inc.,*
 767 F.3d 1308 (Fed. Cir. 2014) ....................................................................... 17

*Williamson v. Citrix Online, LLC,*
 792 F.3d 1339 (Fed. Cir. 2015) ......................................................................... 6

**<u>Statutory Authorities</u>**

35 U.S.C. § 112 ...................................................................................... 6, 7, 9

**<u>Other Authorities</u>**

*Dictionary of Computing*, 75 (4th ed. 1996) ...................................................... 7

1    Google LLC ("Google") respectfully submits this Opening Claim Construction Brief for

2    U.S. Patent Nos. 7,899,187 (the "'187 Patent"), 7,065,206 (the "'206 Patent"), 10,140,375 (the

3    "'375 Patent"), and 10,229,586 (the "'586 Patent"), asserted against Sonos, Inc. ("Sonos").

4    **I.    INTRODUCTION**

5    Google is one of the world's premier innovators in organizing the world's information and

6    making it universally accessible and useful.   This case involves four patents directed to Google's

7    innovations in the fields of search, networking, audio processing, digital media management, and

8    streaming.   These patents cover fundamental technologies that Defendant Sonos is using without

9    authorization in its extensive product line of wireless speaker devices.

10   In construing the disputed terms in these patents, Google has proposed straightforward

11   constructions that reflect the key innovations of the Patents, and which are grounded in the

12   intrinsic evidence.   In contrast, Sonos advances results-oriented constructions, seeking at times to

13   impose unwarranted limitations in an effort to narrow the scope of the claims, while at other times

14   ignoring intrinsic evidence to read out key features and trivialize the inventions.   As demonstrated

15   below, Sonos' proposed constructions do not accord with the intrinsic evidence, the understanding

16   of a person of ordinary skill in the art, or the legal principles governing claim construction.

17   **II.   BACKGROUND**

18   To frame the dispute, Google provides the following summary for each of the four Patents.

19   **A.    U.S. Patent No. 7,899,187**

20   The '187 Patent teaches a digital rights management system that allows for easy and secure

21   enrollment of a device into a domain of devices.   The Patent states that the ease with which digital

22   content can be copied and shared is worrisome to content owners.   Content distributors therefore

23   implement secure measures that help prevent piracy—*e.g.*, a Digital Rights Management system.

24   Declaration of Patrick D. Curran, Ex. 1 ('187 Patent) at 1:16-24.[1]   The '187 Patent describes two

25   problems with such a DRM system.   First, the system presents users with "the potentially

26   cumbersome task of registering all [their] devices into a domain."   *Id.* at 1:40-42, 4:67-5:6.

27   _____

28   [1]    All exhibits referenced herein are attached to the Declaration of Patrick D. Curran.

1   Second, the security of content in the domain is potentially threatened if users can remotely

2   register devices into a domain over a long distance.  *Id.* at 1:42-45, 5:6-20.  The '187 Patent

3   discloses a domain-based key and trust management system to address these problems.

4        The Patent describes how a device to be added communicates with another device in the

5   domain via a "short-range communication link," Ex. 1 ('187 Patent) at 3:30-37, in order to receive

6   "domain information" such as "the domain name, private domain password, and desired domain

7   action," *id.* at 3:47-50.  The user has physical control over both the device being added to the

8   domain and the device already in the domain.  *Id.* at 5:26-30.  The device to be added provides

9   this domain information to a key issuer external to the domain, which responds by providing a

10  DRM certificate.  *Id.* at 3:51-54, 4:42-48.  The rights issuer uses the DRM certificate to

11  authenticate the device and pass licenses to the desired digital content to the user.  *Id.* at 3:57-62,

12  4:48-56.  This receipt of domain information from a device already within the domain, and of a

13  private key from a key-issuer, offers an innovative, secure, and easy-to-use DRM system.

14       **B.    U.S. Patent No. 7,065,206**

15       The '206 Patent is directed to a "method and apparatus for adaptive echo and noise

16  control" Ex. 2 ('206 Patent) at Abstract.  The '206 Patent discloses that communication devices

17  are commonly used in a "variety of environments that have a variety of noise levels" requiring the

18  use of noise suppression, and often have loud speakers requiring the use of acoustic echo

19  cancellation.  *Id.* at 1:13-38.  The Patent further notes that the "use of noise suppression along

20  with echo cancellation can cause additional problems" because echo cancellation can be less

21  efficient when performed on a noise suppressed signal, while performing echo cancellation prior

22  to noise suppression can be inefficient in a noisy environment.  *Id.* at 1:44-50.  To address these

23  issues, the '206 Patent discloses an adaptive echo and noise control system which can be

24  "configured to adaptively determine the order of echo cancellation and noise suppression based on

25  an amount of noise in the received signal to generate a desired signal."  *Id.* at 2:14-29.

26       **C.    U.S. Patent No. 10,140,375**

27       The '375 Patent is directed to "[p]ersonalized network searching, in which a search query

28  is received from a user, and a request is received to personalize a search result."  Ex. 3 ('375

Patent) at Abstract.   Before the '375 Patent, searches did not provide personalized search results based on a user's bookmarks or favorites, and existing bookmark tools did "not effectively leverage the user's preferences to provide personalized search results."   *Id.* at 1:31-2:21.   The '375 Patent solves this problem by providing a personalized search functionality that synchronizes favorite items on a client device with a server, and then searches *both* the set of synchronized favorite items *and* a global database.   *Id.* at Figs. 2-3 & accompanying discussion.   The results of a "personalized search" and a search of one or more "global indexes" are provided together in a "combined search results set" on the display of a client device.   *Id.* at 2:61-66 & claim 1.

### D.      U.S. Patent No. 10,229,586

The '586 Patent is directed to relaying communications in a wireless sensor system.   The invention covers "audio-enabled wireless devices" that operate as sensor units within an overall "wireless mesh network."   Ex. 4 ('586 Patent) at 4:33-59, claim 1.   Devices within the network relay communications traffic to other devices in the network, by comparing an "identification code" of a received communication packet with a "table" of identifiers, and determining whether to relay the packet based on this comparison.   *Id.* at 5:4-9, 7:4-13, 10:44-49.   The invention "use[s] signal strength information to re-route wireless communications traffic in the sensor system" when a device goes offline or has difficulty communicating along a given network path. *See id.* at 9:23-33.   The invention thus provides "a relatively low cost, robust, wireless sensor system that provides an extended period of operability without maintenance."   *Id.* at 2:6-10.

## III.      LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill at the time of invention for the '187, '375, and '586 Patents is provided by the expert declarations submitted by Google's experts for these respective patents:

- **'187 Patent**: A Bachelor of Science degree in Computer Science, Computer Engineering or similar subject matter, and at least approximately two years of work or research experience in the fields of network security or digital rights management, or an equivalent subject matter. Additional education could substitute a lack of work in the field, and additional field experience could substitute for a lack of educational background.   Ex. 5 (Declaration of Alan T. Sherman (hereafter "Sherman Decl.")) at ¶ 31.

