CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
EVAN BREWER (STATE BAR NO. 304411)
ebrewer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:  +1 650 614 7400
Facsimile:  +1 650 614 7401

GEORGE I. LEE (admitted *pro hac vice*)
lee@ls3ip.com
SEAN M. SULLIVAN (admitted *pro hac vice*)
sullivan@ls3ip.com
RORY P. SHEA (admitted *pro hac vice*)
shea@ls3ip.com
J. DAN SMITH (admitted *pro hac vice*)
smith@ls3ip.com
MATT SAMPSON (admitted *pro hac vice*)
sampson@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:  +1 312 754 0002
Facsimile:  +1 312 754 0003

Attorneys for Defendant
Sonos, Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| Google LLC, | Case No. 3:20-cv-03845-EMC |
| Plaintiff, | **SONOS, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| v. | |
| Sonos, Inc., | Judge:     Hon. Edward M. Chen |
| Defendant. | JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

Page(s)

I.      Introduction ........................................................................................................ 1

II.     Background ........................................................................................................ 1

III.    Claim Construction Disputes ............................................................................ 1

        A.      "Domain Information" ('187 Patent, Claims 1, 3, 4, and 10) .................... 1

        B.      "Logic Circuitry for …" ('187 Patent, Claim 10) ................................... 3

                1.      "Logic Circuitry for …" is a Means-Plus-Function
                        Limitation. .................................................................................... 3

                2.      The Corresponding Structure Requires Special Purpose
                        Programming. ................................................................................ 6

                3.      The '187 Patent Does Not Disclose an Adequate Algorithm............ 8

        C.      "Private Key" ('187 Patent, Claims 1 and 10) ......................................... 9

        D.      "Estimated noise level when there is no desired input received at
                the input of the communication device" ('206 Patent, Claims 3 and
                18) ....................................................................................................... 12

        E.      "Combined search results set"/"The combined search results set
                including at least two of: one or more favorite items from the set of
                [favorite items]/[bookmarks] synchronized for the user; one or
                more search results from a first global index; or one or more search
                results from a second global index" ('375 Patent, Claims 1-11 and
                13-20) .................................................................................................. 14

        F.      "Stored [for the user] in a client-side storage of a client device"
                ('375 Patent, Claims 1 and 17-20) .......................................................... 17

        G.      Preambles of claims 1 and 15 ('586 Patent, Claims 1-5, 7-8, 15-16,
                18, and 20) ............................................................................................ 20

        H.      "Reset element" ('586 Patent, Claims 1-5, 7-12, 14-16, 18, and 20)........ 22

        I.      "Preamble portion" ('586 Patent, Claims 1-5, 7-12, 14-16, 18, and
                20) ....................................................................................................... 24

IV.     Conclusion ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
  618 F.3d 1354 (Fed. Cir. 2010) .................................................................................20

*Apex Inc. v. Raritan Computer, Inc.*,
  325 F.3d 1364 (Fed. Cir. 2003) .............................................................................4, 5, 6

*Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) ................................................................................6, 7

*Audionics Sys., Inc. v. AAMP of Fla., Inc.*,
  No. 12-cv-10763, 2013 WL 9602634 (C.D. Cal. Sept. 12, 2013) .....................................18, 19

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002) ..................................................................................20

*Chef America, Inc. v. Lamb-Weston, Inc.*,
  358 F.3d 1371 (Fed. Cir. 2004) ................................................................................15

*EON Corp. IP Holdings LLC v. AT&T Mobility LLC*,
  785 F.3d 616 (Fed. Cir. 2015) ................................................................................7, 9

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
  673 F.3d 1361 (Fed. Cir. 2012) ................................................................................7, 8

*Fortinet, Inc. v. Sophos, Inc.*,
  No. 13-cv-05831-EMC, 2015 WL 6513655 (N.D. Cal. Oct. 28, 2015) ...............................9

*Harris Corp. v. Ericsson Inc.*,
  417 F.3d 1241 (Fed. Cir. 2005) ..................................................................................7

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
  940 F.3d 680 (Fed. Cir. 2019) ...................................................................................12

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ................................................................................23

*In re Katz Interactive Call Processing Patent Litig.*,
  639 F.3d 1303 (Fed. Cir. 2011) ................................................................................7, 8

*Linear Technology Corp. v. Impala Linear Corp.*,
  379 F.3d 1311 (Fed. Cir. 2004) ..................................................................................5

*Lucent Techs., Inc. v. Gateway, Inc.*,
  525 F.3d 1200 (Fed. Cir. 2008) ................................................................................15

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
    800 F.3d 1366 (Fed. Cir. 2015) ................................................................. 12

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ................................................................................. 14

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ................................................................. 24

*In re Omeprazole Patent Litig.*,
    483 F.3d 1364 (Fed. Cir. 2007) ................................................................. 16

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
    778 F.3d 1021 (Fed. Cir. 2015) ............................................................ 16, 17

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............................................ 10, 24

*Shoes by Firebug LLC v. Stride Rite Children's Grp.*,
    962 F.3d 1362 (Fed. Cir. 2020) ............................................................ 20, 22

*Symantec Corp. v. Acronis, Inc.*,
    No. C-11-5310 (EMC), 2013 WL 752472 (N.D. Cal. Feb. 27, 2013) ......................... 2

*TomTom, Inc. v. Adolph*,
    790 F.3d 1315 (Fed. Cir. 2015) ............................................................ 20, 22

*Tristrata, Inc. v. Microsoft Corp.*,
    No. 11-CV-03797-JST, 2013 WL 5645984 (N.D. Cal. Oct. 16, 2013) ......................... 11

*Trs. of Columbia Univ. in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) .................................................................. 4

*Walker Digital, LLC v. Google, Inc.*,
    66 F. Supp. 3d 501 (D. Del. 2014) ............................................................. 11

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ........................................................... 3, 4, 8

**Statutes**

35 U.S.C. § 112, ¶ 6 .......................................................................... 3, 4, 5, 6, 7

1

## I.      INTRODUCTION

Google is asserting four patents against Sonos: U.S. Patent Nos. 7,899,187 ("the '187 Patent"), 7,065,206 ("the '206 Patent"), 10,140,375 ("the '375 Patent"), and 10,229,586 ("the '586 Patent").  Contrary to Google's representation, except for the '375 Patent, the "inventions" claimed in these patents were not developed by Google.  Rather, Google acquired these patents (or their families) from other companies.  Nor do these patents cover fundamental technologies. Instead, at best, they claim fringe-case functionality that Sonos does not use.  As a result, many of Google's claim construction positions attempt to re-draft the claims to suit their infringement theories.[1]

## II.      BACKGROUND

In its opening brief, Google provides what it purports to be "summar[ies]" for each of the asserted patents.  *See* Dkt. 67 at 1-4.  Sonos disputes several of Google's characterizations, both because they misrepresent the actual claims and because they attempt to describe the purported invention in a way that is inconsistent with the specification.  Where pertinent to a disputed claim construction issue, Sonos discusses these issues below.

Google also provides what it contends to be the level of ordinary skill in the art at the time of the invention for the asserted patents.  Dkt. 67 at 3-4.  While Sonos has proffered slightly different levels (*see* Dkt. 69-12 (Wicker Decl.), ¶¶ 34-35; Dkt. 69-15 (Schmidt Decl.), ¶ 26), the differences are immaterial to the present disputes.

## III.      CLAIM CONSTRUCTION DISPUTES

### A.      "Domain Information" ('187 Patent, Claims 1, 3, 4, and 10)

| Sonos's Construction | Google's Construction |
|---|---|
| Plain and ordinary meaning | information corresponding to a group of devices that share rights associated with a common account for use in accessing protected digital content |

Google's construction is redundant.  Domain information should be given its plain meaning.

