CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
EVAN BREWER (STATE BAR NO. 304411)
ebrewer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:  +1 650 614 7400
Facsimile:  +1 650 614 7401

GEORGE I. LEE (admitted *pro hac vice*)
lee@ls3ip.com
SEAN M. SULLIVAN (admitted *pro hac vice*)
sullivan@ls3ip.com
RORY P. SHEA (admitted *pro hac vice*)
shea@ls3ip.com
J. DAN SMITH (admitted *pro hac vice*)
smith@ls3ip.com
MATT SAMPSON (admitted *pro hac vice*)
sampson@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:  +1 312 754 0002
Facsimile:  +1 312 754 0003

Attorneys for Defendant
Sonos, Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| Google LLC, | Case No. 3:20-cv-03845-EMC |
| Plaintiff, | **DECLARATION OF ALYSSA CARIDIS IN SUPPORT OF SONOS, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| v. | |
| Sonos, Inc., | Judge:    Hon. Edward M. Chen |
| Defendant. | JURY TRIAL DEMANDED |

I, Alyssa Caridis, hereby declare:

1.     I am an attorney at the law firm of Orrick, Herrington & Sutcliffe LLP, counsel of record for Defendant Sonos, Inc. in the above-captioned matter.  I am a member of good standing of the Bar of the State of California.  I make this declaration based on my personal knowledge, unless otherwise noted.  If called, I can and will testify competently to the matter set forth herein. I submit this declaration in support of Sonos, Inc.'s Responsive Claim Construction Brief.

2.     Attached hereto as **Exhibit A** is a true and correct copy of excerpts from Newton's Telecom Dictionary, The Official Dictionary of Telecommunications Networking and Internet (2001).

3.     Attached hereto as **Exhibit B** is a true and correct copy of excerpts from Undergraduate Texts in Mathematics, Introductions to Cryptography (2001).

4.     Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the National Institute of Standards and Technology's Special Publication 800-175B, Guideline for Using Cryptographic Standards in the Federal Government: Cryptographic Mechanisms (2016).

5.     Attached hereto as **Exhibit D** is a true and correct copy of excerpts from the file history of U.S. Patent No. 10,140,375.

6.     Attached hereto as **Exhibit E** is a true and correct copy of excerpts from A Dictionary of Computing, Oxford University Press (4th Ed. 1996).

7.     Attached hereto as **Exhibit F** is a true and correct copy of excerpts from The Authoritative Dictionary of IEEE Standard Terms (7th ed. 2000).

8.     Attached hereto as **Exhibit G** is a true and correct copy of excerpts from the Modern Dictionary of Electronics (6th ed. 1997).

9.     Attached hereto as **Exhibit H** is a true and correct copy of excerpts from the Random House Personal Computer Dictionary (2d ed. 1996).

CARIDIS DECL. ISO SONOS'S RESPONSIVE
CLAIM CONSTRUCTION BRIEF
3:20-cv-03845-EMC

10.     Attached hereto as **Exhibit I** is a true and correct copy of excerpts from The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed this 5th day of April 2021 in Los Angeles, California.


*/s/ Alyssa M. Caridis*
ALYSSA M. CARIDIS

CARIDIS DECL. ISO SONOS'S RESPONSIVE
CLAIM CONSTRUCTION BRIEF
3:20-cv-03845-EMC

# EXHIBIT A

# NEWTON's TELECOM DICTIONARY

The Official Dictionary of Telecommunications
Networking and Internet

## STAY INFORMED

To be alerted by email to updates and corrections
go to **www.cmpbooks.com/newton**

SONOS-GVS-00012463

**NEWTON's TELECOM DICTIONARY**
copyright © 2001 Harry Newton
email: Harry_Newton@HarryNewton.com
personal web site: www.HarryNewton.com
business web site: www.TechnologyInvestor.com

All rights reserved under International and Pan-American Copyright conventions,
including the right to reproduce this book or portions thereof in any form whatsoever.

Published by CMP Books
An imprint of CMP Media Inc.
Converging Communications Group
12 West 21 Street
New York, NY 10010


For individual or quantity orders
CMP Books
6600 Silacci Way Gilroy, CA 95020
Tel: 1-800-500-6875 or 1-408-848-5296
Fax:408-848-5784
Email: cmp@rushorder.com
Web:www.cmpbooks.com
Distributed to the book trade in the U.S. and Canada by
Publishers Group West
1700 Fourth St., Berkeley, CA 94710
Phone: 510-528-1444
ISBN Number 1-57820-069-5


February 2001

Seventeenth Edition

Matt Kelsey, Publisher
Christine Kern, Manager
Ray Horak, Managing Editor
Omar Mirabel, Cover Artist
Danel Roldan, Inside Layout Artist

Manufactured in the United States of America
Von Hoffmann Graphics
Owensville, MO 65066

To be

go

SONOS-GVS-00012464

up where you simply
you put your handset
all electronic phone
Prime Line Incoming

ation independent.
See Primitives.
ons of interactions e
een the service user
erence Model — rep

rtance. An owner or
ent, to represent her.
y principles. See Princ
al truth on which othe
cipal.

g to the FCC's definiti
m has one headend, a
or more headends, th
designated, a conce
eadend is a factor in

A coded control chara
rmatted in hard copy.
abs, tabs, etc.
puter, usually consistin
s that can be shared
hat manages print req
placed in a queue unti

sed to schedule printin
ask of feeding a slow
). A small program or p
ads the print task to th
Print spooling is handle
ory to become a print
me a print spooler. Y
he storage space and
ling: 1. You can use th
t to a print controller o
mputer. 2. You can us
particularly good in sm
rinter (and therefore

B. Flat material (fiber
also provides electric
oards are what PCBs
placing PCBs. They're
's're attached to a sta
n a surface you're s
whatever you do.
printed with assemble
g board (PWB) with

puter information and
e PCL. See PCL.
controls how your
such as the printing

m for mimicking a pr
has come from the
well as letterhead,
our printer's memory.

document is printed.
computer and/or program providing LAN (Local Area Network) users
networked printer. A person using the LAN will send a message to the printer
computer will then assign it a piece of memory or disk space to store its
be printed. With a printer server, users can send to the printer any time.
basically handled in the order they are received. But "big bosses" can be
can be bumped to the top of the queue.  Print servers allow fewer printers
Print servers are also especially useful for expensive, laser or high speed
(the print servers) spread the cost of these expensive machines over
them more affordable. See Print Spooling.
a matrix printer which prints using a set of wire hammers which strike
carbon ribbon to generate the matrix characters.
The process of assigning different values to network users, such that
rity will be offered access or service before a user with lower priori-
able as an added option with network operation. Any procedure where
precedence exist.

**Parameters** The hierarchical rules which a network device,
lies to incoming traffic to determine which traffic should be handled

given to a task which determines when it will be processed.
During a link, trunk or facility failure where lower
to network services is interrupted in order to offer those services or
designated higher priority user.
Emergency calls to the attendant bypass the normal queue and alert
some special signal.
Not Atlantic service. While all callers are important, some are more criti-
So give your high-priority callers a ring of their own with Priority Call.
to program up to six callers' numbers. When any of these people
call you because you'll hear a different ring. If you have Call Waiting,
"beep" when you're on the phone. This way, you'll only have to inter-
priority calls.
allows an urgent intercom voice call to be made when the called tele-
has Do Not Disturb activated. Priority Call should not be made available
should be selectively programmed.
A character or group of characters which determine the posi-
message in relation to the urgency of other messages. Priority indica-
in which messages are to be delivered.

a name for a Pacific Bell (and possibly other local telephone
which alerts you to have calls from selected numbers ring at another

**Transport** The capability of a network for certain classes of traffic to
thers and thus have lower delay or otherwise better performance.
**Queuing** Through user-chosen trunk access level, this PBX fea-
er with this or higher level in the class of service assignment ahead of
the same trunk group (or Agent Group in the case of incoming ACD calls).
usually means that once a caller "seizes" a line, no other user can
even though it appears on his/her key set. Privacy can be automat-
with call.
**Privacy Release** All other extensions of a line are unable to
in progress unless the initiating telephone releases the feature.
**Mail.** PEM. An Internet electronic mail capability which pro-
and message integrity using various encryption methods.
Privacy automatically splits the connection whenever an attendant
included on the call, i.e.  the attendant can't listen in to a call she's
one. A tone warning is generated when the attendant bridges into a
gress.
**Override** Activation of a special pushbutton allows the phone user to
line, even though the automatic exclusion facility is being used by the
This privilege of Privacy Override is usually only given to Big Bosses.
**Address** A twenty-byte address used to identify an ATM connec-

**matic Branch Exchange** PABX. A private telephone switch for
organization in which people have to dial "9" to access a local line. In the old

days, private branch exchanges were manual, meaning that operators/attendants were
needed to manually place calls.  Then the systems improved and you were able to dial the out-
side world from your extension without the help (or hindrance?) of an operator. Thus they be-
came known as private automatic branch exchanges. But then all PBXs became Automatic.  So
these days, PABXs are all called PBXs, except in some countries outside North America, where
they're still called PABXs. See also the next definition and PBX.

**Private Branch Exchange** PBX. Term used now interchangeably with PABX.
PBX is a private telephone switching system, usually located on a customer's premises with
an attendant console. It is connected to a common group of lines from one or more cen-
tral offices to provide service to a number of individual phones, such as in a hotel, business
or government office.  For the biggest definition, see PBX. See also PABX.

**Private Carrier** An entity licensed in private services and authorized to provide
communications service to others for money.

**Private Dial-In Ports** A packet network term. For customers who have many
calls, the packet network operator provides dedicated, unpublished phone numbers. The
idea is to give the preferred user better service.

**Private Domain Name** A standard attribute of an O/R (Originator/Recipient)
Address that identifies a PRMD (Private Management Domain) generally relative to an
ADMD (Administrative management Domain). An X.400 term.

**Private Exchange** PX. A telephone switch serving a particular organization and
having no means of connection with a public exchange. In other words, a phone system
just for intercom calls.

**Private Eye** Around 1925, the Pinkerton Detective Agency adopted "We Never
Sleep" as its motto. To symbolize this, the motto was shown over the picture of an open,
ever-wakeful eye. The popularization of this emblem led to private detectives being called
"private eyes."

**Private Facility Trunk** A telephone company AIN term.  A transmission facility
that carries non-public switched telephone network (PST) traffic. An example of a private
facility trunk is an access arrangement to a switch supporting PBXs, including the switched
end of a Foreign Exchange (FX) and an Off Network Access Line (ONAL).

**Private Internet eXchange.** PIX. It's a Cisco term for a family of their
remote access routers with firewall capabilities.

**Private Key** An encryption technique which requires that the decrypting key be kept
secret. Also known as single-key and secret-key.  See Public Key and Encryption for more
detail.

**Private Leased Circuit** A leased communications circuit, available 24 hours a
day, 7 days a week, that connects a company's premises with a remote site.

**Private Line** 1. A direct circuit or channel specifically dedicated to the use of an end
user organization for the purpose of directly connecting two or more sites in a multisite
enterprise. A private line that connects two points together is known as point-to-point; a pri-
vate line that connects one point to multiple points is known as point-to-multipoint.  Private
lines are leased from one or more carriers, which may be local or interexchange in nature.
Private lines provide connectivity on a non-switched basis. As they bypass the network
switches, private lines use the various switching centers (e.g., Central Offices, or COs) only
as wire centers for the interconnection of circuits. Thereby, private lines provide full-time
and immediate availability, eliminating dialup delays and avoiding any potential for con-
gestion in the core of the carrier networks.

Private lines offer highly available connectivity, as they are dedicated to the use of a sin-
gle organization, which may run any type or combination of traffic types over them. As pri-
vate lines are priced based on distance and bandwidth, with no usage-sensitive cost ele-
ment, they can be used constantly and at maximum capacity at the same cost as if they
were never used at all. Therefore, they offer a highly cost-effective to usage-sensitive,
switched services in environments where communications between sites is frequent and
intense. Originally, private lines were, in fact, dedicated circuits which literally could be
physically traced through the network. They also were known as "nailed-up circuits," as
telephone company technicians hung the physically distinct circuits on nails driven into the
walls of the central offices. Contemporary private lines actually involve dedicated channel
capacity provided through the core of the carrier networks over high-capacity, multi-chan-
nel transmission facilities. The access portions (i.e., the local loop portions) of the private
line are, of course, dedicated and physically distinct circuits.

Private lines are agnostic with respect to the form of the data, and the nature of the appli-
cation. They can support voice, data, video, facsimile, or multimedia communications. They
can run at rates of T-1, NxT-1, T-3, OC-3, or any other technically feasible speed. They can

P

549

SONOS-GVS-00012465

# EXHIBIT B

# Undergraduate Texts in Mathematics

*Editors*

S. Axler

F.W. Gehring

K.A. Ribet

# Springer

*New York*
*Berlin*
*Heidelberg*
*Barcelona*
*Hong Kong*
*London*
*Milan*
*Paris*
*Singapore*
*Tokyo*

SONOS-GVS-00012405

## Undergraduate Texts in Mathematics

**Anglin:** Mathematics: A Concise History
and Philosophy.
*Readings in Mathematics.*
**Anglin/Lambek:** The Heritage of
Thales.
*Readings in Mathematics.*
**Apostol:** Introduction to Analytic
Number Theory. Second edition.
**Armstrong:** Basic Topology.
**Armstrong:** Groups and Symmetry.
**Axler:** Linear Algebra Done Right.
Second edition.
**Beardon:** Limits: A New Approach to
Real Analysis.
**Bak/Newman:** Complex Analysis.
Second edition.
**Banchoff/Wermer:** Linear Algebra
Through Geometry. Second edition.
**Berberian:** A First Course in Real
Analysis.
**Bix:** Conics and Cubics: A
Concrete Introduction to Algebraic
Curves.
**Brémaud:** An Introduction to
Probabilistic Modeling.
**Bressoud:** Factorization and Primality
Testing.
**Bressoud:** Second Year Calculus.
*Readings in Mathematics.*
**Brickman:** Mathematical Introduction
to Linear Programming and Game
Theory.
**Browder:** Mathematical Analysis:
An Introduction.
**Buchmann:**  Introduction to
Cryptography.
**Buskes/van Rooij:** Topological Spaces:
From Distance to Neighborhood.
**Callahan:** The Geometry of Spacetime:
An Introduction to Special and General
Relavitity.
**Carter/van Brunt:** The Lebesgue–
Stieltjes Integral: A Practical
Introduction.
**Cederberg:** A Course in Modern
Geometries. Second edition.
**Childs:** A Concrete Introduction to
Higher Algebra. Second edition.
**Chung:** Elementary Probability Theory
with Stochastic Processes. Third
edition.

**Cox/Little/O'Shea:** Ideals, Varieties,
and Algorithms. Second edition.
**Croom:** Basic Concepts of Algebraic
Topology.
**Curtis:** Linear Algebra: An Introductory
Approach. Fourth edition.
**Devlin:** The Joy of Sets: Fundamentals
of Contemporary Set Theory.
Second edition.
**Dixmier:** General Topology.
**Driver:** Why Math?
**Ebbinghaus/Flum/Thomas:**
Mathematical Logic. Second edition.
**Edgar:** Measure, Topology, and Fractal
Geometry.
**Elaydi:** An Introduction to Difference
Equations. Second edition.
**Exner:** An Accompaniment to Higher
Mathematics.
**Exner:** Inside Calculus.
**Fine/Rosenberger:** The Fundamental
Theory of Algebra.
**Fischer:** Intermediate Real Analysis.
**Flanigan/Kazdan:** Calculus Two: Linear
and Nonlinear Functions. Second
edition.
**Fleming:** Functions of Several Variables.
Second edition.
**Foulds:** Combinatorial Optimization for
Undergraduates.
**Foulds:** Optimization Techniques: An
Introduction.
**Franklin:** Methods of Mathematical
Economics.
**Frazier:** An Introduction to Wavelets
Through Linear Algebra.
**Gamelin:** Complex Analysis.
**Gordon:** Discrete Probability.
**Hairer/Wanner:** Analysis by Its History.
*Readings in Mathematics.*
**Halmos:** Finite-Dimensional Vector
Spaces. Second edition.
**Halmos:** Naive Set Theory.
**Hämmerlin/Hoffmann:** Numerical
Mathematics.
*Readings in Mathematics.*
**Harris/Hirst/Mossinghoff:** Combinatorics
and Graph Theory.
**Hartshorne:** Geometry: Euclid and
Beyond.

SONOS-GVS-00012406

Johannes A. Buchmann

# Introduction to Cryptography

 Springer

SONOS-GVS-00012407

Johannes A. Buchmann
Department of Computer Science
Technical University, Darmstadt
Alexanderstrasse 10
64283 Darmstadt
Germany

*Editorial Board*

| S. Axler | F.W. Gehring | K.A. Ribet |
|---|---|---|
| Mathematics Department | Mathematics Department | Mathematics Department |
| San Francisco State | East Hall | University of California |
|   University | University of Michigan |   at Berkeley |
| San Francisco, CA 94132 | Ann Arbor, MI 48109 | Berkeley, CA 94720-3840 |
| USA | USA | USA |

*Cover*: Author photograph by Almut Knaak.
With 7 figures.

Mathematics Subject Classification (2000): 11T71, 14G50, 94A60, 68P25

Library of Congress Cataloging-in-Publication Data
Buchmann, Johannes A.
    Introduction to cryptography / Johannes A. Buchmann.
      p.  cm.—(Undergraduate texts in mathematics)
    Includes bibliographical references and index.
    ISBN-13: 978-1-4684-0498-2      e-ISBN-13: 978-1-4684-0496-8
    DOI: 10.1007/978-1-4684-0496-8
    1. Coding theory.   2. Cryptography.   I. Title.   II. Series.
    QA268.B83   2000
    003 –dc21                                      00-030465

Printed on acid-free paper.

German edition: *Einführung in die Kryptographie* © Springer-Verlag, Heidelberg, 1999.
© 2001 Springer-Verlag New York, Inc.
Softcover reprint of the hardcover 1st edition 2001

All rights reserved. This work may not be translated or copied in whole or in part without the written permission of the publisher (Springer-Verlag New York, Inc., 175 Fifth Avenue, New York, NY 10010, USA), except for brief excerpts in connection with reviews or scholarly analysis. Use in connection with any form of information storage and retrieval, electronic adaptation, computer software, or by similar or dissimilar methodology now known or hereafter developed is forbidden.
The use of general descriptive names, trade names, trademarks, etc., in this publication, even if the former are not especially identified, is not to be taken as a sign that such names, as understood by the Trade Marks and Merchandise Marks Act, may accordingly be used freely by anyone.

Production managed by Terry Kornak; manufacturing supervised by Joe Quatela.
Typeset by The Bartlett Press, Inc., Marietta, GA.

9 8 7 6 5 4 3 2 1

ISBN-13: 978-1-4684-0498-2        SPIN 10765385

*A member of BertelsmannSpringer Science+Business Media GmbH*

# Preface

Cryptography is a key technology in electronic security systems. Modern cryptograpic techniques have many uses, such as to digitally sign documents, for access control, to implement electronic money, and for copyright protection. Because of these important uses it is necessary that users be able to estimate the efficiency and security of cryptographic techniques. It is not sufficient for them to know only how the techniques work.

This book is written for readers who want to learn about modern cryptographic algorithms and their mathematical foundation but who do not have the necessary mathematical background. It is my goal to explain the basic techniques of modern cryptography, including the necessary mathematical results from linear algebra, algebra, number theory, and probability theory. I assume only basic mathematical knowledge.

The book is based on courses in cryptography that I have been teaching at the Technical University, Darmstadt, since 1996. I thank all students who attended the courses and who read the manuscript carefully for their interest and support. In particular, I would like to thank Harald Baier, Gabi Barking, Manuel Breuning, Safuat Hamdy, Birgit Henhapl, Michael Jacobson (who also corrected my English), Andreas Kottig, Markus Maurer, Andreas Meyer, Stefan

**v**

SONOS-GVS-00012409

vi    **Preface**

Neis, Sachar Paulus, Thomas Pfahler, Marita Skrobic, Edlyn Teske, Patrick Theobald, and Ralf-Philipp Weinmann. I also thank the staff at Springer-Verlag, in particular Martin Peters, Agnes Herrmann, Claudia Kehl, Ina Lindemann, and Terry Kornak, for their support in the preparation of this book.

Darmstadt, Germany                             Johannes A. Buchmann
September 2000

SONOS-GVS-00012410

# Contents

**Preface**                                                              **v**

**1 Integers**                                                          **1**

1.1   Basics . . . . . . . . . . . . . . . . . . . . . . . .   1

1.2   Divisibility . . . . . . . . . . . . . . . . . . . . .   2

1.3   Representation of Integers . . . . . . . . . . . . .   4

1.4   $O$- and $\Omega$-Notation . . . . . . . . . . . . . . .   6

1.5   Cost of Addition, Multiplication, and

       Division with Remainder . . . . . . . . . . . . . .   7

1.6   Polynomial Time  . . . . . . . . . . . . . . . . . .   9

1.7   Greatest Common Divisor  . . . . . . . . . . . . .   9

1.8   Euclidean Algorithm  . . . . . . . . . . . . . . .  12

1.9   Extended Euclidean Algorithm . . . . . . . . . . .  16

1.10  Analysis of the Extended Euclidean Algorithm . . .  18

1.11  Factoring into Primes . . . . . . . . . . . . . . .  21

1.12  Exercises . . . . . . . . . . . . . . . . . . . . .  24

**2 Congruences and Residue Class Rings**                     **29**

2.1   Congruences . . . . . . . . . . . . . . . . . . . .  29

2.2   Semigroups . . . . . . . . . . . . . . . . . . . . .  32

2.3   Groups  . . . . . . . . . . . . . . . . . . . . . .  34

**vii**

SONOS-GVS-00012411

# viii   Contents

| | | |
|---|---|---|
| 2.4 | Residue Class Rings | 35 |
| 2.5 | Fields | 36 |
| 2.6 | Division in the Residue Class Ring | 36 |
| 2.7 | Analysis of Operations in the Residue Class Ring | 38 |
| 2.8 | Multiplicative Group of Residues | 39 |
| 2.9 | Order of Group Elements | 41 |
| 2.10 | Subgroups | 42 |
| 2.11 | Fermat's Little Theorem | 44 |
| 2.12 | Fast Exponentiation | 45 |
| 2.13 | Fast Evaluation of Power Products | 48 |
| 2.14 | Computation of Element Orders | 49 |
| 2.15 | The Chinese Remainder Theorem | 51 |
| 2.16 | Decomposition of the Residue Class Ring | 54 |
| 2.17 | A Formula for the Euler $\varphi$-Function | 55 |
| 2.18 | Polynomials | 57 |
| 2.19 | Polynomials over Fields | 59 |
| 2.20 | Structure of the Unit Group of Finite Fields | 62 |
| 2.21 | Structure of the Multiplicative Group of Residues mod a Prime Number | 63 |
| 2.22 | Exercises | 64 |
| **3** | **Encryption** | **69** |
| 3.1 | Encryption Schemes | 69 |
| 3.2 | Symmetric and Asymmetric Cryptosystems | 71 |
| 3.3 | Cryptanalysis | 71 |
| 3.4 | Alphabets and Words | 73 |
| 3.5 | Permutations | 75 |
| 3.6 | Block Ciphers | 77 |
| 3.7 | Multiple Encryption | 78 |
| 3.8 | Use of Block Ciphers | 79 |
| 3.9 | Stream Ciphers | 88 |
| 3.10 | Affine Cipher | 89 |
| 3.11 | Matrices and Linear Maps | 91 |
| 3.12 | Affine Linear Block Ciphers | 96 |
| 3.13 | Vigenère, Hill, and Permutation Ciphers | 97 |
| 3.14 | Cryptanalysis of Affine Linear Block Ciphers | 98 |
| 3.15 | Exercises | 99 |

SONOS-GVS-00012412

**4  Probability and Perfect Secrecy                103**
  4.1  Probability . . . . . . . . . . . . . . . . . . . 103
  4.2  Conditional Probability . . . . . . . . . . . . 105
  4.3  Birthday Paradox . . . . . . . . . . . . . . . 106
  4.4  Perfect Secrecy . . . . . . . . . . . . . . . . 107
  4.5  Vernam One-Time Pad . . . . . . . . . . . . 110
  4.6  Random Numbers . . . . . . . . . . . . . . . 111
  4.7  Pseudorandom Numbers . . . . . . . . . . . 112
  4.8  Exercises . . . . . . . . . . . . . . . . . . . . 112

**5  DES                                                 115**
  5.1  Feistel Ciphers . . . . . . . . . . . . . . . . 115
  5.2  DES Algorithm . . . . . . . . . . . . . . . . 116
  5.3  An Example . . . . . . . . . . . . . . . . . . 123
  5.4  Security of DES . . . . . . . . . . . . . . . . 124
  5.5  Exercises . . . . . . . . . . . . . . . . . . . . 125

**6  Prime Number Generation                            127**
  6.1  Trial Division . . . . . . . . . . . . . . . . . 127
  6.2  Fermat Test . . . . . . . . . . . . . . . . . . 129
  6.3  Carmichael Numbers . . . . . . . . . . . . . 130
  6.4  Miller-Rabin Test . . . . . . . . . . . . . . . 132
  6.5  Random Primes . . . . . . . . . . . . . . . . 135
  6.6  Exercises . . . . . . . . . . . . . . . . . . . . 136

**7  Public-Key Encryption                               139**
  7.1  Idea . . . . . . . . . . . . . . . . . . . . . . 139
  7.2  RSA Cryptosystem . . . . . . . . . . . . . . 141
  7.3  Rabin Encryption . . . . . . . . . . . . . . . 153
  7.4  Diffie-Hellman Key Exchange . . . . . . . . 158
  7.5  ElGamal Encryption . . . . . . . . . . . . . 162
  7.6  Exercises . . . . . . . . . . . . . . . . . . . . 167

**8  Factoring                                           171**
  8.1  Trial Division . . . . . . . . . . . . . . . . . 171
  8.2  $p-1$ Method . . . . . . . . . . . . . . . . . 172
  8.3  Quadratic Sieve . . . . . . . . . . . . . . . . 173
  8.4  Analysis of the Quadratic Sieve . . . . . . . 178

SONOS-GVS-00012413

**x**     **Contents**

8.5    Efficiency of Other Factoring Algorithms . . . . . . . 181

8.6    Exercises . . . . . . . . . . . . . . . . . . . . . . . 182

**9   Discrete Logarithms           185**

9.1    DL Problem   . . . . . . . . . . . . . . . . . . . . . 185

9.2    Enumeration . . . . . . . . . . . . . . . . . . . . . . 186

9.3    Shanks Baby-Step Giant-Step Algorithm . . . . . . . 186

9.4    Pollard $\rho$-Algorithm . . . . . . . . . . . . . . . . . 189

9.5    Pohlig-Hellman Algorithm . . . . . . . . . . . . . . 193

9.6    Index Calculus . . . . . . . . . . . . . . . . . . . . 198

9.7    Other Algorithms . . . . . . . . . . . . . . . . . . . 202

9.8    Generalization of the Index Calculus Algorithm . . . 203

9.9    Exercises . . . . . . . . . . . . . . . . . . . . . . . 203

**10   Cryptographic Hash Functions        205**

10.1   Hash Functions and Compression Functions . . . . . 205

10.2   Birthday Attack   . . . . . . . . . . . . . . . . . . . 208

10.3   Compression Functions from Encryption Functions . 209

10.4   Hash Functions from Compression Functions   . . . . 209

10.5   Efficient Hash Functions . . . . . . . . . . . . . . . 212

10.6   An Arithmetic Compression Function . . . . . . . . 213

10.7   Message Authentication Codes . . . . . . . . . . . . 214

10.8   Exercises . . . . . . . . . . . . . . . . . . . . . . . 215

**11   Digital Signatures             217**

11.1   Idea . . . . . . . . . . . . . . . . . . . . . . . . . . 217

11.2   RSA Signatures . . . . . . . . . . . . . . . . . . . . 218

11.3   Signatures from Public-Key Systems . . . . . . . . . 222

11.4   ElGamal Signature . . . . . . . . . . . . . . . . . . 223

11.5   Digital Signature Algorithm (DSA) . . . . . . . . . . 228

11.6   Exercises . . . . . . . . . . . . . . . . . . . . . . . 231

**12   Other Groups                233**

12.1   Finite Fields . . . . . . . . . . . . . . . . . . . . . . 233

12.2   Elliptic Curves . . . . . . . . . . . . . . . . . . . . 236

12.3   Quadratic Forms . . . . . . . . . . . . . . . . . . . 239

12.4   Exercises . . . . . . . . . . . . . . . . . . . . . . . 240

SONOS-GVS-00012414

**13 Identification**     **241**

  13.1  Passwords . . . . . . . . . . . . . . . . . . . . 242

  13.2  One-Time Passwords . . . . . . . . . . . . . . . 243

  13.3  Challenge-Response Identification . . . . . . . . . . 243

  13.4  Exercises . . . . . . . . . . . . . . . . . . . . . . 247

**14 Public-Key Infrastructures**     **249**

  14.1  Personal Security Environments . . . . . . . . . . . 249

  14.2  Certification Authorities . . . . . . . . . . . . . . 251

  14.3  Certificate Chains . . . . . . . . . . . . . . . . . . 256

**References**     **257**

**Solutions to the Exercises**     **261**

**Index**     **277**

SONOS-GVS-00012415

# 3

**C H A P T E R**

# Encryption

The traditional topic of cryptography is encryption. Encryption schemes are used to keep messages or stored data secret. In this chapter, we introduce fundamental notions that we need to describe encryption schemes. As a first example, we present affine linear ciphers and their cryptanalysis.

## 3.1   Encryption Schemes

We define encryption schemes.

**Definition 3.1.1**
An *encryption scheme* or *cryptosystem* is a tuple
$(\mathcal{P}, \mathcal{C}, \mathcal{K}, \mathcal{E}, \mathcal{D})$ with the following properties:
1. $\mathcal{P}$ is a set. It is called the *plaintext space*. Its elements are called *plaintexts*.
2. $\mathcal{C}$ is a set. It is called the *ciphertext space*. Its elements are called *ciphertexts*.
3. $\mathcal{K}$ is a set. Is is called the *key space*. Its elements are called *keys*.

**69**

J. A. Buchmann, *Introduction to Cryptography*
© Springer-Verlag New York, Inc. 2001

SONOS-GVS-00012416

**70** ___3. Encryption___

**TABLE 3.1**   Correspondence between letters and numbers.

| A | B | C | D | E | F | G | H | I | J | K | L | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| N | O | P | Q | R | S | T | U | V | W | X | Y | Z |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |

4. $\mathcal{E} = \{E_k : k \in K\}$ is a family of functions $E_k : \mathcal{P} \to \mathcal{C}$. Its elements are called *encryption functions*.

5. $\mathcal{D} = \{D_k : k \in K\}$ is a family of functions $D_k : \mathcal{C} \to \mathcal{P}$. Its elements are called *decryption functions*.

6. For each $e \in K$, there is $d \in K$ such that $D_d(E_e(p)) = p$ for all $p \in \mathcal{P}$.

As a first example of an encryption scheme, we describe the *Caesar cipher*.

The plaintext space, ciphertext space, and key space are $\Sigma = \{A, B, \ldots, Z\}$. We identify the letters $A, B, \ldots, Z$ according to Table 3.1 with the numbers $0, 1, \ldots, 25$. This enables us to compute with letters. For $e \in \mathbb{Z}_{26}$, the encryption function $E_e$ is

$$E_e : \Sigma \to \Sigma, \quad x \mapsto (x + e) \bmod 26.$$

Analogously, for $d \in \mathbb{Z}_{26}$ decryption function $D_d$ is

$$D_d : \Sigma \to \Sigma, \quad x \mapsto (x - d) \bmod 26.$$

The decryption key for the encryption key $e$ is $d = e$. This is, however, not true for every cryptosystem.

The Caesar cipher can easily be modified such that the plaintext space and the ciphertext space are the set of all sequences $\vec{w} = (w_1, w_2, \ldots, w_n)$ with $w_i \in \Sigma$, $1 \leq i \leq n$. Again, the key space is $\mathbb{Z}_{26}$. The encryption function $E_e$ replaces each letter $w_i$ by $w_i + e \bmod 26$, $1 \leq i \leq n$. This also is called the Caesar cipher.

**Example 3.1.2**

If we apply the Caesar cipher with key 5 to the word CRYPTOGRAPHY, then we obtain HWDUYTLWFUMD.

The Caesar cipher uses only 26 keys. It is therefore very easy to determine the plaintext from the ciphertext by trying all possible keys and checking which plaintext makes sense. In this way, we also obtain the key that was used.

SONOS-GVS-00012417

# 3.2   Symmetric and Asymmetric Cryptosystems

We briefly explain the difference between symmetric and asymmetric cryptosystems.

If Alice wants to send an encrypted message to Bob, then she uses an encryption key $e$ and Bob uses the corresponding decryption key to recover the plaintext.

If in a cryptosystem the encryption key $e$ is always equal to the decryption key $d$, or if $d$ can be easily computed from $e$, then the cryptosystem is called *symmetric*. If Alice and Bob use a symmetric cryptosystem, they must exchange the secret key $e$ before they start their communication. Secure key exchange is a major problem. The key $e$ must be kept secret since anybody who knows $e$ can determine the corresponding decryption key $d$. The Caesar cipher is an example of a symmetric cryptosystem. The keys for encryption and decryption are equal in this system.

In *asymmetric cryptosystems*, the keys $d$ and $e$ are distinct, and the computation of $d$ from $e$ is infeasible. In such systems, the encryption key can be made public. If Bob wants to receive encrypted messages, he publishes an encryption key $e$ and keeps the corresponding decryption key $d$ secret. Anybody can use $e$ to encrypt messages for Bob. Therefore, $e$ is called the *public key*. But only Bob can decrypt the messages, so $d$ is called the *private key*. Asymmetric cryptosystems are also called *public-key cryptosystems*.

In public-key cryptosystems, it is frequently useful to introduce two different key spaces since the public and the private keys have different shapes. This changes the definition of cryptosystems only slightly.

In this chapter, we only describe symmetric encryption schemes. Public-key cryptosystems will be described in Chapter 7.

# 3.3   Cryptanalysis

Cryptanalysis deals with the attacks on cryptosystems. In this section, we classify those attacks.

SONOS-GVS-00012418

72     **3. Encryption**

To make attacks on cryptosystems more difficult, one can keep the cryptosystem secret. However, it is not clear how much security is really gained in this way because an attacker has many ways of finding out which cryptosystem is used. He can try to tell from intercepted ciphertexts which system is used. He can also try to get information from people who have information about the encryption scheme in use.

Modern cryptanalysis therefore assumes that an attacker knows which cryptosystem is used. Only the (private) keys and the plaintexts are assumed to be secret. The attacker tries to recover plaintexts from ciphertexts or even tries to find out which keys are used.

There are the following types of attacks:

- *Ciphertext-only attack*. The attacker knows ciphertexts and tries to recover the corresponding plaintexts or the key.

- *Known-plaintext attack*. The attacker knows a plaintext and the corresponding ciphertext or several such pairs. He tries to find the key used or to decrypt other ciphertexts.

- *Chosen-plaintext attack*. The attacker is able to encrypt plaintexts but does not know the key. He tries to find the key used or to decrypt other ciphertexts.

- *Adaptive chosen-plaintext attack*. The attacker is able to encrypt plaintexts. He is able to choose new plaintexts as a function of the ciphertexts obtained but does not know the key. He tries to find the key used or to decrypt other ciphertexts.

- *Chosen-ciphertext attack*. The attacker can decrypt but does not know the key. He tries to find the key.

There are many ways to mount these attacks. A simple ciphertext-only attack consists of decrypting the ciphertext with all possible keys. This attack is called *exhaustive search*. The correct plaintext is among the few sensible texts that the attacker obtains. Given the speed of modern computers, this attack is successful for many cryptosystems. It works, for example, for the DES system, which until recently was the U.S. encryption standard. The DES is described in Chapter 5.

A known-plaintext attack may use the statistical properties of the plaintext language. For example, if we apply the Caesar cipher,

SONOS-GVS-00012419

then for a fixed key any plaintext symbol is replaced by the same ciphertext symbol. The most frequent plaintext symbol is encrypted to the most frequent ciphertext symbol. Since we know the most frequent symbol of the plaintext language, we have a good guess how to decrypt the most frequent ciphertext symbol. Analogously, the frequency of other individual symbols, of pairs, triplets, etc., in the plaintext may be reflected in the ciphertext and can be used to decrypt the ciphertext or to recover the key. A number of examples can be found in [32], and [5]. We will see later how affine linear ciphers can be broken by a known-plaintext attack.

## 3.4   Alphabets and Words

To write texts, we need symbols from an alphabet. By an *alphabet* we mean a finite nonempty set $\Sigma$. The *length* of $\Sigma$ is the number of elements in $\Sigma$. The elements of $\Sigma$ are called *symbols* or *letters*.

**Example 3.4.1**
A common alphabet is

$$\Sigma = \{A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V, W, X, Y, Z\}.$$

It has length 26.

**Example 3.4.2**
In computing, we use the alphabet $\{0, 1\}$. It has length 2.

**Example 3.4.3**
A frequently used alphabet is the set of ASCII symbols. This set, including its encoding by the numbers between 0 and 127, can be found in Table 3.2.

Because alphabets are finite sets, their symbols can be identified with nonnegative integers. If an alphabet has length $m$, then its symbols are identified with the numbers in $\mathbb{Z}_m = \{0, 1, \ldots, m-1\}$. For the alphabet $\{A, B, \ldots, Z\}$ and the ASCII symbols, we have shown this in Tables 3.1 and 3.2. We will mostly use the alphabet $\mathbb{Z}_m$, where $m$ is a positive integer.

SONOS-GVS-00012420

**74**    **3. Encryption**

**TABLE 3.2**    The ASCII symbols.

| 0 | NUL | 1 | SOH | 2 | STX | 3 | ETX |
|---|---|---|---|---|---|---|---|
| 4 | EOT | 5 | ENQ | 6 | ACK | 7 | BEL |
| 8 | BS | 9 | HT | 10 | NL | 11 | VT |
| 12 | NP | 13 | CR | 14 | SO | 15 | SI |
| 16 | DLE | 17 | DC1 | 18 | DC2 | 19 | DC3 |
| 20 | DC4 | 21 | NAK | 22 | SYN | 23 | ETB |
| 24 | CAN | 25 | EM | 26 | SUB | 27 | ESC |
| 28 | FS | 29 | GS | 30 | RS | 31 | US |
| 32 | SP | 33 | ! | 34 | " | 35 | # |
| 36 | $ | 37 | % | 38 | & | 39 | ' |
| 40 | ( | 41 | ) | 42 | * | 43 | + |
| 44 | , | 45 | - | 46 | . | 47 | / |
| 48 | 0 | 49 | 1 | 50 | 2 | 51 | 3 |
| 52 | 4 | 53 | 5 | 54 | 6 | 55 | 7 |
| 56 | 8 | 57 | 9 | 58 | : | 59 | ; |
| 60 | ¡ | 61 | = | 62 | ¿ | 63 | ? |
| 64 | @ | 65 | A | 66 | B | 67 | C |
| 68 | D | 69 | E | 70 | F | 71 | G |
| 72 | H | 73 | I | 74 | J | 75 | K |
| 76 | L | 77 | M | 78 | N | 79 | O |
| 80 | P | 81 | Q | 82 | R | 83 | S |
| 84 | T | 85 | U | 86 | V | 87 | W |
| 88 | X | 89 | Y | 90 | Z | 91 | [ |
| 92 | | 93 | ] | 94 | ^ | 95 | _ |
| 96 | ' | 97 | a | 98 | b | 99 | c |
| 100 | d | 101 | e | 102 | f | 103 | g |
| 104 | h | 105 | i | 106 | j | 107 | k |
| 108 | l | 109 | m | 110 | n | 111 | o |
| 112 | p | 113 | q | 114 | r | 115 | s |
| 116 | t | 117 | u | 118 | v | 119 | w |
| 120 | x | 121 | y | 122 | z | 123 | { |
| 124 | — | 125 | } | 126 | ~ | 127 | DEL |

In the following definition, we need finite sequences, which we briefly recall. An example of a finite sequence is

$$(2, 3, 1, 2, 3).$$

SONOS-GVS-00012421

It has five components. The first component is 2, the second is 3, etc. We also write this sequence as

$$23123.$$

For formal reasons, we also need (). It has zero components.

**Definition 3.4.4**
Let $\Sigma$ be an alphabet.
1. A *word* or *string* over $\Sigma$ is a finite sequence of symbols from $\Sigma$ including the empty sequence, which is denoted by $\varepsilon$ and is called the *empty string*.
2. The *length* of a word $\vec{w}$ over $\Sigma$ is the number of its components. It is denoted by $|\vec{w}|$. The empty word has length 0.
3. The set of all words over $\Sigma$ including the empty string is denoted by $\Sigma^*$.
4. If $\vec{v}, \vec{w} \in \Sigma^*$, then $\vec{v}\vec{w} = \vec{v} \circ \vec{w}$ is the string that is obtained by concatenating $\vec{v}$ and $\vec{w}$. It is called the *concatenation* of $\vec{v}$ and $\vec{w}$. In particular, we have $\vec{v} \circ \varepsilon = \varepsilon \circ \vec{v} = \vec{v}$.
5. If $n$ is a nonnegative integer, then $\Sigma^n$ is the set of all words of length $n$ over $\Sigma$.

In Exercise 3.15.5, it is shown that $(\Sigma^*, \circ)$ is a monoid whose neutral element is the empty word.

**Example 3.4.5**
A word over the alphabet from Example 3.4.1 is COLA. It has length four. Another word over $\Sigma$ is COCA. The concatenation of COCA and COLA is COCACOLA.

# 3.5   Permutations

To characterize a very general class of encryption schemes, called the block ciphers (see the following), we need the notion of a permutation.

**Definition 3.5.1**
Let $X$ be a set. A *permutation* of $X$ is a bijective map $f : X \rightarrow X$. The set of all permutations of $X$ is denoted by $S(X)$.

SONOS-GVS-00012422

**Example 3.5.2**
Let $X = \{0, 1, \ldots, 5\}$. We obtain a permutation of $X$ if we map an element of $X$ in the first row of the following matrix to the number below that element in the second row:

$$\begin{pmatrix} 0 & 1 & 2 & 3 & 4 & 5 \\ 1 & 2 & 4 & 3 & 5 & 0 \end{pmatrix}.$$

Using this method, permutations can always be represented.

The set $S(X)$ of all permutations of $X$ together with composition is a group that, in general, is not commutative.

If $n$ is a positive integer, then $S_n$ denotes the group of permutations of the set $\{1, 2, \ldots, n\}$.

**Example 3.5.3**
The group $S_2$ has the elements

$$\begin{pmatrix} 1 & 2 \\ 1 & 2 \end{pmatrix}, \begin{pmatrix} 1 & 2 \\ 2 & 1 \end{pmatrix}.$$

**Theorem 3.5.4**
*The group $S_n$ has order $n! = 1 * 2 * 3 * \cdots * n$.*

*Proof.* We prove the assertion by induction on $n$. Clearly, $S_1$ has order 1. Suppose $S_{n-1}$ has order $(n-1)!$. Consider the permutations of the set $\{1, \ldots, n\}$. We count the number of permutations that send 1 to a fixed number $x$. In such permutations, the numbers $2, \ldots, n$ are bijectively mapped to the numbers $1, 2, \ldots, x-1, x+1, \ldots, n$. By the induction hypothesis, there are $(n-1)!$ such bijections. But since there are $n$ possibilities to map 1 to a number, the order of $S_n$ is $n(n-1)! = n!$. □

Let $X = \{0, 1\}^n$ be the set of all bitstrings of length $n$. A permutation of $X$ in which just the positions of the bits are permuted is called a *bit permutation*. To formally describe such a bit permutation, we choose $\pi \in S_n$. Then we set

$$f : \{0, 1\}^n \to \{0, 1\}^n, \quad b_1 \ldots b_n \mapsto b_{\pi(1)} \ldots b_{\pi(n)}.$$

This is in fact a bit permutation, and every bit permutation can be uniquely written in this way. Therefore, there are $n!$ bit permutations of bitstrings of length $n$.

SONOS-GVS-00012423

Special bit permutations are *circular left- or rightshifts*. A circular leftshift of $i$ positions maps the bitstring $(b_0, b_1, \ldots, b_{n-1})$ to $(b_{i \bmod n}, b_{(i+1) \bmod n}, \ldots, b_{(i+n-1) \bmod n})$. Circular rightshifts are defined analogously.

# 3.6  Block Ciphers

We now introduce block ciphers. They encrypt blocks of fixed length as blocks of the same length. Later, we show how to encrypt messages of arbitrary length using block ciphers.

**Definition 3.6.1**
A cryptosystem is called a *block cipher* if its plaintext space and its ciphertext space are the set $\Sigma^n$ of words of a fixed length $n$ over an alphabet $\Sigma$. The *block length* $n$ is a positive integer.

A simple example of a block cipher is the Caesar cipher. It has block length 1. In general, block ciphers with block length 1 are called *substitution ciphers*.

**Theorem 3.6.2**
*The encryption functions of a block cipher are permutations.*

*Proof.*  Since for each encryption function there is a corresponding decryption function, the encryption functions are injective. An injective map $\Sigma^n \to \Sigma^n$ is bijective.  □

Theorem 3.6.2 implies that the most general block cipher can be described as follows. Fix the block length $n$ and an alphabet $\Sigma$. As plaintext space and ciphertext space use $\mathcal{P} = \mathcal{C} = \Sigma^n$. The key space is the set $S(\Sigma^n)$ of all permutations of $\Sigma^n$. The encryption function for a key $\pi \in S(\Sigma^n)$ is

$$E_\pi : \Sigma^n \to \Sigma^n, \quad \vec{v} \mapsto \pi(\vec{v}).$$

The corresponding decryption function is

$$D_\pi : \Sigma^n \to \Sigma^n, \quad \vec{v} \mapsto \pi^{-1}(\vec{v}).$$

The key space of this scheme is very large. It contains $(|\Sigma|^n)!$ elements. Therefore, the scheme seems quite secure. It is, however,

SONOS-GVS-00012424

rather inefficient since it is not clear how to represent and evaluate an arbitrary $\pi \in (|\Sigma|^n)!$ efficiently. Therefore, it makes sense to use as the key space only a subset of all possible permutations of $\Sigma^n$. Those permutations should be easy to represent and evaluate.

It is, for example, possible to use the *permutation cipher*. It uses only permutations that permute the positions of the symbols. If $\Sigma = \{0, 1\}$, then those are the bit permutations. The key space is the permutations group $S_n$. For $\pi \in S_n$, set

$$E_\pi : \Sigma^n \to \Sigma^n, \quad (v_1, \ldots, v_n) \mapsto (v_{\pi(1)}, \ldots v_{\pi(n)}).$$

The corresponding decryption function is

$$D_\pi : \Sigma^n \to \Sigma^n, \quad (x_1, \ldots, x_n) \mapsto (x_{\pi^{-1}(1)}, \ldots x_{\pi^{-1}(n)}).$$

The key space has $n!$ elements. Each key can be encoded as a sequence of $n$ integers in $\{0, 1, \ldots, n-1\}$.

A method to study the security of block ciphers consists in studying their algebraic properties. Each encryption function is an element of a permutation group. If its order is small, the decryption can be effected by iterating the encryption function a few times.

# 3.7   Multiple Encryption

To increase the security of a block cipher, it is possible to apply it a few times. Frequently, the E-D-E triple encryption is used. A plaintext $p$ is encrypted as

$$c = E_{k_1}(D_{k_2}(E_{k_3}(p))).$$

Here, $k_i$, $1 \le i \le 3$ are three keys, $E_{k_i}$ is the encryption function, and $D_{k_i}$ is the decryption function for key $k_i$, $1 \le i \le 3$. This results in a considerably larger key space. If we only want to double the key length, we use $k_1 = k_3$.

SONOS-GVS-00012425



**FIGURE 3.1**   ECB mode.

# 3.8   Use of Block Ciphers

Before explaining classical examples for block ciphers, we discuss the use of block ciphers for encrypting arbitrarily long documents.

## 3.8.1   ECB mode

In this section, we use a block cipher with alphabet $\Sigma$ and block length $n$. Let $\mathcal{K}$ be the key space. Let $E_k$ be the encryption function and let $D_k$ be the decryption function for key $k \in \mathcal{K}$.

First, we explain the *electronic codebook mode* (ECB mode; see Fig. 3.1). An arbitrarily long plaintext is decomposed into blocks of length $n$. If necessary, the plaintext is supplemented such that its length is divisible by $n$. This supplement can consist of randomly chosen symbols. If the encryption key $e$ is used, then each block of length $n$ is encrypted using the encryption function $E_e$. The ciphertext is the sequence of the cipher texts. The ciphertext is decrypted by applying the decryption function $D_d$ with decryption key $d$, which corresponds to the encryption key $e$.

**Example 3.8.1**

We consider the block cipher that applies bit permutations to bit vectors of length 4 (i.e, the permutation cipher with alphabet $\Sigma = \{0, 1\}$ and block length 4). Then $\mathcal{K} = S_4$, and the encryption function

SONOS-GVS-00012426

**80**    **3. Encryption**

for key $\pi \in S_4$ is

$$E_\pi : \{0,1\}^4 \to \{0,1\}^4, \quad b_1 b_2 b_3 b_4 \mapsto b_{\pi(1)} b_{\pi(2)} b_{\pi(3)} b_{\pi(4)}.$$

We encrypt the plaintext

$$m = 101100010100101.$$

It is decomposed into blocks of length four. The last block has length three. It is supplemented to length four by adding one zero. We obtain

$$m = 1011\ 0001\ 0100\ 1010;$$

hence the blocks

$$m_1 = 1011, \quad m_2 = 0001, \quad m_3 = 0100, \quad m_4 = 1010.$$

We use the key

$$\pi = \begin{pmatrix} 1 & 2 & 3 & 4 \\ 2 & 3 & 4 & 1 \end{pmatrix}.$$

The blocks are encrypted separately. We obtain $c_1 = E_\pi(m_1) = 0111$, $c_2 = E_\pi(m_2) = 0010$, $c_3 = E_\pi(m_3) = 1000$, $c_4 = E_\pi(m_4) = 0101$. The ciphertext is

$$c = 0111001010000101.$$

ECB mode can also be used with an encryption algorithm that maps blocks of length $n$ to blocks of greater length. This is, for example, true for the RSA system (see Section 7.2.2).

When using ECB mode, equal plaintext blocks are encrypted into equal ciphertext blocks. It is therefore possible to recognize patterns of the plaintext in the ciphertext. This makes statistical attacks easier. Also, if ECB mode is used, then an attacker can substitute ciphertext blocks with other ciphertext blocks that have been encrypted under the same key. This manipulation of the ciphertext is hard to detect by the receiver. For those reasons, ECB mode should not be used for the encryption of large plaintexts.

The security of ECB mode can be increased if a certain part of each block is random and the remaining part comes from the plaintext. But then many random bits must be generated, and more blocks must be encrypted. This reduces the efficiency of the ECB mode.

## 3.8.2   CBC mode

The *cipherblock chaining mode* (CBC mode; see Fig. 3.2) avoids the problems of ECB mode. In this mode, the encryption of a block not only depends on the key but also on the previous blocks. Encryption is context-dependent. Equal blocks in different contexts are encrypted differently. The receiver can tell that the ciphertext has been changed because decryption of a manipulated ciphertext does not work.

We now explain CBC mode in detail. We use a block cipher with alphabet $\Sigma = \{0, 1\}$, block length $n$, key space $\mathcal{K}$, encryption functions $E_k$, and decryption functions $D_k$, $k \in \mathcal{K}$.

We need the following definition.

**Definition 3.8.2**
The map

$$\oplus : \{0, 1\}^2 \to \{0, 1\}, (b, c) \mapsto b \oplus c$$

is defined by the following table:

| $b$ | $c$ | $b \oplus c$ |
|---|---|---|
| 0 | 0 | 0 |
| 1 | 0 | 1 |
| 0 | 1 | 1 |
| 1 | 1 | 0 |

It is called the *exclusive or* of two bits or, in shortened form, *XOR*.

For $k \in \mathbb{N}$, $b = (b_1, b_2, \ldots, b_k)$, and $c = (c_1, c_2, \ldots, c_k) \in \{0, 1\}^k$, we set $b \oplus c = (b_1 \oplus c_1, b_2 \oplus c_2, \ldots, b_k \oplus c_k)$.

If the elements of $\mathbb{Z}/2\mathbb{Z}$ are represented by their least non-negative representatives 0 and 1, then exclusive or is addition in $\mathbb{Z}/2\mathbb{Z}$.

**Example 3.8.3**
If $b = 0100$ and $c = 1101$, then $b \oplus c = 1001$.

CBC mode uses a fixed *initialization vector*

$$IV \in \Sigma^n,$$

which can be made public. As in ECB mode, the plaintext is decomposed into blocks of length $n$. If Alice encrypts the sequence

SONOS-GVS-00012428

c0 = IV
cj
cj-1
Dd
d
mj
n
e
Ee
cj-1
n
cj
mj
Encryption
Decryption

**FIGURE 3.2** CBC mode.

$m_1, \ldots, m_t$ of plaintext blocks of length $n$ using the key $e$, then she sets

$$c_0 = IV, \quad c_j = E_e(c_{j-1} \oplus m_j), \quad 1 \leq j \leq t.$$

She obtains the ciphertext

$$c = c_1 \ldots c_t.$$

To decrypt this ciphertext, Bob uses the decryption key $d$, which satisfies $D_d(E_e(w)) = w$ for all plaintext blocks $w$. Then he computes

$$c_0 = IV, \quad m_j = c_{j-1} \oplus D_d(c_j), \quad 1 \leq j \leq t. \tag{3.1}$$

In fact, he obtains $c_0 \oplus D_d(c_1) = c_0 \oplus c_0 \oplus m_1 = m_1$. Analogously, it can be shown that all other plaintexts are correct.

**Example 3.8.4**
We use the same block cipher, the same plaintext, and the same key as in Example 3.8.1. The plaintext blocks are

$$m_1 = 1011, \quad m_2 = 0001, \quad m_3 = 0100, \quad m_4 = 1010.$$

The key is

$$\pi = \begin{pmatrix} 1 & 2 & 3 & 4 \\ 2 & 3 & 4 & 1 \end{pmatrix}.$$

As initialization vector, we use

$$IV = 1010.$$

Then $c_0 = 1010$, $c_1 = E_\pi(c_0 \oplus m_1) = E_\pi(0001) = 0010$, $c_2 = E_\pi(c_1 \oplus m_2) = E_\pi(0011) = 0110$, $c_3 = E_\pi(c_2 \oplus m_3) = E_\pi(0010) = 0100$, $c_4 = E_\pi(c_3 \oplus m_4) = E_\pi(1110) = 1101$. Also, the ciphertext is

$$c = 0010011001001101.$$

We decrypt this ciphertext and obtain $m_1 = c_0 \oplus E_\pi^{-1}(c_1) = 1010 \oplus 0001 = 1011$, $m_2 = c_1 \oplus E_\pi^{-1}(c_2) = 0010 \oplus 0011 = 0001$, $m_3 = c_2 \oplus E_\pi^{-1}(c_3) = 0110 \oplus 0010 = 0100$, $m_4 = c_3 \oplus E_\pi^{-1}(c_4) = 0100 \oplus 1110 = 1010$.

In general, CBC mode encrypts the same plaintext differently with different initialization vectors. Moreover, the encryption of a plaintext block depends on the preceding plaintext blocks. Therefore, if the order of the ciphertext blocks is changed or if ciphertext blocks are replaced, then decryption becomes impossible. This is an advantage over the ECB mode.

We study the effect of transmission errors. In (3.1), the plaintext block $m_j$ is computed from the ciphertext blocks $c_j$ and $c_{j-1}$. Therefore, if ciphertext block $c_j$ is transmitted incorrectly, then the plaintext blocks $m_j$ and $m_{j+1}$ may be incorrect. But the following plaintext blocks $m_{j+2}, m_{j+3}, \ldots$ are not influenced. They can be determined correctly.

## 3.8.3   CFB mode

CBC mode is well suited for the encryption of large messages. In real-time applications (i.e., if Bob wants to decrypt the ciphertext while receiving it), however he may have efficiency problems. Real-time encryption and decryption are, for example, necessary for secure telephone communication. To generate a ciphertext, Alice applies the encryption function. After the encryption is finished, Alice sends

SONOS-GVS-00012430

84    3. Encryption

the block to Bob, who applies the decryption function. This means that the encryption function and the decryption function must be used sequentially. Those functions may be expensive to compute. Therefore, there may be a considerable time difference between encryption and decryption.

In *cipher feedback mode* (CFB mode; see Fig. 3.3), this is different. To explain this mode, we use the same block cipher as in the CBC mode.

In CFB mode, the encryption function is not used directly for encrypting plaintext blocks but for generating a sequence of key blocks. The plaintext is encrypted by adding those key blocks mod 2. The ciphertext is decrypted by adding the same key blocks mod 2. The key blocks can be simultaneously generated by the sender, Alice, and the receiver, Bob. Only the addition mod 2 must be done sequentially, as follows.

Again, we need an initialization vector $IV \in \{0,1\}^n$. We also need a positive integer $r$, $1 \le r \le n$. The plaintext is decomposed into blocks of length $r$. To encrypt the sequence $m_1, \ldots, m_u$ of plaintexts, Alice sets

$$I_1 = IV,$$

and for $1 \le j \le u$:

1. $O_j = E_k(I_j)$,
2. $t_j$ to the string, which consists of the first $r$ bits of $O_j$,
3. $c_j = m_j \oplus t_j$,
4. $I_{j+1} = 2^r I_j + c_j \bmod 2^n$, so $I_{j+1}$ is generated by deleting the first $r$ bits in $I_j$ and appending $c_j$.

The ciphertext is the sequence $c_1, c_2, \ldots, c_n$.

Decryption works similarly. Bob sets

$$I_1 = IV,$$

and then for $1 \le j \le u$:

1. $O_j = E_k(I_j)$,
2. $t_j$ to the string, which consists of the first $r$ bits of $O_j$,
3. $m_j = c_j \oplus t_j$,
4. $I_{j+1} = 2^r I_j + c_j \bmod 2^n$.



**FIGURE 3.3**   CFB mode.

Both Alice and Bob can compute the string $t_{j+1}$ as soon as they know the ciphertext block $c_j$. Therefore, the key block $t_1$ can be computed by Alice and Bob simultaneously. Then Alice generates the ciphertext block $c_1 = m_1 \oplus t_1$ and sends it to Bob. The computation of $c_1$ is fast since it only requires an XOR. Then Alice and Bob can simultaneously compute the key block $c_2$, etc.

**Example 3.8.5**
We use the block cipher, plaintext, and key from Example 3.8.1 as well as the block length $r = 3$. The plaintext blocks are

$$m_1 = 101, \quad m_2 = 100, \quad m_3 = 010, \quad m_4 = 100, \quad m_5 = 101.$$

The key is

$$\pi = \begin{pmatrix} 1 & 2 & 3 & 4 \\ 2 & 3 & 4 & 1 \end{pmatrix}.$$

As initialization vector, we use

$$IV = 1010.$$

SONOS-GVS-00012432

CFB encryption is shown in the following table.

| $j$ | $I_j$ | $O_j$ | $t_j$ | $m_j$ | $c_j$ |
|---|---|---|---|---|---|
| 1 | 1010 | 0101 | 010 | 101 | 111 |
| 2 | 0111 | 1110 | 111 | 100 | 011 |
| 3 | 1011 | 0111 | 011 | 010 | 001 |
| 4 | 1001 | 0011 | 001 | 100 | 101 |
| 5 | 1101 | 1011 | 101 | 101 | 000 |

In CFB mode, transmission errors spoil decryption as long as parts of the wrong ciphertext block are in the vector $I_j$. Note that CFB mode cannot be used with public-key cryptosystems because both sender and receiver use the same key $e$.

## 3.8.4   OFB mode

*Output feedback mode* (OFB mode; see Fig. 3.4) is very similar to CFB mode. As in CFB mode, the OFB mode uses a block cipher with block length $n$, another block length $r$ with $1 \leq r \leq n$, and an initialization vector $I_1$. If Alice encrypts a plaintext using key $e$, then she decomposes it into blocks of length $r$ as in CFB mode. Then she sets for $1 \leq j \leq u$:

1. $O_j = E_k(I_j)$,

2. $t_j$ to the string, which consists of the first $r$ bits of $O_j$,

3. $c_j = m_j \oplus t_j$,

4. $I_{j+1} = O_j$.

Again, decryption works analogously. Step 3 is replaced by $m_j = c_j \oplus t_j$.

If a bit of the ciphertext is transmitted incorrectly, then the plaintext will be wrong in exactly the same position. The wrong bit has no other influence.

The key block $t_j$ only depends on the initialization vector $I_1$ and on the key $k$. They can be computed by the sender and the receiver simultaneously. This is even better than in CFB mode. However, the encryption of a plaintext block in OFB mode does not depend on the previous plaintext blocks but only on its position. Therefore,

SONOS-GVS-00012433



**FIGURE 3.4**   OFB mode.

manipulation of the ciphertext is easier in OFB mode than in CFB mode.

**Example 3.8.6**
We use the block cipher, plaintext, and key from Example 3.8.1. Moreover, we use $r = 3$. The plaintext blocks are

$$m_1 = 101, \quad m_2 = 100, \quad m_3 = 010, \quad m_4 = 100, \quad m_5 = 101.$$

The key is

$$\pi = \begin{pmatrix} 1 & 2 & 3 & 4 \\ 2 & 3 & 4 & 1 \end{pmatrix}.$$

As initialization vector, we use

$$IV = 1010.$$

Encryption is shown in the following table.

SONOS-GVS-00012434

| $j$ | $I_j$ | $O_j$ | $t_j$ | $m_j$ | $c_j$ |
|---|---|---|---|---|---|
| 1 | 1010 | 0101 | 010 | 101 | 111 |
| 2 | 0101 | 1010 | 101 | 100 | 001 |
| 3 | 1010 | 0101 | 010 | 010 | 000 |
| 4 | 0101 | 1010 | 101 | 100 | 001 |
| 5 | 1010 | 0101 | 010 | 101 | 111 |

If the same key $k$ is used for encrypting two plaintexts, then the initialization vector must be changed. Otherwise, the same sequence of key blocks $t_j$ is generated, and from two ciphertext blocks $c_j = m_j \oplus t_j$ and $c'_j = m'_j \oplus t_j$ the attacker, Oscar, obtains $c_j \oplus c'_j = m_j \oplus m'_j$. Hence, he can determine $m'_j$ if he knows $m_j$.

## 3.9 Stream Ciphers

We have explained how block ciphers can be used to encrypt arbitrarily long plaintexts such that the encryption of the individual plaintext blocks depends on their context. This principle is generalized in stream ciphers.

We only give an example for a stream cipher. A well-known stream cipher works as follows. The alphabet is $\Sigma = \{0, 1\}$. The plaintext- and ciphertext space is $\Sigma^*$. The key space is $\Sigma^n$ for a positive integer $n$. Words in $\Sigma^*$ are encrypted bit by bit. This works as follows. Let $k = (k_1, \ldots, k_n)$ be a key and $w = \sigma_1 \ldots \sigma_m$ a word of length $m$ in $\Sigma^*$. Alice generates a key stream $z_1, z_2, \ldots, z_m$. She sets

$$z_i = k_i, \quad 1 \leq i \leq n \tag{3.2}$$

and for $m > n$

$$z_i = \sum_{j=1}^{n} c_j z_{i-j} \bmod 2, \quad n < i \leq m, \tag{3.3}$$

where $c_1, \ldots, c_n$ are fixed coefficients. Such an equation is called *linear recursion* of degree $n$. The encryption function $E_k$ and the decryption function $D_k$ are defined by

$$E_k(w) = \sigma_1 \oplus z_1, \ldots, \sigma_m \oplus z_m, D_k(w) = \sigma_1 \oplus z_1, \ldots, \sigma_m \oplus z_m.$$



**FIGURE 3.5**   Linear shift register.

**Example 3.9.1**
Let $n = 4$. The key stream is generated by the recursion

$$z_{i+4} = z_i + z_{i+1},$$

so we have chosen $c_1 = c_2 = 0$, $c_3 = c_4 = 1$. Let $k = (1, 0, 0, 0)$ be the key. Then we obtain the key stream

$$1, 0, 0, 0, 1, 0, 0, 1, 1, 0, 1, 0, 1, 1, 1, 1, 0, 0, 0, \cdots.$$

This key stream is periodic with period length 15.

The stream cipher that was just described can be implemented in hardware using *linear shift registers*. Figure 3.5 shows such a shift register. The registers contain the last four values of the key stream. In each step, the key from the first register is used for encryption, the contents of the second, third, and fourth registers are shifted by one to the left, and the fourth key is computed by adding those bits for which the coefficient $c_i$ is 1.

We do not discuss stream ciphers in more detail but refer to [30].

# 3.10   Affine Cipher

Let $m$ be a positive integer. The *affine cipher* with plaintext alphabet $\mathbb{Z}_m$ is a block cipher with block length $n = 1$. The key space consists of all pairs $(a, b) \in \mathbb{Z}_m^2$ for which $m$ is prime to $a$. The encryption function $E_k$ for key $k = (a, b)$ is

$$E_k : \Sigma \to \Sigma, \quad x \mapsto ax + b \bmod m.$$

The decryption function for key $k = (a', b)$ is

$$D_k : \Sigma \to \Sigma, \quad x \mapsto a'(x - b) \bmod m.$$

SONOS-GVS-00012436

**90**    3. Encryption

To compute the decryption key that corresponds to the encryption key $(a, b)$ we solve the congruence $aa' \equiv 1 \bmod m$ with the extended euclidian algorithm. Then this key is $(a', b)$.

**Example 3.10.1**

If Alice chooses $m = 26$, $(a, b) = (7, 3)$, and encrypts the German word BALD with the affine cipher in ECB mode, then she obtains

| B | A | L | D |
|---|---|---|---|
| 1 | 0 | 11 | 3 |
| 10 | 3 | 2 | 24 |
| K | D | C | Y |

Bob computes the corresponding decryption function. He determines an integer $a'$ with $7a' \equiv 1 \bmod 26$. Using the extended euclidean algorithm, he obtains $a' = 15$. Hence, the decryption function maps a symbol $\sigma$ to $15(\sigma - 3) \bmod 26$. In fact, Bob computes

| K | D | C | Y |
|---|---|---|---|
| 10 | 3 | 2 | 24 |
| 1 | 0 | 11 | 3 |
| B | A | L | D |

The key space of the affine cipher with $m = 26$ contains $\varphi(26) * 26 = 312$ elements. Hence, if this block cipher is used in ECB mode, it can be broken with a ciphertext-only attack by an exhaustive key search. If a known plaintext attack is used and two symbols, together with their encryption, are known, then the affine cipher can be broken using an easy linear algebra computation, as the next example shows.

**Example 3.10.2**

The alphabet $\{A, B, \ldots, Z\}$ is identified with $\mathbb{Z}_{26}$ in the usual way. If the attacker, Oscar, knows that an application of the affine cipher with a fixed key $(a, b)$ maps the letter $E$ to $R$ and $S$ to $H$, then he obtains the following congruences:

$$4a + b \equiv 17 \bmod 26, \quad 18a + b \equiv 7 \bmod 26.$$

From the first congruence, he obtains $b \equiv 17 - 4a \bmod 26$. If he uses this in the second congruence, then he obtains $18a + 17 - 4a \equiv 7 \bmod 26$ and therefore $14a \equiv 16 \bmod 26$. This implies $7a \equiv$

SONOS-GVS-00012437

8 mod 13. He multiplies this congruence by the inverse 2 of 7 mod 13 and obtains $a \equiv 3$ mod 13, so he can compute $a = 3$ and $b = 5$.

# 3.11  Matrices and Linear Maps

In order to generalize affine ciphers, we review a few basic results of linear algebra over rings without proving them. For details, we refer the reader to [26].

Let $R$ be a commutative ring with unit element 1. For example, $R = \mathbb{Z}/m\mathbb{Z}$ for some positive integer $m$.

## 3.11.1  Matrices over rings

A $k \times n$ *matrix* over $R$ is a rectangular scheme

$$A = \begin{pmatrix} a_{1,1} & a_{1,2} & \cdots & a_{1,n} \\ a_{2,1} & a_{2,2} & \cdots & a_{2,n} \\ \vdots & \vdots & \cdots & \vdots \\ a_{k,1} & a_{k,2} & \cdots & a_{k,n} \end{pmatrix}.$$

We also write

$$A = (a_{i,j}).$$

If $n = k$, then the matrix is called a *square matrix*. The *i*th *row* of $A$ is the vector $(a_{i,1}, \ldots, a_{i,n})$, $1 \le i \le k$. The *j*th *column* of $A$ is the vector $(a_{1,j}, \ldots, a_{k,j})$, $1 \le j \le n$. The *entry* in row $i$ and column $j$ is $a_{i,j}$. The set of all $k \times n$ matrices over $R$ is denoted by $R^{(k,n)}$.

**Example 3.11.1**
Let $R = \mathbb{Z}$. For example,

$$\begin{pmatrix} 1 & 2 & 3 \\ 4 & 5 & 6 \end{pmatrix}$$

is a matrix over $\mathbb{Z}$. It has two rows, namely $(1, 2, 3)$ and $(4, 5, 6)$, and three columns, namely $(1, 4)$, $(2, 5)$, and $(3, 6)$.

SONOS-GVS-00012438

**92**    **3. Encryption**

## 3.11.2    Product of matrices and vectors

If $A = (a_{i,j}) \in R^{(k,n)}$ and $\vec{v} = (v_1, \ldots, v_n) \in R^n$, then the product $A\vec{v}$ is defined as the vector $\vec{w} = (w_1, w_2, \ldots, w_k)$ with

$$w_i = \sum_{j=1}^{n} a_{i,j} v_j, \quad 1 \le i \le k.$$

**Example 3.11.2**
Let $A = \begin{pmatrix} 1 & 2 \\ 2 & 3 \end{pmatrix}, \vec{v} = (1,2)$. Then $A\vec{v} = (5,8)$.

## 3.11.3    Sum and product of matrices

Let $n \in \mathbb{N}$ and $A, B \in R^{(n,n)}$, $A = (a_{i,j})$, $B = (b_{i,j})$. The *sum* of $A$ and $B$ is

$$A + B = (a_{i,j} + b_{i,j}).$$

The *product* of $A$ and $B$ is $A \cdot B = AB = (c_{i,j})$ with

$$c_{i,j} = \sum_{k=1}^{n} a_{i,k} b_{k,j}.$$

**Example 3.11.3**
Let $A = \begin{pmatrix} 1 & 2 \\ 2 & 3 \end{pmatrix}$, $B = \begin{pmatrix} 4 & 5 \\ 6 & 7 \end{pmatrix}$. Then $A + B = \begin{pmatrix} 5 & 7 \\ 8 & 10 \end{pmatrix}$, $AB = \begin{pmatrix} 16 & 19 \\ 26 & 31 \end{pmatrix}$, $BA = \begin{pmatrix} 14 & 23 \\ 20 & 33 \end{pmatrix}$. Multiplication of matrices is, in general, not commutative.

## 3.11.4    The ring of matrices

The $n \times n$ *identity matrix* over $R$ is $E_n = (e_{i,j})$ with

$$e_{i,j} = \begin{cases} 1 & \text{for } i = j, \\ 0 & \text{for } i \ne j. \end{cases}$$

The $n \times n$ zero matrix over $R$ is the $n \times n$ matrix all of whose entries are zero.

SONOS-GVS-00012439

**Example 3.11.4**

The $2 \times 2$ identity matrix over $\mathbb{Z}$ is $\begin{pmatrix} 1 & 0 \\ 0 & 1 \end{pmatrix}$. The $2 \times 2$ zero matrix over $\mathbb{Z}$ is $\begin{pmatrix} 0 & 0 \\ 0 & 0 \end{pmatrix}$.

Together with addition and multiplication, the set $R^{(n,n)}$ is a ring with unit element $E_n$. In general, this ring is not commutative. The neutral element with respect to addition is the zero matrix.

## 3.11.5    Determinants

The *determinant* $\det A$ of a matrix $A \in R^{(n,n)}$ can be defined recursively. For $n = 1$, $A = (a)$, we have $\det A = a$. Let $n > 1$. For $i, j \in \{1, 2, \ldots n\}$, denote by $A_{i,j}$ the matrix that is obtained from $A$ by deleting the $i$th row and $j$th column. Fix $i \in \{1, 2, \ldots, n\}$. Then the determinant of $A$ is

$$\det A = \sum_{j=1}^{n} (-1)^{i+j} a_{i,j} \det A_{i,j}.$$

This value is independent of the choice of $i$. Also, for all $j \in \{1, 2, \ldots, n\}$, we have

$$\det A = \sum_{i=1}^{n} (-1)^{i+j} a_{i,j} \det A_{i,j}.$$

**Example 3.11.5**

Let $A = \begin{pmatrix} a_{1,1} & a_{1,2} \\ a_{2,1} & a_{2,2} \end{pmatrix}$. Then $A_{1,1} = (a_{2,2}), A_{1,2} = (a_{2,1}), A_{2,1} = (a_{1,2}), A_{2,2} = (a_{1,1})$. Therefore, $\det A = a_{1,1} a_{2,2} - a_{1,2} a_{2,1}$.

## 3.11.6    Inverse of matrices

A matrix $A \in R^{(n,n)}$ has a multiplicative inverse if and only if $\det A$ is a unit in $R$. Here is a formula for this inverse. If $n = 1$, then $(a_{1,1}^{-1})$ is the inverse of $A$. Let $n > 1$ and $A_{i,j}$ as defined earlier. The *adjoint*

SONOS-GVS-00012440

of $A$ is an $n \times n$ matrix defined by

$$\operatorname{adj} A = ((-1)^{i+j} \det A_{j,i}).$$

The inverse of $A$ is

$$A^{-1} = (\det A)^{-1} \operatorname{adj} A.$$

**Example 3.11.6**

Let $A = \begin{pmatrix} a_{1,1} & a_{1,2} \\ a_{2,1} & a_{2,2} \end{pmatrix}$. Then $\operatorname{adj} A = \begin{pmatrix} a_{2,2} & -a_{1,2} \\ -a_{2,1} & a_{1,1} \end{pmatrix}$.

Let $A = (a_{i,j}), B = (b_{i,j}) \in \mathbb{Z}^{(n,n)}$ and $m \in \mathbb{N}$. We write

$$A \equiv B \bmod m$$

if $a_{i,j} \equiv b_{i,j} \bmod m$ for $1 \leq i, j \leq n$.

As an application of the results described in this section, we explain how to solve the congruence

$$AA' \equiv E_n \bmod m. \tag{3.4}$$

First, we give an example.

**Example 3.11.7**

Let $A = \begin{pmatrix} 1 & 2 \\ 3 & 4 \end{pmatrix}$. We want to solve the congruence

$$AA' \equiv E_2 \bmod 11 \tag{3.5}$$

for $A' \in \mathbb{Z}^{(2,2)}$. Denote by $\overline{A}$ the matrix that is obtained from $A$ by replacing its entries with their residue classes mod $m$. Solving the congruence (3.5) means finding the inverse $\overline{A'}$ of $\overline{A}$. It exists if the determinant of $\overline{A}$ is a unit in $\mathbb{Z}/11\mathbb{Z}$. This is true if and only if $\det A$ is prime to 11. Now $\det A = -2$, and hence prime to 11. Moreover, $(-2)(-6) \equiv 1 \bmod 11$. If we set

$$A' = (-6) * \operatorname{adj} A \bmod 11 = 5 * \begin{pmatrix} 4 & -2 \\ -3 & 1 \end{pmatrix} \bmod 11 = \begin{pmatrix} 9 & 1 \\ 7 & 5 \end{pmatrix},$$

then a solution of (3.5) is found.

We generalize the result of the preceding example. Let $A \in \mathbb{Z}^{n,n}$ and $m > 1$. The congruence (3.4) is solvable if and only if $\det A$ and

SONOS-GVS-00012441

$m$ are coprime. If this is true and if $a$ is an inverse of $\det A \bmod m$ (i.e., $a \det A \equiv 1 \bmod m$), then

$$A' = a \operatorname{adj} A \bmod m$$

is a solution of the congruence (3.4). This solution is unique mod $m$. The matrix $A'$ can be computed in polynomial time.

## 3.11.7   Affine linear functions

We define affine linear functions. They can be used to construct simple block ciphers.

**Definition 3.11.8**
A function $f : R^n \to R^l$ is called *affine linear* if there is a matrix $A \in R^{(l,n)}$ and a vector $\vec{b} \in R^l$ such that

$$f(\vec{v}) = A\vec{v} + \vec{b}$$

for all $\vec{v} \in R^n$. If $\vec{b} = 0$, then this function is called *linear*.

Affine linear functions $\mathbb{Z}_m^n \to \mathbb{Z}_m^n$ are defined analogously.

**Definition 3.11.9**
A function $f : \mathbb{Z}_m^n \to \mathbb{Z}_m^l$ is called *affine linear* if there is a matrix $A \in \mathbb{Z}^{(l,n)}$ and a vector $\vec{b} \in \mathbb{Z}^l$ such that

$$f(\vec{v}) = (A\vec{v} + \vec{b}) \bmod m$$

for all $\vec{v} \in \mathbb{Z}_m^n$. If $\vec{b} \equiv 0 \bmod m$, then this function is called *linear*.

**Theorem 3.11.10**
*The affine linear map from Definition 3.11.8 is bijective if and only if $l = n$ and $\det A$ is a unit in $R$.*

Analogously, the map from Definition 3.12 is bijective if and only if $l = n$ and $\det A$ is prime to $m$.

**Example 3.11.11**
Consider the map $f : \{0, 1\}^2 \to \{0, 1\}^2$, which is defined by

$$f(0, 0) = (0, 0), f(1, 0) = (1, 1), f(0, 1) = (1, 0), f(1, 1) = (0, 1).$$

SONOS-GVS-00012442

This map is linear because $f(\vec{v}) = \begin{pmatrix} 1 & 1 \\ 1 & 0 \end{pmatrix} \vec{v}$ for all $\vec{v} \in \{0, 1\}^2$.

We characterize linear and affine linear functions.

**Theorem 3.11.12**
*A function $f : R^n \to R''''$ is linear if and only if*

$$f(a\vec{v} + b\vec{w}) = af(\vec{v}) + bf(w)$$

*for all $\vec{v}, \vec{w} \in R^n$ and all $a, b \in R$. It is affine linear if and only if the function $R^n \to R^n$, $\vec{v} \mapsto f(\vec{v}) - f(\vec{0})$ is linear.*


# 3.12    Affine Linear Block Ciphers

We introduce *affine linear block ciphers*. They are generalizations of the affine cipher. We discuss those ciphers on the one hand for historical reasons. On the other hand, we want to show that affine linear ciphers can be quite easily attacked. This leads to an important design principle for block ciphers: Secure block ciphers must not be linear or easy to approximate by linear functions.

To define linear block ciphers, we need a positive integer $n$, the block length, and a positive integer $m$, $m > 2$.

**Definition 3.12.1**
A block cipher with block length $n$ and plaintext- and ciphertext space $\mathbb{Z}_m$ is called *affine linear* if all of its encryption functions are affine linear. It is called *linear* if all of its encryption functions are linear.

We describe affine linear block ciphers explicitly. The encryption functions are affine linear, and hence of the form

$$E : \mathbb{Z}_m^n \to \mathbb{Z}_m^n, \quad \vec{v} \mapsto A\vec{v} + \vec{b} \bmod m$$

with $A \in \mathbb{Z}^{(n,n)}$ and $b \in \mathbb{Z}^n$. Moreover, by Theorem 3.6.2, the function $E$ is bijective. Therefore, $\det A$ is prime to $m$ by Theorem 3.11.10. The encryption function is uniquely determined by the pair $(A, \vec{b})$. We can use this pair as the key. By the results of Section 3.11.6, the

SONOS-GVS-00012443

corresponding decryption function is

$$D : \mathbb{Z}_m^n \to \mathbb{Z}_m^n, \quad \vec{v} \mapsto A'(\vec{v} - \vec{b}) \bmod m,$$

where $A' = (a' \operatorname{adj} A) \bmod m$ and $a'$ is an inverse of $\det A \bmod m$.

# 3.13   Vigenère, Hill, and Permutation Ciphers

We give two examples of affine linear ciphers.

The Vigenère cipher is named after Blaise Vigenère, who lived in the 16th century. The key space is $\mathcal{K} = \mathbb{Z}_m^n$. If $\vec{k} \in \mathbb{Z}_m^n$, then

$$E_{\vec{k}} : \mathbb{Z}_m^n \to \mathbb{Z}_m^n, \quad \vec{v} \mapsto \vec{v} + \vec{k} \bmod m$$

and

$$D_{\vec{k}} : \mathbb{Z}_m^n \to \mathbb{Z}_m^n, \quad \vec{v} \mapsto \vec{v} - \vec{k} \bmod m.$$

The encryption and decryption functions are obviously affine linear. The number of elements in the key space is $m^n$.

The *Hill cipher* is another classical cryptosystem. It was invented in 1929 by Lester S. Hill. The key space $\mathcal{K}$ is the set of all matrices $A \in \mathbb{Z}_m^{(n,n)}$ with $\gcd(\det A, m) = 1$. The encryption function for key $A \in \mathcal{K}$ is

$$E_A : \mathbb{Z}_m^n \to \mathbb{Z}_m^n, \quad \vec{v} \mapsto A\vec{v} \bmod m. \tag{3.6}$$

Hence, the Hill cipher is the most general linear block cipher.

Finally, we show that the permutation cipher is linear. Let $\pi \in S_n$ and denote by $\vec{e}_i$, $1 \le i \le n$, the row vectors of the identity matrix. They are called *unit vectors*. Moreover, let $E_\pi$ be the $n \times n$ matrix whose $i$th row vector is $\vec{e}_{\pi(i)}$, $1 \le i \le n$. This matrix is obtained from the $n \times n$ identity matrix by permuting its rows according to the permutation $\pi$. The $j$th column of $E_\pi$ is the unit vector $\vec{e}_{\pi(j)}$. For any vector $\vec{v} = (v_1, \ldots, v_n) \in \Sigma^n$, we have

$$(v_{\pi(1)}, \ldots, v_{\pi(n)}) = E_\pi \vec{v}.$$

Therefore, the permutation cipher is a linear cipher (i.e., a special case of the Hill cipher).

SONOS-GVS-00012444

# 3.14   Cryptanalysis of Affine Linear Block Ciphers

We explain how an affine linear cipher with alphabet $\mathbb{Z}_m$ and block length $n$ can be broken by means of a known plaintext attack.

Suppose that Alice and Bob use an affine linear cipher and have agreed on a key. The encryption function is

$$E : \mathbb{Z}_m^n \to \mathbb{Z}_m^n, \quad \vec{v} \mapsto A\vec{v} + \vec{b} \bmod m$$

with $A \in \mathbb{Z}^{(n,n)}$ and $\vec{b} \in \mathbb{Z}^n$. The attacker, Oscar, wants to determine the key $(A, \vec{b})$. Oscar uses $n + 1$ plaintexts $\vec{w}_i$, $0 \le i \le n$ and the corresponding cipher texts $\vec{c}_i = A\vec{w}_i + \vec{b}$, $0 \le i \le n$. Then

$$\vec{c}_i - \vec{c}_0 \equiv A(\vec{w}_i - \vec{w}_0) \bmod m.$$

If $W$ is the matrix

$$W = (\vec{w}_1 - \vec{w}_0, \dots, \vec{w}_n - \vec{w}_0) \bmod m,$$

whose columns are the differences $(\vec{w}_i - \vec{w}_0) \bmod m$, $1 \le i \le n$ and if $C$ is the matrix

$$C = (\vec{c}_1 - \vec{c}_0, \dots, \vec{c}_n - \vec{c}_0) \bmod m$$

whose columns are the differences $(\vec{c}_i - \vec{c}_0) \bmod m$, $1 \le i \le n$, then we have

$$AW \equiv C \bmod m.$$

If $\det W$ is coprime to $m$, then

$$A \equiv C(w' \operatorname{adj} W) \bmod m,$$

where $w'$ is the inverse of $\det W \bmod m$. Moreover, we have

$$\vec{b} = \vec{c}_0 - A\vec{w}_0.$$

Thus, the key has been determined from $n + 1$ plaintext-ciphertext pairs. If the cipher is linear, then Oscar can set $\vec{w}_0 = \vec{c}_0 = \vec{b} = \vec{0}$.

**Example 3.14.1**
We show how to break a Hill cipher with block length 2. Suppose that we know that the encryption of HAND is FUSS. Then the encryption of $\vec{w}_1 = (7, 0)$ is $\vec{c}_1 = (5, 20)$ and that of $\vec{w}_2 = (13, 3)$ is $\vec{c}_2 = (18, 18)$.

SONOS-GVS-00012445

We obtain $W = \begin{pmatrix} 7 & 13 \\ 0 & 3 \end{pmatrix}$ and $C = \begin{pmatrix} 5 & 18 \\ 20 & 18 \end{pmatrix}$. Now $\det W = 21$ is coprime to 26. The inverse of 21 mod 26 is 5. This implies

$$A = 5C(\text{adj } W) \bmod 26 = 5 * \begin{pmatrix} 5 & 18 \\ 20 & 18 \end{pmatrix} \begin{pmatrix} 3 & 13 \\ 0 & 7 \end{pmatrix} \bmod 26 = \begin{pmatrix} 23 & 19 \\ 14 & 6 \end{pmatrix}.$$

In fact, we have $AW = C$.

## 3.15   Exercises

**Exercise 3.15.1**
The ciphertext VHFUHW has been generated with the Caesar cipher. Determine the key and the plaintext.

**Exercise 3.15.2**
Show that the following procedure defines a cryptosystem.

Let $w$ be a string over $\{A, B, \ldots, Z\}$. Choose two Caesar cipher keys $k_1$ and $k_2$. Encrypt the elements of $w$ having odd numbers with $k_1$ and those having even numbers with $k_2$. Then reverse the order of the encrypted string.

Determine the plaintext space, the ciphertext space, and the key space.

**Exercise 3.15.3**
Show that the encryption function of a cryptosystem is always injective.

**Exercise 3.15.4**
Determine the number of strings of length $n$ over an alphabet $\Sigma$ that do not change if they are reversed.

**Exercise 3.15.5**
Let $\Sigma$ be an alphabet. Show that the set $\Sigma^*$ together with concatenation is a monoid. Is this monoid a group?

**Exercise 3.15.6**
Determine the number of block ciphers over the alphabet $\{0.1\}$ whose ciphertexts have the same number of ones as the plain texts.

SONOS-GVS-00012446

**100**   **3. Encryption**

**Exercise 3.15.7**
Which of the following schemes is a cryptosystem? What is the plain-text space, the ciphertext space, and the key space? We always let $\Sigma = \mathbb{Z}_{26}$.
1. Each letter $\sigma \in \Sigma$ is replaced by $k\sigma \bmod 26$, $k \in \{1, 2, \dots, 26\}$.
2. Each letter $\sigma \in \Sigma$ is replaced by $k\sigma \bmod 26$, $k \in \{1, 2, \dots, 26\}$, $\gcd(k, 26) = 1$.

**Exercise 3.15.8**
Give an example for a cryptosystem with encryption functions that are injective but not surjective.

**Exercise 3.15.9**
Determine the number of bit permutations of the set $\{0, 1\}^n$, $n \in \mathbb{N}$ and the number of circular right shifts of $\{0, 1\}^n$.

**Exercise 3.15.10**
A *transposition* is a permutation that interchanges two elements and maps all other elements to themselves. Prove that every permutation can be obtained as a composition of transpositions.

**Exercise 3.15.11**
Find a permutation of $\{0, 1\}^n$ that is not a bit permutation.

**Exercise 3.15.12**
Find a permutation of $\{0, 1\}^n$ that is not affine linear.

**Exercise 3.15.13**
Let $X$ be a set. Show that the set $S(X)$ of permutations of $X$ is a group with respect to composition and that this group is, in general, not commutative.

**Exercise 3.15.14**
Decrypt the plaintext 111111111111 using ECB mode, CBC mode, CFB mode, and OFB mode. Use the permutation cipher with block length 3 and key

$$k = \begin{pmatrix} 1 & 2 & 3 \\ 2 & 3 & 1 \end{pmatrix}.$$

The initialization vector is 000. For the OFB and CFB modes, use $r = 2$.

SONOS-GVS-00012447

**Exercise 3.15.15**
Encrypt the plaintext 101010101010 using ECB mode, CBC mode, CFB mode, and OFB mode. Use the permutation cipher with block length 3 and key

$$k = \begin{pmatrix} 1 & 2 & 3 \\ 2 & 1 & 3 \end{pmatrix}.$$

The initialization vector is 000. For OFB and CFB modes, use $r = 2$.

**Exercise 3.15.16**
Let $k = 1010101$, $c = 1110011$, $w = 1110001\ 1110001\ 1110001$. Encrypt $w$ using the stream cipher from Section 3.9.

**Exercise 3.15.17**
Determine the determinant of the matrix

$$\begin{pmatrix} 1 & 2 & 3 \\ 2 & 3 & 1 \\ 3 & 1 & 2 \end{pmatrix}.$$

**Exercise 3.15.18**
Find a closed formula for the determinant of a $3 \times 3$ matrix.

**Exercise 3.15.19**
Find an injective affine linear map $(\mathbb{Z}/2\mathbb{Z})^3 \to (\mathbb{Z}/2\mathbb{Z})^3$ that sends $(1, 1, 1)$ to $(0, 0, 0)$.

**Exercise 3.15.20**
Determine the inverse of the matrix

$$\begin{pmatrix} 1 & 1 & 1 \\ 1 & 1 & 0 \\ 1 & 0 & 0 \end{pmatrix}$$

mod 2.

**Exercise 3.15.21**
Find a key for the affine linear cipher with alphabet {A,B,C,. . . ,Z} and block length three that encrypts "RED" as "ONE".

SONOS-GVS-00012448

# EXHIBIT C

# Withdrawn NIST Technical Series Publication

**Warning Notice**

The attached publication has been withdrawn (archived), and is provided solely for historical purposes. It may have been superseded by another publication (indicated below).

## Withdrawn Publication

| | |
|---|---|
| **Series/Number** | NIST Special Publication 800-175B |
| **Title** | Guideline for Using Cryptographic Standards in the Federal Government: Cryptographic Mechanisms |
| **Publication Date(s)** | August 2016 |
| **Withdrawal Date** | March 31, 2020 |
| **Withdrawal Note** | SP 800-175B is superseded in its entirety by the publication of SP 800-175B Revision 1. |

## Superseding Publication(s) *(if applicable)*

The attached publication has been **superseded by** the following publication(s):

| | |
|---|---|
| **Series/Number** | NIST Special Publication 800-175B Revision 1 |
| **Title** | Guideline for Using Cryptographic Standards in the Federal Government: Cryptographic Mechanisms |
| **Author(s)** | Elaine Barker |
| **Publication Date(s)** | March 2020 |
| **URL/DOI** | https://doi.org/10.6028/NIST.SP.800-175Br1 |

## Additional Information *(if applicable)*

| | |
|---|---|
| **Contact** | Computer Security Division (Information Technology Laboratory) |
| **Latest revision of the attached publication** | |
| **Related Information** | https://csrc.nist.gov/projects/cryptographic-standards-and-guidelines<br>https://csrc.nist.gov/publications/detail/sp/800-175B/rev-1/final |
| **Withdrawal Announcement Link** | |



National Institute of
Standards and Technology
U.S. Department of Commerce

Date updated: March 31, 2020

**NIST Special Publication 800-175B**

# Guideline for Using Cryptographic Standards in the Federal Government:
## *Cryptographic Mechanisms*

Elaine Barker

This publication is available free of charge from:
http://dx.doi.org/10.6028/NIST.SP.800-175B

## C O M P U T E R    S E C U R I T Y



**NIST Special Publication 800-175B**

# Guideline for Using Cryptographic Standards in the Federal Government:

*Cryptographic Mechanisms*

Elaine Barker
*Computer Security Division*
*Information Technology Laboratory*

This publication is available free of charge from:
http://dx.doi.org/10.6028/NIST.SP.800-175B

August 2016



U.S. Department of Commerce
*Penny Pritzker, Secretary*

National Institute of Standards and Technology
*Willie May, Under Secretary of Commerce for Standards and Technology and Director*

## Authority

This publication has been developed by NIST in accordance with its statutory responsibilities under the Federal Information Security Modernization Act (FISMA) of 2014, 44 U.S.C. § 3551 *et seq.*, Public Law (P.L.) 113-283. NIST is responsible for developing information security standards and guidelines, including minimum requirements for federal information systems, but such standards and guidelines shall not apply to national security systems without the express approval of appropriate federal officials exercising policy authority over such systems. This guideline is consistent with the requirements of the Office of Management and Budget (OMB) Circular A-130.

Nothing in this publication should be taken to contradict the standards and guidelines made mandatory and binding on federal agencies by the Secretary of Commerce under statutory authority. Nor should these guidelines be interpreted as altering or superseding the existing authorities of the Secretary of Commerce, Director of the OMB, or any other federal official. This publication may be used by nongovernmental organizations on a voluntary basis and is not subject to copyright in the United States. Attribution would, however, be appreciated by NIST.

National Institute of Standards and Technology Special Publication 800-175B
Natl. Inst. Stand. Technol. Spec. Publ. 800-175B, 73 pages (August 2016)
CODEN: NSPUE2

This publication is available free of charge from:
http://dx.doi.org/10.6028/NIST.SP.800-175B

Certain commercial entities, equipment, or materials may be identified in this document in order to describe an experimental procedure or concept adequately. Such identification is not intended to imply recommendation or endorsement by NIST, nor is it intended to imply that the entities, materials, or equipment are necessarily the best available for the purpose.

There may be references in this publication to other publications currently under development by NIST in accordance with its assigned statutory responsibilities. The information in this publication, including concepts and methodologies, may be used by federal agencies even before the completion of such companion publications. Thus, until each publication is completed, current requirements, guidelines, and procedures, where they exist, remain operative. For planning and transition purposes, federal agencies may wish to closely follow the development of these new publications by NIST.

Organizations are encouraged to review all draft publications during public comment periods and provide feedback to NIST. Many NIST cybersecurity publications, other than the ones noted above, are available at http://csrc.nist.gov/publications.

### Comments on this publication may be submitted to:

National Institute of Standards and Technology
Attn: Computer Security Division, Information Technology Laboratory
100 Bureau Drive (Mail Stop 8930) Gaithersburg, MD 20899-8930
Email: SP800-175@nist.gov

All comments are subject to release under the Freedom of Information Act (FOIA).

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

## Reports on Computer Systems Technology

The Information Technology Laboratory (ITL) at the National Institute of Standards and Technology (NIST) promotes the U.S. economy and public welfare by providing technical leadership for the Nation's measurement and standards infrastructure. ITL develops tests, test methods, reference data, proof of concept implementations, and technical analyses to advance the development and productive use of information technology. ITL's responsibilities include the development of management, administrative, technical, and physical standards and guidelines for the cost-effective security and privacy of other than national security-related information in federal information systems. The Special Publication 800-series reports on ITL's research, guidelines, and outreach efforts in information system security, and its collaborative activities with industry, government, and academic organizations.

## Abstract

This document is intended to provide guidance to the Federal Government for using cryptography and NIST's cryptographic standards to protect sensitive, but unclassified digitized information during transmission and while in storage. The cryptographic methods and services to be used are discussed.

## Keywords

asymmetric-key algorithm; authentication; confidentiality; cryptography; digital signatures; encryption; integrity; key agreement; key derivation; key management; key transport; key wrapping; message authentication codes; non-repudiation; Public Key Infrastructure (PKI); random bit generation; symmetric-key algorithm.

GUIDELINE FOR USING CRYPTO STANDARDS:
CRYPTOGRAPHIC MECHANISMS

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

## Acknowledgments

The author wishes to thank the authors of SP 800-21 from which this document was derived, Annabelle Lee and William C. Barker, along with those colleagues that reviewed drafts of this document and contributed to its development: Lily Chen, Shu-jen Chang, and Kerry McKay. The author also gratefully acknowledges and appreciates the many comments from the public and private sectors whose thoughtful and constructive comments improved the quality and usefulness of this publication.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST SP 800-175B

# Table of Contents

**SECTION 1:  INTRODUCTION** ................................................................ 1

  1.1  Overview and Purpose ................................................................. 1
  1.2  Audience .................................................................................... 2
  1.3  Scope ......................................................................................... 2
  1.4  Background ................................................................................. 2
  1.5  Terms and Definitions ................................................................ 3
  1.6  Acronyms ................................................................................... 9
  1.7  Content ..................................................................................... 10

**SECTION 2: STANDARDS AND GUIDELINES** ................................... 12

  2.1  Benefits of Standards ............................................................... 12
  2.2  Federal Information Processing Standards and Special Publications ................ 13

    2.2.1  The Use of FIPS and SPs .................................................. 13
    2.2.2  FIPS Waivers ................................................................... 14

  2.3  Other Standards Organizations ................................................ 14

    2.3.1  American National Standards Institute (ANSI) ................... 14
    2.3.2  Institute of Electrical and Electronics Engineers (IEEE) Standards Association ........... 15
    2.3.3  Internet Engineering Task Force (IETF) ............................. 16
    2.3.4  International Organization for Standardization (ISO) ........... 17
    2.3.5  Trusted Computing Group (TCG) ...................................... 18

**SECTION 3: CRYPTOGRAPHIC ALGORITHMS** ................................ 19

  3.1  Cryptographic Hash Functions ................................................ 19
  3.2  Symmetric-Key Algorithms ..................................................... 20

    3.2.1  Block Cipher Algorithms .................................................. 22

      3.2.1.1  Data Encryption Standard (DES) .......................... 22
      3.2.1.2  Triple Data Encryption Algorithm (TDEA) .............. 22
      3.2.1.3  SKIPJACK .......................................................... 22
      3.2.1.4  Advanced Encryption Standard (AES) ................... 23
      3.2.1.5  Modes of Operation ............................................. 23

    3.2.2  Hash-based Symmetric-key Algorithms ............................ 23

  3.3  Asymmetric-Key Algorithms ................................................... 23

    3.3.1  DSA ................................................................................ 25
    3.3.2  ECDSA ............................................................................ 25
    3.3.3  RSA ................................................................................ 26
    3.3.4  Diffie-Hellman and MQV .................................................. 26

  3.4  Algorithm Security Strength .................................................... 26
  3.5  Algorithm Lifetime .................................................................. 27

**SECTION 4: CRYPTOGRAPHIC SERVICES** ...................................... 28

  4.1  Data Confidentiality ................................................................ 28
  4.2  Data Integrity and Source Authentication ................................ 29

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

4.2.1 Hash Functions ..................................................................................... 30
4.2.2 Message Authentication Code Algorithms ........................................... 30
    4.2.2.1   MACs Based on Block Cipher Algorithms ............................ 31
    4.2.2.2   MACs Based on Hash Functions ........................................... 32

4.2.3 Digital Signature Algorithms ............................................................... 32

4.3 Combining Confidentiality and Authentication in a Block-Cipher Mode of
Operation ........................................................................................................ 34
4.4 Random Bit Generation .................................................................................. 35
4.5 Symmetric vs. Asymmetric Cryptography .................................................... 36

SECTION 5: KEY MANAGEMENT ........................................................................... 37

5.1 General Key Management Guidance ............................................................... 37

5.1.1 Recommendation for Key Management ................................................. 37
5.1.2 Security Requirements for Cryptographic Modules .............................. 39
5.1.3 Transitions to New Cryptographic Algorithms and Key Lengths ......... 39

5.2 Cryptographic Key Management Systems ...................................................... 40

5.2.1 Key Management Framework ................................................................ 40
5.2.2 Key Management System Profile .......................................................... 41
5.2.3 Public Key Infrastructure ..................................................................... 41
    5.2.3.1   PKI Components, Relying Parties and Their Responsibilities ......... 42
    5.2.3.2   Basic Certificate Verification Process .................................. 44
    5.2.3.3   CA Certificate Policies and Certificate Practice Statements ........... 44
    5.2.3.4   Federal Public Key Infrastructure ........................................ 45

5.3 Key Establishment .......................................................................................... 45

5.3.1 Key Generation ..................................................................................... 46
5.3.2 Key Derivation ...................................................................................... 46
5.3.3 Key Agreement ...................................................................................... 47
5.3.4 Key Transport ........................................................................................ 49
    5.3.4.1   SP 800-56A Key Transport .................................................. 49
    5.3.4.2   SP 800-56B Key Transport .................................................. 50

5.3.5 Key Wrapping ....................................................................................... 51
5.3.6 Derivation of a Key from a Password .................................................... 51

5.4 Key Management Issues .................................................................................. 52

5.4.1 Manual vs. Automated Key Establishment ........................................... 52
5.4.2 Selecting and Operating a CKMS ......................................................... 52
5.4.3 Storing and Protecting Keys .................................................................. 52
5.4.4 Cryptoperiods ........................................................................................ 53
5.4.5 Use Validated Algorithms and Cryptographic Modules ....................... 53
5.4.6 Control of Keying Material ................................................................... 53
5.4.7 Compromises ......................................................................................... 54
5.4.8 Accountability and Auditing ................................................................. 54

SECTION 6:  OTHER ISSUES .................................................................................. 56

6.1 Required Security Strength ............................................................................. 56

6.2    Interoperability ................................................................................................ 56
6.3    When Algorithms are No Longer Approved .................................................... 57
6.4    Registration Authorities (RAs) ...................................................................... 57
6.5    Cross Certification .......................................................................................... 58

**Appendix A:  References .................................................................................... 59**

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

# SECTION 1:  INTRODUCTION

## 1.1   Overview and Purpose

In today's environment of increasingly open and interconnected systems and networks and the use of mobile devices, network and data security are essential for the optimum safe use of this information technology. Cryptographic techniques should be considered for the protection of data that is sensitive, has a high value, or is vulnerable to unauthorized disclosure or undetected modification during transmission or while in storage.

Cryptography is a branch of mathematics that is based on the transformation of data and can be used to provide several security services: confidentiality, data integrity authentication, and source authentication, and also to support non-repudiation.

- *Confidentiality* is the property whereby sensitive information is not disclosed to unauthorized entities. Confidentiality can be provided by a cryptographic process called *encryption*.

- *Data integrity* is a property whereby data has not been altered in an unauthorized manner since it was created, transmitted or stored. The process of determining the integrity of the data is called *data integrity authentication*.

- *Source authentication* is a process that provides assurance of the source of information to a receiving entity; source authentication can also be considered as identity authentication (i.e., providing assurance of an entity's identity). A special case of source authentication is called *non-repudiation*, whereby support for assurance of the source of the information is provided to a third party.

This document is one part in a series of documents intended to provide guidance to the Federal Government for using cryptography to protect its sensitive, but unclassified digitized information during transmission and while in storage; hereafter, the shortened term "sensitive" will be used to refer to this class of information. Other sectors are invited to use this guidance on a voluntary basis. The following are the initial publications in the Special Publication (SP) 800-175 subseries. Additional documents may be provided in the future.

- SP 800-175A provides guidance on the determination of requirements for using cryptography. It includes the laws and regulations for the protection of the Federal Government's sensitive information, guidance for the conduct of risk assessments to determine what needs to be protected and how best to protect that information, and a discussion of the required security-related documents (e.g., various policy and practice documents).

- SP 800-175B (this document) discusses the cryptographic methods and services available for the protection of the Federal Government's sensitive information and provides an overview of NIST's cryptographic standards.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

1

## 1.2    Audience

This document is intended for federal employees and others who are responsible for providing and using cryptographic services to meet identified security requirements. This document might be used by:

- Program managers responsible for selecting and integrating cryptographic mechanisms into a system;

- A technical specialist requested to select one or more cryptographic methods/techniques to meet a specified requirement;

- A procurement specialist developing a solicitation for a system, network or service that will require cryptographic methods to perform security functionality; and

- Users of cryptographic services.

The goal is to provide these individuals with sufficient information to allow them to make informed decisions about the cryptographic methods that will meet their specific needs to protect the confidentiality and integrity of data that is transmitted and/or stored in a system or network, as well as to obtain assurance of its authenticity.

This document is not intended to provide information on the federal procurement process or to provide a technical discussion on the mathematics of cryptography and cryptographic algorithms.

## 1.3    Scope

This document limits its discussion of cryptographic methods to those that conform to Federal Information Processing Standards (FIPS) and NIST Special Publications (SPs), which are collectively discussed as NIST "standards" in this document. While the Federal Government is required to use these standards, when applicable, industry and national and international standards bodies have also adopted these cryptographic methods.

This document provides information on selecting and using cryptography in new or existing systems.

## 1.4    Background

The use of cryptography relies upon two basic components: an *algorithm* and a *key*. The algorithm is a mathematical function, and the key is a parameter used during the cryptographic process. The algorithm and key are used together to apply cryptographic protection to data (e.g., to encrypt the data or to generate a digital signature) and to remove or check the protection (e.g., to decrypt the encrypted data or to verify the digital signature). The security of the cryptographic protection relies on the secrecy of the key. Security should not rely on the secrecy of the algorithm, as the algorithm specification may be publicly available.

In order to use a cryptographic algorithm, cryptographic keys must be "in place," i.e., keys must be established for and/or between parties that intend to use cryptography. Keys

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

may be established either manually (e.g., via a trusted courier) or using an automated method. However, when an automated method is used, authentication is required for the participating entities that relies on an established trust infrastructure, such as a Public Key Infrastructure (PKI) or on a manually distributed authentication key.

In general, keys used for one purpose (e.g., the generation of digital signatures) must not be used for another purpose (e.g., for key establishment) because the use of the same key for two different cryptographic processes may weaken the security provided by one or both of the processes. See Section 5.2 in SP 800-57, Part 1[1] for further information.

## 1.5    Terms and Definitions

The following terms and definitions are used in this document.  In general, the definitions are drawn from FIPS and NIST Special Publications.

| | |
|---|---|
| Algorithm | A clearly specified mathematical process for computation; a set of rules that, if followed, will give a prescribed result. |
| Approved | FIPS-Approved and/or NIST-recommended. An algorithm or technique that is either 1) specified in a FIPS or NIST recommendation, or 2) specified elsewhere and adopted by reference in a FIPS or NIST Recommendation. |
| Asymmetric-key algorithm | See *public-key algorithm*. |
| Authentication | A process that provides assurance of the source and integrity of information that is communicated or stored. |
| Bit string | An ordered sequence of 0's and 1's. |
| Block cipher algorithm | A family of functions and their inverse functions that is parameterized by cryptographic keys; the functions map bit strings of a fixed length to bit strings of the same length. |
| Certificate (or public key certificate) | A set of data that uniquely identifies an entity, contains the entity's public key and possibly other information, and is digitally signed by a trusted party, thereby binding the public key to the entity identified in the certificate. Additional information in the certificate could specify how the key is used and the validity period of the certificate. |
| Certificate Revocation List (CRL) | A list of revoked but unexpired certificates issued by a Certification Authority. |

---

[1] SP 800-57 Part 1, *Recommendation for Key Management: General Guideline*.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| | |
|---|---|
| Certification Authority (CA) | The entity in a public key infrastructure (PKI) that is responsible for issuing certificates and exacting compliance to a PKI policy. |
| Ciphertext | Data in its encrypted form. |
| Compromise | The unauthorized disclosure, modification, substitution or use of sensitive data (e.g., keying material and other security-related information). |
| Confidentiality | The property that sensitive information is not disclosed to unauthorized entities. |
| Cross certify | The establishment of a trust relationship between two Certification Authorities (CAs) through the signing of each other's public key in a certificate referred to as a "cross-certificate." |
| Cryptographic algorithm | A well-defined computational procedure that takes variable inputs, including a cryptographic key (if applicable), and produces an output. |
| Cryptographic boundary | An explicitly defined continuous perimeter that establishes the physical bounds of a cryptographic module and contains all the hardware, software and/or firmware components of a cryptographic module. |
| Cryptographic checksum | A mathematical value created using a cryptographic algorithm that is assigned to data and later used to test the data to verify that the data has not changed. |
| Cryptographic hash function | A function that maps a bit string of arbitrary length to a fixed-length bit string. **Approved** hash functions satisfy the following properties:<br><br>1. (One-way) It is computationally infeasible to find any input that maps to any pre-specified output, and<br><br>2. (Collision resistant) It is computationally infeasible to find any two distinct inputs that map to the same output. |
| Cryptographic key | A parameter used in conjunction with a cryptographic algorithm that determines its operation in such a way that an entity with knowledge of the key can reproduce or reverse the operation, while an entity without knowledge of the key cannot. Examples include:<br><br>1. The transformation of plaintext data into ciphertext data,<br><br>2. The transformation of ciphertext data into plaintext data, |

|  | 3. The computation of a digital signature from data, |
|--|--|
|  | 4. The verification of a digital signature, |
|  | 5. The computation of an authentication code from data, |
|  | 6. The verification of an authentication code from data and a received authentication code, and |
|  | 7. The computation of a shared secret that is used to derive keying material. |
| Cryptographic module | The set of hardware, software and/or firmware that implements **_approved_** security functions (including cryptographic algorithms and key generation) and is contained within a cryptographic boundary. |
| Cryptographic primitive | A low-level cryptographic algorithm used as a basic building block for higher-level cryptographic algorithms. |
| Cryptography | The discipline that embodies the principles, means and methods for providing information security, including confidentiality, data integrity, and non-repudiation. |
| Cryptoperiod | The time span during which a specific key is authorized for use or in which the keys for a given system may remain in effect. |
| Data integrity | A property whereby data has not been altered in an unauthorized manner since it was created, transmitted or stored. |
| Decryption | The process of changing ciphertext into plaintext using a cryptographic algorithm and key. |
| Digital signature | The result of a cryptographic transformation of data that, when properly implemented, provides the services of: |
|  | 1. Source authentication, |
|  | 2. Data integrity, and |
|  | 3. Supports signer non-repudiation. |
| Digital Signature Algorithm (DSA) | A public-key algorithm that is used for the generation and verification of digital signatures. |
| Elliptic Curve Digital Signature Algorithm (ECDSA) | A digital signature algorithm that is an analog of DSA using elliptic curves. |
| Encryption | The process of changing plaintext into ciphertext for the purpose of security or privacy. |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST SP 800-175B

| Entity | An individual (person), organization, device or process. |
|---|---|
| Ephemeral key pair | A short-term key pair that is generated when needed; the public key of an ephemeral key pair is not provided in a public key certificate, unlike static public keys which often are. |
| Function | As used in this document, used interchangeability with algorithm. |
| Hash function | See *cryptographic hash function*. |
| Hash value | The result of applying a hash function to information; also called a message digest. |
| Initialization Vector (IV) | A vector used in defining the starting point of a cryptographic process. |
| Integrity | The property that data has not been modified or deleted in an unauthorized and undetected manner. |
| Interoperability | The ability of one entity to communicate with another entity. |
| Key | See *cryptographic key*. |
| Key agreement | A (pair-wise) key-establishment procedure where the resultant secret keying material is a function of information contributed by two participants, so that no party can predetermine the value of the secret keying material independently from the contributions of the other party. Contrast with key-transport. |
| Key derivation | The process by which one or more keys are derived from either a pre-shared key, or a shared secret and other information. |
| Key establishment | The procedure that results in keying material that is shared among different parties. |
| Key management | The activities involving the handling of cryptographic keys and other related security parameters (e.g., IVs and counters) during the entire life cycle of the keys, including the generation, storage, establishment, entry and output, and destruction. |
| Key pair | A public key and its corresponding private key; a key pair is used with a public key (asymmetric-key) algorithm. |
| Key transport | A key-establishment procedure whereby one party (the sender) selects a value for the secret keying material and then securely distributes that value to another party (the receiver). Contrast with key agreement. |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| Key-wrapping key | A symmetric key used to provide confidentiality and integrity protection for other keys. |
|---|---|
| Keying material | The data (e.g., keys and IVs) necessary to establish and maintain cryptographic keying relationships. |
| Keying relationship, cryptographic | The state existing between two entities such that they share at least one cryptographic key. |
| Message Authentication Code (MAC) | A cryptographic checksum on data that uses a symmetric key to detect both accidental and intentional modifications of data. |
| Message digest | See _hash value_. |
| Mode of operation | An algorithm that uses a block cipher algorithm to provide a cryptographic service, such as confidentiality or authentication. |
| NIST standard | Federal Information Processing Standard (FIPS) or Special Publication (SP). |
| Non-repudiation | A service using a digital signature that is used to support a determination of whether a message was actually signed by a given entity. |
| Plaintext | Data that has not been encrypted. |
| Primitive | See _Cryptographic primitive_. |
| Private key | A cryptographic key, used with a public key cryptographic algorithm that is uniquely associated with an entity and is not made public. In an asymmetric (public) key cryptosystem, the private key is associated with a public key.  Depending on the algorithm, the private key may be used to: <br><br> 1. Compute the corresponding public key, <br><br> 2. Compute a digital signature that may be verified by the corresponding public key, <br><br> 3. Decrypt data that was encrypted by the corresponding public key, or <br><br> 4. Compute a shared secret during a key-agreement process. |
| Public key | A cryptographic key used with a public-key cryptographic algorithm, that is uniquely associated with an entity and that may be made public. In an asymmetric (public) key cryptosystem, the public key is associated with a private key. The public key may be known by anyone and, depending on the |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST SP 800-175B

|  | algorithm, may be used to: <br> 1. Verify a digital signature that is signed by the corresponding private key, <br> 2. Encrypt data that can be decrypted by the corresponding private key, <br> 3. Compute a shared secret during a key-agreement process. |
| --- | --- |
| Public key (asymmetric) cryptographic algorithm | A cryptographic algorithm that uses two related keys, a public key and a private key. The two keys have the property that determining the private key from the public key is computationally infeasible. |
| Public Key Infrastructure (PKI) | A framework that is established to issue, maintain and revoke public key certificates. |
| Relying party | An entity that relies on the certificate and the CA that issued the certificate to verify the identity of the certificate owner, and the validity of the public key, associated algorithms and any relevant parameters in the certificate, as well as the owner's possession of the corresponding private key. |
| RSA | A public-key algorithm that is used for key establishment and the generation and verification of digital signatures. |
| Secret key | A cryptographic key that is used with a symmetric (secret key) cryptographic algorithm and is not made public. The use of the term "secret" in this context does not imply a classification level, but rather implies the need to protect the key from disclosure. Compare with a private key, which is used with a public key algorithm. |
| Secret key (symmetric) cryptographic algorithm | See *symmetric (secret key) algorithm*. |
| Sensitive (information) | Sensitive, but unclassified information. |
| Security strength | A number associated with the amount of work (that is, the number of operations) that is required to break a cryptographic algorithm or system. |
| Shared secret | A secret value that is computed during a key-agreement transaction and is used as input to derive a key using a key-derivation method. |

| Signature generation | The use of a digital signature algorithm and a private key to generate a digital signature on data. |
|---|---|
| Signature verification | The use of a digital signature and a public key to verify a digital signature on data. |
| Source authentication | A process that provides assurance of the source of information. |
| Static key pair | A long-term key pair for which the public key is often provided in a public-key certificate. |
| Symmetric key | A single cryptographic key that is used with a symmetric (secret key) algorithm. Also called a secret key. |
| Symmetric (secret key) algorithm | A cryptographic algorithm that uses the same secret key for an operation and its complement (e.g., encryption and decryption). |

## 1.6   Acronyms

| | |
|---|---|
| AES | Advanced Encryption Standard; specified in FIPS 197. |
| ANS | American National Standard. |
| ANSI | American National Standard Institute. |
| ASC | Accredited Standards Committee. |
| CA | Certification Authority. |
| CBC | Cipher Block Chaining mode; specified in SP 800-38A. |
| CFB | Cipher Feedback mode; specified in SP 800-38A. |
| CKMS | Cryptographic Key Management System. |
| CP | Certificate Policy. |
| CPS | Certification Practice Statement. |
| CRL | Certificate Revocation List. |
| CTR | Counter mode; specified in SP 800-38A. |
| DES | Data Encryption Standard; originally specified in FIPS 46; now provided in SP 800-67. |
| DH | Diffie-Hellman algorithm. |
| DNSSEC | Domain Name System Security Extensions. |
| DRBG | Deterministic Random Bit Generator; specified in SP 800-90A. |
| DSA | Digital Signature Algorithm; specified in FIPS 186. |
| ECB | Electronic Codebook mode; specified in SP 800-38A. |
| ECDSA | Elliptic Curve Digital Signature Algorithm. |
| EMC | Electromagnetic Compatibility. |
| FCKMS | Federal Cryptographic Key Management System. |
| FIPS | Federal Information Processing Standard. |
| FISMA | Federal Information Security Management Act. |
| GCM | Galois Counter Mode; specified in SP 800-38D. |
| HMAC | Keyed-Hash Message Authentication Code; specified in FIPS 198. |
| IEC | International Electrotechnical Commission. |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| IEEE | Institute of Electrical and Electronics Engineers. |
| IETF | Internet Engineering Task Force. |
| EMI | Electromagnetic Interference. |
| INCITS | International Committee for Information Technology Standards. |
| IPSEC | Internet Protocol Security. |
| ISO | International Standards Organization. |
| IT | Information Technology. |
| MAC | Message Authentication Code. |
| MQV | Menezes-Qu-Vanstone algorithm; specified in SP 800-56A. |
| NRBG | Non-deterministic Random Bit Generator. |
| NIST | National Institute of Standards and Technology. |
| OFB | Output Feedback mode; specified in SP 800-38A. |
| OTAR | Over-the-Air-Rekeying. |
| PKI | Public Key Infrastructure. |
| RA | Registration Authority. |
| RBG | Random Bit Generator. |
| RFC | Request for Comment. |
| RSA | A public key algorithm attributed to Rivest, Shamir and Adleman. |
| SHA | Secure Hash Algorithm. |
| SP | Special Publication. |
| SSH | Secure Shell protocol. |
| TCG | Trusted Computing Group. |
| TDEA | Triple Data Encryption Algorithm; specified in SP 800-67. |
| TLS | Transport Layer Security. |

## 1.7   Content

This document is organized into the following sections:

- Section 1 provides an introduction to the SP 800-175 series of publications and to this document in particular, and provides a glossary of terms and a list of acronyms.

- Section 2 discusses the importance of standards, as well as the national and international standards bodies concerned with cryptography.

- Section 3 introduces the **approved** algorithms used for encryption, digital signature and key-establishment, and provides discussions on security strengths and algorithm lifetime.

- Section 4 discusses the services that cryptography can provide: data confidentiality, data integrity authentication, source authentication and support for non-repudiation.

- Section 5 discusses the key management required for the use of cryptography, providing general guidance and discussions on key-management systems, key-establishment mechanisms and random bit generation.

- Section 6 discusses additional issues associated with the use of cryptography.

There is one appendix in this document:

- Appendix A lists applicable Federal Information Processing Standards, recommendations, and guidelines.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

# SECTION 2: STANDARDS AND GUIDELINES

## 2.1   Benefits of Standards

Standards define common practices, methods, and measures/metrics. Standards provide solutions that have been evaluated by experts in relevant areas, reviewed by the public and subsequently accepted by a wide community of users. By using standards, organizations can reduce costs and protect their investments in technology.

Standards provide the following benefits:

- **Interoperability.** Products developed to a specific standard may be used to provide interoperability with other products that conform to the same standard. For example, by using the same cryptographic encryption algorithm, data that was encrypted using vendor A's product may be decrypted using vendor B's product. The use of a common standards-based cryptographic algorithm is necessary, but may not be sufficient to ensure product interoperability.  Other common standards, such as communications protocol standards, may also be necessary.

  By ensuring interoperability among the products of different vendors, standards permit an organization to select from various available products to find the most cost-effective solution.

- **Security.** Standards may be used to establish a common level of security.  For example, most agency managers are not cryptographic security experts, and, by using an **approved** cryptographic algorithm and key length, a manager knows that the algorithm has been found to be adequate for the protection of sensitive government data and has been subjected to a significant period of public analysis and comment.

- **Quality.** Standards may be used to assure the quality of a product.  Standards may:

  o   Specify how a feature is to be implemented,

  o   Require self-tests to ensure that the product is still functioning correctly, and

  o   Require specific documentation to assure proper implementation and product-change management.

  Many NIST standards have associated conformance tests and specify the conformance requirements.  The conformance tests may be administered by NIST-accredited laboratories and provide validation that the NIST standard was correctly implemented.

- **Common Form of Reference.** A NIST standard may become a common form of reference to be used in testing/evaluating a vendor's product.  For example, FIPS 140[2] contains security and integrity requirements for *any* cryptographic module implementing cryptographic operations.

---

[2] FIPS 140, *Security Requirements for Cryptographic Modules*.

- **Cost Savings.** Implementations that comply with commonly accepted specifications provided by standards can save money. Without standards, users may be required to become experts in every information technology (IT) product that is being considered for procurement. Also, without standards, products may not interoperate with different products purchased by other users. This could result in a significant waste of money or in the delay of implementing IT.

## 2.2   Federal Information Processing Standards and Special Publications

### 2.2.1   The Use of FIPS and SPs

The use of a Federal Information Processing Standard (FIPS) is *mandatory* for the Federal Government whenever the type of service specified in that standard is required by a federal agency for the protection of sensitive information. For example, FIPS 197[3] contains a specific set of technical security requirements for the AES algorithm. Whenever AES is used by an agency, its implementation and use must conform to FIPS 197. A FIPS is **approved** by the Secretary of Commerce.

A NIST Special Publication (SP) is similar to a FIPS, but is not mandatory unless a particular government agency (e.g., OMB) makes it so. An SP does not need the approval of the Secretary of Commerce.

Although the requirements for the use of a FIPS and an SP are different, both types of publications have been subjected to the same review process by the federal agencies and the public. The approval process for a FIPS is more formal than that of an SP, and subsequently takes longer for the initial approval and the approval of any subsequent revisions.

When a federal agency requires the use of cryptography (e.g., for encryption), an **approved** algorithm must be used; approval is indicated by inclusion in a FIPS or SP. For example, two **approved** algorithms for encryption are AES (as specified in FIPS 197) and TDEA (as specified in SP 800-67[4]). Whenever encryption is used by a federal agency for the protection of sensitive information, either AES or TDEA must be used. Whenever AES is to be used, it must be implemented as specified in FIPS 197; whenever TDEA is to be used, it must be implemented as specified in SP 800-67. In addition to using **approved** algorithms, federal agencies are required to use only implementations of these algorithms that have been validated and are included in validated cryptographic modules (see Section 5.4.5 for further discussion).

When developing a specification or the criteria for the selection of a cryptographic mechanism or service, cryptographic algorithms specified in FIPS and SPs must be used, when available. Some guidelines may be used to specify the functions that the algorithm will perform (e.g., FIPS 199[5] or SP 800-53[6]). Other NIST standards specify the

---

[3] FIPS 197, *Advanced Encryption Standard (AES)*.

[4] SP 800-67, *Recommendation for the Triple Data Encryption Algorithm (TDEA) Block Cipher*.

[5] FIPS 199, *Standards for Security Categorization of Federal Information and Information Systems*.

[6] SP 800-53, *Security and Privacy Controls for Federal Information Systems and Organizations*.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

operation and use of specific types of algorithms (e.g., AES, DSA) and the level of independent testing required for classes of security environments (e.g., FIPS 140).

Appendix A contains a list of FIPS and SPs that apply to the implementation of cryptography in the Federal Government. Note that when a FIPS is revised, its number is commonly followed by a revision number that indicates the number of times that it has been revised (e.g., "FIPS 186-4" is used to indicate the fourth revision of FIPS 186); this practice is not used in the main body of this document; the reader must refer to the latest version of the FIPS or SP that has been officially **approved** (see http://csrc.nist.gov/publications/; note that this site also contains clearly marked draft publications) .

### 2.2.2   FIPS Waivers

In the past, a waiver was sometimes issued by an agency to indicate that the use of a FIPS was not required by that agency. However, the Federal Information Security Management Act (FISMA) of 2002 (P.L. 107-347) eliminated previously authorized provisions for waivers from FIPS (see SP 800-175A for a discussion).

## 2.3   Other Standards Organizations

NIST develops standards, recommendations, and guidelines that are used by vendors who are developing security products, components, and modules.  These products may be acquired and used by federal government agencies.  In addition, there are other groups that develop and promulgate standards.  These organizations are briefly described below.

### 2.3.1   American National Standards Institute (ANSI) [7]

The American National Standards Institute (ANSI) is the administrator and coordinator of the United States' private-sector voluntary standardization system. ANSI does not develop American National Standards itself; rather, it facilitates the development of standards by establishing consensus among qualified groups.

Several ANSI committees have developed standards that use cryptography, but the primary committee that has developed standards for the cryptographic algorithms themselves is Accredited Standards Committee (ASC) X9, which is a financial-industry committee[8]. Many of the standards developed within ASC X9 have been adopted within NIST standards (e.g., the Elliptic Curve Digital Signature Algorithm specified in American National Standard X9.62[9] has been adopted in FIPS 186); likewise, ASC X9 has approved the use of NIST standards via a registry of approved standards from non-ASC X9 sources (e.g., AES, as specified in FIPS 197).

A number of ASC X9 standards have also been incorporated into the standards of other standards bodies, such as the International Standards Organization (ISO) (see Section

---

[7] Further information is available at the ANSI web site: www.ansi.org.

[8] Further information is available at the ANSI X9 web site: x9.org.

[9] ANS X9.62, *Public Key Cryptography for the Financial Services Industry: The Elliptic Curve Digital Signature Algorithm (ECDSA).*

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

2.3.4) via a Technical Advisory Group (TAG) called the International Committee on Information Technology Standards (INCITS). INCITS has been responsible for assuring that U.S. standards (e.g., both those developed by NIST and those developed within ASC X9) are incorporated within ISO standards.

### 2.3.2  Institute of Electrical and Electronics Engineers (IEEE) Standards Association[10]

IEEE is an international, professional association that is dedicated to advancing technological innovation and excellence. The technical objectives of the IEEE focus on advancing the theory and practice of electrical, electronics and computer engineering, and computer science.  IEEE develops and disseminates voluntary, consensus-based industry standards involving leading-edge electro-technology.   IEEE supports international standardization and encourages the development of globally acceptable standards.

The Institute of Electrical and Electronics Engineers Standards Association (IEEE-SA) is an organization within IEEE that develops global standards. It has more than one thousand active standards, some of which are related to cryptography.

IEEE P1363[11] is the only IEEE standard that focuses on cryptography. It includes a series of standards on public-key cryptography. IEEE P1363 was developed at the same time as the ANSI public-key cryptographic standards, such as ANS X9.31[12], X9.42[13], X9.44[14], X9.62[15], and X9.63[16], which were developed in ASC X9 (see Section 2.4.1).

- The first part of the IEEE P1363 standard was published in 2000 and revised in 2004 as IEEE P1363a[17]. It includes the basic public-key cryptography schemes, such as RSA encryption, signatures, the Digital Signature Algorithm (DSA), and key establishment using Diffie-Hellman (DH) and Menezes-Qu-Vanstone (MQV) over finite fields and elliptic curves.

- IEEE P1363.1[18], which was published in 2008, specifies NTRU encryption and signature schemes.

---

[10] Further information is available at the IEEE-SA web site: standards.ieee.org.

[11] IEEE P1363: *Standard Specifications for Public-Key Cryptography.*

[12] ANS X9.31, *Digital Signatures Using Reversible Public Key Cryptography for the Financial Services Industry (rDSA)*, which has now been withdrawn.

[13] ANS X9.42, *Agreement of Symmetric Keys Using Discrete Logarithm Cryptography*, which has now been withdrawn.

[14] ANS X9.44, *Key Establishment Using Integer Factorization Cryptography.*

[15] ANS X9.62, *The Elliptic Curve Digital Signature Algorithm (ECDSA).*

[16] ANS X9.63*, Key Agreement and Key Transport Using Elliptic Curve Cryptography.*

[17]  IEEE P1363a, *Standard Specifications for Public Key Cryptography - Amendment 1: Additional Techniques.*
[18] IEEE P1363.1, *Public-Key Cryptographic Techniques Based on Hard Problems over Lattices.*

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

- IEEE P1363.2[19] was also published in 2008. It specifies password-authenticated key agreement and password-authenticated key retrieval schemes.

The schemes specified in IEEE P1363.1 and P1363.2 are not included in the NIST standards.

Cryptographic schemes are used in IEEE standards for different applications. One of the more notable is the IEEE 802 LAN/MAN group of standards, which are widely used computer networking standards for both wired (Ethernet) and wireless (IEEE 802.11[20]) networks. Cryptographic algorithms are used to protect wireless communications. The CCM mode for authentication and confidentiality specified in SP 800-38C was adopted from IEEE 802.11. Other AES modes of operation (e.g., GCM, which is specified in SP 800-38D) are also used in IEEE 802 standards. IEEE 802 standards also use the SHA-1 and SHA-2 family of hash functions specified in FIPS 180 and used in HMAC, as specified in FIPS 198.

XTS, a block cipher mode of operation specified in SP 800-38E, was adopted from IEEE P1619[21] as SP 800-38E.

### 2.3.3   Internet Engineering Task Force (IETF)

The Internet Engineering Task Force (IETF) is an international community of network designers, operators, vendors, researchers, and technologists that work on the Internet architecture, and its techniques and protocols. An IETF official technical specification or recommendation is called a Request for Comments (RFC).

The technical work of the IETF is done in its working groups, which are organized by topic into several areas, such as routing, transport and security. In the security area, different working groups develop security mechanisms for different protocols or applications. For example,

1. The PKIX (Public-Key Infrastructure X.509) Working Group (PKIX-WG) developed technical specifications and recommendations to support a Public Key Infrastructure, based on the X.509 protocol, which is used to build a trust and authentication services infrastructure.

2. The IPSEC (Internet Protocol Security) working group developed a protocol and other technical recommendations for secure routing between network devices, and

3. The TLS (Transport Layer Security) working group has been specifying a communication protocol and technical recommendations to provide security services for communication between a server and a client, etc.

NIST-approved cryptographic algorithms, such as block cipher modes of operation, hash functions, key establishment schemes, and digital signatures are used in various IETF protocols. For example, RFC 5288 specifies the AES Galois Counter Mode (GCM) Cipher Suites for TLS, based on SP 800-38D.

---

[19] IEEE P1363.2, *Password-Based Public-Key Cryptography*.
[20] IEEE 802.11, *Wireless Local Area Networks*.
[21] IEEE P1619, *Standard for Cryptographic Protection of Data on Block-Oriented Storage Devices*.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

Further information is available at the IETF web site, http://ietf.org.

### 2.3.4   International Organization for Standardization (ISO)[22]

ISO is a non-governmental, worldwide federation of national standards bodies. Its mission is to develop international standards that help to make industry more efficient and effective. ISO standards cover almost all aspects of technology and business, from food safety to computers, and from agriculture to healthcare. Experts from all over the world develop the standards that are required by their sector, using a consensus process.

ISO/IEC JTC 1 is a joint technical committee of the International Organization for Standardization (ISO) and the International Electrotechnical Commission (IEC). ISO/IEC JTC 1 SC 27 is the subcommittee for IT security. Working group 2 (WG2) is the group developing standards for cryptography and security mechanisms. It usually has more than twenty active projects to develop either a revision of an existing standard or a new standard. Each standard consists of multiple parts, and each part includes multiple algorithms and/or mechanisms.

The cryptographic algorithms and schemes in FIPS and SPs are usually included in ISO/IEC JTC 1 standards, along with many other algorithms submitted by other countries. The following is a list of ISO/IEC standards that include cryptographic algorithms and schemes specified in NIST standards.

1. ISO/IEC 9797-1:2011, *Information technology − Security techniques − Message Authentication Codes (MACs) -- Part 1: Mechanisms using a block cipher*.

2. ISO/IEC 9797-2:2011, *Information technology − Security techniques − Message Authentication Codes (MACs) -- Part 2: Mechanisms using a dedicated hash-function*.

3. ISO/IEC 10116:2006, *Information technology − Security techniques − Modes of operation for an n-bit block cipher*.

4. ISO/IEC 10118-3:2004, *Information technology − Security techniques − Hash-functions -- Part 3: Dedicated hash-functions*.

5. ISO/IEC 11770-3:2008, *Information technology − Security techniques − Key management -- Part 3: Mechanisms using asymmetric techniques*.

6. ISO/IEC CD 11770-6, *Information technology − Security techniques − Key management -- Part 6: Key derivation*.

7. ISO/IEC 14888-2: 2008, *Information technology − Security techniques − Digital signatures with appendix -- Part 2: Integer factorization based mechanisms*.

8. ISO/IEC CD 14888-3, *Information technology − Security techniques − Digital signatures with appendix -- Part 3: Discrete logarithm based mechanisms*.

9. ISO/IEC 18033-3:2010, *Information technology − Security techniques − Encryption algorithms − Part 3: Block ciphers*.

---

[22] Further information is available at the ISO web site, http://www.iso.org.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

10. ISO/IEC 19772:2009, *Information technology − Security techniques − Authenticated encryption*.

## 2.3.5   Trusted Computing Group (TCG)

The Trusted Computing Group (TCG) develops and promotes a set of industry standards that build upon roots of trust. Roots of Trust (RoTs) are hardware, firmware, and software components that are inherently trusted to perform specific, vital security functions. Because misbehavior by RoTs cannot be detected, they must be secure by design. To ensure that they are reliable and resistant to tampering, RoTs are often implemented in, or protected by, hardware.

Industry standards developed by the TCG define the capabilities of a set of fundamental roots of trust, and describe how to use those roots of trust in a variety of architectures and use cases. Many of the use cases supported by TCG technologies and specifications focus on one or more of the following areas: 1) device identity, 2) cryptographic key or credential storage, and 3) attestation of the system state.

Technologies supporting TCG-developed standards are deployed enterprise-class clients and servers, storage devices, embedded systems, and virtualized devices. Families of relevant TCG standards and specifications include:

- Trusted Platform Module (TPM): A TPM is a cryptographic module that can, among other capabilities, establish device identity in a platform, provide secure storage for keys and credentials, and support the measurement and reporting of the system state. The TPM 2.0 Library Specification provides the general architecture and command set for TPMs, with platform-specific specifications detailing how a TPM can be implemented in particular classes of systems. ISO/IEC JTC 1 has approved the TPM Library Specification as ISO/IEC 11889:2015 Parts 1-4.

- Trusted Network Connect (TNC): The TCG's TNC Working Group defines specifications that allow network administrators to enforce policies regarding endpoint integrity on devices connected to a network. These specifications were the basis for much of the work in the IETF's Network Endpoint Assessment (NEA) working group, and are highly complimentary to the on-going work in the IETF Security Automation and Continuous Monitoring (SACM) working group.

- Storage: The TCG's Storage Work Group defines specifications that enable standards-based mechanisms to protect data on storage devices, and manage these devices and capabilities. The TCG's storage specifications break out from a common core specification into two Security Subsystem Classes (SSCs): the Opal SSC, which is intended for client devices (e.g., tablets, notebooks and desktops), and the Enterprise SSC, which is intended for high-performance storage systems (e.g., servers).

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

# SECTION 3: CRYPTOGRAPHIC ALGORITHMS

This document describes three types of cryptographic algorithms: cryptographic hash functions, symmetric-key algorithms and asymmetric-key algorithms, which are discussed in Sections 3.1, 3.2 and 3.3, respectively. Other topics to be introduced in this section include the concept of algorithm security strength and algorithm lifetime (see Sections 3.4 and 3.5, respectively).

## 3.1 Cryptographic Hash Functions

A hash function (also called a hash algorithm) is a cryptographic primitive algorithm that produces a condensed representation of its input (e.g., a message). A hash function takes an input of arbitrary length and outputs a value with a predetermined length. Common names for the output of a hash function include *hash value* and *message digest*.

A cryptographic hash function is a one-way function that is extremely difficult to invert. That is, it is not practical to reverse the process from the hash value back to the input.

Figure 1 depicts the process of generating and verifying a hash value.



**Figure 1: Hash Function Generation and Verification**

A hash function is used as follows:

- Hash Generation:

  1. Hash value ($H_1$) is generated on data ($M_1$) using the hash function.

  2. $M_1$ and $H_1$ are then saved or transmitted.

- Hash Verification:

  1. Hash value ($H_2$) is generated on the received or retrieved data ($M_2$) using the same hash function that generated $H_1$.

  2. $H_1$ and $H_2$ are compared. If $H_1 = H_2$, then it can be assumed that $M_1$ has not changed during storage or transmission.

The above description is for the simplest use of a hash function. Hash functions are usually used in higher-level algorithms, including:

- Keyed-hash message authentication code algorithms (Sections 3.2.2 and 4.2.2.2),

- Digital signature algorithms (Section 4.2.3),

- Key derivation functions (e.g., for key establishment) (Section 5.3.2), and

- Random bit generators (Section 4.4).

**Approved** hash functions for Federal Government use are specified in FIPS 180[23] and FIPS 202[24].

- FIPS 180 specifies the SHA-1, SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256 hash functions. Additional guidance for the use of these hash functions is provided in SP 800-106[25] and SP 800-107[26].

  Note that attacks on SHA-1 have indicated that SHA-1 provides less security than originally thought when generating digital signatures (see Section 4.2.3); consequently, SHA-1 is now disallowed for that purpose. However, SHA-1 may continue to be used for most other hash-function applications, including the verification of digital signatures previously signed using SHA-1 as the hash function (see SP 800-131A[27]).

- FIPS 202 specifies SHA3-224, SHA3-256, SHA3-384 and SHA3-512. This FIPS also specifies two extendable-output functions (SHAKE128 and SHAKE256), which are not, in themselves, considered to be hash functions; guidance on their use will be provided in the future.

## 3.2 Symmetric-Key Algorithms

Symmetric-key algorithms (sometimes called secret-key algorithms) use a single key to both apply cryptographic protection and to remove or check the protection. For example, the key used to encrypt data (i.e., apply protection) is also used to decrypt the encrypted data (i.e., remove the protection); in the case of encryption, the original data is called the plaintext, while the encrypted form of the data is called the ciphertext. The key must be kept secret if the data is to remain protected.

Several classes of symmetric-key algorithms have been approved: those based on block cipher algorithms (e.g., AES) and those based on the use of hash functions (e.g., a keyed-hash message authentication code based on SHA-1).

---

[23] FIPS 180, *Secure Hash Standard (SHS)*.

[24] FIPS 202, *SHA-3 Standard: Permutation-Based Hash and Extendable Output Functions*.

[25] SP 800-106, *Randomized Hashing for Digital Signatures*.

[26] SP 800-107, *Recommendations for Applications Using Approved Hash Algorithms*.

[27] SP 800-131A, *Transitions: Recommendation for Transitioning the Use of Cryptographic Algorithms and Key Lengths*.

Symmetric-key algorithms are used for:

- Encryption to provide data confidentiality (see Section 4.1),

- Authentication to provide assurance of data integrity and the source of the data (see Section 4.2),

- Key derivation (see Section 5.3.2),

- Key wrapping (see Section 5.3.5), and

- Random bit generation (see Section 4.4).

When using a symmetric-key algorithm, a unique key needs to be generated for each cryptographic relationship[28] and for each purpose (e.g., encryption, data integrity authentication and key wrapping). Technically, the same key can be used for multiple purposes when the same algorithm is used, but this is usually ill-advised, as the use of the same key for two different cryptographic processes (e.g., HMAC and key derivation using the same hash function) may weaken the security provided by one or both of the processes. However, exceptions to this rule have been approved (see Section 4.3).

As an example of the number of keys required for the use of symmetric-key algorithms, suppose that there are four entities (A, B, C, and D) that need to communicate using encryption, with each pair of entities using a different encryption key. There are six possible pair-wise relationships (A-B, A-C, A-D, B-C, B-D, and C-D), so, at least six keys are required[29]. If, instead, there are 1000 entities that wish to communicate with each other, there are 499 500 possible pair-wise relationships, and at least one unique key would be required for each relationship. If more than one algorithm, key length or purpose is to be supported (e.g., both encryption and key wrapping), then additional keys will be needed. Each entity must keep all its symmetric keys secret and protect their integrity. The need for a large number of keying relationships is a significant problem; methods for mitigating this problem are discussed in Section 5.

Several symmetric-key algorithms have been **approved** by NIST for the protection of sensitive data. However, some of these algorithms are no longer approved for applying cryptographic protection (e.g., encryption), but may continue to be used for processing already-protected information (e.g., decryption), providing that the risk of doing so is acceptable (e.g., there is reason to believe that a key was not compromised). See SP 800-57, Part 1 and SP 800-131A for more information about the acceptability of using the different cryptographic algorithms.

---

[28] A cryptographic relationship exists when two or more parties can communicate using the same key and algorithm. A relationship may be one-to-one or one-to-many (e.g., broadcast).

[29] Although only six cryptographic relationships are used in the example, different keys may be required by some protocols for each communication direction, i.e., a different key may be required for communications sent from A to B than is used for communications sent from B to A.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

### 3.2.1    Block Cipher Algorithms

A block cipher algorithm is used with a single key in an **approved** mode of operation to both apply cryptographic protection (e.g., encrypt) and to subsequently process the protected information (e.g., decrypt). Several block cipher algorithms have been approved by NIST as cryptographic primitives, some of which may no longer be approved for applying cryptographic protection. However, they may still be needed for processing information that was previously protected (e.g., they may be needed for decrypting previously encrypted information).

The block cipher algorithms are discussed in Sections 3.2.1.1 through 3.2.1.4. The **approved** modes of operation are discussed in Section 3.2.1.5.

### 3.2.1.1    Data Encryption Standard (DES)

The Data Encryption Standard (DES) became effective in July 1977, and was the first NIST-**approved** cryptographic algorithm. It was reaffirmed several times, but due to advances in computer power and speeds, the strength of the DES algorithm is no longer sufficient to adequately protect Federal Government information. Therefore, DES was withdrawn as an **approved** algorithm in 2005 (i.e., the use of DES is no longer approved for encryption or otherwise applying cryptographic protection). However, the DES "cryptographic engine" continues to be used as a component function of TDEA (see the next section).

### 3.2.1.2    Triple Data Encryption Algorithm (TDEA)

The Triple Data Encryption Algorithm (TDEA), also known as Triple DES, uses the DES cryptographic engine to transform data in three operations. TDEA is specified in SP 800-67.

TDEA encrypts data in blocks of 64 bits, using three keys that define a key bundle. The use of TDEA using three distinctly different (i.e., mathematically independent) keys is **approved** and is commonly known as three-key TDEA (also referred to as 3TDEA or 3TDES).

Other variations of TDEA, where two or three of the keys are identical, are no longer approved for applying cryptographic protection because of increased computing power or weaknesses in the algorithm.

### 3.2.1.3    SKIPJACK

SKIPJACK is referenced in FIPS 185[30] and specified in a classified document. SKIPJACK is no longer considered adequate for the protection of federal information and has been withdrawn as a FIPS. The use of SKIPJACK for applying cryptographic protection (e.g., encryption) is **not approved**, although it is permissible to use the algorithm for decrypting information.

---

[30] FIPS 185, *Escrowed Encryption Standard.*

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

#### 3.2.1.4   Advanced Encryption Standard (AES)

The Advanced Encryption Standard (AES) was developed as a replacement for DES and is the preferred block cipher algorithm for new products. AES is specified in FIPS 197. AES operates on 128-bit blocks of data, using 128-, 192- or 256-bit keys.

Note that the performance of AES is significantly better than that of TDEA.

#### 3.2.1.5   Modes of Operation

With a symmetric-key block cipher algorithm, the same input block will always produce the same output block when the same key is used. Furthermore, certain kinds of data patterns in the plaintext, such as repeated blocks, would be apparent in the ciphertext. To counteract these properties, modes of operation have been specified to use a block cipher algorithm to provide an information service, such as confidentiality or integrity protection.

These modes combine the cryptographic primitive algorithm with a symmetric key and variable starting values (commonly known as initialization vectors) to perform a cryptographic service (e.g., the encryption of a message). **Approved** modes for block cipher algorithms have been specified in the SP 800-38 series of publications and include modes for:

- Encryption, as specified in SP 800-38A, SP 800-38E and SP 800-38G (see Section 4.1),

- Authentication, as specified in SP 800-38B (see Section 4.2.2.1),

- Authenticated encryption, as specified in SP 800-38C and SP 800-38D (see Section 4.3), and

- Key wrapping, as specified in SP 800-38F (see Section 5.3.5).

### 3.2.2   Hash-based Symmetric-key Algorithms

A symmetric-key algorithm based on the use of a hash function has been specified in FIPS 198[31]. This algorithm, known as HMAC, has been **approved** for use with any **approved** hash function specified in FIPS 180 or FIPS 202. Guidance on the use of the hash functions specified in FIPS 180 for HMAC is provided in SP 800-107.

## 3.3   Asymmetric-Key Algorithms

Asymmetric-key algorithms (often called public-key algorithms) use a pair of keys (i.e., a key pair): a public key and a private key that are mathematically related to each other. The public key may be made public without reducing the security of the process, but the private key must remain secret if the data is to retain its cryptographic protection. Even though there is a relationship between the two keys, the private key cannot efficiently be determined based on knowledge of the public key.

---

[31] FIPS 198, *Keyed Hash Message Authentication Code (HMAC).*

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

One of the keys of the key pair is used to apply cryptographic protection, and the other key is used to remove or verify that protection. The key to use depends on the algorithm used and the service to be provided. For example, a digital signature is computed using a private key, and the signature is verified using the public key (i.e., the protection is applied using the private key and verified using the corresponding public key). For those asymmetric algorithms also capable of encryption[32], the encryption is performed using the public key, and the decryption is performed using the private key (i.e., the protection is applied using the public key and removed using the private key).

Asymmetric-key algorithms are used primarily for data integrity authentication and source authentication (see Section 4.2), and for key establishment (see Section 5.3). These algorithms tend to be much slower than symmetric-key algorithms, so are not used to process large amounts of data. However, when used for key establishment (see Section 5), there are methods that combine the use of symmetric and asymmetric algorithms to reduce the number of keys required for establishing cryptographic relationships.

Key pairs for asymmetric-key algorithms should be generated for each purpose (e.g., one key pair for generating and verifying digital signatures, and a different key pair for key establishment). Technically, it is sometimes possible to use the same key pair for more than one purpose, but this is ill-advised, as the use of the same key pair for two different cryptographic purposes (e.g., digital signatures and key establishment) may weaken the security provided by one or both of the processes.

The use of asymmetric-key algorithms requires the establishment of fewer initial keys than the use of symmetric-key algorithms. As an example, suppose that an entity wants to generate digital signatures and participate in a key-establishment process using its own key pair[33]; a key pair needs to be generated for each purpose. If there are six entities that intend to both generate digital signatures and participate in the key-establishment process, then six key pairs are needed for digital signature generation, and another six key pairs are needed for key establishment, for a total of twelve key pairs. For 1000 entities, 1000 key pairs of each would be needed for each purpose, for a total of 2000 key pairs. A unique key pair does not need to be generated for each relationship; recall that for symmetric-key algorithms, a unique key needs to be generated for each relationship (see Section 3.2). If multiple public-key algorithms or key lengths are to be used for either process, then additional key pairs will be required.

The private key is retained by the entity who "owns" the key pair; it must be kept secret and its integrity protected. The public key is usually distributed to other entities and requires integrity protection; this is often accomplished by using a public-key certificate, as discussed in Section 5.2.3. When a public-key certificate is used, the certificate provides the integrity protection for the public key, so the burden of key protection by each entity is limited to only those private keys owned by the entity.

---

[32] Not all public-key algorithms are capable of multiple functions, e.g., both encryption and decryption, and the generation and verification of digital signatures.

[33] Note that some key-establishment schemes do not require that all parties have key pairs, so some parties will not need a key pair for key establishment.

24

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

Some asymmetric-key algorithms use domain parameters, which are additional values necessary for the use of the cryptographic algorithm. These values are mathematically related to each other and to the keys with which they will be used. Domain parameters are usually public and are used by a community of users for a substantial period of time. These domain parameters are either contained within or referenced by a certificate containing a public key.

The secure use of asymmetric-key algorithms is dependent on users obtaining certain assurances:

- Assurance of domain-parameter validity (for those algorithms requiring domain parameters) provides confidence that the domain parameters are mathematically correct,
- Assurance of public-key validity provides confidence that the public key appears to be a suitable key, and
- Assurance of private-key possession provides confidence that the party that is supposedly the owner of the private key really has the key.

### 3.3.1    DSA

The Digital Signature Algorithm (DSA) is **approved** and specified in FIPS 186. This algorithm is used to generate and verify digital signatures using finite-fields. FIPS 186 defines methods for generating DSA domain parameters and key pairs, and specifies the key lengths to be used for secure interoperability and the algorithms to be used for digital-signature generation and verification.

### 3.3.2    ECDSA

The Elliptic Curve Digital Signature Algorithm (ECDSA) is **approved** within FIPS 186, but actually specified within American National Standard (ANS) X9.62[34]. The basic signature and verification algorithms are the same as those used for DSA, except that the mathematics is based on the use of elliptic curves, rather than finite fields. FIPS 186 provides guidance for the use of ECDSA within the Federal Government, as well as providing recommended elliptic curves to facilitate interoperability and security. An advantage of using ECDSA is that the key lengths are considerably shorter than those used for DSA and RSA, requiring less storage space and transmission bandwidth, and the execution of the algorithm is generally faster than DSA and RSA

ANS X9.62 includes specifications for the generation of the ECDSA domain parameters and key pairs, as well as the algorithms for digital signature generation and verification. FIPS 186 defines the key lengths to be used for secure interoperability, provides additional guidance on the use of random bit generators to generate the key pairs, and recommends elliptic curves for use by the Federal Government. Note that the same elliptic curves are also included in ANS X9.62.

---

[34] ANS X9.62, *Public Key Cryptography for the Financial Services Industry: The Elliptic Curve Digital Signature Algorithm (ECDSA)*.

### 3.3.3   RSA

The RSA algorithm is **approved** for the generation and verification of digital signatures in FIPS 186] and specified in PKCS 1 [35] and ANS X9.31 [36]. FIPS 186 includes restrictions on the use of RSA to generate digital signatures, methods to generate RSA key pairs, and defines the key lengths to be used for secure interoperability.

The RSA primitive can be used for key establishment, as well as for the generation and verification of digital signatures. Its use for key establishment is specified in SP 800-56B [37]; that publication specifies **approved** methods for both key agreement and key transport (see Section 5.3 for further information on key establishment, key agreement and key transport).

The key pairs used for RSA digital-signature generation and verification, and for RSA key establishment are generated in the same way, but need to be different for each purpose.

### 3.3.4   Diffie-Hellman and MQV

Diffie-Hellman (DH) and MQV [38] are two classes of key-establishment algorithms used for key agreement (see Section 5.3.3). The use of these algorithms for key agreement is specified in SP 800-56A [39] using both finite-fields and elliptic-curves. For elliptic-curve key pairs and domain parameters, the methods for generating those key pairs and domain parameters are specified in ANS X9.62 using the same methods used to generate ECDSA key pairs and domain parameters.

The recommended elliptic curves for elliptic-curve DH and MQV are the same as those provided in FIPS 186 for ECDSA.

## 3.4   Algorithm Security Strength

The security strength of a cryptographic algorithm is measured by an attacker's difficulty in breaking the algorithm. Breaking a cryptographic algorithm can be defined as defeating some aspect of the protection that the algorithm is intended to provide. For example, a block cipher encryption algorithm that is used to protect the confidentiality of data is broken if, with an acceptable amount of work, it is possible to determine the value of its key or to recover the plaintext from the ciphertext without knowledge of the key.

---

[35] Public Key Cryptography Standard #1.

[36] ANS X9.31, *Digital Signatures Using Reversible Public Key Cryptography For The Financial Services Industry (RDSA)*. This standard has been withdrawn as an ANSI standard.

[37] SP 800-56B, *Recommendation for Pair-wise Key Establishment Schemes Using Integer Factorization Cryptography*.

[38] Menezes–Qu–Vanstone.

[39] SP 800-56A, *Recommendation for Pair-Wise Key-Establishment Schemes Using Discrete Logarithm Cryptography*.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

SP 800-57, Part 1 provides the current estimates for the security strengths that can be provided by the **approved** cryptographic algorithms; these strengths have been determined with respect to specific key lengths.

The **approved** security strengths for federal applications are 112, 128, 192 and 256 bits. Note that a security strength of 80 bits was previously approved as well. Since it is no longer considered as providing adequate protection, the use of algorithms and keys providing a security strength of 80 bits is **no longer approved** for applying cryptographic protection (e.g., encrypting data). However, algorithms and keys providing 80 bits of strength can be used for processing data that was previously protected at that strength (e.g., for decryption).

Appropriate algorithms, key lengths, and key generation and handling methods need to be used to actually support those security strengths, and are further discussed in Section 5.1.4.

## 3.5   Algorithm Lifetime

Over time, algorithms may be successfully attacked so that the algorithm no longer provides the desired protection. The attack could be on the algorithm itself, or could be on the algorithm with a specific key length. In the latter case, the use of a longer key may prevent a successful attack, or at least delay it for a period of time.

When selecting the algorithms and key lengths to be used for an application, the length of time for which the data needs to be protected should be taken into account so that a suitable algorithm and key length is used.   SP 800-57, Part 1 provides a current estimate of the time frames during which the **approved** algorithms and key lengths are considered to be secure. The algorithms and key lengths used for cryptographic protection need to fall within the estimated time frame. However, these estimates are just that – estimates. It is possible that an advance in technology (e.g., the use of quantum computers and algorithms) or cryptanalysis could occur prior to the end date of that time frame. It is often the case that these advances are initially impractical or limited in their threat. It is recommended that an organization have a transition strategy for addressing this problem if it occurs, including assessing the risk for the compromise of the organization's data, and transitioning to a new algorithm or key length, as appropriate.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST SP 800-175B

# SECTION 4: CRYPTOGRAPHIC SERVICES

All sensitive information requires integrity protection, and confidentiality protection may be required as well. This section discusses the cryptographic services that can be provided for the protection of sensitive data other than keys. These services include data confidentiality, data integrity authentication and source authentication, including non-repudiation. The protection and management of the keys used while providing these cryptographic services are discussed in Section 5.

Ideally, cryptographic services would be provided using as few algorithms as possible. For example, AES could be used to provide confidentiality (Section 4.1), data integrity authentication (Section 4.2), key wrapping (Section 5.3.5) and as the basis for a random bit generator (see Section 4.4). However, this may not be as practical as it first appears, as other algorithms may also be available that are needed for different applications and that provide other security properties.

## 4.1   Data Confidentiality

Encryption is used to provide confidentiality for data. The unprotected form of the data is called plaintext. Encryption transforms the data into ciphertext, and ciphertext can be transformed back into plaintext using decryption. Data encryption and decryption are generally provided using symmetric-key block cipher algorithms. The **approved** symmetric-key algorithms for data encryption are: AES and TDEA (see Section 3.2.1.4 and Section 3.2.1.2, respectively). Decryption of the ciphertext is performed using the algorithm and key that were used to encrypt the plaintext. Unauthorized recipients of the ciphertext who know the cryptographic algorithm but do not have the correct key should not be able to decrypt the ciphertext. However, anyone who has the key and the cryptographic algorithm can easily decrypt the ciphertext and obtain the original plaintext.



**Figure 2: Encryption and Decryption**

Figure 2 depicts the encryption and decryption processes. The plaintext and a key are used by the encryption process to produce the ciphertext. To decrypt, the ciphertext and the same key are used by the decryption process to recover the plaintext data.

28

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

Note that asymmetric-key algorithms could also be used to encrypt and decrypt data, but because these algorithms are slow in comparison to block cipher algorithms, they are not normally used to encrypt and decrypt general data; they can, however, be used to protect keys, as discussed in Section 5.

As discussed in Section 3.2.1.5, encryption is performed using a block cipher algorithm and a mode of operation. The **approved** modes of operation for encryption are specified in:

- SP 800-38A for AES and TDEA: the Electronic Codebook (ECB), Cipher Block Chaining (CBC), Cipher Feedback (CFB), Counter (CTR), and Output Feedback (OFB) modes,

- SP 800-38E for AES: the XTS-AES mode (for protecting the confidentiality of data on storage devices only), and

- SP 800-38G for AES: the FF1 and FF3 modes for Format Preserving Encryption.

Additional modes that provide both confidentiality and authentication (as discussed in Section 4.2) are discussed in Section 4.3.

## 4.2    Data Integrity and Source Authentication

Data integrity (often referred to as simply *integrity*) is concerned with whether or not data has changed between two specified times (e.g., between the time when the data was created, stored and/or transmitted, and the time when it was retrieved and/or received). While data integrity cannot be guaranteed, the use of data integrity codes provides a means to detect changes with a high probability. A data integrity code is computed on data when it is created, before storage or before transmission, and computed again when the data is retrieved or received. Verification that these computations agree provides a measure of assurance of data integrity. In cryptographic literature, this process is called *message* (or data) *authentication*.

Source authentication is a process used to provide assurance of the source of information. Source authentication includes identity authentication, which provides assurance to one of the parties in a communication (say, Bob) that he is receiving data from or providing data to another specific party (say, Alice). Depending on the method used, source authentication could also support non-repudiation, whereby both Bob and some third party (say, Carl) have some assurance that the data came from Alice.

Cryptography can be used to provide these services, but the same algorithm may not provide all of them. Hash functions, as discussed in Section 4.2.1, can be used to provide some assurance of data integrity. Message Authentication Code (MAC) algorithms, as discussed in Section 4.2.2, can provide both data integrity and source authentication services. Digital signature algorithms can be used to provide data integrity and source authentication services, as well as supporting non-repudiation, but at a higher performance cost (see Section 4.2.3).

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

### 4.2.1   Hash Functions

A hash function is used to generate a hash value that can provide some assurance of the integrity of the data over which the hash value is generated. However, if a hash function is used alone (e.g., without the use of a secret key, as is the case of HMAC, or in conjunction with the generation of digital signatures), there is no assurance that the data has not been altered by an adversary and a new hash value computed. Therefore, the use of a hash function alone for providing integrity protection is not recommended unless there is a very low risk of this scenario (e.g., when data is provided by a trusted source, and the hash value is used only to determine changes that may occur because of a degraded transmission medium).

### 4.2.2   Message Authentication Code Algorithms

A Message Authentication Code algorithm and a cryptographic key are used to generate a message authentication code (MAC) that can be used to provide assurance of data integrity and source authentication. A MAC is a cryptographic checksum on the data that can provide assurance that the data has not changed or been altered since some point in time, and that the MAC was computed by the party or parties sharing the key. Typically, MACs are used between two or more parties that share the same secret key to authenticate information exchanged between those parties; the use of MACs to provide data integrity and source authentication depends on limiting knowledge of the secret key to only those parties. Since a MAC key is shared among a community of users (e.g., two or more parties), only those parties sharing the key can compute a correct MAC on given data.



**Figure 3: Message Authentication and Verification**

[Figure 3](#) depicts the use of MACs:

- A MAC ($MAC_1$) is computed on data ($M_1$) using a key ($K$). $M_1$ and $MAC_1$ are then saved or transmitted.

- At a later time, the integrity of the retrieved or received data is checked by labeling the retrieved or received data as $M_2$ and computing a MAC ($MAC_2$) on $M_2$ using the same key ($K$).

- If $MAC_1$ is the same as $MAC_2$, then it can be assumed that $M_2$ is the same as the original data ($M_1$) (i.e., $M_1 = M_2$). The verifying party also knows that only a party that shares the key could have correctly generated the MAC.

For example, if two parties (e.g., A and B) share a key, party A generates the MAC and sends it to party B, and party B successfully verifies the received MAC, then party B knows that party A generated the original MAC, and source authentication has been accomplished. However, if three parties share the key (e.g., A, B and C), party A generates the MAC to be sent to party B, and party B successfully verifies the received MAC; party B knows that either party A or party C generated the original MAC, but has no proof of which one. Note that this may be acceptable for some applications.

MACs are used to detect data modifications that occur between the initial generation of the MAC and the verification of the received MAC. They do not detect errors that occur before the MAC is originally generated.

Assurance of data integrity is frequently provided using non-cryptographic techniques known as error detection codes. However, these codes can be altered by an adversary to the adversary's benefit. The use of an **approved** cryptographic mechanism, such as a MAC, addresses this problem. That is, the assurance of integrity provided by a MAC is based on the assumption that it is not likely that anyone could correctly generate a MAC without knowing the cryptographic key. An adversary without knowledge of the key will be unable to modify data and then generate a verifiable MAC on the modified data. It is therefore crucial that MAC keys be kept secret.

Two types of algorithms for computing a MAC have been **approved** for Federal Government use: MAC algorithms that are based on symmetric-key block cipher algorithms, and MAC algorithms that are based on hash functions.

### 4.2.2.1   MACs Based on Block Cipher Algorithms

The SP 800-38 series of publications includes modes for the generation of MACs:

- SP 800-38B[40] defines the CMAC mode for computing a MAC using the NIST-**approved** block-cipher algorithms: AES and TDEA.

- SP 800-38D[41] defines the GMAC mode for the computation of a MAC using AES.

- Modes providing both confidentiality (i.e., encryption) and authentication (i.e., computing a MAC) in a single operation are also defined (see Section 4.3).

---

[40]   SP 800-38B, *Recommendation for Block Cipher Modes of Operation: The CMAC Mode for Authentication.*

[41]   SP 800-38D, *Recommendation for Block Cipher Modes of Operation: Galois/Counter Mode (GCM) and GMAC.*

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

#### 4.2.2.2 MACs Based on Hash Functions

FIPS 198[42] defines a MAC (HMAC) that uses a cryptographic hash function in combination with a secret key. HMAC must be used with an **approved** cryptographic hash function (see Section 4.2.1). The security associated with the use of HMAC is discussed in SP 800-107[43].

### 4.2.3   Digital Signature Algorithms

A digital signature algorithm is used with a pair of keys – a private key and a public key – to generate and verify digital signatures. The private key is used to generate signatures and must be known only by the signer (the key-pair owner); the public key is used to verify the signatures. Because of the design of the algorithm, and the methods for generating key pairs, the public key cannot efficiently be used to determine the private key. Because two keys are required for the generation and verification process, digital signature algorithms are classified as asymmetric-key algorithms.

A digital signature is represented in a computer as a string of bits and is an electronic analogue of a hand-written signature that can be verified by anyone with access to the public key. The signature can be used to provide assurance of data integrity and source authentication, and to support non-repudiation.

Each signer possesses a private and public key pair. Signature generation (with a verifiable digital signature) can be performed only by the party that has access to the private key. Anyone that knows the public key can verify the signature by employing the associated public key. The security of a digital-signature system is dependent on maintaining the secrecy of the signer's private key. Therefore, signers must guard against the unauthorized acquisition of their private keys.

Digital signatures offer protection that is not available by using alternative signature techniques. One such alternative is a digitized signature. A digitized signature is generated by converting a visual form of a handwritten signature to an electronic image (e.g., by scanning it into a computer). Although a digitized signature resembles its handwritten counterpart when printed, it does not provide the same protection as a digital signature. Digitized signatures can be forged and can be duplicated and appended to other electronic data; digitized signatures cannot be used to determine if information has been altered after it is signed. Digital signatures, however, are computed on each message using a private key known only by the signer. Each different message signed by the signer will have a different digital signature. Even small changes to the message will result in a different signature. If an adversary does not know the private key, the adversary cannot generate a valid signature (i.e., a signature that can be verified using the public key that corresponds to the private key used to generate the signature).

Figure 4 depicts the generation and verification of digital signatures. A digital signature algorithm includes a signature generation process and a signature verification process:

---

[42] FIPS 198-1, *The Keyed-Hash Message Authentication Code (HMAC)*.

[43] SP 800-107, *Recommendation for Applications Using Approved Hash Algorithms*.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

- Signature generation:
  - A hash function (see Section 3.1) is used in the signature generation process to obtain a hash value, which is a condensed version of the data to be signed (i.e., shown as $M_1$ for signature generation in Figure 4).

  - The hash value is then input to the signature generation process, along with a private key, to generate the digital signature (shown as $DS_1$ in Figure 4).

  - The digital signature ($DS_1$) is provided to the verifier, along with the signed data ($M_1$).

- Signature verification: The receiver of the data and signature verifies the signature as follows:

  - The received data ($M_2$) is hashed using the same hash function to produce another hash value.

  - The newly computed hash value and the received signature ($DS_2$) are input to the signature verification process, along with the the signer's public key. The output of this process is an indication of whether or not the signature is valid or invalid for the received message ($M_2$).



**Figure 4: Digital Signature Generation and Verification**

Note that the details of the signature generation and verification processes are different for each approved algorithm. Also, note that $M_2$ is used in the verification process rather than $M_1$, and $DS_2$ is used rather than $DS_1$ because of the possibility that $M_1$ and $DS_1$ could have been deliberately or accidentally modified before the verification process performed by the receiver.

FIPS 186 specifies methods for generating and verifying digital signatures using asymmetric (public-key) cryptography.   The FIPS includes three digital signature algorithms:

- The Digital Signature Algorithm (DSA) (see Section 3.3.1),

- The Elliptic Curve Digital Signature Algorithm (ECDSA) (see Section 3.3.2), and

- RSA (see Section 3.3.3).

The digital signature algorithms are used in conjunction with the hash functions specified in FIPS 180[44] and FIPS 202. Each of these algorithms requires obtaining assurances about the domain parameters and/or keys used, as discussed in Section 3.3; SP 800-89[45] provides methods for obtaining these required assurances when using digital signatures.

In many cases, determining when a digital signature was generated is important. For example, it may be important to determine whether a document was signed before a certain date, e.g., which of two wills was signed closest to and prior to the date that a person died. SP 800-102[46] provides guidance on establishing when a digital signature was generated.

## 4.3   Combining Confidentiality and Authentication in a Block-Cipher Mode of Operation

Confidentiality and authentication can be provided using either two separate block-cipher algorithms (e.g., AES in the CBC mode for encryption and HMAC for authentication) or in a single block-cipher mode of operation. Note that in this discussion, authentication is used to obtain both an assurance of data integrity and of the source of the data that has been cryptographically protected.

If encryption and authentication are performed as two separate operations (see Sections 4.1 and 4.2, respectively), two distinct keys are required. If care is not taken in performing these operations (e.g., performing the operations in the right order), vulnerabilities can be introduced that may allow attacks.

An alternative is to use modes that both encrypt and authenticate in a single operation using a single key; such a mode is called an "authenticated-encryption" mode. Using such modes requires fewer keys and is generally faster than using two separate operations. Two authenticated-encryption modes have been defined for AES (no such mode has been defined for TDEA):

- SP 800-38C[47] specifies the CCM mode, and

- SP 800-38D[48] defines the Galois/Counter mode (GCM).

---

[44] FIPS 180, *Secure Hash Standard (SHS)*.

[45] SP 800-89, *Recommendation for Obtaining Assurances for Digital Signature Applications*.

[46] SP 800-102, *Recommendation for Digital Signature Timeliness*.

[47] SP 800-38C, *Recommendation for Block Cipher Modes of Operation: the CCM Mode for Authentication and Confidentiality*.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

## 4.4 Random Bit Generation

Cryptography and security applications make extensive use of random numbers and random bits. For cryptography, random values are needed to generate cryptographic keys. The term "entropy" is used to describe the amount of randomness in a value, and the amount of entropy determines how hard it is to guess that value.

There are two classes of random bit generators (RBGs): Non-Deterministic Random Bit Generators (NRBGs), sometimes called true random number (or bit) generators, and Deterministic Random Bit Generators (DRBGs), sometimes called pseudorandom bit (or number) generators. Each RBG is dependent on the use of an entropy source to provide unpredictable bits that are outside of human control; these bits are acquired from some physical source, such as thermal noise, ring oscillators or hard-drive seek times. An NRBG is dependent on the availability of new, unused entropy bits produced by the entropy source for every NRBG output. A DRBG is initially "seeded" with entropy produced by an entropy source or using an **approved** method that depends on an entropy source (e.g., an NRBG); depending on the application, the DRBG may or may not receive additional entropy during operation (e.g., by being reseeded).

Several publications have been developed or are currently under development for random-bit generation:

- SP 800-90A[49] specifies **approved** DRBG algorithms, based on the use of hash functions and block-cipher algorithms; DRBGs must be initialized from a randomness source (e.g., an entropy source or an NRBG) that provides sufficient entropy for the security strength(s) to be supported by the DRBG.

- SP 800-90B[50], which is currently under development, discusses entropy sources, including the health tests needed to determine that the entropy source has not failed and tests to estimate how much entropy that the entropy source can reliably provide.

- SP 800-90C[51] provides constructions for the design and implementation of NRBGs and DRBGs from the algorithms in SP 800-90A and the entropy sources designed in accordance with SP 800-90B. Note that the NRBGs are constructed to include a DRBG algorithm from SP 800-90A to provide a fallback capability if an entropy source failure is not immediately detected.

- SP 800-22[52] discusses some aspects of selecting and testing random and pseudorandom number generators. This document includes some criteria for

---

[48] SP 800-38D, *Recommendation for Block Cipher Modes of Operation: Galois/Counter Mode (GCM) and GMAC*.

[49] SP 800-90A, *Random Number Generation Using Deterministic Random Bit Generator Mechanisms*.

[50] SP 800-90B, *Recommendation for the Entropy Sources Used for Random Bit Generation*.

[51] SP 800-90C, *Recommendation for Random Bit Generator (RBG) Constructions*.

[52] SP 800-22, *A Statistical Test Suite for Random and Pseudorandom Number Generators for Cryptographic Applications*.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

characterizing and selecting appropriate generators, discusses statistical testing and its relation to cryptanalysis and provides some recommended statistical tests. These tests may be useful as a first step in determining whether or not a generator is suitable for a particular cryptographic application. However, for federal applications, the RBGs must be validated for compliance to FIPS 140 and the appropriate parts of SP 800-90.

## 4.5   Symmetric vs. Asymmetric Cryptography

As discussed in Sections 3.2 and 3.3, when large numbers of cryptographic relationships are required, the number of initial symmetric keys that will be required may be significantly larger than the number of public/private key pairs required.

However, the primary advantage of symmetric-key cryptography is speed. Symmetric-key algorithms are generally significantly faster than asymmetric-key algorithms, and the keys are shorter in length for the same security strength; the key length may be an important consideration if memory for storing the keys, or the bandwidth for transporting the keys is limited. In addition, advances in cryptanalysis and computational efficiency have tended to reduce the level of protection provided by public-key cryptography more rapidly than that provided by symmetric-key cryptography. Also, in a potential post-quantum world, the currently approved asymmetric-key algorithms will not provide adequate protection.

Since asymmetric-key (i.e., public-key) cryptography requires fewer keys overall, and symmetric-key cryptography is significantly faster, a hybrid approach is often used, whereby asymmetric-key algorithms are used for the generation and verification of digital signatures and for key establishment, while symmetric-key algorithms are used for all other purposes (e.g., encryption), especially those involving the protection of large amounts of data. For example, an asymmetric-key system can be used to establish a symmetric key via a key-agreement or key-transport process (see Sections 5.3.3 and 5.3.4, respectively), after which the symmetric key is used to encrypt files or messages.

In some situations, asymmetric-key cryptography is not necessary, and symmetric-key cryptography alone is sufficient. This includes environments where secure symmetric-key establishment can take place using symmetric keys already shared between entities, environments where a single authority knows and manages all the keys, and in single-user environments.

In general, asymmetric cryptography is best suited for an open, multi-user environment.

# SECTION 5: KEY MANAGEMENT

The proper management of cryptographic keys is essential to the effective use of cryptography for security. Keys are analogous to the combination of a safe. If a safe combination becomes known by an adversary, that safe provides no security against penetration by that adversary. Similarly, poor key management may easily compromise strong algorithms. Ultimately, the security of information protected by cryptography directly depends on the strength of the keys, the effectiveness of mechanisms and protocols associated with keys, and the protection afforded to the keys themselves. All keys need to be protected against modification (i.e., their integrity needs to be preserved), and secret and private keys (i.e., keys used by symmetric and asymmetric algorithms, respectively) need to be protected against unauthorized disclosure (i.e., their confidentiality needs to be maintained).

Key management provides the foundation for the secure generation, storage, distribution/establishment, use and destruction of keys, and is essential at all phases of a key's life. If a strong algorithm is used to encrypt data using keys that are properly generated, then the protection of that data can subsequently be reduced to just protecting the keys, i.e. the security of information protected by cryptography directly depends on the protection afforded the keys. Therefore, a Cryptographic Key Management System (CKMS) is required for managing the keys.

## 5.1   General Key Management Guidance

Several publications have been developed to provide general key-management guidance: SP 800-57 (see Section 5.1.1), FIPS 140 (see Section 5.1.2), and SP 800-131A (see Section 5.1.3).

### 5.1.1   Recommendation for Key Management

SP 800-57[53] provides general guidance on the management of cryptographic keys: their generation, use, and eventual destruction. Related topics, such as algorithm selection and appropriate key size, and cryptographic policy are also included in SP 800-57, which consists of three parts:

- SP 800-57, Part 1, *General Guidance*, contains basic key-management guidance, including:

  - The protection required for keying material;

  - Key life-cycle responsibilities;

  - Key backup, archiving and recovery;

  - Changing keys;

  - Cryptoperiods (i.e., the appropriate lengths of time that keys are to be used);

  - Accountability and auditing;

---

[53] SP 800-57, *Recommendation for Key Management*.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

- o   Contingency planning; and

- o   Key compromise recovery (e.g., by generating new keys).

Federal agencies have a variety of information that they have determined to require cryptographic protection; the sensitivity of the information and the periods of time that the protection is required also vary. To this end, NIST has established four security strengths for the protection of information: 112, 128, 192 and 256 bits[54]. These security strengths have been assigned to the **approved** cryptographic algorithms and key sizes, and dates have been projected during which the use of these algorithms and key sizes is anticipated to be secure. For further information, see SP 800-131A.

Agencies need to determine the length of time that cryptographic protection is required before selecting an algorithm and key size with the appropriate security strength.

Note that SP 800-57, Part 1 will be updated if the guidance provided therein is no longer valid (e.g., an algorithm no longer provides adequate security).

- SP 800-57, Part 2, *Best Practices for Key Management Organization*, contains:

  - o   A generic key-management infrastructure,

  - o   Guidance for the development of organizational key-management policy statements and key-management practices statements,

  - o   An identification of key-management information that needs to be incorporated into security plans for general support systems and major applications that employ cryptography, and

  - o   An identification of key-management information that needs to be documented for all federal applications of cryptography.

- SP 800-57, Part 3, *Application-Specific Key Management Guidance*, addresses the key management issues associated with currently available cryptographic mechanisms, such as the Public Key infrastructure (PKI), Internet Protocol Security (IPsec), the Transport Layer Security protocol (TLS), Secure/Multipart Internet Mail Extensions (S/MIME), Kerberos, Over-the-Air Rekeying (OTAR), Domain Name System Security Extensions (DNSSEC), Encrypted File Systems and the Secure Shell (SSH) protocol.

Specific guidance is provided regarding:

  - o   The recommended and/or allowable algorithm suites and key sizes,

  - o   Recommendations for the use of the mechanism in its current form for the protections of federal government information, and

---

[54] A fifth security strength (i.e., 80 bits of security) was acceptable for applying cryptographic protection (e.g., encryption) prior to 2014. However, this strength is not adequate.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

     o   Security considerations that may affect the effectiveness of key-management processes and the cryptographic mechanisms using keys that are generated and managed by those key-management processes.

Note that in the case of TLS, a reference is provided to a separate publication – SP 800-52[55] – that provides extensive details for using TLS.

New key-management techniques and mechanisms are constantly being developed, and existing key-management mechanisms and techniques are constantly being refined.  While the security-guidance information contained in Part 3 will be updated as mechanisms and techniques evolve, new products and technical specifications can always be expected that are not reflected in the current version of the document.  Therefore, the context provided may include status information, such as version numbers or implementation status at the time that the document was last revised.

## 5.1.2   Security Requirements for Cryptographic Modules

FIPS 140 provides minimum security requirements for cryptographic modules that embody or support cryptography in federal information systems. A cryptographic module performs the actual cryptographic computations for a security system protecting sensitive information. The security requirements cover areas related to the secure design and implementation of a cryptographic module, including the module specification; cryptographic module ports and interfaces; roles, services and authentication; finite-state models; physical security; the operational environment; cryptographic key management; electromagnetic interference/electromagnetic compatibility (EMI/EMC); self-tests; design assurance; and the mitigation of attacks.

FIPS 140 is applicable to all federal agencies that use cryptography to protect sensitive information in computer and telecommunications systems. Further information about FIPS 140 and the validation of cryptographic modules is available at http://csrc.nist.gov/groups/STM/cmvp/index.html.

## 5.1.3   Transitions to New Cryptographic Algorithms and Key Lengths

With the development and publication of SP 800-57, Part 1, NIST provided recommendations for transitioning to new cryptographic algorithms and key lengths because of algorithm breaks or the availability of more powerful computers that could be used to efficiently search for cryptographic keys. SP 800-131A was developed to provide more specific guidance for such transitions. Each algorithm and service is addressed in

---

[55] SP 800-52, *Guidelines for the Selection, Configuration, and Use of Transport Layer Security (TLS) Implementations*.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

SP 800-131A, indicating whether its use is acceptable[56], deprecated[57], restricted[58], allowed only for legacy applications[59], or disallowed.

Note that SP 800-131A will be updated if the guidance provided therein is no longer valid (e.g., an algorithm no longer provides adequate security).

## 5.2    Cryptographic Key Management Systems

Several publications have been developed for the development of key-management systems: SP 800-130[60] (see Section 5.2.1), SP 800-152[61] (see Section 5.2.2) and documents relating to the Public Key Infrastructure used for asymmetric-key cryptography (see Section 5.2.3).

A Cryptographic Key Management System (CKMS) includes policies, procedures, components and devices that are used to protect, manage and distribute cryptographic keys and associated information (called metadata). A CKMS includes all devices or subsystems that can access a key or its metadata.  The devices could be computers, cell phones, tablets, or other smart devices, such as cars, alarm systems, or refrigerators.

### 5.2.1    Key Management Framework

SP 800-130 contains topics that should be considered by a CKMS designer when developing a CKMS design specification. Topics include security policies, cryptographic keys and metadata, interoperability and transitioning, security controls, testing and system assurances, disaster recovery, and security assessments.

For each topic, SP 800-130 specifies one or more documentation requirements that need to be addressed by the designer. SP 800-130 is intended to assist in:

- The definition of the CKMS design by requiring the specification of significant CKMS capabilities,

- Encouraging CKMS designers to consider the factors needed in a comprehensive CKMS,

- Logically comparing different CKMSs and their capabilities,

- Performing security assessments by requiring the specification of implemented and supported CKMS capabilities, and

---

[56] No security risk is known at present.

[57] The use of the algorithm and key length is allowed, but the user must accept some risk.

[58] The use of the algorithm is discouraged, and there are additional restrictions required for use.

[59] The algorithm and key length may be used to process already-protected information, but there may be a risk in doing so.

[60] SP 800-130, *A Framework for Designing Cryptographic Key Management Systems*.

[61] SP 800-152, *A Profile for U. S. Federal Cryptographic Key Management Systems (CKMS)*.

- Forming the basis for the development of Profiles that specify the specific requirements for the CKMS to be used by an organization.

## 5.2.2   Key Management System Profile

SP 800-152 contains requirements for the design, implementation, procurement, installation, configuration, management, operation and use of a CKMS by and for U.S. federal organizations and their contractors. The Profile is based on SP 800-130 (see Section 5.2.1). SP 800-152 specifies requirements, makes recommendations for federal organizations having special security needs and desiring to augment the base security and key-management services, and suggests additional features that may be desirable to implement and use.

In addition to providing design requirements to be incorporated into a CKMS design, SP 800-152 provides requirements for a Federal CKMS (FCKMS) to be operated by a service provider that may be a federal agency or a third party operating an FCKMS under contract for one or more federal agencies and their contractors.

This Profile is intended to:

- Assist CKMS designers and implementers in supporting appropriate cryptographic algorithms and keys, selecting the metadata associated with the keys, and selecting protocols for protecting sensitive U.S. federal computing applications and data;

- Establish requirements for testing, procurement, installation, configuration, administration, operation, maintenance and usage of the FCKMS;

- Facilitate an easy comparison of one CKMS with another by analyzing their designs and implementations in order to understand how each meets the Framework and Profile requirements; and

- Assist in understanding what is needed to evaluate, procure, install, configure, administer, operate, and use an FCKMS that manages the cryptographic keys that protect sensitive and valuable data obtained, processed, stored, and used by U.S. federal organizations and their contractors.

## 5.2.3   Public Key Infrastructure

A PKI is a security infrastructure that creates and manages public-key certificates to facilitate the use of public-key (i.e., asymmetric-key) cryptography.  To achieve this goal, a PKI needs to perform two basic tasks:

1. Generate and provide public key certificates that bind public keys to the identifier associated with the owner of the corresponding private key[62] and to other required information *after* validating the accuracy of the information to be bound, and

---

[62] The identifier could be the true identity of the owner, or could be an alias or a pseudonym used to represent the owner.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

2. Maintain and provide certificate-status information for unexpired and revoked certificates.

Two types of certificates are commonly used: certificates used to provide the public keys that are used to verify digital signatures, and certificates used to provide the public keys used for key management (i.e., key establishment). Each certificate associated with digital signatures provides the public keys of one of the three digital-signature algorithms approved in FIPS 186: DSA, ECDSA or RSA (see Section 3.3). Certificates that convey the public keys to be used for key establishment may be of two types: those that provide a key-agreement public key (see Section 5.3.3), and those that provide a key-transport public key (see Section 5.3.4). Key-usage bits in a certificate indicate the purpose for which the public key is intended to be used.

As discussed in Section 3.3, public keys can be made available to anyone. However, a private key must be maintained under the exclusive control of the owner of that private key[63] (i.e., the user that is authorized to use the private key).

- If a private key that is used to generate digital signatures is lost, the owner can no longer generate digital signatures; some policies may permit users to maintain backup copies of the private key for continuity of operations, but this is not encouraged, so an alternative is to simply generate new key pairs and certificates.

- If the private key used to generate digital signatures is compromised, relying parties can no longer trust the digital signatures generated using that private key (e.g., someone may be using the signature to provide false information).

- If a private key used for key establishment is lost (e.g., a key used for key transport or key agreement), then further key establishment processes cannot be accomplished until the key is recovered or replaced; if the key is needed to recover data protected by the key, then that data is lost unless the key can be recovered. For example, if the key is used to transport a decryption key for encrypted data, and the key is lost, then the encrypted data cannot be decrypted. To ensure that access to critical data is not lost, PKIs often backup the private key-establishment key for possible recovery.

- If a private key used for key establishment is compromised, then any transactions involving that key cannot be trusted (e.g., someone other than the true owner of the private key may be attempting to enter into a supposedly "secure" transaction for some illicit purpose).

### 5.2.3.1   PKI Components, Relying Parties and Their Responsibilities

For scalability, PKIs are usually implemented with a set of complementary components, each focused on specific aspects of the PKI process.  The main PKI tasks are assigned to

---

[63] An exception could be some other trusted entity, such as the owner's organization. In these cases, the organization could be considered to be the *real* owner of the key.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

the following logical components; other components are also used to support the PKI, but are not discussed here (see SP 800-32[64] for further discussion):

- *Certification authorities* (CAs) generate certificates and certificate-status information, and

- *Registration authorities* (RAs) verify the identity of users applying for a certificate[65] and authenticate other information to be included in the certificate.

In general, a PKI operates as follows:

1. An entity applies to an RA to request a certificate.

2. The RA verifies the identity of the applicant, and 2) verifies the information to be inserted in the certificate.

3. If the checks made by the RA in step 2 indicate that the information to be inserted in the certificate is valid, then the RA sends the public key and other relevant information to the CA to request that a certificate be generated.

4. Upon receiving the certificate request from the RA, the CA creates a digital certificate, returns the certificate to the RA and deposits the certificate in a repository.

5. When a relying party interacts with another entity that has a public-key certificate, the relying party needs to obtain the other entity's certificate, either directly or from the CA's repository. After acquiring the certificate, the relying entity verifies the signature on the certificate. Assuming that the certificate is "good," then the relying party can proceed safely with its interaction with the certificate's owner.

Most of the interaction involved with using a certificate is transparent to the user. However, a user or a system administrator may be responsible for obtaining and installing a certificate. Thereafter, an application (e.g., a browser) uses the certificate to interact with other entities, and the user may not be aware of these actions. An exception might be when a certificate has expired or been revoked, in which case a message may be displayed to indicate this status.

Certificates expire at a predetermined time unless revoked prior to the expiration date. Certificates can be revoked for a variety of reasons, including the compromise of the private key corresponding to the public key in the certificate, or the owner of the certificate leaving the organization. When a certificate has been revoked, a system will quite often display the certificate-revocation message and perhaps include the reason for the revocation. Depending on the application implementation and the revocation reason, the application could disallow further actions, or could allow the user to indicate whether to ignore the warning and continue operations, or to simply discontinue operations. This warning must not be taken lightly. Ignoring the warning means that the user is accepting the risks associated with doing so. For example, if a warning indicates a compromised

---

[64] SP 800-32, *Introduction to Public Key Technology and the Federal PKI Infrastructure.*

[65] The certificate could be for the user or for a device for which the user is authorized to obtain a certificate.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

digital signature certificate, there is a possibility that someone other than the claimed owner of the certificate actually used the private key corresponding to the public key to sign data. Depending on the data, it may not be prudent to ignore the warning. A user should consult with his organization to determine how to respond to this warning.

### 5.2.3.2   Basic Certificate Verification Process

A PKI consists of at least one CA with its subscribers, as shown in Figure 5. Each of the subscribers (e.g., User 1, User 2 and User 3) obtains a certificate containing their public key and other information, which is signed by their CA. All CA subscribers are provided with the public key of the CA.

As a basic example of how this works, suppose that User 3 signs a document and sends it to User 1, who needs to verify the contents and source of the signed document. This is accomplished as follows:



1. User 1 obtains the certificate containing the public key that corresponds to the private key used to sign the document, i.e., User 1 obtains User 3's certificate. Either User 3 supplies that certificate, or the certificate is obtained from some other source, e.g., the CA.

2. User 1 verifies User 3's certificate using the CA's public key.

3. User 1 then employs the public key in User 3's certificate to verify the signature on the document received from User 3. If the signature is successfully verified, then User 1 knows that User 3 generated the signature, and no unauthorized modifications were made to the document after the signature was generated.

**Figure 5: Basic Certificate Verification Example**

Note that other more-complicated scenarios exist when users subscribing to different CAs need to interact using CAs that have cross certified by signing a certificate for each other.

### 5.2.3.3   CA Certificate Policies and Certificate Practice Statements

Each CA has a Certificate Policy and a Certificate Practices Statement. As defined by ITU[66] Recommendation X.509, a Certificate Policy (CP) is "a named set of rules that indicates the applicability of a certificate to a particular community and/or class of application with common security requirements." The CP defines the expectations and requirements of the relying party community that will trust the certificates issued by the CAs using that policy. A CP addresses such issues as key generation and storage;

---

[66] International Telecommunication Union.

certificate generation; key escrow[67] and recovery; certificate status services, including Certificate Revocation List (CRL) generation and distribution; and system management functions, such as security audits, configuration management, and archiving.

A Certification Practice Statement (CPS) describes how a specific CA issues and manages public-key certificates. The CPS is derived from the applicable CP for the community or application in which the CA participates.

A Federal Public Key Infrastructure (FPKI) has been established for use by the Federal Government (see Section 5.2.3.4 for further information).

DRAFT NISTIR 7924[68] identifies a baseline set of security controls and practices to support the secure issuance of certificates. NISTIR 7924 is designed to be used as a template and guide for writing a CP for a specific community, or a CPS for a specific CA.

### 5.2.3.4   Federal Public Key Infrastructure

A Federal Public Key Infrastructure (FPKI) provides the Federal Government with a common infrastructure to administer digital certificates and public-private key pairs. The network portion of the FPKI (commonly referred to as the "Bridge") consists of "Principal CAs" designated by various agencies. Each CA within the bridge is cross-certified with every other CA within the bridge, thus establishing a conduit for trust relationships among all CAs within the FPKI. Each Principal CA may also be associated with other CAs that are not part of the bridge. For more information about the FPKI, including its certificate policy and certificate practices statement, see http://www.idmanagement.gov/federal-public-key-infrastructure.

## 5.3   Key Establishment

Key establishment is the means by which keys are generated and provided to the entities that are authorized to use them. An entity may be a person, organization, device or process. Scenarios for which key establishment could be performed include the following:

- A single entity could generate a key (see Section 5.3.1) and use it without providing it to other entities (e.g., for protecting locally stored data),

- A key could be derived from a key that is already shared between two or more entities (see Section 5.3.2),

- Two entities could generate a key using contributions (i.e., data) from each entity using an automated protocol that incorporates a key-agreement scheme (see Section 5.3.3), or

---

[67] Saving a key or information that allows the key to be reconstructed so that the key can be recovered if ever needed (e.g., because of being lost or corrupted).

[68] NISTIR 7924, *Reference Certificate Policy (Second Draft)*.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

- A single entity could generate a key and provide it to one or more other entities, either by a manual means (e.g., a courier or a face-to-face meeting, with the key in either printed or electronic form, such as on a flash drive) or using automated protocols that incorporate a key-transport scheme (see Sections 5.3.4 and 5.3.5).

### 5.3.1   Key Generation

Cryptographic keys are required by most cryptographic algorithms, the exception being hash functions when not used as a component of another cryptographic process (e.g., HMAC). SP 800-133 [69] discusses the generation of the keys to be used with the **approved** cryptographic algorithms.

All keys must be based directly or indirectly on the output of an **approved** Random Bit Generator (RBG) and must be generated within FIPS 140-compliant cryptographic modules (see FIPS 140). Any random value required by the module must be generated within a cryptographic module.

SP 800-133 provides guidance on generating a key directly from an RBG, and references other publications for additional information required for the generation of keys for specific algorithms:

- FIPS 186 provides rules for the generation of the key pairs to be used for the generation of digital signatures,

- SP 800-108 provides methods for the generation of keys from an already-shared key (see Section 5.3.2),

- SP 800-56A specifies the rules for the generation of key pairs for Diffie-Hellman and MQV key-agreement schemes (see Section 5.3.3),

- SP 800-56B specifies the rules for the generation of key pairs for RSA key-agreement and key-transport schemes (see Sections 5.3.3 and 5.3.4, respectively), and

- SP 800-132 specifies the rules for the generation of keys from passwords (see Section 5.3.6).

### 5.3.2   Key Derivation

Key derivation is concerned with the generation of a key from secret information, although non-secret information may also be used in the generation process in addition to the secret information. Typically, the secret information is shared among entities that need to derive the same key for subsequent interactions. The secret information could be a key that is already shared between the entities (i.e., a pre-shared key), or could be a shared secret that is derived during a key-agreement scheme (see Section 5.3.3).

SP 800-108 [70] specifies several key-derivation functions that use pre-shared keys. A pre-shared key could have been

---

[69] SP 800-133, *Recommendation for Cryptographic Key Generation*.

[70] SP 800-108, *Recommendation for Key Derivation Using Pseudorandom Functions*.

- Generated by one entity and provided to one or more other entities by some manual means (e.g., a courier or face-to-face meeting),

- Agreed upon by the entities using an automated key-agreement scheme (see Section 5.3.3), or

- Generated by one entity and provided to another entity using an automated key-transport scheme (see Sections 5.3.4 and 5.3.5).

SP 800-56A, SP 800-56B and SP 800-56C[71] provide methods for deriving keys from the shared secrets generated during key agreement (see Section 5.3.3). SP 800-56A and SP 800-56 B specify two key-derivation methods for this purpose, and refer to SP 800-56C and SP 800-135[72] for additional **approved** methods[73].

### 5.3.3   Key Agreement

Key agreement is a key-establishment procedure in which the resultant keying material is a function of information contributed by all participants in the key-agreement process so that no participant can predetermine the value of the resulting keying material independently of the contributions of the other participants. Key agreement is usually performed using automated protocols.

SP 800-56A and SP 800-56B provide several automated pair-wise key-agreement schemes, i.e., key-agreement schemes involving two parties. For each scheme, a shared secret is generated, and keying material is derived from the shared secret using a key-derivation method specified or approved by reference in SP 800-56A, SP 800-56B or SP 800-56C.

SP 800-56A and SP 800-56B include variations of key-agreement schemes, differing in the number of keys used and whether the keys are long term (i.e., static) or an ephemeral value (e.g., a nonce or a short-term key pair). The key-agreement schemes have two participating entities: an initiator and a responder.

---

[71] SP 800-56C, *Recommendation for Key Derivation through Extraction-then-Expansion*.

[72] SP 800-135, *Recommendation for Existing Application-Specific Key Derivation Functions*.

[73] Note that a modification is in progress to move the KDF specifications and references in SP 800-56A and SP 800-56B to SP 800-56C.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B



**Figure 6: Key Agreement Example**

Figure 6 provides an example of a key-agreement scheme where the responder uses a static key pair during the scheme, and the initiator uses an ephemeral key pair. Note that other key-agreement schemes may use other arrangements of key pairs (e.g., each party could use a static key pair or each party could use an ephemeral key pair). In the example provided in the figure above, the responder's private key is retained by the responder (who is the owner of the key pair), but the responder's public key may be provided to anyone. In this example, the public key is provided to the initiator:

1. The initiator obtains the responder's public key (e.g., from a CA or directly from the responder); for this scheme, this public key is the responder's contribution to the key-agreement process.

2. The initiator then generates a short-term key pair (i.e., an ephemeral key pair), and sends the ephemeral public key to the responder, retaining the ephemeral private key. The ephemeral public key is the initiator's contribution to the key-agreement process for this scheme.

3. Both parties use their own key pair and the other party's public key to generate a shared secret.

4. Both parties then use their copy of the shared secret to derive one or more keys that are (hopefully) identical.

Key confirmation is an optional, but highly recommended, step that provides assurance that both parties now have the same (identical) key(s), and is shown in Figure 6 for the case that the initiator receives key confirmation from the responder. See SP 800-56A and SP 800-56B for further information.

48

SP 800-56A specifies Diffie-Hellman (DH) and MQV key-agreement schemes using finite field or elliptic curve mathematics and asymmetric key pairs to generate the shared secret, and SP 800-56B specifies two RSA key-agreement schemes. SP 800-56A and SP 800-56B also provide an analysis of the merits of each key-agreement scheme.

### 5.3.4   Key Transport

Key transport is a method whereby one party (the sender) generates a key and distributes it to one or more other parties (the receiver(s)). Key transport could be accomplished using manual methods (e.g., using a courier) or performed using automated protocols. SP 800-56A and SP 800-56B provide automated pair-wise key-transport schemes, and an analysis of the merits of each key-transport scheme.

#### 5.3.4.1   SP 800-56A Key Transport

SP 800-56A specifies a key-transport method whereby a key-establishment transaction includes both a key-agreement process and a key-wrapping process. Key wrapping is a process that provides both confidentiality and integrity protection for keying material using a symmetric-key algorithm (see Section 5.3.5 for further information about key wrapping).

During the transaction, the key generated during the key-agreement part of the transaction is used as a key-wrapping key with a symmetric-key algorithm (e.g., AES) by the sending party to wrap a key to be sent to the other party (the receiver). Note that the sender can be either the initiator or the responder in the key-agreement process.



**Figure 7: SP 800-56A Key Transport Example**

Figure 7 illustrates the key transport process that follows the key-agreement discussed in Section 5.3.3 and shown in Figure 6. After the key-agreement part of the transaction, the initiator and responder share a symmetric key-wrapping key, which is then used as follows:

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

The sender:

1. Generates (or otherwise obtains) a symmetric key to be transported (note that the sender could have been either the initiator or the responder in the key-agreement part of the transaction),

2. Wraps the symmetric key from step 1 using the key-wrapping key, and

3. Sends the resulting ciphertext (i.e., the wrapped key) to the intended receiver.

The receiver:

4. Unwraps the ciphertext using his copy of the key-wrapping key to obtain the original plaintext symmetric key, and

5. Optionally performs key confirmation; although this step is optional, it is highly recommended to provide assurance that both parties now have the same symmetric key.

### 5.3.4.2    SP 800-56B Key Transport

SP 800-56B specifies two very different methods for transporting keys whereby the sender uses the receiver's public key to securely transport keying material to the receiver.

Figure 8 provides a simplified example of one of the key-transport methods in SP 800-56B. In both methods, the receiver must have a key pair that is used during a key-transport transaction. In the example shown in the figure, key transport is accomplished as follows.

The sender:

1. Obtains the public key of the intended receiver,

2. Generates a symmetric key to be transported,

3. Encrypts the symmetric key using the receiver's public key, and

4. Sends the resulting ciphertext key to the receiver.

The receiver:

5. Uses his private key to decrypt the ciphertext key, thus obtaining the original plaintext key.

6. Optionally performs key confirmation; although this step is optional, it is highly recommended to provide assurance that both parties now have the same symmetric key.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B



**Figure 8: SP 800-56B Key Transport Example**

### 5.3.5   Key Wrapping

Key wrapping is a method used to provide confidentiality and integrity protection to keys (and possibly other information) using a symmetric key-wrapping key that is known by both the sender and receiver, and a symmetric-key block cipher algorithm. The wrapped keying material can then be stored or transmitted (i.e., transported) securely. Unwrapping the keying material requires the use of the same algorithm and key-wrapping key that was used during the original wrapping process.

Key wrapping differs from simple encryption in that the wrapping process includes an integrity feature. During the unwrapping process, this integrity feature is used to detect accidental or intentional modifications to the wrapped keying material.

Three methods have been specified in SP 800-38F [74] for key wrapping, and other SP 800-38 modes (or combination of modes) that that can also be used for key wrapping are also **approved** in SP 800-38F. Depending on the method or mode, either AES or TDEA can be used.

### 5.3.6   Derivation of a Key from a Password

Keys can be derived from passwords. Due to the ease of guessing most passwords, keys derived in this manner are not suitable to be used for most applications. However, SP 800-132 [75] specifies a family of functions that can be used to derive keying material from

---

[74] SP 800-38F, *Recommendation for Block Cipher Modes of Operation: Methods for Key Wrapping*.

[75] SP 800-132, *Recommendation for Password-Based Key Derivation Part 1: Storage Applications*.

a password[76] for electronic storage applications (e.g., when encrypting an entire disk drive).

## 5.4   Key Management Issues

A number of issues need to be addressed for selecting and using a CKMS.

### 5.4.1   Manual vs. Automated Key Establishment

As discussed in Sections 5.3 and 5.3.4, keys can be established between entities either manually or using automated methods. In many cases, a hybrid approach is used in which an entity generates and manually distributes one or more keys to other entities, and thereafter these keys are used to establish other keys (see SP 800-56A and SP 800-56B).

The number of keys to be manually distributed depends on the type of cryptography to be used (i.e., symmetric or asymmetric methods) and must be considered when selecting the capabilities required of a CKMS.

### 5.4.2   Selecting and Operating a CKMS

A CKMS could be designed, implemented and operated by the organization that will use it. Or, the organization could operate a CKMS procured from a vendor. Or, an organization could procure the services of a third party that procures a CKMS from a vendor. Whichever choice is made, the organization needs to make sure that the CKMS that is used provides the protections that are required for the organization's information. SP 800-130 and SP 800-152 discuss the considerations that need to be addressed by the federal organization, including the scalability of the CKMS, and the metadata to be associated with the keys.

### 5.4.3   Storing and Protecting Keys

Keys can be stored in a number of places and protected in a variety of ways. They could be stored in a safe. They could be present only in a validated cryptographic module where the module itself might adequately protect the keys, depending on its design. Keys could also be stored on electronic media, such as a flash drive; in this case, a key may need to be encrypted or split into key components so that no single person can determine what the key is. These issues need to be addressed for operational keys.

Certain keys may need to be backed up so that if an operational key is inadvertently lost or modified, it can be recovered and operations resumed. Some keys may also need to be archived for long-term storage (e.g., because of legal requirements or to decrypt archived data). A key-recovery capability is needed whenever keys are backed up or archived. This capability needs to be designed so that the keys can be recovered in an acceptable amount of time and only by those entities authorized to do so; see SP 800-57, Part 1 for more information about key backup, key archiving and key recovery.

---

[76] Note that this publication considers a passphrase to be a password.

### 5.4.4   Cryptoperiods

A cryptoperiod is the time span during which a specific key is authorized for use. A cryptoperiod for a key is assigned for a number of reasons, including limiting the amount of exposure of encrypted data if a single key is compromised. Cryptoperiods are usually assigned for a carefully considered period of time or by the maximum amount of data protected by the key. Tradeoffs associated with the determination of a cryptoperiod involve the risks and consequences of exposure. Section 5.3 of SP 800-57, Part 1 provides a more detailed discussion of the need for establishing cryptoperiods, the factors to be considered when deciding on a suitable cryptoperiod and some suggestions for the length of cryptoperiods.

### 5.4.5   Use Validated Algorithms and Cryptographic Modules

Cryptographic algorithms must be validated and implemented in FIPS 140-validated cryptographic modules. Every IT product available makes a claim as to functionality and/or offered security. When protecting sensitive data, a minimum level of assurance is needed that a product's stated security claim is valid. There are also legislative restrictions regarding certain types of technology, such as cryptography, that require federal agencies to use only tested and validated products.

Federal agencies, private industry, and the public rely on cryptography for the protection of information and communications used in electronic commerce, the critical infrastructure, and other application areas. At the core of all products offering cryptographic services is the cryptographic module. Cryptographic modules, which contain cryptographic algorithms, are used in products and systems to provide security services such as confidentiality, integrity, and authentication. Although cryptography is used to provide security, weaknesses such as poor design or weak algorithms can render the product insecure and place highly sensitive information at risk. Adequate testing and validation of the cryptographic module and its underlying cryptographic algorithms against established standards is essential to provide security assurance.

NIST has established programs to validate the implementation of the **approved** cryptographic algorithms and the cryptographic modules in which they are used: the Cryptographic Algorithm Validation Program (CAVP) and the Cryptographic Module Validation Program (CMVP). Information about the CAVP is available at http://csrc.nist.gov/groups/STM/cavp/, while information about the CMVP is available at http://csrc.nist.gov/groups/STM/cmvp/.

Also, see Section 5.1.2 in this document for a discussion of the security requirements for cryptographic modules.

### 5.4.6   Control of Keying Material

The access to keys needs to be controlled. A key should only be accessible by an authorized entity, and only for the purpose for which it is authorized. For example, a key

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

designated for key transport must not be used for the generation or verification of digital signatures.

The proliferation of keys also needs to be controlled. While it is often convenient to make copies of keys, these extra copies need to be accounted for. If a key is compromised, that key and all its copies may need to be destroyed to prevent subsequent unauthorized use. For example, if a private key used for the generation of a digital signature is compromised, and a copy of the key still exists after the original copy was destroyed, then there is a possibility that the copy could be used to generate unauthorized digital signatures at a later time.

Users must be provided with a list of responsibilities and liabilities, and each user should sign a statement acknowledging these concerns before receiving a key. Users must be made aware of their unique responsibilities, especially regarding the significance of a key compromise or loss. Users must be able to store their secret and private keys securely, so that no intruder can access them, yet the keys must be readily accessible for legitimate use.

### 5.4.7   Compromises

It is imperative to have a plan for handling the compromise or suspected compromise of keys, particularly those used and managed at a central site (e.g., the keys used by a CA to sign certificates); this should be established before the system becomes operational.  A compromise-recovery plan should address what actions will be taken with compromised system software and hardware, CA keys, user keys, previously generated signatures, encrypted data, etc. SP 800-57, Part 1 includes discussions of the effects of a key compromise, measures for minimizing the likelihood or consequences of a key compromise, and what should be considered in developing a compromise-recovery plan.

If someone's private or secret key is lost or compromised, other users must be made aware of this, so that they will no longer initiate the protection of data using a compromised key, or accept data protected with a compromised key without assessing and accepting the risk of doing so. This notification is often accomplished using CRLs or Compromised Key Lists (CKLs); see SP 800-57, Part 1 for discussions.

In some cases, a key and all copies of the key should be destroyed immediately upon the detection of a key compromise. For example, a private key used for the generation of digital signatures should be immediately destroyed. However, the corresponding public key may need to remain available for verifying the signatures that were previously generated using the compromised private key. Note that there is a risk associated with accepting these signatures.

### 5.4.8   Accountability and Auditing

Accountability involves the identification of those entities that have access to or control of cryptographic keys throughout their lifecycles. Accountability can be an effective tool to help prevent key compromises and to reduce the impact of compromises when they are detected. Accountability 1) aids in the determination of when a compromise could have occurred and what individuals could have been involved, 2) discourages key compromise because users know their access to the key is known, and 3) is useful in determining

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

where the key was used and what data or other keys were protected by a compromised key, and therefore, may also be compromised.

Auditing is another mechanism used for the detection of and recovery from key compromises. Auditing includes reviewing the actions of humans that use, operate and maintain systems, looking for unusual events that may indicate inappropriate actions by the humans or processes using a key management system.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

# SECTION 6:  OTHER ISSUES

The use of cryptography should not be undertaken without a thorough risk analysis, and a determination of the sensitivity of the information to be protected and the security controls to be used (see SP 800-175A and SP 800-53). After performing a risk assessment and determining the sensitivity level of the information to be protected (Low, Moderate or High) and the security controls to be used, a number of issues need to be addressed to ensure that cryptography is used properly.

This section identifies issues to be addressed after determining that cryptography is required.

## 6.1  Required Security Strength

The minimum security strength is determined by the sensitivity level of the information (see FIPS 199). SP 800-152 requires a security strength of at least 112 bits for the protection of Low-impact information, 128 bits for Moderate-impact information, and 192 bits for High-impact information. The required security strength can then be used to determine the algorithm and key size to be used. Section 5.6 of   SP 800-57, Part 1 provides tables for selecting appropriate algorithms and key sizes.

Many applications require the use of several different cryptographic algorithms. Ideally, these algorithms would all offer the same security strength, but this may not always be the case for performance, availability and interoperability reasons. When algorithms of different strengths are used together to protect data, the security provided by the combination of algorithms is the strength associated with the algorithm with the lowest security strength (see Section 5.6 of SP 800-57, Part 1). For example, RSA with 2048-bit keys can support a security strength of 112 bits, but is often used with SHA-256, which can support a security strength of 128 bits. When the combination is used to generate a digital signature, the signature can only provide a security strength of 112 bits – the lesser strength offered by the two algorithms.

**Approved** combinations of algorithms (called cipher suites) for some of the protocols are provided in SP 800-57, Part 3 (for S/MIME) and SP 800-52 (for TLS).

## 6.2   Interoperability

Interoperability is the ability of one entity to communicate with another entity, whether the entities are people, devices or processes. In order to communicate, the entities must have:

- A communications channel (e.g., the Internet) and the same communications protocol (e.g., TLS), and

- Policies that allow the entities to communicate.

In order to communicate securely, the entities must also have:

- Trust that each entity will enforce its own policies.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

- Interoperable cryptographic capabilities as discussed in Section 4, and

- Share appropriate keying material that has been established securely (see Section 5.3).

For example, if entities A and B are in two different organizations, and

- Each organization has a policy that allows the entities to communicate,

- Each entity trusts that the other entity will enforce its own policies,

- There is a TLS capability that can be used for communication,

- Each entity can encrypt and decrypt information using AES with a 128-bit key and establish keys using 3072-bit RSA key transport (see Section 5.3.4), and

- One of the entities can generate a 128-bit AES key and act as the sender in the key-transport scheme, and the other entity has a 3072-bit RSA key pair and can act as the receiver (see Section 5.3.4.2 for a discussion on key transport),

then the two entities have a secure and interoperable communication channel that can be used to establish a 128-bit key for encrypting information using AES. In this case, the security strength that can be provided by an encryption operation using AES is 128 bits, since both 3072-bit RSA and AES-128 are rated at a security strength of 128 bits (see Section 6.1).

## 6.3    When Algorithms are No Longer Approved

In the case that an algorithm is **no longer approved** for providing adequate protection (e.g., the algorithm may have been "broken"), a risk assessment needs to be performed to determine whether the information should be re-protected using an **approved** algorithm and key size that will protect the information for the remainder of its security life. See Section 5.6.4 for SP 800-57, Part 1 for additional discussion.

## 6.4    Registration Authorities (RAs)

As discussed in Section 5.2.3.1, an RA verifies the identity of users applying for a certificate and authenticates other information to be included in a certificate generated by a Certification Authority (CA). The correctness of this information is the linchpin on which the security of using certificates is based. Once this information is verified, the appropriate information is submitted to a CA for certificate generation using a signed certification request. The CA must deem the RA as trustworthy, e.g.,

- Appropriate identification is provided by an entity requesting a certificate and is fully checked by the RA;

- Information submitted for inclusion in the certificate is checked for validity (e.g., that the public key is valid, and the private key is in the possession of the claimed owner); and

- The RA provides adequate protection for the private key used to sign the certification request.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

## 6.5   Cross Certification

Cross certification is the establishment of a trust relationship between two Certification Authorities (CAs) through the signing of each other's public key in a certificate referred to as a "cross-certificate." Cross-certificates provide a means to create a chain of trust from a single, trusted, root CA to multiple other CAs so that subscribers in one CA domain can interact safely with subscribers in other CA domains (e.g., the subscriber in one CA domain has assurance of the identity of the subscriber in the other domain and assurance of the accurateness of the other information provided by his certificate).

Cross certification should only be performed when each CA examines the other CA's policies, finds them acceptable and trusts that CA to operate in accordance with those policies.

# Appendix A:  References

The following FIPS and NIST Special Publications (SP) apply to the use of cryptography in the Federal Government.

All publications are available at http://csrc.nist.gov/publications.

| | |
|---|---|
| FIPS 140 | Federal Information Processing Standard 140-2, *Security Requirements for Cryptographic Modules*, May 25, 2001 (updated December 3, 2002 (Change Notice 2)).<br><br>http://csrc.nist.gov/publications/fips/fips140-2/fips1402.pdf [accessed 8/18/16].<br><br>FIPS 140-2 specifies the requirements that must be met by cryptographic modules protecting U.S. Government information. The standard provides four increasing, qualitative levels of security. The security requirements cover areas related to the secure design and implementation of a cryptographic module. |
| FIPS 180 | Federal Information Processing Standard 180-4, *Secure Hash Standard (SHS)*, August 2015.<br><br>http://dx.doi.org/10.6028/NIST.FIPS.180-4<br><br>FIPS 180-4 specifies seven cryptographic hash algorithms: SHA-1, SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256. |
| FIPS 185 | Federal Information Processing Standard 185, *Escrowed Encryption Standard*, February 9, 1994 [withdrawn October 19, 2015].<br><br>http://csrc.nist.gov/publications/fips/fips185/fips185.pdf [accessed 8/18/16].<br><br>FIPS 185 specified the use of an encryption/decryption algorithm and a Law Enforcement Access Field (LEAF) creation method that could be implemented in electronic devices and used for protecting government telecommunications when such protection was desired. The algorithm and the LEAF creation method were classified. The LEAF was intended for use in a key escrow system that provided for the decryption of telecommunications when access to the telecommunications was lawfully authorized. |
| FIPS 186 | Federal Information Processing Standard 186-4, *Digital Signature Standard (DSS)*, July 2013.<br><br>http://dx.doi.org/10.6028/NIST.FIPS.180-4<br><br>FIPS 186-4 specifies a suite of algorithms that can be used to generate a digital signature: DSA, ECDSA and RSA. This Standard includes methods for the generation of digital signatures, methods for the generation of domain parameters (for DSA and ECDSA), and methods for the generation of key pairs, and requires certain |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST SP 800-175B

|  |  |
|---|---|
|  | assurances for using digital signatures: assurance of domain-parameter validity (DSA and ECDSA), and assurance of public-key validity and assurance of private-key possession for all three algorithms. |
| FIPS 197 | Federal Information Processing Standard 197, *Advanced Encryption Standard (AES)*, November 26, 2001.<br><br>http://csrc.nist.gov/publications/fips/fips197/fips-197.pdf [accessed 8/18/16].<br><br>FIPS 197 specifies a symmetric key block cipher algorithm. The Standard supports key sizes of 128, 192, and 256 bits and a block size of 128 bits. |
| FIPS 198 | Federal Information Processing Standard 198-1, *Keyed-Hash Message Authentication Code (HMAC)*, July 2008.<br><br>http://csrc.nist.gov/publications/fips/fips198-1/FIPS-198-1_final.pdf [accessed 8/18/16].<br><br>FIPS 198-1 defines a message authentication code (MAC) that uses a cryptographic hash function in conjunction with a secret key for the calculation and verification of the MACs. |
| FIPS 199 | Federal Information Processing Standard 199, *Standards for Security Categorization of Federal Information and Information Systems,* February 2004.<br><br>http://csrc.nist.gov/publications/fips/fips199/FIPS-PUB-199-final.pdf [accessed 8/18/16].<br><br>FIPS 199 establishes security categories for both information and information systems. The security categories are based on the potential impact on an organization if certain events occur that jeopardize the information and information systems needed by the organization to accomplish its assigned mission, protect its assets, fulfill its legal responsibilities, maintain its day-to-day functions, and protect individuals. |
| FIPS 202 | Federal Information Processing Standard 202, *SHA-3 Standard: Permutation-Based Hash and Extendable-Output Functions*, August 2015.<br><br>http://dx.doi.org/10.6028/NIST.FIPS.202<br><br>FIPS 202 specifies SHA3-224, SHA3-256, SHA3-384 and SHA3-512. This FIPS also specifies two extendable-output functions (SHAKE128 and SHAKE256), which are not, in themselves, considered to be hash functions. |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| | |
|---|---|
| SP 800-22 | Special Publication 800-22 Revision 1a, *A Statistical Test Suite for Random and Pseudorandom Number Generators for Cryptographic Applications*, April 2010.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-22r1a<br><br>SP 800-22 discusses some aspects of selecting and testing random and pseudorandom number generators for providing random numbers that are indistinguishable from truly random output. |
| SP 800-32 | Special Publication 800-32, *Introduction to Public Key Technology and the Federal PKI Infrastructure*, February 26, 2001.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-32<br><br>SP 800-32 was developed to assist agency decision-makers in determining if a PKI is appropriate for their agency, and how PKI services can be deployed most effectively within a Federal agency. It is intended to provide an overview of PKI functions and their applications. |
| SP 800-38 | A series of publications specifying modes of operation for block cipher algorithms. |
| SP 800-38A | Special Publication 800-38A, *Recommendation for Block Cipher Modes of Operation: Methods and Techniques*, December 2001.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-38A<br><br>SP 800-38A defines five confidentiality modes of operation for use with an underlying symmetric key block cipher algorithm: Electronic Codebook (ECB), Cipher Block Chaining (CBC), Cipher Feedback (CFB), Output Feedback (OFB), and Counter (CTR). Used with an **approved** underlying block cipher algorithm (i.e., AES and TDEA), these modes can provide cryptographic protection for sensitive computer data. |
| SP 800-38B | Special Publication 800-38B, *Recommendation for Block Cipher Modes of Operation: the CMAC Mode for Authentication*, May 2005.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-38B<br><br>SP 800-38B specifies a message authentication code (MAC) algorithm based on a symmetric key block cipher (i.e., AES or TDEA). This block cipher-based MAC algorithm, called CMAC, may be used to provide assurance of the source and integrity of binary data. |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| SP 800-38C | Special Publication 800-38C, *Recommendation for Block Cipher Modes of Operation: the CCM Mode for Authentication and Confidentiality*, May 2004 (updated July 20, 2007).<br><br>http://dx.doi.org/10.6028/NIST.SP.800-38C<br><br>SP 800-38C defines a mode of operation, called CCM, for a symmetric-key block cipher algorithm with a 128-bit block size (i.e., AES). CCM may be used to provide assurance of the confidentiality and the authenticity of computer data by combining the techniques of the Counter (CTR) mode specified in SP 800-38A, and the Cipher Block Chaining-Message Authentication Code (CBC-MAC) algorithm (specified in SP 800-90B, but **not** currently approved for general use). |
|---|---|
| SP 800-38D | Special Publication 800-38D, *Recommendation for Block Cipher Modes of Operation: Galois/Counter Mode (GCM) and GMAC*, November 2007.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-38D<br><br>SP 800-38D specifies the Galois/Counter Mode (GCM), an algorithm for authenticated encryption with associated data, and its specialization, GMAC, for generating a message authentication code (MAC) on data that is not encrypted. GCM and GMAC are modes of operation for an underlying, **approved** symmetric-key block cipher with a 128-bit block size (i.e., AES). |
| SP 800-38E | Special Publication 800-38E, *Recommendation for Block Cipher Modes of Operation: the XTS-AES Mode for Confidentiality on Storage Devices*, January 2010.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-38E<br><br>SP 800-38E approves the XTS-AES mode of the AES algorithm by reference to IEEE 1619, subject to one additional requirement, as an option for protecting the confidentiality of data on storage devices. The mode does not provide authentication of the data or its source. |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| | |
|---|---|
| SP 800-38F | Special Publication 800-38F, *Recommendation for Block Cipher Modes of Operation: Methods for Key Wrapping*, December 2012.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-38F<br><br>SP 800-38F describes cryptographic methods that are approved for key wrapping. In addition to approving existing methods, this publication specifies two new, deterministic authenticated-encryption modes of operation of the Advanced Encryption Standard (AES) algorithm: the AES Key Wrap (KW) mode and the AES Key Wrap with Padding (KWP) mode. An analogous mode with the Triple Data Encryption Algorithm (TDEA) as the underlying block cipher, called TKW, is also specified to support legacy applications. |
| SP 800-38G | Special Publication 800-38G, *Recommendation for Block Cipher Modes of Operation: Methods for Format-Preserving Encryption*, March 2016.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-38G<br><br>SP 800-38G specifies methods for format-preserving encryption, called FF1 and FF3. Each of these methods is a mode of operation of the AES algorithm, which is used to construct a round function within the Feistel structure for encryption. |
| SP 800-52 | Special Publication 800-52 Revision 1, *Guidelines for the Selection, Configuration, and Use of Transport Layer Security (TLS) Implementations*, April 2014.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-52r1<br><br>Transport Layer Security (TLS) provides mechanisms to protect sensitive data during electronic dissemination across the Internet. SP 800-52 provides guidance about the selection and configuration of TLS protocol implementations, while making effective use of Federal Information Processing Standards (FIPS) and NIST-recommended cryptographic algorithms (specified in SPs), and requires that TLS 1.1 be configured with FIPS-based cipher suites as the minimum appropriate secure transport protocol. This publication also identifies TLS extensions for which mandatory support must be provided and identifies other recommended extensions. |
| SP 800-53 | Special Publication 800-53 Revision 4, *Security and Privacy Controls for Federal Information Systems and Organizations*, April 2013 (updated January 22, 2015).<br><br>http://dx.doi.org/10.6028/NIST.SP.800-53r4<br><br>SP 800-53 provides a catalog of security and privacy controls for federal information systems and organizations, and a process for selecting controls to protect organizational operations (including |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| | |
|---|---|
| | mission, functions, image, and reputation), organizational assets, individuals, other organizations, and the Nation from a diverse set of threats, including hostile cyber attacks, natural disasters, structural failures, and human errors. |
| SP 800-56A | Special Publication 800-56A Revision 2, *Recommendation for Pair-Wise Key-Establishment Schemes Using Discrete Logarithm Cryptography*, May 2013.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-56Ar2<br><br>SP 800-56A specifies key-establishment schemes based on the discrete logarithm problem over finite fields and elliptic curves, including several variations of Diffie-Hellman and Menezes-Qu-Vanstone (MQV) key-establishment schemes. |
| SP 800-56B | Special Publication 800-56B Revision 1, *Recommendation for Pair-Wise Key-Establishment Schemes Using Integer Factorization Cryptography*, September 2014.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-56Br1<br><br>SP 800-56B specifies key-establishment schemes using integer-factorization cryptography (RSA). Both key transport and key-agreement schemes are specified. |
| SP 800-56C | Special Publication 800-56C, *Recommendation for Key Derivation through Extraction-then-Expansion*, November 2011.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-56C<br><br>SP 800-56C specifies techniques for the derivation of keying material from a shared secret established during a key-establishment scheme defined in SP 800-56A or SP 800-56B through an extraction-then-expansion procedure. |
| SP 800-57, Part 1 | Special Publication 800-57, Part 1 Revision 4, *Recommendation for Key Management, Part 1: General*, January 2016.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-57pt1r4<br><br>Part 1 of SP 800-57 provides general guidance and best practices for the management of cryptographic keying material. It focuses on issues involving the management of cryptographic keys: their generation, use, and eventual destruction. Related topics, such as algorithm selection and appropriate key size, cryptographic policy, and cryptographic module selection, are also included. |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP 800-175B

| | |
|---|---|
| SP 800-57, Part 2 | Special Publication 800-57, Part 2, *Recommendation for Key Management, Part 2: Best Practices for Key Management Organization*, August 2005.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-57p2<br><br>   Part 2 of SP 800-57 provides guidance on policy and security planning requirements for U.S. government agencies. This part of SP 800-57 contains a generic key-management infrastructure, guidance for the development of organizational key-management policy statements and key-management practices statements, an identification of key-management information that needs to be incorporated into security plans for general support systems and major applications that employ cryptography, and an identification of key-management information that needs to be documented for all Federal applications of cryptography. |
| SP 800-57, Part 3 | Special Publication 800-57, Part 3 Revision 1, *Recommendation for Key Management, Part 3: Application-Specific Key Management Guidance*, January 2015.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-57pt3r1<br><br>   Part 3 of SP 800-57 addresses the key-management issues associated with currently available cryptographic mechanisms, such as the Public Key infrastructure (PKI), Internet Protocol Security (IPsec), the Transport Layer Security protocol (TLS), Secure/Multipart Internet Mail Extensions (S/MIME), Kerberos, Over-the-Air Rekeying (OTAR), Domain Name System Security Extensions (DNSSEC), Encrypted File Systems and the Secure Shell (SSH) protocol. |
| SP 800-67 | Special Publication 800-67 Revision 1, *Recommendation for the Triple Data Encryption Algorithm (TDEA) Block Cipher*, January 2012.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-67r1<br><br>   SP 800-67 specifies the Triple Data Encryption Algorithm (TDEA), including its primary component cryptographic engine, the Data Encryption Algorithm (DEA). |
| SP 800-89 | Special Publication 800-89, *Recommendation for Obtaining Assurances for Digital Signature Applications*, November 2006.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-89<br><br>   Entities participating in the generation or verification of digital signatures depend on the authenticity of the process. SP 800-89 specifies methods for obtaining the assurances necessary for valid digital signatures: assurance of domain parameter validity, assurance |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| | |
|---|---|
| | of public key validity, assurance that the key-pair owner actually possesses the private key, and assurance of the identity of the key pair owner. |
| SP 800-90A | Special Publication 800-90A Revision 1, *Recommendation for Random Number Generation Using Deterministic Random Bit Generators*, June 2015. |
| | http://dx.doi.org/10.6028/NIST.SP.800-90Ar1 |
| | SP 800-90A specifies DRBG mechanisms for the generation of random bits using deterministic methods. The methods provided are based on either hash functions or block cipher algorithms and are designed to support selected security strengths. DRBGs must be initialized from a randomness source that provides sufficient entropy for the security strength to be supported by the DRBG. |
| SP 800-90B | Special Publication 800-90B (Draft), *Recommendation for the Entropy Sources Used for Random Bit Generation*, January 2016. |
| | http://csrc.nist.gov/publications/PubsSPs.html#800-90B [accessed 8/18/16]. |
| | SP 800-90B specifies the design principles and requirements for the entropy sources used by Random Bit Generators, including health tests to determine that the entropy source has not failed and tests for the validation of entropy sources. |
| SP 800-90C | Special Publication 800-90C (Draft), *Recommendation for Random Bit Generator (RBG) Constructions*, April 2016. |
| | http://csrc.nist.gov/publications/PubsSPs.html#800-90C [accessed 8/18/16]. |
| | SP 800-90C specifies constructions for the implementation of random bit generators (RBGs). An RBG may be a deterministic random bit generator (DRBG) or a non-deterministic random bit generator (NRBG). The constructed RBGs consist of DRBG mechanisms as specified SP 800-90A and entropy sources as specified in SP 800-90B. |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| SP 800-102 | Special Publication 800-102, *Recommendation for Digital Signature Timeliness*, September 2009.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-102<br><br>Establishing the time when a digital signature was generated is often a critical consideration. A signed message that includes the (purported) signing time provides no assurance that the private key was used to sign the message at that time unless the accuracy of the time can be trusted. With the appropriate use of digital signature-based timestamps from a Trusted Timestamp Authority and/or verifier-supplied data that is included in the signed message, the signer can provide some level of assurance about the time that the message was signed. |
|---|---|
| SP 800-106 | Special Publication 800-106, *Randomized Hashing for Digital Signatures*, February 2009.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-106<br><br>NIST-approved digital signature algorithms require the use of an **approved** cryptographic hash function in the generation and verification of signatures. SP 800-106 specifies a method to enhance the security of the cryptographic hash functions used in digital signature applications by randomizing the messages that are signed. |
| SP 800-107 | Special Publication 800-107 Revision 1, *Recommendation for Applications Using Approved Hash Algorithms*, August 2012.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-107r1<br><br>Hash functions that compute a fixed-length message digest from arbitrary length messages are widely used for many purposes in information security. SP 800-107 provides security guidelines for achieving the required or desired security strengths when using cryptographic applications that employ the approved hash functions specified in FIPS 180. These include functions such as digital signatures, Keyed-hash Message Authentication Codes (HMACs) and Hashed-based Key Derivation Functions (hash-based KDFs). |
| SP 800-108 | Special Publication 800-108, *Recommendation for Key Derivation Using Pseudorandom Functions (Revised)*, October 2009.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-108<br><br>SP 800-108 specifies techniques for the derivation of additional keying material from a secret key (i.e., a key-derivation key) using pseudorandom functions. The key-derivation key may have been either established through a key-establishment scheme or shared through some other manner (e.g., a manual key distribution). |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| | |
|---|---|
| SP 800-130 | Special Publication 800-130, *A Framework for Designing Cryptographic Key Management Systems*, August 2013.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-130<br><br>SP 800-130 contains topics to be considered by a CKMS designer when developing a CKMS design specification. Topics include security policies, cryptographic keys and metadata, interoperability and transitioning, security controls, testing and system assurances, disaster recovery, and security assessments. |
| SP 800-131A | Special Publication 800-131A Revision 1, *Transitions: Recommendation for Transitioning the Use of Cryptographic Algorithms and Key Lengths*, November 2015.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-131Ar1<br><br>Section 5.6.4 of SP 800-57, Part 1 provides recommendations for transitioning to new cryptographic algorithms and key lengths because of algorithm breaks or the availability of more powerful computers that could be used to efficiently search for cryptographic keys. SP 800-131A offers more specific guidance for such transitions. Each algorithm and service is addressed in SP 800-131A, indicating whether its use is acceptable, deprecated, restricted, allowed only for legacy applications[77], or disallowed. |
| SP 800-132 | Special Publication 800-132, *Recommendation for Password-Based Key Derivation, Part 1: Storage Applications*, December 2010.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-132<br><br>SP 800-132 specifies techniques for the derivation of master keys from passwords or passphrases to protect stored electronic data or data protection keys. |
| SP 800-133 | Special Publication 800-133, *Recommendation for Cryptographic Key Generation*, December 2012.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-133<br><br>SP 800-133 discusses the generation of the keys to be managed and used by the **approved** cryptographic algorithms. |

---

[77] The algorithm and key length may be used to process already-protected information, but there may be a risk in doing so.

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| SP 800-135 | Special Publication 800-135 Revision 1, *Recommendation for Existing Application-Specific Key Derivation Functions*, December 2011.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-135r1<br><br>Many widely-used internet security protocols have their own application-specific Key Derivation Functions (KDFs) that are used to generate the cryptographic keys required for their cryptographic functions. SP 800-135 provides security requirements for those KDFs. |
|---|---|
| SP 800-152 | Special Publication 800-152, *A Profile for U. S. Federal Cryptographic Key Management Systems (CKMS)*, October 2015.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-152<br><br>SP 800-152 contains requirements for the design, implementation, procurement, installation, configuration, management, operation and use of a CKMS by and for U.S. federal organizations and their contractors. The Profile is based on NIST Special Publication SP 800-130. |
| SP 800-175A | Special Publication 800-175A, *Guideline for Using Cryptographic Standards in the Federal Government: Directives, Mandates and Policies*, August 2016.<br><br>http://dx.doi.org/10.6028/NIST.SP.800-175A<br><br>SP 800-175A provides guidance on the determination of requirements for using cryptography. It includes a summary of laws and regulations concerning the protection of the Federal Government's sensitive information, guidance regarding the conduct of risk assessments to determine what needs to be protected and how best to protect that information, and a discussion of the relevant security-related documents (e.g., various policy and practice documents). |
| NISTIR 7924 | NIST Internal Report 7924 (Second Draft), *Reference Security Policy*, May 2014.<br><br>http://csrc.nist.gov/publications/PubsDrafts.html#NIST-IR-7924 [accessed 8/18/16].<br><br>NIST 7924 is intended to identify a set of security controls and practices to support the secure issuance of certificates. It was written in the form of a Certificate Policy (CP), a standard format for defining the expectations and requirements of the relying party community that will trust the certificates issued by its Certificate Authorities (CAs). |

Non-NIST Publications:

| IEEE 802.11 | *Wireless Local Area Networks* [web page].<br><br>http://standards.ieee.org/about/get/802/802.11.html |
|---|---|
| IEEE P1363 | IEEE P1363: *Standard Specifications for Public-Key Cryptography* [web page].<br><br>http://grouper.ieee.org/groups/1363/ |
| IEEE P1363a | IEEE P1363a: *Standard Specifications For Public Key Cryptography-Amendment 1: Additional Techniques*, 2004. |
| IEEE P1363.1 | *Public-Key Cryptographic Techniques Based on Hard Problems over Lattices*, October 2008. |
| IEEE P1363.2 | *Password-Based Public-Key Cryptography*, 2008. |
| IEEE P1619 | *Standard for Cryptographic Protection of Data on Block-Oriented Storage Devices*, 2008. |
| ISO/IEC 9594-8 | ITU-T Recommendation X.509 (2012) | ISO/IEC 9594-8:2014, *Information technology - Open Systems Interconnection - The Directory: Public-key and attribute certificate frameworks*. |
| ISO/IEC 9797-1 | ISO/IEC 9797-1:2011, *Information technology − Security techniques − Message Authentication Codes (MACs) − Part 1: Mechanisms using a block cipher*, March 2011.<br><br>This standard includes CMAC, as specified in SP 800-38B. |
| ISO/IEC 9797-2 | ISO/IEC 9797-2:2011, *Information technology − Security techniques − Message Authentication Codes (MACs) − Part 2: Mechanisms using a dedicated hash-function*, May 2011.<br><br>This standard includes HMAC, as specified in FIPS 198. |
| ISO/IEC 10116 | ISO/IEC 10116:2006, *Information technology − Security techniques − Modes of operation for an n-bit block cipher*, February 2006.<br><br>This standard includes all the modes specified in SP 800-38A. |
| ISO/IEC 10118-3 | ISO/IEC 10118-3:2004, *Information technology − Security techniques − Hash-functions − Part 3: Dedicated hash-functions*, March 2004.<br><br>This standard includes SHA-1 and the SHA-2 family of hash functions specified in FIPS 180. A revision of  ISO/IEC 10118-3 will |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

|  | include the SHA-3 functions specified in FIPS 202. |
|---|---|
| ISO/IEC 11770-3 | ISO/IEC 11770-3: 2015, *Information technology − Security techniques − Key management -- Part 3: Mechanisms using asymmetric techniques*, August 2015.<br><br>This standard specifies key establishment mechanisms, some of which can be instantiated with key-establishment schemes specified in SP 800-56A and SP 800-56B. |
| ISO/IEC FDIS 11770-6 | ISO/IEC FDIS 11770-6, *Information technology − Security techniques − Key management − Part 6: Key derivation*, 2015.<br><br>This draft standard will include all key derivation functions specified in SP 800-108, as well as the two-step key derivation methods specified in SP 800-56C. |
| ISO/IEC 11889 | ISO/IEC 11889-1:2015, *Information technology − Trusted Platform Module Library − Part 1: Architecture*, August 2015.<br><br>ISO/IEC 11889-2:2015, *Information technology − Trusted Platform Module − Part 2: Structures*, August 2015.<br><br>ISO/IEC 11889-3:2015, *Information technology − Trusted Platform Module − Part 3: Commands*, August 2015.<br><br>ISO/IEC 11889-4:2015, *Information technology − Trusted Platform Module Library − Part 4: Supporting Routines*, August 2015. |
| ISO/IEC 14888-2 | ISO/IEC 14888-2:2008, *Information technology − Security techniques − Digital signatures with appendix − Part 2: Integer factorization based mechanisms*, April 2008.<br><br>This standard includes RSA signatures, as specified in FIPS 186. |
| ISO/IEC 14888-3 | ISO/IEC 14888-3:2016, *Information technology − Security techniques − Digital signatures with appendix − Part 3: Discrete logarithm based mechanisms*, March 2016.<br><br>This standard includes DSA, as specified for finite fields and elliptic curves in FIPS 186. |
| ISO/IEC 18033-3 | ISO/IEC 18033-3:2010, *Information technology − Security techniques − Encryption algorithms − Part 3: Block ciphers*, December 2010.<br><br>This standard includes 64-bit block ciphers: TDEA, MISTY1, CAST-128, HIGHT and 128-bit block ciphers: AES, Camellia, and SEED. Note that TDEA is specified in SP 800-67 and AES is specified in FIPS 197. |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| ISO/IEC 19772 | ISO/IEC 19772:2009, *Information technology − Security techniques − Authenticated encryption*, February 2009.<br><br>This standard includes CCM (as specified in SP 800-38C), GCM (as specified in SP 800-38D), and Key wrapping (as specified in SP 800-38E). |
|---|---|
| PKCS 1 | Public Key Cryptography System #1, version 2.2, *RSA Cryptography Standard*, October 27, 2012.<br><br>http://www.emc.com/emc-plus/rsa-labs/pkcs/files/h11300-wp-pkcs-1v2-2-rsa-cryptography-standard.pdf [accessed 8/18/16].<br><br>PKCS 1 provides recommendations for the implementation of public-key cryptography based on the RSA algorithm, covering cryptographic primitives, encryption schemes, signature schemes with appendix and the ASN.1 syntax for representing keys and for identifying the schemes. |
| X9.31 | American National Standard for Financial Services X9.31-1998, *Digital Signatures Using Reversible Public Key Cryptography for the Financial Services Industry (rDSA)*, 1998 [withdrawn].<br><br>ANS X9.31 defined a method for digital signature (signature) generation and verification for the protection of financial messages and data using reversible public key cryptography systems without message recovery. In addition, criteria for the generation of public and private keys required by the algorithm and the procedural controls required for the secure use of the algorithm were provided. |
| X9.42 | American National Standard for Financial Services X9.42-2001, *Public Key Cryptography for the Financial Services Industry: Agreement of Symmetric Keys Using Discrete Logarithm Cryptography*, 2001 [withdrawn].<br><br>ANS X9.42, partially adapted from ISO 11770-3, specifies schemes for the agreement of symmetric keys using the Diffie-Hellman and MQV algorithms. It covers methods for domain-parameter generation, domain-parameter validation, key-pair generation, public-key validation, shared secret value calculation, key derivation, and test message authentication code computation for discrete-logarithm problem-based key-agreement schemes. |

This publication is available free of charge from: http://dx.doi.org/10.6028/NIST.SP.800-175B

| X9.44 | American National Standard for Financial Services X9.44-2007, *Key Establishment Using Integer Factorization Cryptography*, 2007.<br><br>ANS X9.44 specifies key-establishment schemes using public-key cryptography, based on the integer factorization problem. Two types of key-establishment schemes are specified: key transport and key agreement. |
|---|---|
| X9.62 | American National Standard X9.62-2005, *Public Key Cryptography for the Financial Services Industry: the Elliptic Curve Digital Signature Algorithm (ECDSA)*, 2005.<br><br>ANS X9.62 defines methods for digital signature (signature) generation and verification for the protection of messages and data using the Elliptic Curve Digital Signature Algorithm (ECDSA). This Standard provides methods and criteria for the generation of public and private keys that are required by ECDSA and the procedural controls required for the secure use of the algorithm with these keys. This ECDSA Standard also provides methods and criteria for the generation of elliptic-curve domain parameters that are required by ECDSA and the procedural controls required for the secure use of the algorithm with these domain parameters. |
| X9.63 | American National Standard X9.63-2011, *Public Key Cryptography for the Financial Services Industry: Key Agreement and Key Transport Using Elliptic Curve Cryptography*, 2011.<br><br>ANS X9.63 defines key-establishment schemes that employ asymmetric cryptographic techniques. The arithmetic operations involved in the operation of the schemes take place in the algebraic structure of an elliptic curve over a finite field. Both key-agreement and key-transport schemes are specified. |

# EXHIBIT D

Atty. Dkt. No. 098981-5480

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

First Inventor Name:   Gregory Joseph Badros

Title:                 PERSONALIZED
                       NETWORK SEARCHING

Prior Appl. No.:       15/492,513

Prior Appl. Filing
Date:                  4/20/2017

Examiner:              Not yet assigned

Art Unit:              Not yet assigned

## CONTINUING PATENT APPLICATION
## TRANSMITTAL LETTER

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

Transmitted herewith for filing under 37 C.F.R. § 1.53(b) is a:

[ **X** ] Continuation   [ ] Division   [ ] Continuation-In-Part (CIP)

of the above-identified copending prior application in which no patenting, abandonment, or termination of proceedings has occurred.  Priority to the above-identified prior application is hereby claimed under 35 U.S.C. § 120 for this continuing application.  The entire disclosure of the above-identified prior application is considered as being part of the disclosure of the accompanying continuing application and is hereby incorporated by reference therein.

[ ]      Applicant claims small entity status under 37 CFR 1.27.

Enclosed are:

[ **X** ]    Description, Claim(s), and Abstract (29 pages).

-1-

GOOG-GVS-00000153

Atty. Dkt. No. 098981-5480

[ X ]    Drawings (4 sheets, Figures 1-4).

[ X ]    Executed Declaration (2 pages).

[ X ]   Power of Attorney (2 pages).

[ X ]    Preliminary Amendment (7 pages)

[ X ]    Application Data Sheet (37 CFR 1.76).

[ X ]    PTO/SB/424 - Request for Prioritized Examination.

The adjustment to the number of sheets for EFS-Web filing follows:

| Number of Sheets | | EFS-Web Adjustment | Number of Sheets for EFS-Web |
|---|---|---|---|
| 40 | x | 75% | 30 |

The filing fee is calculated below at the large entity rate:

-2-

GOOG-GVS-00000154

Atty. Dkt. No. 098981-5480

| | Number Filed | | Included in Basic Fee | | Extra | | Rate | | Fee Totals |
|---|---|---|---|---|---|---|---|---|---|
| Basic Filing Fee | | | | | | | $280.00 | = | $280.00 |
| Search Fee | | | | | | | $600.00 | | $600.00 |
| Examination Fee | | | | | | | $720.00 | | $720.00 |
| Size Fee | 30 | - | 100 | = 0 | | x | $400.00 | | $0.00 |
| Total Claims: | 20 | - | 20 | = 0 | | x | $80.00 | = | $0.00 |
| Independents : | 2 | - | 3 | = 0 | | x | $420.00 | = | $0.00 |
| If any Multiple Dependent Claim(s) present: | | | | | + | | $780.00 | = | $0.00 |
| Surcharge under 37 CFR 1.16(e) for late filing of Executed Declaration or late payment of filing fee | | | | | + | | $140.00 | = | $0.00 |
| Prioritized Examination fee (Track I) under  37 C.F.R. § 1.17 (c) | | | | | | | | | $4,000.00 |
| Processing Fee (Track I) under  37 C.F.R. § 1.17 (i) | | | | | | | | | $140.00 |
| | | | | | | | TOTAL FILING FEE: | = | $5,740.00 |
| Assignment Recordation Fee: | | | | | + | | $40.00 | = | $0.00 |
| Processing Fee under 37 CFR 1.17(i) for Late Filing of English Translation of Application: | | | | | + | | $140.00 | = | $0.00 |
| Publication Fee | | | | | | | | | $0.00 |
| TOTAL FEE | | | | | | | | = | $5,740.00 |

The above-identified fees of $5,740.00 are being paid by credit card via EFS-Web.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.

4815-1905-3145.1

GOOG-GVS-00000155

Atty. Dkt. No. 098981-5480

Please direct all correspondence to the undersigned attorney or agent at the address indicated below.

Respectfully submitted,

Date <u>December 26, 2017</u>                    By <u>/James De Vellis/</u>

FOLEY & LARDNER LLP                          James De Vellis
Customer Number: 10575                        Attorney for Applicant
Telephone:     (617) 342-4037                 Registration No. 52,814
Facsimile:     (617) 342-4001

-4-

GOOG-GVS-00000156

ATTORNEY DOCKET NO.: 098981-5480

PERSONALIZED NETWORK SEARCHING

CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]  This application is a continuation of U.S. Patent Application Serial No. 15/492,513, filed April 20, 2017, which is a continuation of U.S. Patent Application Serial No. 14/516,019, filed October 16, 2014, now U.S. Patent No. 9,679,067 which is a continuation of U.S. Patent Application Serial No. 14/074,872, filed November 8, 2013, now U.S. Patent No. 8,886,626, which is a continuation of U.S. Patent Application Serial No. 13/442,386, filed April 9, 2012, now U.S. Patent No. 8,612,415, which is a continuation of U.S. Patent Application Serial No. 13/172,961, filed June 30, 2011, now U.S. Patent No. 8,166,017, which is a continuation of U.S. Patent Application Serial No. 12/099,583, filed April 8, 2008, now U.S. Patent No. 8,015,170, which is a continuation of U.S. Patent Application Serial No. 10/726,410, filed December 3, 2003, now U.S. Patent No. 7,523,096, all of which are incorporated herein by reference in their entirety.

FIELD OF THE INVENTION

[0002]  The present invention relates generally to methods and systems for network searching.  The present invention relates particularly to methods and systems for personalized network searching.

BACKGROUND

[0003]  In general, most page visits on the World Wide Web are revisits; in other words, the user is returning to a web page previously visited.  As search engines have improved, many users have turned to search engines for navigating to often-visited sites, rather than typing in uniform resource locators (URLs) or using browser bookmarks.  A search engine performs the search based on a conventional search method.  For example, one known method, described in an article entitled "The Anatomy of a Large-Scale Hypertextual Search Engine," by Sergey Brin and Lawrence

GOOG-GVS-00000157

ATTORNEY DOCKET NO.: 098981-5480

Page, assigns a degree of importance to a document, such as a web page, based on the link structure of the web page. As these navigational queries become increasingly common, users are able to learn which queries will take them to their favorite sites. Bookmarks, however, can provide a benefit to the user.  For example, a common use of bookmarks is for navigation to sites that search engines (such as the Google™ Search Engine) do not rank highly or that are otherwise hard to find via a search query.

[0004]  Accordingly, bookmarks that the user continues to use are a valuable resource for the user. An Internet user often has difficulty propagating bookmarks between the various machines on which the user depends.  For example, many users have a computer at work and at home.  Often, the bookmarks relied on in the work setting are useful at home as well.  In most cases, however, the user must manually synchronize the bookmark lists of the two machines. In addition, conventional methods of organizing bookmarks tend to be limited at best, making it difficult for the user to find a favorite site.

[0005]  Some users have attempted to solve the propagation problem by using a commercial product that allows the user to store bookmarks on a server on the web, such as BlinkPro (Blink.com, Inc.; www.blinkpro.com) or BookmarkTracker (BookmarkTracker.com, Inc.; www.bookmarktracker.com).  Such products allow the bookmarks to be managed and utilized from a browser application.  In some cases, the user can also automatically synchronize each of the user's computers to the common list stored on-line.  While storing the bookmarks on-line addresses the propagation problem, such systems fail td address the organizational problems inherent in conventional bookmarks.

[0006]  Various other conventional bookmark-related software products provide the user with functionality to facilitate the use of bookmarks.  For example, systems and methods for automatically organizing bookmarks on a client machine, searching previously-stored bookmarks by keyword, and integrating the back, history, and bookmark functions to improve the user's ability to visit previously visited sites have been described (see, e.g., *Integrating Back, History and Bookmarks in Web Browsers*,

GOOG-GVS-00000158

ATTORNEY DOCKET NO.: 098981-5480

Kaasten, S. and Greenberg, S. (2001), In Extended Abstracts of the ACM Conference of Human Factors in Computing Systems (CHI'01), 379-380, ACM Press.).  These tools, however, do not effectively leverage the user's preferences to provide personalized search results.

[0007]  Thus, a need exists to provide an improved system and method for providing personalized network searching.

## SUMMARY

[0008]  Embodiments of the present invention provide systems and methods for personalized network searching.  In one embodiment, a search engine implements a method comprising receiving a search query, determining a personalized result by searching a personalized search object using the search query, determining a general result by searching a general search object using the search query, and providing a search result for the search query based at least in part on the personalized result and the general result.  An embodiment of the present invention may utilize ratings, annotations, history of use, or other data associated with the previously-identified uniform resource locator to locate and sort results.

[0009]  Further details and advantages of embodiments of the present invention are set forth below.

## BRIEF DESCRIPTION OF THE FIGURES

[0010]  These and other features, aspects, and advantages of the present invention are better understood when the following Detailed Description is read with reference to the accompanying drawings, wherein:

[0011]  Figure 1 is a block diagram illustrating an exemplary environment in which one embodiment of the present invention may operate;

GOOG-GVS-00000159

ATTORNEY DOCKET NO.: 098981-5480

[0012]  Figure 2 is a flowchart, illustrating a method for storing bookmarks, ratings, and annotations in an embodiment of the present invention;

[0013]  Figure 3 is a flowchart illustrating a method of performing a network search in one embodiment of the present invention; and

[0014]  Figure 4 is a flowchart illustrating a process of implicitly rating a page 'One embodiment of the present invention.

DETAILED DESCRIPTION

[0015]  Embodiments of the present invention comprise methods and systems for personalized network searching.  In one embodiment, a search engine combines search results obtained from a global index or global indexes with those retrieved from a list of a user's favorite sites to produce a combined search result set.  The combined result set may be sorted, marked, or otherwise used based on the user's preferences.  Such an embodiment may provide the user with a mechanism to perform searches and visit favorite sites from one interface.

[0016]  Referring now to the drawings in which like numerals indicate like elements throughout the several figures, Figure 1 is a block diagram illustrating an exemplary environment for implementation of an embodiment of the present invention.  The system 100 shown in Figure 1 includes multiple client devices 102a-n in communication with a server device 104 over a network 106.  The network 106 shown includes the Internet. In other embodiments, other networks, such as an intranet may be used.  Moreover, methods according to the present invention may operate within a single computer.

[0017]  The client devices 102a-n shown each includes a computer-readable medium, such as a random access memory (RAM) 108 coupled to a processor 110.  The processor 110 executes computer-executable program instructions stored in memory 108.  Such processors may include a microprocessor, an ASIC, and state machines.  Such processors include, or may be in communication with, media, for example computer-readable media, which stores instructions that, when executed by the

GOOG-GVS-00000160

ATTORNEY DOCKET NO.: 098981-5480

processor, cause the processor to perform the steps described herein.  Embodiments of computer-readable media include, but are not limited to, an electronic, optical, magnetic, or other storage or transmission device capable of providing a processor, such as the processor 110 of client 102a, with computer-readable instructions.  Other examples of suitable media include, but are not limited to, a floppy disk, CD-ROM, DVD, magnetic disk, memory chip, ROM, RAM, an ASIC, a configured processor, all optical media, all magnetic tape or other magnetic media, or any other medium from which a computer processor can read instructions.  Also, various other forms of computer-readable media may transmit or carry instructions to a computer, including a router, private or public network, or other transmission device or channel, both wired and wireless.  The instructions may comprise code from any computer-programming language, including, for example, C, C++, C#, Visual Basic, Java, Python, Perl, and JavaScript.

[0018]  Client devices 102a-n may also include a number of external or internal devices such as a mouse, a CD-ROM, DVD, a keyboard, a display, or other input or output devices.  Examples of client devices 102a-n are personal computers, digital assistants, personal digital assistants, cellular phones, mobile phones, smart phones, pagers, digital tablets, laptop computers, Internet appliances, and other processor-based devices.  In general, a client device 102a may be any type of processor-based platform that is connected to a network 106 and that interacts with one or more application programs.  Client devices 102a-n may operate on any operating system capable of supporting a browser or browser-enabled application, such as Microsoft® Windows® or Linux.  The client devices 102a-n shown include, for example, personal computers executing a browser application program such as Microsoft Corporation's Internet Explorer™, Netscape Communication Corporation's Netscape Navigator™, and Apple Computer, Inc.'s Safari™.

[0019]  Through the client devices 102a-n, users 112a-n can communicate over the network 106 with each other and with other systems and devices coupled to the network 106.  As shown in Figure 1, a server device 104 is also coupled to the network 106.  In

GOOG-GVS-00000161

ATTORNEY DOCKET NO.: 098981-5480

the embodiment shown, a user 112a-n generates a search query 114 at a client device 102a.  The client device 102a transmits the query 114 the server device 104 via the network 106.  For example, a user 112a types a textual search query into a query field of a web page of a search engine interface or other client-side software displayed on the client device 102a, which is then transmitted via the network 106 to the server device 104.  In the embodiment shown, a user 112a inputs a search query 114 at a client device 102a, which transmits an associated search query signal 130 reflecting the search query 114 to the server device 104.  The search query 114 may be transmitted directly to the server device 104 as shown.  In another embodiment, the query signal 130 may instead be sent to a proxy server (not shown), which then transmits the query signal 130 to server device 104. Other configurations are possible.

[0020]  The server device 104 shown includes a server executing a search engine application program, such as the Google™ search engine.  Similar to the client devices 102a-n, the server device 104 shown includes a processor 116 coupled to a computer-readable memory 118.  Server device 104, depicted as a single computer system, may be implemented as a network of computer processors.  Examples of a server device 104 are servers, mainframe computers, networked computers, a processor-based device, and similar types of systems and devices.  Client processor 110 and the server processor 116 can be any of a number of computer processors, such as processors from Intel Corporation of Santa Clara, California and Motorola Corporation of Schaumburg, Illinois.

[0021]  Memory 118 contains the search engine application program, also known as a search engine 120.  The search engine 120 locates relevant information in response to a search query 114 from a user 112a-n.

[0022]  In the embodiment shown, the server device 104, or related device, has previously performed a crawl of the network 106 to locate articles, such as web pages, stored at other devices or systems connected to the network 106, and indexed the articles in memory 118 or on another data storage device.  Articles include, for example,

GOOG-GVS-00000162

ATTORNEY DOCKET NO.: 098981-5480

web pages of various formats, such as HTML, XML, XHTML, Portable Document Format (PDF) files, and word processor, database, and application program document files, audio, video, or any other documents or information of any type whatsoever made available on a network (such as the Internet), a personal computer, or other computing or storage means.  The embodiments described herein are described generally in relation to HTML files or documents, but embodiments may operate on any type of article, including any type of image.

[0023]  In an embodiment of the present invention, the search engine 120 also searches a user's list of favorite sites, which personalizes the search.  For example, a user's list of favorite sites may be saved as a list of bookmarks.  Bookmarks are objects that include a uniform resource locator (URL) identified by a user.  A bookmark may be referred to by different terms in different applications. For example, Microsoft® products often refer to bookmarks as "favorites."  Similar to the client devices 102a-n and the server device 104, the server device 122 shown includes a processor 124 coupled to a computer-readable memory 126.  As with server device 104, server device 122, depicted as a single computer system, may be implemented as a network of computer processors or may be incorporated into the server device 104.  Examples of a server device 122 are servers, mainframe computers, networked computers, a processor-based device, and similar types of systems and devices.

[0024]  Memory 126 contains the bookmark manager application program, also known as a bookmark manager 128.  In the embodiment shown, the bookmark manager 128 is a C++ program, however, the bookmark manager 128 may be constructed from various other programming languages as well.

[0025]  Referring still to the embodiment shown in Figure 1, the bookmark manager 128 comprises an interface so that a user 112a may manage bookmarks on the server.  For example, in one embodiment, the bookmark manager 128 provides a browser-based application that allows the user to create, modify, delete, and save bookmarks on the network.  The application may comprise, for example, HTML and JavaScript, an ActiveX

GOOG-GVS-00000163

ATTORNEY DOCKET NO.: 098981-5480

component, or a Java applet.  The bookmarks are saved in the bookmark database 140.  In an embodiment of the present invention, the bookmark manager 128 also provides the data stored in the bookmark database 140 to the search engine 120.

[0026]  When the search engine 120 performs a search in response to the query search query signal 130, the search engine 120 searches previously indexed articles.  The search engine 120 also creates a bookmark request 136, corresponding to user 112a.  The bookmark manager 128 responds by sending one or more bookmarks 138 to the search engine 120.  The search engine 120 utilizes the bookmarks, 138 to search sites previously identified by the user 112a.  The search engine then merges the results of the two searches to provide a result set 134 to the client 102a.

[0027]  It should be noted that the present invention may comprise systems having different architecture than that which is shown in Figure 1.  For example, in some systems according to the present invention, server device 104 and server device 122 may comprise a single physical or logical server.  The system 100 shown in Figure 1 is merely exemplary, and is used to explain the exemplary methods shown in Figures 2 through 4.

[0028]  In embodiments of the present invention, a user 112a can track their conventional browser bookmarks using server-side storage.  These bookmarks can then be made available to the user on all the various computers the user uses and can be integrated with browser bookmarks and with the browser (e.g., via a toolbar).  For example, a user's set of bookmarks can be primed on a server by having the user POST their bookmarks file to the server, and the user can be permitted to download the bookmarks as a bookmarks file or other related representation.  Alternatively, client-side software may implicitly manage the server-side storage.  In one embodiment, the bookmarks may comprise a continuous user rating, e.g., 0.0 - 1.0, rather than just a discrete bookmarked-or-not bit.  In another embodiment, a user can integrate per-page annotations into their data regarding bookmarks or favorites.  In yet another embodiment, a user can store multiple user personalities (e.g., previously defined sets

GOOG-GVS-00000164

ATTORNEY DOCKET NO.: 098981-5480

of bookmarks) and can receive recommendations based on the set of bookmarks saved by users with similar tastes as derived by their bookmarks or other stored or monitored preferences.

[0029]  Various methods may be implemented in the environment shown in Figure 1 and other environments according to the present invention.  For example in one embodiment, a user 112a enters a search query 114, which a client 102a transmits as a query signal 130 to a server device 104 over a network 106.  The server device 104 executes a search engine 120.  The search engine 120 receives the query signal 130.  The search engine 120 determines a personalized result by searching a personalized search object using the search query.

[0030]  Examples of a personalized search object include, for example, a list of bookmarks or favorites and the history list of a browser.  The search engine 120 also determines a general search result by searching a general search object.  The general search object may comprise, for example, an index of articles, such as, for example, those associated with a conventional search engine.  The search engine 120 provides a search result to the user based at least in part on the personalized result and the general result.  In another embodiment, the search engine 120 provides a search result to the user based solely on the personalized result.

[0031]  The search engine 120 may generate the search result by combining the general results and the personalized results.  The search engine may instead provide separate lists:  one containing the general search result and a second containing the personalized search result.  The search engine 120 transmits the search result as a result set 134 to the client 102a.

[0032]  In one embodiment, the search engine 120 returns the list sorted as in a conventional search engine and with the personalized search results indicated in some way, such as, for example, highlighted or shown with a symbol beside the personalized search result.  In another embodiment, the search engine sorts the combined results list

GOOG-GVS-00000165

ATTORNEY DOCKET NO.: 098981-5480

based at least in part on a rating that the user 112a has associated with the uniform resource locator.

[0033]   The results may be sorted in a number of ways.  For example, in one embodiment, the combined results list is sorted based at least in part on an annotation or rating that has been associated with the user 112a and the uniform resource locator. The results may instead or further be sorted based on whether the result in the combined result list originated in the global results list or in the personalized search result.  For example, the user 112a may wish to see their personalized results displayed at the top.  The results may be instead or further sorted based on a rating of a page provided by or created for the user 112a.  In one embodiment, rather than changing the sorting order of the pages provided in a result set, the search engine 120 marks results that originated in the user's personalized search results.  A fuzzy algorithm may also be employed to sort the results.  For example, the sorting of the combined results list may only slightly favor the personalized search result.  In another embodiment, the results list is sorted by measures indicating user preferences.  For example, if many of the user's bookmarks are computer-related, computer-related results are sorted closer to the top of the result set 134 than non-computer related results.  Other operations may also be performed on the results based at least in part on user-specific information.  For example, the results may be interleaved, merged where necessary or desired, presented with annotations, or presented in other ways that provide useful information to the user 112a.

[0034]   An embodiment of the present invention may comprise features to facilitate community building.  For example, in one embodiment, the uniform resource locator comprises a community bookmark.  The bookmark may be shared by a set of users or may be transmitted by one user and received by another.  The second user can then perform personalized queries that are based, at least in part, on the shared bookmark. In another embodiment, a cluster of users is identified based at least in part on the bookmarks and annotations that they have previously identified.

GOOG-GVS-00000166

Attorney Docket No.: 098981-5480

[0035]  A user 112a may specify bookmarks explicitly.  In one embodiment, the bookmarks are implicitly identified based on a measure of the behavior of the user.  For example, in one embodiment, the implicit measure comprises the linger time.  In other words, if a user spends a great deal of time on a site, it is identified as a bookmark for later personalized searches.  In other embodiments, the implicit measure may comprise at least one of the quantity of repeat visits to the site or the quantity of click-throughs on the site.  In one embodiment, temporal decay of ratings may be utilized so that unused or rarely used bookmarks, whether explicitly marked or implicitly marked, become unmarked over time.  Other implicit measures include printing the page, saving the page, and the amount of scrolling performed on the page.

[0036]  In one embodiment of the present invention, the user associates a text string with a uniform resource locator (URL).  The text string may comprise, for example, a search query, a URL-format text string, or a short-hand indicator of the URL.  The client 102a receives the personalized association data associating the text string with the URL and stores the personalized association data in a personalized search object.  The client 102a subsequently receives an input signal comprising the search string, determines the URL associated with the text string and displays an article associated with the URL.  The article may be received from a global network element, such as a web server.

[0037]  Figure 2 is a flowchart illustrating a method for storing bookmarks, ratings, and annotations in an embodiment of the present invention.  In the embodiment shown, a user 112a navigates to a site by typing in a URL or other means.  The user 112a determines that the site is useful and that the user 112a will revisit the site.  Accordingly, the user 112a bookmarks the site using a bookmark manager 128.  The user 112a may access the bookmark manager 128 in various ways.  For example, in one embodiment, the user 112a accesses a client-side application via a built-in user-interface element or one available via a toolbar or other available plug-in in a browser executing on the client 102a.  The button causes a popup window to be displayed in which the user enters an annotation and rating.  When the user clicks a submit button, the information is

GOOG-GVS-00000167

ATTORNEY DOCKET NO.: 098981-5480

submitted to the bookmark manager 128 for storage as a bookmark in the bookmark database 140.

[0038]  In the embodiment shown, the bookmark manager 128 first receives a valid user identifier (ID) 202 from the client 102a.  Users who desire synchronization across different browsers/computers or other types of personalization need to identify themselves to the bookmark manager 128 to some extent so that the bookmark manager 128 has a primary key with which to store a user's bookmarks.  The bookmark manager 128 can perform the identification and authentication in numerous ways.  For example, in one embodiment, the IP address is tracked throughout a session.  In another embodiment, the authentication is done via a user manager system.  In another embodiment, a cookie on the client 102a may include user-identifying information, which is supplied to the bookmark manager 128 by the client 102a.

[0039]  The bookmark manager 128 then receives the URL for the site that the user identifies 204.  The bookmark manager 128 stores the URL, its rating(s), and its annotations) in the bookmark database 140 for later retrieval 206.  It is likely that a user already has a set of bookmarks (or several sets of bookmarks) that they would like to make available for their searches.  Accordingly, in one embodiment, the bookmark manager 128 includes a mechanism for migrating that data to the bookmark database 140.  The hierarchy of bookmarks can be used as implicit annotations on the named URLs and can at least be preserved when synchronizing the bookmarks among browsers.  In another embodiment, the full text of an article when it was last visited serves as an annotation of the URL.  In still another embodiment, as bookmarks are edited on a supported browser's native interface, the corresponding edits are made to the server-side bookmarks.

[0040]  In one embodiment, the bookmark manager 128 provides a server-side management tool via an HTML interface (which, again may mirror changes into a supported browser's native bookmarks).  Synchronization of client and server-side bookmarks may increase adoption of the bookmark manager 128 if the user can at least

GOOG-GVS-00000168

ATTORNEY DOCKET NO.: 098981-5480

manually synchronize server-side bookmarks into client-side browser bookmark lists.  In one embodiment, the management tool also displays the bookmark rating for a given page and allows the user 112a to manipulate the rating and/or an annotation associated with the page.  In another embodiment, bookmark manager 128 supports listing recently rated pages to facilitate returning to recently bookmarked pages, thus enabling a work-list like review of a surfing session.

[0041]  Referring still to Figure 2, the bookmark manager 128 also receives 208 and stores 210 an annotation of the URL in the bookmark database 140.  The annotation is a remark that the user provides regarding the URL.  The annotation may simply be a text string stored in a database 140 and associated with the URL.  The annotation may be instead stored in a standardized format, see, e.g., *Annotea: An Open RDF Infrastructure for Shared Web Annotations*, J. Kahan, M. Koivunen, E. Prud'Hommeaux, and R. Swick (2001), In Proceedings of WWW10, May 1-5, 2001 Hong Kong.

[0042]  In the embodiment shown, the bookmark manager 128 also receives 212 and stores 214 the rating of the site provided by the user 112a in the bookmark database 140.  For example, in one embodiment, the user 112a clicks a rating button.  In response, the user 112a is presented with a series of ten radio buttons labeled 0.0 through 1.0.  The user selects one of the radio buttons and clicks submit.  The bookmark manager 128 receives the rating and the URL and saves the two data values in the bookmark database 140.  Figure 2 is merely exemplary.  In other embodiments the user may provide more or less information related to a site to the bookmark manager 128.

[0043]  Although in the embodiment shown, the reception and storage of the URL, annotation, and rating are shown as linear steps, they may be performed in other ways as well.  For example, the bookmark manager may receive the URL, annotation, and rating together and perform one step to store them in the bookmark database 140.

GOOG-GVS-00000169

ATTORNEY DOCKET NO.: 098981-5480

[0044]  The data stored in the bookmark database 140 may be updated fairly frequently as pages are bookmarked (or the bookmark is toggled, or a rating slider is changed).

[0045]  Figure 3 is a flowchart illustrating a method of performing a network search in one embodiment of the present invention.  Embodiments of the present invention may combine conventional network searches with, for example, personalized searches utilizing information provided by the user previously or in conjunction with the submission of the search.  In the embodiment shown in figure 3, the search engine 120 receives a query signal 130 from a client (102a) 302.  The search engine 120 responds to the query signal 130 by performing a search.  In the embodiment shown, the search comprises three sub-processes, which may be run in parallel.  These three processes comprise: searching global indices 304, searching the URLs stored as bookmarks 306, and searching annotations 308.  Other embodiments may employ a fewer or greater number of sub-processes:  For example, in one embodiment, the URLs present in the navigation history of the browser are searched.

[0046]  Conventional search engines search global search objects, such as global search indices.  Embodiments of the present invention are also capable of searching personal search objects, such as bookmarks, annotations, ratings, and other objects.  In one embodiment, such searching comprises reading a list of URLs from the bookmark database 140, and for each page, searching the various parts of the page using the search query 114 submitted by the user 112a.  In another embodiment, an agent operating on the client 102a searches a personal search object stored on the client 102a or in a repository accessible to the client 102a via the network 106.

[0047]  Searching annotations comprises searching the user-entered annotations using the search query 114 submitted by the user 112a.  For example, a user 112a may enter the term "boat" as an annotation for a page comprising marine supplies.  If the users 112a enters "boat" as part of the search query 114 utilized by the search engine 120, the page with the "boat" annotation will be returned by the search annotations component.  Another embodiment of the present invention searches not only the pages

GOOG-GVS-00000170

ATTORNEY DOCKET NO.: 098981-5480

that the user has bookmarked or annotated, but also pages similar to the pages that the user has bookmarked or pages with similar annotations.

[0048]  Each of the sub-processes 304, 306, and 308 shown may generate a separate result set in the embodiment shown. In other embodiments, the sub-processes 304, 306, and 308 may be combined and/or configured to provide a combined result set automatically.  The result sets may overlap to some degree.  In the embodiment shown, the search engine 120 merges the search results into one list 310.  The search engine 120 then ranks the pages 312.  Various methods may be utilized to rank the pages.  For example, the search engine 120 may rank results returned via annotation based on their user-based ratings, if any, then per the standard ranking algorithm. Several examples are set out below.  The search engine 120 then provides a sorted result set 134 to the user 112a requesting the search 314.

[0049]  In another embodiment, the user supplies an annotation that is associated with a URL.  The annotation is stored on a per-user basis to supplement the search results and to further improve scoring.  Other users who share similar interests with the user who provided the annotation may use the annotation.

[0050]  Embodiments of the present invention may make further use of the annotation. For example, in one embodiment, the search engine 120 searches for the keywords provided in a search query 114 in user-supplied annotations, e.g., treating those annotations as user-specific anchor text that refer to the annotated URL.  The result set generated by a search engine in one such embodiment reflects the union of the global index and the results from the annotation keyword search.

[0051]  Embodiments may also utilize other data, such as user ratings to determine the ranking of the results, to mark the results, or for other purposes.  For example, in one embodiment, the page rankings that the search engine 120 provides are not affected by the user-supplied ratings for each page, but an indicator, such as an asterisk or other

GOOG-GVS-00000171

ATTORNEY DOCKET NO.: 098981-5480

small image, identifies specific results that are rated based on ratings data stored in the
bookmark database 140.

[0052]  Embodiments of the present invention may combine the results of several types
of results, or may present the results separately.  For example, in one embodiment, a
user 112a submits a search query 114.  The search engine 120 searches a global
search object and presents the results in one list.  The search engine 120 also searches
a personal search object and presents the results of the search in a second list.

[0053]  In another embodiment of the present invention, the search engine 120 also
uses a user-applied rating to rank the pages.  For example, a user 112a applies a rating
(e.g., between 0.0 and 10.0) to each of the bookmarks stored in the bookmark database
140.  The search engine 120 utilizes the user-applied rating in determining where in the
result set 134 a particular article should be displayed.  For, example, a rating of 0.5
might represent indifference, and lower ratings would penalize a result while higher
ratings would make it score higher. In yet another embodiment, the search engine 120
more highly scores unrated pages that are similar to the content of highly rated URLs.
In one embodiment, in which a large set of diverse user ratings and annotations have
been stored, the search engine 120 may provide additional related features such as
page suggestions based on similar users' ratings, e.g., via simple clustering
approaches.

[0054]  The term or alternate URL associated with the primary URL is a distinct token in
the personalized search that indicates a desire of the user not to search for the term or
navigate to the alternate URL, as would be the case in a conventional browser
application, but instead to immediately go directly to a specific page that is associated
with the term or alternate URL for the user 112a.

[0055]  In one embodiment, a user 112a associates a specific term or alternate URL
with a primary URL, such as the URL associated with a previously-stored bookmark in
the bookmark database 140.  For example, the user 112a may enter a term in one text

GOOG-GVS-00000172

ATTORNEY DOCKET NO.: 098981-5480

box and a URL in another text box and then click a button to associate the two. The association is then stored in a computer-readable medium on the client machine 102a or in a computer-readable medium accessible by a server 104, such as in the bookmark database 140. The term or alternate URL becomes a "speed-dial" navigation link to the URL. In one embodiment, the user 112a enters the term in a query search box and clicks a link or control, such as a standard search link or button, and, rather than performing a search for the term using a search engine, the browser or browser-enabled application retrieves the URL previously associated with the term and immediately jumps to the site associated with the URL. In another embodiment, a keyboard binding causes the browser to jump to the site associated with the URL. In either case, the command by the user 112a causes a behavior to occur that is personalized to the user as opposed to the conventional query behavior common to all users of the search engine. In other words, no search is performed; the browser simply navigates to the URL associated with the term in lieu of performing the search.

[0056]  In yet another embodiment, the user 112a enters the alternate URL in the address field of the browser and clicks the "go" control or otherwise causes the browser to evaluate the alternate URL. Rather than navigating to the URL, the browser first searches for the alternate URL in the list of URL's associated with bookmarks. If the alternate URL is found, the browser navigates directly to the primary URL that is associated with the alternate URL.

[0057]  For example, in one embodiment, a user 112a associates the term "home" with the user's corporate intranet page. The user 112a enters the term "home" in a text box and the URL for the corporate intranet page in another text box and clicks a control to associate the two. Alternatively, the user clicks a control during display of the corporate intranet page that provides the user 112a with an opportunity to associate the term and the page. Subsequently, the user 112a enters the term "home" in a search field and clicks the search control. Since the term "home" has been associated with the corporate intranet homepage, the browser immediately navigates to the user's corporate intranet homepage rather than executing a search for the term "home." The

GOOG-GVS-00000173

ATTORNEY DOCKET NO.: 098981-5480

user 112a may want to select terms or phrases for association that are unlikely to be used in standard searches.  For example, the user 112a may use a single number (e.g., "1") to associate with a URL.

[0058]  In another embodiment, the user 112a associates the alternate URL "www.myhome.com" with the actual or primary URL for the user's 112a personal homepage.  When the user 112a enters the URL "www.myhome.com" in the address line of the browser executing on the client 102a, the browser locates the association between the alternate and primary URL's and navigates to the page identified by the primary URL, the user's personal home page.

[0059]  An embodiment of the present invention may provide various user interfaces.  For example, in one embodiment, two distinct user interfaces are provided: one for novice users and one for advanced users.  The novice interface may simply give visual feedback about whether a page is bookmarked or not and permits the user to toggle that state with a simple click.  The richer, advanced-user interface may utilize a slider control reflecting a rating for the current page and a personality-mode (e.g., work/home/hobby) drop-down box that switches among different rating sets.  Another embodiment includes an intermediate-level interface that includes a bookmark (vote positive) and a booknegate (vote negative) button (not unlike the voting buttons as part of the advanced features of some search toolbars, such as the Google Toolbar).

[0060]  A user interface according the present invention may also include a personalized result page that includes a visual indication of a result that was reordered due to personalization.  In one embodiment of the present invention, the user interface includes a means for toggling the personalization of results.  For example, in one embodiment, the user clicks a button on the HTML interface to turn on personalization. If personalization is active, the user may click a button disabling personalization.  Such a feature addresses the need to depersonalize results before sharing a query result links with other users (e.g., via email).

GOOG-GVS-00000174

ATTORNEY DOCKET NO.: 098981-5480

[0061]  One embodiment of the present invention supports applying bookmarks directly via a results page.  For more advanced users, bookmark manager 128 may support a "Rank these results" link that lets advanced users select a rating (perhaps using radio buttons) for each result on a given page.  Because of privacy concerns, bookmark manager 128 may disallow access to "View bookmarks" to not-logged-in users; nevertheless, search results may be appropriately personalized based on just the cookie of not-logged-in users.

[0062]  Embodiments of the present invention implement various measures to help encourage user adoption.  For example, although not. all users may be willing to expend the effort to provide ratings, an embodiment of the present invention provides noticeable benefits for relatively low effort on the part of the user.  In addition, by incorporating bookmark synchronization, an embodiment of the present invention helps drive adoption.

[0063]  Embodiments of the present invention may also implement network and community features to foster adoption of the service.  For example, as described above, an embodiment of the present invention may utilize like-user recommendations to locate and rank results.  One embodiment of the present invention implements user groups and friend-lists whereby a user can choose to expose a bookmark list to friends or the public at large.  In another embodiment, a user has the ability to transparently overlay a weighted set of bookmarks onto their own set of bookmarks.

[0064]  An organization implementing an embodiment of the present invention may utilize partnerships to encourage adoption of the service.  For example, a service provider may encourage partner sites to display a "bookmark this page!" snippet on their homepages and other content pages.  For the partner, an embodiment of the present invention provides a means to ask users to opt-in to making it especially easy to get at their site via a search.  And for users it's a nice reminder to mark the page or add an annotation.  For the provider of the bookmark and search service, such an arrangement helps introduce users to the idea of bookmarks at the moment it matters most: when

GOOG-GVS-00000175

ATTORNEY DOCKET NO.: 098981-5480

they are visiting a page they are interested in.  It may be advantageous to (e.g., for security reasons) to have partners wishing to display a "bookmark this page!" link to register with the service provider first.  Registration with the service provider also helps the service provider to develop relationships with additional content providers.

[0065]  A provider of a bookmark service may receive various benefits from implementing the service.  For example, the provider is able to collect data concerning users' attribution of value on pages.

[0066]  One embodiment of the present invention utilizes an anti-spamming mechanism to avoid the problem of companies with a financial interest in driving traffic to their sites attempting to falsify end user interest in their pages.  In one embodiment, the search engine 120 addresses this problem by not trusting the bookmark signal globally, but leveraging it only for user personalization.  In one embodiment, the bookmark manager employs credit card validation (for identification only) and/or CAPTCHAs (Completely Automated Public Turing Test to Tell Computers and Humans Apart) to gain evidence that bookmark manager 128 is interacting with a legitimate user.

[0067]  An embodiment of the present invention may provide other features as well.  For example, one embodiment provides collaborative link recommendations.  When logged in, a user 112a is provided a link with anchor text, such as "See related bookmarks for users similar to you."  The linked page provides other suggested links that may be of interest to the user 112a.  This feature may be integrated into or separate from the main results page.

[0068]  An embodiment of the present invention may provide useful information to the provider of the bookmark service.  For example, for sites that users visit most frequently, client-side bookmarks are often the tools of choice.  An unfortunate consequence is that those page visits are largely hidden from the provider of a search service.  With bookmarks being used as a navigational tool according to the present invention, the service provider has access to the previously unavailable data and may

GOOG-GVS-00000176

ATTORNEY DOCKET NO.: 098981-5480

be better equipped to provide user-personalized portals.  For example, pattern recognition might let the service provider realize that a user visit various stock quotes every Monday morning, checks CNN.com in the afternoons, etc.  In such an embodiment, the search engine 120 may anticipate the pages that users will likely require.

[0069]  An embodiment of the present invention may also improve the relevance of advertisements presented in conjunction with search results.  For example, one embodiment of the present invention is able to use bookmarks to cluster user interests and leverage click-through data of various advertisements for similar users to present even more relevant advertisements.  In other words, the advertisements are based, at least in part, on the search results returned based on the bookmarks or other personal search object.  This feature provides numerous benefits.  Not only are users more likely to be satisfied because the advertising is more targeted, but the click-through rate for the service provider may increase, resulting in increased revenue.

[0070]  In one embodiment, a user may share or overlay bookmarks.  For example in one embodiment, a user is able to open up their bookmarks for others to view.  In another embodiment, a user is able to aggregate other users' bookmarks into their own set of bookmarks (either via copying or via an overlaid reference semantics).  Such a feature may prove useful for community building (e.g., "Add this group's bookmarks to your favorites" when joining a new mailing list).  In one such embodiment, the bookmark indicators in results pages distinguish between those pages explicitly bookmarked by the user from those gathered by others.  Given a canonical URL through which to reference another individual/organization's bookmarks, the service provider can derive a sense of the popularity of a person's links and weight those bookmarks correspondingly (a la PageRank applied to the subgraph of bookmark interlinks).

[0071]  One embodiment of the present invention fosters community and relationship building.  In one embodiment, the search engine is able to recognize clusters or pairs of

GOOG-GVS-00000177

ATTORNEY DOCKET NO.: 098981-5480

users having similar interests.  Such an embodiment is able to suggest other users with which to network.

[0072]  An embodiment of the present invention may include various other features as well.  For example, in one embodiment, linger time and/or repeat visits is used to implicitly bookmark a page.  Other implicit measures, such as the ones described above, may also be utilized.  With this feature, a toolbar slider may start inching to the right as you view a given page (and should attempt to alert the user that the change has occurred, perhaps by flashing).  The user explicitly dragging the slider would override the setting (and turn off the implicit rating improvement for this visit to the site).

[0073]  Figure 4 is a flowchart illustrating a process of implicitly rating a page in one embodiment of the present invention. In the embodiment shown, the bookmark manager 128 receives a URL 402.  The bookmark manager 128 determines whether or not the URL has been saved as a in the bookmark database 140 as a bookmark 403.  If so, the process ends 414.  Otherwise, the bookmark manager 128 determines whether this is a first visit by the user to the URL 404.  If so, the bookmark manager adds the bookmark to the bookmark database 140 and sets the rating equal to 0.5 408.  The process then ends 414. In the embodiment shown, the bookmark manager 120 does not identify the URL as a bookmark, but merely adds an entry to maintain the rating of the site.

[0074]  If the bookmark has been visited before, the bookmark manager 128 adds 0.05 to the value of the rating 406.  Once the rating has been set or adjusted, the bookmark manager 128 determines whether the rating is greater than or equal to 0.7 410.  The value 0.7 is a threshold for implicitly creating a bookmark and may be adjusted in various embodiments.  If the value is greater than or equal to 0.7, the bookmark manager 128 marks the URL as a favorite in the bookmark database (140) 412.  The process then ends 414.  If the value is less than 0.7, the process ends, and the bookmark is not added to the bookmark database 140.  Another embodiment of the

GOOG-GVS-00000178

ATTORNEY DOCKET No.: 098981-5480

present invention utilizes linger time in addition to or instead of page visits for implicitly bookmarking pages.

[0075]  An embodiment of the present invention may use the ratings, annotations, or any other data in presenting search results.  In several of the examples described above, the data is used to sort or mark search results shown to a user 112a. In one embodiment, the data is used to exclude search results from those shown to the user.

[0076]  Embodiments of a rating process according to the present invention may provide other features as well.  For example, one embodiment provides the capability to search previously stored bookmarks as a completely separate search experience rather than integrating the results into the basic results page.  In one such embodiment, the interface on the client 102a presents the user with two checkboxes.  By checking the first checkbox, the user 112a specifies that the search engine 120 should search global indices.  By checking the second checkbox, the user 112a specifies that the search engine 120 should search the user's bookmarks.  The user 112a is able to vary the search based on the particular type of search that the user 112a wishes to perform.  In another embodiment, hits due to indexed annotations are presented separately at the top, and hits due to results that were otherwise found are marked in their usual ranking position and may also be shown at the top.  The links presented at the top of the result set 134 may not include snippets.

[0077]  To mitigate privacy concerns, embodiments of the present invention may require users to opt-in to the tracking.  In such an embodiment, the system alerts the user when personalized search is in effect and provides a simple mechanism for reverting to generic search.  In such an embodiment, bookmark data may be stored in a secure data center separate from a user's other personal data.

[0078]  Various interface designs may be implemented in an embodiment of the present invention.  For example, in one embodiment, marking of pages of interest and non-interest is provided via JavaScript bookmarklets.  One such embodiment displays the

GOOG-GVS-00000179

ATTORNEY DOCKET No.: 098981-5480

user-specified ranking (if any) by usurping the PageRank display to be user-specific. The color changes when the bookmark rating exceeds the mark threshold (.7 in Figure 3).

[0079]  In another embodiment of a user interface according to the present invention, the user is provided with a simple user interface for adding an annotation for an arbitrary page, such as via a new menu option in the toolbar's Info drop-down or via a star button in the browser or a toolbar or a plug-in of the browser.  The bookmarked or booknegated pages in results sets are displayed and the bookmarks and booknegates may be edited directly in the results list.

[0080]  In the embodiment shown in Figure 1, client 102a transmits query signal 130 to the server device 104 executing the search engine 120.  In another embodiment, the server device 122 executing the bookmark manager 128 may receive queries directly. In one such embodiment, seven queries are defined to retrieve and/or save various pieces of data.  In each of the queries, the user identifier is provided as a primary identifier.

[0081]  In a first query, a user provides a rating of a page.  The rating may be a simple yes/no or up/down rating or may include a rating across a scale.  The response may just be the new bookmark rating (for example, as an ASCII-encoded integer).  For a query implementing an up/down rating, the rating may be boosted or dropped slightly along a scale.  An example of a rating query is:

GET /set-bookmark?rating=NUM&url-URL&annotation=ANNOTATION.

[0082]  In a second query, information for new pages visited by the user is requested. Such a query may include a features parameter, which may be extended to explicitly ask for bookmark ratings.  The response may be something like: "Rank_l :1:8."  One example of such a query is:

GOOG-GVS-00000180

ATTORNEY DOCKET NO.: 098981-5480

GET /search?client=navclient-auto&q=info:URL.

**[0083]**  In a third query, a bare bookmark rating is requested for a set of documents.  In the query shown, the URLLIST is a list of URLS, separated by spaces, re-urlencoded, and DocIds is a space-separated list of docids, url-encoded.  Results for all of these are returned, one per line.  One example of such a query is:

GET /get-bookmarks?urls=URLLIST&docids=DOCIDLIST.

**[0084]**  In a fourth query, an annotation for a URL is requested.  In one embodiment, when the URL is not specified, the server returns a list of URLs that have bookmark annotations in a HTML user interface that permits a user to view and edit those annotations.  One example of such a query is

GET /annotations?url=URL.

**[0085]**  A fifth query transmits a list of bookmarks to a server.  One example of a bookmark POST acceptor is as follows:

POST /set-bookmarks.

**[0086]**  In the POST acceptor query, the POST-data may have a Content-Type of "text/html" and be a favorites list represented in HTML, for example, in the format Microsoft Internet Explorer™ exports.

**[0087]**  A sixth query provides a means to get a full bookmark list in XML format.  One such query is as follows:

GET /get-bookmarks.xml.

GOOG-GVS-00000181

ATTORNEY DOCKET NO.: 098981-5480

[0088]  A seventh query provides a means for searching an annotation and returning URLs or Docids that match the query terms provided in the query.  One such query is as follows:

GET /search-annotations?q=QUERYTERMS.

[0089]  Embodiments of the present invention provide numerous advantages to the user and to the provider of the search service.  An embodiment of the present invention improves the user experience by providing personalized search results and rankings.

[0090]  An embodiment of the present invention provides advantages to the provider of a search service by (1) increasing the stickiness of the search experience by giving users a compelling reason to identify themselves and share their interest in topics with the provider, and (2) gathering better data regarding the relevancy of pages to different users and different classes of users.

[0091]  In an embodiment of the present invention, the user providing bookmarks to the service provider enables the search provider to personalize the search for them.  The feature can be viewed as a server-side generalization of bookmarks integrated with annotations.  Users are able to share that personalization data across different browsers (e.g., work and home) if desired and hence eliminate the drudgery associated with managing bookmarks.  An embodiment of the present invention also unifies all navigational queries under a single experience.

[0092]  The foregoing description of the preferred embodiments of the invention has been presented only for the purpose of illustration and description and is not intended to be exhaustive or to limit the invention to the precise forms disclosed.  Numerous modifications and adaptations thereof will be apparent to those skilled in the art without departing from the spirit and scope of the present invention.

GOOG-GVS-00000182

ATTORNEY DOCKET NO.: 098981-5480

WHAT IS CLAIMED IS:

1.      A method comprising:

receiving a search query;

determining a personalized result by searching a personalized search
object using the search query;

determining a general result by searching a general search object using
the search query; and

providing a search result for the search query based at least in part on the
personalized result and the general result.

2.      The method of claim 1, wherein the personalized search object comprises
an article associated with a bookmark.

3.      The method of claim 2, wherein an index associated with the bookmark is
stored on a server remote from a client with which the bookmark is associated.

4.      The method of claim 2, wherein an index associated with the bookmark is
stored on a client with which the bookmark is associated wherein searching of the
personalized search object is performed by, a client-side agent.

5.      The method of claim 1, wherein the general search object comprises an
index of articles.

6.      The method of claim 5, wherein the index comprises an index of articles
associated with a global computer network.

7.      The method of claim 1, wherein providing the search result for the search
query comprises combining the personalized result and the general result.

8.      The method of claim 1, wherein the general search object comprises a
plurality of global indices.

9.      The method of claim 1, wherein the personal search object comprises a
plurality of bookmarks.

GOOG-GVS-00000183

ATTORNEY DOCKET NO.: 098981-5480

10.     The method of claim 1, wherein the personal search object comprises an annotation.

11.     The method of claim 1, wherein the personal search object comprises a rating.

12.     The method of claim 1, wherein the search result comprises a plurality of search results and further comprising sorting the plurality of search results based at least in part on an origin of each of the plurality of search results.

13.     The method of claim 12, wherein the origin comprises the personal search object.

14.     The method of claim 12, wherein the origin comprises the general search object.

15.     The method of claim 1, wherein the search result comprises a plurality of search results and further comprising marking each of the plurality of search results that comprise a personalized result.

16.     The method of claim 1, wherein the search result comprises a plurality of search results and further comprising sorting the plurality of search results based at least in part on a rating of each of the plurality of search results.

17.     The method of claim 1, further comprising providing an advertisement based at least in part on the search result.

18.     The method of claim 1, further comprising identifying a cluster of users based at least in part on the personalized search object.

19.     The method of claim 1, further comprising identifying a personal search object based at least in part on an implicit measure.

20.     The method of claim 19, wherein the implicit measure comprises a history of user accesses.

GOOG-GVS-00000184

ATTORNEY DOCKET NO.: 098981-5480

## ABSTRACT OF THE DISCLOSURE

Personalized network searching, in which a search query is received from a user, and a request is received to personalize a search result.  Responsive to the search query and the request to personalize the search result, a personalized search result is generated by searching a personalized search object.  Responsive to the search query, a general search result is generated by searching the general search object.  The personalized search result and the general search result are provided to a client device, an advertisement is selected based at least in part upon the personalized search object, and the advertisement, the personalized search result, and the general search result are displayed.

GOOG-GVS-00000185



FIG. 1

GOOG-GVS-00000186



FIG. 2

GOOG-GVS-0000187

GOOG-GVS-00000188



FIG. 3

Receive Search Query 302

Search Global Index 304

Search Bookmarks 306

Search Annotations 308

Merge Search Results 310

Rank Pages 312

Provide Result Set to User 314

GOOG-GVS-00000188



FIG. 4

GOOG-GVS-0000189

Page 4 of 4

Attorney Docket No. 098981-5480

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| First Inventor Name: | Gregory Joseph Badros |
| Title: | PERSONALIZED NETWORK SEARCHING |
| Appl. No.: | Not Yet Assigned |
| Filing Date: | Herewith |
| Examiner: | Not Yet Assigned |
| Art Unit: | Not Yet Assigned |
| Confirmation Number: | Not Yet Assigned |

### PRELIMINARY AMENDMENT UNDER 37 CFR 1.115

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

Prior to examination of the present Continuing Application, Applicant respectfully requests that the application be amended as follows:

**Amendments to the Claims** begin on page 2.

**Remarks** begin on page 7.

-1-

4839-7391-7528

GOOG-GVS-00000190

Attorney Docket No. 098981-5480

**AMENDMENTS TO THE CLAIMS:**

This listing of claims will replace all prior versions and listings of claims in the application:

1.–20.  (Canceled)

21.  (New) A computer-implemented method performed by data processing apparatus, the computer-implemented method comprising:

identifying a user;

receiving user input from the user through an interface of a client device, the user input indicating a modification to a set of favorite items for the user;

in response to receiving the user input:

modifying the set of favorite items stored for the user in a client-side storage of the client device; and

synchronizing the set of favorite items modified responsive to the user input with a server-side storage system configured to synchronize favorite items for the user with one or more other client devices.

22.  (New) The computer-implemented method of claim 21, wherein the client device comprises at least one of a digital assistant, a smart phone, a digital tablet, a laptop computer, or an Internet appliance.

23.  (New) The computer-implemented method of claim 21, wherein the set of favorite items comprises an identifier to a resource.

24.  (New) The computer-implemented method of claim 21, wherein the set of favorite items comprises an identifier to an audio file.

-2-

GOOG-GVS-00000191

Attorney Docket No. 098981-5480

25.  (New) The computer-implemented method of claim 21, wherein the set of favorite items comprises an identifier to an audio file that is accessible via a network.

26.  (New) The computer-implemented method of claim 21, wherein the user input indicating the modification to the set of favorite items for the user comprises an indication to create a favorite item to add to the set of favorite items for the user, the computer-implemented method comprising:

adding the favorite item to the set of favorite items in the client-side storage of the client device; and

adding the favorite item to the set of favorite items in the server-side storage system.

27.  (New) The computer-implemented method of claim 21, comprising:

adding a favorite item to the set of favorite items stored on the one or more other client devices.

28.  (New) The computer-implemented method of claim 21, wherein the user input indicating the modification to the set of favorite items for the user comprises an indication to delete a favorite item from the set of favorite items for the user.

29.  (New) The computer-implemented method of claim 21, comprising:

deleting a favorite item from the set of favorite items in the client-side storage of the client device;

deleting the favorite item from the set of favorite items in the server-side storage system; and

deleting the favorite item from the set of favorite items stored on the one or more other client devices.

30.  (New) The computer-implemented method of claim 21, comprising:

-3-

GOOG-GVS-00000192

Attorney Docket No. 098981-5480

storing the set of favorite items in a bookmark file on at least one of the client-side storage of the client device, the server-side storage system, or a second client device of the one or more other client devices.

31.  (New) The computer-implemented method of claim 21, wherein the interface of the client device through which the client device receives the user input comprises a built-in interface of a client-side application.

32.  (New) The computer-implemented method of claim 21, wherein the interface of the client device comprises a pop-up window.

33.  (New) The computer-implemented method of claim 21, comprising:

providing, by an application, via the client device, the interface through which the user provides the user input.

34.  (New) The computer-implemented method of claim 33, wherein the application comprises at least one of a manager, HTML-based application, JavaScript-based application, an ActiveX component, a Java applet, or a C++ program.

35.  (New) The computer-implemented method of claim 21, wherein the client device is associated with a valid user identifier and the one or more other client devices are associated with the valid user identifier.

36.  (New)  The computer-implemented method of claim 21, comprising:

authenticating, via a user identifier, the client device for synchronization of the set of favorite items;

authenticating, via the user identifier, the one or more other client devices for synchronization of the set of favorite items; and

-4-

GOOG-GVS-00000193

Attorney Docket No. 098981-5480

subsequent to authenticating the one or more other client devices for synchronization of the set of favorite items, synchronizing the set of favorite items among the one or more other client devices.

37.  (New) A system to synchronize bookmarks among devices, comprising:

a first client device comprising one or more processors and memory, the first client device comprising a first application program stored in the memory of the first client device and executed by the first client device; and

a second client device comprising one or more processors and memory, the second client device comprising a second application program stored in the memory of the second client device and executed by the second client device,

wherein the first application program of the first client device is configured to:

authenticate with a server for synchronizing with a set of bookmarks stored in a server-side storage of the server;

receive an input via an interface of the first client device, the input comprising an instruction to the first client device to modify a set of bookmarks stored in a client-side storage of the first client device; and

transmit, from the first client device and to the server, an indication to modify the set of bookmarks stored in the server-side storage, and

wherein the second application program of the second client device is configured to:

authenticate with the server for synchronizing with the set of bookmarks stored in the server-side storage of the server;

receive, at the second client device and from the server, an indication to modify a set of bookmarks stored in a client-side storage of the second client device; and

modify, responsive to the indication to modify the set of bookmarks received from the server, the set of bookmarks stored in the client-side storage of the second client device.

4839-7391-7528

GOOG-GVS-00000194

Attorney Docket No. 098981-5480

38.  (New) The system of claim 37, wherein the set of bookmarks stored in the server-side storage of the server comprises one or more favorite items, wherein the set of bookmarks stored in the client-side storage of the first client device comprises the one or more favorite items, and wherein the set of bookmarks stored in the client-side storage of the second client device comprises the one or more favorite items.

39.  (New) The system of claim 37, wherein the set of bookmarks stored in the server-side storage of the server comprises one or more identifiers of one or more audio files, wherein the set of bookmarks stored in the client-side storage of the first client device comprises the one or more identifiers of the one or more audio files, and wherein the set of bookmarks stored in the client-side storage of the second client device comprises the one or more identifiers of the one or more audio files.

40.  (New) The system of claim 39, wherein the second client device is further configured to:
    display, via an interface of the second client device, an indication of modification of bookmark information for at least one of the one or more audio files identified by the set of bookmarks stored in the client-side storage of the second client device.

4839-7391-7528

GOOG-GVS-00000195

Attorney Docket No. 098981-5480

## REMARKS

Entry of this Preliminary Amendment is respectfully requested.  Claims 1–20 are cancelled without prejudice or disclaimer.  New claims 21–40 are added.   No new matter has been added.  Upon entry of this Preliminary Amendment, claims 21–40 will be pending.

A Notice of Allowance is respectfully requested.  The Examiner is invited to call the undersigned if the Examiner believes doing so will help advance prosecution.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741.  Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.  If any extensions of time are needed for timely acceptance of papers submitted herewith, Applicant hereby petitions for such extension under 37 C.F.R. §1.136 and authorizes payment of any such extensions fees to Deposit Account No. 19-0741.

Respectfully submitted,

Date:  December 26, 2017                    By:  /James De Vellis/

FOLEY & LARDNER LLP                       James De Vellis
Customer Number: 10575                    Attorney for Applicant
Telephone:     (617) 342-4037             Registration No. 52,814
Facsimile:      (617) 342-4001

-7-

4839-7391-7528

GOOG-GVS-00000196

Attorney Docket No. 098981-5480

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

First Inventor Name:    Gregory Joseph Badros

Title:    PERSONALIZED NETWORK
SEARCHING

Appl. No.:    15/854,208

Filing Date:    December 26, 2017

Examiner:    LEWIS, CHERYL RENEA

Art Unit:    2155

Confirmation Number:    1362

### AMENDMENT AND RESPONSE TO NON-FINAL OFFICE ACTION

Mail Stop AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

This communication is responsive to the March 22, 2018 Non-Final Office Action for the

above-referenced patent application.

**Amendments to the Claims** begin on page 2.

**Remarks** begin on page 8.

4835-2399-5492

GOOG-GVS-00000641

Attorney Docket No. 098981-5480

**AMENDMENTS TO THE CLAIMS:**

This listing of claims will replace all prior versions and listings of claims in the application:

1.–20.  (Canceled)

21.  (Currently Amended) A computer-implemented method performed by ~~data processing apparatus~~ at least one processor, the computer-implemented method comprising:

identifying a user;

receiving user input from the user through an interface of a client device, the user input indicating a modification to a set of favorite items for the user;

in response to receiving the user input:

modifying the set of favorite items stored for the user in a client-side storage of the client device, ~~; and~~ the modification to the set of favorite items initiating a synchronization process to synchronize ~~synchronizing~~ the set of favorite items modified responsive to the user input with a server-side storage system configured to synchronize favorite items for the user with one or more other client devices, the server-side storage system remote from the client-side storage;

presenting through a single interface of the client device, in response to a query from the user, a combined search results set generated via one or more search sub-processes, the combined search results set including at least two of:

one or more favorite items from the set of favorite items synchronized for the user;

one or more search results from a first global index; or

one or more search results from a second global index.

22.  (Previously Presented) The computer-implemented method of claim 21, wherein the client device comprises at least one of a digital assistant, a smart phone, a digital tablet, a laptop computer, or an Internet appliance.

-2-

GOOG-GVS-00000642

Attorney Docket No. 098981-5480

23. (Previously Presented) The computer-implemented method of claim 21, wherein the set of favorite items comprises an identifier to a resource.

24. (Previously Presented) The computer-implemented method of claim 21, wherein the set of favorite items comprises an identifier to an audio file.

25. (Previously Presented) The computer-implemented method of claim 21, wherein the set of favorite items comprises an identifier to an audio file that is accessible via a network.

26. (Previously Presented) The computer-implemented method of claim 21, wherein the user input indicating the modification to the set of favorite items for the user comprises an indication to create a favorite item to add to the set of favorite items for the user, the computer-implemented method comprising:

    adding the favorite item to the set of favorite items in the client-side storage of the client device; and

    adding the favorite item to the set of favorite items in the server-side storage system.

27. (Previously Presented) The computer-implemented method of claim 21, comprising:

    adding a favorite item to the set of favorite items stored on the one or more other client devices.

28. (Previously Presented) The computer-implemented method of claim 21, wherein the user input indicating the modification to the set of favorite items for the user comprises an indication to delete a favorite item from the set of favorite items for the user.

29. (Previously Presented) The computer-implemented method of claim 21, comprising:

    deleting a favorite item from the set of favorite items in the client-side storage of the client device;

-3-

GOOG-GVS-00000643

Attorney Docket No. 098981-5480

deleting the favorite item from the set of favorite items in the server-side storage system; and

deleting the favorite item from the set of favorite items stored on the one or more other client devices.

30. (Previously Presented) The computer-implemented method of claim 21, comprising:

storing the set of favorite items in a bookmark file on at least one of the client-side storage of the client device, the server-side storage system, or a second client device of the one or more other client devices.

31. (Previously Presented) The computer-implemented method of claim 21, wherein the interface of the client device through which the client device receives the user input comprises a built-in interface of a client-side application.

32. (Previously Presented) The computer-implemented method of claim 21, wherein the interface of the client device comprises a pop-up window.

33. (Previously Presented) The computer-implemented method of claim 21, comprising:

providing, by an application, via the client device, the interface through which the user provides the user input.

34. (Previously Presented) The computer-implemented method of claim 33, wherein the application comprises at least one of a manager, HTML-based application, JavaScript-based application, an ActiveX component, a Java applet, or a C++ program.

35. (Previously Presented) The computer-implemented method of claim 21, wherein the client device is associated with a valid user identifier and the one or more other client devices are associated with the valid user identifier.

-4-

GOOG-GVS-00000644

Attorney Docket No. 098981-5480

36.  (Previously Presented)  The computer-implemented method of claim 21, comprising:

authenticating, via a user identifier, the client device for synchronization of the set of favorite items;

authenticating, via the user identifier, the one or more other client devices for synchronization of the set of favorite items; and

subsequent to authenticating the one or more other client devices for synchronization of the set of favorite items, synchronizing the set of favorite items among the one or more other client devices.

37.  (Currently Amended) A system to synchronize bookmarks among devices, comprising:

a first client device comprising one or more processors and memory, the first client device comprising a first application program stored in the memory of the first client device and executed by the first client device; and

a second client device comprising one or more processors and memory, the second client device comprising a second application program stored in the memory of the second client device and executed by the second client device,

wherein the first application program of the first client device is configured to:

authenticate with a server for synchronizing with a set of bookmarks stored in a server-side storage of the server;

receive an input via an interface of the first client device, the input comprising an instruction to the first client device to modify a set of bookmarks stored in a client-side storage of the first client device, the client-side storage remote from the server-side storage; and

transmit, from the first client device and to the server, an indication to modify the set of bookmarks stored in the server-side storage, and

wherein the second application program of the second client device is configured to:

authenticate with the server for synchronizing with the set of bookmarks stored in the server-side storage of the server;

4835-2399-5492

GOOG-GVS-00000645

Attorney Docket No. 098981-5480

receive, at the second client device and from the server, an indication to modify a set of bookmarks stored in a client-side storage of the second client device, the client-side storage remote from the server-side storage; ~~and~~

modify, responsive to the indication to modify the set of bookmarks received from the server, the set of bookmarks stored in the client-side storage of the second client device; and

present through a single interface of the second client device, in response to a query from a user, a combined search results set generated via one or more search sub-processes, the combined search results set including at least two of:

one or more favorite items from the set of bookmarks synchronized for the user;

one or more search results from a first global index; or

one or more search results from a second global index.

38.  (Previously Presented) The system of claim 37, wherein the set of bookmarks stored in the server-side storage of the server comprises one or more favorite items, wherein the set of bookmarks stored in the client-side storage of the first client device comprises the one or more favorite items, and wherein the set of bookmarks stored in the client-side storage of the second client device comprises the one or more favorite items.

39.  (Previously Presented) The system of claim 37, wherein the set of bookmarks stored in the server-side storage of the server comprises one or more identifiers of one or more audio files, wherein the set of bookmarks stored in the client-side storage of the first client device comprises the one or more identifiers of the one or more audio files, and wherein the set of bookmarks stored in the client-side storage of the second client device comprises the one or more identifiers of the one or more audio files.

40.  (Previously Presented) The system of claim 39, wherein the second client device is further configured to:

GOOG-GVS-00000646

Attorney Docket No. 098981-5480

display, via an interface of the second client device, an indication of modification of bookmark information for at least one of the one or more audio files identified by the set of bookmarks stored in the client-side storage of the second client device.

4835-2399-5492

GOOG-GVS-00000647

Attorney Docket No. 098981-5480

## REMARKS

Claims 21-40 are pending.  With this Response, claims 21 and 37 are amended without any prejudice or disclaimer.  No new matter is added.  Support for the amendment can be found throughout the application as-filed including, for example, at least at paragraphs 15, 45 and 91. Upon entry of this Response, claims 21-40 will remain pending.  Applicant respectfully traverses all rejections and requests allowance of this application.

### Statement on the Substance of the Interview

Applicant and Applicant's representatives Brad Riel, James De Vellis and Chethan Srinivasa thank Examiner Cheryl Renea Lewis for participating in a telephone interview on May 1, 2018.  During the interview, Applicant's representatives pointed out how the proposed claim amendments and clarifications recite technical subject matter and distinguish over the cited references.  The Examiner agreed to further consider the points in view of the present Response. While the Examiner reserved judgment regarding allowance, the Examiner indicated that the proposed claim amendments and clarifications discussed during the interview would likely advance prosecution of this case, pending further search and consideration.

### Claim Rejections Under 35 U.S.C. § 101

On page 2, the Office Action rejected claims 21-40 under 35 U.S.C. § 101 as allegedly directed to non-statutory subject matter.  Applicant respectfully traverses this rejection.

Applicant respectfully disagrees, and submits that the Office Action exhibits a clear deficiency in the *prima facie* case in support of the rejection.  With respect to asserting that the claims are not patent subject matter eligible under 35 U.S.C. § 101, MPEP § 2106(III) instructs that "[i]f the record as a whole suggests that *it is more likely than not* that the claimed invention

-8-

GOOG-GVS-00000648

would be considered significantly more than an abstract idea, natural phenomenon, or law of nature, then [*the Examiner*] *should <u>not</u> reject the claim*"[1] (Emphasis added).

I.     <u>Grounds for Subject Matter Eligibility Analogous to *McRO v. Bandai*</u>

       The grounds for patent eligibility of the claims of the present application are analogous to those of the claims held eligible in *McRO, Inc. dba Planet Blue v. Bandai Namco Games America*, 120 USPQ2d 1091 (Fed. Cir. 2016). In the Memorandum "Recent Subject Matter Eligibility Decisions" promulgated to the Patent Examining Corps on November 2, 2016, Deputy Commissioner Bahr ("McRO Memo") noted that "[a]n 'improvement in computer-related technology' is not limited to improvements in the operation of a computer or a computer network per se, but may also be claimed as a set of 'rules' (basically mathematical relationships) that improve computer-related technology by allowing computer performance of a function not previously performable by a computer." McRO Memo at 2 (citing *McRO*). The Memorandum instructs that "[a]n indication that a claim is directed to an improvement in computer-related technology may include: ... a particular solution to a problem or a particular way to achieve a desired outcome defined by the claimed invention, as opposed to merely claiming the idea of a solution or outcome." *Id.* at 2–3. Moreover, the Memorandum expounds that "[i]n contrast [to *McRO*], *Electric Power Group's* claimed method was directed to an abstract idea because it merely presented the results of collecting and analyzing information, without even identifying a particular tool for the presentation." *Id.* at 3.

---

[1] *See also* MPEP § 2106(III) ("*USPTO personnel should review the totality of the evidence* (**e.g., the specification, claims, relevant prior art**) *before reaching a conclusion* with regard to whether the claimed invention sets forth patent eligible subject matter") (Emphasis added).

GOOG-GVS-00000649

Attorney Docket No. 098981-5480

In *McRO*, the Federal Circuit found a claimed invention directed to automating a process that required subjective human judgement and thus previously could only be done by humans to be patent eligible and *not* directed to an abstract idea. *See* McRO Memo. Specifically, *McRO*'s claims "defined a specific way, namely using particular rules to set morph weights and transitions through phenomes, to solve the problem of producing accurate and realistic lip synchronization and facial expressions in animated characters." *Id.* at 3.

Analogously, the claims of the present application recite a particular way to achieve a desired outcome defined by the claimed invention. In particular, the claims of the present application recite a particular set of rules that allow a computing system to synchronize favorite items or bookmarks, and provide a combined search results set via a single interface. For example, claim 21 recites, among other features, "receiving user input from the user through an interface of a client device, the user input indicating a modification to a set of favorite items for the user; "modifying the set of favorite items stored for the user in a client-side storage of the client device, the modification to the set of favorite items initiating a synchronization process to synchronize the set of favorite items modified responsive to the user input with a server-side storage system configured to synchronize favorite items for the user with one or more other client devices, the server-side storage system remote from the client-side storage system; presenting through a single interface of the client device, in response to a query from the user, a combined search results set generated via one or more search sub-processes, the combined search results set including at least two of: one or more favorite items from the set of favorite items synchronized for the user; one or more search results from a first global index; or one or more search results from a second global index."

-10-

GOOG-GVS-00000650

Attorney Docket No. 098981-5480

The claims of the instant case are also analogous to how *McRo*'s claims "defined a specific way, namely using particular rules to set morph weights and transitions through phenomes, to solve the problem of producing accurate and realistic lip synchronization and facial expressions in animated characters." Accordingly, as with the claims at issue in *McRO*, the present claims are not directed to an abstract idea, but rather, a technological advancement allowing computer performance of a function not previously performable by a computer.

II.   Grounds for Subject Matter Eligibility Analogous to *Enfish v. Microsoft*

The bases for patent eligibility of the claims of the instant application are also similar to those of the claims found eligible in *Enfish, LLC v. Microsoft Corporation*, 822 F.3d 1327 (Fed. Cir. 2016). In *Enfish*, the Court stated that "[s]oftware can make non-abstract improvements to computer technology just as hardware improvements can." *Enfish*. In particular, claims may be patentable when "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *Id.* As outlined in the USPTO's May 19, 2016 Memorandum on Recent Subject Matter Eligibility Decisions ("Enfish Memo") "[t]o make the determination of whether these claims are directed to an improvement in existing computer technology, the court looked to the teachings of the specification.... It was noted that the improvement does not need to be defined by reference to "physical" components[, i]nstead, the improvement [can be] defined by logical structures and processes, rather than particular physical features." Enfish Memo at 2.

Similarly, the plain focus of the claims in the present application is on an improvement to the computer itself, not on economic or other tasks for which a computer is used in its ordinary capacity. In particular, the instant claims are directed to improving the management of favorite

-11-

GOOG-GVS-00000651

items or bookmarks across multiple devices, and search.  Indeed, amended claim 21 recites "receiving user input from the user through an interface of a client device, the user input indicating a modification to a set of favorite items for the user; "modifying the set of favorite items stored for the user in a client-side storage of the client device, the modification to the set of favorite items initiating a synchronization process to synchronize the set of favorite items modified responsive to the user input with a server-side storage system configured to synchronize favorite items for the user with one or more other client devices, the server-side storage system remote from the client-side storage system; presenting through a single interface of the client device, in response to a query from the user, a combined search results set generated via one or more search sub-processes, the combined search results set including at least two of: one or more favorite items from the set of favorite items synchronized for the user; one or more search results from a first global index; or one or more search results from a second global index."

As the Federal Circuit established in *Enfish*, "[the Court recognizes] that, in other cases involving computer-related claims, there may be close calls about how to characterize what the claims are directed to.  In such cases, an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two."  Applicant submits that when properly considered, the present claims are "not ones in which general-purpose computer components are added after the fact to a fundamental economic practice or mathematical equation, but [are] directed to a specific implementation of a solution to a problem in the software arts."  Enfish Memo at 2.  That is, when the recited limitations of the present claims are properly considered in a reasoned analysis in the manner required, it is readily

-12-

GOOG-GVS-00000652

Attorney Docket No. 098981-5480

apparent that the various elements, and combinations of such elements, amount to significantly more than an "abstract idea" alleged in the present rejection.

III.   Office Action's Rationale Deficient in View of *Berkheimer v. HP, Inc.*

In addition, the Office Action's rationale in asserting that the elements of the present claims individually or in combination do not amount to significantly more than the alleged abstract idea and thus are directed to a judicial exception under 35 U.S.C. § 101 is deficient, especially in view of *Berkheimer v. HP, Inc.*, 883 F.3d 1360 (Fed. Cir. 2018).  The Office Action merely provides conclusory statements that the recited elements of the claims represent "a generic computer structure that servers to perform generic computer functions that are routine activities known in the industry," without providing any citations, to conclude that "the claim as a whole does not add significantly more to the abstract idea."  (Office Action, page 4.)

This is in contravention of the USPTO Memorandum on Changes in Examination Procedure Pertaining to Subject Matter Eligibility, Recent Subject Matter Eligibility Decision (*Berkheimer v. HP, Inc.*) promulgated to the Patent Examining Corps on April 19, 2018 ("Berkheimer Memo").  The Court in *Berkheimer* notes that "[w]hether something is well-understood, routine, and conventional to a skilled artisan *at the time of the patent* is a factual determination."  (Emphasis Added.)  According to the Berkheimer Memo, the combination of elements *cannot be held* to be well-understood, routine, or conventional unless the Office Action: (1) provides a citation to an express statement in the specification that demonstrates the well-understood, routine, or conventional nature of the combination of elements, (2) a citation to one or more court decisions that the combination of elements is well-understood, routine, or conventional in nature, (3) a citation to a publication that demonstrates that the combination of

-13-

GOOG-GVS-00000653

Attorney Docket No. 098981-5480

elements are well-understood, routine, or conventional in nature, or (4) a statement that the examiner is taking official notice that the combination of elements are well-understood, routine, or conventional in nature. *Id* at 3–4.

**The Office Action *does not provide any citations to support* the assertion that the combination of elements recited in the claims is well-understood, routine, or conventional in nature**. As such, the Office Action's rationale in contending that the claims of the present application do not amount to more than the significantly more than the purported abstract idea is clearly deficient.

For at least these reasons, the Office Action fails to establish a *prima facie* case of unpatentability with respect to claims 21-40, and thus exhibits a clear deficiency in support of the rationale in rejecting the claims. *See* MPEP § 2106(III). Withdrawal of the rejection under 35 U.S.C. § 101 is therefore respectfully requested.

## Double Patenting Rejection

Claims 21-36 are rejected on the ground of nonstatutory double patenting as unpatentable over claims 1-19 of U.S. Pat. No. 8,886,626. Applicant respectfully traverses this rejection.

Because these claims remain pending and allowable subject matter of all pending claims has not yet been agreed upon, this rejection is a provisional one. Accordingly, Applicant respectfully requests that this rejection be held in abeyance until allowable subject matter of all claims has been identified, at which time a Terminal Disclaimer may be considered.

## Claim Rejections Under 35 U.S.C. § 102

I.      <u>Claims 21-36</u>

-14-

GOOG-GVS-00000654

Attorney Docket No. 098981-5480

Claims 21-36 are rejected under 35 U.S.C. § 102 as unpatentable over U.S. Pat. App. Pub. No. 2003/0103088 ("Dresti"). (Office Action, page 8.) Applicant respectfully traverses this rejection.

As discussed during the interview, Dresti does not disclose each and every element of independent claim 21. Accordingly, withdrawal of this rejection of independent claim 21, and claims 22-36 that depend from claim 21, is requested.

II.   <u>Claims 37-40</u>

Claims 37-40 are rejected under 35 U.S.C. § 102 as unpatentable over U.S. Pat. App. Pub. No. 2005/0097623 ("Tecot"). (Office Action, page 14.) Applicant respectfully traverses this rejection.

As discussed during the interview, Tecot does not disclose each and every element of independent claim 37. Accordingly, withdrawal of this rejection of independent claim 37, and claims 38-40 that depend from claim 37, is requested.

4835-2399-5492

GOOG-GVS-00000655

Attorney Docket No. 098981-5480

# CONCLUSION

Withdrawal of all rejections and a Notice of Allowance is respectfully requested. The Examiner is invited to call the undersigned if the Examiner believes doing so will help advance prosecution. The absence of a specific rebuttal of a position in the Office Action, such as the individual rejection of dependent claims, does not indicate agreement with the position taken in the Office Action. Individual rebuttal of all rejections is not necessary in view of this Response.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17, or credit any overpayment, to Deposit Account No. 19-0741. Should no proper payment be enclosed herewith, as by the credit card payment instructions in EFS-Web being incorrect or absent, resulting in a rejected or incorrect credit card transaction, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741. If any extensions of time are needed for timely acceptance of papers submitted herewith, Applicant hereby petitions for such extension under 37 C.F.R. §1.136 and authorizes payment of any such extensions fees to Deposit Account No. 19-0741.

Respectfully submitted,

Date: June 13, 2018                    By:     /James De Vellis/

FOLEY & LARDNER LLP                            James De Vellis
Customer Number:  10575                        Attorney for Applicant
Telephone:     (617) 342-4037                  Registration No. 52,814
Facsimile:     (617) 342-4001

-16-

4835-2399-5492

GOOG-GVS-00000656

# EXHIBIT E

A Dictionary of
# Computing

FOURTH EDITION

Oxford    New York

OXFORD UNIVERSITY PRESS

SONOS-GVS-00012736

## OXFORD
### UNIVERSITY PRESS

Great Clarendon Street, Oxford OX2 6DP

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide in

Oxford New York

Auckland Bangkok Buenos Aires Cape Town Chennai
Dar es Salaam Delhi Hong Kong Istanbul Karachi Kolkata
Kuala Lumpur Madrid Melbourne Mexico City Mumbai Nairobi
São Paulo Shanghai Taipei Tokyo Toronto

Oxford is a registered trade mark of Oxford University Press
in the UK and in certain other countries

Published in the United States
by Oxford University Press Inc., New York

© Market House Books Ltd. 1983, 1986, 1990, 1996

The moral rights of the author have been asserted
Database right Oxford University Press (maker)

First published 1983
Second published 1986
Third edition 1990
Fourth edition 1996

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior permission in writing of Oxford University Press,
or as expressly permitted by law, or under terms agreed with the appropriate
reprographics rights organization. Enquiries concerning reproduction
outside the scope of the above should be sent to the Rights Department,
Oxford University Press, at the address above

You must not circulate this book in any other binding or cover
and you must impose this same condition on any acquirer

British Library Cataloguing in Publication Data

Data available

Library of Congress Cataloging in Publication Data

Data available

ISBN 0-19-280046-9

10

Printed in Great Britain by
Clays Ltd, St Ives plc

SONOS-GVS-00012737

Case 3:20-cv-03845-EMC   Document 70-1   Filed 04/05/21   Page 200 of 220

**stiff equations** *See* ordinary differential equations.

**STM** *Abbrev. for* synchronous transfer module. *See* SDH.

**stochastic matrix** A matrix, much used for example in simulation, modeling, and communication theory, in which every row is a probability distribution, i.e. every element lies between 0 and 1, and the sum of the elements of each row is unity. A *doubly stochastic matrix* is a stochastic matrix whose transpose is a stochastic matrix.

**stochastic model** *See* stochastic process.

**stochastic process** A set of *random variables whose values vary with time (or sometimes in space). Examples include populations affected by births and deaths, the length of a queue (*see* queuing theory), or the amount of water in a reservoir. *Stochastic models* are models in which random variation is of major importance, in contrast to *deterministic models. Stochastic processes give theoretical explanations for many *probability distributions, and underly the analysis of *time-series data.

**storage (memory, store)** A device or medium that can retain data for subsequent retrieval. *See* storage device. *See also* memory.

**storage allocation 1.** The amount of storage allocated to a *process.

**2.** The act of allocating storage to a *process. In a multiprogramming system it is necessary to control the use of storage to ensure that processes do not interfere with one another's workspace, except where they do so intentionally in order to cooperate. This represents one instance of the resource control activities within the system.

**storage device** A device that can receive data and retain it for subsequent retrieval. Such devices cover a wide range of capacities and speeds of access. The semiconductor devices used as the *main memory for the processor may take only a few nanoseconds to retrieve data but the cost of storing each bit is very high by comparison with the devices used as *backing store, which may take milliseconds or even many seconds to retrieve data. *See*

*also* memory hierarchy, memory management.

**storage element** *See* memory element.

**storage hierarchy** *See* memory hierarchy.

**storage location** *See* location.

**storage oscilloscope** An instrument that is used to measure fast nonrepetitive signals. It does this by capturing the signal on demand and continuing to display it until reset. This can be achieved in two ways: a digital storage oscilloscope samples the incoming signal, stores these samples, and displays them; other storage oscilloscopes use a special storage *cathode-ray tube that retains the image by mapping it as a charge pattern on an electrode behind the screen; the pattern then modulates the electron beam to give a picture of the captured signal.

**storage pool** Those areas of storage that are not allocated to *processes and are used by the storage allocation system as the source from which to meet requests. When a process releases storage it will be returned to the pool for subsequent reallocation.

**storage protection** The mechanisms, both hardware and software, ensuring that *processes access storage in a controlled manner. For storage in the high-speed levels of the *memory hierarchy, protection is implemented by hardware in order to maintain speed; for slower devices the protection may be entirely by software. In all cases, the intention is to ensure that the type of access made by a process to the storage is in accordance with that indicated when the storage was allocated to the process. For example, in a system with paged memory management a process may be granted access to an area of memory, but only for the purpose of executing the code in that page. Attempts to read from the page or to write to it would be prohibited by the (hardware) protection mechanism.

**storage schema (internal schema)** A specification of how the data relationships and rules specified in the *logical schema of a database will be mapped to the physical storage level in terms of the available constructs, such as aggregation into records,

SONOS-GVS-00012738

## STORAGE STRUCTURE

478

clustering on pages, indexing, and page sizing and caching for transfer between secondary and primary storage. Storage schema facilities vary widely between different DBMS.

**storage structure** The mapping from a *data structure to its implementation (which may be another data structure). Thus a date may be represented as a vector of three integers (with six permutations to choose from), directly as a string of characters, or, in more recent high-level languages, as a record with three selectors – day, month, and year. A good choice of storage structure permits an easy and efficient implementation of a given data structure.

**storage tube** A vacuum tube that can receive and retain information. The data can be erased and new data entered as required. The data may be graphical and visible on the face of the tube or it may be retrieved as an electric signal. *See also* electrostatic storage device.

**store 1.** *Another name for* storage, or memory, used especially in the UK.
**2.** To enter or retain information for subsequent retrieval.

**store and forward** A method in which information is passed from node to node in a communication network, pausing in each node until sufficient resources (bandwidth, buffer pools, etc.) are available for the next leg of the journey – called a *hop*. In computer networks the information being passed may be *messages, *packets, or *cells (small fixed-structure packets), and may be self-contained with regard to the store-and-forward network (*datagrams), or may depend upon the maintenance of state information (*flow control, *routing paths, etc.) from previous messages or packets. A store-and-forward network is based upon the tradeoff between the cost of memory and computational resources in the store-and-forward nodes, and the cost of the transmission lines between the nodes. *See also* message switching, packet switching.

**stored program** A *program that is stored in the *memory of a computer. The execution of the program then requires the use of a *control unit – to read instructions from the memory at appropriate times and arrange to carry them out.

The memory used to store the program may be the same as or different from memory used to store the data. There are advantages in using the same (read-write) memory, allowing programs to be modified, but there may be advantages in limiting opportunities for program modification, either by using physically read-only memory or by restricting access to the part of the memory containing programs.

The concept of program and data sharing the same memory is fundamental to what is usually referred to as a *von Neumann machine or a von Neumann architecture. Although there is some disagreement as to whether the stored-program concept was originated by John von Neumann or by the team of John W. Mauchly and J. Presper Eckert, the first documentation was written by von Neumann in 1945 in his proposal for the *EDVAC.

**storyboard** An outline specification of an animated film or a report.

**STP** *Abbrev. for* shielded twisted pair. *See* twisted pair.

**straight insertion sort (sifting technique; sinking technique)** A sorting algorithm that looks at each sortkey in turn, and on the basis of this places the record corresponding to the sortkey correctly with respect to the previous sortkeys.

**straight selection sort** A sorting algorithm based upon finding successively the record with the largest sortkey and putting it in the correct position, then the record with the next largest key, etc.

**Strassen algorithm** An algorithm developed in 1968 by V. Strassen to multiply large numbers. It uses the properties of *Fourier transforms. *See also* Schonhage–Strassen algorithm.

**stream 1.** A flow of data characterized by relatively long duration and constant rate. When the rate is known ahead of time then communication resources may be reserved for the stream. For example, stream traffic may be carried using low-overhead synchronous

# EXHIBIT F

# IEEE 100
# The Authoritative Dictionary of
# IEEE Standards Terms

### Seventh Edition



Published by
Standards Information Network
IEEE Press

SONOS-GVS-00012725

Trademarks and disclaimers

*IEEE believes the information in this publication is accurate as of its publication date; such information is subject to change without notice. IEEE is not responsible for any inadvertent errors.*

*Other tradenames and trademarks in this document are those of their respective owners.*

*The Institute of Electrical and Electronics Engineering, Inc.*
*3 Park Avenue, New York, NY, 10016-5997, USA*

*Copyright © 2000 by the Institute of Electrical and Electronics Engineers, Inc. All rights reserved. Published December 2000. Printed in the United States of America.*

*No part of this publication may be reproduced in any form, in an electronic retrieval system or otherwise, without the prior written permission of the publisher.*

*To order IEEE Press publications, call 1-800-678-IEEE.*

*Print: ISBN 0-7381-2601-2          SP1122*

See other standards and standards-related product listings at: http://standards.ieee.org/

*The publisher believes that the information and guidance given in this work serve as an enhancement to users, all parties must rely upon their own skill and judgement when making use of it. The publisher does not assume any liability to anyone for any loss or damage caused by any error or omission in the work, whether such error or omission is the result of negligence or any other cause. Any and all such liability is disclaimed.*

*This work is published with the understanding that the IEEE is supplying information through this publication, not attempting to render engineering or other professional services. If such services are required, the assistance of an appropriate professional should be sought. The IEEE is not responsible for the statements and opinions advanced in this publication.*

Library of Congress Cataloging-in-Publication Data

IEEE 100 : the authoritative dictionary of IEEE standards terms.—7th ed.
    p. cm.
    ISBN 0-7381-2601-2 (paperback : alk. paper)
    1. Electric engineering—Dictionaries. 2. Electronics—Dictionaries. 3. Computer engineering—Dictionaries. 4. Electric engineering—Acronyms. 5. Electronics—Acronyms. 6. Computer engineering—Acronyms. I. Institute of Electrical and Electronics Engineers.

TK9 .I28 2000
621.3'03—dc21                                    00-050601

Con

Intro

How

Categ

Trade

The A

Abstr

Non-

*The Au*

SONOS-GVS-00012726

**stop code** *See:* stop character.

**stop dowel (rotating machinery)** A pin fitted into a hole to limit motion of a second part.                                    (PE) [9]

**stop element (1) (data transmission)** In a character transmitted in a start-stop system, the last element in each character, to which is assigned a minimum duration, during which the receiving equipment is returned to its rest condition in preparation for the reception of the next character. The stop element is a marking signal.                                    (PE) 599-1985w
**(2)** *See also:* stop signal.                                    (C) 610.7-1995

**stop-go pulsing (telephone switching systems)** A method of pulsing control wherein the pulsing operation may take place in stages, and the sending end is arranged to pulse the digits continuously unless or until the stop-pulsing signal is received. *Note:* When this occurs, the pulsing of the remaining digits is suspended until the sending end receives a start-pulsing signal.                                    (COM) 312-1977w

**stop instruction** A computer instruction that specifies the termination of the execution of a computer program. *See also:* pause instruction.                                    (C) 610.10-1994w

**stop joint (power cable joints)** A joint that is designed to prevent any transfer of dielectric fluid between the cables being joined.                                    (PE/IC) 404-1986s

**stop lamp (illuminating engineering)** A lighting device giving a steady warning light to the rear of a vehicle or train of vehicles, to indicate the intention of the operator to diminish speed or to stop.                                    (EEC/IE) [126]

**stop list** In automatic indexing, a list of terms, words, or roots of words that are considered insignificant for purposes of information retrieval, and are excluded from being keywords in an index. *Synonym:* stopword list. *Contrast:* go list.                                    (C) 610.2-1987

**stop-motion switch** *See:* machine final-terminal stopping device.

**stopping off** The application of a resist to any part of a cathode or plating rack. *See also:* electroplating.                                    (EEC/PE) [119]

**stop-pulsing signal (telephone switching systems)** A signal transmitted from the receiving end to the sending end of a trunk to indicate that the receiving end is not in a condition to receive pulsing.                                    (COM) 312-1977w

**stop-record signal (facsimile)** A signal used for stopping the process of converting the electrical signal to an image on the record sheet. *See also:* facsimile signal.                                    (COM) 168-1956w

**stop signal (1) (facsimile)** A signal that initiates the transfer of a facsimile equipment condition from active to standby. *See also:* facsimile signal.                                    (COM) 168-1956w
**(2) (data management)** A signal at the end of a start-stop character that prepares the receiving device for the reception of a subsequent character. *Note:* A stop signal is usually limited to one signal element having any duration equal to or greater than a specified minimum value.                                    (C) 610.5-1990w
**(3)** In asynchronous transmission, a signal following a character that prepares the receiving device for the reception of a subsequent character or block. *Synonym:* stop element. *Contrast:* start signal.                                    (C) 610.7-1995

**stop time** *See:* deceleration time.

**stop valve (1) (control systems for steam turbine-generator units)** [throttle valve(s)] Those valve(s) that normally provide fast interruption of the main energy input to the turbine. Throttle valves are sometimes used for turbine control during start-up. *Note:* The term stop valve is defined as an open or closed valve. A throttle valve has some portion of its opening through which it can modulate flow.                                    (PE/EDPG) 122-1985s
**(2) (power system device function numbers)** A control device used primarily to shut down an equipment and hold it out of operation. This device may be manually or electrically actuated, but excludes the function of electrical lockout on abnormal conditions. *See also:* lockout relay.                                    (SUB/PE) C37.2-1979s

**stopword list** *See:* stop list.

**storable swimming or wading pool** A pool with a maximum dimension of 15 ft and a maximum wall height of 3 ft and is so constructed that it may be readily disassembled for storage and reassembled to its original integrity.                                    (NESC/NEC) [86]

**storage (1) (A) (electronic computation)** The act of storing information. **(B) (electronic computation)** Any device in which information can be stored, sometimes called a memory device. **(C) (electronic computation)** In a computer, a section used primarily for storing information. Such a section is sometimes called a memory or store (British). *Notes:* 1. The physical means of storing information may be electrostatic, ferroelectric, magnetic, acoustic, optical, chemical, electronic, electric, mechanical, etc., in nature. 2. Pertaining to a device in which data can be entered, in which it can be held, and from which it can be retrieved at a later time. *See also:* store.                                    (MIL/C) [2], [85], [20]
**(2) (data management)** In a computer, one or more bytes that are used to store data.                                    (C) 610.5-1990w
**(3) (A)** The retention of data in a storage device. **(B)** The action of placing data into a storage device. **(C)** A storage device. **(D)** Any medium in which data can be retained.                                    (C) 610.10-1994

**storage access** *See:* access.

**storage allocation (1) (computers)** The assignment of sequences of data or instructions to specified blocks of storage.                                    (C) [20], [85]
**(2) (software)** An element of computer resource allocation, consisting of assigning storage areas to specific jobs and performing related procedures, such as transfer of data between main and auxiliary storage, to support the assignments made. *See also:* paging; buffer; contiguous allocation; cyclic search; virtual storage; overlay; memory compaction.                                    (C) 610.12-1990

**storage assembly (storage tubes)** An assembly of electrodes (including meshes) that contains the target together with electrodes used for control of the storage process, those that receive an output signal, and other members used for structural support. *See also:* storage tube.                                    (ED) 158-1962w

**storage battery** A battery comprised of one or more rechargeable cells of the lead-acid, nickel-cadmium, or other rechargeable electrochemical types.                                    (NESC/NEC) [86]

**storage breakpoint** *See:* data breakpoint.

**storage capacitor** A low leakage capacitor on which a data value can be stored.                                    (C) 610.10-1994w

**storage capacity (1)** The amount of data that can be contained in a storage device. *Notes:* 1. The units of capacity are bits, characters, words, etc. For example, capacity might be "32 bits," "10 000 decimal digits," "16 384 words with 10 alphanumeric characters each." 2. When comparisons are made among devices using different character sets and word lengths, it may be convenient to express the capacity in equivalent bits, which is the number obtained by taking the logarithm to the base 2 of the number of usable distinguishable states in which the storage can exist. 3. The storage (or memory) capacity of a computer usually refers only to the internal storage section.                                    (C) 162-1963w
**(2) (software)** The maximum number of items that can be held in a given storage device; usually measured in words or bytes.                                    (C) 610.12-1990
**(3)** The amount of data that can be contained in a storage device measured in binary characters, bytes, words, or other units of data.                                    (C) 610.10-1994w
**(4)** The amount of data that can be contained in a storage device.                                    (ED) 1005-1998

**storage cell (1) (electric energy) (secondary cell or accumulator)** A galvanic cell for the generation of electric energy in which the cell, after being discharged, may be restored to a fully charged condition by an electric current flowing in a direction opposite to the flow of current when the cell discharges.                                    (EEC/PE) [119]

**(2) (A)** One or more storage elements considered as a unit. **(B)** The smallest subdivision of storage into which a unit of data can be placed, retained, and with which the unit can be retrieved. *Synonym: data cell. See also:* binary cell; magnetic cell.    (C) 610.10-1994

**(3)** An elementary unit of storage (e.g., a binary cell or a decimal cell).    (ED/C) 1005-1998, [85], [20]

**storage channel** A channel that can be used to access a storage device.    (C) 610.10-1994w

**storage device (1)** A device in which data can be stored and from which it can be copied at a later time. The means of storing data may be chemical, electrical, mechanical, etc. *See also:* storage.    (C) 162-1963w

**(2)** A device into which data can be placed, in which they can be retained, and from which they can be retrieved. *See also:* store.    (C) 610.10-1994w

**storage display** *See:* storage tube display device.

**storage efficiency** The degree to which a system or component performs its designated functions with minimum consumption of available storage. *See also:* execution efficiency.    (C) 610.12-1990

**storage element (1) (storage tubes)** An area of a storage surface that retains information distinguishable from that of adjacent areas. *Note:* The storage element may be a portion of a continuous storage surface or a discrete area such as a dielectric island. *See also:* storage tube.    (ED) 158-1962w, 161-1971w

**(2)** The basic unit of a storage device, such as a sector, or a track.    (C) 610.10-1994w

**storage-element equilibrium voltage (storage tubes)** A limiting voltage toward which a storage element charges under the action of primary electron bombardment and secondary emission. At equilibrium voltage the escape ratio is unity. *Note:* Cathode equilibrium voltage, second-crossover equilibrium voltage, and gradient-established equilibrium voltage are typical examples. *See also:* charge-storage tube.    (ED) 158-1962w

**storage-element equilibrium voltage, cathode (storage tubes)** The storage element equilibrium voltage near cathode voltage and below first-crossover voltage. *See also:* charge-storage tube.    (ED) 158-1962w

**storage-element equilibrium voltage, collector** *See:* charge-storage tube.

**storage-element equilibrium voltage, gradient established (storage tubes)** The storage-element equilibrium voltage, between first- and second-crossover voltages, at which the escape ratio is unity. *See also:* charge-storage tube.    (ED) 158-1962w

**storage-element equilibrium voltage, second-crossover (storage tubes)** The storage-element equilibrium voltage at the second-crossover voltage. *See also:* charge-storage tube.    (ED) 158-1962w

**storage error** An error in which the data retrieved from storage is different from that which was originally stored in that location. *See also:* soft error; hard error; transient error.    (C) 610.10-1994w

**storageid (microprocessor operating systems parameter types)** An identifier for a block of data. The identifier is not guaranteed to be valid outside the allocating process and should not be passed between processes.    (C/MM) 855-1985s

**storage integrator** In an analog computer, a device used to store a voltage in the hold condition for future use. *See also:* electronic analog computer.    (C) 610.10-1994w, 165-1977w

**storage life (accelerometer) (gyros) (inertial sensors)** The nonoperating time interval under specified conditions, after which a device will still exhibit a specified operating life and performance. *See also:* operating life.    (AES/GYAC) 528-1994

**storage light** A light found on a storage device indicating that a parity check error has occurred on a character as it was read into storage.    (C) 610.10-1994w

**storage light-amplifier** *See:* image-storage panel.

**storage location (1)** An area in a storage device that can be explicitly and uniquely specified by means of an address.    (C) 610.5-1990w

**(2)** A location in a storage device that is uniquely specified by means of an address.    (C) 610.10-1994w

**storage medium** Any device or recording medium into which data can be stored and held until some later time, and from which the entire original data can be obtained.    (IA) [61]

**storage protection (computers)** An arrangement for preventing access to storage for either reading or writing, or both.    (C) [20]

**storage rate** The frequency with which sampled signals are recorded in crashworthy nonvolatile memory. The event recorder may store any signal less often than it samples.    (VT) 1482.1-1999

**storage, reservoir** *See:* reservoir storage.

**storage schema** In a CODASYL database, statements expressed in data storage definition language that describe storage areas, stored records, and any associated indices and access paths supporting the records and sets defined by a given schema. *See also:* CODASYL database.    (C) 610.5-1990w

**storage stack** *See:* stack.

**storage station (power operations)** A hydroelectric generating station associated with a water storage reservoir.    (PE/PSE) 858-1987s, 346-1973w

**storage structure (A)** The manner in which data structures are represented in storage. **(B)** The configuration of a database resident on computer storage devices after mapping the data elements of the logical structure of the database onto their respective physical counterparts. *Note:* The relationships and associations that provide the physical means for accessing the information stored in the database are preserved.    (C) 610.5-1990

**storage surface (storage tubes)** The surface upon which information is stored. *See also:* storage tube.    (ED) 158-1962w

**storage temperature (1) (power supply)** The range of environmental temperatures in which a power supply can be safely stored (for example, $-40\,°C$ to $+85\,°C$).    (AES/IA) [41], [12]

**(2) (light-emitting diodes)** The temperature at which the device, without any power applied, is stored.    (ED) [127]

**storage temperature range** The range of temperatures over which the Hall generators may be stored without any voltage applied, or without exceeding a specified change in performance.    (MAG) 296-1969w

**storage time** *See:* decay time; maximum retention time.

**storage tube** An electron tube into which information can be introduced and read at a later time. *Note:* The output may be an electric signal and.or a visible image corresponding to the stored information.    (ED) 161-1971w, 158-1962w

**storage tube display device** A type of cathode ray tube display device that retains a display image on its surface in the form of a pattern of electric charges. *Synonyms:* storage display; display storage tube; direct-view storage tube. *Contrast:* refresh display device.    (C) 610.10-1994w

**storage unit** The length of an addressable element of storage in the machine, measured in bits. (Every storage element has the same size.). *Note:* The storage unit is very likely to be one byte, but this is not a requirement. For example, it might be 32 or 64 bits.    (C) 1003.5-1999

**store (A)** A device into which data can be placed, in which they can be retained, and from which they can be retrieved. *Note:* This term is the equivalent of the term storage in British (U.K.) usage. **(B)** To place data into a device as in definition (A). **(C)** To retain data in a device as in definition (A).    (C) 162-1963, 610.10-1994

**(2) (A)** To place or retain data in a storage device. **(B) (software) (data management)** To copy computer instructions or data from a register to internal storage or from internal storage to external storage. *Contrast:* retrieve; load. *See also:* move; fetch.    (C) 610.12-1990, 610.5-1990

# EXHIBIT G

MODERN
DICTIONARY
of
ELECTRONICS

SIXTH EDITION

REVISED AND UPDATED

Rudolf F. Graf

Newnes
Boston  Oxford  Johannesburg  Melbourne  New Delhi  Singapore

SONOS-GVS-00012732

Newnes is an imprint of Butterworth–Heinemann

Copyright © 1997 by Butterworth–Heinemann

A member of the Reed Elsevier group

All rights reserved.
No part of this publication may be reproduced, stored in a retrieval system,
or transmitted in any form or by any means, electronic, mechanical, photocopying,
recording, or otherwise, without the prior written permission of the publisher.

Recognizing the importance of preserving what has been written,
Butterworth–Heinemann prints its books on acid-free paper whenever possible.

**Library of Congress Cataloging-in-Publication Data**
Graf, Rudolf F.
    Modern dictionary of electronics / by Rudolf F. Graf.  — 6th ed.
        p.    cm.
    Reprint. Originally published: Indianapolis, Ind. : H.W. Sams,
© 1984.
    ISBN 0-7506-9870-5
    1. Electronics—Dictionaries.
TK7804.G67   1996                        96-25894
621.381'03—dc 20                         CIP

**British Library Cataloguing-in-Publication Data**
A catalogue record for this book is available from the British Library.

The publisher offers special discounts on bulk orders of this book.
For information, please contact:
Manager of Special Sales
Butterworth–Heinemann
313 Washington Street
Newton, MA 02158–1626
Tel: 617-928-2500
Fax: 617-928-2620

For information on all Newnes electronics publications available, contact
our World Wide Web home page at: http://www.bh.com/bh

Edited by: *Charlie Buffington* and *Jack Davis*
Illustrated by: *T.R. Emrick*

Printed in the United States of America
10 9 8 7 6 5 4 3 2 1

electric signal into an image on the record sheet.

**stop signal** — The signal that transfers facsimile equipment from active to standby.

**storage** — 1. The act of storing information (*See also* Store, 1 and 2.) 2. A computer section used primarily for storing information in electrostatic, ferroelectric, magnetic, acoustic, optical, chemical, electronic, electrical, mechanical, etc., form. Such a section is sometimes called a memory, or a store, in British terminology. 3. In an oscilloscope, the ability to retain the image of an electrical event on the cathode-ray tube (crt) for further analysis after that event ceases to exist. This image retention may be for only a few seconds with variable persistence storage, or it may be for hours with bistable storage. 4. The retention of data so that the data can be obtained at a later time. 5. A computer-oriented medium in which data is retained. Primary storage is the internal storage area where the data and program instructions are retained for active use in the system—normally core storage. Auxiliary or external storage is for less active data. These may include magnetic tape, disk, or drum. 6. Synonymous with memory.

**storage access time**—In a computer, the time required to transfer information from a storage location to the local storage register or other location, where the information then becomes available for processing.

**storage allocation** — The assignment of specific sections of computer memory to blocks of data or instructions.

**storage battery** — Two or more storage cells connected in series and used as a unit.



*Storage battery.*

**storage capacity** — 1. The amount of information that a storage (memory) device can retain. It is often expressed as the number of words the device can retain (given the number of digits and the base of the standard word). In the case of comparisons among devices that use different bases and word lengths, the capaci-

ty is customarily expressed in bits. 2. The number of bits that a memory can hold; for example, a 1K semiconductor memory can store 1024 bits, a 2K semiconductor memory can store 2048 bits. Fixed memories usually contain instructions and therefore their capacity is sometimes expressed as the number of words of a certain length that they can hold. For example, "256 × 4" means that the memory can store 256 four-bit words, which makes it a 1K memory (1024 bits). The same 1K memory could be a 128 × 8 memory. 3. The number of items of data that a storage device is capable of containing. Frequently defined in terms of computer words, or by a specific number of bytes or characters.

**storage cell**—1. Also called a secondary cell. A cell which, after being discharged, can be recharged by sending an electric current through it in the opposite direction from the discharging current. 2. An elementary unit of storage (e.g., binary cell, decimal cell). 3. A cell that converts chemical energy into electrical energy by a reversible chemical reaction and that may be recharged by passing a current through it in the direction opposite to that of its discharge.

**storage counter** — A counter in which a series of current pulses charge a capacitor with each pulse raising the voltage to a higher level. A comparator circuit determines when the capacitor voltage reaches a predetermined level. Special techniques are frequently used to linearize the charging curve of the capacitor.

**storage crt**—A crt that can retain a visual image for some length of time so that it is not necessary to refresh to avoid flicker. Thus the picture can be written at a slower rate. The absence of refresh eliminates the refresh memory and reduces display-deflection and video-bandwidth requirements. The resultant system is available at a price less than that of most other systems. However, it does have deficiencies such as low luminance and contrast, and the need to rewrite an entire picture if any element is changed.

**storage cycle**—1. The periodic sequence of events that occur when information is transferred to or from a computer storage device. 2. Storing, sensing, and regeneration from parts of the storage sequence.

**storage device** — 1. A device into which data can be inserted, in which it can be retained, and from which it can be retrieved. 2. A device used for storing data within a computer system, e.g., core storage, magnetic-disk unit, magnetic-tape unit, magnetic-drum unit, etc.

**storage element** — 1. An area which retains information distinguishable from that of adjacent areas on the storage area of charge-storage tubes. 2. The smallest

SONOS-GVS-00012734

part of a digital-computer storage facility used for storage of a single bit.

**storage integrator** — In an analog computer, an integrator used to store a voltage in the hold condition for future use while the rest of the computer assumes another computer control state.

**storage key** — In a computer, an indicator that is associated with a storage block or blocks and that requires tasks to have a matching protection key in order to use the blocks.

**storage laser** — Any laser which stores unusually high energy prior to discharge. For example, a storage diode laser is a laser in which some carriers are electrically excited for a time longer than the lasing period.

**storage life** — 1. The minimum length of time over which a device, system, or transducer can be exposed to specified environmental storage conditions without changing the performance beyond a specified tolerance. 2. The period during which a battery can be stored and remain suitable for use. Also called shelf life. 3. The length of time an item can be stored under specified conditions and still meet specified requirements.

**storage location** — 1. A computer storage position that holds one machine word and usually has a specific address. 2. A position in storage where a character, byte, or word may be stored.

**storage medium** — Any recording device or medium into which data can be copied and held until some later date, and from which the entire original data can be obtained.

**storage oscilloscope** — 1. An instrument that has the ability to store a crt display in order that it may be observed for any required time. This stored display may be instantly erased to make way for storage of a later event. 2. An oscilloscope used as the output device of analog and digital computers or in the analysis of nonperiodic events and the monitoring of slow signals.

**storage print** — In computers, a utility program that causes the requested core image, core memory, or drum locations to be recorded in either absolute or symbolic form on either the line printer or the delayed printer tape.

**storage protection** — In a computer, an arrangement by which access to storage is prevented for reading, writing, or both. Also called memory protection.

**storage register** — A collection of electronic circuits which allows data (usually one or more computer words) to be stored until needed.

**storage surface** — The part of an electrostatic storage tube on which storage of information takes place.

**storage temperature** — The temperature of the medium, immediately adjacent to the device, at which the device, without power applied, may be stored indefinitely without deterioration.

**storage time** — 1. The time during which the output current or voltage of a pulse is falling from maximum to zero after the input current or voltage has been removed. 2. An increase in the time needed to turn off a transistor that has been driven into saturation. It results from the fact that a transistor in heavy conduction has many excess charge carriers moving in the collector region. When the base signal is changed to the cutoff level, collector current continues until all the excess charge carriers have been removed from the collector region.

**storage tube** — 1. An electron tube into which information can be stored and later read out, usually a cathode ray tube with a storage screen which will retain charges impressed on it and which can control an electron beam in some way, allowing charges to be read out. 2. A crt that stores images on a separate storage screen behind the viewing screen in the tube. Images remain on the viewing screen until the storage screen is erased. Since a storage tube does not have to be refreshed, it can display an extremely large amount of data without flicker. 3. A cathode-ray tube combined with an electrostatic storage unit that is used to introduce, store and retrieve information translated into electric charge form. 4. A crt which retains an image for a considerable period without redrawing.

**store** — 1. To retain information in a device from which the information can later be withdrawn. 2. To introduce information into the device in (1) above. 3. A British synonym for storage. (See Storage, 2).

**store-and-forward** — 1. Process of message handling used in a message-switching system. 2. Communications system in which messages received at intermediate routing points are recorded



*Storage oscilloscope.*

SONOS-GVS-00012735

# EXHIBIT H

# SECOND EDITION

 RANDOM HOUSE

# PERSONAL COMPUTER DICTIONARY

## PHILIP E. MARGOLIS

- Easy to Read
- More than 1,900 Terms Clearly Explained
- Over 400 New Entries, Plus Major Revisions
- More than 4,000 Cross References
- Clear, Clean Illustrations

SONOS-GVS-00012740

Copyright © 1996 by Philip E. Margolis

All rights reserved under International and Pan-American Copyright Conventions.
Published in the United States by Random House, Inc., New York, and simultaneously
in Canada by Random House of Canada, Limited.

The first edition of this book was published by Random House in 1991.

Library of Congress Cataloging-in-Publication Data

Margolis, Philip E.
        Random House personal computer dictionary/
Philip E. Margolis .—2nd ed.
            p.  cm.
        ISBN 0—679—76424—0
        1.Microcomputers—Dictionaries.    I. Title.
QA76.15.M37  1996
004.16'03—dc20
                ·95-45508
                CIP

A number of entered words in which we have reason to believe trademark, service mark or other
proprietary rights may exist have been designated as such by use of initial capitalization.
However, no attempt has been made to designate as trademarks or service marks all personal
computer words or terms in which proprietary rights might exist. The inclusion, exclusion or
definition of a word or term is not intended to affect, or to express any judgment on, the validity
or legal status of any proprietary rights which may be claimed in that word or term.

Book design © REM Studio, Inc.
Illustrations by Jared Schneidman Design Inc.
Desktop publishing by Philip E. Margolis

Typeset and printed in the United States of America
9 8 7 6 5 4 3 2

SONOS-GVS-00012741

ST-506 is sometimes referred to as MFM, which is the most prevalent encoding scheme used on ST-506 disk drives. ST-506 also supports the RLL encoding format.

➡ See also *hard disk; IDE interface; interface; MFM; RLL; SCSI.*

**stop bit:** In asynchronous communications, a bit that indicates that a byte has just been transmitted. Every byte of data is preceded by a start bit and followed by a stop bit.

➡ See also *asynchronous; bit; byte.*

**storage:** The capacity of a device to hold and retain data.

➡ See also *mass storage.*

**storage device:** A device capable of storing data. The term usually refers to mass storage devices, such as disk and tape drives.

➡ See also *disk drive; mass storage; tape drive.*

**store:** To copy data from a CPU to memory, or from memory to a mass storage device.

**streamer:** Same as *tape.*

**strikeout:** A method of highlighting text by drawing a horizontal line through the characters. ~~This text, for example, has strikeout formatting.~~
Many word processors support edit modes in which deleted sections are displayed with strikeouts. This is particularly effective in workgroups where two or more people are editing the same document.

Strikeout is also called *strikethrough.*

➡ See also *workgroup computing.*

463

SONOS-GVS-00012742

**map file:** See under *map*.

**MAPI:** Abbreviation of *Messaging Application Programming Interface*, a system built into Microsoft Windows that enables different e-mail applications to work together to distribute mail. As long as both applications are *MAPI-enabled*, they can share mail messages with each other.

➡ See also *API*; *e-mail*.

**margins:** In word processing, the strips of white space around the edge of the paper. Most word processors allow you to specify the widths of margins. The wider the left and right margins, the narrower the page. The wider the top and bottom margins, the shorter the page.

If your word processor performs *word wrap*, it will automatically adjust the length of the lines when you change the widths of the margins.

➡ See also *word processing*; *word wrap*.

**mask:** A filter that selectively includes or excludes certain values. For example, when defining a database field, it is possible to assign a mask that indicates what sort of value the field should hold. Values that do not conform to the mask cannot be entered.

➡ See also *field*.

**mass storage:** Refers to various techniques and devices for storing large amounts of data. The earliest storage devices were punched paper cards, which were used as early as 1804 to control silk-weaving looms. Modern mass storage devices include all types of disk drives and tape drives. Mass storage is distinct from *memory*, which refers to temporary storage areas within the computer. Unlike main memory, mass storage devices retain data even when the computer is turned off.

The main types of mass storage are:

**floppy disks:** Relatively slow and have a small capacity, but they are portable, inexpensive, and reliable.

SONOS-GVS-00012743

# EXHIBIT I

# IEEE 100
# The Authoritative Dictionary of
# IEEE Standards Terms

### Seventh Edition



Published by
Standards Information Network
IEEE Press

SONOS-GVS-00012832

Case 3:20-cv-03845-EMC   Document 70-1   Filed 04/05/21   Page 219 of 220

Trademarks and disclaimers

*IEEE believes the information in this publication is accurate as of its publication date; such information is subject to change without notice. IEEE is not responsible for any inadvertent errors.*

*Other tradenames and trademarks in this document are those of their respective owners.*

*The Institute of Electrical and Electronics Engineering, Inc.*
*3 Park Avenue, New York, NY, 10016-5997, USA*

*Copyright © 2000 by the Institute of Electrical and Electronics Engineers, Inc. All rights reserved. Published December 2000. Printed in the United States of America.*

*No part of this publication may be reproduced in any form, in an electronic retrieval system or otherwise, without the prior written permission of the publisher.*

*To order IEEE Press publications, call 1-800-678-IEEE.*

*Print: ISBN 0-7381-2601-2          SP1122*

See other standards and standards-related product listings at: http://standards.ieee.org/

*The publisher believes that the information and guidance given in this work serve as an enhancement to users, all parties must rely upon their own skill and judgement when making use of it. The publisher does not assume any liability to anyone for any loss or damage caused by any error or omission in the work, whether such error or omission is the result of negligence or any other cause. Any and all such liability is disclaimed.*

*This work is published with the understanding that the IEEE is supplying information through this publication, not attempting to render engineering or other professional services. If such services are required, the assistance of an appropriate professional should be sought. The IEEE is not responsible for the statements and opinions advanced in this publication.*

Library of Congress Cataloging-in-Publication Data

IEEE 100 : the authoritative dictionary of IEEE standards terms.—7th ed.
    p. cm.
  ISBN 0-7381-2601-2 (paperback : alk. paper)
    1. Electric engineering—Dictionaries. 2. Electronics—Dictionaries. 3. Computer
engineering—Dictionaries. 4. Electric engineering—Acronyms. 5. Electronics—Acronyms.
6. Computer engineering—Acronyms. I. Institute of Electrical and Electronics Engineers.

TK9 .I28 2000
621.3'03—dc21                                                    00-050601

SONOS-GVS-00012833

same terminals of entry. In determining the components, the reference terminals for voltage measurement are taken as the neutral terminal of entry, if one exists, otherwise as the true neutral point. The vector power is also the (vector) sum of the vector powers for the individual terminals of entry. The vector power for each terminal of entry is determined by considering each phase conductor and the common reference point as a single-phase circuit, as described for distortion power. The sign given to the distortion power in determining the vector power for each single-phase circuit is the same as that of the total active power. The magnitude of the vector power is the apparent power. If the voltages have the same waveform as the corresponding currents, the magnitude of the vector power is equal to the amplitude of the phasor power. Vector power is expressed in voltamperes when the voltages are in volts and the currents in amperes. *See also:* network analysis.



**power vector**

(Std100) 270-1966

**power winding (saturable reactor)** A winding to which is supplied the power to be controlled. Commonly the functions of the output and power windings are accomplished by the same winding, which is then termed the output winding. *See also:* magnetic amplifier. (PE/EEC) [119]

**Poynting vector (1)** If there is a flow of electromagnetic energy into or out of a closed region, the rate of flow of this energy is, at any instant, proportional to the surface integral of the vector product of the electric field strength and the magnetizing force. This vector product is called Poynting's vector. If the electric field strength is E and the magnetizing force is H, then Poynting's vector is given by

$$U = E \times H \text{ and } U = E \times H/4\pi$$

in rationalized and unrationalized systems, respectively. Poynting's vector is often assumed to be the local surface density of energy flow per unit time. (Std100) 270-1966w **(2)** *See also:* time-averaged Poynting vector; instantaneous Poynting vector. (AP/PROP) 211-1997

**Poynting vector, instantaneous [$\overline{P}(t,\overline{r})$]** *See:* instantaneous Poynting vector.

**Poynting vector, time-averaged** *See:* time-averaged Poynting vector.

**PPCSN** *See:* private packet/frame and circuit switching network.

***p*-percent disruptive discharge voltage ($V_p$)** The prospective value of the test voltage that has a *p*-percent probability of producing a disruptive discharge. (PE/PSIM) 4-1995

**PPI** *See:* plan-position indicator.

***p-p* junction (semiconductor)** A region of transition between two regions having different properties in *p*-type semiconducting material. *See also:* semiconductor device. (PE/EEC) [119]

**ppm** *See:* parts per million.

**PPM** *See:* periodic permanent-magnet focusing; pulse position modulation.

**PPMV** *See:* parts per million by volume.

**PPMW** *See:* parts per million by weight.

**PPS** *See:* preferred power supply.

**PPSN** *See:* private packet/frame switching network.

**PR** *See:* physical record.

**PRA** *See:* pendulous reference axis.

**practical reference pulse waveform (pulse measurement)** A reference pulse waveform which is derived from a pulse which is produced by a device or apparatus. (IM/WM&A) 181-1977w

**practical stability** *See:* finite-time stability.

**practice** Recommended approach, employed to prescribe a disciplined, uniform approach to the software life cycle. (C/SE) 730.1-1995

**practices (software quality assurance)** Requirements employed to prescribe a disciplined uniform approach to the software development process. *See also:* conventions; standards. (C) 610.12-1990

**pragma** A generic term used to define a construct with no predefined language semantics that influences how a synthesis tool will synthesize VHDL code into an equivalent hardware representation. (C/DA) 1076.6-1999

**preallocation** The reservation of resources in a system for a particular use. Preallocation does not imply that the resources are immediately allocated to that use, but merely indicates that they are guaranteed to be available in bounded time when needed. (C/PA) 9945-1-1996

**preamble (1)** In networking, a sequence of bits at the start of each new transmission to allow synchronization of clocks and other physical layer circuitry at other stations. *See also:* postamble; abnormal preamble. (C) 610.7-1995 **(2)** A sequence of bits recorded at the beginning of each block on a magnetic tape for the purpose of synchronization. *Contrast:* postamble. (C) 610.10-1994w

**preamble breakpoint** *See:* prolog breakpoint.

**preamplifier (1)** An amplifier connected to a low-level signal source to present suitable input and output impedances and provide gain so that the signal may be further processed without appreciable degradation in the signal-to-noise ratio. *Notes:* 1. A preamplifier may include provision for equalizing and/or mixing. 2. Further processing frequently includes further amplification in a main amplifier. *See also:* amplifier. (SP) 151-1965w **(2)** The input section of an amplifier chain, usually located as close to the detector element as possible. (NPS) 325-1996

**preamplifier, pulsed optical feedback** *See:* pulsed optical feedback preamplifier.

**pre-arbitrated (PA) access function** The *access control function* in this part of ISO/IEC 8802 that uses assigned *offsets* in *Pre-Arbitrated (PA) slots* for the transfer of *isochronous service octets*. (LM/C) 8802-6-1994

**pre-arbitrated (PA) segment** A multiuser *segment* transferred using *Pre-Arbitrated Access (PA) functions*. The payload of the *PA segment* contains *isochronous service octets* from zero or more *Isochronous Service Users (ISUs)*. (LM/C) 8802-6-1994

**pre-arbitrated (PA) slot** A *slot* that is dedicated by the *Head of Bus function* for transfer of *isochronous service octets* in the payload of a *PA segment*. (LM/C) 8802-6-1994

**pre-arcing time** *See:* melting time.

**preassigned multiple access (communication satellite)** A method of providing multiple access in which the satellite channels are preassigned at both ends of the path. (COM) [19]

**precedence call (telephone switching systems)** A call on which the calling party has elected to use one of several levels of priority available to him. (COM) 312-1977w

**precedented system** A system for which design examples exist within its class, so as to provide guidance for establishing the design architecture, engineering and technical plans, specifications, or low risk alternatives. (C/SE) 1220-1998

SONOS-GVS-00012834