1  QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
2  Charles K. Verhoeven (Bar No. 170151)
   charlesverhoeven@quinnemanuel.com
3  50 California Street, 22nd Floor
   San Francisco, California 94111-4788
4  Telephone: (415) 875-6600
   Facsimile: (415) 875-6700
5

6  David A. Nelson (*pro hac vice*)
   davenelson@quinnemanuel.com
7  191 N. Wacker Drive, Suite 2700
   Chicago, Illinois 60606
8  Telephone:    (312) 705-7400
   Facsimile:    (312) 705-7401
9

10  *Attorneys for GOOGLE LLC*

11

12              **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
13               **SAN FRANCISCO DIVISION**

14  GOOGLE LLC,                          Civil Action No. 3:20-CV-03845-EMC

15                      Plaintiff,       **GOOGLE'S REPLY**
                                         **CLAIM CONSTRUCTION BRIEF**
16          v.

17                                       Judge: Hon. Edward M. Chen
    SONOS, INC.,                         JURY TRIAL DEMANDED
18

19                      Defendant.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

A.   "DOMAIN INFORMATION" ('187: CLAIMS 1, 3, 4, AND 10).....................................1

B.   "LOGIC CIRCUITRY FOR PROVIDING THE DOMAIN INFORMATION TO A KEY ISSUER" ('187: CLAIM 10).....................................................................................1

    1.   The term "logic circuitry" does not invoke § 112, ¶6. ...........................................1

    2.   Sonos misconstrues the function of the claimed "logic circuit." ...........................3

    3.   Even if § 112 ¶6 applies, there is adequate corresponding structure. ....................4

C.   "PRIVATE KEY" ('187: CLAIMS 1 AND 10)..........................................................5

D.   "ESTIMATED NOISE LEVEL WHEN THERE IS NO DESIRED INPUT RECEIVED AT THE INPUT OF THE COMMUNICATION DEVICE" ('206: CLAIMS 3 & 18) ...........................................................................................................7

E.   "COMBINED SEARCH RESULTS SET" ('375: CLAIMS 1-11 AND 13-20) ................8

F.   "STORED [FOR THE USER] IN A CLIENT-SIDE STORAGE OF A CLIENT DEVICE" ('375: CLAIMS 1 & 17-20)......................................................................10

G.   PREAMBLES OF CLAIMS 1 and 15 ('586: CLAIMS 1-5, 7-8, 15-16, 18, & 20).........11

H.   "RESET ELEMENT" ('586: CLAIMS 1-5, 7-12, 14-16, 18, AND 20)..........................13

I.   "PREAMBLE PORTION" ('586: CLAIMS, 1-5, 7-12, 14-16, 18, AND 20) .................15

CONCLUSION ......................................................................................................................15

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.,*
  340 F.3d 1298 (Fed. Cir. 2003) ........................................................................................ 7

*Apex Inc. v. Raritan Computer, Inc.*
  325 F.3d 1364 (Fed. Cir. 2003) ........................................................................................ 2

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
  598 F.3d 1336 (Fed. Cir. 2010) ...................................................................................... 12

*Audionics Sys., Inc. v. AAMP of Fla., Inc.,*
  No. 12-cv-10763, 2013 WL 9602634 (C.D. Cal. Sept. 12, 2013)................................... 11

*BASF Corp. v. Johnson Matthey Inc.,*
  875 F.3d 1360 (Fed. Cir. 2017) ........................................................................................ 7

*Bio-Rad Labs, Inc. v. 10X Genomics Inc.,*
  967 F.3d 1353 (Fed. Cir. 2020) ................................................................................. 12, 13

*Dell Inc. v. Acceleron, LLC,*
  818 F.3d 1293 (Fed. Cir. 2016) ........................................................................................ 8

*Edward Lifesciences LLC v. Cook Inc.,*
  582 F.3d 1322 (Fed. Cir. 2009) ........................................................................................ 9

*E-Pass Technologies, Inc. v. 3Com Corp.,*
  343 F.3d 1364 (Fed. Cir. 2003) ........................................................................................ 5

*Ethicon LLC v. Intuitive Surgical, Inc.,*
  --- Fed. App'x. ---, 2021 WL 960766 (Fed. Cir. Mar. 15, 2021) ..................................... 10

*Immunex Corp. v. Sanofi-Aventis U.S. LLC,*
  977 F.3d 1212 (Fed. Cir. 2020) ...................................................................................... 15

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004) ...................................................................................... 14

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
  572 U.S. 898 (2014) .......................................................................................................... 7

*Northrop Grumman Corp. v. Intel Corp.,*
  325 F.3d 1346 (Fed. Cir. 2003) ........................................................................................ 5

*Personalized Media Commc'ns, LLC v. Int'l Trade Com'n,*
  161 F.3d 696 (Fed. Cir. 1998) .......................................................................................... 7

*Realtime Data, LLC v. Rackspace US, Inc.*
  C.A. 6:16-CV-00961, 2017 WL 2590195 (E.D. Tex. June 14, 2017)................................ 3

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013) ............................................................................................. 9

*Shoes by Firebug LLC v. Stride Rite Children's Grp, LLC*,
    962 F.3d 1362 (Fed. Cir. 2020) ........................................................................................... 13

