Pages 1 - 69

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

```
GOOGLE LLC,                     )
                                )
            Plaintiff,          )
                                )
   VS.                          )     NO. C 20-3845 EMC
                                )
SONOS, INC.,                    )
                                )
            Defendant.          )
_____     )
```
San Francisco, California
Friday, April 30, 2021

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiff:

> QUINN, EMANUEL, URQUHART & SULLIVAN LLP
> 711 Louisana Street - Suite 500
> Houston, Texas  77002
> **BY:  BRETT WATKINS, ATTORNEY AT LAW**
>
> QUINN, EMANUEL, URQUHART & SULLIVAN LLP
> 1300 I Street, NW - Suite 900
> Washington, D.C.  20005
> **BY:  PATRICK J. STAFFORD, ATTORNEY AT LAW**
>
> QUINN, EMANUEL, URQUHART & SULLIVAN LLP
> 111 Huntington Avenue - Suite 520
> Boston, Massachusetts  02199
> **BY:  PATRICK D. CURRAN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

<u>**APPEARANCES BY ZOOM WEBINAR**</u>:   (CONTINUED)

For Defendant:
                      ORRICK, HERRINGTON & SUTCLIFFE LLP
                      777 South Figueroa Street - Suite 3200
                      Los Angeles, California  90017
            **BY:   ALYSSA M. CARIDIS, ATTORNEY AT LAW**


Also Present:        **Patrick Weston**
                      **In-house Counsel for Google LLC**

**Friday - April 30, 2021**                                   **9:00 a.m.**

<u>**P R O C E E D I N G S**</u>

---oOo---

    **THE CLERK:**  Court is now in session.  The Honorable Edward M. Chen is presiding.

    Calling Civil action 20-3845, Google LLC vs. Sonos, Inc.

    Counsel, please state your appearances for the record beginning with counsel for plaintiff.

    **MR. WATKINS:**  Brett Watkins from Quinn Emanuel for plaintiff Google.

    **THE COURT:**  All right.  Good morning, Mr. Watkins.

    **MR. WATKINS:**  Good morning.

    **MR. STAFFORD:**  Patrick Stafford with Quinn Emanuel for plaintiff Google.

    **THE COURT:**  All right.  Good morning, Mr. Stafford.

    **MR. STAFFORD:**  Good morning.

    **MR. CURRAN:**  And Patrick Curran from Quinn Emanuel for plaintiff Google.  Also present today, Your Honor, is Patrick Weston, in-house counsel for Google.

    **THE COURT:**  All right.  Thank you, Mr. Curran.

    **MR. CARIDIS:**  Good morning, Your Honor.  Alyssa Caridis of Orrick, Harrington & Sutcliffe on behalf of defendant Sonos.

    **THE COURT:**  All right.  Good morning.  Ms. Caridis.

    All right.  I suppose Google will go first.

1        **MR. WATKINS:**  That works for us, Your Honor.

2        **THE COURT:**  Who's going to do the presentation?

3        **MR. WATKINS:**  I will start, Your Honor.  My name is

4   Brett Watkins, and I will handle part of our presentation and

5   Patrick Stafford will handle the rest of it.

6        **THE COURT:**  Okay.

7        **MR. WATKINS:**  So if you're ready to proceed, may I

8   share my screen?

9        **THE COURT:**  Yeah.

10        **MR. WATKINS:**  Great.

11   Just to confirm, can you see that presentation,

12   Your Honor?

13        **THE COURT:**  Yes, I can.  Thank you.

14        **MR. WATKINS:**  Thank you.

15   Okay.  So the four patents that are at issue in this case

16   are shown in Slide 2 of Google's presentation, Your Honor.  Our

17   plan is to proceed today in this order as shown in the slide.

18   I will be presenting the '187 and '206 patents and Mr. Stafford

19   will present the '375 and '586 patents.

20        **THE COURT:**  Okay.

21        **MR. WATKINS:**  Of course -- sorry.

22        **THE COURT:**  Go ahead.

23        **MR. WATKINS:**  I'm sorry.  I was just going to mention

24   that if you have a different preferred order, we would be happy

25   to change it around.

1          **THE COURT:**  No.  That's fine.

2          **MR. WATKINS:**  Great.

3          **THE COURT:**  Thank you.

4          **MR. WATKINS:**  So the first patent that we will be

5      addressing today will be the '187 patent.  The title of this

6      patent is "Domain-Based Digital-Rights Management System With

7      Easy and Secure Device Enrollment."  This patent issued in

8      March 2011 from an application filed in November 2002.

9          You see in the background of the invention of the patent

10     it describes how copying and sharing digital content is a

11     concern to content owners and their rights are protected via

12     digital-rights management, which is commonly known as DRM.

13         Because the patent describes DRM and related concepts, we

14     will first provide some background on those concepts and then

15     we'll turn to how those are applied in the '187 patent.

16         So, first, cryptography is something that the '187 patent

17     touches on.  At a high level, cryptography relates to the study

18     of techniques for securing data in the presence of adversaries.

19     People working in this field often encounter problems like the

20     ones listed here:  Confidentiality relates to keeping

21     information secret, integrity relates to detecting whether

22     information has been manipulated, and authentication relates to

23     confirming the identity of other parties.

24         In cryptography there are tools that are known in the art

25     as cryptographic primitives.  These are basically building

1    blocks that can be used in different combinations to design and

2    develop a DRM system.  On Slide 7 we list some -- we provide a

3    nonexhaustive list of some of those primitives.

4         So first we have encryption and decryption, which is a way

5    to prevent others from reading a message.  So that would

6    address the problem of confidentiality.

7         Second, digital signatures.  They confirm to a receiver

8    that a message has been sent by a purported sender.  Digital

9    signatures would address the problem of authentication.

10        Hash functions enable the receiver to detect changes to a

11   message.  So that would address the problem of integrity.

12        And message authentication codes would convince a receiver

13   that a message came from a purported sender and also that it

14   was not modified.  So that sort of addresses both

15   authentication and integrity.

16        Your Honor, on Slides 8 to 15 of Google's presentation, we

17   included a series of illustrations and animations that show how

18   these primitives work.  For purposes of our discussion today,

19   we plan to move past those slides for now, although we may come

20   back to them.  If you have any questions, of course we would be

21   happy to answer questions about them.

22             **THE COURT:**  Okay.

23        **MR. WATKINS:**  So we move on to Slide 16, and on this

24   slide you see in the background of the invention section of the

25   patent how DRM protection might be implemented in a way that

1  allows for devices that are within the same domain to share

2  content.

3       The patent also identifies some problems with

4  content-sharing systems.

5            THE COURT:  Hold on a second.  I want to make sure I

6  understand.

7       When you say share the same domain, can you define

8  "domain"?

9            MR. WATKINS:  Sure.  I think this is something that

10  was called out in our briefing; but during prosecution, there

11  was actually a specific definition that was provided to the

12  Patent Office, and I think it goes something along the lines of

13  it applies to a group of devices that share rights associated

14  with a common account for use in accessing protected content.

15            THE COURT:  Okay.

16            MR. WATKINS:  So turning back to Slide 17, the patent

17  identifies a couple of problems with content-sharing systems.

18  One of those problems is that registering devices into the

19  domain can be cumbersome.  It requires that a user manually

20  register each device that they want to add to the domain.

21       Second, if devices can be registered into the domain from

22  remote locations, that can actually present a security threat.

23  So the inventors recognized a need for a domain-based DRM

24  system with easy and secure device enrollment that increases

25  the level of security.

1          And turning to Slide 18, the inventors addressed these

2     issues by providing a system in which when a user wants to add

3     a new device to a domain that already exists, the new device

4     receives domain information from any device that is already

5     part of the domain.  That new device will take that domain

6     information and send it to a key issuer to complete the

7     registration process.  The key issuer will respond by providing

8     the new device with information that it needs to obtain and

9     render protected content; for example, a private key.

10         The patent -- in introducing the preferred embodiment of

11    the invention, the patent describes some relevant DRM concepts

12    in columns 2 and 3 of the patent.

13         First, it refers to public key cryptography, which is a

14    technique that uses a public key and a private key.  The patent

15    describes that in this context the private key can be used for

16    either decrypting data or generating digital signatures, and

17    the public key can be used for either encrypting data or

18    verifying digital signatures.

19         The patent also notes later on that the person -- a person

20    of ordinary skill in the art would know of other methods to

21    secure the DRM system; for example, using symmetric key

22    techniques or broadcast key encryption.

23         Because public key cryptography involves the use of two

24    different keys, a public key and a private key, it's commonly

25    referred to as asymmetric cryptography.  In other

1  implementations that use a single shared private key, those are

2  referred to as symmetric cryptography because they use the same

3  key on both ends.

4          **THE COURT:**  And what is a public key?

5          **MR. WATKINS:**  A public key refers to -- in the public

6  key cryptography context, it is a value that is assumed to be

7  not kept private by the devices.  So it is something that is

8  assumed to be publicly available and that other parties can use

9  to encrypt data to be sent to the party that owns the

10 corresponding private key.

11         Alternatively, in the digital signature context, a public

12 key is something that the verifier, that would be the receiving

13 party, can use to verify that the message that has been signed

14 came from the party that signed that message with their private

15 key.

16         And we provide examples of those uses of public keys and

17 private keys in the context of public key cryptography, and

18 Slides 9 and I believe 10 of our presentation shows some

19 animations of how that would work.

20         The patent then addresses certificates, and digital

21 certificates are basically data issued by a trusted third

22 party.  Those are called certification authorities.  A digital

23 certificate contains information identifying the certificate

24 holder along with a copy of their public key.

