Pages 1 - 65

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

GOOGLE, LLC,                        )
                                    )
            Plaintiff,              )
                                    )
  VS.                               ) NO. 20-cv-03845-EMC
                                    )
SONOS, INC.,                        )
                                    )  San Francisco, California
            Defendant.              )
                                    )
_____)

Tuesday, May 11, 2021

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**: (By Zoom Webinar)

For Plaintiff:

        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        191 North Wacker Drive
        Suite 2700
        Chicago, Illinois  60606
        **BY:  DAVID A. NELSON, ESQ.**

        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        1300 I Street, N.W.
        Suite 900
        Washington, D.C.  20005
        **BY:  JEFFREY S. GERCHICK, ESQ.**

        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        865 South Figueroa Street
        Los Angeles, California  90017
        **BY:  PATRICK T. SCHMIDT, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court

(Appearances continued, next page)

**<u>APPEARANCES, CONTINUED</u>:**

For Plaintiff:

          QUINN EMANUEL URQUHART & SULLIVAN, LLP
          711 Louisiana Street
          Suite 500
          Houston, Texas  77002
    BY:  **BRETT WATKINS, ESQ.**

For Defendant:

          ORRICK HERRINGTON & SUTCLIFFE, LLP
          405 Howard Street
          San Francisco, California  94105-2669
    BY:  **CLEMENT S. ROBERTS, ESQ.**

          ORRICK HERRINGTON & SUTCLIFFE, LLP
          777 South Figueroa Street
          Suite 3200
          Los Angeles, California  90017
    BY:  **ALYSSA M. CARIDIS, ESQ.**

          LEE SULLIVAN SHEA AND SMITH LLP
          656 West Randolph Street
          Suite 5W
          Chicago, Illinois  60661
    BY:  **DAVID R. GROSBY, ESQ.**

<u>**Tuesday - May 11, 2021**</u>                                          <u>**2:30 p.m.**</u>

**P R O C E E D I N G S**

**THE COURTROOM DEPUTY:**  This court is now in session;
the Honorable Edward M. Chen is presiding.

Calling Civil Action 20-3845, Google, LLC versus Sonos,
Inc.  Counsel, please state your appearances for the record,
beginning with counsel for plaintiff.

**MR. NELSON:**  Good afternoon, Your Honor.  This is
Dave Nelson on behalf of plaintiff Google, and with me is
Brett Watkins, Jeff Gerchick and Patrick Schmidt.

**THE COURT:**  All right.  Thank you, Mr. Nelson.

**MR. ROBERTS:**  Good morning, Your Honor.  This is Clem
Roberts from Orrick Herrington on behalf of the defendant
Sonos.  And with me is Alyssa Caridis from our firm, and David
Grosby from LS3.

Thank you.

**THE COURT:**  All right.  Thank you, Mr. Roberts.

We're on for construction of nine terms.  You've each
submitted slides.  We don't have time to go through all 160 of
them.  And I want to try to spend maybe an average of five to
ten minutes per term.  Some of these may not take as long.

And probably the most efficient thing for me to do is if
I've got a particular question that I want answered, then I'll
allow the parties to use whatever slides are useful in that
arena, and you can be selective about that.  So let's try it

1    and see where we go and see where that ends up, rather than

2    just sitting through a lengthy presentation.

3          "Domain information."  Seems to me that Sonos's main

4    argument when you look at the wording around the term, that

5    Google's importation of certain limitations is replicated in

6    some of the claim terms.  And generally, you know, you don't

7    have redundant terms.  And so just the -- just the -- the

8    context and the wording of the claim, itself, would seem to

9    indicate that Sonos' construction is more accurate.

10         So I'll let me Google respond to that argument.

11              **MR. NELSON:**  Sure, Your Honor.  This is Dave Nelson.

12         A couple of things here.  The main thing that we were

13    getting at was to incorporate the antecedent reference.  There

14    was in the prosecution history, as you see from the briefing,

15    some confusion at some point from the examiner as to whether

16    the "domain information" was just some generic reference.

17         And the response there was that it referred to the

18    collection of the devices that share the common account for the

19    protected digital content.  So that was the reason why we

20    incorporated that, because we didn't want to have that same

21    confusion crop up here again.  But in terms of the

22    construction, that's really the only thing that we were getting

23    at.

24         There was one thing in the Sonos briefing that was a

25    little bit concerning which was this notion that domain

1   information had to somehow uniquely identify the domain.   I

2   don't know that that is really something need to address here,

3   Your Honor, given that their construction is just plain

4   meaning.

5            **THE COURT:**  Right.

6            **MR. NELSON:**  But, happy to address that, if you want.

7            **THE COURT:**  Yeah, I don't -- if what they're

8    advocating is plain and ordinary meaning, I'm not going to

9    accept that and import more stuff into it.   I mean, plain and

10   ordinary means plain and ordinary.

11         Isn't it answered by the fact that the -- the context

12   makes it clear that the first step is:   Receiving domain

13   information corresponding to domain of devices from a device

14   existing within the domain?   I mean, it's pretty clear where

15   it's coming from, where it's got to come from.

16         It's not just -- I mean, the context of the claim language

17   would seem to answer your concern about the -- any ambiguity

18   about any antecedent reference?

19         What's your response to that?

20            **MR. NELSON:**  I think in claim 1, Your Honor, that

21    that's pretty apparent.   It's in the apparatus -- the

22    corresponding apparatus claim in claim 10, it's maybe a little

23    less so apparent.

24         And really, this just goes back to the fact that there was

25   inclusion by the examiner at some point during the

1    prosecution,so that had to be dealt with there.  But with

2    respect to claim 1, I think I'm in agreement with Your Honor,

3    it's pretty straightforward that it is -- the antecedent

4    reference is right there.  Both in the preamble and in the --

5    the first time "domain information" is introduced in the claim.

6         **THE COURT:**  And claim 10, the apparatus claim, does

7    also say:  Circuitry receiving domain information from a

8    device existing within a domain of devices which share rights

9    associated with a common account for use, et cetera,

10   et cetera.

11       So, seems like that context is pretty clear.  Seems fairly

12   clear to me.

13        **MR. NELSON:**  Yeah, well, Your Honor, if it's clear to

14   you, that was what we were getting at.  And so, I mean, that's

15   fine, moving forward.  But that -- that was -- to be perfectly

16   frank and open, that was the purpose of our construction.

17        **THE COURT:**  I see.  All right.  Anything you want to

18   add to that, Mr. Roberts?

19        **MR. ROBERTS:**  No.  I think Your Honor has it.  We

20   don't need to take more time with it.  We don't dispute that

21   the domain information comes from a device within the domain

22   of devices.  We don't dispute that those devices share rights

23   associated with a common account.  That's all in the claim.

24        **THE COURT:**  Yeah.  All right.  I don't think there's

25   much of a dispute there.  Let's talk about what sounds like a

bigger dispute.  The question of the application of Section

112, Paragraph 6.

     My -- my read -- and you can tell me where I'm wrong -- is

that "logic circuitry," if it is put in sufficient context in

terms of explaining where it fits, how it fits, what it does,

that there's enough structure there that a POSITA would

understand what that is, at least enough that that takes it out

of the 112, Paragraph 6 arena.  And given that the word "means"

does not appear, that would suggest that this is not governed

by 112.

     But I'll let Mr. Roberts sort of tell me where I'm off

track here.

          **MR. ROBERTS:**  Yeah, let me take that head-on, Your

Honor.

     (Document displayed)

     So first of all, we agree that where "means" is not used,

that we have the burden of showing that there isn't sufficient

structure.  And "sufficient structure" in this context means

sufficiently definite structure.  Those are the terms that the

Federal Circuit has used.  And it needs to be sufficiently

definite structure for a person of ordinary skill in the art to

understand what the claimed structure is.  Doesn't have to be a

specific structure, but it has to be a class of structures

where a person of ordinary skill in the art would understand

what it is.

1        And we also don't dispute, Your Honor, that in some

2    contexts, "circuitry" or "circuit" has been found to be

3    sufficient structure.  And there is Federal Circuit cases cited

4    by both parties which say that the term "circuit" connotes at

5    least some structure.  And then the question is whether it

6    connotes enough structure in context.

7        And this is a question that really requires looking at the

8    evidence and the context.  And we have the burden.  That burden

9    is a preponderance-of-the-evidence standard that comes directly

10   out of *Apex*.  It's not a high burden, but it's a preponderance

11   burden.

12       So the question is:  What's the evidence here?  The key

13   evidence we are pointing to, Your Honor, comes directly from

14   the specification.  And I have it up here on the screen.  Which

15   is this.  This patent specifically says that user equipment,

16   101, additionally includes logic circuitry 221.

17       And by the way, Your Honor, this is the only place in the

18   specification where it says what the logic circuitry is.  And

19   it says the logic circuitry in the preferred embodiment -- so

20   not limited, but in a non-limiting preferred embodiment --

21   comprises -- which as Your Honor knows means includes but is

22   not limited to -- a microprocessor controller.  And then those

23   microprocessor controllers are such as but are not limited to a

24   Motorola or a TIOMAP.

25       So what the specification is telling us is that the logic

 1  circuitry is not an individual circuit within a microprocessor.

 2  It is not a microprocessor.   It is some class -- undefined,

 3  unspecified, class of structures that includes -- comprises --

 4  but is not limited to a microprocessor.

 5      And the problem is when you use the term "logic circuitry"

 6  in that way, you are using it in a way that is open and

 7  unbounded, and not, as in all of the other cases that we've

 8  seen that have construed circuitry, to mean a circuit within a

 9  device.