-3-

- **'375 Patent**: A Bachelor of Science degree in Computer Engineering, Computer Science or similar subject matter, or equivalent work experience and, in addition, at two years of work or research experience in the fields of client-server computing and network searching, or equivalent subject matter.   Ex. 6 (Declaration of Michael Shamos (hereafter "Shamos Decl.")) at ¶ 31.

- **'586 Patent**: A Bachelor of Science degree in Electrical Engineering, Computer Science, or similar subject matter, or at least two years of work or research experience in the fields of computer hardware and software, wireless networking, or an equivalent subject matter. Ex. 7 (Declaration of Paul Min (hereafter "Min Decl.")) at p.8.

Google has not proffered expert testimony for the '206 Patent, but submits that the level of ordinary skill in the art would consist of a Bachelor of Science degree in Electrical Engineering, Computer Science, or similar subject matter, or at least two years of work or research experience in the fields of computer hardware and software, audio processing, or an equivalent subject matter.

## IV.    LEGAL STANDARDS

Claim construction is a question of law.   *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).   Because the claims define the right to exclude, "the analytical focus must begin and remain centered on the language of the claims themselves."   *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1354-55 (Fed. Cir. 2014).   "[T]he words of a claim are generally given their ordinary and customary meaning," as understood by a skilled artisan at the time of the invention.   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (internal quotation omitted).

Patent claims, however, do not stand in isolation.   "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."   *Id.* Indeed, the specification is "the single best guide to the meaning of a disputed term."   *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019).   In addition to the words of the claim and the specification, courts "should also consider the patent's prosecution history, if it is in evidence."   *Phillips*, 415 F.3d at 1317 (citation omitted).

Courts may also consider extrinsic evidence, such as dictionaries, treatises, and expert testimony, to provide technology background or to explain the meaning of a term as it would be understood by a person of ordinary skill at the time of the invention.  *Id.* at 1317-18.  However, extrinsic evidence is less helpful when divorced from the context of the invention.  *Id.* at 1319 ("[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840-41 (2015).

## V.    ARGUMENT

### A.    "DOMAIN INFORMATION" ('187 PATENT CLAIMS 1, 3, 4, AND 10)

| Google's Proposed Construction | Sonos' Proposed Construction |
|---|---|
| information corresponding to a group of devices that share rights associated with a common account for use in accessing protected digital content | Plain and ordinary meaning |

The phrase "domain information" refers to information corresponding to a "domain" as that term is described within the context of the '187 Patent.

Claims 1 and 10 recite a "domain of devices, which share rights associated with a common account, for use in accessing protected digital content."   And the prosecution history confirms the type of "domain" to which the '187 Patent is directed.   In particular, Applicant stated during prosecution that "a domain in the claimed context is intended to apply to a group of devices, which share rights associated with a common account for use in accessing protected digital content."   Ex. 8 (6/12/2006 Prelim. Am. at 6).   The clarification distinguished "domain[s]" generally consisting of a communications network of devices (*e.g.,* an IEEE P802.15, Wireless Personal Area Network as relied upon by the Examiner in rejecting claims during prosecution) that "are separate from the management of digital content in a digital rights management system" or do not "share rights associated with a common account."   *Id.*; *see also* Ex. 9 (App's Br. at 6).

Google's proposed construction is intended to clarify that "domain information" is information associated with, or descriptive of, such a "domain."   To the extent this is disputed, the '187 Patent provides examples of "domain information"—*e.g.*, domain name, private domain password, credit card information (shared by the devices in the domain)—confirming this to be the

case.   Ex. 1   ('187 Patent) at 2:2-6, 2:16-20, 5:2-6, 5:9-14.   Sonos' proposal for plain and ordinary meaning risks jury confusion regarding whether the claimed "domain information" corresponds to the type of "domain" to which the '187 Patent (and its claims) is directed.

### B. "LOGIC CIRCUITRY FOR PROVIDING THE DOMAIN INFORMATION TO A KEY ISSUER" ('187 PATENT, CLAIM 10)

| Google's Proposed Construction | Sonos' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning; not governed by 35 U.S.C. §112, ¶ 6. To the extent §112, ¶ 6 applies, sufficient corresponding structure is disclosed in the intrinsic evidence cited below. | Governed by 35 U.S.C. §112, ¶ 6. Where the function is "providing the domain information to a key issuer which is separate from the domain of devices" and there is no corresponding structure. At best, the corresponding structure includes a processor or microprocessor, but this is inadequate because there is no sufficient corresponding algorithm. |

The term "logic circuitry," as recited in claim 10 of the '187 Patent, connotes a definite structure that does not invoke 35 U.S.C. § 112, ¶ 6.   The phrase "logic circuit" does not include the word "means," and is therefore presumed to fall outside the scope of 35 U.S.C. § 112, ¶ 6. *Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1349 (Fed. Cir. 2015).   Sonos has not rebutted (and cannot rebut) this presumption.   As the phrase "logic circuit" connotes definite structure to a person of ordinary skill in the art, the phrase should not be construed pursuant to §112, ¶ 6.

### 1. Courts have routinely found the term "circuit" should not be construed as a means-plus-function limitation.

Courts have found that the phrase "logic circuit" should not be construed as a means-plus-function limitation.   For example, in *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364 (Fed. Circ. 2003),[2] the Federal Circuit found claim terms using the term "circuit" to fall outside § 112, ¶ 6.   Specifically, the Federal Circuit held that "[w]hile we do not find it necessary to hold that the term 'circuit' by itself always connotes sufficient structure, the term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural

---

[2] The Federal Circuit decided *Raritan* prior to issuing its decision in *Williamson*.   However, as acknowledged by this Court in *Technology Licensing Corp. v. Blackmagic Design Pty Ltd.*, CA C 13-05184 SBA, 2016 WL 8902602, *13 (N.D. Cal. Nov. 23, 2016), *Williamson* did not invalidate *Apex* (or *Linear Tech. Cor. v. Impala Linear Corp.,* 379 F.3d 1311 (Fed. Cir. 2004)) because those cases were "both pre-*Lighting World* cases" and "applied the appropriate standard for overcoming the presumption against means-plus-function treatment."

meaning to one of ordinary skill in the art." *Id.* at 1373.   In support, the Federal Circuit stated that "[t]he term 'circuit' is defined as 'the combination of a number of electrical devices and conductors that, when interconnected to form a conducting path, fulfill some desired function." *Id.* (citing *Dictionary of Computing*, 75 (4th ed. 1996)).   Further, in finding "circuit" limitations to fall outside § 112, ¶ 6, the Court confirmed that, where the written description does not use the terms "in a manner clearly inconsistent with the ordinary meaning" to a person of ordinary skill, the ordinary meaning applies.   *Id.* at 1373-74.   The Federal Circuit has also held that "when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112, ¶ 6 presumptively will not apply."   *Linear Tech. Corp.*, 379 F.3d at 1320.