[1] The parties identified 20 disputed terms in the Joint Claim Construction Statement ("JCCS"). Dkt. 66.  Google only briefed the terms that the parties identified as "most significant" pursuant to c.  To streamline disputes, for the time being, Sonos does not contest that plain and ordinary meaning may be applied to the terms in the JCCS not briefed herein. However, Sonos reserves its rights to challenge those meanings at a later juncture, if necessary.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

Google's construction merely repeats surrounding claim language, rendering the construction superfluous and unnecessary. *See, e.g.*, *Symantec Corp. v. Acronis, Inc.*, No. C-11-5310 (EMC), 2013 WL 752472, at *2 (N.D. Cal. Feb. 27, 2013). In *Symantec*, the plaintiff sought a construction for "intermediate storage device" that read "storage device that stores data storage blocks prior to storage on the backup storage device." *Id.* This Court declined to apply that construction, reasoning that it was "redundant given the surrounding words of the claim—that is, the surrounding claim language already specifies that the intermediate storage device stores data storage blocks prior to storage on the backup storage device." *Id.* The same holds true here. Google's construction of "domain information" simply repeats nearly two dozen words that are already in the claims. For example, claim 1 in part reads "a domain of devices, which share rights associated with a common account, for use in accessing protected digital content." Dkt. 69-1 ('187 Patent) at 7:60-62. The claim goes on to recite "receiving domain information." Substituting Google's proposed construction for "***domain information***" into the claim results in the following:

> A method for registering a new device as part of a domain of devices, which <u>share rights associated with a common account, for use in accessing protected digital content</u> … , the method comprising the steps of: receiving ***information corresponding to a group of devices that share rights associated with a common account for use in accessing protected digital content*** …

As illustrated, Google's construction simply repeats the description of domain of devices (swapping "domain" with "group") that is already expressly part of the claim. As a result, Google's construction deprives "domain information" of any independent meaning, essentially erasing the term from the claim in favor of other terms already present. Such a construction is improper.

Moreover, the intrinsic evidence does not afford "domain information" any specialized meaning. The specification mentions "domain information" at least 38 times to describe, among other things, "domain name and private domain password" (Dkt. 69-1 ('187 Patent) at 2:4-5, *see also* Abstract, 2:16-17, 5:2-6, 5:23-25, 7:46-49), "desired domain action" (*Id.* at 3:47-50; *see also* 4:24-27), and "credit card information, … , etc." (*Id.* at 5:2-6). In addition, it is clear from the claims (*e.g.*, all claims include the limitation that "the *private* key is based on the domain information") and the specification that the claimed "domain information" is capable of uniquely identifying the domain. Google's construction reads out this plain and ordinary meaning.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

**B.     "Logic Circuitry for …" ('187 Patent, Claim 10)**

| __Sonos's Construction__ | __Google's Construction__ |
|---|---|
| Governed by 35 U.S.C. 112, ¶ 6. Where the function is "providing the domain information to a key issuer which is separate from the domain of devices" and there is no corresponding structure.  At best, the corresponding structure includes a processor or microprocessor, but this is inadequate because there is no sufficient corresponding algorithm. | Plain and ordinary meaning; not governed by 35 U.S.C. § 112, ¶ 6.  To the extent § 112, ¶ 6 applies, sufficient corresponding structure is disclosed in the intrinsic evidence cited below. |

Claim 10 requires "logic circuitry for providing the domain information to a key issuer." This is functional claiming: it recites a generic computing device and describes what that computing device *is* by claiming what it ***must do***.  Moreover, the term "logic circuitry" is used in the '187 Patent as a stand-in for a generic class of computing devices.  And because the specification fails to set forth a corresponding algorithm for the recited function (providing the domain information to a key issuer which is separate from the domain of devices), the claim is indefinite.

**1.     "Logic Circuitry for …" is a Means-Plus-Function Limitation.**

"When a claim term [in this form] lacks the word 'means,' … §112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).

In the context of this patent, "logic circuitry" is not sufficiently definite structure.  Rather, the specification explains that in a preferred embodiment, "logic circuitry … comprises a microprocessor controller such as but not limited to a Motorola MC68328 DragonBall integrated microprocessor or a TIOMAP1510 processor."  Dkt. 69-1 ('187 Patent) at 5:62-65.  This passage establishes three important points: (1) the applicant intended that "logic circuitry" be understood broadly enough to encompass processors and microprocessors, (2) "logic circuitry" is *broader* than that because it "comprises" (but is not limited to) such processors,[2] and (3) the applicant did not intend to limit logic circuitry to the two products. *See* Dkt. 69-12 (Wicker Decl.), ¶ 112.  In addition, the '187 Patent does not expressly link a specific structure to the claimed function. *Id.*, ¶ 114.  At

---

[2] Google's expert's opinion that logic circuitry "would generally be found in a general-purpose microcontroller or purpose-built integrated circuit" (Dkt. 69-5 at ¶ 37) is at odds with the patent. He has it backwards.  According to the '187 Patent, logic circuitry is not found *in* a processor; a processor is part of (or "comprises") the logic circuitry.  Dkt. 69-1 ('187 Patent) at 5:62-65.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

1   most, the patent discusses that a "second device … sends the domain information 209 to key issuer

2   105." *Id.*  But the specification does not identify the "second device," leaving a POSITA to infer

3   what the applicant intended to refer to.  *Id.*, ¶ 114-115.  Reinforcing this open-ended nature, the

4   patent explains that "it is contemplated that these elements within DRM system 100 are configured

5   in well known manners with processors, memories, instruction sets, and the like, which operate in

6   any suitable manner to perform the function set forth herein."  Dkt. 69-1 ('187 Patent) at 4:5-11.

7       In light of this, the term "logic circuitry" here refers to a broad class of undefined computing

8   devices that includes (1) a processor along with and other undefined elements or (2) other "devices"

9   for performing the claimed function.  *See* Dkt. 69-12 (Wicker Decl.), ¶ 112.  In this way, the '187

10  Patent's use of "logic circuitry" is no different than "[g]eneric terms such as 'mechanism,'

11  'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be

12  used in a claim in a manner that is tantamount to using the word 'means' because they 'typically

13  do not connote sufficiently definite structure' and therefore may invoke § 112, para. 6."

14  *Williamson*, 792 F.3d at 1350.  Accordingly, "logic circuitry" used in the '187 patent is a means-

15  plus-function limitation.

16      Google ignores how the patent utilizes "logic circuitry" and instead seems to argue that

17  "logic circuitry" *in any context* is sufficiently definite.  Dkt. 67 at 6-7.  Of course, claim

18  construction is a context-specific endeavor.  *See Trs. of Columbia Univ. in City of New York v.

19  Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) ("The only meaning that matters in claim

20  construction is the meaning in the context of the patent.").  Google's attempt to divorce the analysis

21  from the actual patent at issue is improper.  *Id.*

22      The cases that Google cites are distinguishable.  Those decisions were not based on the

23  mere presence of the term "logic circuitry"—the courts analyzed the specific disclosures and

24  claimed functions before concluding that in *those contexts*, the term was not means-plus-function.

25  Moreover, the patents in question did not use "circuitry" to refer to a generic class of computing

26  devices, they used "circuitry" in an ordinary sense—to refer to "the combination of a number of

27  electrical devices and conductors that, when interconnected to form a conducting path, fulfill some

28  desired function."  *See Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003).

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

1   In this way, the hardware itself—by virtue of the constituent devices and connections—dictates its

2   functionality.  For example, the circuit shown here is composed of well-known logic gates

3   (electrical devices) connected in a particular way to perform a particular function.  Dkt. 69-12

4   (Wicker Decl.), ¶ 70.   The specific hardware

5   dictates the output Z based on the inputs A and B.

6   *Id.* at ¶¶ 74-75.  By contrast, the physical structure

7   of the generic computing devices of the '187

8   Patent's  "logic circuitry"  does  not  dictate  any



9   outcome.  *Id.* at ¶ 79.  Indeed, the same **physical structure** can be used to perform vastly different

10  functions depending on its **software and programming**.  *Id.*

11       So, for example, in *Linear Technology Corp. v. Impala Linear Corp.*, the Federal Circuit

12  analyzed "circuit" limitations that included the objective of the circuit (e.g., "monitoring a signal")

13  and its desired output (e.g., "generat[ing] a first feedback signal").  379 F.3d 1311, 1320 (Fed. Cir.