*SIMO Holdings Inc. v. HongKong uCloudlink Network Tech. Ltd.*,
    983 F.3d 1367 (Fed. Cir. 2021) ........................................................................................... 12

*TomTom, Inc. v. Adolph*,
    790 F.3d 1315 (Fed. Cir. 2015) .................................................................................... 11, 12

*Vita Zahn-Fabrik H. Rauter GMBH & Co. KG v. Dentsply Int'l, Inc.*,
    No. 04-729, 2005 WL 6220491 (C.D. Cal. May 4, 2005) ...................................................... 8

*Woods v. DeAngelo Marine Exhaust, Inc.*,
    692 F.3d 1272 (Fed. Cir. 2012) ............................................................................................. 6

**<u>Statutes</u>**

35 U.S.C. § 101 ................................................................................................................................ 9

1    Google respectfully submits this Reply Brief in support of its claim construction positions.

2    **A.    "DOMAIN INFORMATION" ('187: CLAIMS 1, 3, 4, AND 10)**

3    Sonos argues that Google's proposed construction for "domain information" is redundant.

4    Yet, Sonos confirms that the "domain information" recited in the "receiving" step corresponds to

5    the domain of devices which share rights associated with a common account, as provided by

6    Google's construction, which therefore does not deprive "domain information" of an independent

7    meaning.   Moreover, Sonos' assertion that "the claimed 'domain information' is capable of

8    uniquely identifying the domain" (Dkt. 70 at 2) is inconsistent with the '187 Patent.   For example,

9    the patent describes a private domain password or credit card number as examples of "domain

10   information," but does not say they must be unique—e.g., two domains can share the same credit

11   card or use the same password (whether purposeful or not).   To the extent a private key is unique

12   to a domain, the patent does not require that the domain information be the root of this uniqueness.

13   Sonos' effort to import this requirement into the plain meaning of the term is clearly incorrect.

14   **B.    "LOGIC CIRCUITRY FOR PROVIDING THE DOMAIN INFORMATION**
15   **TO A KEY ISSUER" ('187: CLAIM 10)**

16   Sonos' argument that "logic circuitry" invokes § 112, ¶6 mischaracterizes applicable case

17   law, the claim language, and the '187 Patent as a whole.   "Logic circuitry" connotes structure and

18   does not invoke § 112, ¶6.   Yet even if it does, the specification discloses adequate structure.

19   **1.    The term "logic circuitry" does not invoke § 112, ¶6.**

20   Sonos asserts that the term "logic circuitry" does not disclose structure because the

21   specification "establishes" that this term is intended to be "broader than" a processor or

22   microprocessor through its use of the term "comprises."   Dkt. 70 at 3.   Sonos is incorrect.

23   "Logic circuitry" does not refer to a "broad class of undefined computing devices" that

24   includes a microprocessor **and** "other 'devices'." *Id*. at 4.   Rather, the '187 specification

25   identifies that in the preferred embodiment "logic circuitry" is a microprocessor, providing two

26   examples—the MC683238 DragonBall and TI OMAP1510.   '187 Patent at 5:61-64.   This

27   disclosure of a microprocessor, and examples thereof, illustrates to a POSITA the structure

28   associated with "logic circuitry" for performing the claimed function of "providing [] domain

-1-

information to a key issuer."[1]   Furthermore, the term "circuit" is not synonymous with "mechanism," "element," or "device," and is not a "nonce" word.   Dkt. 70 at 4.   Rather, the cases cited in Google's opening brief confirm that courts have consistently found that the term "circuit" connotes structure, in a variety of applicable contexts.   Dkt. 67 at 6-7.   In arguing otherwise, Sonos misconstrues the '187 specification and applicable case law.

Sonos attempts to distinguish *Apex Inc. v. Raritan Computer, Inc.* by arguing that that the claims at issue in that case "did not use 'circuitry' to refer to a generic class of computing devices" but rather "used 'circuitry' in an ordinary sense—to refer to 'the combination of a number of electrical devices and conductors that, when interconnected to form a conducting path, fulfill some desired function."   Dkt. 70 at 4 (quoting *Apex*, 325 F.3d 1364, 1373 (Fed. Cir. 2003)).   It is not clear what distinction Sonos is attempting to make, as a "microprocessor" plainly fits this description of 'circuitry' in the "ordinary sense."[2]   Further, Sonos ignores the finding in *Apex* that "programmed logic circuit," which is nearly identical to "logic circuitry," was found not to invoke § 112, ¶6.   Specifically, the Federal Circuit in *Apex* stated that "[w]hile we do not find it necessary to hold that the term 'circuit' by itself always connotes sufficient structure, the term 'circuit' ***with an appropriate identifier such as*** "interface," "programming" and "***logic***," certainly identifies some structural meaning to one of ordinary skill in the art."   *Apex*, 325 F.3d at 1373 (emphases added).   The Court also found that, because the various circuit limitation embodiments did not use the terms "in a manner clearly inconsistent with the ordinary meaning," the definition given those terms should not deviate from this ordinary meaning.   *Id.*   The same is the case here.