25         So this is a way that allows parties to authenticate the

1    certificate holder and to confirm that they have the right

2    public key for that party.  So if they want to encrypt data to

3    send to a party that has a private key, they need to confirm

4    they have the right public key and they do this via digital

5    certificates.

6         Next, the patent goes into digital signatures, which we

7    mentioned before.  They are a way to provide -- they provide a

8    way for parties to authenticate the identity of the sender of a

9    message.  The patent also refers to digitally signed objects,

10   which would be in this context the message.  Those digital

11   signatures are illustrated on Slide 10 of our presentation.

12        Moving on to Slide 22, the patent also describes

13   authentication as the process of determining whether something

14   or someone is, in fact, what or who it is declared to be.

15        Now we're going to skip to Slide 24 moving into the

16   application of these concepts to the preferred embodiment.

17        The patent shows how the domain-based DRM system would

18   operate using Figure 1 as an illustration.  This figure shows

19   two devices that are labeled "user equipment 101."  These are

20   the devices in the domain that would be capable of rendering

21   content; playing back music, for example.  And the patent gives

22   examples of computers, cell phones, PDAs, set-top boxes, and

23   network MP3 players as examples of what those could be.

24        I'll now skip to Slide 31 where we show Figure 2 where the

25   '187 patent provides some further detail regarding what the

1  user equipment consists of.

2      For example, the user equipment includes logic circuitry

3  for carrying out various functions of the device.  In the

4  preferred embodiment, that logic circuitry is described as a

5  microprocessor controller, and the patent provides two specific

6  examples of a Motorola and a TI chip for those.

7          **THE COURT:**  And what does it do?

8          **MR. WATKINS:**  The logic circuitry?

9          **THE COURT:**  Yeah.

10         **MR. WATKINS:**  Well, I think it would carry out various

11  functionality.  I think there is some specific functionality

12  that relates to some of the claim language asserted in this

13  case, but the patent describes that the logic circuitry, I

14  believe, would carry out a broader set of functionality of the

15  device beyond what is claimed.

16     So the patent describes a series of functions that the

17  device could perform, and I think we'll get into those in a

18  little bit.  But, for example, the user equipment would

19  establish communications with the key issuer, and this would be

20  a secure authenticated communication.  So there's some exchange

21  of information to establish that.  The logic circuitry would

22  take care of handling that.

23     You see there's also a short-range communications unit 213

24  shown in Figure 2.  That one is really about communicating with

25  other user equipment to receive the domain information from

1    within the domain.

2         **THE COURT:**  So it serves as kind of an intermediary

3    between the external -- is it external network and some of the

4    things I see in that box in 211?  That's what the logic

5    circuitry does?

6         **MR. WATKINS:**  Yes.  So I think 211 is really depicting

7    a storage area of the device.  So it shows different pieces of

8    information that would be stored; for example, certificates,

9    keys, applications, domain information, and the content itself.

10   So the logic circuitry would utilize that storage area to

11   perform -- to carry out the functions that are described in the

12   patent as being performed by the user equipment.

13        **THE COURT:**  Okay.

14        **MR. WATKINS:**  So if we move to Slide 33, I think this

15   gets a little bit deeper into the functions that are carried

16   out by the user equipment.  Figure 3 shows a flowchart

17   illustrating the various steps in the process of device

18   enrollment.

19        In the first four steps that we've highlighted on this

20   slide, the domain information is transferred from a first

21   device, which is already in the domain, to a second device,

22   which is the one that's being added to the domain.  That

23   transfer happens over this link shown as 108.  That's a

24   short-range communications link.

25        And then if you move to Slide 34, the next series of steps

relates to how the new device will take that domain information
and first establish a secure communications channel with the
key issuer and send the domain information to that key issuer,
and in response the key issuer will register the new device to
the domain and then send back some DRM information, for example
a private key, that the new device can use to then access
protected digital content.

So that concludes our presentation on the '187 patent.  If
Your Honor has any further questions, I would be happy to
address them now.

**THE COURT:**  No.  That's fine.  Thank you.

**MR. WATKINS:**  Thank you.

Moving on to the '206 patent, you see the '206 patent is
titled "Method and Apparatus for Adaptive Echo and Noise
Control."  This patent issued in 2006 from an application filed
in 2003.  The background section of the '206 patent indicates
that it's directed to adaptive echo and noise control.  It
refers in the next sentence to reconfiguring noise suppression
and echo cancellation based on noise conditions.

So I think our tutorial will provide some background
information on what noise suppression and echo cancellation are
in this context.

The patent describes that communications devices can be
used in a variety of environments having a variety of noise
levels, and that can make communication difficult.  It notes

1    that noise suppression can be used to enhance communications in

2    those noisy environments.

3        In Slide 39 we provide an illustration of a noisy

4    environment.  Here we see a person speaking into a speakerphone

5    with multiple other noise sources.  You have people perhaps

6    having conversations.  You maybe have an appliance creating

7    noise.  You might have background music.  For the speakerphone,

8    each of those other sources of sound would constitute

9    background noise because it's really trying to hear what the

10   person is saying.

11       The next slide, Slide 40, illustrates how that speech and

12   noise might appear to the device.  The microphone receives both

13   the speech, which is shown in green, and noise, which we show

14   in red.  This appears to the device as a combined signal with

15   speech and noise components as shown in yellow.  They're mixed

16   together.

17       The background noise makes it difficult to parse the

18   speech from the received signal.  So the device will apply a

19   noise-suppression algorithm and the goal of that algorithm is

20   to suppress the noise components of the signal while not

21   suppressing the speech.  That's shown in the blue box.

22       The patent goes on to describe another problem, which is

23   caused by the fact that these devices have their own speakers

24   which are emitting sound.  That sound can be picked up by the

25   device's own microphone, which causes an echo effect.

1       Here on Slide 42 we show an illustration of this.  The

2   sound -- the speakerphone is emitting sound from its own

3   speakers, which is shown in yellow, and that sound could, for

4   example, bounce off of walls in the room and that echo shown

5   here in red would then be picked up by the device microphone

6   along with the user's speech.

7       One way the devices can handle this problem is through a

8   process called echo cancellation.  This is shown in Slide 43

9   where we have a diagram of a device that has a speaker and a

10  microphone.  The microphone you can see at the bottom receives

11  both a speech component shown in green and an echo from the

12  speaker, which is shown in red.  That combined signal is then

13  fed into an AEC block.  Here "AEC" stands for acoustic echo

14  cancellation.  The AEC block also receives a reference signal.

15  That reference signal is essentially a copy of the audio that

16  the device was outputting via the speaker.

17      The AEC block will use that reference signal to attempt to

18  remove the echo component from the signal received by the

19  microphone.  So here you see that the AEC removes the echo

20  signal in red and passes on the speech signal in green.

21      The '206 patent also describes how performing echo

22  cancellation can be impacted by environmental noise.  It notes

23  that using noise suppression and echo cancellation in

24  combination can also cause problems.  For example, performing

25  echo cancellation on a noise-suppressed signal kind of hurts

1    the efficiency of the echo cancellation process, and performing

2    echo cancellation in a particularly noisy environment can also

3    be pretty inefficient.

4         So, as a result, you have a situation where noise

5    suppression provides some advantages and echo cancellation also

6    provides some advantages but using them together can cause some

7    problems.

8         To address these issues, the inventor describes an

9    adaptive echo and noise control system.  That system can

10   adaptively determine the order of echo cancellation and noise

11   suppression based on an amount of noise in the received signal.

12        Preferred embodiment of this system would be shown on

13   Figure 1 on Slide 46.  This figure shows the components of a

14   communications device 100 which includes an audio input labeled

15   140, an audio output like a speaker labeled 130, and the

16   communications device also includes an adaptive echo and noise

17   control system 110.  That system receives the signal from the

18   audio input, the microphone, and determines the amount of

19   background noise in that signal and adaptively determines the

20   order of noise suppression and echo cancellation based on that

21   determined background noise.

22             THE COURT:  Is it just a function -- is the function

23   here a quantitative one determining the amount of each and

24   making an adjustment, or is there some other algorithm that

25   intelligently can sort of decipher what's going on and apply an

1    appropriate algorithm?

2         **MR. WATKINS:**  I think the determination of the amount

3    of background noise can include some subcomponents.  It can

4    include things like voice activity detection, which is a way of

5    determining if there is someone speaking at the time, and

6    that's the signal you want to try to capture.  So if you detect

7    that there is someone speaking, then you don't want to measure

8    the background noise at that point because you would be

9    estimating the amount of background noise that includes the

10   speech.

11        So what you want to do ideally is to detect when there is

12   no speech, there is no voice being detected, and at that point

13   you can measure the amount of background noise.

14        You can also provide -- include some other functionality,

15   like smoothing of the background noise measurement, so that you

16   can sort of reduce the peaks and increase the valleys to, you

17   know, sort of generate a more -- a leveled-out estimate of the

18   background noise.

19        And then on the adaptive ordering determination, there are

20   also things that the patent says that can be done, which are

21   comparing the level to thresholds.  You can use a single

22   threshold.  You can use multiple thresholds.  I think we were

23   going to get into that in the next slide, but there are some

24   nuances to how the -- both the measurement and the

25   determination as to order can occur.

1          **THE COURT:**  I take it, though, central to this is the

2    ability to distinguish between echo and background noise?

3          **MR. WATKINS:**  I think the central point is being able

4    to measure the amount of background noise and, yes, that would

5    involve distinguishing both between the background noise and

6    the echo and the background noise and the desired component.

7    That's the speech that you're trying to pick up.

8          And that's a good point, Your Honor.  You also would not

9    want to measure the background noise while the speaker is

10   playing out a lot of music because you're going to have maybe a

11   situation where that would also pollute your estimate of the

12   amount of background noise.  So I think you do want to try to

13   separate these components out.