10      So if we could have the next slide, please.

11      (Document displayed)

12      **MR. ROBERTS:**   This is what Google said both in their

13  Markman brief and in their technical tutorial.   In both

14  places, Google took the position that logic circuitry is a

15  microprocessor.   That's in their reply Markman brief, 74, at

16  1.   And it says -- logic circuitry is described as a

17  microprocessor controller.   That's their argument.

18      That's not what the patent says.   The patent says that

19  logic circuitry -- again, in a preferred embodiment, so not

20  exclusively, but in a preferred embodiment -- includes but is

21  not limited to -- comprises -- a microprocessor.

22      So the patent uses the term "logic circuitry" here far

23  more broadly than all of the cases we have seen which talk

24  about an individual circuit within a microprocessor.

25      Next slide, please.

1    Google's expert takes a different tack.

2    (Document displayed)

3        **MR. ROBERTS:**  Google's expert -- and this is the

4    declaration of Mr. Sherman, Dr. Sherman.

5    It says (As read):

6        "...'logic circuitry' would be understood to refer to

7        a combination of logic gates arranged to perform a

8        number of functions, such as would generally be found

9        in a general-purpose microcontroller...'"

10   So their expert says "logic circuitry," as generally

11   understood, refers to individual arrangements of logic gates

12   within a microprocessor.  That's not what Google said.  And

13   it's not what the specification says.  The specification says

14   this is a category that is broader than microprocessors.

15   And that is a very unique way of using the term "logic

16   circuitry" that takes this case and make it different from

17   every one of the other cases that we've seen and that are cited

18   in the briefing.

19   Next slide, please.

20   (Document displayed)

21       **MR. ROBERTS:**  Here's what our expert, Dr. Wicker,

22   said (As read):

23       "The term 'logic circuitry' is not such a term..."

24   And he's talking about terms here that are reasonably

25   well-defined, by their fusion.

1              "...instead it is a term that persons of ordinary

2              skill in the art regularly use to describe a nearly

3              infinite variety of different structures which

4              perform...functions in vastly different ways.  For

5              this reason it is my opinion that the term in dispute

6              does not in itself specify any reasonably

7              ascertainable class or category of structures."

8         And that is consistent with the specification, because the

9    specification, as we've pointed to, says that "logic circuitry"

10   includes but is not limited to microprocessors; it's a broader

11   category.  But it gives us no foothold for understanding what

12   that category is supposed to be, or what the outer limits are.

13        It's no different, effectively, from saying, Your Honor,

14   "computer stuff."  It's not structurally defined and a person

15   of ordinary skill in the art wouldn't know what the sufficient

16   structure is because of the specific way it's used here.

17        And I want to compare that, Your Honor, to *Linear* and

18   *Apex*.

19        Ms. Caridis, if I could have Slide 13, please.

20        (Document displayed)

21        **MR. ROBERTS:**  So in *Linear,* Your Honor, you didn't --

22   weren't dealing with circuitry in this context.  It calls for

23   a first circuit.  An individual circuit.  And that circuit was

24   within a processor.  Was within a device.  Not a broader class

25   of devices that included microprocessors.

1      And the expert testimony in that case was that a person of

2   ordinary skill in the art would understand the structural

3   arrangements of circuit components from the term "circuit"

4   coupled with the qualifying language.  Coupled with the

5   functional language.  So that's a very different case.  It's

6   not talking about logic circuitry.

7      By the way, there is a dependent claim in *Linear* claim 53

8   that talks about "circuitry."  But it talks about circuitry not

9   as a category of stuff; it talks about circuitry as being the

10   individual components within the first logic circuit.  So it is

11   using "circuitry" more narrowly.

12          **THE COURT:**  Isn't the key not so much whether it is a

13    microprocessor or circuit within a microprocessor or a family,

14    a larger family?  Isn't the key that it is some kind of a

15    circuit that performs a very specific function, whether it's

16    coupled in a certain way or does something in a certain way,

17    such that a POSITA would understand what it is?

18      I know you're focusing on the ambiguity of what a circuit

19   is.  Is it a microprocessor?  Is it part of a microprocessor?

20   Is it just something broader that we don't know what it is?

21      But what about the argument that there is a -- some

22   structure is given to it by its context here, and what it does.

23          **MR. ROBERTS:**  Yes.

24          **THE COURT:**  Why don't you --

25          **MR. ROBERTS:**  Yes, Your Honor.

1      I absolutely agree that the term "circuit" connotes some

2  structural something.  The Federal Circuit has said as much.

3  And if you look at the claim here -- and the only place this

4  appears is claim 10 -- we're not challenging communication

5  circuitry.  Right?  If you look at claim 10, it starts with

6  communication circuitry.

7      So we're not taking the position that merely because it

8  uses the term "circuitry," that means it's indefinite and it's

9  overbroad and it's 112.6.  That's the argument they made in

10  *Linear*; that's the argument the plaintiffs made in *Apex*.

11  That's been rejected.  We're not making that argument.

12      The argument we are making here is that when you look at

13  the term "logic circuitry," you have to look at the evidence to

14  decide whether there is a sufficiently definite class of

15  structures to inform a person of ordinary skill in the art what

16  that class is.  And where, as here, it says that that class is

17  broader than microprocessors, but gives no limitation or bounds

18  on that class whatsoever, that argument falls apart.

19      In all of the previous cases, in *Apex* and *Linear* and every

20  other case that's been cited, they were talking about an

21  individual circuit.  And based upon what was functionally

22  there, and based upon the context of the patent specification,

23  and the expert testimony that was introduced, the Federal

24  Circuit or the District Court said:  I -- a person of ordinary

25  skill in the art can tell what the metes and bounds of this

1  class of structures are.  And therefore, although it doesn't

2  specify an exact structure, we can kind of tell.

3       But Your Honor, is the National Supercomputing Center a --

4  a logic circuitry 201?  Is the internet logic circuitry 210?

5  Is my abacus logic circuitry 210?  There's nothing here to tell

6  us what -- or inform a person of ordinary skill in the art what

7  the bounds are.

8       And simply saying "Well, there's dictionary definitions

9  that say it's a set of products that complete a circuit"

10  doesn't tell you.  Because of course, Your Honor microprocessor

11  controllers are not just made up of circuits.  They have other

12  components in them, as well, beyond circuits.

13       And this is a class of structures that includes

14  microprocessors, but is not limited to them.  It's not limited

15  to the logic elements within a microprocessor.  It includes the

16  entire microprocessor and, I don't know, the motherboard?

17  Maybe the keyboard?  It doesn't tell us.  And that's the

18  problem I'm getting at.

19       **THE COURT:**  All right let me hear the response to

20   that from Google.

21       **MR. NELSON:**  Thank you, Your Honor.

22       Brad, if you could -- or Mr. Watkins, if you could put up

23  -- let's go to slide 10 first.

24       (Document displayed)

25       **MR. NELSON:**  Your Honor, I think the problem with

```
1   Sonos' argument is it starts from the wrong place.  Which

2   Your Honor recognized at the beginning.  The question that you

3   go to -- you don't go the specification initially.  What you

4   go to is the claim.  And whether the terms of the claim "logic

5   circuitry" connote sufficient structure when coupled with the

6   function.  Which, the function here is simply "for providing

7   domain information to a key issuer."  In other words, output

8   logic circuitry connected to a communication channel.

9        That -- if we could move forward, Mr. Watkins.

10       (Document displayed)

11        MR. NELSON:  This, this has been determined in both

12   *Apex* and in *Linear Tech*.  In fact, they both talk about and

13   cite, those cases cite that the idea that the term "circuit,"

14   itself, or "circuitry" generally connotes structure to one of

15   ordinary skill in the art, particularly when coupled with the

16   claim function.  And that's all that you need.

17       Now in addition, for example, we see here in *Apex* that

18   certainly when it's combined with a term -- one of the terms

19   that's laid out in the case is, in fact, "logic."  It says when

20   you combine "logic" with "circuit," that would connote

21   sufficient structure to one of ordinary skill in the art.

22       The *Linear Tech* case which is -- if we move forward to the

23   next case -- excuse me, the next slide.

24       (Document displayed)

25        MR. NELSON:  -- says exactly the same thing.  That
```

1    "circuit" coupled with a description of the circuit's

2    operation, which, here, we have the adjective modifier "logic"

3    to indicate the type of circuit or the class of circuits, as

4    well as the idea of "for providing."

5        And in fact, if we move forward here --

6        (Document displayed)

7        **MR. NELSON:**  -- you'll see -- just to make this very

8    clear, because I know *Williamson* was something that was argued

9    in the briefing, Your Honor, and we know that comes -- I

10   forget -- 2016, somewhere along there.  *Apex* and *Linear* came

11   before that, but they applied the proper standard.

12       The Northern District of California has already -- and the

13   technology licensing court went through that.  So those are

14   good law.  No question about that, those cases are good law.

15       And if we move forward an additional slide, --

16       (Document displayed)

17       **MR. NELSON:**  -- we will see here, this is the

18   *Intellicheck* case.  It's from the Western District of

19   Washington.

20       But actually the important thing in this case, Your Honor,

21   there was a challenge by the District Court in this case of the

22   defendant, to say whether any case out there had found that the

23   term "circuit" or "circuitry," when used in the claim was

24   subject to 112.6, they came up with none.  Once again, here, we

25   come up with none.