District courts construing "circuit" limitations have also consistently held that they do not invoke § 112, ¶ 6.   *See, e.g., Realtime Data, LLC v. Rackspace US, Inc.*, CA 6:16-CV-00961 RWS-JDL, 2017 WL 2590195, *14 (E.D. Tex. June 14, 2017) ("The claim provides a sufficient description of the circuits' operations such that, in combination with the 'structure-connoting term 'circuit,' sufficient structural meaning is conveyed to persons of skill in the art."); *Intellicheck Mobilisa, Inc. v. Honeywell Int'l Inc.*, C.A. C16-0341JLR, 2017 WL 6550700, *4 (W.D. Wash. Dec. 21, 2017) ("Following [] Federal Circuit guidance, district courts considering a 'circuit' or 'circuitry' term have overwhelmingly concluded that it is not a means-plus-function limitation."); *Technology Licensing*, 2016 WL 8902602 at *13-14.   Sonos has identified no evidence that warrants deviating from this prior precedent.[3]   For these reasons, the "logic circuit" limitation of claim 10 of the '187 Patent should not be construed pursuant to § 112, ¶ 6.

### 2.   Even if "logic circuit" is construed pursuant to § 112, ¶ 6, the '187 Patent discloses sufficient corresponding structure.

Even if "logic circuit" invokes § 112, ¶ 6, it is not indefinite.   First, the claimed "logic circuit" performs an operation of a general purpose computer—*i.e.,* "providing" information—

---

[3]   At the time of the filing of the application for the '187 Patent, the phrase "logic circuitry" was understood by those of skill in the art to refer to a combination of logic gates arranged to perform functions found in a general-purpose microcontroller .   Ex. 5 (Sherman Decl.) at ¶ 37.

and, therefore, the disclosure of a microprocessor in the '187 Patent is sufficient.  Second, the '187 Patent discloses an algorithm for the recited function in the form of steps performed by the microprocessor in "providing domain information" to a key issuer.

(a)    The "logic circuit" of Claim 10 performs a function that can be achieved using a general purpose microprocessor.

Claim 10 recites "logic circuitry for providing the domain information to a key issuer." The recited function of "providing domain information" would have been understood by a skilled artisan be a common data output operation of a general-purpose processor, such as that referenced in the '187 Patent.  Ex. 5 (Sherman Decl.) at ¶ 38.  This would involve transmitting data ("domain information") to an intended destination ("a key issuer") over a network.  *Id.*

As confirmed by the '187 Patent, this function can be achieved using well-known computing components operating in their known, intended manner.  Ex. 1 ('187 Patent) at 4:5-11; Ex. 5 (Sherman Decl.) at ¶ 38.  Specific examples of well-known computing components constituting logic circuitry in the '187 Patent include the Motorola MC68328 DragonBall integrated microprocessor or a TI OMAP1510 processor.  Ex. 1 ('187 Patent) at 5:61-65.  Such microprocessor controllers were known to control the input and output of data over a communication channel—*e.g.*, via cellular network, local area network, wide-area network, etc.— such that data could be transmitted to and/or received from other components, including those connected by network, such as a key issuer.  Ex. 5 (Sherman Decl. at ¶ 39).

For example, the Product Bulletin for the OMAP1510 identifies it as an "Application Processor for 2.5 and 3G Wireless Devices," and describes its ability to work with any air interface standard to allow for data and voice communications.  *Id.*; Ex. 10 (GOOG-GVS-00007029).  The Bulletin identifies a Modem Interface, Bluetooth Interface, UART (including IrDA/infrared), and USB connections, among others.  Ex. 5 (Sherman Decl.) at ¶ 39; Ex. 10 (GOOG-GVS-00007030).  Thus, one of ordinary skill would have understood the processor to control transmitting and/or receiving data, including with external devices over these exemplary interfaces.  Ex. 5 (Sherman Decl.) at ¶ 39.

As another example, the Product Brief for the MC68328 also references interfaces for

1   transmitting and/or receiving data (*i.e.,* standard input from and output) with external devices.

2   *Id.*; Ex. 11 (GOOG-GVS-00006889).   As contemplated by the Patent, such a microprocessor

3   controller—*i.e.*, "logic circuitry"—would be "configured in well known manners" to "operate in

4   [a] suitable manner to perform the function set forth [t]herein."   Ex. 1 ('187 Patent) at 4:5-11.

5   This is consistent with the disclosure of the '187 Patent, which contemplates user equipment

6   "logic circuitry" (*i.e.,* the microcontroller) outputting domain information to a key issuer over, for

7   example, a network communication channel.   Ex. 5 (Sherman Decl.) at ¶ 39.

8       A person of ordinary skill in the art would have understood that the microprocessor (or

9   "logic circuitry") would not require any special programming to provide domain information

10   received from another device in the domain to a key issuer.   Rather, this would involve use of

11   common input/output operations, including those performed over well-known communications

12   channels.   Ex. 5 (Sherman Decl.) at ¶ 40.   Nowhere in the language of claim 10, or the '187

13   Patent in general, is the function of "providing the domain information to a key issuer" defined to

14   include the creation or manipulation of "domain information."   Instead, after the domain

15   information is received from a device existing with a domain of devices, the logic circuitry

16   "provide[s]" this information to the "key issuer."   This function of "providing" requires nothing

17   more than the common output of this data over a known communications channel.   *Id.*

18       As "providing" domain information—just like "processing," "receiving" and "storing"

19   data—can be achieved by a general purpose computer without special programming, there is no

20   requirement for the '187 Patent to disclose more structure (*e.g.*, an algorithm) than the general

21   purpose processor that performs that function.   *See In re Katz Interactive Call Processing Patent*

22   *Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011).   This rationale has been adopted by other courts in

23   finding that, even if a claim term is construed pursuant to § 112, ¶ 6, a patent need not specify an

24   algorithm where the claimed function can be performed by a general purpose computer without

25   special purpose programming.   *See, e.g.*, *Finjan Inc. v. Sophos Inc.*, C.A. 14-cv-01197-WHO,

26   2015 WL 890621, *8-9 (N.D. Cal. Mar. 2, 2015) (citing *Freeny v. Murphy USA Inc.*, No. 2:13-

27   CV-791-RSP, 2015 WL 294012, at *37 (E.D. Tex. Jan. 21, 2015); *e-LYNXX Corp. v.*

28   *Innerworkings, Inc.*, No. 1:10-CV-2535, 2012 WL 4484921, at *19 (M.D. Pa. Sept. 27, 2012)).

(b)      The '187 Patent discloses an algorithm for "providing domain information" to a key issuer.

Even if an algorithm is required, the Patent discloses such an algorithm in describing that "the second device [i.e., the "apparatus" of claim 10] uses the network link 107 (e.g., the cellular network or Internet) to contact key issuer 105. The second device follows the same protocol with key issuer 105 as the first device did when establishing the domain, as already described above." Ex. 1 ('187 Patent) at 6:34-36; *see also id.* at 4:20-35.   "At Step 311, the second device communicates its unit certificate 207 to key issuer 105 and may use its unit private key 208 to respond to a challenge.   Once the channel is established it sends the domain information 209 to key issuer 105."   *Id.* at 6:37-45.   Logic circuitry 210 controls these functions, *id.* at 6:61-62, and a person of ordinary skill in the art would have understood the coordination and control of this sending of domain information to be a common output function of logic circuitry, as well as how it would function to do so in view of the disclosure of the '187 Patent.   Ex. 5 (Sherman Decl.) at ¶ 41.   Thus, the '187 Patent discloses an algorithm for the recited function.