14  2004).  The court concluded, based on patentee's expert, that "persons of ordinary skill in the art

15  would understand **the structural arrangements of circuit components** from the term 'circuit'

16  coupled with the qualifying language of claim 1" and, therefore, § 112, ¶ 6 did not apply.  *Id.*

17  (emphasis added).  This presents two key take-aways.  First, the court did not simply see the word

18  "circuit" and conclude it was not a means-plus-function limitation.  *Id.*  Instead, the Federal Circuit

19  analyzed the phrase *in the context of the patent*.  Second, the patentee's expert in *Linear Technology*

20  opined that the term "circuit" coupled with the stated objective was sufficient to describe the

21  **structural arrangements of circuit components**.  *Id.*  Google has offered no such evidence here.

22  Rather, Google's expert concludes that "logic circuitry" refers to any combination of logic gates,

23  such as would be in a general-purpose microcontroller.  Dkt. 69-5 (Sherman Decl.), ¶ 37.  In other

24  words, Dr. Sherman essentially admits that logic circuitry **is** a general-purpose computer—not that

25  it connotes any specific structure.  This is consistent with Dr. Wicker's testimony that the hardware

26  (or arrangement of circuit components) of a computer does not dictate the functions it performs—

27  programming or software is necessary.  Dkt. 69-12 (Wicker Decl.), ¶¶ 76-81.

28       In *Apex*, the Federal Circuit overturned the lower court's determination that certain "circuit"

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

terms were means-plus-function, concluding that the "primary source of [the lower court's] error lies in [its] reliance on single words of the limitations, e.g., 'circuit,' as opposed to the limitations as a whole, e.g., 'a first interface circuit for receiving keyboard and cursor control device signals from the workstation.'"  325 F.3d at 1372.  Again, instead of basing its conclusion on the word "circuit," the court in *Apex* considered how that term is used in the patent.  Specifically, the court pointed to a dictionary definition of "circuit" that recited "the combination of a number of electrical devices … that, when interconnected …, fulfill some desired function" and concluded that the specification did not use the term "in a manner clearly inconsistent with the ordinary meaning."  *Id.* at 1373.  In contrast, here, the '187 specification makes clear that "logic circuitry" is not limited to a specific set of components that, when interconnected, perform a prescribed function.[3]  Rather, "logic circuitry" is an undefined class of "devices" that may include a processor which must be programmed to perform functions.  Dkt. 69-12 (Wicker Decl.), ¶¶ 76-81, 117-18.

Google's cited cases confirm that whether a term is means-plus-function is case-specific.  In this patent, "logic circuitry" does not recite sufficiently definite structure and § 112, ¶ 6 applies.

**2.      The Corresponding Structure Requires Special Purpose Programming.**

Because "logic circuitry" is a means-plus-function limitation, its scope is defined by the disclosed structure.  *Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1331 (Fed. Cir. 2008).  If the specification lacks structure for performing the claimed function, the claim is indefinite.  *Id.*  The claimed function here is "providing the domain information to a key issuer, which is separate from the domain of devices."  Dkt. 69-1 ('187 Patent) at Claim 10.[4]

As previously noted, the only physical structure tied to sending domain information in the specification is a "second device."  Dkt. 69-1 ('187 Patent) at 6:38-43; Dkt. 69-12 (Wicker Decl.), ¶¶ 114-15.  And the only structures identified in the specification as being part of (but not

---

[3] Although the *Apex* court noted that a qualifier such as "logic" "certainly identifies some structural meaning to one of ordinary skill in art," the court did not hold so definitively.  325 F.3d at 1373.  Further, it did not specifically assess the term "logic circuitry," as it was not a term in the claim at hand, nor did *Apex* concern the same specifications as here where "logic circuitry" is not consistent with the traditional dictionary definition or "ordinary meaning of the term 'circuit.'"  *Id.* at 1374.

[4] Google appears to contend that if § 112, ¶ 6 applies, the claimed function is simply "providing information."  Dkt. 67 at 7-8.  That ignores the express language of the claim, which recites the function of providing *specific* information to a *specific* destination, outside the domain of devices.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

coextensive with) logic circuitry are the examples of particular processors.  Dkt. 69-1 ('187 Patent) at 5:62-65.  But "in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'"  *Aristocrat*, 521 F.3d at 1333.  Accordingly, "the corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005).

Google, relying on the Federal Circuit's decision in *In re Katz*, argues that the '187 Patent need not specify an algorithm because the recited function is a "common data output operation of a general purpose processor."  Dkt. 67 at 8.  This is incorrect because the claimed function is not a common data output operation of a general purpose processor, as detailed below.  The Federal Circuit has made clear that *Katz* is a "narrow" exception and that "[i]t is only in the rare circumstances where **any** general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed."  *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012) (emphasis added).  The Federal Circuit further clarified *Katz*'s narrow exception in *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616 (Fed. Cir. 2015).  The court explained that "special programming" had nothing to do with how complex or simple the function was to implement.  *See id.* at 623.

> To the contrary, ... "special programming" includes any functionality that is not "coextensive" with a microprocessor or general purpose computer. ... A microprocessor or general purpose computer lends sufficient structure only to basic functions of a microprocessor. All other computer-implemented functions require disclosure of an algorithm.

*Id.*[5]

Providing domain information to a key issuer is not a "basic" function of a microprocessor, nor is it "coextensive" with a microprocessor or general purpose computer. *See* Dkt. 69-12 (Wicker Decl.), ¶¶ 118, 122.  For example, according to the specification, providing domain information to a key issuer requires at least identifying an appropriate key issuer, identifying a suitable transmission means, contacting the recipient, exchanging unit certificates to establish a

---

[5] The district court cases cited by Google pre-date *EON*.

communication channel, and sending the domain information.  Dkt. 69-1 ('187 Patent) at 6:32-40.  These particularized steps require specialized instructions.  Dkt. 69-12 (Wicker Decl.), ¶ 118.  In no way is "providing domain information" performed by "merely plugging in a general-purpose computer."  *See Ergo*, 785 F3d at 621.  Accordingly, "[a] special purpose computer is required because the [recited structure] has specialized functions as outlined in the written description."  *Williamson*, 792 F.3d at 1352.

Google's arguments otherwise are unavailing.  Google relies on the specific hardware identified in the specification, arguing that *those* processors can perform the recited function.  Dkt. 67 at 8-9.  They don't help Google for two reasons.  First, even if ***those*** components can perform the recited function, that does not mean that the function is coextensive with ***any*** processor or computing device.  More importantly, even if those components are capable of performing the recited function, that does not mean they transmit domain information to a key issuer without the use of special programming.

The narrow *Katz* exception is not applicable here.  The recited function is not co-extensive with a general purpose computer, and so the '187 Patent must disclose an appropriate algorithm.

### 3.  The '187 Patent Does Not Disclose an Adequate Algorithm.

The claim term is indefinite because the '187 Patent fails to disclose an adequate algorithm to perform the claimed function (providing domain information to a key issuer).  At most, it states:

> At step 309, the second device uses the network link 107 . . . to contact key issuer 105.  The second device follows the same protocol with key issuer 105 as the first device did when establishing the domain . . . .  At step 311, [a] the second device communicates its unit certificate 207 to key issuer 105 and may use its unit private key 208 to respond to a challenge.  Once the channel is established it [b] sends the domain information 209 to key issuer 105.

Dkt. 69-1 ('187 Patent) at 6:33-40.  Breaking this passage down into its constituent pieces, first (step 309) the second device uses the network link to contact the key issuer following "the same protocol" previously described, then (step 311[a]) the second device communicates its key unit certificate to key issuer and may use its unit private key to respond to a challenge, and finally (step 311[b]) once the channel is established, the domain information is sent.  *Id.*

Google contends that if "logic circuitry" is a means-plus-function limitation reciting a

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

1  special purpose computer, this is the disclosed algorithm.  Dkt. 67 at 10.  But this "algorithm" is

2  incomplete. Specifically, while it requires that: "[t]he second device follows the *same protocol* with

3  key issuer 105 as the first device did when establishing the domain" ('187 Patent at 6:34-36

4  (emphasis added)), no such protocol is ever described.  Dkt. 69-12 (Wicker Decl.), ¶ 121.