In addition to misconstruing or otherwise downplaying the Federal Circuit's holdings in *Apex* and *Linear Tech.*, Sonos simply ignores other cases cited by Google.   In particular, Sonos

---

[1] Sonos' "second device" arguments are similarly misplaced.   Dkt. 70 at 3-4.   The "second device" is "user equipment" being added to a domain previously created by a "first device."   As such, the "second device" includes its own "logic circuitry" for providing of domain information to a key issuer.   '187 Patent at 6:38-50.   The patent's description that the second device can be configured in "well known manners with processors, memories, instruction sets, and the like" (*id.* at 4:5-11) merely confirms that its logic circuitry would be known to a person of skill.

[2] Sonos' example of a rudimentary circuit comprised of four logic gates (Dkt. 70 at 5) does not limit the types of structure that constitute "logic circuitry," or otherwise exclude microprocessors.

contends that Google's expert, Dr. Sherman, "concludes that 'logic circuitry' refers to any combination of logic gates, such as would be in a general-purpose microcontroller" (Dkt. 70 at 5), but ignores the fact that courts have rejected the same argument.   For example, in *Realtime Data, LLC v. Rackspace US, Inc.*, the court stated:

> According to Defendants, Dr. Zeger "merely suggest[s] some unspecified arrangement of 'electronic components,'" in "stark contrast" with *Linear Technology*, where the Federal Circuit found that a person would understand the "structural arrangement of circuit components."   This argument is unpersuasive. As the Court noted in *Core Wireless*, "[t]hough Defendants attempt to distinguish *Linear Tech.* based on the extent of the circuit descriptions in the stated function, *Linear Tech.* first noted that the general term [circuit] connotes structure." Further, nowhere in *Linear Technology* does the Federal Circuit hold that a patent claim or specification must lay out in detail the *exact* potential circuit structures that would satisfy the claims.

C.A. 6:16-CV-00961, 2017 WL 2590195 at *14 (E.D. Tex. June 14, 2017) (citations omitted). Here, even if the specification does not define the precise layout of the "logic circuitry," the use of the term "circuitry" (further narrowed by "logic") and disclosure of a preferred embodiment microprocessor (with particular examples) certainly connote structure to a person of skill.

And Sonos fails to cite even a single case—either pre- or post-*Williamson*— in which a court has construed the term "logic circuitry" (or "circuit") to invoke § 112, ¶6, which is consistent with the fact that "circuitry" (or "logic circuitry") is understood to connote structure.

### 2.        Sonos misconstrues the function of the claimed "logic circuit."

Sonos incorrectly defines the function of "providing domain information to a key issuer" as including the steps of "identifying an appropriate key issuer, identifying a suitable transmission means, contacting the recipient, [and] exchanging unit certificates to establish a communication channel."   Dkt. 70 at 7-8.   The plain meaning of "providing" does not require any of these additional functions.   At most, these additional steps are precursors to the "providing" or "send[ing]" of domain information to a key issuer.[3]   '187 Patent at 6:32-40.   Because Sonos' argument that the claimed "logic circuit" requires "special programming" is premised on

---

[3] By using the transitional term "comprising" in claim 10, Applicant confirmed that their claim is open ended.   Thus, the fact that the "logic circuit" "provid[es] the domain information" does not preclude it from performing additional, unclaimed functions, such as those identified by Sonos. However, these additional functions should not be read into the claim.

importing these additional, unclaimed functions into the language of the claim, its argument fails when "providing" is given its proper meaning—*i.e.*, sending.

### 3.   Even if § 112 ¶6 applies, there is adequate corresponding structure.

Even if the Court were to find that "logic circuit" invokes § 112, ¶6, the patent's description of a microprocessor (and its basic output functionality) is adequate disclosure of corresponding structure for "providing [] domain information."   *See* Dkt. 69-5 (Sherman Decl.) at ¶¶ 38-40.   Sonos offers no evidence that a microprocessor cannot perform the function of "providing" (*i.e.*, "send[ing]") data (*e.g.*, domain information) to another device (*e.g.*, a key issuer).   Instead, Sonos attempts to import additional unclaimed functions to argue indefiniteness. However, even accepting Sonos' over-inclusive interpretation of the recited function, the patent still discloses an algorithm.   As Sonos itself states, "according to the specification, providing domain information to a key issuer requires at least identifying an appropriate key issuer, identifying a suitable transmission means, contacting the recipient, exchanging unit certificates to establish a communication channel, and sending the information.   Dkt. 70 at 7-8 (citing '187 Patent at 6:32-40).   This is undoubtedly an algorithm, or series of steps, that would be carried out by a microprocessor in "providing [] domain information."

Sonos argues this algorithm is "incomplete" because "[t]he second device follows the same protocol with key issuer 105 as the first device did when establishing the domain" without disclosing that "same protocol." *Id.* at 8-9.   This argument is nonsensical.   Step 309 (of the preferred embodiment) describes that the "second device" uses a network link to contact a key issuer. '187 Patent at 6:32-34.   The next sentence of the patent refers to use of the "same protocol" in reference to step 311, which states the "second device communicates its unit certificate 207 to key issuer 105 and may use its unit private key 208 to respond to a challenge." '187 Patent at 6:34-40.   Step 311 uses the "same protocol"—*i.e.,* a challenge-response protocol involving a unit certificate—previously described in relation to the "first device."   *See* '187 Patent at 3:41-44; *see also id.* at 4:13-30, 5:41-50.   Thus, both the "first device" and the "second device" can authenticate to the key issuer using the same secure authentication protocol (*i.e.*, the "same protocol").   Sonos' attempt to argue otherwise incorporate some additional, undisclosed protocol

into the patent (and claim 10) should be rejected.