14         **THE COURT:**  Okay.

15         **MR. WATKINS:**  If we move into the next slide, Figure 5

16   shows a flowchart of how the system could work in a preferred

17   embodiment.  It starts at step 510 where the initial order of

18   echo cancellation and noise suppression is set.  It moves on to

19   step 515 where the system obtains the total noise energy, which

20   it calls T sub N.

21         In step 520 the device will determine the current order of

22   operation.  You can have a low-noise setting or a high-noise

23   setting.  If the device is currently in the low-noise setting,

24   the device will compare the T sub N, the total noise, to a high

25   threshold.  If the T sub N, the total noise, is less than the

1   high threshold, then it's going to determine that the low noise

2   setting is still appropriate and it will just loop back to the

3   step 515.

4        If, on the other hand, the total noise is greater than or

5   equal than the high threshold, the system will change to a

6   high-noise setting, set a flag indicating that's the case, and

7   then loop back.  So the next time it will branch over to the

8   other side.

9        So the process on the other side, the high-noise setting,

10  is essentially the same.  You're going to use a different

11  threshold in this example, and you're going to determine in

12  step 540 whether the total noise is less than or equal to

13  T LOW.  If the total noise is greater than your low threshold,

14  then you're going to stay in the high-noise setting.  You're

15  just going to exit this branch and loop back to 515.

16       If, on the other hand, the total noise has reduced and

17  you're now lower than the low-noise threshold, you're going to

18  change to a low-noise setting shown in 545 and set a flag.

19            **THE COURT:**  What does that mean, "set a flag"?

20            **MR. WATKINS:**  I'm sorry.  Go ahead, sir.

21            **THE COURT:**  What does "set a flag" mean?

22            **MR. WATKINS:**  The flag is just an indicator within the

23  device to indicate whether the device is operating in a

24  low-noise setting or a high-noise setting.  So it's pretty

25  simple.  I think it could be -- you know, for example, you

1    could imagine it's a 0 or a 1; 0 corresponding to low noise and

2    1 corresponding to high noise.

3        THE COURT:  And so that then varies the amount of

4    noise suppression based on -- or what happens when you get one

5    flag or the other?

6        MR. WATKINS:  So the flag will determine whether it's

7    a low-noise configuration or a high-noise configuration.  I

8    think the preferred embodiment, the one that's described in the

9    patent, is that in the low-noise configuration, that is a

10    situation where it would be appropriate to perform echo

11    cancellation before noise suppression because echo cancellation

12    can operate pretty well when there's not much noise.

13        On the other hand, if you're in a high-noise situation,

14    that's a situation where echo cancellation doesn't work so well

15    so you're going to want to try to suppress that noise using the

16    noise suppression before you perform the echo cancellation.

17        THE COURT:  So it's the order, the sequence that's

18    important then?

19        MR. WATKINS:  Yes.

20        THE COURT:  Noise cancellation vis-a-vis echo

21    cancellation?

22        MR. WATKINS:  Yes.  I think the patent describes a way

23    to control the ordering of these steps in a way that is based

24    on the background noise.

25        And that concludes our presentation for this patent,

1    Your Honor.  If you have any further questions, I would

2    certainly be happy to address them.

3          **THE COURT:**  So the key to this is the order of the

4    echo cancellation versus noise suppression based on the noise

5    level as opposed to the ability to use some kind of form of

6    artificial intelligence to sort out what's an echo, what's

7    noise, and suppress the appropriate event?

8          **MR. WATKINS:**  Yes.  I think that's right, Your Honor.

9    The patent isn't describing a sort of unique way of performing

10   noise suppression itself or echo cancellation itself.  The

11   patent is really about how to manage the two of those

12   components and set them up in a way that they are both

13   operating at their most efficient level.

14         **THE COURT:**  Good.  Great.  Thank you.  That's helpful.

15         **MR. WATKINS:**  So I will stop sharing and hand the

16   presentation over to Patrick Stafford.

17         **MR. STAFFORD:**  Good morning, Your Honor.  This is

18   Patrick Stafford.  I'll be presenting Google's technology

19   tutorial for the '375 and '586 patents.

20         **THE COURT:**  Okay.

21         **MR. STAFFORD:**  I'll pull up my screen.

22      Can you see the '375 patent slide?

23         **THE COURT:**  Yes.  Yes.

24         **MR. STAFFORD:**  Great.

25      So I'm going to turn to Slide 58.  This is an overview of

 1    the '375 patent.  As you'll see, it is titled "Personalized

 2    Network Searching" and it claims priority to December 3rd,

 3    2003, which is the relevant date for this technology tutorial.

 4         As indicated by the title of the '375 patent, the

 5    technology at issue in the '375 patent is personalized network

 6    searching.

 7         Personalized network searching involves two key technical

 8    concepts.  First it involves the synchronization of bookmarks

 9    between a client device and a server, and it also then includes

10    the technical aspect of searching these synchronized bookmarks

11    as well as what's called a global index -- where the general

12    URLs or other bigger index, it's not limited to bookmarks -- in

13    order to provide a combined search result that would include

14    results from the personal bookmarks as well as global search

15    results.

16         These technical aspects are identified here in the

17    abstract as it details that the personalized network searching

18    is done by receiving first the request by a user to personalize

19    the search result and then the personalization is done of the

20    search result by using the synchronized bookmarks and a global

21    index to present a combined search result of personalized

22    search results and general search results.

23         I'm going to turn to Slide 68 of Google's presentation,

24    and here we identify the preexisting or conventional network

25    searches that existed before the '375 patent.  As we indicate

here, these preexisting or conventional network searches cannot
use a user's bookmarks or favorites in order to provide a
combined search result that would include synchronized
bookmarks as well as general search results from a general
index.

Instead, the '375 patent identified these conventional
bookmark systems in the background of the invention and
indicated that these preexisting bookmarking tools did not
allow for synchronization.  Instead, if a user wanted to
synchronize bookmarks between two different devices, the user
had to do this manually.  And what is meant by manual
synchronization is that the user had to physically store the
bookmarks on each device and make any modification to that
device by the user.  So the user had to go into that second
device and delete or add the bookmarks that were added or
deleted from the other device in order to provide the
synchronization between these different devices.

But by using synchronization, the '375 patent allowed for
the use of what's called nonpermanent storage within the user's
device because the synchronization allowed -- for any
modification that was done to the bookmarks that were going to
be stored on the device, it allowed for it to be synchronized
on a server instead of having to always be permanently stored
on the device.  So this allowed for using nonpermanent storage.
You're also allowed to have a synchronized group of bookmarks

1   that could be associated with that user and used on different

2   devices.

3       And since these conventional bookmarking tools didn't

4   provide automatic synchronization, the preexisting bookmarking

5   tools could not allow for an organization of the bookmarks in a

6   usable format for performing this personalized network

7   searching that's identified within the '375 patent.

8       As shown on Slide 70, instead these conventional

9   synchronization or bookmarking tools that existed only allowed

10   for the organization of bookmarks in a usable format for

11   pulling up that website later at a later date, not for

12   searching all of these bookmarks and providing a search result

13   that would include the bookmarks as well as including the

14   global indices.

15       And so that's why the '375 patent identified the issue

16   with these conventional tools and said that these tools,

17   however, do not effectively leverage the user's preferences to

18   provide personalized search results.  And so that's why there's

19   a need to provide an improved system and method for providing

20   the inventive personalized network searching.

21       **THE COURT:**  What would be helpful is if you gave me a

22   concrete example.  Right now you're sort of describing

23   conceptually how this works, and it might be helpful if you

24   gave me a concrete example of the concepts, the synchronization

25   and all that you're describing.

1          **MR. STAFFORD:**  Sure.  So the concrete example would be

2   for synchronization, for example, a user could have their user

3   device and they can identify a new favorite item or a website

4   or some sort of URL that they want to add to their favorite

5   list.  So they could make that modification on the device that

6   the user was using and when they make that modification, that

7   device can transmit the modification to the bookmarks that are

8   stored on the server and associated with that user and update

9   the stored bookmarks for that user to add in that modified

10  bookmark or favorite item.

11         And then after that's done, what the user could do is they

12  could look to see, "Well, do I want to add other results or do

13  I want to look at other results that might be somewhat related

14  to this?"  And so the user could perform a search where the

15  user could type in keywords or something else that might be

16  associated with his favorite item.

17         But by using this combined personalized network searching,

18  it would also provide results that weren't limited to the

19  bookmark.  So the user could then look through these results

20  and say, "Okay.  This result wasn't previously bookmarked, but

21  it's an item that I would like to add."  So the user could then

22  add that result to the bookmarks on the device and then the

23  device could perform that synchronization again.

24         **THE COURT:**  What's the value of the bookmark?  That

25  sounds like just a regular search, Google search or whatever.

1   As you're describing it, there's something different about

2   that.

3       MR. STAFFORD:  The value of the bookmark is that it's

4   returning personalized results.  So it's going to return

5   results that are within the bookmarks or favorite items, and so

6   that would be shown to the user and the user could see that

7   "These are the results that I already have -- that I've already

8   saved as favorite items," but then it's also going to return

9   results that are general results that are not limited to the

10  bookmarked results so that the user could then look for new

11  content and add them to the bookmark set that they already had.

12      THE COURT:  So the value of the bookmark, it sort of

13  defines the parameters or the subject matter area for which the

14  search is designed to enhance or -- again, if you could make it

15  as concrete as possible, like give me a specific example of

16  that, that might be helpful.