1     So we have Federal Circuit cases that have dealt

2  specifically with this have actually, in the *Apex* case, gone

3  further to say when you combine with it a term like "logic,"

4  and here, the -- it's -- the function is for providing the

5  information.  So, you know, that's simply an output function to

6  a communication channel.  That one of ordinary skill in the art

7  understands that class of structures.

8     So here, we have the Appellate -- the relevant appellate

9  court already dealing with this issue.  And the district courts

10  that have considered it, which, we provided those cases, there

11  is not a single one that has determined even just the term

12  "circuit" would be subject to 112.6, much less when it's

13  combined with, in this case in the claim, an adjective modifier

14  like "logic," which, *Apex* said that connotes even more

15  structure.  And then on top of that, the function there simply

16  being "for providing the information to the key issuer,"

17  Your Honor.

18          **THE COURT:**  All right.

19          **MR. NELSON:**  So the issue has been decided.

20          **THE COURT:**  All right.  Thank you.

21     Let's go to claim 3 and the "private key" question.  And

22  there, it seems to me there is a definition --

23          **MR. ROBERTS:**  Your Honor, before we move on, could I

24   literally put in two sentences?

25          **THE COURT:**  All right.  Two sentences.

1          MR. ROBERTS:   Two sentences.

2      One is Mr. Nelson says there's no cases.  That's not true,

3  *Apex* itself cites *Nilssen versus Motorola,* 80 F.Supp 2d, 921,

4  holding that the term "circuit" is so generic that, by itself,

5  it conveys no structure at all.  So, his statement that there

6  are no such cases is wrong.

7      And two, when he puts up the language from *Linear* or *Apex*

8  talking about -- in his slide -- about the fact that -- the

9  fact that it uses "circuit" means that there's a presumption.

10 That is the starting point of the analysis, not the conclusion

11 of the analysis.  You then have to look at the preponderance of

12 the evidence that has been put in, including the intrinsic

13 record from the specification.

14     Thank you.

15          THE COURT:  All right, thank you.

16     All right.  On the "private key" question, normally

17 specifications aren't to be limitations as read, or limitations

18 on the claim, unless it's clearly intended to do so.  And

19 that's where the inventor uses its own lexicography here.

20     And in this case, we do have a definitional section in

21 column 2 of the '187 that defines "public-key cryptography,"

22 and talks about "private key."  And the "private key" is

23 defined as -- within that definition, is "used for either

24 decrypting data or generating digital signatures," and doesn't

25 include anything else.

```
 1        So why doesn't that definition hold here?

 2             MR. NELSON:  If we could go to Slide 26, Mr. Watkins.

 3        (Document displayed)

 4             MR. NELSON:  I think this is the portion of the

 5   specification Your Honor was referring to.

 6             THE COURT:  Yep.

 7             MR. NELSON:  I mean, Your Honor's correct.  In the

 8   context of public-key cryptography, which is a preferred

 9   embodiment, that would be -- I mean, this language right here

10   would be a definition.  There's no question.

11        The issue is that the claims are not limited to public-key

12   cryptography, so they're not limited to that preferred

13   embodiment.  So that the definition of "key" -- excuse me,

14   "private key" or the construction of "private key" that Google

15   provided considers the other potential embodiments in the

16   claim.  And in fact, there are other types of cryptography

17   systems or digital rights management systems that are referred

18   to in the claim.

19        If we move forward, Mister --

20        (Document displayed)

21             MR. NELSON:  Well, here, just to address one point

22   before I move forward to the second point, Your Honor, in the

23   definition that Sonos provided for the construction, it says

24   "a non-public key used for either decrypting data or

25   generating digital signatures," certainly within the context
```

1   of public-key cryptography, Google doesn't really have a

2   problem with that.

3        In the briefing what Sonos argued is:  Well, what that

4   construction means is that you always have to be able to use

5   the key for decrypting data.  In fact, that's not what the

6   construction -- excuse me.  That's not what the specification

7   says, or even their construction says.

8        And in fact, you know, the second part "or generating

9   digital signature," we see that here -- this is from column 2,

10  lines 59 to 64.  Also in that definitional section within the

11  context of public-key cryptography that Your Honor pointed to,

12  we have the "digital signature" definition, which is the second

13  part of that construction.  And it says:

14            "A digital signature (not to be confused with a

15            digital certificate) is an electronic signature that

16            can be used to authenticate the identity of the

17            sender..."

18       So there's nothing in there about decryption or any

19  requirement of decryption.  So that part we want to make sure

20  is very clear, that that part of their -- at least their

21  construction, Sonos's construction of its construction doesn't

22  find its way in.

23            **THE COURT:**  So where is the term -- that's

24  interesting.  So you're saying that that definition in column

25  2 is only in the context and of and about, quote, "public-key

1    cryptography."  And the private key defined therein is within

2    the context or within the bounds of that particular definition

3    of "public-key cryptography."  Right?

4         **MR. NELSON:**  Correct.

5         **THE COURT:**  So where is that term "public-key

6    cryptography" used in any of the claims?  Am I missing

7    something?

8         **MR. NELSON:**  It's not used in any of the claims.

9    That's -- that's our point.  There's -- there's no -- the term

10   "public-key cryptography" or even specifically what the

11   cryptographic or identifying system is -- authentication

12   system, excuse me, Your Honor -- is -- is not part of the

13   claim.  Nor is there anything in the claim -- the asserted

14   claims that refer to encryption or decryption.

15       So if we move back one slide, to 25, Mr. Watkins.

16       (Document displayed)

17       **MR. NELSON:**  We see here the asserted claim.  And so

18   there is -- that was the point about the public-key

19   cryptography being the preferred embodiment, but the claims

20   are not so limited.

21       **THE COURT:**  Why is there this definition?  Why is

22   there a definition of "public key," very first definition, yet

23   it never appears in the claim?  I don't get it.

24       **MR. NELSON:**  Because it's -- that's within the

25   context of the preferred embodiment, which is the public-key

1    cryptography.

2            THE COURT:  Why would you have to use a definition

3    for a mere -- describing a mere preferred embodiment?

4            MR. NELSON:  Well, the purpose of it, Your Honor, was

5    to level-set the definitions within the context of the

6    preferred embodiment that was described in the specification.

7    So that was the context within which the preferred embodiment

8    in -- that was -- when -- the specification goes on to

9    describe used some of those terms.  And so the inventors laid

10   out those definitions.

11           THE COURT:  All right.  So it's not used to define

12   the claim terms; it's used to define a mere preferred

13   embodiment.  And therefore, not a limitation on the claims

14   term -- claim terms.

15           MR. NELSON:  Correct.  That was the reason for the

16   difference in the constructions.  Because if we move forward

17   to Slide 27 --

18       (Document displayed)

19           MR. NELSON:  Well, we were just at slide 27.  To the

20   Slide 30, Mr. Watkins.

21       (Document displayed)

22           MR. NELSON:  Here, this is at the end of the

23   specifications column 7, lines 52 to 57.  You'll see that (As

24   read):

25               "Also, for example, the above description was given

1              with respect to using public and private keys.  One

2              of ordinary skill in the art would recognize that

3              alternate methods of securing the DRM system are

4              possible using symmetric key techniques or broadcast

5              key encryption techniques."

6         So there are other techniques that are within the scope of

7    the claims.  And that's really the reason for the differing

8    definition.

9         But the biggest concern that we have, Your Honor, about

10   the Sonos definition is less -- because the definition within

11   the context of public-key cryptography, Your Honor, comes out

12   of the specification.  Right?  Totally agree with that.  Your

13   Honor pointed to that right away.

14        But Sonos' construction of its construction is very

15   problematic.  The notion, when it says right there that the

16   public key can be used for digital signatures, that -- what I

17   went through, and digital signatures are used for

18   authentication, no mention of any type of encryption.

19        In their briefing, they suggest that even though the term

20   says it can be used for -- either for encryption -- or

21   decryption, and -- or digital signatures.  They argue that that

22   construction means that it needs to be able to do both of those

23   things.  Which, of course, is not consistent with the plain

24   language.

25             **THE COURT:**  All right.  Thank you.

1          Let me hear the response from Sonos.

2              **MR. ROBERTS:**  Thank you, Your Honor.  So I -- it will

3      come as no surprise that I disagree with my colleague,

4      Mr. Nelson, about almost everything that he said.

5          If we could have Slide 23, please.

6          (Document displayed)

7              **MR. ROBERTS:**  So -- this is fine; we can start here.

8      This is slide 27.

9          (Document displayed)

10             **MR. ROBERTS:**  We're having a little bit of slowness.

11         Okay, so this is what their -- Mr. Nelson said repeatedly

12     to you, Your Honor, that this is just an embodiment of a

13     preferred embodiment.  That this definition is not given as a

14     definition for the patent; it's really only in the context of

15     one embodiment, and then the patent claim is not limited to

16     that embodiment.  That was his argument.

17             **THE COURT:**  Right.

18             **MR. ROBERTS:**  But -- and that's what they said in

19     their brief.  That -- the DRM system, in accordance with the

20     preferred embodiment.  But if you look at the passage, it

21     talks about prior to describing the preferred embodiment, "the

22     following definitions are provided to set background."

23         So these are definitions for the patent that are given

24     prior to the preferred embodiment.  This is not a description

25     of the preferred embodiment.  These are how the terms will be

1   used in the patent.

2        And the notion that the second sentence is not definitive,

3   it is not a definition, and really, only the first sentence is

4   a definition, and the second sentence is not a definition, or

5   the second sentence is contingent on the first sentence is, I

6   think, belied by the structure of that entire column.