## C.      "PRIVATE KEY" ('187 PATENT, CLAIMS 1 AND 10)

| Google's Proposed Construction | Sonos' Proposed Construction |
|---|---|
| a non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be computed | a non-public key used in conjunction with a cryptographic algorithm that determines its operation in such a way that an entity with knowledge of the key can reproduce or reverse the operation, while an entity without knowledge of the key cannot |

The parties agree as to certain aspects of the meaning of this term.   The parties agree that a "private key" is one that is "non-public."   The parties also agree that a "private key" is used in relation to a "cryptographic algorithm."   Setting aside the lack of clarity in Sonos' proposed construction, Google understands the dispute to center on Sonos' desire to limit "private key" to certain embodiments disclosed in the '187 patent, rather than giving the term the breadth that a person of ordinary skill would ascribe to it.

The '187 Patent describes the need for content distributors to implement secure measures to protect content, noting that "Digital-Rights Management (DRM) is a popular phrase used to describe such protection of rights and the management of rules related to accessing and processing

1   digital items."  Ex. 1 ('187 Patent) at 1:13-22.  In this context, the Patent describes a system in

2   which a device being added to a domain contacts a "key issuer" to obtain a "private key," which

3   the device uses to access protected digital content.  *See, e.g.*, *id.* at Abstract ("The key issuer

4   returns a DRM domain private key (206) as well as a DRM certificate (202). Both are utilized by

5   the device to obtain and render digital content (204)."); *id.* at 2:10-13 (same).

6       The '187 Patent discloses multiple exemplary techniques for protecting "digital content."

7   For example, the specification describes cryptographic techniques that utilize "Public-Key

8   Cryptography," which involves use of a public key and a private key.  Ex. 1 ('187 Patent) at 2:45-

9   50.  The patent also described that, within a Public-Key Cryptographic system, a private key "is

10  used for either decrypting data or generating digital signatures."  *Id*.  The specification describes

11  that a "digital signature" is "an electronic signature that can be used to authenticate the identity of

12  the sender of a message or the signer of a document, and possibly to ensure that the original

13  content of the message or document that has been sent is unchanged."  *Id*. at 2:59-64.  The Patent

14  also describes authentication as "[t]he process of determining whether someone or something is, in

15  fact, who or what it is declared to be," which can involve the use of public-key cryptography.  *Id*.

16  at 3:1-6.  In addition to "Public-Key Cryptography" (also known as "asymmetric cryptography,"

17  because it uses two different keys), the Patent also states that "alternate methods of securing the

18  DRM system are possible using symmetric key techniques or broadcast key encryption

19  techniques."  *Id*. at 7:52-57.

20      The '187 Patent therefore discloses multiple exemplary cryptographic techniques available

21  for use in DRM systems for protecting digital content.  However, nowhere does the '187 Patent

22  limit the claimed inventions to use of one or more of these three exemplary techniques.  Rather,

23  the claims only require use of a "private key" to "access the protected content."  The parties and

24  their experts agree that this "private key" is a "cryptographic key."  *See* Ex. 5 (Sherman Decl.) at

25  ¶ 56; Ex. 12 (Declaration of Stephen B. Wicker (Sonos' expert) (hereafter "Wicker Decl.")) at ¶

26  125.  Google's proposed construction reflects the common understanding in the art of what a

27  "cryptographic key" is—it is a key that is used as an input to a cryptographic algorithm designed

28

1    such that, without the key, the output of the algorithm cannot be computed.  *See* Ex. 13 (3/8/2021

2    Sherman Dep.) at 16:3-9.

3        Sonos' proposed construction, on the other hand, would only serve to confuse a jury by

4    reciting that the "key [is] used in conjunction with a cryptographic algorithm that determines its

5    operation in such a way that an entity with knowledge of the key can reproduce or reverse the

6    operation, while an entity without knowledge of the key cannot."  The phrases "that determines

7    an operation" and "reproduce or reverse the operation [of the cryptographic algorithm]" would not

8    be clear to a jury.  Ex. 13 (Sherman Dep.) at 36:23-39:23.  For example, it is not clear what it

9    means to "reproduce" an operation.  *Id.* at 39:10-23.  And, while Sonos' proposed construction

10   does not explicitly use the terms encryption or decryption, Sonos' expert's testimony makes clear

11   that it is Sonos' position that the claimed "private key" is restricted to use with cryptographic

12   algorithms that employ encryption or decryption.  Ex. 14 (3/9/2021 Wicker Dep.) at 46:5-15; *see*

13   *also id.* at 19:1-17; 37:3-8; 54:20-55:7.  It does so even though neither claim 1 nor claim 10

14   mention encryption or decryption.

15       The non-limiting nature of claims 1 and 10 is consistent with testimony of the parties'

16   experts, which confirms that there are private keys for use in cryptographic algorithms that  do

17   not require use of encryption or decryption.  For example, hash algorithms are a type of

18   cryptographic algorithm used for authentication that can employ private keys, but hash algorithms

19   do not involve encryption or decryption.  *See* Ex. 13 (3/8/2021 Sherman Dep.) at 29:18-31:3,

20   45:19-46:12; Ex. 14 (3/9/2021 Wicker Dep.) at 14:7-15, 28:5-19.   Additional examples of

21   cryptographic algorithms that use private keys but do not involve encryption or decryption include

22   message authentication codes, key expansion, pseudorandom number generation, and sharing of

23   secrets.  Ex. 13 (3/8/2021 Sherman Dep.) at 45:5-18.  Furthermore, the '187 Patent itself uses the

24   term "private key" more broadly, describing a "unit private key" that is used in relation to a secure

25   authentication protocol.  Ex. 1 ('187 Patent) at 4:20-24, 6:38-40.  Sonos' expert admitted that the

26   "private key" in this context would be used in relation to authentication, but the specification does

27   not say that this would necessarily involve encryption or decryption.  Ex. 14 (3/9/2021 Wicker

28   Dep. at 30:3-34:8).

In sum, the term "private key" would have been understood by a person of ordinary skill in the art to mean a cryptographic key used in relation to a cryptographic algorithm (which may or may not involve encryption or decryption). Sonos' attempt to limit the term to a preferred embodiment by requiring use of encryption or decryption should be rejected.