5       Google attempts to fill this hole with expert testimony.  To be sure, where a patent discloses

6  a *partial* algorithm (like here), expert testimony may be used to "fill in the blanks."  *Fortinet, Inc.*

7  *v. Sophos, Inc.*, No. 13-cv-05831-EMC, 2015 WL 6513655, at *8 (N.D. Cal. Oct. 28, 2015) (citing

8  *EON Corp.*, 785 F.3d at 624).  But here, Google's expert testimony is unavailing. Dr. Sherman

9  opines that "the '187 Patent disclosure describes at least one implementation of such a protocol in

10  which the device supplies its unit certificate to the key issuer to establish its authenticity prior to

11  the device supplying the domain information to that key issuer."  Dkt. 69-5 (Sherman Decl.), ¶ 48.

12  But *that* step is already specifically called for in step 311[a].  It says nothing about what a POSITA

13  would understand to be the protocol used when contacting the key issuer, as required by step 309.

14       The specification does not disclose a complete algorithm; the claim is indefinite.

15  **C.**    **"Private Key" ('187 Patent, Claims 1 and 10)**

| **Sonos's Construction** | **Google's Construction** |
|---|---|
| a non-public key used for either decrypting data or generating digital signatures | a non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be computed |

20       The parties agree that the "private key" of the '187 Patent is a non-public key that is used

21  in relation to a "cryptographic algorithm."  Dkt. 67 at 10.  The real crux of the dispute is what type

22  of cryptographic function the private key powers.  Sonos's construction[6] mirrors a definition

23  provided in the patent and is consistent with how a POSITA would understand "private key."

24       The patent provides a definition for "private key":

25         Prior to describing the DRM system in accordance with the preferred embodiment
       of the present invention *the following definitions* are provided to set the *necessary*

---

27  [6] During a meet-and-confer process, the parties attempted to reach a resolution on this term. In that
discussion, both parties exchanged proposed compromise constructions.  No agreement was

28  reached.  In its briefing, Google attacks one of Sonos's proposed compromise constructions, instead
of Sonos's actual construction, as presented in the JCCS.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

> ***background.*** Public-Key Cryptography—Cryptographic technique that uses a pair of keys, a public and a private key.  The ***private key is used for either decrypting data or generating digital signatures*** and the public key is used for either encrypting data or verifying digital signatures.

Dkt. 69-1 ('187 Patent) at 2:42-48 (emphasis added). *Prior to* describing a preferred embodiment, the specification sets forth definitions that provide necessary background.  Part of that definitional necessary background is that the private key is used for either decrypting data or generating digital signatures.  This is the minimum of what a private key in this context must do.  A private key may be used for other purposes, but—as made clear by the patentee's lexicography—it must at least be used for either decrypting data or generating digital signatures.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).

The patent also notes that other ways of securing the DRM system "are possible using symmetric key techniques or broadcast key encryption techniques."  Dkt. 69-1 ('187 Patent) at 7:54-58.  But those alternative methods, even if they use private keys, are still used to decrypt data. *See* Dkt. 69-13 (Sherman Dep.) at 44:17-21, 56:3-8; Dkt. 69-12 (Wicker Decl.), ¶ 127.

Divorced from the '187 Patent, Google attempts to muddy the water by discussing other hypothetical uses for private keys such as "hash algorithms," "message authentication codes, key expansion, pseudorandom number generation and sharing of secrets."  Dkt. 67 at 12.  But none of these are mentioned in the patent, much less included in the patent's ***definition*** of "private key." Indeed, the patent's recitation of alternative techniques are listed as a closed set: "alternative methods … are possible using symmetric key techniques or broadcast key encryption techniques." Dkt. 69-1 ('187 Patent) at 7:54-57.  The common thread between all disclosed methods is that the "private key" is used for decrypting data or generating digital signatures. *See, e.g.*, Dkt. 69-12 (Wicker Decl.), ¶ 127; Dkt. 69-13 (Sherman Dep.) at 44:12-16.  Hypothetical functions untethered to the claims or specification cannot possibly override the express definition included in the patent.

The patent's definition of private key is enforced throughout the patent.  The claims state that the "private key" issued by the key issuer is used to "access[] [the] protected digital content." The specification refers to this private key as the "DRM private key."  *See, e.g.*, Dkt. 69-1 ('187 Patent) at 3:38-41, 4:39-41.  The patent further explains that "[t]he content encryption key is

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

1    encrypted with the DRM public key so it can be *decrypted only using the DRM private key*" and

2    "[i]n order to execute digital content 204, user equipment 101 must access DRM private key 206

3    and *uses it to decrypt* the content encryption key from rights object 205." *Id.* at 4:54-56, 6:57-61

4    (emphasis added).  Thus, confirming the patent's express definition, the private key is used to

5    *decrypt* data as a part of accessing the protected digital content.

6          Contemporaneous extrinsic evidence confirms the patent's definition.  Specifically, the

7    evidence all indicates that private keys must decrypt, though they may *also* be used for other

8    purposes.  Dkt. 69-12 (Wicker Decl.), ¶¶123-28.  For example, *Newton's Telecom Dictionary*

9    (2001) defines "private key" as "[a]n encryption technique which requires that the *decrypting* key

10   be kept secret."  Ex. A[7] (emphasis added).  Relevant texts also confirm this: in a symmetric

11   cryptosystem "[t]he keys for encryption and decryption are equal" and in an asymmetric

12   cryptosystem the private key "can decrypt."  Ex. B (Introduction to Cryptography, 2001) at 71-72.[8]

13         Additionally, courts regularly construe similar "key" terms to refer to the data used to

14   encrypt or decrypt data. *See, e.g., Tristrata, Inc. v. Microsoft Corp.*, No. 11-CV-03797-JST, 2013

15   WL 5645984, at *10 (N.D. Cal. Oct. 16, 2013) (construing "key" as "[a] string of bits used in

16   encryption to make data unreadable, or in decryption to render encrypted data readable.'"); *Walker*

17   *Digital, LLC v. Google, Inc*., 66 F. Supp. 3d 501, 513 (D. Del. 2014) (construing "cryptographic

18   key" to mean "data used as an input to an operation to encrypt or decrypt other data.").

19         Finally, Google's discussion of the "unit private key" is a distraction.  First, the "unit private

20   key" is not the "private key" of the claims.  The private key of the claims must be issued by a key

21   issuer and is utilized by all the devices within the domain of devices.  Dkt. 69-1 ('187 Patent) at

22   Claims 1 and 10.  By contrast, the unit private key is preloaded during manufacturing, and is

23   therefore unique to the device.  *Id.* at 4:20-24.  Second, there is nothing in the specification that

---

[7] All lettered exhibits referenced herein are attached to the declaration of Alyssa Caridis.

[8] Google spends much of its briefing attacking what it contends is Sonos's construction (but is not).
*Supra* n. 6.  It bears noting that the language Google attacks is taken directly from the National
Institute of Standards and Technology's Guideline for Using Cryptographic Standards in the
Federal Government.  *See* Ex. C at 4.  And Google's expert (outside the context of his paid
consultancy work) directs the readers of his academic papers to that exact publication for
background on cryptography.  Dkt. 69-13 (Sherman Dep.) at 18:6-20:4; 36:5-17.

1   would suggest the unit private key is not used for decryption or encryption as Google assumes.

2   Indeed, Dr. Wicker notes that the use of the term "private key" even in this phrase points "towards

3   encryption or decryption" in the context of the patent.  Dkt. 69-14 (Wicker Dep.) at 34:3-21.

4          Google's proposed construction is flawed.  Distilled down, Google's construction is that a

5   private key is an input to a cryptographic algorithm.  Of course, this lacks the key's necessary

6   decryption capability (as confirmed by the patent's definition).  But it would also improperly sweep

7   in elements that no POSITA would consider a key.  For example, in their most basic form,

8   cryptosystems take *plaintext* as an input and output *ciphertext*.  Dkt. 69-12 (Wicker Decl.), ¶ 82.