### C.   "PRIVATE KEY" ('187: CLAIMS 1 AND 10)

Sonos' currently proposed construction for "private key"[4] seeks to limit the '187 Patent claims to a preferred embodiment, which is improper.  *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1354-56 (Fed. Cir. 2003).   Ignoring the well-known prohibition on limiting claims to a preferred embodiment, Sonos relies heavily on the '187 Patent's description of how a "private key" is used in *one specific context*—Public-Key Cryptography—and frames it as a universal definition for "private key."   In doing so, Sonos ignores the fact that the '187 Patent clearly identifies this as a description of "the DRM system in accordance with the preferred embodiment of the present invention."  '187 Patent at 2:42-50.   As such, a person of ordinary skill would understand this description of "private key" to be specifically directed (and, thus, limited) to the preferred embodiment's use of "Public-Key Cryptography."   Dkt. 69-13 (3/8/2021 Sherman Dep.) at 54:3-55:24.   Nowhere are the '187 Patent claims defined as being limited to Public-Key Cryptography.   Thus, there is no basis for limiting "private key" as Sonos suggests.

The parties' experts agree that "private key[s]" are not limited to Public-Key Cryptography, and can be used in cryptographic algorithms that do not require any use of encryption or decryption.   *See id.* at 28:19-31:3, 45:19-46:12; Dkt. 69-14 (3/9/2021 Wicker Dep.) at 14:7-15, 28:5-19, 35:15-25.   Thus, the ordinary meaning of "private key" does not restrict its use to encryption or decryption.   And while the '187 Patent describes a "private key" in the context of Public-Key Cryptography, the patent contains no indication the inventors intended this to redefine "private key" in a way that differs from the ordinary meaning.   Sonos' attempt to mischaracterize the description of a preferred embodiment as a disclaimer of claim scope should be rejected.   *E-Pass Technologies, Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003).

In an effort to buttress its argument, Sonos incorrectly describes the exemplary alternative

---

[4]  Google's opening brief addresses a compromise construction offered by Sonos concerning its interpretation of "private key."  Dkt. 67 at 10.  Sonos' responsive brief makes clear that it is abandoning that convoluted compromise proposal and reverting to the construction it originally presented in the JCCS, which is also flawed for the reasons described herein.

1   embodiments disclosed in the '187 Patent as a "closed set."   Dkt. 70 at 10.   In describing that the

2   invention is not limited to the Public-Key Cryptography embodiment, the patent states that

3   persons of ordinary skill would know that "alternate methods of securing the DRM system are

4   possible using symmetric key techniques or broadcast key encryption techniques."   '187 Patent at

5   7:42-58.   Again, nowhere does the patent provide an indication that these two examples are the

6   only "alternate methods of securing the DRM system."   In essence, Sonos seeks to impose a

7   requirement that, in order for the term "private key" to be given its ordinary meaning, the patent

8   specification must disclose *every single* possible embodiment associated with the term, and that

9   undisclosed embodiments should be excluded from the scope of the claims.   This is contrary to

10   well-established law.   *See, e.g.*, *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1283

11   (Fed. Cir. 2012) ("The specification need not describe every embodiment of the claimed invention,

12   and the claims should not be confined to the disclosed embodiments—even when the specification

13   discloses only one embodiment[.]") (internal citations omitted).

14          Lastly, Sonos attempts to rely on the claims' requirement that the "private key" be used in

15   "accessing the protected digital content within the digital-rights management system,"[5] again

16   arguing that the term "private key" should be limited based on the description of a "DRM private

17   key" in the preferred embodiment as a key used to decrypt a "content encryption key."   Dkt. 70 at

18   10-11.   There is no indication or requirement in the specification that "accessing" protected

19   digital content must occur via decryption.   In fact, as discussed by Dr. Sherman, while decryption

20   is one way of "access[ing]" protected digital content, private keys can be used to access digital

21   content via means other than decryption.   *See* Dkt. 69-13 (3/8/2021 Sherman Dep.) at 48:11-24,

22   50:19-51:13.   Sonos has identified nothing in the '187 Patent indicating that a "private key" must

23   be used to decrypt data.   In fact, Sonos ignores the patent's description of a "unit private key,"

24   which its expert admitted is not described as being used for decryption or encryption, though he

25   simply assumed that to be the case because it uses the term "private key."   Dkt. 70 at 11-12.   The

26   patent's description of a "unit private key" without restricting use of such a private key to

27   ─────────────────────
    [5] Sonos did not propose "accessing the protected digital content within the digital-rights
28   management system" as a term for construction.

1  decryption (or encryption) confirms that "private key" should not be limited as Sonos proposes.

2  *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308-09 (Fed. Cir.

3  2003) ("[V]aried use of a disputed term in the written description attests to the breadth of a term

4  rather than providing a limiting definition.").