17      MR. STAFFORD:  You're right.  What the goal of the

18  bookmarks is is to provide this personalized search result so

19  that the user can see that they already have these results in

20  their bookmarks, so they've already indicated them as favorite

21  items or items that they value and that they want to have

22  return; but then it allows them by returning the general

23  results to also be able to easily realize that there are

24  additional results that may also be of interest and that the

25  user could then add to the bookmarks.

1        By doing this, you're able to provide personal search

2   results so that you're not just constantly returning a general

3   search, which I think you mentioned it was like a Google

4   search.  If you're just using a Google search all the time and

5   returning general results, then the user has to constantly sift

6   through these general results in order to find -- in order to

7   eliminate the previously favorited items or bookmarked items

8   and be able to add them.  But by doing this, the user can

9   readily identify these are the ones that have already been

10  favorited, have already been added to my bookmark database.

11  These are the -- this is the new content that I could add and

12  add to the bookmark site if I want to.

13        **THE COURT:**  Does that -- so is the role of the

14  bookmark to essentially focus the search, narrow the search so

15  it's not just a general search of the global database?

16        **MR. STAFFORD:**  It narrows the results.  It doesn't

17  necessarily narrow the search.  The search is being performed

18  both on the general database as well as the bookmark database,

19  but the results are returned in a combined search result set,

20  which identifies the bookmarks and also identifies the general

21  index results.  So the results that are not limited to the

22  bookmark set.

23        And so it allows for the user, if all they want to do is

24  just look at what the bookmark results are, they can readily

25  see that because those are part of the search result.  But if

1   the user would like to also add or look at content that's not

2   in the bookmark set, that's also part of the search result so

3   the user can then look at that content as well and add it as a

4   favorited item if the user wishes to.

5           **THE COURT:**  So that general index result that the user

6   sees is influenced by the bookmark, the content of what is

7   returned to the user after the search, is it enhanced or

8   focused or influenced in any way by the bookmark?

9           **MR. STAFFORD:**  The search of the general database is

10  not going to be influenced by the bookmarks; but the actual

11  search result when it's shown to the user, that will include

12  the bookmark results and the database results -- the general

13  database results so that the user can see the difference

14  between the bookmarked results and the general indexed results

15  and be able to then look at the content that's not only in the

16  bookmark results; or if the user wishes to look at just the

17  bookmarks and ignore the general database results, they can

18  also do that within this combined search results.

19          **THE COURT:**  I guess what I'm asking:  Is the general

20  database results -- not the search, the results, you've made

21  that distinction -- is that filtered in any way or narrowed or

22  focused as a result of the bookmark?

23          **MR. STAFFORD:**  They would be merged together in the

24  results so that the general database search results would be

25  merged as a combined set.

1          So the patent doesn't require that the general database

2    search, for example, remove duplicate results.  It doesn't

3    require that the general database result be modified.  The

4    focus of the '375 patent is this combining of those general

5    database search results with the bookmarked database search

6    results.

7          THE COURT:  So it's just the combining, it's not that

8    the results returned from the general index is somehow altered

9    content-wise by the bookmark?

10          MR. STAFFORD:  Right.  It doesn't require altering the

11    combined search result, but it does -- it does require that the

12    combined search result be provided with the merging of the

13    bookmarked search results as well as the general database

14    search results.

15          THE COURT:  And that's a matter of sort of

16    convenience, then, for the user because you can now see your

17    bookmark and compare it to the general index results?

18          MR. STAFFORD:  Yes.  It's convenience for the user.

19    It allows them to leverage their bookmark results.

20          There are embodiments within the '375 patent that also

21    includes what are called annotations or rankings that a user

22    may perform; and so the user could within the bookmark database

23    annotate bookmarks and say "I like this result" or "This is my

24    favorite, like, number one ranking for these results."  And so

25    that could then influence the display of the combined search

result by moving up a search result so that it's higher and more readily accessible to the user when they look at the top of the list.

That's one embodiment of the '375 patent that it also allows for by providing the synchronization of bookmarks and providing a combined search result.

**THE COURT:**  Okay.  Go ahead.

**MR. STAFFORD:**  And so, again, this is something that we just discussed, but the '375 patent focuses on the search engine that combines search results obtained from the global index or global indices with those retrieved from a list of a user's favorite sites to produce this combined search result set.

And then the '375 patent includes this flowchart that's an example of performing this search and providing the combined search result set.

So stepping through this flowchart, the first step is that it receives a search query from the user.  So the user would go to their device, type in a search query, and then that would be sent to the search engine to perform a search.

The next step is that the search engine then responds to the query signal by performing the search.  And so here it shows the three subprocesses that are going to be run parallel by the search engine.

So first it would search the global index, which again is

1   the global index, it's not limited to the bookmarks.  It would

2   also run a search on the bookmarks so the synchronized

3   bookmarks for the user.  And then it could also run a search on

4   annotations, and these annotations are things that could be

5   generated by rankings or other kind of general annotations of

6   the bookmarks that could help provide a more personalized

7   result.

8       THE COURT:  When you say "search annotations," how is

9   that different from the searching of the bookmarks and the

10  global index?  Is that something that preexists, or what is it?

11      MR. STAFFORD:  The annotations -- it is a database

12  that's associated with the bookmarks.  The annotations are a

13  separate annotation that annotates these bookmarks or the

14  favorite items for the user.

15      An example of the annotations as provided by the '375

16  patent is a ranking or other kind of useful annotating of the

17  results by the user that kind of helps them organize the

18  bookmarks in a way that provides more information to them so

19  that it's not just a general list of "These are all of my

20  favorite bookmarks."  Instead, it could include a ranking of

21  that subset of bookmarks that the combined search could perform

22  and then merge that result with the combined search result set.

23      THE COURT:  So these are annotations that would have

24  been made by the user?

25      MR. STAFFORD:  The '375 patent doesn't limit it to the

1  user but that's one option, is that it could be made by the

2  user.

3          **THE COURT:**  All right.

4          **MR. STAFFORD:**  Okay.  And after this search is done,

5  the '375 patent search engine then merges the search results

6  into this combined search.  And so as it says here, the results

7  may overlap to some degree because there may be bookmarks that

8  are associated with the global index, but it still would merge

9  these results into a single list that could be provided to the

10  user.

11          And then after the search results are merged together,

12  another step that could be performed by the search engine is

13  that it could rank the pages or rank the results, and the '375

14  patent describes different options for the ranking of these

15  results.

16          And, for example, it gives here it could be done via

17  annotation based on a user-based rating, if any, or it could

18  then be applied to what they call a standard ranking algorithm.

19  And so this is just another step that could be performed by the

20  search engine in providing the combined search results set.

21          The final step of this flowchart is step 314.  Finally,

22  once this combined search result set is created, it's provided

23  as the result to the user so that the user can then look at the

24  combined search result, which would include search results from

25  the global index as well as search results from the bookmarks

1   for favorite items so the user could then sift through that

2   content.

3          THE COURT:  And does that provided results distinguish

4   between bookmarks and global index results?

5          MR. STAFFORD:  By that do you -- are you asking does

6   the page that's provided to the user or does the screen show

7   these are bookmarks and these are --

8          THE COURT:  Yes.

9          MR. WATKINS:  -- bookmarked before?

10         That's one option, yeah, that it would create -- it would

11  show that distinction to the user so the user could clearly see

12  these were bookmarked items or "These are ones that I've

13  already looked at."  And then the global results would also be

14  part of this list, but it would be clear that these haven't

15  been previously bookmarked or favored and so the user can look

16  at those as well.

17         THE COURT:  Okay.

18         MR. STAFFORD:  And, Your Honor, there are other slides

19  in our technology tutorial for this patent.  I'll conclude

20  Google's presentation on the '375 patent with this slide in the

21  interest of time.

22         THE COURT:  All right.  Thank you.

23         MR. STAFFORD:  So unless Your Honor has any questions

24  about the '375 patent, I'll now turn to the '586 patent.

25         THE COURT:  Yes.  Go ahead.  You can go on to the

 1   '586.

 2         MR. STAFFORD:  Sure.

 3      So the '586 patent tutorial slides begin at Slide 88 with

 4   our presentation.

 5      Slide 89 of the presentation shows the intro of the '586

 6   patent, and so this is the cover of the '586 patent; and as

 7   indicated here, the '586 patent's title is "Relaying

 8   Communications in a Wireless Sensor System" and it claims

 9   priority to May 27, 2004, which is the relevant date for this

10   technology background.

11      The key concept here for the '586 patent is using a

12   wireless mesh network, and the '586 patent is directed to using

13   devices such as sensors or audio devices within this wireless

14   mesh network instead of just relying on network nodes within

15   the wireless mesh network.

16      And I'm just going to jump ahead in the presentation to

17   Slide 98 where we provide a definition of "mesh networks" as it

18   was known at the time of the '586 patent.

19      And as indicated here by this definition, mesh networks

20   are networks that include at least two pathways to each node.

21   While some mesh networks can be what's called fully meshed,

22   meaning that every node has to have direct connection to

23   another node, this is actually not the norm as indicated here

24   by this definition.

25      It's not the norm for the reason that they are very

1    elaborate and expensive if you require a network to be fully

2    meshed.  Instead, as indicated by this definition, most mesh

3    networks are partially meshed, which means that the pathway

4    goes from each node to every other, which would allow for

5    redundancy, which is important within a wireless mesh network

6    because if there's a failure where one node within this mesh

7    network goes offline or is having technical issues, the data

8    path can be rerouted so the entire mesh network doesn't go

9    offline.  Just this node is removed from the wireless mesh

10   network.

11        And, Your Honor, it goes to Slide 91 of our presentation

12   just jumping back to the '586 patent where it provides an

13   example of the wireless mesh network within the '586 patent.