7        Right below this definition in the patent, it talks

8   about -- it says "certificate."  And then it says a digital

9   certificate is a block of data issued by a trusted

10  certification authority.  And it goes on to describe expiration

11  dates and the strict (Inaudible) holder's public keys, and

12  various other pieces.

13       So the notion that public-key cryptography, really, we're

14  only defining "private key" in that context is, I think, belied

15  by the actual language here.  Number one.

16       Number two --

17            **THE COURT:**  I'm not sure I understand your point.

18   Simply because it says "prior to"?  isn't that like saying,

19   "Well, before I begin to tell you the story, let me tell you

20   what the story..."  It's just intro.  It doesn't necessarily

21   mean it doesn't -- you know, this doesn't apply.

22       Plus you haven't dealt with the fact that the term

23   "Public-Key Cryptography" in initial caps doesn't appear at all

24   in any of the claims.  Which was my point, my first question.

25            **MR. ROBERTS:**  Yes, Your Honor.

1          **THE COURT:**  That definition doesn't literally apply.

2          **MR. ROBERTS:**  So Your Honor, the only place that this

3     entire patent specification talks about private keys is in

4     connection with public-key cryptography.  You can read the

5     entire specification.  There is not one discussion of private

6     keys except in the context of public-key cryptography.

7     Because in a symmetric-key cryptography, the keys are shared

8     by both parties.  So in symmetric-key cryptography, both keys

9     are known to both sides, because it's symmetric.  It's the

10    same key.  It's only in public-key cryptography that you have

11    a key that is, in fact, private.  It's not known in

12    symmetric-key cryptography.

13        And if you -- if we could turn to the slide --

14         **THE COURT:**  Those are the only two options, is

15    symmetric and private and public-key cryptography?

16         **MR. ROBERTS:**  So there's -- if we could turn to slide

17    24.

18        (Document displayed)

19         **MR. ROBERTS:**  The patent talks about another --

20    sorry, not slide 24.  I meant -- it's -- excuse me --

21        (Documents displayed)

22         **MR. ROBERTS:**  Slide 28, excuse me.

23        (Document displayed)

24         **MR. ROBERTS:**  So it talks about two alternate

25    methods.  So for example, Your Honor -- and the entire passage

1    here is important.  It says (As read):

2              "...the above description was given with respect to

3              using public and private keys."

4       One would ordinarily recognize that alternative -- not

5    using public keys, not using private keys -- are available.

6    Those are symmetric keys which are different because the two

7    keys are the same, or broadcast-key encryption techniques.

8    These are the only two possibilities mentioned for securing the

9    DRM system.  Neither one of these two mentions private keys,

10   whatsoever.

11      So Mr. Nelson is absolutely right.  It talks about private

12   keys, only in the context of public-key cryptography.   And

13   then it talks about these two alternative methods.  But these

14   two alternative methods don't involve private keys.  The

15   symmetric keys are known to both the encryptor and the

16   decrypter.  It's a totally different context.

17      And I would also point out, Your Honor, what's going on

18   here because I want to frame this as to why they're doing this.

19      If we could have slide 24 now, please.

20      (Document displayed)

21      **MR. ROBERTS:**  What Google wants to do is say that a

22    private key just includes a password.  And this is just from

23    their Markman brief.  And you can see it here at the bottom,

24    "sharing of secrets."

25      So what Google wants to say is that when I log into

Facebook, ClementRoberts12345, that my password is a private

key.  It's not.  And the way they get there is -- it's

interesting, Your Honor.  Their expert in their proposed

construction acknowledges that the private key has to be

cryptographic.  It has to be an input to a cryptographic

algorithm.

But then what they've done is they've said:  Well,

cryptographic algorithms don't actually have to involve any

cryptography.  They don't have to involve encryption; they

don't have to involve decryption.  They can just involve

hashing or just involve a look-up table.  It's not required

that you do encryption or decryption in order to have

cryptography.

And so what they're trying to do is they're really trying

to read as hard as they can this notion of encryption and

decryption out of the claims.  They want it to mean simply a

password and a look-up.  Because that's what the accused

instrumentality does.

So they're saying:  Well, private key, not limited to the

definition.  And if it's not limited to the definition, it can

mean anything.  And if it can mean anything, it can mean simply

a password.  That's the chain of logic that they're following.

And that chain of logic is contradicted by the structure

of the specification.  Because even if Your Honor decides that

this passage -- the passage we pointed to -- is not

1   lexicography, --

2        (Document displayed)

3        **MR. ROBERTS:** -- you still have to determine what a

4   person of ordinary skill in the art would understand "private

5   key" to be in this context.  There's no other proposal for

6   "private key" in the specification.   It never says the

7   private key is a shared secret.  Absolutely not.  The only

8   place you will find that is in the self-serving declaration of

9   their expert.

10       It never says anything about the private key, other than

11  that the private key is used to encode a digital signature, or

12  that the private key is used to decrypt.

13       And by the way Your Honor, when you encode a digital

14  signature, what you're doing is you're encrypting it.  That's

15  how you encode a digital signature.  You take a piece of plain

16  text, and you encrypt it with your private key so that someone

17  who's out in the world can take your public key and decrypt it,

18  and know that you were the person who encrypted it.  And they

19  know that, because public and private keys have this property

20  called "duality," where that which was encrypted by the private

21  key can only be decrypted by the public key, and that which was

22  encrypted by the public key can only be decrypted by the

23  private key.

24       And that's how digital signatures work.  You know that it

25  is authentically from the entity that signed it if, in fact,

1    you can decrypt it with your -- with that entity's public key.

2    Because if you can, you know it was encrypted with that

3    entity's private key, and you know it's a --

4            **THE COURT:**  This is one of those instances where the

5    specification does impose a limit on the claim term.

6            **MR. ROBERTS:**  It does, Your Honor.

7            **MR. GERCHICK:**  Your Honor, I apologize for

8    interrupting.  Mr. Nelson lost his connection.

9            **THE COURT:**  Oh.

10           **MR. GERCHICK:**  And, needs to be promoted back in.

11           **THE COURT:**  Oh, okay.  All right.

12        Angie, can you do that?

13        (Reporter interruption)

14           **MR. ROBERTS:**  Yes, absolutely, Madam Clerk.  I am

15    hard on the court reporters.  There is no doubt.

16           **THE COURT:**  All right.

17           **MR. ROBERTS:**  So it seems like Mr. Nelson is back.

18        So, yes, Your Honor.  This is one of those rare cases --

19    one of those cases where you have to look at the specification

20    as a whole.  I submit, you can get there through lexicography.

21    But even if you aren't getting there through lexicography, you

22    have to look at how the specification uses the term "private

23    key" to decide how a person of ordinary skill in the art would

24    use it.  Would understand it.  And a person of ordinary skill

25    in the art would not understand "private key" to simply include

1   shared secrets like a password.

2       And there's literally no support for that concept in the

3   specification.  Everywhere the private key is used, it is used

4   to either sign a digital signature, which is a form of

5   encryption, or it's used to decrypt information.  Those are the

6   only two ways in which it's used, because it's always used in

7   connection with public-key cryptography.  Because that's really

8   where the notion of a private key comes from.

9           **THE COURT:**  All right.

10      Let me just get, if Mr. Nelson's on, a brief response to

11   the idea that "private key" can only have one meaning, and that

12   the alternative methods don't really incorporate a private

13   company.

14      And, given both the definitional section in column 2 and

15   the singular focus of the specifications and the lack of any

16   other obvious application of "private key" outside the

17   public-key cryptography context, makes this one of those cases

18   where the specification does impose a limit, a claims

19   limitation.

20          **MR. NELSON:**  Well, so, a couple of things, there,

21   Your Honor.

22      So the -- the first thing is there's another reference to

23   the unit private key that Sonos -- which is the term "private

24   key" -- said in its briefing:  Well, that one doesn't apply.

25   Because it says explicitly in the specification that that one's

1    used for authentication purposes.  So, that -- that one has

2    nothing to do with public-key cryptography that -- that we're

3    talking about here.

4        So the term "key" even within the specification -- and

5    even their own expert didn't go so far as to say the term "key"

6    only has meaning within the context of public-key cryptography.

7            **THE COURT:**  But the term "private," "private key" has

8    only that meaning, is what I under- --

9            **MR. NELSON:**  Well, that -- no.  That was the one --

10   the term used is "unit private key."  And it was stated by

11   Sonos in a brief that that's something different.  That's not

12   -- because it's used -- it says in the specification it's used

13   for authentication purposes, not for encryption purposes.  Or

14   decryption purposes.

15       So -- and, I mean -- and this notion that digital

16   signatures are only involved with an encryption, I mean, that's

17   -- there's no expert testimony to that.  There's only testimony

18   from Mr. Roberts, who I don't believe is an expert.

19       So that notion that somehow the second part of that

20   definition, in and of itself, requires encryption because it

21   refers to digital signatures, which, if we're going to use his

22   spec for a definition, then we've got to use it for everything.

23       And the second part of their construction talks about

24   digital signatures.  If you go slightly below that, in that

25   column, it talks about digital signatures being used for

1   authentication.  Says nothing about encryption; says nothing

2   about Mr. Roberts' testimony -- and I'll call it testimony

3   because that's exactly what it was -- that says:  Oh, well,

4   digital signatures don't -- it doesn't ever say in it the spec,

5   but what those really are are plain text that's encrypted.