**D.** **"ESTIMATED NOISE LEVEL WHEN THERE IS NO DESIRED INPUT RECEIVED AT THE INPUT OF THE COMMUNICATION DEVICE ('206 PATENT, CLAIMS 3 AND 18)**

| Google's Proposed Construction | Sonos' Proposed Construction |
|---|---|
| an estimate of noise based on the amount of noise measured when the communication device does not detect speech in the received signal | Indefinite |

Sonos contends that this phrase is indefinite, but it is clear and understandable to a person of ordinary skill in the art based on the '206 Patent specification. To the extent Sonos argues that the phrase is indefinite because it uses the term "desired input," courts have found that the term "desired" is definite when the specification identifies to a person of ordinary skill in the art what is "desired." *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1316-17 (Fed. Cir. 2007) (construing claims reciting "desired" tooth positions); *RevoLaze LLC v. J.C. Penney Company, Inc.*, No. 2:19-cv-00043-JRG, 2020 WL 697891, *9-*11 (E.D. Tex. 2020) (ruling that claim terms "desired" and "undesired" were not indefinite since the specification identified what was "desired" or "undesired"). Here, the specification explains what a "desired input" is—the speech component of a received audio signal.

The preferred embodiment of the '206 Patent discloses an audio input device that can include "a microphone, an attached speakerphone, a headset, a car kit, or any other audio input device," which can "receive an input acoustic signal such as speech" that "may include a desired signal component, a noise signal component, and an echo signal component." Ex. 2 ('206 Patent) at 3:12-14, 21-24. The '206 Patent also discloses a noise suppressor that can receive a signal that includes "a desired signal portion and an undesired signal portion. For example, the signal can include speech and noise." *Id*. at 5:9-12. The preferred embodiment further includes an adaptive echo and noise control system, which can "receive a signal at an input 140 to the communication device 100, determine background noise in the signal, and adaptively determine the order of noise

-13-

suppression and echo cancellation based on the background noise in the signal."  *Id*. at 3:51-56.

The specification discloses that the background noise can be "based on an estimated and smoothed

noise level when there is no desired input nor echo received at the input 140 of the communication

device 100."  *Id*. at 3:64-67.

The '206 Patent therefore identifies the "desired signal component" of a received audio

signal—the speech component—and describes the device as estimating the background noise

when there is no desired component (*i.e.,* no speech) received at the input.  Based on the

specification, a person of ordinary skill in the art would therefore understand this phrase to have a

meaning consistent with Google's proposal: "an estimate of noise based on the amount of noise

measured when the communication device does not detect speech in the received signal."

**E.   "COMBINED SEARCH RESULTS SET" / "THE COMBINED SEARCH RESULTS SET INCLUDING AT LEAST TWO OF: ONE OR MORE FAVORITE ITEMS FROM THE SET OF [FAVORITE ITEMS]/[BOOKMARKS] SYNCHRONIZED OF THE USER; ONE OR MORE SEARCH RESULTS FROM A FIRST GLOBAL INDEX; OR ONE OR MORE SEARCH RESULTS FROM A SECOND GLOBAL INDEX" ('375 PATENT, CLAIMS 1-11 AND 13-20)**

| Google's Proposed Construction | Sonos' Proposed Construction |
|---|---|
| Google proposes that the term "combined search results set" be construed to mean "a search results set that includes results from at least one personalized search"<br><br>As a result of that construction, Google proposes that the larger phrase be construed to mean "the combined search results set including at least one or more favorite items from the set of favorite items synchronized for the user and either one or more search results from a first global index or one or more search results from a second global index" | Two or more of: [a], [b], or [c]<br>Where [a] is "one or more favorite items from the set of favorite items",<br>Where [b] is "one or more search results from a first global index", and<br>Where [c] is "one or more search results from a second global index." |

This dispute boils down to whether a "combined search results" set, as that term is used

within the larger disputed claim phrase, must include results from at least one personalized search

(*i.e.,* a search of "favorite items" or "bookmarks"), which are then combined with results from at

least one other type of search.   As shown below, this is required by the intrinsic evidence.

Sonos focuses on the larger claim limitation, which recites that the "combined search

results set" must include "at least two" of three enumerated categories, and then incorrectly jumps

to the conclusion that the entire limitation is satisfied so long as *any* two of the three categories are present.   There are two problems with Sonos' analysis.   First, it ignores the "combined search results set" language itself which, when read within the context of the specification, plainly requires results combined from at least two different *types* of searches.   *See, e.g.*, Ex. 3 ('375 Patent) at 2:61-66.   Contrary to Sonos' conclusion, the "at least two" claim language does not *define* the "combined search results set" requirement; rather it applies *in addition to* the "combined search results set" requirement.   The second problem with Sonos' analysis is that it disregards the specification's teaching that the purpose of the claimed invention is to provide a results set that *at least* includes the results of a personalized search, such as bookmarks or favorite items.   *See, e.g.*, *id.* at 1:25-27, 2:61-62.   Google's construction follows directly from the intrinsic evidence.

> ### 1.   The "Combined Search Results Set" Must Be The Combined Results Of At Least Two Different Types Of Searches.

The "combined search results set" language plainly requires a set that is generated from two different types of searches, and then combined to form a single results set.   This meaning is clear within the context of the specification.   For example, the Patent states:

> In one embodiment, a search engine combines search results obtained from a global index or global indexes with those retrieved from a list of a user's favorite sites to produce a ***combined search result set***.

Ex. 3 ('375 Patent) at 2:61-66 (emphasis added); *see also id.* at 9:53-55 ("Embodiments of the present invention may ***combine the results of several types of results***, or may present the results separately." (Emphasis added).   As this passage confirms, it is the *combination* of (1) a search result "from a global index ***or*** global indexes"; *and* (2) a search result "from a list of a user's favorite sites," that renders the set a "combined search results set."   Results obtained from multiple "global indexes" alone would not be enough.   Consistent with the plain meaning of the claims, the results set only becomes a "combined search results set" when combined with results obtained from a search of a different type of set (*e.g.*, in this embodiment, a search across a "user's favorite sites").   While this statement arises in the context of describing an embodiment involving a particular combination of search sets, it nevertheless evinces the patentee's intent that a "combined search results set" must comprise an actual combination of results from different types

of sets.   *See Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) (holding that the "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").   To be sure, in other embodiments, different combinations may be possible.

This interpretation of a "combined search results set" is further supported by Figure 3 and its accompanying discussion.   Figure 3 depicts three distinct "sub-processes": a search of a "global index" (304), a search of "bookmarks" (306), and a search of "annotations" (308).   *See* Ex. 3 ('375 Patent) at Fig. 3; *see also id.* at 9:17-30.   Individually, each of these sub-processes generate merely a "separate result set." *Id.* at 9:17-18.   It is only when two or more of these separate result sets are "merged into one list 310," that a "combined search result set" is generated. *Id.* at 9:17-23; *see also id.* at 8:57-60 ("Other embodiments may employ a fewer or greater number of sub-processes . . . ."), 9:53-55.

Thus, the intrinsic record makes clear that when the claims refer to a "combined search results set," they are, at a minimum, referring to a set combined from the results of at least two different types of searches.   The claim language goes on to specify the further limitation that the "combined search results set" must include results from a search of at least two of: (a) "one or more favorite items . . . "; (b) "a first global index"; and (c) "a second global index."   But, a set comprising merely (b) and (c) would not satisfy the claim language as a whole.   While such a results set might contain results from two of the three recited categories, it would not involve results from at least two different types of searches, and would not qualify as a "combined search results set" in the first place.