9   In those systems, the algorithm that is used to decipher the plaintext to ciphertext is controlled by

10  a key.  *Id.*   But that plaintext readily fits Google's construction—it is used as an input to a

11  cryptographic algorithm and without it, the output of the algorithm cannot be computed.

12          **D.**      **"Estimated noise level when there is no desired input received at the input of**
13                  **the communication device" ('206 Patent, Claims 3 and 18)**

| **Sonos's Construction** | **Google's Construction** |
| --- | --- |
| Indefinite | an estimate of noise based on the amount of noise measured when the communication device does not detect speech in the received signal |

17          On its face, this term is subject to several conflicting meanings, and the specification

18  provides no guidance as to which meaning is intended; the term is indefinite.  *See HZNP Medicines*

19  *LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 698 (Fed. Cir. 2019) (quoting *Media Rights Techs.,*

20  *Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015)) ("[A] claim is indefinite if

21  its language might mean several different things and no informed and confident choice is available

22  among the contending definitions.").  Google's construction should be rejected as it amounts to

23  nothing more than an attempt to rewrite its claim to suit Google's infringement theories.

24          Claim 3 recites: "wherein the background noise is based on an estimated noise level when

25  there is no desired input received at the input of the communication device."[9] Several ambiguities

26  exist: (1) what is "estimated" noise; (2) what does "when" modify; and (3) what is a "desired input."

27

28  _____
    [9] Claim 18 is functionally equivalent but depends on apparatus claim 9.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

*First*, the patent does not explain what it means for a noise level to be "estimated"—what is the estimate based on and how is it calculated?  The specification mentions "estimated" noise twice.  First, the patent explains that "[t]he amount of noise can be based on an estimated and smoothed noise level when there is no desired input nor acoustic echo received at the audio input of the electronic device." Dkt. 69-2 ('206 Patent) at 2:61-67.[10]  This just repeats the claim language while adding an additional concept (smoothing) and an additional condition (when there is no echo), it does not resolve the ambiguity.  If there is no desired input or echo, the only thing left is noise (*id.* at 3:22-24), which can be *actually* measured.  But the claims (and specification) do not discuss taking an *actual* measurement of noise—they recite *estimating* noise (in an undisclosed way, using undisclosed inputs).  Second, the specification discloses that the claimed invention can generate "a noise estimate based on the input signal" (*id.* at 5:17-20), but not how.

*Second*, it is unclear what "when" modifies. Read in context, "when" could refer to: (1) when no desired input is received, the background noise is based on an estimate, or it could mean that (2) when no desired input is received, an estimate of the noise level is calculated, and at a later point, the background noise is based on this estimate.[11] As with "estimate", the specification does not resolve the meaning, but merely repeats the language of the claim.

*Finally*, the specification does not explain "desired input."  Google relies heavily on a passage that reads: "In operation, the audio output 130 can generate an output acoustic signal. The audio input 140 can receive an input acoustic signal such as speech. The input acoustic signal may include a desired signal component, a noise signal component, and an echo signal component." *Id.* at 3:20-24. This disclosure does not limit a "desired signal" to speech. Rather, speech is only an example of an "input acoustic signal" and a *sub-component* of that example is a "desired signal component."  None of the other passages that Google cites provide any explanation of what is meant by "desired input."  *See, e.g.*, *id.* at 2:61-67 (mentions "desired input" without explanation).

---

[10] A nearly identical disclosure is repeated in the specification at column 3, lines 64-67, replacing "audio input" with "input 140" and "electronic device" with "communication device 100."

[11] Without explaining why, Google appears to favor the latter meaning.  *See* Dkt. 67 at 13.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

1   Setting aside the uncertainty regarding desired input, this term could mean: (1) background

2   noise is always "based on" an estimate of what the noise level is or will be when there is no "desired

3   input" received; (2) background noise is "based on" a measurement of the noise level taken when

4   there was no "desired input" and thus when used later in time is an "estimate" of the noise level;[12]

5   or (3)  only when there is no "desired input" received at the input of the device, the background

6   noise is "based on" an estimated noise level; otherwise the noise level is directly measured.  The

7   term is indefinite.  *See Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901 (2014) ("[A]

8   patent is invalid for indefiniteness if its claims, read in light of the specification … fail to inform,

9   with reasonable certainty, those skilled in the art about the scope of the invention.").

10   **E.**   **"Combined search results set"/"The combined search results set including at**
11   **least two of: one or more favorite items from the set of [favorite**
       **items]/[bookmarks] synchronized for the user; one or more search results from**
12   **a first global index; or one or more search results from a second global index"**
       **('375 Patent, Claims 1-11 and 13-20)**

13

| **Sonos's Construction** | **Google's Construction** |
|---|---|
| Two or more of: [a], [b], or [c] | "combined search results set" means "a search results set that includes results from at least one personalized search."  As a result of that construction, the larger phrase means "the combined search results set including at least one or more favorite items from the set of favorite items synchronized for the user and either one or more search results from a first global index or one or more search results from a second global index" |
| Where [a] is "one or more favorite items from the set of favorite items", | |
| Where [b] is "one or more search results from a first global index", and | |
| Where [c] is "one or more search results from a second global index." | |

20   The claim language is straightforward.  It requires presenting a "combined search results

21   set."  It then explicitly sets forth the bounds of that set: "*the* combined search results set including

22   *at least two of*: [A] one or more favorite items from the set of favorite items synchronized for the

23   user; [B] one or more search results from a first global index; or [C] one or more search results

24   from a second global index."  Dkt. 69-3 ('375 Patent) at claim 1 (emphasis added).  There is no

25   ambiguity—the claimed set is defined to include at least two of [A], [B], or [C].

26   Google ignores this and attempts to rewrite its claims.  Its construction can be simplified to:

27   "the combined search results set including [A] one or more favorite items from the set of favorite

28   _____

[12] This reading corresponds with Google's proposed construction.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

items synchronized for the user and [B / C] one or more search results from a global index."[13]  In other words, Google's construction would exclude the combination of B and C because it *always* requires that A be part of the combination.  That is not what the claim says.  The Federal Circuit "has repeatedly held that courts may not redraft claims to cure a drafting error made by the patentee," even when needed "to make them operable or to sustain their validity." *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008).  In *Lucent*, the Federal Circuit agreed that the district court's construction was "not supported by the sole embodiment described in the specification." *Id.*  But the court upheld the construction because "the claim language clearly supports [it]." *Id.*  Specifically, the court noted that "where we conclude that the claim language is unambiguous, we have construed the claims to exclude all disclosed embodiments. *Id.* at 1215-16. Here, the language is clear—the combined search results set covers the combinations A+B, A+C, and B+C. *See id.* at 1215 ("[W]hen the claims are susceptible to only one reasonable construction, we will construe the claims as the patentee drafted them.").

The prosecution history confirms that the plain language should control.  The original claims recited "a search result … based at least in part on the personalized result and the general result," similar to what Google now proposes.  Ex. D (12/26/17 Application) at GOOG-GVS-00000183.  In a preliminary amendment, the applicant canceled those claims, replacing them with claims that did not mention searching. *Id.* (12/26/17 Prelim. Amendment) at GOOG-GVS-00000191.  Later, in response to a rejection, the applicant amended the claims to recite presenting search results, including the disputed language. *Id.* (6/13/18 Amendment) at GOOG-GVS-00000642.  This "suggests that the patentees intentionally used" the current language—requiring at least two out of three possibilities—rather than requiring a personalized result as in the original claims. *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374-75 (Fed. Cir. 2004) ("patentees consciously selected 'to' rather than 'at'" even though that construction led to the "nonsensical" result of heating dough "to" 400°F).