5      **D.    "ESTIMATED NOISE LEVEL WHEN THERE IS NO DESIRED INPUT
        RECEIVED AT THE INPUT OF THE COMMUNICATION DEVICE" ('206:
6      CLAIMS 3 & 18)**

7          Sonos fails to show by clear and convincing evidence that this term is indefinite for failing

8  to inform, with reasonable certainty, persons skilled in the art of the scope of the invention.

9  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014); *BASF Corp. v. Johnson*

10 *Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).   Sonos' argument amounts to nothing more

11 than speculation that a POSITA would be unable to discern with reasonable certainty what terms

12 like "estimated," "when," and "desired input" mean in the context of the '206 Patent.   This

13 argument should be rejected.

14          First, Sonos argues that "the patent does not explain what it means for a noise level to be

15 'estimated'" (Dkt. 70 at 13), positing "what is the estimate based on and how is it calculated?"

16 *Id*.   Sonos' actual argument is that a POSITA would not know how to *calculate* the estimate, as

17 compared to understanding the *meaning* of "estimate."   This is not a question of indefiniteness,

18 and therefore not a question for claim construction.   *Personalized Media Commc'ns, LLC v. Int'l*

19 *Trade Com'n*, 161 F.3d 696, 705-06 (Fed. Cir. 1998) (rejecting argument that a patent's failure to

20 describe how to make the claimed "digital detector" rendered the claim indefinite where the

21 meaning of "digital detector" was clear).

22          Second, Sonos somehow argues that the term "when" is unclear, presenting what it

23 apparently considers to be two alternatives for determining "when" the estimated background

24 noise level is calculated.   Yet Sonos provides no support, either in the patent specification or

25 expert testimony, for its hypothetical scenarios.   For example, Sonos' second alternative interprets

26 the claim to mean that "when no desired input is received, an estimate of the noise level is

27 calculated, and at a later point, the background noise is based on this estimate."   Dkt. 70 at 13.

28 Nowhere is this alternative disclosed in the '206 Patent.   The Court should reject Sonos' attempt

to muddy the clear meaning of the claim—the estimated noise level is based on the amount of noise measured when there is no desired input received, consistent with Google's proposed construction.

Finally, with respect to the "desired input" aspect of this term, Sonos ignores the '206 Patent's description of a signal that includes "a desired signal portion and an undesired signal portion," and identifies these respective portions as "speech" and "noise." '206 Patent at 5:9-12. The meaning of "desired input" is clear based on this description and other portions of the specification, as described in Google's opening brief. *See* Dkt. 67 at 13-14.

**E.     "COMBINED SEARCH RESULTS SET" ('375: CLAIMS 1-11 AND 13-20)**

The Court should construe "combined search results set" to mean "a search results set that includes results from at least one personalized search." Sonos argues that the language requiring "at least two of" three categories "explicitly define[s]" the "combined search results set," and that Google is therefore attempting to rewrite the claim. Dkt. 70 at 14. But, it is Sonos who is rewriting the claim by failing to give effect to the separate, "combined search results set" language. *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1300 (Fed. Cir. 2016) ("[M]eaning should be given to all of a claim's terms.").

The claim construction order in *Vita Zahn-Fabrik H. Rauter GMBH & Co. KG v. Dentsply Int'l, Inc.*, No. 04-729, 2005 WL 6220491 (C.D. Cal. May 4, 2005), is instructive. There, a term required a "color mixture of at least two of said dental color materials." *Id.* at *4. The court rejected an argument that the plain meaning of this language could be satisfied by a mixture of *any* two color materials, recognizing instead that "a 'color mixture' results only when two *diverse* colors are mixed." *Id.* Thus, the limitation, as a whole, required "[a] combination of two or more dental color materials that must be of different colors." *Id.* The same reasoning applies here. A "combined search results set" must involve the combination of at least two different types of searches. While the "combined search results set" must also include results from at least two of the three recited categories, it must be a "combined search results set" in the first instance.

Sonos cites the prosecution history, but this supports Google's position. Sonos admits that the original claims required results from *both* a personalized search and a general search, "similar

-8-

to what Google now proposes." Dkt. 70 at 15.   In a preliminary amendment, Google changed the focus of the claims to the synchronization features that now appear in the issued claims. *Id.* Later, in response to a rejection, Google re-introduced the search features, this time using the language now at issue. *Id.* Sonos would have the Court believe that this new language somehow *broadened* the search features that were initially claimed, because according to Sonos results from a personalized search are no longer necessary.   But, Google's remarks accompanying the amendment refute this.   Specifically, in response to a rejection under 35 U.S.C. § 101, Google argued that "the plain focus" of the newly amended was "directed to improving the management of ***favorite items*** or ***bookmarks*** across multiple devices and search."   Ex. D to the Caridis Decl. (Dkt. 70-1) at -651-52 (6/13/2018 Remarks accompanying amendment) (emphasis added).   It is a mistake to assume that an applicant's amendment reaches subject matter (here, a completely non-personalized search) that is inconsistent with the explanation for that amendment in the remarks. *See Edward Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330–31 (Fed. Cir. 2009).