14        And so here this example just shows the wireless mesh

15   network is within a building, which is annotated in Figure 1 as

16   a yellow box.  And then within this wireless mesh network,

17   there are sensor units which are 102 -- elements 102 and

18   annotated in green.  There are also repeater units, which are

19   annotated in orange.  It's 110 and 111.  And all of these units

20   are connected to the base unit, which is annotated in blue as

21   112.

22        And this base unit then communicates with what's called

23   the monitoring computer, which is 113, and all of these units

24   together form a wireless mesh network.

25        THE COURT:  So the base unit must communicate with

 1   each of 102 through 106?

 2           MR. STAFFORD:   The base unit does communicate through

 3   102 through 106.  Now, as I was discussing with the partially

 4   meshed network, if there's a failure, for example, where a

 5   sensor unit goes offline or something else happens, the base

 6   unit could then communicate with other sensor units or it could

 7   add other additional sensor units.  But, yes, the base unit

 8   would be communicating with the sensor units and the repeater

 9   units.

10           THE COURT:   And the sensor units, what would -- what

11   is a sensor unit?

12           MR. STAFFORD:   So the sensor unit, it can be something

13   that -- for example, there's an audio-enabled unit or it could

14   be a unit that has other general sensing capabilities; but

15   it's -- it is a node within the wireless mesh network and also

16   has -- for example, Slide 92, as the '586 patent makes clear,

17   the sensor unit and the repeater units share the same

18   functionality.

19         And so the '586 patent, when it describes these units, it

20   describes them interchangeably.  So it could -- it could still

21   have the same functionality as the repeater unit.  It would

22   still transmit and communicate with other nodes within the

23   wireless mesh network.  It also could include the audio-enabled

24   communication or audio-enabled portion as a sensor.

25         There are other examples that are given by the '586 patent

1  where it could also be alarms or other kinds of sensing that

2  could be performed by that sensor unit.

3       **THE COURT:**  Could it be another communication device

4  or no?  The sensor unit then communicates with another device

5  such as a laptop or a smartphone?

6       **MR. STAFFORD:**  The sensor unit could be a

7  communications device.  It's not limited.  It can communicate

8  with the repeater units or other sensor units.  So there's no

9  requirement that the sensor unit not be a communication device.

10  And, in fact, it does -- as the '586 patent describes, it does

11  communicate with these repeater units and other sensor units to

12  create the wireless mesh network.

13       **THE COURT:**  So the repeater unit takes the signal from

14  a sensor unit and then repeats it and then transmits it, or

15  what does it do?

16       **MR. STAFFORD:**  Yes.  Within the example provided in

17  Figure 1, the repeater unit takes a communications packet or

18  receives a communication from a sensor unit and transmits it to

19  the base unit.  It also could transmit it to other sensor

20  units, and it's just part of that wireless mesh network.

21       But, again, the '586 patent makes clear that the

22  functionalities, when it's talking about the repeater unit,

23  could also apply to the sensor unit so the sensor unit could

24  also perform those same functionalities of transmitting and

25  receiving of the communication within the wireless mesh

1    network.

2         **THE COURT:**  And the dots, the three dots between the

3    sensor units, what does that represent?

4         **MR. STAFFORD:**  Those are communications between the

5    sensor units, but it's also just showing that there could be

6    additional sensor units here as well.

7         **THE COURT:**  Okay.

8         **MR. STAFFORD:**  Okay.  Now, just to skip ahead to

9    Slide 96.  And so this is still talking about the example of

10   Figure 1, but we've provided an annotation here to kind of show

11   what the signal path could be within this wireless mesh

12   network.

13        And as we were talking about before, these arrows that

14   were already existing within Figure 1 between the sensor units

15   and the repeater unit are showing the transmission of data,

16   wireless transmission between the repeater unit and sensor

17   unit.

18        Now, just for example purposes we've annotated this taking

19   a path that we've annotated just as an example where you would

20   go from the base unit 112 to repeater unit 110 and sensor unit

21   102.  And so as shown by these red dots, the data can flow from

22   base unit to repeater unit to sensor unit 102 and back.  And so

23   this is just showing how it works when this is in operational

24   mode.

25        Now, we've gone through -- we'll step through a

1  hypothetical that we used which the '586 patent is focused on,

2  which is identifying fault issues and correcting them.

3       So, for example, here this is taking where you all of a

4  sudden realize there's a communication problem, that data is

5  not being transmitted from repeater unit 110 to sensor unit 102

6  anymore.  So that's a fault issue that's been identified.

7       Now, what happens is that the monitoring unit identifies

8  the repeater unit 111 as one that could handle the transmission

9  to sensor unit 102 instead of flowing through repeater unit

10  110.  So what happens is the repeater unit adds sensor unit 102

11  to its pathway to be able to route the data to sensor unit 102.

12       So after it adds 102, what happens is that repeater unit

13  110 would move sensor unit 102 so sensor unit 102 is no longer

14  going to be transmitting -- it's not going to be transmitting

15  to unit 102 anymore.  And this is identified within what's

16  called the table of identifiers within these units.

17       And so these units include what the claim talks about is a

18  typical identifier that has the ID for each of these different

19  units that are making up the wireless mesh network; and so when

20  it receives a packet that includes the ID, it can route it to

21  the proper endpoint or other devices.  So it could include this

22  ID for sensor unit 102.

23       And so by doing this process, the repeater unit 111 now

24  knows when it gets a packet that says "I need to go to sensor

25  unit 102," it can route it happily to sensor unit 102.

1      **THE COURT:**  Okay.

2      **MR. STAFFORD:**  And so this is just showing the final

3   result of when this is performed correctly then, it allows for

4   this wireless mesh network to still be operational and be able

5   to transmit and receive data.  It's going to flow through

6   repeater 111 instead of having to rely on 110.

7      And one other technical feature of the '586 patent relates

8   to what's called this reset element, and the reset element is

9   an element that's within the device.  Here it's within the

10  sensor unit.

11     And the reset element is going to be coupled to a

12  controller, and the purpose of this reset element is to be a

13  switch so that it can put the sensor unit into a receiving mode

14  and allow it to join the wireless mesh network.

15     And so that's -- we just wanted to address this as a final

16  technical aspect of the '586 patent and explaining what this

17  reset portion functionality would be within these units within

18  the wireless mesh network.

19     And, Your Honor, again, similar to the '375 patent, while

20  we have other slides in our technology tutorial for this

21  patent, I'll conclude Google's presentation on the '586 patent

22  with this slide in the interest of time.  So unless Your Honor

23  has any questions about the '586 patent, this concludes

24  Google's presentation.

25     **THE COURT:**  Could you go back two slides to the one we

1    were looking at that set up -- that illustrated the mesh

2    network?

3              **MR. STAFFORD:**  This one?

4              **THE COURT:**  Yes.

5         So what about 120 and 121, all those devices, the pager

6    122, the phone 123?  What's their -- and I see some arrows and

7    communications.  Does that mean the entire network, then that's

8    what it communicates with, these other devices?

9              **MR. STAFFORD:**  Yes.  So this is just an example that

10   it provides for these devices.

11        Again, 101 here, that dashed line, that's the building

12   where this wireless mesh network would exist within.  This is

13   just showing that this information from the wireless mesh

14   network could be transmitted then to, for example, the Internet

15   or other devices outside of the building.

16        And those portions -- those devices, though, are not going

17   to be part of the wireless mesh network within this example.

18   The wireless mesh network in this example is showing it

19   through -- within the building 101 and flowing from the base

20   unit to repeater units and sensor units.

21        But it's just acknowledging the fact that this isn't going

22   to be what would be called like an intranet where it's all

23   wholly contained within the building.  In fact, the information

24   could be transmitted outside the building and transmitted to

25   the Internet, and that information could be received by the

1  monitoring unit and then transmitted through the building and

2  the wireless mesh network.

3          **THE COURT:**  All right.  So it's not really directly

4  relevant to the network, the mesh network.

5          **MR. STAFFORD:**  Correct.

6          **THE COURT:**  Okay.  All right.  Thank you.

7          **MR. STAFFORD:**  You're welcome, Your Honor.

8          **THE COURT:**  Okay.  I guess the ball is in your court,

9  Ms. Caridis.

10          **MR. CARIDIS:**  Caridis.  Thank you, Your Honor.

11      I'm going to share my screen now.

12      Your Honor, can you see the technology tutorial

13  presentation for Sonos on your screen?

14          **THE COURT:**  Yes.

15          **MR. CARIDIS:**  Wonderful.

16      Your Honor, I first wanted to start, if you'll indulge me,

17  with a brief introduction to my clients in case you're not

18  familiar with Sonos.

19      Sonos was founded in 2002 at a time where home music

20  looked very different than it does today.  Back then the iPod

21  was brand new, MP3s were coming into favor, and CDs were still

22  king.  At that point speakers were directly connected to the

23  audio source.  For example, a boom box might have a CD player

24  but it only played through the attached speakers.

25      More complicated home stereo systems existed, but you had

1    to connect the speakers by wire to the audio output.  So if you

2    wanted to have speakers in different rooms, you had to drill

3    holes in the walls and run speaker wire throughout your house.

4        The founders of Sonos were from the tech industry, not the

5    audio industry, and so they approached the problem of home

6    sound systems without the assumptions and biases of existing

7    audio companies.  They placed intelligence in each audio

8    player, used that intelligence to create a decentralized and

9    interconnected system, used the Internet to access music, and

10   sent audio around the home wirelessly.

11       Sonos was a true startup.  The founders invested their own

12   money and worked in small offices in Santa Barbara to develop

13   the first product designs and prototypes, which shown on the

14   screen here in Slide 5 are actual pictures of those early

15   offices in Santa Barbara and Boston where the original

16   prototypes and designs were developed.