6        I mean, that's just from him.  Right?  So if we're going

7   buy the definitions that are in the specification within the

8   context of public-key cryptography, and say that's the only

9   thing, then --

10           **THE COURT:**  All right.  But we don't have to go that

11   far if we -- if we apply the "private key" definition for

12   either decrypting data or generating digital signatures.

13   Assuming those are two distinct and separate phenomena or

14   steps, there's still a definitional limitation there.  One --

15   it's got to be one or the other.

16           **MR. NELSON:**  With -- with respect to those things,

17   yeah.  Digital signatures are used for authentication, as a

18   broad class of things.  But the -- the notion, though, that a

19   key is always used in the context of public-key cryptography,

20   if you look at the briefing and the expert's testimony that

21   we've cited, so for example, if we could go, Mr. Watkins to --

22   I think it's slide -- 29, I believe it is?

23        (Document displayed)

24           **MR. NELSON:**  I don't know; I lost my presentation.

25   It's the expert testimony.

```
 1        (Documents displayed)

 2             MR. NELSON:  The testimony from Dr. Sherman.

 3        (Document displayed)

 4             MR. NELSON:  It's perhaps -- no, no, no, it's in the

 5     slides, Mr. Watkins.

 6        And I apologize, Your Honor.  I had my presentation up on

 7     the other computer, but I needed to use that to log in when the

 8     other one froze.

 9             THE COURT:  I understand.

10        (Document displayed)

11             MR. NELSON:  So, here we go.

12        And here, this is in the context of the known uses of

13     private keys.  And the question, and this is from Sonos'

14     counsel (As read):

15             "Are there other purposes that you believe in the

16             context of the '187 patent a cryptographic key can be

17             used for, aside from an asymmetric encryption system,

18             symmetric encryption systems, and computing a digital

19             signature?

20             "Yes.

21             "And what are they?"

22        And then you see here:

23             "There are variety of purposes that could be used --

24             this could well be known to a person of art at the

25             time.  Those might include hashing, keyed hashing,
```

1              message authentication codes, key expansion,

2              pseudorandom number generation, sharing of secrets

3              and other cryptographic purposes to support

4              confidentiality, authentication, and integrity."

5      So that -- that's the -- and the cites from the expert

6  declaration that we have, those are the same things.  So that's

7  the information from the expert, which, that was sworn

8  testimony from an expert, as opposed to argument of counsel.

9      Dr. Wicker, who's Sonos' expert, his testimony was

10  different.  What he said is to him, "key" connotes encryption.

11  It didn't say that the term "key" was always used within the

12  context of this specific type of public-key cryptography.

13      So those two things are incongruous.  The argument, and

14  then the testimony from the experts, Your Honor.

15          THE COURT:  All right.  Let me move on, before we run

16   out of time here.

17          MR. ROBERTS:  Your Honor, may I have two sentences?

18   Again?

19          THE COURT:  Two sentences.

20          MR. ROBERTS:  One, this text on the screen is asking

21   about a cryptographic key.  It is not talking about a private

22   key.

23      Secondly, the unit private key which Mr. Nelson referred

24  to, number one, it's not what's called for in the claim.  It is

25  what is installed on the computer beforehand.  And two, the

 1   specification doesn't say one way or the other whether that key

 2   is used for encryption or decryption, or how it's used.  It

 3   just says it's there, and it's used as part of an

 4   authentication challenge.

 5        So it's not at all inconsistent with what we've said, or

 6   the definition, or how the term "private key" is used in

 7   connection with this invention.

 8        Thank you.

 9            **THE COURT:**  All right.  Thank you.

10        I want to skip to the "stored" question, No. 6.  It

11   appears that what Sonos is arguing is that it's obvious, given

12   the function of the invention, that you have to have storage

13   other than transitory storage.  Storage which is retrievable.

14   You know, bookmarks or whatever it is.

15        So I guess it's sort of implied.  It's not necessarily --

16   it's not a plain and ordinary meaning, because plain and

17   ordinary meaning wouldn't have any sort of limitation, I would

18   think.  But it is one that is implied from the whole -- from

19   the context of the claims, the nature of the invention,

20   et cetera, et cetera.

21        And again, that would seem to be implying perhaps from the

22   specifications a limitation that is otherwise not obvious on

23   its face, but I'll let Mr. Roberts explain.

24        Am I on the right track?  Is that essentially your

25   argument?

1        **MS. CARIDIS:**  Your Honor, this is Alyssa Caridis on

2   behalf of Sonos.  I'll field this question, if that's all

3   right with you.

4        **THE COURT:**  Sure.

5        **MS. CARIDIS:**  So I think Your Honor's exactly right.

6   In the context of the claims of this patent which talk about

7   synchronizing lists of favorites amongst multiple devices, the

8   only way that that makes sense is if you have that information

9   stored in each device so that it can be retrieved or accessed

10   by a user.

11        As opposed to, you know, if I -- if I indicate that

12   newyorktimes.com is a favorite item, and instead of storing it

13   on my computer, my device, instead, just pushes it off to a

14   server somewhere.  That's not the type of storage that this

15   claim is talking about, where it's specifically talking about

16   synchronizing the list of favorites and the list of favorite

17   items amongst multiple devices.

18        So I think Your Honor is exactly right in distilling the

19   issue here, in that in this context, we're not just talking

20   about transitory storage where the information might fleetingly

21   be present on my device as it gets pushed off to a server.  But

22   it has to be, in the context of these claims and what this

23   patent is talking about, something that I can actually use or

24   access, as opposed to just transitory storage passing through

25   my device.

1          **THE COURT:**  All right.

2      Mr. Nelson, why isn't that obvious from the nature of the

3  invention here?

4          **MR. NELSON:**  Mr. Gerchick is going to handle this

5   one, if that's okay with Your Honor.

6          **THE COURT:**  All right.  Mr. Gerchick, same question.

7          **MR. GERCHICK:**  Sure.  So first of all, there is no

8  description of this type of continued storage for later access

9   anywhere in the specification, number one.  Number two, the

10  concept of transitory storage is defined nowhere, and defined

11   nowhere in the definitions provided by Sonos.

12      The patent, itself, is talking about -- and the claim is

13  talking about the ability to store all bookmarks in a bookmark

14  manager on the server side.  And synchronization just merely

15  requires the ability for the common bookmarks for a user to be

16  maintained and provided to individual client sites, as needed.

17      So there is no -- the concept of storing or modifying a

18  bookmark in a client-side device and then needing to maintain

19  that set of bookmarks on each client-side device for,

20  quote-unquote, "later retrieval," as identified in Sonos'

21  claim -- which again is unspecified -- is unnecessary and

22  contrary to what's disclosed in the specification.

23      The specification identifies that it's the bookmark

24  manager which is the server-side storage that will maintain the

25  entirety of the bookmarks.  Those can then be provided, on a

session basis, down to each individual client, as needed.  They

can be stored locally in the client device.

But, the concept of having to maintain them for some

extended period of time or permanently, in the -- the

indication of Sonos's construction is just not supported by the

specification at all.

Again, whenever a client user is going to access or use a

browser, that browser session can involve pulling down

favorites for use locally during that session from the bookmark

manager and the master storage of a client's synchronized

bookmarks in the server side.

**THE COURT:**  Well, when the claim talks about

modifying a favorite -- a set of favorite items stored for the

user in a client-side storage of the device, and then -- why

isn't it evident that that storage has to be something

that's -- you know, has enough endurance or persistence that

it has some meaning, it's retrievable, or does something?

If it's only transitory and disappears, what's the point

of that claim language?

**MR. GERCHICK:**  Well, I guess the question is: What

constitutes transitory?  Because the way that the expert

declaration of Sonos' expert describes it is that transitory

storage would exclude any sort of buffer or cache.  And buffer

or cache memory -- which is a type of memory and specifically

would be the type of ram that's disclosed in the

specification, volatile memory -- can hold that information

for some period of time, but doesn't need to hold it for some

later use.  So to the extent that -- well, let me rephrase

that.  Doesn't need to be -- hold it for some much later in

time future use.

So if I am operating on my browser, I do a search and save

something as a favorite, and then go do another search, and go

right back within a matter of minutes or a matter of 30 or 45

seconds, that information would still be stored.  I can use it

and access it.  I can then shut my -- it will be then, as

modified, synchronized to the server-side storage.

If I close my browser down and that cache is flushed, or

the memory is emptied, but then I start my browser back up at a

later period of time, I can download from the server my

favorites again.  And they'll be there for the next set of

usage.

So in that instance, even there, you would have the

information stored.  It would then also be sent up to the

server for storage, and later usage.  And you would still

fulfill the language of the claim.

**THE COURT:**  All right.

So I guess the question, Ms. Caridis, it appears to be, is

that when your proposed construction is:  Retained on the

client device for later retrieval, later, and excludes, quote,

"transitory."  And there seems to be, here, your proposal has

1  some ambiguity, because Google says that:  Well, I mean, you

2  can have cache storage, and something that you might deem

3  transitory, but it's still available for some period of time

4  for later retrieval.

5       So how do you define the limits of that?

6            **MS. CARIDIS:**  Sure, Your Honor.  So a couple of

7   things that I just want to make clear.

8       One is that Sonos is not at all trying to exclude the type

9  of storage, the physical medium.  Whether it be, you know, SSD

10 or a USB key, or anything else.

11           **THE COURT:**  Yeah, I understand that.

12           **MS. CARIDIS:**  Okay.  There's no limitation here on

13  the structure.  Sure.