### 2.   The Patent Further Requires That The Results Set Include At Least Results From A Personalized Search

Google's interpretation is further supported by the Patent's consistent emphasis on providing the user a "personalized" search (*i.e.*, one that includes at least results from a search across the user's bookmarks or favorite items).   The very title of the '375 Patent is "Personalized Network Search."   *See Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (holding patent's title defined the invention and limited scope of claim); *UltimatePointer,*

*L.L.C. v. Nintendo Co.*, 816 F.3d 816, 823 (Fed. Cir. 2016) (using patent title to inform claim construction).   As the Abstract states, a "personalized search result" search is generated by a search of a "personalized search object."   While the "personalized search result" may be displayed on a client device with a "general search result," the Abstract, as well as the Patent as a whole, emphasizes how a personalized search is a significant feature of the invention.   *Tate Access Floors, Inc. v. Maxcess Tech., Inc.*, 222 F.3d 958, 965 n.2 (Fed. Cir. 2000) ("the abstract of a patent is a potentially useful source of intrinsic evidence as to the meaning of a disputed claim term").

The '375 Patent specification, including the "Summary" section, also consistently refers to the "invention" as "personalized network searching" in which "a search result for the search query [is] based at least in part on the personalized result and the general result."   Ex. 3 ('375 Patent) at 2:25-33; *see also id.* at 2:61-3:3, 8:44-50, 8:55-60, 8:61-65.   These statements give "primacy to these attributes [and] strongly indicates that the invention requires [these attributes]."   *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014) (holding the Summary of the Invention's touting of the anonymity feature of the invention required that it "be read as part of the claim"); *see also Pacing Techs, LLC v. Garmin Intern., Inc.*, 778 F.3d 1021, 1025 (Fed. Cir. 2015) ("When a patentee 'describes the features of the 'present invention' as a whole,' he alerts the reader that 'this description limits the scope of the invention.'").

Adding further support, the '375 Patent distinguishes the personalized search of the claimed invention from the prior art.   Specifically, the Patent teaches how "[c]onventional search engines search global search objects such as global search indices."   Ex. 3 ('375 Patent) at 8:61-62.   The Patent contrasts this "conventional" approach with "[e]mbodiments of the present invention" which "are also capable of searching personal search objects, such as bookmarks, annotations, ratings, and other objects."   *Id.* at 8:62-65.   Because the Patent distinguishes prior art searches that apply *only* across global search indices, while noting that the "present invention" adds to the conventional approach by also searching "personal search objects," the claims should be construed to require at least a personal search (*i.e.*, of favorites or bookmarks).   *See Poly-America, L.P. v. API Indus, Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("[A]n inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages

prior art based on the absence of that feature."); *Ch. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372-73 (Fed. Cir. 2012) ("derogatory statements" about prior art "may be viewed as a disavowal of that subject matter from the scope of the Patent's claims").

### 3. Sonos' Proposed Construction Ignores The Intrinsic Record

The construction offered by Sonos fails to account for the intrinsic record outlined above. According to Sonos, the claims may be satisfied by displaying results that include results obtained only from two global indices.   But, as discussed above, this disregards the Patent's teaching that "combined search results" must include results from at least two different *types* of searches.   *See, e.g.*, Ex. 3 ('375 Patent) at 2:61-66.   This also broadens the scope of the claims to read on what the Patent expressly refers to as the "conventional" approach, *id.* 8:61-62, and ignores the Patent's repeated emphasis on "personalized" searching as an important and required feature of the "present invention," *e.g.*, *id.* at 2:61-3:3, 8:44-50, 8:55-60, 8:61-65.

Accordingly, the Court should construe "combined search results set" to mean "a search results set that includes results from at least one personalized search," and construe the larger claim phrase to mean "the combined search results set including at least one or more favorite items from the set of [favorite items]/[bookmarks] synchronized for the user and either one or more search results from a first global index or one or more search results from a second global index."

### F. "STORED [FOR THE USER] IN A CLIENT-SIDE STORAGE OF A CLIENT DEVICE" ('375 PATENT CLAIMS 1 AND 17-20)

| Google's Proposed Construction | Sonos' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | retained in a computer-readable medium of the client device for later retrieval by the user. Excludes transitory storage |

The Court should hold that "stored [for the user] in a client-side storage of a client device" of claims 1 and 17-20 of the '375 Patent has its plain and ordinary meaning.   The intrinsic evidence confirms that "stored [for the user] in a client-side storage of a client device" was not intended to carry any specialized meaning.   The claims do not provide any restriction on the type of storage required by the claims, nor do they require retention for later retrieval.   *See* Ex. 3 ('375 Patent) at Claims 1, 17-20.   The specification consistently uses the plain and ordinary meaning of

"stored [for the user] in a client-side storage of a client device" and broadly provides various examples of storage medium that 'include, *but are not limited to*, a floppy disk, CD-ROM, DVD, magnetic disk, memory chip, ROM, RAM, an ASIC, a configured processor, all optical media, all magnetic tape, or other magnetic media, *or any other medium from which a computer processor can read instructions*." *Id.* at 3:23-33 (emphases added).   The specification provides absolutely no indication, much less a clear and unmistakable indication, that the patentee intended to limit the form of media that would comprise "client-side storage of a client device." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

The construction offered by Sonos purports to inject a negative requirement that excludes "transitory storage," an ambiguous timing requirement ("for later retrieval"), and a purpose requirement ("by the user").   There is no compelling reason to impose these limitations.   Sonos' expert arrives at its desired construction only by (1) relying on a mere embodiment to conclude that storage must be "for purposes of later retrieval," Ex. 15 (Declaration of Douglas C. Schmidt (hereafter "Schmidt Decl.")) at ¶ 65, (2) reasoning from this purpose requirement that there must be some "separation between the acts" of storage and retrieval that would support the timing requirement, *id.* ¶ 69; and (3) attempting to bootstrap the timing requirement to conclude that transitory storage must be excluded, *id.*   The Court should reject this tortured logic.

Sonos' construction also contradicts the legal principles of claim construction.   Absent evidence of an "express intent" by the patentee, it is generally improper to impose a "novel meaning imparted by [a] negative limitation." *See Omega Eng., Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *see also Interwoven, Inc. v. Vertical Computer Sys. Inc.*, Case No. C 10-4645 RS, 2011 WL 6936186, at *4 (N.D. Cal. Dec. 30, 2011).   Recognizing this principle, Courts routinely hold that "storage" should have its plain and ordinary meaning and does not require permanent storage or retaining information for later retrieval. *See Audionics Sys., Inc. v. AAMP of Fla., Inc.*, No. 12-cv-10763, 2013 WL 9602634, at *24 (C.D. Cal. Sept. 12, 2013)

-19-

(holding "store" does not require non-transitory storage for later retrieval as "there is no logical requirement that every signal stored in the memory be perpetually accessible for recall").