---

[13] Functionally, B and C are the same: they are "global index[es]," just designated as "first" or "second" to tell them apart.  Since the claim is open-ended, and Google's formulation only requires "at least one," there is no need, in Google's proposal, to even refer to the "second" global index.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

1    The only way for Google to narrow the unambiguous claim language is by showing intrinsic

2    evidence that includes either lexicography or disavowal.  *See Pacing Techs., LLC v. Garmin Int'l,*

3    *Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015).  Google does not argue for lexicography and the *Pacing*

4    court provided an instructive example of disavowal.  There, the Federal Circuit deviated from the

5    plain meaning of the phrase "repetitive motion pacing system for pacing a user" only where the

6    specification "contain[ed] a clear and unmistakable statement of disavowal or disclaimer."  *Id.* at

7    1025.  The specification included 19 enumerated "objects of the invention" and then concluded that

8    those objects "are accomplished … by a repetitive motion pacing system that includes … a data

9    storage and playback device adapted to producing the sensible tempo."  *Id.*  The court concluded

10   "this clearly and unmistakably limits 'the present invention' to a repetitive motion pacing system

11   having a data storage and playback device that is adapted to producing a sensible tempo."  *Id.*  No

12   such disavowal or clear and unmistakable limit is present here.

13       First, Google *ignores* that "combined search result" is explicitly defined in the claim and

14   argues that the "combined search results set" must be a combination of different "types" of results.

15   Google's support for this assertion are passages in the specification describing exemplary

16   embodiments: "***In one embodiment***, a search engine combines search results…" (Dkt. 67 at 15

17   (citing '375 Patent at 2:61-66) (emphasis added)); "***Embodiments*** of the present invention ***may***

18   combine the results of several types of results" (Dkt. 67 at 15 (citing '375 Patent at 9:53-55)

19   (emphasis added)).  It is improper to import limitations from preferred embodiments into the

20   specification, much less limitations that are explicitly optional.  *In re Omeprazole Patent Litig.,*

21   483 F.3d 1364, 1372 (Fed. Cir. 2007) ("[E]mbodiments and examples appearing in the specification

22   will not generally be read into the claims.").  And Google's cited embodiments are a far cry from

23   the "unmistakabl[e] limits" required by the Federal Circuit.  *See Pacing Techs.*, 778 F.3d at 1025.

24       Google also points to Figure 3's depiction of "three distinct 'sub-processes,'" arguing that

25   a combined search result requires two or more sub-processes.  Dkt. 67 at 16.  Not only is Figure 3

26   an illustration of a single embodiment (Dkt. 69-3 ('375 Patent) at 2:53-55), but the claims recite "a

27   combined search results set generated via ***one*** or more search sub-processes."  Thus, to the extent

28   Google equates "types" of results with separate sub-processes, it is proposing yet more improper

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

1  rewriting of the claim—changing "one or more" sub-processes to "two or more."

2      Google next argues that the '375 Patent has a "consistent emphasis on … 'personalized'

3  search." *Id.* at 16.  But again, Google is unable to point to any disavowal in the '375 specification

4  that would necessitate changing the claim's plain language.  In fact, Google's cited passages only

5  refer to searching bookmarks or "personalized results" with respect to specific embodiments; they

6  do not purport to describe "the invention."  *See, e.g.*, Dkt. 69-3 ('375 Patent) at 2:25-33 ("*In one*

7  *embodiment*, a search engine … provid[es] a search result ... based at least in part on the

8  personalized result and the general result."), 2:61-3:3 ("*In one embodiment*, a search engine

9  combines search results obtained from a global index or global indexes with those received from a

10 list of a user's favorite sites …").  And one of the cited passages confirms that personalized results

11 are an optional aspect of the combined results: "Embodiments of the present invention *may*

12 combine conventional network searches with, *for example*, personalized searches utilizing

13 information provided by the user …"  *Id.* at 8:46-50 (emphasis added).  These descriptions of

14 particular embodiments do not meet the "exacting" standard of disavowal required to depart from

15 the plain language.  *See Pacing Techs.*, 778 F.3d at 1024-25.

16     Finally, Google argues that the '375 Patent distinguishes its personalized search from the

17 prior art.  In support, Google points to only a single reference of "conventional search engines" in

18 the specification.  Dkt. 67 at 17 (citing '375 Patent at 8:61-65).  This passage neither distinguishes

19 nor disparages the prior art.  Moreover, the '375 Patent also recognizes that systems for "searching

20 previously-stored bookmarks" were "conventional," Dkt. 69-3 ('375 Patent) at 2:6-17, defeating

21 Google's argument that a particular type of search provides any contrast with the prior art.

22    **F.   "Stored [for the user] in a client-side storage of a client device" ('375 Patent,**
23         **Claims 1 and 17-20)**

24

| **Sonos's Construction** | **Google's Construction** |
|---|---|
| retained in a computer-readable medium of the client device for later retrieval by the user.  Excludes transitory storage. | Plain and ordinary meaning |

25

26

27    The independent claims of the '375 Patent recite modifying a set of favorite items or

28 bookmarks "stored for the user in a client-side storage of the client device" (claim 1) or "stored in

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

a client-side storage of the [first/second] client device" (claim 17).  Sonos's proposed construction clarifies the meaning of the claim language and focuses the issues in this case by addressing the scenario of transitory storage.  Contrary to Google's argument, Sonos's construction reflects the ***function*** of the storage and does not exclude any physical ***form*** of media.  Nor does Sonos's construction impose a "negative limitation"—the phrase "excludes transitory storage" is intended to clarify a situation that may not be apparent to a layperson but which a POSITA would already understand from both the claim language and Sonos's construction.

Sonos's construction is consistent with the claim language.  The '375 Patent explains that favorites/ bookmarks are a way for a user to later refer back to a website.  *See, e.g.*, Dkt. 69-3 ('375 Patent) at 1:45-51 ("[A] common use of bookmarks is for navigation to sites … Accordingly, bookmarks that the user continues to use are a valuable resource for the user."), 2:6-18 ("Various other conventional bookmark-related software products provide the user with functionality to facilitate the use of bookmarks … [such as] searching previously-stored bookmarks by keyword, and … improv[ing] the user's ability to visit previously visited sites…"); Dkt. 69-15 (Schmidt Decl.), ¶¶ 48-51, 54, 64.  The claims of the '375 Patent require that specific pieces of data—favorite items or bookmarks—are "stored" in "client-side storage."  Thus, in view of the specification, when the claim term recites "stor[ing]" such bookmarks "***for the user***" in "client-side ***storage***," the entire purpose is so that the user may access them later, as Sonos's construction provides.[14]  *Id.*, ¶ 64.

The specification confirms that when bookmarks are "stored" in "storage," it is for later retrieval.  For example, the '375 Patent describes an embodiment "for storing bookmarks, ratings, and annotations" in a server-side bookmark manager. Dkt. 69-3 ('375 Patent) at 7:21-65.  The user submits information to the bookmark manager "for storage as a bookmark," and the server "receives the URL, … ***stores the URL***, its rating(s), and its annotations) [*sic*] in the bookmark database 140 ***for later retrieval*** 206."  *Id.* at 7:32-35, 7:50-53 (emphasis added).  As one example,

---

[14] Google miscites *Audionics* for the proposition that "storage" "does not require permanent storage or retaining information for later retrieval." Dkt. 67 at 19.  To the contrary, the court found "an item that is 'stored' is kept secure and intact ***until some later time when it can be retrieved***." *Audionics Sys., Inc. v. AAMP of Fla., Inc.*, No. 12-cv-10763, 2013 WL 9602634, at *23 (C.D. Cal. Sept. 12, 2013) (emphasis added).  Sonos's construction does not require "permanent" storage, so Google's argument in that regard is irrelevant.

the user provides preexisting bookmarks "that they would like to **make available** for their searches." *Id.* at 7:53-58 (emphasis added).  The '375 Patent also explains "a user 112a can track their conventional browser bookmarks using server-side ***storage***," so that "[t]hese bookmarks can … be ***made available*** to the user on all the various computers the user uses."  *Id.* at 5:34-39 (emphasis added).  Thus, "stor[ing]" bookmarks in "storage" allows later access by the user.