Sonos' criticism of Google's specification support is also misplaced.   Contrary to Sonos' argument, Google *acknowledged* that the passage at column 2, lines 61-66 was an embodiment, and that a "combined search results set" might involve different combinations.   Dkt. 67 at 15-16. The point was to explain that when this passage describes a "combined search results set," it recognizes that a combination of results from two global indices alone would not suffice.[6]

Sonos does not seriously dispute that the '375 Patent consistently emphasizes "personalized search," but instead argues that such emphasis falls short of a disavowal.   But Sonos ignores the combined effect of the intrinsic record, including the '375 Patent title, the abstract, the repeated discussion of personalized search throughout the specification, and the consistent examples of what does and does not qualify as a "combined search results set." *See Saffran v. Johnson & Johnson*, 712 F.3d 549, 560 (Fed. Cir. 2013) (construing claim term in

---

[6] Google also does not "equate[] 'types' of results with separate sub-processes" as Sonos contends.   Dkt. 70 at 16-17.   Again, Google's argument is merely that when the specification describes a "combined result set," the context makes clear that results from a global index, or even global indices, alone is not sufficient. *See* '375 Patent at 9:17-21, 8:61-65.

1    accordance with the "[e]xtensive, consistent usage in the specification . . . ."). Sonos criticizes

2    Google's support in the specification as describing mere embodiments, but Sonos doesn't cite a

3    single embodiment lacking personalized search. And, when read in context, the passages that

4    Sonos highlights are prefaced with language directed to the invention "as a whole." '375 Patent

5    at 2:25-26 ("Embodiments of *the present invention* provide systems and methods for *personalized*

6    *network searching*.") (emphases added); *id.* at 2:61-62 ("Embodiments of *the present invention*

7    comprise methods and systems for *personalized network searching*.") (emphases added).

8           Finally, Sonos is wrong that the specification does not distinguish the prior art. The

9    specification states "[c]onventional search engines search global search objects such as global

10   search indices. Embodiments of the present invention are *also* capable of searching personal

11   search objects . . . ." '375 Patent at 8:61-65 (emphasis added). Sonos' argument that the

12   specification also characterizes a search of bookmarks as "conventional," Dkt. 70 at 17, is

13   irrelevant. Neither the described invention, nor the claims, are directed to searching *only*

14   bookmarks, but rather to a combined search of both personalized *and* global indices.

15       **F.    "STORED [FOR THE USER] IN A CLIENT-SIDE STORAGE OF A CLIENT
              DEVICE" ('375: CLAIMS 1 & 17-20)**
16

17          This term has a plain and ordinary meaning, and the Court should reject Sonos' effort to

18   limit it further. Sonos argues that its attempt to exclude "transitory storage" from the scope of the

19   term is not a disfavored negative limitation, but this strains credibility. Semantics aside, an

20   express exclusion of subject matter "must find support either 'in words of the claim' or through an

21   'express disclaimer or independent lexicography in the written description,'" *Ethicon LLC v.*

22   *Intuitive Surgical, Inc.*, --- Fed. App'x. ---, 2021 WL 960766, at *5 (Fed. Cir. Mar. 15, 2021), none

23   of which Sonos has shown here. Similarly, Sonos' argument that its proposed construction "does

24   not exclude any physical form of media" is belied by the testimony of its own expert, who plainly

25   states that Sonos' proposal is aimed at excluding "temporary memory" such as a "buffer or cache."

26   Dkt. 69-15 at ¶ 69. This proposed exclusion is unsupported and, in fact, *contradicted* by the

27   specification which teaches the use of temporary memory such as RAM. '375 Patent at 3:23-33.

28          Sonos' reliance on the claim language similarly fails. That the recited "storage" is "*for*

-10-

*the user*" does *not* imply that the "entire purpose is so that the user may access them later."   Dkt. 70 at 18.   To the contrary, there are perfectly sensible reasons why a bookmark or favorite item might be synchronized from a server, and stored in client-side memory only for *immediate* use by the user.   Dkt. 69-6 (Shamos Decl.) at ¶ 44 ("This sort of model would allow a user of the client-side device to access pertinent information recently synchronized from the server, without cluttering the client-side device with persistently stored instances of this information.").

Sonos' reliance on the specification fares no better.   The specification's discussion at column 7 (described as just "one embodiment of the present invention," *see* '375 Patent at 7:7, 7:36, 7:66) relates to storage by "bookmark manager 128" (*id.* at 7:50-53), which is part of the *server* (*see* Fig. 1), and therefore has nothing to do with the claim term requiring storage in "a *client*-side storage."   The other cited portions of the specification are also inapposite, establishing at most that storage in a client-side device is so the information can be "made available" to the user, which again does not imply any purpose or temporal requirement on the type of storage.

Sonos argues that Google miscites *Audionics Sys., Inc. v. AAMP of Fla., Inc.*, No. 12-cv-10763, 2013 WL 9602634, at *23 (C.D. Cal. Sept. 12, 2013), but that is not true.   In *Audionics*, the court held that based on the specific claim language at issue, the term "to store" should mean "to retain" rather than simply "to place."   *Id. at* *23.   Even under this more restrictive interpretation, however, the court made clear that the term "does not necessarily entail permanence."   *Id.*   Thus, the court rejected any effort to limit the "time frame during which subsequent activation and recall must occur."   *Id.* at 23.   Accordingly, *Audionics* establishes that Sonos' effort to exclude transitory storage must be rejected under any scenario.   In any event, because the claim at issue here differs from *Audionics*, (*i.e.*, the term here does not specifically recite "subsequent" action that "recall[s]" the stored information from memory), the term includes the broader notion of "to place," and the Court need not even reach the temporal issue.