17       Sonos announced its first products in the summer of 2004

18   and it took years for the rest of the market, including Google,

19   to follow into this advanced home audio space.

20       And today Sonos offers an array of home audio products,

21   some of which are accused in this case, as well as several

22   platforms with which users can control those products.  And

23   Sonos also has a portfolio of over a thousand homegrown patents

24   relating to its home audio products.

25       So turning to the first asserted patent in this case, the

'187 patent was originally assigned to Motorola and was later purchased by Google.

Now, when the '187 patent was filed in 2002, digital media content was predominantly delivered to end users by downloading entire files in order to play them back.  This was because for most people the Internet simply wasn't fast enough to stream content.  And by "stream content," I mean downloading it fast enough to play it in realtime.  So users had to wait for a music file to be downloaded before they could play it.

So within that paradigm, the distributors of digital content had to implement security measures to help prevent piracy.  If whole copies of content were going to be downloaded and were going to reside on an end user's system, content providers needed some means to prevent those users from making additional unauthorized copies or using the downloaded files in a way that the provider had not intended.

This isn't as much of an issue with streaming systems because the files don't generally end up in whole on the end user's computer.  Instead, they're downloaded and played at the same time so they flow through temporary storage buffers but don't wind up on the user's hard drive as a complete file.

But, anyway, the systems used to protect against unauthorized copying or use of downloaded files are as, you know, we heard Mr. Watkins talk about, referred to as digital-rights management or DRM systems.  And these DRM

1    systems allowed publishers or authors to control what paying

2    users can do with a given work.  Can they copy the work?  Can

3    they play the work?  What can they do with this protected

4    digital content?

5        For example, DRM systems generally encrypt files and only

6    provide the decryption keys to authorized devices.  Put

7    differently, by encrypting the files and then restricting

8    access to the keys needed to decrypt those files, the DRM

9    systems can prevent unauthorized copying and use of those

10   protected files.

11       The '187 patent acknowledges this fact and Mr. Watkins,

12   you know, put up this portion of the background of the

13   invention that I have here on Slide 13.  The background starts

14   with a discussion, again, of how content owners were worried

15   about the ease with which their content can be copied and

16   shared, and it states that DRM systems were known and can

17   address these concerns.

18       But the '187 patent was particularly concerned with

19   solutions for sharing rights among devices, and it explains

20   that existing solutions for sharing rights among devices

21   suffered from two problems.  First, the registering --

22   registering devices as authorized is cumbersome; second, the

23   '187 patent explains that the security created by existing DRM

24   systems may be threatened if new devices can be registered

25   remotely.

1      In light of these concerns, the background of the

2  invention concludes, and I have this quote here on Slide 14,

3  that (reading):

4          "A need exists for domain-based digital-rights

5          management with easy and secure device enrollment that

6          increases the security of content."

7      So I want to stress here that there are two problems the

8  applicant stated it was seeking to solve; namely, the ease and

9  security of the registration process.

10     Now, this passage mentions domain-based DRM systems, and

11  Your Honor asked again what is a domain.  So it is important to

12  understand what domain-based DRM is in the context of this

13  patent and the claims and the parties' dispute.

14     Put simply, domain-based DRM, as used in this patent,

15  refers to the process of controlling digital rights for an

16  entire domain of devices rather than for individual devices

17  standing alone.

18     For example, if you think of all of the devices on a home

19  network as being part of the same domain, then domain-based DRM

20  would refer to the process of governing the user's rights to a

21  piece of media across all of those devices.

22     The specification of the '187 patent gives an example of

23  this when it describes a situation where a user pays to access

24  a movie a single time but wishes to view that movie on one of

25  several authorized devices.

1        It's also important, Your Honor, to understand how keys

2   work in the context of DRM systems, and Mr. Watkins touched

3   previously on keys.  Both parties here agree in principle that

4   the private keys at issue in the '187 patent are cryptographic

5   keys.  At a high level that fact is confirmed by an express

6   definition in the patent that the claimed private keys are used

7   for decrypting content in DRM systems in order to control which

8   devices can access a particular piece of content.  Put simply,

9   if you don't have the proper key, you can't decrypt and,

10  therefore, view or listen to the digital content.

11       Again, this ties into the basic idea of a DRM system,

12  which is that by controlling the access to the keys needed to

13  decrypt or unlock the content, you can control access to the

14  content itself.

15       Now, Mr. Watkins discussed what he called cryptographic

16  primitives and Google's slide presentation includes what were

17  described as exemplary primitives.  I don't need to belabor

18  this point, but the notion of cryptographic primitives are not

19  in the record anywhere.  The patent doesn't disclose crypto --

20  doesn't discuss cryptographic primitives.  Google's expert, who

21  submitted an expert declaration and also sat for deposition,

22  didn't so much as mention cryptographic primitives at all, and

23  Google didn't submit any extrinsic evidence relating to

24  cryptographic primitives.

25       What's happened here is that Google's expert admitted that

1   private keys are cryptographic keys, but Google has now

2   realized that Sonos doesn't use cryptographic keys so Google is

3   trying to redefine "cryptographic" so it doesn't involve

4   encryption or decryption.

5        Now, you'll hear much more about this on May 11th at the

6   *Markman* hearing, but I just want to make clear for the record

7   that Google Slide 7 and the ensuing animations that discuss

8   cryptographic primitives, that Sonos strongly disagrees with

9   those -- with what's presented on those slides.  There's no

10  evidence for it.  They are not technical facts and, instead,

11  they're an attempt to create a linguistic taxonomy to support a

12  claim construction position.

13       I would also, Your Honor, want to briefly point out

14  another related issue.  What I've put up on the screen here is

15  Google's Slide 19 with additional material that I have added in

16  red text.

17       Now, you heard from Mr. Watkins and it says on the screen

18  here that the portion of the '187 specification that's cited,

19  namely, lines 46 to 50 of the '187 patent -- column 2 of the

20  '187 patent, are a preferred embodiment.  This is not a

21  preferred embodiment, Your Honor.  It's expressly definitional.

22       If we look at the three lines above Google's cited

23  portion, which are what I have included in red on this slide,

24  we see that the portion of the spec that Google didn't cite

25  explicitly says (reading):

1          "Prior to describing the DRM system in accordance

2     with the preferred embodiment, the following definitions

3     are provided..."

4          So, again, Your Honor, you'll hear more about this at the

5     *Markman* hearing, but I just want to make clear since you have

6     this presentation in front of you that it's misleading to

7     characterize this passage as a preferred embodiment.  If you

8     just look three lines above, we can see what's actually going

9     on in the spec.

10          Turning back to the patent and the claims at issue, I

11     think, you know, Mr. Watkins described with his reference to

12     the figures the general process of what is being claimed; but I

13     think it's helpful -- I like illustrations -- to illustrate the

14     process that was discussed using the diagram that I have here

15     on Slide 18.

16          In this diagram we have a television and a computer on the

17     left and that represents the existing domain of devices.  The

18     phone represents a new device that will be joining that domain.

19     For instance, maybe you got a new phone and want to be able to

20     play on it the videos that you've already purchased.

21          According to Claim 1, the new device would receive domain

22     information from one of the TV or the computer as shown by the

23     arrows on the left-hand side.  Then the key issuer would be

24     provided with that domain information.  The key issuer is

25     outside of the domain of devices.  And the key issuer then

1   generates a private key based on the domain information it

2   received and provides that key to the newly registered device.

3       And you can see here that all three of the devices within

4   the domain, both the existing devices and the new phone, all

5   now have this same private key as illustrated with the green

6   key icon.  In this way all of these devices can then decrypt

7   the same files.

8       So before we turn to the next patent, I want to spend a

9   little bit of time talking about the building blocks of modern

10  computers.

11      Your Honor asked about the logic circuitry in the figures

12  of the '187 patent and that's a disputed claim term, and we

13  will get into that on May 11th; but the background, the

14  technical background, I think here will help inform the

15  decision or inform the discussion that we have at the *Markman*

16  hearing.

17      So starting at a very low level, what I have on the screen

18  here is a graphical representation of a logic gate.  Now, to

19  back up, computers are digital devices.  Everything is one of

20  two states, on or off.  This is often called binary because

21  there's nothing other than those two choices.

22      So a logic gate, like what's shown on the screen here, is

23  used to perform a logic operation on one or more binary inputs

24  and to produce a binary output.  In other words, the inputs are

25  0 or 1 and the output depends on the logic and the input and

1   will also be a 0 or a 1.

2        So the gate illustrated on this slide is known as an "and"

3   gate.  It takes inputs as A and B; and if both A and B are 1,

4   then the output at Z will also be 1.  There are only a handful

5   of basic logic gates like this, but these gates can be

6   aggregated together to perform more complicated operations.

7        For example, we can combine our original "and" gate with

8   other logic gates to create logic circuits that can perform

9   basic math operations.  The logic circuit shown here is known

10  as an adder, which is a digital circuit that performs addition.

11  Logic gates can be used to construct various different logic

12  circuits that each perform higher level of mathematical

13  operations.

14       So then if we focus on this logic circuit and zoom out a

15  great amount, we can see that large numbers of logic circuits

16  can be integrated together to a block of semiconducting

17  material, like a silicon wafer.

18       Other circuits are also integrated on the wafer.  These

19  include things like storage, units to decode instructions,

20  units that serve as traffic cops to direct data between all

21  these various components.

22       The image on the screen here is a magnified view of a

23  silicon chip.  It may contain millions or billions of logic

24  gates formed into various kinds of circuits.