14      So the issue here -- and frankly, I think, Your Honor,

15 that Mr. Gerchick's examples did disclose storing, how we

16 understand it, because a user is able to access the

17 information, retrieve the information that is stored on the

18 user device.

19      What we are trying to make clear is not covered by these

20 claims and what is clear in Google's infringement contexts that

21 it is trying to cover is simply placing a piece of information,

22 and because it's 1s and 0s it has to be placed somewhere in

23 memory, but is never is actually intended for the user because

24 it's just pushed off onto a server side.

25      And so our point here, Your Honor, what we're trying to

1    make clear is that which is stored on the client device has to

2    be able to be retrieved or accessed by the user after it is

3    stored.

4         **THE COURT:**  So if we did have the "excluding

5    transitory storage," which implicates another set of

6    definitions, the main point, it's got to be available for

7    later retrieval by the user.  That's the key?

8         **MS. CARIDIS:**  Yes, Your Honor.  And the "excluding

9    transitory storage" was just our attempt to make clear what we

10   think should already be clear from a person of ordinary skill

11   in the art, of the main part of our construction.

12        **THE COURT:**  All right.  What's Google's response to

13   the whole idea that the main point is that it's got to be

14   available for later retrieval by the user?  And your example

15   is an example of storage.

16        **MR. GERCHICK:**  Well, you know, I guess where we still

17   are a little stuck, Your Honor, is later retrieval could be

18   placing something in memory, and then pulling it out of

19   memory.  Right then.  I just don't understand temporally what

20   is being referred to by "later."

21        So if what we're talking about is just the fact that the

22   information is placed in a computer-readable medium of the

23   client device, then I think that that would meet the plain

24   language of the claim.  But to the extent that some sort of

25   temporal limitation is being put here with actually no support

1    in the specification, and that being unbounded to the point

2    where it's not clear what's intended, that claim construction

3    becomes difficult.

4           **THE COURT:**  Well, I understand Ms. Caridis is saying

5    what is intended is something that essentially is accessible

6    to the user.  It's not just meant as a -- you know, and I

7    don't -- I don't know, I don't want to use the word

8    "transitory" because then we get a definition.  But that's the

9    idea, that it's not -- there are certain kinds of brief memory

10    that's not intended to be retrievable.  It operates -- it

11    functions for computing purposes, not for, you know, for

12    functional use by the user.

13    I think that's the gist of it, as I understand it.

14           **MS. CARIDIS:**  Yes, Your Honor.

15           **MR. GERCHICK:**  Yeah, without understanding what that

16    claim construction is, it's difficult to respond.  I mean, the

17    idea is that there is some placement of this information in

18    memory.  And then you would have to meet the remainder of the

19    claim.

20    So if you have favorites placed in memory that -- that are

21    modified, and that could involve the placement of the first

22    favorite in memory, and then from there, there is an initiation

23    of a synchronization process, then you would meet the claim.

24    There's nothing about retrieval for later use anywhere in

25    the claim here.  All that the claim says is that you have

1    something in memory, and that's been modified.  So there might

2    be a bookmark that's added or a favorite that's added that

3    initiates the synchronization process to synchronize to the

4    server side.  And from there -- and that server side is remote

5    from the client storage.  So from that perspective, that's what

6    the claim requires.  And storing would require some placement

7    of that modified set of favorites in memory, and patching it to

8    the server side.

9         There's nothing in the claim, though, about retrieving for

10   later usage.  So it's not -- it's not clear exactly where that

11   comes from, within the context of Sonos's construction, the

12   claim language itself, or the specification.

13        THE COURT:  All right.

14        Ms. Caridis, your brief response?  Then I'll move on top

15   the next --

16        MS. CARIDIS:  Sure.  I can sum it up in one sentence.

17        The claim says that the favorites are stored for the user.

18   So just putting something in ephemeral memory and then spitting

19   it off into a server is not stored for the user of the client

20   device.

21        THE COURT:  All right.  Let me turn to the "reset"

22    question.  And let me just hear from Sonos why Google's

23    construction -- and that is that it's tied to resetting the

24    configuration of the controller -- is too limiting or not

25    accurate.

1      I mean, there are, certainly in the specification, an

2  indication that that's what this is about.  Why is that

3  erroneous?

4           MR. GROSBY:  Your Honor, David Grosby for Sonos.

5   I'll field this question.

6      Ms. Caridis, if you could turn to slide 63.

7      (Document displayed)

8           MR. GROSBY:  And while she's pulling it up,

9   Your Honor, the main issue that Sonos takes --

10      (Document displayed)

11          MR. GROSBY:  -- with Google's construction here is

12  that, you know, there's only two passages in the entire patent

13  that address a reset function, and both of them are in front

14  of you.  And the main issue is that Google seeks to limit the

15  "reset element" to resetting a configuration of the

16  controller, but there is nothing in either of these two

17  passages that talk about a configuration.  In fact, I'm not

18  entirely sure what a configuration means.

19      Now, you know, Sonos is not disputing that structurally,

20  the, you know, reset element is tied to the controllers through

21  the transceiver.  But I think our main issue is that there's no

22  definition for what the configuration is.  And Sonos's

23  construction that it should be hardware or software that

24  returns a device to a prescribed state is actually more

25  accurate, and encompasses Google's construction here.

1      **THE COURT:**  So it's the resetting the configuration

2  that's the issue, as opposed to of the controller?

3      **MR. GROSBY:**  Yes, Your Honor.

4      **THE COURT:**  And you want "configuration" to mean to

5  return the device to a prescribed state.

6      **MR. GROSBY:**  Well, not "configuration," because

7  again, these two passages don't discuss configuration.  But we

8  think, yes, that the reset functionality is to return the

9  device -- in this instance, the transceiver because that's

10  what's spoken about in this passage -- return the transceiver

11  to a prescribed state which is being placed in a receiving

12  mode.

13      **THE COURT:**  Can you think of a way to incorporate the

14  fact that this pertains to the controller?  I don't know; is

15  there some way to borrower from Google's construction that

16  doesn't do violence to the point you're trying to make?

17      **MR. GROSBY:**  Well, we could say, you know, hardware

18  or software, you know, that is con- --

19      (Document displayed)

20      **MR. GROSBY:**  Yeah, thank you.

21  "Hardware or software that functions to return the

22  controller to a prescribed state," I think Sonos would be fine

23  with that construction.

24      **THE COURT:**  All right.  What is Google's response to

25  that?

1          **MR. SCHMIDT:**  Good afternoon, Your Honor, this is

2     Patrick Schmidt.  I'll field that question.  That construction

3     is still problematic for a few reasons.

4          And Mr. Watkins, can I ask that you put slide 81 up,

5     please.

6          (Document displayed)

7          **MR. SCHMIDT:**  So we take issue with Sonos's

8     construction that the reset element has to return a device to

9     a prescribed state.  Not only do we think that this is not

10    supported  by the specification, it's actually contradicted by

11    the specification.

12         And if you go back one slide, Mr. Watkins?

13         (Document displayed)

14         **MR. SCHMIDT:**  The primary embodiment describing the

15    reset function talks about how the reset function uses the

16    controller to place the transceiver into a receiving mode for

17    a prescribed reset interval.  And during this reset interval,

18    the device receives the identification code from an external

19    programmer.

20         And keep in mind, Your Honor, that this identification

21    code is the code that's used in the wireless mesh network for

22    purposes of routing the packets to the appropriate sensor unit.

23    So what this is describing is an initialization function

24    whereby the audio-enabled device receives its identification

25    code, so that it can fulfill its role in the packet-relaying

1    function that is intended to be covered by the invention.

2         And back to slide 81, Mr. Watkins.

3         (Document displayed)

4         **MR. SCHMIDT:**  That embodiment is not describing the

5    return of a device to a prescribed state.  It's describing an

6    initialization of a device, in the first instance.  So Sonos's

7    proposed construction excludes the prior embodiment for the

8    reset element in the '586 patent.

9         And the second thing I would note, Your Honor, is that

10   this definition is too broad, in the sense that it would

11   purport to cover hardware and/or software.

12        Mr. Watkins, if you could go to Slide 77.

13        (Document displayed)

14        **MR. SCHMIDT:**  This is our primary argument.  Claim 1

15   of the '586 patent covers a series of hardware elements.  A

16   wireless transceiver, an audio output element, a reset

17   element.  And then goes on to state these hardware elements

18   are operatively coupled to a controller.  And the idea that a

19   reset element would be purely a software construct is

20   inconsistent with the idea of being operatively coupled to the

21   controller.

22        And of course, the "operatively coupled" language has

23   additional significance because it tells us that it implies a

24   functional relationship between the reset element and the

25   controller.  And we cited the *Innova* case to Your Honor for

1    that principle.

2             THE COURT:  What is a a hardware reset element?

3             MR. SCHMIDT:  A reset button, Your Honor.  Or if you

4    look at the dependent claims, one of the dependent claims says

5    that the reset element would comprise a reset switch.

6         But what we're talking about is some physical element on

7    the device that is enabled to reset -- we say "configuration of

8    the controller."  We didn't mean anything special there.  What

9    we meant is you reset the control settings of the controller.

10   And the controller is the central element between all of these

11   other hardware elements.

12        So the reset element can allow the controller to reset its

13   control settings for the transceiver, for example.  Or the

14   audio output element, for example.

15        But if you go -- Mr. Watkins, if you could go to slide 78,

16   please.

17        (Document displayed)

18             MR. SCHMIDT:  The reset element is operatively

19   coupled to the controller.  It's not operatively coupled to

20   any other elements.  So this is not a generic reset function

21   for one of these other components.  It's intertwined to the

22   controller.  And all the embodiments are consistent with that.