Finally, Sonos' construction is objectionable insofar as it seeks to leverage its proposed negative limitation to exclude *all* "temporary" storage.   While Sonos' proposal purports to merely exclude "transitory" memory, its expert candidly admits that the intent is to exclude storage in *all* "temporary" memory, including storage in memory buffers or a cache.   Ex. 15 (Schmidt Decl.) at ¶ 69.   But, the breadth of this exclusion is flatly inconsistent with the specification's teaching that "storage" could include storage in certain temporary memory, such as random access memory ("RAM").   *See* Ex. 3 ('375 Patent) at 3:23-33 (explaining RAM as a possible storage medium). A construction that excludes such a disclosed embodiment is "rarely, if ever correct." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010).   The breadth of Sonos' proposed exclusion also ignores the context of the invention, where synchronization with the server helps to avoid the need for persistent storage of favorites across multiple different client devices.   *See* Ex. 6 (Shamos Decl.) ¶ 46.

The Court should hold that "stored [for the user] in a client-side storage of a client device" as used in claims 1 and 17-20 of the '375 Patent has its plain and ordinary meaning.

### G.      PREAMBLES OF CLAIMS 1 and 15 ('586 PATENT, CLAIMS 1-5, 7-8, 15-16, 18, AND 20)

| Google's Proposed Construction | Sonos' Proposed Construction |
|---|---|
| Preambles are limiting | Preambles are not limiting |

The Court should construe the preambles of claims 1 and 15 of the '586 Patent to be limiting.   The preamble of claim 1 requires "An audio-enabled wireless device configured for bidirectional wireless communication in a wireless mesh network, the wireless device comprising: . . . ."   The preamble of claim 15 requires "A wireless mesh network system, comprising: . . . ." In both cases, the preambles are limiting because they define the environment in which the invention operates and therefore specify capabilities that an infringing instrumentality must have. *See Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1368 (Fed. Cir. 2020) (hereafter, *Firebug*) ("[U]se of preamble terms to define positive limitations in the body of

1  claims can evince an inventor's intent that the preamble limit the scope of the claim."); *see also*

2  *Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1374-75 (Fed. Cir. 2011) ("[T]he

3  claims at issue in this case contain preambles that define the environment in which an accused

4  infringer must act or describe capabilities that an accused device must have.").

5       Specifically, the preambles of both claims specify a particular network topology in which

6  the claimed "audio-enabled wireless devices" must be configured to operate—namely, a "***wireless***

7  ***mesh network***."   The parties and their experts agree that a "wireless mesh network" is a network

8  with at least the capability to form multiple paths between nodes of the network.  *See, e.g.*, Ex. 7

9  (Min Decl.) at ¶¶ 37-39; Ex. 12 (Wicker Decl.) at ¶¶ 136, 137.[4]   Thus, the preambles are

10 describing a capability of the audio-enabled devices to operate within a network affording a degree

11 of redundancy, ensuring that when a given network path becomes unavailable, an alternative path

12 can be accessed to ensure continued connectivity.   Ex. 7 (Min Decl.) at ¶ 37.

13      This ability to use alternative network paths is an important feature of the claimed

14 invention.   As the '586 Patent specification describes, a key purpose of "[t]he present invention"

15 is to provide "a relatively low cost, robust, wireless sensor system that provides an extended

16 period of operability without maintenance." Ex. 4 ('586 Patent) at 2:6-10.   A disclosed approach

17 to ensuring this sort of robust and reliable network is to "use signal strength information to re-

18 route wireless communications traffic in the sensor system" when a particular device goes offline

19 or has difficulty communicating along a particular network path.   *See id.* at 9:23-33; Ex. 7 (Min

20 Decl.) at ¶ 32.   Thus, the Patent is teaching that the ability of the claimed "audio-enabled wireless

21 device" to form alternative paths and thereby "re-route" packets is a significant feature of the

22 invention.  This feature is captured in the preamble's recitation that the devices operate in a

23 "wireless mesh network."   Where, as here, the preamble describes a "fundamental characteristic"

24 of what the specification refers to as the "present invention," the Court should find that the

25

26      [4]    The parties' experts dispute whether additional functionality is required of the nodes of a
   "wireless mesh network."   *See* Ex. 7 (Min Decl.) at ¶¶ 42-44; Ex. 12 (Wicker Decl.) at ¶¶ 137-
27 139.   This dispute was not identified by the parties as amongst the "most significant" under P.L.R.
   4-3(c), and is accordingly not briefed here.

28

preamble is limiting. *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012); *see also Bondyopadhyay v. United States*, 748 Fed. Appx. 301, 306 (Fed. Cir. 2018).

Claim 1 further specifies that the "audio-enabled wireless device" be "configured for **bidirectional** wireless communication in a wireless mesh network."  (Emphasis added).  Again, the ability of the "audio-enabled wireless device" to operate bi-directionally, as opposed to merely in a "listen-and relay" mode, is an important limitation of "the present invention."  Ex. 4 ('586 Patent) at 1:38-39 ("[t]he ***present invention*** relates to a wireless sensor unit system providing ***bi-directional*** communication between a sensor and a repeater or base unit." (Emphases added)); Ex. 7 (Min Decl.) ¶¶ 33-34.  This reinforces the conclusion that the preamble of claim 1 is limiting.

Finally, the preamble of claim 1 provides antecedent basis for the term "audio-enabled wireless device."  Specifically, a later limitation in claim 1 states "a table of identifiers stored in ***the audio-enabled wireless device***."  (Emphasis added).  The preamble provides antecedent basis for the "audio-enabled wireless device."  This is analogous to the recent holding in *Firebug*, where the Federal Circuit held that because a preamble provided antecedent for a single subsequently recited term ("footwear"), this rendered the entire preamble "essential to understanding the structural limitations of the illumination system."  962 F.3d at 1368.  The same rationale should apply here.

For these reasons, the Court should hold that the preambles of claims 1 and 15 are limiting.

## H.    "RESET ELEMENT" ('586 PATENT, CLAIMS 1-5, 7-12, 14-16, 18, AND 20)

| Google's Proposed Construction | Sonos' Proposed Construction |
| --- | --- |
| an element for resetting the configuration of the controller | hardware and/or software that functions to return a device to a prescribed state |

The Court should adopt Google's proposed construction that the "reset element" term of claims 1, 9, and 15 refers to "an element for resetting the configuration of the controller."  This construction follows logically from the requirement in claim 1 that the "reset element" and the "controller" are "operatively coupled."  This demonstrates that the "reset element" is not merely some component for performing a generic reset function, but rather a component providing functionality specific to the recited "controller."  Ex. 7 (Min Decl.) at ¶ 48; *see also* Ex. 4 ('586

Patent) at 9:40-41 ("A reset device (e.g., a switch) 208 is provided to the controller 202."); *id.* at Fig. 2 (depicting "reset element" coupled to "controller"). Indeed, where a claim recites two elements that are "operatively connected," the ordinary meaning is that "the claimed components must be connected in a way to perform a designated function." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys, Inc.*, 381 F.3d 1111, 1118, 1120 (Fed. Cir. 2004) (holding that in a claim for a filtration system, claim term requiring two components to be "operatively connected" required that two components "arranged in a manner capable of performing the function of filtering").