There is nothing unusual about the '375 Patent's usage of the words "store" and "storage."  The common understanding, as confirmed by technical dictionary definitions, is that those words refer to retaining data for later retrieval, as Sonos's construction provides.  *See* Dkt. 69-15 (Schmidt Decl.), ¶ 67; Exs. E-H (definitions); *Audionics*, 2013 WL 9602634, at *22-23 ("[A]n item that is 'stored' is kept secure and intact until some later time when it can be retrieved.").

In contrast to storing bookmarks for later availability and access, there are situations in which data may reside in computer memory only while in transit.  For example, if a user uses a client device to enter a bookmark to be stored on the server, the bookmark will pass through the client device in the process of being transmitted to the server.  However, the user cannot later access that transitory data in the client; thus, such a scenario does not constitute being "stored in a client-side storage of the client device" within the meaning of the claims.  *See* Dkt. 69-15 (Schmidt Decl.), ¶¶ 69-70.  By analogy, when a person mails a letter by placing it in a mailbox, the letter is not "stored" in "storage" in the mailbox; it is merely in transit.

Contrary to Google's argument, Sonos's construction does not limit the "form of media" that would constitute "client-side storage of a client device."  Dkt. 67 at 19.  Sonos's construction requires only a "computer-readable medium."  *Compare id.* at 18-19 (citing '375 Patent at 3:23-33).[15]  Nor does Sonos's construction impose a negative limitation by "exclud[ing]" transitory storage—that additional language merely makes clear to a layperson what is already apparent to a POSITA: that, by definition, transitory storage does not meet Sonos's construction requiring "retain[ing]" data "for later retrieval by the user."  *See* Dkt. 69-15 (Schmidt Decl.), ¶ 69.

---

[15] Dr. Schmidt only explained that "a temporary memory buffer or cache" are places that may be used for "transitory storage of data," Dkt. 69-15 (Schmidt Decl.), ¶ 69.  That does not exclude such media when used to "retain[]" the bookmarks "for later retrieval by the user."

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

### G.    Preambles of claims 1 and 15 ('586 Patent, Claims 1-5, 7-8, 15-16, 18, and 20)

| Sonos's Construction | Google's Construction |
|---|---|
| Preambles are not limiting | Preambles are limiting |

The preamble of claim 1 recites "[a]n audio-enabled wireless device configured for bidirectional wireless communication in a wireless mesh network, the wireless device comprising…"; claim 15's preamble is "a wireless mesh network system."  Neither is limiting.

Courts generally presume that preambles are not limiting.  *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010).  A preamble may be limiting if "it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim."  *Shoes by Firebug LLC v. Stride Rite Children's Grp.*, 962 F.3d 1362, 1367 (Fed. Cir. 2020).  The Federal Circuit has provided "guideposts" to consider when determining whether a preamble is limiting. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-09 (Fed. Cir. 2002).  In particular, preambles are likely to be limiting: (1) if the preamble provides antecedent basis for other claim elements, (2) if the preamble is essential to understand limitations in the claim body, (3) if the preamble recites "additional structure or steps underscored as important by the specification," and (4) if there is "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art."  *Id.*  But if the patent "defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention," the preamble is not limiting.  *Shoes by Firebug*, 962 F.3d at 1367.  Further, even if part of a preamble is limiting, a court need not find the *entire* preamble limiting.  *See TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015).

The preamble of claim 1 can be broken into three parts: (1) an audio-enabled wireless device, (2) configured for bidirectional communication, and (3) in a wireless mesh network.  The preamble of claim 15 consists of just the final part.  None of these parts are limiting.

First, consider "a wireless mesh network."  There is no argument that this element provides antecedent basis for other claim elements—the term does not appear anywhere else in any claim. In fact, "wireless mesh network" or "mesh network" ***is not found anywhere in the '586 Patent's***

1    *specification*.  Given that mesh networks are neither discussed in the specification nor relied on

2    during prosecution, it is impossible to conclude that they are essential to understand the limitations

3    or underscored as important by the specification.

4    Google tries to gloss over this critical fact by redefining "mesh network" to "the capability

5    to form multiple paths between nodes of the network" and arguing that the language defines the

6    environment in which the invention operates.  Dkt. 67 at 21.  Google's insistence that the "ability

7    to use alternative network paths is an important feature of the claimed invention" is not supported.

8    First, Google points out that the "present invention" provides a "low cost, robust, wireless sensor

9    system."  *Id.*  Google then notes that "a disclosed approach" involves re-routing signals.  *Id.*  But

10   that "disclosed approach" is only describing "one embodiment."  Dkt. 69-4 ('586 Patent) at 9:23-

11   33.  In other words, Google relies on a single embodiment (out of dozens disclosed) to conclude

12   that the use of alternative network paths is a "significant feature" or a "fundamental characteristic"

13   of the invention.  This is not proper.

14   Google's supposed "significant feature" is also contradicted by the '586 Patent. Figure 1

15   and its description do not show multiple communication paths between nodes—it merely shows a

16   network topology where sensor units communicate with a base unit through one communication

17   path via a repeater unit.[16]  Dkt. 69-4 ('586 Patent) at Figure 1.  Neither "mesh network" nor

18   Google's articulation of what that means are essential to the claims or underscored as important.

19   Next, we turn to "configured for bidirectional communication."  Google points only to the

20   "Field of the Invention" to argue that this portion of the preamble is "important" and therefore

21   should be limiting.  But the ***actual*** "Field of the Invention" is "a wireless sensor unit system

22   providing bi-directional communication between a sensor (e.g., smoke sensor, fire sensor,

23   temperature sensor, water, etc.) and a repeater or base unit in a building protection system."  Dkt.

24   69-4 ('586 Patent) at 1:38-42.  The patent here is discussing a building protection system that

25   provides for bi-directional communication between different ***types*** of devices (sensors on the one

26   hand and repeaters or base units on the other).  *Id.*  Google attempts to recast this passage as saying

27

28   [16] There is no disclosure in the '586 Patent that the sensor units are capable of communicating amongst themselves.  Each sensor unit is described only as communicating with a base unit.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

1  that bi-directional communication between *any* devices in *any* type of system is "important."

2  However, this is merely an attempt to distract the court and avoid addressing the fact that the patent

3  does not disclose sensors communicating bi-directionally with one another.

4    The final piece of claim 1's preamble is an "audio-enabled wireless device."  In *Shoes by*

5  *Firebug*, the Court analyzed two claims with "textile footware" in the preambles.  962 F.3d at 1367.

6  When finding the first claim preamble not limiting, the court reasoned that because the body of the

7  claim reintroduced the "footware" element of the preamble, the "preamble … cannot be said to

8  provide essential structure or necessary meaning to the claimed invention."  *Id.* at 1367-68.  When

9  finding the second claim preamble limiting, the court focused on the fact that the claim body did

10  not reintroduce "footware" but instead relied on "footware" in the preamble for "antecedent basis."

11  *Id.* at 1368.  However, the court noted that "[w]hile antecedent basis alone is not determinative of

12  whether a preamble is limiting, use of preamble terms to define positive limitations in the body of

13  claims can evince an inventor's intent that the preamble limit the scope of the claim."  *Id.*

14    Here, claim 1 of the '586 Patent only refers to "audio-enabled wireless device" in the body

15  of the claim with respect to the claim term "a table of identifiers stored in the audio-enabled wireless

16  device."  While it is true that this term relies on the "audio-enabled wireless device" for antecedent

17  basis, it does not "define positive limitations in the body of [the] claim" and thus does not evince

18  any intent that the *preamble* limits the claim in any tangible manner.

19    But even if this Court were persuaded that "audio-enabled wireless device" in claim 1's

20  preamble was limiting, as outlined above, that is the ***only*** portion of any preamble that should be

21  limiting.  *See TomTom, Inc.*, 790 F.3d at 1323.

22    **H.    "Reset element" ('586 Patent, Claims 1-5, 7-12, 14-16, 18, and 20)**

| Sonos's Construction | Google's Construction |
|---|---|
| hardware and/or software that functions to return a device to a prescribed state | an element for resetting the configuration of the controller |

26    The dispute is whether reset element be given its plain meaning of a component capable of

27  a reset function (Sonos) or be limited to an element responsible for a specific type of reset (Google).