## G.   PREAMBLES OF CLAIMS 1 and 15 ('586: CLAIMS 1-5, 7-8, 15-16, 18, & 20)

The Court should hold that the preambles of claims 1 and 15 are limiting.   As an initial matter, Sonos improperly urges the Court to parse the limiting effect of the preamble to claim 1, citing *TomTom, Inc. v. Adolph*, 790 F.3d 1315 (Fed. Cir. 2015).   But, in *TomTom*, the preamble at

issue included a prefatory statement regarding the overall "intended use" of the claimed invention, followed by a necessary structural element. *Id.* at 1324. The Court found the structural element limiting, but not the purpose statement. *Id.* The '586 Patent, claim 1 preamble is distinguishable. Here, the preamble recites only a necessary structural component (*i.e.*, an "audio-enabled wireless device") that is configured in a specific way (*i.e.*, "for bi-directional wireless communication in a wireless mesh network"). The language about how the audio-enabled wireless device is configured is thus "intertwined" with the device itself, rendering it inappropriate to parse the preamble in the way Sonos urges. *Bio-Rad Labs, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1371 (Fed. Cir. 2020) ("We also are disinclined to sanction finding a preamble 'partially' limiting by splicing it as the district court did here."); *see also SIMO Holdings Inc. v. HongKong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1375-76 (Fed. Cir. 2021).

Even if the Court were to endorse Sonos' approach of breaking the preamble up into three arbitrary "parts," each of those three "parts" themselves provide necessary context for the claimed invention, rendering them limiting. Regarding "wireless mesh network," Sonos argues that those precise words do not appear in the specification. But, there is of course no requirement that the exact terms of a claim be used *in haec verba* in the specification. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) (*en banc*). Sonos also criticizes Google for relying on a mere embodiment "to conclude that the use of alternative network paths is a 'significant feature' . . . of the invention." Dkt. 70 at 21. But this is misdirection. The '586 Patent teaches that the "*present invention*" provides "a relatively low cost, robust, wireless sensor system that provides an extended period of operability without maintenance." '586 Patent at 2:6-10 (emphasis added). While the embodiment at 9:23-33 provides an example of how to achieve a robust and reliable network, it is the statement regarding the "present invention" as a whole that supports treating "wireless mesh network" as limiting. Sonos does not dispute that a "wireless mesh network" is one with *at least* the capability to form multiple paths between network nodes.

Regarding the requirement that the audio-enabled wireless device be configured for "*bidirectional* wireless communication," Sonos does not seriously dispute that this is a disclosed feature of the "present invention" as a whole. *See* '586 Patent at 1:38-42. Instead, Sonos

-12-

accuses Google of attempting to "recast" the cited passage in column 1.  But, Google is not attempting to recast anything.   The passage at column 1 provides that a "sensor" (*i.e.*, the "audio-enabled wireless device" of claim 1) of the present invention is configured for "bidirectional communication," which is entirely consistent with Google's position that the preamble is limiting.[7]

Finally, Sonos does not dispute that the "audio-enabled wireless device" in the preamble provides antecedent basis for the subsequent recitation of that term in the body of the claim.  *See Bio-Rad Labs*, 967 F.3d at 1371 ("The fact that [claim terms] provide antecedent basis for these terms in the body of the claim is a strong indication that the preamble acts as a necessary component of the claimed invention." (quotation and citation omitted)).  This recitation in the preamble also "define[s] positive limitations in the body of [the] claim," because it describes the type of device that contains all of the other structural limitations of the claim (*i.e.*, "a wireless transceiver," an "audio output element," a "reset element," and a "controller").  *See Shoes by Firebug LLC v. Stride Rite Children's Grp, LLC*, 962 F.3d 1362, 1368 (Fed. Cir. 2020).

### H.    "RESET ELEMENT" ('586: CLAIMS 1-5, 7-12, 14-16, 18, AND 20)

The Court should adopt Google's construction that the "reset element" is "an element for resetting the configuration of the controller."   Sonos first attacks Google's reliance on what is indisputably the exclusive description of the reset functionality in the specification, arguing that the passage at column 6, lines 23 through 29, relates merely to the *transceiver* and not to the *controller*.  Dkt. 70 at 23.  Sonos, however, ignores that the controller is the central element between the reset element and the transceiver.  *See* '586 Patent at Fig. 2.  As the specification teaches "[a] reset device (e.g., a switch) 208 is provided to the controller 202."  *Id.* at 9:40-41.  The controller "provides power, data, and control information to the sensor(s) 201 and the transceiver."   *Id.* at 9:36-38.   Thus, Google's proposed construction comports with these

---

[7]   Sonos' argument appears to be that there is a *further* limitation on the types of devices that the audio-enabled wireless devices must communicate with.  Dkt. 70 at 21.  This is a strange position, considering that Sonos denies that the preamble is limiting in the first place.  In any event, Sonos' suggestion that the Patent draws a sharp distinction between a "sensor" and a "repeater" is refuted by the specification.  *See, e.g.*, '586 Patent at 5:4-9 (noting that discussion of sensor unit 102 also "generally refers to the repeater 110 by way of example, and not limitation.").

teachings that the reset functionality resets the configuration of *the controller*, which in turn controls the transceiver to receive an "identification code" during a prescribed internal of time.