25       Again, zooming out, our silicon wafer is combined with

1  additional elements like power and clocking circuitry and a
2  control unit to form a microprocessor like what's shown on
3  Slide 24.  That microprocessor can then be integrated onto a
4  motherboard that includes various network and peripheral
5  interfaces and storage, many of which themselves are made up of
6  individual gates and circuits.

7      And, finally, motherboards can be combined with an
8  enormous number of other computer components, including hard or
9  flash drives, graphic processors, special purpose chipsets, and
10 the like, to create a workstation of the kind you might buy
11 today.

12     And we're not only talking about typical computers here.
13 The same basic underlying technology powers phones, tablets,
14 gaming consoles, and other consumer electronics.

15     And so, Your Honor, that's just a brief overview of kind
16 of if we start at the very macro level of the logic gate, we
17 can see how you build out and out and out until you get to
18 these modern computing devices.  And in the context of the '187
19 patent we'll hear more about that when we get to the *Markman*
20 hearing in a few weeks.

21     So unless Your Honor has any questions, I'll turn to the
22 '206 patent.

23         **THE COURT:**  Go ahead.  Thank you.

24         **MR. CARIDIS:**  Okay.  So the '206 patent was also
25 issued to Motorola; and, as Mr. Watkins explained, it generally

1   relates to audio processing and specifically a method and

2   apparatus for adaptive echo and noise control.

3       Now, Mr. Watkins gave a general overview of what noise

4   suppression and echo cancellation are, and I don't need to and

5   I'm sure you don't want to hear me repeat any of that.  So I

6   think I'm just going to jump to, unless you have any questions

7   about that, what you identified as the central point or the key

8   to this '206 patent.

9       So jumping to slide -- one moment.

10      I think Your Honor correctly identified that the key to

11  this patent is the ordering of echo cancellation and noise

12  suppression based on the amount of noise that has been detected

13  or measured.

14      And just to kind of drive this point home, the '206 patent

15  actually provides some functional block diagrams of this that I

16  think are illustrative here.

17      So Figure 6, which is currently on the screen, is

18  described as being in a high-noise setting you first perform

19  noise suppressing on a -- noise suppression on an incoming

20  signal and then you perform echo cancellation.  Conversely, on

21  a low-noise setting, you first have echo cancellation and then

22  you have noise suppression.

23      So you can see in Figures 6 and 7 how the actual order of

24  those functional blocks that represent the two sound processing

25  actually changes, and that's what the crux of this invention

1  is.

2       Each of the independent claims contain this concept of

3  adaptively determining an order of noise suppression or echo

4  cancellation based on the amount of background noise.  Claims 1

5  and 9 both specifically detail adaptively determining an order

6  and Claim 19 similarly discusses configuring the order of these

7  two processes.

8       And the importance of determining this order, and this is

9  the crux of the invention, is confirmed in the prosecution

10 history where the applicant distinguished over prior art by

11 arguing that prior art didn't disclose the order of echo

12 cancellation and noise suppression and explained that order is

13 defining performing echo cancellation prior to noise

14 suppression or vice versa.

15      So the issue here, and as Your Honor pointed out, the

16 central point here is determining which of echo cancellation

17 and noise suppression will occur first based on the amount of

18 noise suppression in the signal itself -- sorry -- based on the

19 amount of noise in the signal itself.

20      And I guess Mr. Watkins did a good job in describing the

21 general technology background of noise suppression and echo

22 cancellation, which were both known processes because unless

23 Your Honor has any questions, I can turn to the '375 patent.

24      **THE COURT:**  Yeah.  That's fine.  I think I have the

25 information.  So go ahead.  You can go on to the next one.

1          **MR. CARIDIS:**  Great.

2       So the '375 patent, as Mr. Stafford explained, is titled

3  "Personalized Network Searching."  And one thing that I wanted

4  to note, and I'll explain why this is important in a bit, is

5  that the application claims priority through a long line of

6  continuation patents.  So this particular application has so

7  far led to seven issued patents and there are more being

8  prosecuted, and each patent is directed to different aspect or

9  aspects of the specification.

10      So what that means in this case is that we really have to

11 look at the claims at issue to determine what's actually

12 relevant for this present dispute.  If you just look at the

13 specification or even preferred embodiments of the

14 specification, it might be relating to topics and subjects that

15 are claimed in different patents and not part of the '375

16 patent at all.

17      So what I have on the screen here is Claim 1, which is

18 asserted in this case, and I've split it into two parts:  A

19 synchronization part and a search part.  And you heard

20 Mr. Stafford talk in general about some of these topics, but

21 just to be a little bit more granular as to what's actually

22 going on.

23      The first set of claim elements claim receiving user input

24 to modify a set of favorite items stored on your computer.  So

25 imagine adding New York dot -- nytimes.com as a bookmark on

1   your computer that you have sitting at work.  That addition of

2   nytimes.com would be modifying a bookmark.  So the claims

3   recite modifying the favorite stored on the client device, here

4   your computer at work, and then also synchronizing that

5   modification with a set of favorite items stored on a

6   server-side storage.

7       In other words, you have a set of bookmarks stored on your

8   computer and also a set of bookmarks that are stored on a

9   server somewhere and after you've indicated that you want

10  newyorktimes.com to be a bookmark on your computer, the server

11  is then synced and that list on the server now also includes

12  newyorktimes.com.

13      In this way if you then go home and sign onto your

14  computer at home, your list of bookmarks at home can be

15  synchronized by the server -- with the server and your list of

16  bookmarks at home would then include newyorktimes.com.

17      Now, the second part of the claim relates to search, and

18  the language here in my mind is pretty straightforward but it's

19  a claim construction dispute, and you'll hear much more about

20  this language in a couple weeks.

21      I think for purposes of this discussion, it's just

22  important to note that in what's colored in blue in Slide 46

23  relates to sync and the green portion is talking about -- is no

24  longer talking about modifying or synchronized favorite items;

25  rather, it's talking about presenting the results of a search.

1        So just speaking briefly about the background of the art

2    as it's described in the patent.  And I think that, you know, I

3    take issue with some of Mr. Stafford's characterizations of the

4    background of the art, so just touching on those briefly.

5        The '375 patent explained, the applicants described

6    already existing commercial products that allow a user to store

7    her bookmarks on a server on the Web.  One such product, and

8    you can see in the blowup of column 1 on this slide, is called

9    Blink Pro, and you can see on the right-hand side of the screen

10   an image from the web page for Blink Pro in November of 2002.

11   And Blink Pro is described as a powerful bookmark management

12   that lets you access the sites you visit most from anywhere and

13   store your bookmarks on a secure account.

14       Now, Mr. Watkins also said that preexisting tools relating

15   to bookmark management did not have synchronization, that they

16   must -- that synchronization must be done manually and that

17   they did not provide automatic synchronization; but that's

18   belied by the patent itself which explains that in some

19   cases -- and this again is talking about known commercial

20   products -- users can also automatically synchronize each of

21   the user's computers to the common lists of favorites or

22   bookmarks stored online.

23       And so -- sorry -- we see that here in Slide 49 where the

24   Blink Pro page explains that you can add new sites from

25   anywhere and access your sites from any wireless device.

1          The '375 patent also provides some context on the

2     background of searching.  For example, the specification in

3     column 2 explains that conventional bookmark-related software

4     included systems and methods for searching previously stored

5     bookmarks by keyword.  The specification in column 8 also

6     discloses that conventional search engines, which search global

7     search objects, were known.

8          Now, Your Honor asked a question about a concrete example

9     of personalized searching, and I'll start out by saying that

10    it's Sonos' position that personalized searching is not

11    required in these claims and that will be an issue for claim

12    construction.

13         But just to give a concrete example of personalized

14    searching, let's say that you're an avid gardener and on your

15    computer you've bookmarked your favorite nurseries that are

16    open in the area; and later when you're interested in searching

17    for a particular varietal of rose, you can search for that rose

18    and the search results will come back with not only, you know,

19    a generic search of that varietal across the entire Internet

20    but it will also bring back and identify to you which of those

21    nurseries that you have bookmarked also carry or, you know,

22    disclose or mention on their website that particular varietal

23    of rose.

24         And so in this way, you know, depending on what you're

25    searching for, depending on the global indices that you're

1    searching, you might not -- it might not be readily apparent

2    that the nurseries nearby carry that varietal of rose; but by

3    searching your bookmarks specifically in addition to searching

4    the global indices, your search can be personalized by making

5    sure that the results of your particular bookmarked pages are

6    identified for you.

7             THE COURT:  The search of the general Internet using

8    the criteria of a particular varietal of rose, that portion of

9    the search is not influenced by the bookmark?

10            MR. CARIDIS:  That is correct.

11            THE COURT:  But you're saying that the bookmark

12   reference may be influenced because it will either narrow or

13   annotate or somehow indicate which of your bookmarks best

14   respond to that particular inquiry or that query?

15            MR. CARIDIS:  Sure.  So, basically, whether any of the

16   nurseries that are your favorites carry that rose varietal.

17            THE COURT:  Right.  Okay.

18            MR. CARIDIS:  So before I conclude, I think I want to

19   touch on something that I briefly mentioned at the outset

20   because we heard a lot of discussion about personalized network

21   searching by Mr. Stafford, and specifically you heard extensive

22   characterizations of what these claims must cover and what this

23   patent must be talking about based on statements in the

24   specification itself and not based on the claims, but let's

25   talk about that specification.

1          That same specification, the '375 specification, has been

2     used by seven patents prior to the '375, and I have those

3     patents on the screen here.  And the numbers in parentheses

4     next to each patent number indicates a particular independent

5     claim in that patent.  So this is a sampling of claims in these

6     other patents that all share the same specification.