23   And for that reason, we think our construction should be

24   adopted.

25             THE COURT:  How do you define -- you're defining

1   "reset element" as a piece of hardware.  I got that.

2        How else -- what other words would you -- is it -- "reset

3   element" same as "reset device"?  208 is "A reset device (e.g.,

4   a switch)."  Is that the same as a reset element?

5             MR. SCHMIDT:  The only reason I pause with "reset

6    device," Your Honor, is these are components in a larger

7    device, if you look at the figure that's on the screen.

8        102 is an example of a sensor unit.  The audio-enabled

9   device of the claim.  And these different components within the

10  sensor unit are components of the one device.  So the reset

11  element is just one element of the sensor unit.  So it would

12  not be a standalone device.

13            THE COURT:  But is there -- is "reset device" the

14   same as "reset element"?

15            MR. SCHMIDT:  Well, Your Honor, I -- I don't think

16   so.  I think "reset device" would imply some standalone

17   device.  And that's not what the patent is describing.  It's

18   describing an element within the sensor device, for purposes

19   of resetting the configuration of the controller.

20            THE COURT:  So what are we looking at here?  It says:

21            "Reset device 208 is proved to the controller."

22            MR. SCHMIDT:  Yeah.  I think that's a typo,

23   Your Honor.  I think it meant "provided."

24            THE COURT:  Amazing how this is supposed to be the

25   art of exactness, and you can't even use the right word.  But

1    in any event, so now I am confused.  What --

2          **MR. SCHMIDT:**  I see your confusion, Your Honor.  The

3    specification uses the term "reset device."

4          **THE COURT:**  Yeah.

5          **MR. SCHMIDT:**  It then says that's what's being

6    referred to as 208.  You know, what I was thinking of is this

7    is one element on the device of the sensor unit.  But

8    certainly, as you note, the specification is describing it as

9    reset device, which is a component of a sensor unit such as

10   102.

11         **THE COURT:**  Well, for this particular embodiment, is

12   the reset device a reset element?

13         **MR. SCHMIDT:**  Yes, Your Honor.  That's correct.

14         **THE COURT:**  And there are other kinds of reset

15   elements.  So how would you define -- if you could just sum it

16   up, what is a -- I think in your proposed construction it just

17   says "an element for resetting the configuration."  I'm still

18   not sure what that means.

19     But what is it, concretely?  What is a jury supposed to

20   understand it to be?  Other than -- the switch is one thing.

21   Can it be something else?

22         **MR. SCHMIDT:**  It could be a switch or a button, if

23   there's a distinction between a button or switch.  But what

24   we're really talking about is a button on the audio-enabled

25   device that tells the controller to reset one of these other

1    hardware elements on the device.

2        And Mr. Watkins, if you would go to Slide 80, please.

3        (Document displayed)

4        **MR. SCHMIDT:**  The primary embodiment talks about how

5    the reset function causes the controller to place the

6    transceiver into this receiving mode so that the device can be

7    initialized, and so it can join the wireless mesh network.  So

8    this embodiment, I would say, is exactly what the reset

9    element functionality is described as.

10       **THE COURT:**  So it essentially initializes or

11   activates the controller to do what it needs to do.

12       **MR. SCHMIDT:**  Yes, Your Honor.  It tells the

13   controller to place the transceiver into a receiving mode.

14   And that's so that the transceiver can receive its

15   identification code, and so that the device can join the

16   network.

17       **THE COURT:**  So it doesn't have to have its own sort

18   of circuitry or, to use a dirty word, logic circuitry or

19   anything else.  It could be as simple as a switch.

20       **MR. SCHMIDT:**  I think that's right, Your Honor.  I

21   think that that would be within the scope of the claim.  And

22   remember, the controller is the central element between all of

23   these features of the device, and the reset element is acting

24   through the controller.

25       **THE COURT:**  All right.

1          Brief response from Sonos?

2              **MR. GROSBY:**  Yes, Your Honor.

3          Ms. Caridis, if you could put up that slide again, slide

4      63.

5          (Document displayed)

6              **MR. GROSBY:**  Yeah.  Thank you.

7          Your Honor, again, the only example of placing this device

8      into a state is shown right here.  And it's placing the

9      transceiver into a receiving mode.

10          And, you know, I think we would offer that, you know, the

11      term "reset" means it's not to set; it's to reset.  It means to

12      place something into a state that it's already been in before.

13      And I don't think Sonos's construction runs afoul of that.

14      Right?

15          All Sonos's construction is saying, that, you know, we're

16      placing it into a prescribed state.  If -- I'm not sure if

17      Your Honor takes issue with the word "return," as Google does,

18      but, you know, we think that the example given here is well

19      within Sonos's construction.

20              **THE COURT:**  Well, let me just ask Google.

21          What is the problem of returning to a prescribed state?  I

22      mean, putting the transceiver in receiving mode is a prescribed

23      state.  What's the problem with that?

24              **MR. SCHMIDT:**  The problem, Your Honor, is it's not

25       returning the device to that state.  The embodiment that is

1    showing here in column 6 is talking about giving the

2    audio-enabled wireless device its identification code, in the

3    first instance.  This is an initialization function.  It is a

4    function to allow the device to join the network.

5            THE COURT:  So the word "return" is a problem.  If

6    you use a different word, to put the controller in a

7    prescribed state, would that be okay?

8            MR. SCHMIDT:  I think it would be okay if you adopted

9    a construction that said a hardware element that functions to

10   place the audio-enabled wireless device in a prescribed state.

11           THE COURT:  So you want to add the word

12   "audio-enabled."  But that's already evident from the context

13   of the claim, isn't it?

14      (Documents displayed)

15           THE COURT:  Well, let's do this.  Maybe we're not

16   that far apart.

17      I would like the parties to meet and confer to see if you

18   can come up with something.  Or, if not, give me your revised

19   narrowed definition so I can look at them, as we've gone

20   through this iterative process here.

21      I think we can get -- certainly, if not on the same page,

22   within a couple of pages of each other, as opposed to what

23   you've got right now.

24           MR. ROBERTS:  Your Honor, what form -- I apologize,

25   Your Honor.  I didn't mean to interrupt.

1          **THE COURT:**  Yeah, go ahead.

2          **MR. ROBERTS:**  What form would you like that in?  If

3  we met and conferred, would you like a joint letter of --

4          **THE COURT:**  Yeah.

5          **MR. ROBERTS:**  -- six pages or something that --

6          **THE COURT:**  Yeah.  I don't need a whole explanation.

7  I just want to see if you can get on the same page.  And if

8  not, give me sort of your best shot at it.  And I'm inclined

9  to try baseball arbitration to keep you reasonable.

10         **MR. ROBERTS:**  Thank you, Your Honor.

11         **THE COURT:**  Something along those lines.

12     All right.  Let me just ask about this preamble portion,

13  Claim No. 9.  I guess Google argues that the function and the

14  role of the preamble portion is not necessarily limited to the

15  initiation and synchronization, and Dr. Min cites the 3G, to

16  which the comeback is:  Well, 3G doesn't apply to this, and

17  therefore, you know, the only possible role of the preamble is

18  for initiation and synchronization.

19     But let me ask Google, what is the -- you say "plain and

20  ordinary meaning."  What is the plain and ordinary meaning

21  here?  What is it?

22         **MR. SCHMIDT:**  Sure, Your Honor.

23     Mr. Watkins, can you go to Slide 85?

24     (Document displayed)

25         **MR. SCHMIDT:**  This is all that the specification has

1    to say about the preamble portion, Your Honor.  So to answer

2    your question, I would say that the plain and ordinary meaning

3    is simply a portion of the packet that precedes the other

4    enumerated portions.  Namely, the address, the data, the

5    checksum, which are things like the integrity portion, the

6    data payload portion, and the identification code portion

7    that's recited in the claim.

8        And nothing else in the intrinsic evidence suggests a

9    limitation on the form or function of the preamble portion.

10       Mr. Watkins, if you could go to slide 86.

11       (Document displayed)

12       **MR. SCHMIDT:**  Frankly, Sonos's proposed construction

13   comes up with these three limitations out of whole cloth.

14   It's not in the intrinsic evidence, whatsoever.  They're

15   proposing that the preamble be limited to a series of bits, as

16   opposed to a single bit.  They're saying that it has to be

17   used to initiate the receiving device, which, we're not even

18   sure what that means.  It's not discussed in the extrinsic

19   evidence at all.

20       And then they say it further has to be used to synchronize

21   the receiving device.  And none of those limitations find any

22   support in the intrinsic record.

23       This is a classic case of a party trying to use extrinsic

24   evidence to interject an ambiguity that's not there.  And

25   that's not proper, under the Federal Circuit law.  Where the

1    intrinsic evidence in the claim language provides no basis for

2    limiting beyond the plain and ordinary meaning, you can't use

3    extrinsic evidence to create that ambiguity.

4         **THE COURT:**  Can you give me an example of something

5    that a preamble does that's different from this, other than

6    the 3G?  Is there -- is there any other role of a preamble?

7         **MR. SCHMIDT:**  A preamble in some cases has some

8    training bits to it.  It can alert a receiving device that

9    further data is coming, without necessarily doing a

10   synchronization process.

11        A preamble can be as simple as a flag, as a single bit.  A

12   0 or a 1.  So there are lots of forms and functions that a

13   preamble would take.  Preambles can exist in lots of different

14   packet formats.  They could exist at lots of different levels

15   of the communication hierarchy.