The consistent and exclusive description of the "reset element" in the patent specification provides further support for the conclusion that this term refers to an element for resetting the configuration of the "controller." For example, the sole described purpose of the "reset function" in the '586 Patent is to cause the controller to place the transceiver into a receiving mode for a prescribed interval of time, during which the transceiver can receive an identification code from an external programmer. Ex. 4 ('586 Patent) at 6:23-29. This passage directly links to "reset element" to the configuration and initialization of the networking/packet relay function of the claimed "controller." Ex. 7 (Min Decl.) at ¶ 50; *see also* Ex. 4 ('586 Patent) at 6:23-29, 10:44-49. No other disclosed function of the "reset element" is identified by Sonos, which supports Google's proposed construction. *See Saffran v. Johnson & Johnson*, 712 F.3d 549, 560 (Fed. Cir. 2013) (construing claim term according to "[e]xtensive, consistent usage in the specification . . . ."); *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1379 (Fed. Cir. 2006) (rejecting overly broad construction of "adjustable" because the specification "consistently, and without exception describe[d] adjustment" more narrowly).

The Court should reject Sonos' proposed construction of "hardware and/or software that functions to return a device to a prescribed state." Similar to the defendant in *Innova*, Sonos ignores the functional relationship between the "controller" and the "reset element" that is implied by the requirement that the two be "operatively coupled." *See* 381 F.3d at 1119 ("If, as Safari proposes, the claim refers in the abstract to the creation of a filter assembly structure, without any grounding to an intended use, the term 'operatively' is unnecessary and superfluous as the patentee could have as easily used the term 'connected' alone."). Moreover, Sonos injects an unwarranted

1   limitation that the "reset element" function to "return a device to a prescribed state."  There is no

2   basis in the intrinsic evidence for this limitation.  Sonos' only justification for this limitation is a

3   single dictionary definition that arises in a different field.  *See* Ex. 7 (Min Decl.) at ¶ 52.

4       Accordingly, the Court should construe "reset element" to mean "an element for resetting

5   the configuration of the controller."

6   **I.   "PREAMBLE PORTION" ('586 PATENT CLAIMS, 1-5, 7-12, 14-16, 18, AND 20)**

| Google's Proposed Construction | Sonos' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | a series of bits that is used to initiate and synchronize the receiving device |

10      Claims 1, 9, and 15 recite a "communication packet" that includes a "preamble portion,"

11  an "identification code portion," a "data payload portion," and an "integrity portion."  Sonos only

12  requests construction of the "preamble portion" term.  The Court should reject Sonos' specialized

13  (and ostensibly results-oriented) construction.

14      The intrinsic evidence confirms that "preamble portion" was not intended to carry any

15  specialized meaning.  The written description uses the term exactly once to note that the

16  "preamble portion" is part of a packet 500.  Ex. 4 ('586 Patent) at 11:3-5.  Figure 5 depicts the

17  preamble (501) as that portion of the packet that precedes the other portions—consistent with the

18  plain meaning of the term.  Because no other requirement is implied in the intrinsic evidence, the

19  Court should reject any further limiting definition.  *Thorner v. Sony Computer Entm't Am. LLC*,

20  669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to

21  obtain the full scope of its plain and ordinary meaning . . . .").

22      The construction offered by Sonos injects at least three unwarranted limitations into the

23  "preamble portion" term.  According to Sonos, the "preamble portion" must (i) comprise a "series

24  of bits," (ii) be "used to initiate" the receiving device, and (iii) be used to "synchronize the

25  receiving device."  There is no basis for any of these limitations.  In seeking to impose these

26  restrictions, Sonos and its expert, Dr. Wicker, rely solely upon extrinsic references, most of which

27  are expressly describing the functionality of certain, *specific* communication protocols (*i.e.*,

28  802.11, 802.3 or "Ethernet").  *See, e.g.*, Ex. 12 (Wicker Decl.) at ¶¶ 158, 160-161, *citing, e.g.*, Ex.

-24-

16 (SONOS-GVS-00012524) (IEEE 802.11(a) standard), Ex. 17 (SONOS-GVS-00012829) (dictionary definition expressly referring to "Ethernet"), Ex. 18 (SONOS-GVS-00012615) (A beginner's guide to 802.3). These references do not purport to define a "preamble" for *all* types of protocols, and Sonos provides no justification for why the "preamble portion" of the claim should be limited to the form and function of any one specific protocol. As Google's expert, Dr. Min opines, a person of ordinary skill in the art would recognize that a "preamble" portion could be implemented in many different ways, and not all preexisting examples of "preambles" were used for "synchronization" and "initiation" of receiving devices. Ex. 7 (Min Decl.) at ¶¶ 59-60. For example, Dr. Min identifies 3G W-CDMA networks, which used preamble signatures for purposes other than "synchronization" or "initiation" of the receiving device. *Id.* at ¶ 60.

Moreover, the various extrinsic references cited by Sonos and Dr. Wicker do not even consistently require both the "initiation" and "synchronization" features that their proposed construction requires here. *See* Ex. 7 (Min Decl.) at ¶ 61(a)-(d). Notably, while Dr. Wicker provides a brief summary of each of Sonos' extrinsic evidence references, he never once explains where these references discuss an "initiation" function, or even what such an "initiation" function might entail. Ex. 12 (Wicker Decl.) at ¶¶ 158-161; *see Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."). The overly restrictive construction proposed by Sonos is therefore not even supported by the selective extrinsic evidence it has cited.

Thus, the Court should hold that "preamble portion" has its plain and ordinary meaning.

## VI. CONCLUSION

For the foregoing reasons, the Court should adopt Google's proposed constructions and reject the constructions of Sonos.

1

Respectfully submitted,

2

Dated:   March 22, 2021

3

By: */s/ David A. Nelson*

4

QUINN EMANUEL URQUHART & SULLIVAN,
LLP

5

Charles K. Verhoeven (Bar No. 170151)

6

charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor

7

San Francisco, California 94111-4788
Telephone: (415) 875-6600

8

Facsimile: (415) 875-6700

9

David A. Nelson (*pro hac vice*)

10

davenelson@quinnemanuel.com
191 N. Wacker Drive, Suite 2700

11

Chicago, Illinois 60606

12

Telephone:     (312) 705-7400
Facsimile:     (312) 705-7401

13

Attorneys for GOOGLE LLC

14

15

**ATTESTATION**

16

17

I, Patrick D. Curran, am the ECF user whose ID and password are being used to file the foregoing

18

document.  In compliance with Civil L.R. 5-1(i)(3), I hereby attest that David A. Nelson has

19

concurred in this filing.

20

Dated:  March 22, 2021                    */s/ Patrick D. Curran*

21

Patrick D. Curran

22

23

24

25

26

27

28

Case No. 3-20-cv-03845-EMC

GOOGLE'S OPENING CLAIM CONSTRUCTION BRIEF