28    The specification includes only two passages that mention reset:

1

> In one embodiment, the sensor unit 102 includes a **reset** function. In one embodiment, the **reset** function is activated by the **reset** switch 208. In one embodiment, the **reset** function is active for a prescribed interval of time. During the **reset** interval, the transceiver 203 is in a receiving mode and can receive the identification code from an external programmer.

2

3

4

Dkt. 69-4 ('586 Patent) at 6:23-29 (emphasis added); and:

5

> A **reset** device (e.g., a switch) 208 is proved [*sic*] to the controller 202.

6

*Id.* at 9:40-41 (emphasis added). From these disclosures, Google argues that the term should be

7

limited to a "component providing functionality specific to the recited 'controller.'" Dkt. 67 at 22.

8

Even if these example embodiments were enough for lexicography or disavowal (they are not), the

9

passages don't support Google's construction.  One of the exemplary reset functions is the ability

10

for "transceiver 203 [to be] in a receiving mode and [] receive the identification code from an

11

external programmer."  Dkt. 69-4 ('586 Patent) at 6:23-29.  In no way does this indicate that the

12

reset element functions to reset the "configuration" of the **controller**—it merely indicates that the

13

reset element functions to place the **transceiver** in a receiving mode.

14

Google attempts to distract the Court by focusing on the term "operatively coupled"

15

appearing in claim 1, arguing that "the claimed components must be connected in a way to perform

16

a designated function."  Dkt. 67 at 23 (citing *Innova/Pure Water, Inc. v. Safari Water Filtration*

17

*Sys., Inc.*, 381 F.3d 1111, 1118, 1120 (Fed. Cir. 2004)).  Google is wrong.  For starters, the term

18

"operatively coupled" only appears in claim 1 and thus should not control the construction of "reset

19

element" across multiple independent claims.  Further, Google misapplies the holding of *Innova*.

20

The Court in *Innova* held that a filter tube that was "operatively **connected**" to a cap meant that the

21

cap and tube had to be arranged in a manner capable of performing a filtering function.  381 F.3d

22

at 1120.  Here, claim 1 of the '586 Patent recites "a controller operatively **coupled** to…the reset

23

element."   While the court in *Innova* construed the term "operatively connected" and not

24

"operatively coupled," if this Court follows the logic of *Innova*, this suggests that the controller and

25

the reset element be arranged in a manner capable of performing a reset function, not that the reset

26

element is "an element for resetting the configuration of the controller" as Google insists.

27

Finally, Google's allegation that Sonos's proposed construction is contrary to the intrinsic

28

record is also wrong.  Sonos's construction that the reset element should be construed as hardware

23

1    and/or software that functions to return a device to a prescribed state is entirely in line with the

2    intrinsic record.  *See* Dkt. 69-12 (Wicker Decl.), ¶¶ 143, 148.  For example, the reset element serves

3    to return the sensor to a prescribed state by placing the transceiver into receiving mode, which is

4    not at all related to a "configuration" of the controller.  Dkt. 69-4 ('586 Patent) at 6:23-29.

5    **I.**    **"Preamble portion" ('586 Patent, Claims 1-5, 7-12, 14-16, 18, and 20)**

| Sonos's Proposed Construction | Google's Proposed Construction |
| --- | --- |
| a series of bits that is used to initiate and synchronize the receiving device | Plain and ordinary meaning |

9    It is axiomatic that a claim term is to be given its ordinary meaning, as it would have been

10   understood by a POSITA in view of the specification.  *Phillips*, 415 F.3d at 1312-13.  "[I]n many

11   cases, the meaning of a claim term as understood by persons of skill in the art is not readily

12   apparent."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir.

13   2008).  Such is the case here—while *preamble* may be a term familiar to the jury (*e.g.* the preamble

14   of the U.S. Constitution), a POSITA would have a particular understanding in the context of this

15   patent.  Specifically, based on the type of networking and communications in the '586 Patent, a

16   POSITA would understand the "preamble portion" of the claimed data packet is "a series of bits

17   that is used to initiate and synchronize the receiving device."  Dkt. 69-12 (Wicker Decl.), ¶¶ 155,

18   156.  There is no dispute that the '586 Patent "uses the term exactly once to note that the 'preamble

19   portion' is part of a packet."  Dkt. 67 at 24.  But that does not negate that "preamble portion", when

20   viewed in the context of this patent, is a highly specialized term that is well understood in the art.

21   Dr. Wicker supports his conclusion with several contemporaneous technical documents that

22   reflect this well understood meaning.  *Id.* at ¶¶ 158-61.  These documents are not limited to

23   exemplary standards, but also include technical and networking dictionaries:

- Newton's Telecom Dictionary (2004): Preamble is "[a] *synchronization mechanism* used in Ethernet LANs (Local area Networks), the preamble is a set of eight octets (8-bit values) which precede the Ethernet frame. A very specific *bit sequence*, the preamble serves to alert each Ethernet-attached device to the fact that a data frame is traveling across the circuit. Once alerted to this fact, the preamble is used by all attached devices to *synchronize* on the rate of transmission of the data bits across the circuit."  Dkt. 69-17 at 654 (emphasis added).

- The Authoritative Dictionary of IEEE Standards Terms, Seventh Edition (2000): Preamble is: (1) "In networking, *a sequence of bits at the start of each new transmission to allow synchronization* of clocks and other physical layer circuitry at other stations;" and (2) "A *sequence of bits* recorded at the beginning of each block on a magnetic tape for the *purpose of synchronization*." Ex. I at 857 (emphasis added).

These dictionaries *in addition to* the various standards Dr. Wicker cites, confirm that Sonos's construction reflects how one of ordinary skill in the art would understand this term in the context of the '586 Patent—it is a series of bits to initiate and synchronize a receiving device.

Google attacks Sonos's construction by alleging that Dr. Wicker's "references do not purport to define a 'preamble' for *all* types of protocols." Dkt. 67 at 25 (emphasis in original).[17] In support, Google relies on the testimony of its expert. *Id.* But Dr. Min is only able to provide a single protocol, for the 3G W-CDMA network, in support of his theory that not all preambles enable initiation and synchronization. The problem is that this 3G protocol is inapplicable to the '586 Patent, and therefore wouldn't be considered by a POSITA when seeking to understand how "preamble portion" is used in the claims. Specifically, the 3G network is used in "wireless cellular communication systems" where "the mobile unit *does not transmit anything other than the preamble itself*." Dkt. 69-7 (Min Decl.) at ¶ 60 (emphasis added). But claim 1 of the '586 Patent requires a "communication packet including a preamble portion, an identification code portion, a data payload portion, and an integrity portion." Dkt. 69-4 ('586 Patent) at claim 1. In other words, by the express limitations of the claims themselves, Dr. Min's 3G example is irrelevant to the '586 claims because the claims require communication packets with *more* than just a preamble portion. Once Dr. Min's 3G W-CDMA protocol is disregarded, his opinions are pure *ipse dixit* and cannot overcome Dr. Wicker's opinion, which is supported by technical definitions and local networking protocols that were commonly used in systems such as the one described in the '586 patent.

## IV.   CONCLUSION

For the foregoing reasons, the Court should accept Sonos's proposed constructions.

---

[17] Dr. Wicker is not defining preambles for "*all*" protocols, just those in the context of the '586 Patent. *See* Dkt. 69-12 (Wicker Decl.), ¶ 152.

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC

Dated:    April 5, 2021

By:      *Alyssa Caridis*
                    CLEMENT SETH ROBERTS
                    ALYSSA CARIDIS

ORRICK, HERRINGTON & SUTCLIFFE LLP

GEORGE I. LEE
SEAN M. SULLIVAN
RORY P. SHEA
J. DAN SMITH

LEE SULLIVAN SHEA & SMITH LLP

*Attorneys for Defendant Sonos, Inc.*

SONOS, INC.'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
3:20-cv-03845-EMC