Sonos next urges the Court to discount the "operatively coupled" language in claim 1. Sonos, first encourages the Court to ignore *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004), on the grounds that case construed the term "operatively **connected**" as opposed to "operatively **coupled**."   But, other than noting the difference in language, Sonos provides no explanation as to why the use of "coupled" in the '586 Patent, as opposed to "connected" in *Innova*, should result in a materially different outcome.   The key language, of course, is "operatively" which implies a functional relationship between the two components.   *Innova*, 381 F.3d at 1118 (operatively connected "is a general descriptive term frequently used in patent drafting to reflect a functional relationship between claimed components"), at 1119 (declining interpretation that would render "operatively" superfluous).

It is Sonos, not Google, that misapplies the holding of *Innova*.   There, the claim recited a cap and tube that were "operatively connected."   In order to determine the functional relationship implied by this language, the Federal Circuit looked to the purpose of the *claimed invention* as a whole (*i.e.*, "filtering").   381 F.3d at 1118.   Following this logic, the relationship implied by the "operatively coupled" language in claim 1 of the '586 Patent is *not* that "the controller and the reset element be arranged in a manner capable of performing a *reset function*" as Sonos contends. Dkt. 70 at 23 (emphasis added).   Rather, the relationship implied is that the controller and reset element be arranged in a way that enables the controller to fulfill its role in relaying packets between devices.   Only Google's proposed construction gives effect to this relationship.   *See* Dkt. 67-70 (Min Decl.) ¶ 50.

Finally, Sonos fails to justify its proposed limitation that the reset element "functions to return a device to a prescribed state."   Here, Sonos itself cites to column 6, lines 23-39, Dkt. 70 at 22-23, despite arguing just one page earlier that this very same passage is a mere, non-limiting embodiment.   In any event, this passage does not support the limitation Sonos attempts to import, because it describes the controller placing the transceiver in listening mode, which could relate to an initialization function rather than a return to some "prescribed" state.   '586 Patent at 6:23-29.

-14-

## I.    "PREAMBLE PORTION" ('586: CLAIMS, 1-5, 7-12, 14-16, 18, AND 20)

The Court should give "preamble portion" its plain and ordinary meaning.  Sonos *admits* that the term would be familiar to the jury, but argues that "a POSITA would have a particular understanding in the context of this patent."  *Id.*  But Sonos cites no intrinsic evidence, relying instead on extrinsic documents and conclusory expert opinion.  *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1221-22 (Fed. Cir. 2020) (It is improper to use extrinsic evidence to "introduce ambiguity in a way that disregards the language usage in the patent itself.").

None of Sonos' four extrinsic references persuasively define a "preamble" in all network contexts.  One is a particular network protocol standard, *see* Dkt. 69-16 (802.11a standard), and two others are specific to a particular network protocol, *see* Dkt. 69-17 (dictionary definition pertaining to "Ethernet") & 69-18 (beginner's guide to 802.3).  The fourth is a dictionary definition that describes a "preamble" for *physical* layer networking, *see* Dkt. 70-1 Ex. I, and thus also fails to define a packet "preamble" at all networking layers, or in all networking contexts.

The declaration of Sonos' expert, Dr. Wicker, does little more than summarize the aforementioned extrinsic references, and provides no additional reasons why the "preamble portion" term should be limited to anything less than its plain and ordinary meaning.  Dkt. 69-12 ¶¶ 151-164.  In any event, Dr. Min disputes Dr. Wicker's testimony, and provides examples as to why a POSITA would not understand a "preamble" to be limited to the form and function required by Sonos' proposed construction.  Dkt. 69-7 ¶¶ 57-60.  Sonos takes issue with the *application* of Dr. Min's example to the claims, but that is an issue for the merits, not for claim construction.

Finally, neither Sonos' extrinsic references, nor its expert declaration, provide any justification for the "initiation" function that its construction would require of a "preamble portion."  Sonos' responsive claim construction brief also notably fails to defend this limitation at all, which casts doubt on the credibility of its entire construction.

## CONCLUSION

For the foregoing reasons, as well as those provided in Google's Opening Claim Construction Brief, the Court should adopt Google's proposed constructions.

Respectfully submitted,

Dated:   April 12, 2021

By: */s/ David A. Nelson*

QUINN EMANUEL URQUHART & SULLIVAN,
LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

David A. Nelson (*pro hac vice*)
davenelson@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone:    (312) 705-7400
Facsimile:    (312) 705-7401

Attorneys for GOOGLE LLC

## **ATTESTATION**

I, Patrick D. Curran, am the ECF user whose ID and password are being used to file the foregoing document.  In compliance with Civil L.R. 5-1(i)(3), I hereby attest that David A. Nelson has concurred in this filing.

Dated:  April 12, 2021

*/s/ Patrick D. Curran*
Patrick D. Curran