7          And you can see that some claims reference bookmarks or

8     favorites, some reference advertisements, some reference

9     search.  Ultimately, despite sharing the same specification,

10    there's no one universal theme spanning all these claims.

11         So when you hear that this invention must be talking about

12    personalized search because the specification mentions it,

13    that's just not true and a straightforward example is the '626

14    patent, which I have on the screen here.

15         The '626 patent shares the same title, is titled

16    "Personalized Network Searching."  It shares the same abstract

17    and the same spec; and Claim 1 is on the screen, and you can

18    see that it also is nearly verbatim of the sync language in

19    Claim 1 of the '375 patent.

20         But you can see that Claim 1 of the '626 patent doesn't

21    mention searching at all, and there are examples that go the

22    other way.  There are examples in this patent family that are

23    directed to where you have claims directed to searching but not

24    to favorites or bookmarks.

25         And the point that I want to make here, Your Honor, the

1    important takeaway is that this specification includes a lot of

2    descriptions and embodiments, but we can see from Google's

3    prosecution of that specification that not all descriptions or

4    embodiments apply to every claim.

5         The technology at issue in this case, you know, is set

6    forth by the claims themselves; and, you know, we can see,

7    again, the '375 patent, Claim 1, is the combination of

8    favorites syncing and search.

9         **THE COURT:**  Okay.  Well, we're getting into argument

10   here.  This is not -- you are now exceeding the tutorial at

11   this point.  This is something you're going to argue, I'm sure,

12   at the claim construction hearing.

13        **MR. CARIDIS:**  Understood, Your Honor.  I was just

14   referring to the multiple -- I was just responding to the

15   multiple references of personalized network searching that you

16   heard before, but I will move on.

17        **THE COURT:**  All right.

18        **MR. CARIDIS:**  So the final patent is the '586 patent

19   and it's titled "Relaying Communications in a Wireless Sensor

20   System."  And this patent family was originally assigned to

21   Nest Labs, whose products in the early 2010s consisted of smart

22   thermostats and smoke and carbon monoxide detectors.  Google

23   acquired Nest Labs, including this patent family, in 2014 and

24   continued to file new continuation applications, including the

25   one that matured to the '586 patent.  So the fact that this

1   patent originated from work done by Nest helps provide some

2   context for the stated field of invention.

3       The '586 patent explains that the present invention

4   relates to a wireless sensor unit system providing

5   bidirectional communication between a sensor -- e.g., smoke

6   sensor, fire sensor, temperature sensor, water, et cetera --

7   and repeater or base unit in a building protection system;

8   right?

9       So this patent as filed was talking about sensor units

10  which were described as units that could detect anomalous

11  conditions like increased temperature or smoke from smoke

12  alarms that were used or deployed in a building protection

13  system.

14      And the '586 patent explains that in the prior art adding

15  sensors to existing structures can be prohibitively expensive

16  due to the cost of installing wiring between the sensors and a

17  centralized monitoring device; but by using wireless sensors,

18  the sensor units can detect anomalous conditions like smoke or

19  rapid temperature rise and communicate that to the base unit.

20      Your Honor asked previously what the figures up on the top

21  right-hand corner of Figure 1 were, and the patent describes

22  that a sensor unit can send an anomalous condition report to

23  the repeater unit that is then sent to the base unit; and the

24  base unit can then contact a supervisor, like a fire station,

25  through known communication means, like the telephone, pager,

1   and Internet shown here, in order to alert the fire station

2   that there is a sensor unit in this particular building that

3   has detected smoke or an increase in temperature.

4        So to describe Figure 1 in a bit more -- in a bit of a

5   broader sense, the sensor units 102 through 106 are, for

6   example, smoke detectors that wirelessly communicate with

7   repeater units which then wirelessly communicate to a base

8   unit.

9        Mr. Stafford mentioned that the three dots between the

10  sensor units indicate communication lines.  I'm not aware of

11  anything in the record that would support that.  I'm not aware

12  of anything in the record that indicates that the sensor units

13  can communicate with each other.  The only disclosures are the

14  sensor units communicating with the base unit through

15  potentially the optional repeater units.

16       There are several preferred embodiments that are disclosed

17  in the specification.  One, like I just mentioned, the repeater

18  units are not necessary so a sensor unit can communicate

19  directly with the base unit.

20       Sensor units can also potentially communicate

21  bidirectionally.  So in that case, you know, the sensor unit

22  can send a message relating to an anomalous condition and the

23  base unit can send an instruction asking for the present

24  temperature.

25       In some embodiments, like Figure 1, repeaters are used to

1   extend the range of the system by relaying communications.

2   And, you know, when I think of relaying communications here,

3   you know, in my mind I think of the Olympic torch race -- the

4   Olympic torch relay where you're just passing the torch from

5   one runner to the next in order to get the torch from point A

6   to point B.  That's what the repeater units are doing here.

7   They -- if the sensor unit 102 is too far away to communicate

8   with the base unit 112, the repeater unit will first receive

9   the message, see that it's destined for base unit 112, and just

10  pass it off.

11      So the repeater units, you know, just are -- just route

12  the traffic from point A to point B, but they're handing off

13  the same message in order to get it to its final destination.

14      So, you know, if the invention is described about -- as

15  describing systems for building protection, obviously, you

16  know, Sonos doesn't -- is not in the business of building

17  protection sensors; but when Mr. Stafford mentioned that the

18  claims relate to audio-enabled wireless devices, what he has to

19  be referring to is the figure and the blurb that I have here on

20  the screen.

21      Figure 2 is a block diagram of a sensor unit.  So remember

22  the patent previously explained that sensor units detect

23  anomalous conditions; and the specification explains that in

24  one embodiment of a sensor unit, the optional audio output

25  device is provided.

1          So think of the noise a smoke detector makes when it

2     senses smoke or when it's 3:00 o'clock in the morning and the

3     smoke detector decides that it's low on battery.  You know,

4     that's what this is talking about.

5          But this figure and the corresponding text in column 9 is

6     the only mention of audio in the entirety of the claims.  So

7     this was the -- you know, these were the sensor devices that

8     the specification was discussing.

9               THE COURT:  Can we go back to the prior slide --

10    yeah -- about the three dots?

11              MR. CARIDIS:  Yeah.

12              THE COURT:  There's no dispute that this patent

13    concerns a mesh network; is that right?

14              MR. CARIDIS:  Your Honor, there actually is a dispute

15    there, and that is because mesh network was not added to this

16    patent until 2018 when this application was first filed.  You

17    can look through the specification and you will not see "mesh

18    network" anywhere.

19         It was added to the preamble, and we can disclose later

20    whether the -- we can discuss later whether the preamble is

21    limiting or not, but "mesh network" is not found at all in the

22    specification.  It was added to the claims when this

23    application was filed in 2018.

24              THE COURT:  Well, so as of -- what does it mean?  If

25    it was added to the claims in 2018, why is that not part of the

1  invention?

2      **MR. CARIDIS:**  Your Honor, if Google wants to rely on

3  mesh network as part of its invention, then I would submit that

4  we're no longer talking about a 2004 state of the art.  We are

5  talking about 2018 state of the art, and any -- and prior art

6  and other conversations would flow from the practical effects

7  of having this patent judged as of 2018 instead of 2004.

8      **THE COURT:**  All right.  Because a mesh network does

9  require more than just -- without the communication between the

10  sensor units, I'm not sure how this would qualify as a mesh

11  network.

12      **MR. CARIDIS:**  So, Your Honor, you know, I think the

13  parties have disputed what "mesh network" actually means, and

14  so I don't want to get into that; but I think the point here is

15  let's judge the patent as of its filing.

16      You know, I will not dispute Mr. Stafford's

17  characterization that the patent discloses that if repeater

18  unit 110 goes offline, then repeater unit 111 can route

19  messages to sensor unit 102.  So in that way there's some sort

20  of a dynamic route assessment.

21      I think that the actual limits -- the scopes and bounds of

22  what a mesh network is is disputed by the parties and there

23  were expert reports submitted on that particular issue.

24      **THE COURT:**  But you said there is a claim that does

25  not include a repeater unit?

1        **MR. CARIDIS:**  There are embodiments in the

2    specification -- there are embodiments described in the

3    specification that do not include repeater units, yes.

4        **THE COURT:**  But the claims do require a repeater unit?

5        **MR. CARIDIS:**  That's on some level a point of

6    distinction as well, Your Honor.  The claims do not separate

7    the architecture as we see it in this particular figure.  They

8    just talk about an audio-enabled wireless device; and in Sonos'

9    view, they've merged the functions that are described by both

10   the sensor unit and the repeater unit into that audio-enabled

11   wireless device in a way that's not disclosed in the

12   specification, but I don't want to, you know --

13       **THE COURT:**  All right.  Okay.  We'll have plenty of

14   discussion about that.

15       **MR. CARIDIS:**  Indeed.

16       **THE COURT:**  Thank you.  Go on.

17       **MR. CARIDIS:**  And, Your Honor, unless you have any

18   other questions, that concludes my presentation on these four

19   patents.

20       **THE COURT:**  All right.  That's helpful.  I will --

21   that's helpful to us and we will, I guess, have a full hearing

22   of the issues that are now teed up at the claim construction

23   hearing.

24       All right.  Thank you, Counsel.  I appreciate your efforts

25   in trying to educate the Court here.

1          **MR. CARIDIS:**  Thank you very much, Your Honor.

2          **MR. WATKINS:**  Thank you, Your Honor.

3          **THE COURT:**  I'll see you at the claim construction.

4          **THE CLERK:**  Court is adjourned.

5              (Proceedings adjourned at 10:45 a.m.)

6                       ---oOo---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                         **<u>CERTIFICATE OF REPORTER</u>**

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Monday, May 3, 2021

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25