16        And, and frankly, in a lot of ways, Sonos's construction

17   appears to be aimed at limiting the preamble in this claim to

18   particular packet protocols.  Namely Ethernet and 802.11, wifi.

19   And there's no basis in the claim for that.

20        **THE COURT:**  All right.  Response?

21        **MR. GROSBY:**  Your Honor, the reason Sonos is relying

22   on so much extrinsic evidence is because this is a term of

23   art.  And it's something that a person of ordinary skill in

24   the art would understand to mean, when talking about these

25   types of network and communication systems that are described

1    in the '586.

2         (Document displayed)

3         **MR. GROSBY:**  You know, here's one of the examples

4    that was discussed in Dr. Stephen Wicker's declaration, which

5    is saying that a preamble is a synchronization mechanism.  And

6    as far as the initiation is concerned, right here, the

7    preamble serves to alert each Ethernet-attached device to the

8    fact that a data frame is traveling across the circuit.

9         You know, and then, Ms. Caridis, if you could move to the

10   next slide, too.

11        (Document displayed)

12        **MR. GROSBY:**  This is an excerpt from the 802.11

13   standard that shows that the preamble field is used for

14   synchronization.

15        Now, if the drafters of the '586 patent wanted to use

16   something that was more broad they could have used a term like

17   "header" or some other equivalent term that didn't imply this

18   very specific usage in the networking context.

19        **THE COURT:**  So, that is the only definition for

20   "preamble," that -- is that your position, that there is no

21   other definition of "preamble" that -- or are you saying in

22   this context, that's how it would be understood?

23        **MR. GROSBY:**  Right.  In this context, that's how it

24   would be understood.  If a person skilled in the art were to

25   read this patent and see that it's talking about wireless

sensor systems, they would understand that "preamble" would

have this specific meaning, and wouldn't just be something

that came before, and just -- and couldn't be a packet that

just preceded the other portions of the communication packet.

       **THE COURT:**  So again, you're applying a limitation

that is discernable from both the nature of the invention, as

well as extrinsic evidence, it appears.

       **MR. GROSBY:**  Yes, Your Honor.

       **THE COURT:**  What's the response?  Read in context,

this is the only possible way a POSITA could understand what

the term means.

       **MR. SCHMIDT:**  Mr. Watkins, can you put up slide 91?

   (Document displayed)

       **MR. SCHMIDT:**  The response, Your Honor, is that's

disputed.  Our expert says exactly the opposite.  Our expert

says (As read):

           "There is nothing in the intrinsic evidence or the

           understanding of a person of ordinary skill in the

           art, to support the conclusion that a 'preamble

           portion' must necessarily perform a synchronization

           and initiation function of the receiving device..."

And Your Honor I don't know if you caught it when counsel

put up Dr. Wicker's testimony when he was speaking previously,

he sort of glossed over this, but Dr. Wicker doesn't say

anything about initiation.  None of the evidence they cite says

 1   anything about initiation.  I don't even know where

 2   "initiation" comes from.  It's not even in the extrinsic

 3   evidence that they cite.

 4       There's no reason why this all has to be -- has to perform

 5   the function with respect to the receiving device.  There's no

 6   reason why the preamble has to be a series of bits, as opposed

 7   to a single bit.  All of these are just results-oriented

 8   constructions.

 9       The last thing I would note, Your Honor, is if you look at

10   the whole claim, the claim recites a communication packet.  And

11   maybe we should put it up.

12       Mr. Watkins, can you put up Slide 84?

13       (Document displayed)

14       **MR. SCHMIDT:**  This is the last point, Your Honor.

15       The claim recites a communication packet that includes

16   these various portions:  A preamble portion, identification

17   code portion, data payload portion, and an integrity portion.

18       The parties agree that the terms in green, purple and blue

19   have a plain and ordinary meaning.  There's no reason construe

20   those.  But Sonos plucks out the preamble portion for

21   specialized treatment.  And there's no reason in the intrinsic

22   evidence to do that.

23       And all they have to base this on is exemplary protocols

24   in the extrinsic evidence, which really have no connection to

25   this specific patent.

1        **THE COURT:**  Is there any evidence that, in the

2   context of this invention, that a preamble portion of the

3   packet can do something other than what Sonos contends?

4   Initiation and synchronization of the receiving device?

5        **MR. SCHMIDT:**  There's no evidence that -- well, let

6   me say this, Your Honor.  There's no evidence that it can't.

7   And when we look at a patent claim, we don't read the claim

8   restrictively, unless there's a reason to do so.

9        And I guess the way I would answer your question is

10  there's no reason in the specification to believe that the

11  preamble couldn't do other functions.  And in fact, Dr. Min

12  provides an example of a preamble in a prior art protocol that

13  did functions other than the ones that Sonos is proposing.

14       **THE COURT:**  Right.  Although Sonos says that that

15  context doesn't apply here, that protocol doesn't apply, so

16  it's -- doesn't -- you know, doesn't help.  And so that's why

17  I'm asking.

18       Can you -- is there any evidence of -- I understand, you

19  know, they've got the burden since they're trying to, frankly,

20  import a language that's not evident and plain from the claim

21  language, itself.  But nonetheless, is there any other

22  testimony that shows that, well, you could have a preamble

23  portion here, in this context, in the context of this invention

24  that does something other than initiation and synchronization

25  of the receiving device?

1          MR. SCHMIDT:  Well, I would just point to Dr. Min's

2     testimony again, Your Honor.  And the reason why Sonos's

3     argument doesn't work, their criticism of Dr. Min, the reason

4     why it doesn't work is because they take his argument too far.

5     The issue is not whether 3G, CDMA, would read on every single

6     element to the claim.  That's not the issue.

7          We cited that example for the simple fact that in that

8     protocol, there was something called a preamble.  And that

9     preamble did things other than what Sonos is saying is required

10    here.

11         So the idea that a person of ordinary skill in the art

12    would understand a preamble to be limited to these specific

13    functions is just not true.  You know, whether that's with

14    respect to a device that meets every single element of the

15    claim, or some device that does not meet some of them, the fact

16    of the matter is that this is broad language that was used in

17    many different contexts for many different purposes.

18         And, you know, looking at the specification, the

19    specification doesn't provide a lot of examples, because the

20    patentee intended the claim broadly.  So, you know, the fact

21    that there aren't other functions to the preamble in the

22    specification is not a reason to adopt their restrictive

23    limitation.  It's, frankly, a reason to reject it.  Because

24    that evidence shows that the patentee did not intend to limit

25    the claim term.

1          **THE COURT:**  All right.  All right.  Well, this has

2     been helpful.  I'd like you, let's say by Monday, close of

3     business Monday, see if you can come to an agreement.  And if

4     not, at least a revised closer set of constructions on the

5     "reset element" question.  Seems to me that one could be

6     resolved.

7          I will take the rest under submission, and issue a ruling

8     shortly.

9          **MS. CARIDIS:**  Your Honor, briefly, if I may?

10          **THE COURT:**  Yeah.

11          **MS. CARIDIS:**  I just want to make sure that you got

12     the parties' messages earlier today, that the parties appear

13     to be on the precipice of settling -- or of dismissing the

14     '206 patent, the adaptive echo-cancellation patent.

15          **THE COURT:**  Oh.

16          **MS. CARIDIS:**  And I know that there is a claim term

17     that is in dispute.  I believe it's the fourth term in the

18     briefing.

19          **THE COURT:**  Yes.

20          **MS. CARIDIS:**  So it seems that if you are so inclined

21     to prioritize other terms, that may be a better use of your

22     time.

23          **THE COURT:**  I appreciate that.  I very much

24     appreciate that.  So I will put on the back burner Claim

25     No. 4.

1          **MS. CARIDIS:**  Yes.

2          **THE COURT:**  With hopes that you all can resolve that,

3     and concentrate on the other claims, and await your submission

4     on Monday, on 8.

5          **MR. NELSON:**  Just on that point, to clarify,

6     Your Honor?

7          **THE COURT:**  Yeah.

8          **MR. NELSON:**  Dave Nelson.  You're just looking for

9     constructions on the "reset element."  Correct?

10         **THE COURT:**  Yeah.

11         **MR. NELSON:**  No argument, no briefing, because --

12         **THE COURT:**  Yeah, no, I've got enough briefing on it.

13    I'm just hoping that you all can work out something else.  I'm

14    not looking for anything more than a one-pager on that.

15         **MR. NELSON:**  Yeah.  I was just -- because at one

16    point Mr. Rodents said "six pages," and then you kind of moved

17    on, and I --

18         **THE COURT:**  Oh, no, I don't want six pages.

19         **MR. ROBERTS:**  Okay, Your Honor.  Thank you.  I didn't

20    know whether, if the parties had changed positions or

21    whatever, you wanted some explanation of those changes.  But

22    if you don't, that's totally fine.  I just wanted to clarify.

23         **THE COURT:**  No, I understand enough, and I'm hoping

24    you all understand enough that we can get there.

25         **MR. ROBERTS:**  Very good, Your Honor.

1          **THE COURT:**  All right?

2          **MR. ROBERTS:**  Thank you.

3          **THE COURT:**  Thank you.  It's been helpful.

4     Appreciate it.

5          **MS. CARIDIS:**  Thank you.

6          **MR. SCHMIDT:**  Thank you, Your Honor.

7          **THE COURTROOM DEPUTY:**  Court is adjourned.

8        (Proceedings concluded)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

      I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Wednesday, May 12, 2021