CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
croberts@orrick.com
BAS DE BLANK (STATE BAR NO. 191487)
basdeblank@orrick.com
ALYSSA CARIDIS (STATE BAR NO. 260103)
acaridis@orrick.com
EVAN D. BREWER (STATE BAR NO. 304411)
ebrewer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

GEORGE I. LEE (*pro hac vice*)
lee@ls3ip.com
SEAN M. SULLIVAN (*pro hac vice*)
sullivan@ls3ip.com
RORY P. SHEA (*pro hac vice*)
shea@ls3ip.com
J. DAN SMITH (*pro hac vice*)
smith@ls3ip.com
LEE SULLIVAN SHEA & SMITH LLP
656 W Randolph St., Floor 5W
Chicago, IL 60661
Telephone:    +1 312 754 0002
Facsimile:    +1 312 754 0003

*Attorneys for Defendant Sonos, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Google LLC,<br><br>               Plaintiff,<br><br>     v.<br><br>Sonos, Inc.,<br><br>               Defendant. | Case No. 20-cv-03845-EMC<br><br>**DECLARATION OF ALYSSA CARIDIS IN SUPPORT OF SONOS, INC.'S MOTION FOR LEAVE TO AMEND INVALIDITY CONTENTIONS**<br><br>Date: September 16, 2021<br>Time: 1:30 p.m.<br>Courtroom: 5, 17th Floor |

I, Alyssa Caridis, declare as follows and would so testify under oath if called upon to do so:

1.      I am an attorney with the law firm of Orrick, Herrington & Sutcliffe LLP, counsel of record to Sonos, Inc. ("Sonos") in the above-captioned matter. I am a member in good standing of the Bar of the State of California and duly licensed to practice law before this Court. I make this declaration based on my personal knowledge, unless otherwise noted. If called, I can and will testify competently to the matters set forth herein.

2.      Attached as **Exhibit 1** is a true and correct copy of Sonos's Amended Exhibit D-4, Invalidity Claim Chart for Claims 1-5, 7-12, 14-16, 18, and 20 of U.S. Patent No. 10,229,586 (The "'586 Patent") Regarding Sonos System ("Sonos") served May 10, 2021. [***HIGHLY CONFIDENTIAL – SOURCE CODE***]

3.      Attached as **Exhibit 2** is a true and correct copy of Sonos, Inc.'s Patent L.R. 3-3 Invalidity Contentions served December 14, 2020.

4.      Attached as **Exhibit 3** is a true and correct copy of Sonos's Exhibit D-4, Invalidity Claim Chart for Claims 1-5, 7-12, 14-16, 18, and 20 of U.S. Patent No. 10,229,586 (The "'586 Patent") Regarding Sonos System ("Sonos") served December 14, 2020. [***HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY***]

5.      Attached as **Exhibit 4** is a true and correct copy of Plaintiff Google LLC's Amended Disclosure of Asserted Claims and Infringement Contentions served March 15, 2021.

6.      Attached as **Exhibit 5** is a true and correct copy of an email chain between David Grosby, Cole Richter and Patrick Schmidt regarding Sonos's amended invalidity contention chart regarding the '586 patent, dated May 10, 2021 to July 28, 2021.

7.      Attached as **Exhibit 6** is a true and correct copy of a redlined version of Sonos's Amended Exhibit D-4, Invalidity Claim Chart for Claims 1-5, 7-12, 14-16, 18, and 20 of U.S. Patent No. 10,229,586 (The "'586 Patent") Regarding Sonos System ("Sonos") served on May 10, 2021. [***HIGHLY CONFIDENTIAL – SOURCE CODE***]

8.      Attached as **Exhibit 7** is a true and correct copy of a letter dated May 21, 2021 from Patrick Schmidt to Cole Richter regarding Sonos's recent amendment to its invalidity contentions. [***HIGHLY CONFIDENTIAL – SOURCE CODE***]

9.      Attached as **Exhibit 8** is a true and correct copy of an email dated June 14, 2021 from Cole Richter to Patrick Schmidt regarding Sonos's amended invalidity contentions. [***HIGHLY CONFIDENTIAL – SOURCE CODE***]

10.      Attached as **Exhibit 9** is a true and correct copy of a redline compare of Google's October 29, 2020 '586 infringement contention chart to its March 15, 2021 '586 infringement contention chart. [***HIGHLY CONFIDENTIAL – SOURCE CODE (ATTORNEYS' EYES ONLY***]

11.      Attached as **Exhibit 10** is a true and correct copy of Google's Infringement Contention Chart regarding the '586 patent served on October 29, 2020.

12.      Attached as **Exhibit 11** is a true and correct copy of Google's Amended Infringement Contention Chart regarding the '586 patent served on March 15, 2021. [***HIGHLY CONFIDENTIAL – SOURCE CODE (ATTORNEYS' EYES ONLY***]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 10th day of August, 2021 in Surf City, New Jersey.

By:  */s/ Alyssa Caridis*
Alyssa Caridis

CARIDIS DECL. ISO SONOS'S MOTION FOR LEAVE TO
AMEND INVALIDITY CONTENTIONS
20-cv-03845-EMC

# EXHIBIT 1

# FILED UNDER SEAL

## HIGHLY CONFIDENTIAL – SOURCE CODE

# EXHIBIT 2

1  CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
   croberts@orrick.com
2  BAS DE BLANK (STATE BAR NO. 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (STATE BAR NO. 260103)
   acaridis@orrick.com
4  EVAN D. BREWER (STATE BAR NO. 301411)
   ebrewer@orrick.com
5  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
6  405 Howard Street
   San Francisco, CA  94105-2669
7  Telephone:     +1 415 773 5700
   Facsimile:      +1 415 773 5759
8
   GEORGE I. LEE (admitted *pro hac vice*)
9  lee@ls3ip.com
   SEAN M. SULLIVAN (admitted *pro hac vice*)
10 sullivan@ls3ip.com
   RORY P. SHEA (admitted *pro hac vice*)
11 shea@ls3ip.com
   J. DAN SMITH (admitted *pro hac vice*)
12 smith@ls3ip.com
   LEE SULLIVAN SHEA & SMITH LLP
13 656 W Randolph St., Floor 5W
   Chicago, IL 60661
14 Telephone:     +1 312 754 0002
   Facsimile:      +1 312 754 0003
15
   *Attorneys for Defendant*
16 SONOS, INC.

17                    UNITED STATES DISTRICT COURT

18                   NORTHERN DISTRICT OF CALIFORNIA

19                      SAN FRANCISCO DIVISION

20 Google LLC,                        | Case No. 3:20-cv-03845

21            Plaintiff,              | **SONOS, INC.'S PATENT L.R. 3-3**
                                       | **INVALIDITY CONTENTIONS**
22     v.
                                       | Judge:      Hon. Edward M. Chen
23 Sonos, Inc.,

24            Defendant.

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ............................................................................................... 1

II.    PRIORITY DATE ............................................................................................... 3

III.   PATENT L.R. 3-3(A) ....................................................................................... 3

     A.     PRIOR ART PATENTS AND APPLICATIONS ........................... 4

     B.     PRIOR ART NON-PATENT PUBLICATIONS ............................ 7

     C.     PRIOR ART APPARATUSES AND SYSTEMS ......................... 11

     D.     PRIOR ART UNDER 35 U.S.C. § 102(G) ................................. 12

IV.   PATENT L.R. 3-3(B) ..................................................................................... 13

     A.     '187 PATENT .............................................................................. 13

     B.     '375 PATENT .............................................................................. 18

     C.     '206 PATENT .............................................................................. 32

     D.     '586 PATENT .............................................................................. 66

V.    PATENT L.R. 3-3(C) ..................................................................................... 87

VI.   PATENT L.R. 3-3(D) ..................................................................................... 88

     A.     GROUNDS OF INVALIDITY UNDER 35 U.S.C. § 112 ........... 88

     B.     GROUNDS OF INVALIDITY UNDER 35 U.S.C. § 101 ........... 93

VII.  DOCUMENT PRODUCTION ACCOMPANYING INVALIDITY
     CONTENTIONS ............................................................................................ 96

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

Pursuant to Patent Local Rule 3-3, Defendant Sonos, Inc. ("Sonos" or "Defendant") hereby serves these Invalidity Contentions on Plaintiff Google LLC ("Google" or "Plaintiff"). These Invalidity Contentions address only claims 1, 3, 4, 10, and 12 of U.S. Patent No. 7,899,187 (the "'187 Patent"), 1-11, and 13-20 of U.S. Patent No. 10,140,375 (the "'375 Patent"), 1-3, 9, 11, 12, 18, and 19 of U.S. Patent No. 7,065,206 (the "'206 Patent"), and 1-5, 7-12, 14-16, 18, and 20 of U.S. Patent No. 10,229,586 (the "'586 Patent") (collectively the "Asserted Claims" and "Patents-in-Suit"), as asserted in Google's Initial Disclosure of Asserted Claims and Infringement Contentions served on October 29, 2020.[1]

## I.     **INTRODUCTION**

Sonos has not completed its investigation of the facts and documents relating to this action and has not completed its preparation for trial. Sonos has not taken any depositions in this action, including, without limitation, any depositions of the named inventors of the Patents-in-Suit and/or other persons having potentially relevant information.  As discovery in this action provides Sonos with additional information, it is possible that Sonos will discover additional prior art pertinent to the invalidity of the Asserted Claims of the Patents-in-Suit, and Sonos reserves the right to supplement these contentions after becoming aware of additional prior art or information. Sonos further reserves the right to introduce and use such supplemental materials at trial.

There has been no claim construction ruling in this case. Accordingly, Sonos's Invalidity Contentions reflect the presumed readings of the claims advanced by Plaintiff in its Infringement Contentions, not what Sonos contends is the proper meaning of the claims. These Invalidity Contentions are not admissions or adoptions as to any particular claim scope or construction nor an admission that any particular element is met in any particular way in Sonos's Accused Instrumentalities. Nothing herein should be treated as an admission that Sonos agrees with Plaintiff's express or implied claim constructions or that Plaintiff has proposed any discernible constructions for claims and/or claim terms in their Infringement Contentions. To the extent that Sonos understands Plaintiff's allegations of infringement, Plaintiff attempts to stretch the language

---

[1] These Invalidity Contentions do not address U.S. Patent No. 8,583,489 ("the '489 Patent"). Since Google served its infringement contentions, the Court granted Sonos's Motion to Dismiss, finding the '489 Patent unpatentable. Dkt. 60.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 1 -

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
5:18-CV-02621

of the Asserted Claims beyond the scope to which the claims could reasonably be entitled in light of the disclosures of the Patents-in-Suit and the prosecution histories.

Sonos's Invalidity Contentions are made in a variety of alternatives and are not intended to be consistent with each other and should not be otherwise construed. Sonos expressly reserves the right to amend or supplement these contentions based on any claim constructions issued by the Court and once Plaintiff serves amended Infringement Contentions with pinpoint source code citations, and if Google is allowed to further supplement its Infringement Contentions.

Sonos contends that the Asserted Claims are invalid under 35 U.S.C. § 102 and/or § 103 as being anticipated by or rendered obvious by prior art disclosed herein and/or in view of the knowledge of one of ordinary skill in the art. Prior art not included in this disclosure, whether or not now known to Sonos, may become relevant depending on the claim constructions ultimately adopted by the Court, or positions taken by Google. Sonos's ongoing investigation may also uncover additional prior art. Any obviousness combinations of references provided herein pursuant to 35 U.S.C. § 103 are not intended to be exhaustive. Additional obviousness combinations of the references identified below are possible, and Sonos reserves the right to use any such combinations in this litigation.

In addition, Sonos contends that certain Asserted Claims do not satisfy one or more requirements of 35 U.S.C. §§ 101 and/or 112. In order to fulfill its obligations pursuant Patent L.R. 3-3, however, Sonos has applied the prior art based on an assumption that Plaintiff contends all Asserted Claims satisfy all of the applicable requirements of 35 U.S.C. §§ 101 and/or 112. The application of prior art in these Invalidity Contentions should not be construed as an admission that Sonos agrees that any of the Asserted Claims satisfies all the requirements of 35 U.S.C. §§ 101 and 112.

Sonos does not believe Plaintiff's Infringement Contentions comply with Patent L.R. 3.1, which necessarily has compromised Sonos's ability to prepare its invalidity contentions.  As a result, to the extent Plaintiff further supplements its infringement contentions at a later date, Sonos reserves its right to update its invalidity contentions accordingly.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-2-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

Because Sonos's investigation, prior art search, and analysis are still ongoing, it is likely that Sonos will identify additional prior art or contentions that will add meaning to already known prior art or contentions or possibly lead to additions or changes to these Invalidity Contentions. Without obligating itself to do so, Sonos reserves all rights to amend, modify, or supplement these Invalidity Contentions. Sonos further reserves the right to rely on any facts, documents, or other evidence that are: (i) subsequently discovered; (ii) subsequently determined to be relevant for any purpose; or (iii) subsequently determined to have been omitted from a production, whether inadvertently or otherwise. Sonos further reserves the right to rely on expert testimony. Documents related to expert testimony, if any, will be produced when expert discovery is exchanged pursuant to the Court's Case Management Order.

The foregoing statements and reservations of rights are hereby expressly incorporated by reference in their entirety into each of the disclosures below, into the invalidity charts served herewith as Exhibits, and into each disclosure corresponding to each element of every claim.

## II.   <u>PRIORITY DATE</u>

For each of the Asserted Claims, Plaintiff has failed to demonstrate any basis upon which the claims are entitled to a priority date earlier than the filing date of the applications. The priority dates of the Asserted Claims are no earlier than the filing dates of the respective patent applications at least because: any claim to earlier priority documents was not timely and properly claimed, there is no continuity of disclosure, there is insufficient disclosure in the earlier priority documents, and there is no specific claim of priority within the earlier priority documents; and any claim to an earlier date of conception is not sufficiently supported by evidence and was not adequately coupled with sufficient reduction to practice and diligence.

## III.   <u>PATENT L.R. 3-3(A)</u>

In the following subsections, Sonos identifies each item of prior art that Sonos alleges anticipates one or more of the Asserted Claims or renders them obvious. These prior art patents, publications, systems, and products disclose the elements of the Asserted Claims either explicitly, implicitly, inherently, or via an obvious combination. They may also be relied upon to show the state of the art in the relevant timeframes. Sonos further reserves the right to rely upon the

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-3-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

following to show the state of the art in the relevant timeframes: all prior art cited on the face of the Patents-in-Suit and Related Patents, the admitted prior art references[2] in the specification of the Patents-in-Suit and Related Patents, all prior art cited in the prosecution histories of the Patents-in-Suit and Related Patents, including in any reexaminations, reissue, or *inter partes* review proceedings, and the references produced herewith pursuant to Patent Local Rule 3-4(b).

To the extent that Google challenges a prior art patent's qualification as prior art, Sonos reserves the right to rely upon: (i) foreign counterparts of U.S. patents identified in these Invalidity Contentions; and (ii) U.S. counterparts of foreign patents and foreign patent applications identified in these Invalidity Contentions, to the extent such references qualify as prior art and contain the same substantive disclosure.

A.     **Prior Art Patents and Applications**

Sonos has identified each prior art patent or application by its number, country of origin, and date of issue or, if an application, date of publication. Unless otherwise noted, the country of origin for the prior art patent or patent application is the U.S.

1.     **'187 Patent**

- United States Patent Application Publication Number US 2002/0174354, application filed March 8, 2002, and published November 21, 2002 ("Bel").

- United States Patent Application Publication Number US 2002/0166047, application filed April 30, 2002, and published November 7, 2002 ("Kawamoto").

- United Kingdom Patent Application Number GB 2 367 925 A, application filed May 23, 2001, and published April 17, 2002 ("Lambert").

2.     **'375 Patent**

- United States Patent No. 6,023,708, issued February 8, 2000 ("Mendez").

- United States Patent No. 6,480,853, issued November 12, 2002 ("Jain").

- United States Patent No. 6,493,702, issued December 10, 2002 ("Adar").

- United States Patent No. 6,950,861, issued September 27, 2005.

---

[2] The admitted prior art of the Patents-in-Suit include the systems and methods described in the "Background" sections of the Patents-in-Suit.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-4-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

- United States Patent No. 7,725,422, issued May 25, 2010 ("Ryan").

- United States Patent Application Publication Number US 2001/0037332, application filed April 27, 2001, and published November 1, 2001 ("Miller").

- United States Patent Application Publication Number US 2002/0198962, application filed April 17, 2002, and published December 26, 2002 ("Horn").

- United States Patent Application Publication Number US 2003/0069874, application filed May 5, 2000, and published April 10, 2003.

- United States Patent Application Publication Number US 2003/0088554, application filed May 22, 2002, and published May 8, 2003.

- United States Patent Application Publication Number US 2003/0073412, application filed October 16, 2001, and published April 17, 2003.

- United States Patent Application Publication Number US 2004/0002938, application filed June 28, 2002, and published January 1, 2004.

- United States Patent Application Publication Number US 2004/0107236, application filed March 14, 2002, and published June 3, 2004 ("Nakagawa").

- United States Patent Application Publication Number US 2005/0091205, application filed September 3, 2004, and published April 28, 2005.

- United States Patent Application Publication Number US 2006/0235873, application filed June 21, 2006, and published October 19, 2006.

- PCT International Patent Application Publication Number WO 01/35211, international application filed November 8, 2000, and published May 17, 2001 ("Kapoor").

- PCT International Patent Application Publication Number WO 01/55909, international application filed January 25, 2001, and published August 2, 2001 ("Lim").

- PCT International Patent Application Publication Number WO 02/15617, international patent application filed July 25, 2001, and published February 21, 2002.

### 3. '206 Patent

- United States Patent No. 7,003,099, issued February 21, 2006 ("Zhang").

- United States Patent No. 7,359,504, issued April 15, 2008 ("Reuss").

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-5-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

- United States Patent No. 6,904,146, issued June 7, 2005 ("Domer").

- United States Patent No. 7,539,615, May 26, 2009 ("Koistinen").

- United States Patent Application Publication Number US 2002/0041678, application filed May 31, 2001, and published April 11, 2002 ("Basberg-Ertem").

- United States Patent No. 4,554,417, issued November 19, 1985 ("Boyer").

- United States Patent No. 7,016,488, issued March 21, 2006 ("He '488").

- United States Patent No. 7,242,762, issued July 10, 2007 ("He '762").

- United States Patent No. 7,027,591, issued April 11, 2006 ("Cairns").

### 4.    '586 Patent

- United States Patent No. 6,624,750, issued September 23, 2003 ("Marman").

- United States Patent No. 6,754,188, issued June 22, 2004 ("Garahi").

- United States Patent Nos. 7,020,501, issued March 28, 2006 ("Elliot '501"), 7,421,257, issued September 2, 2008 ("Elliot '257"), and 10,588,139, issued March 10, 2020 ("Elliot '139") (collectively referred to herein as the "Elliot Family of References").

- United States Patent No. 7,027,773, issued April 11, 2006 ("McMillin").

- United States Patent Application Publication Number US 2006/0120433, international application filed May 21, 2004, and published June 8, 2006 ("Baker").

- United States Patent No. 5,488,608, issued January 30, 1996 ("Flammer")

- United States Patent No. 6,005,853, issued December 21, 1999 ("Wang")

- United States Patent No. 7,463,907, issued December 9, 2008 ("Smith")

- United States Patent No. 7,546,086, issued June 9, 2009 ("Hansson")

- United States Patent No. 7,610,050, issued October 27, 2009 ("Sayers")

- United States Patent Application Publication Number US 2004/0183687, application filed April 1, 2004, and published September 23, 2004 ("Petite").

- PCT International Patent Application Publication Number WO 97/32419, international application filed February 20, 1997, and published September 4, 1997 ("Melnik")

- PCT International Patent Application Publication Number WO 03/084146, international application filed April 2, 2003, and published October 9, 2003 ("Cho")

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-6-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

- PCT International Patent Application Publication Number WO 05/079026, international application filed February 5, 2005, and published August 25, 2005 ("Bauer")

## B. Prior Art Non-Patent Publications

To the extent feasible, Sonos has identified each prior art publication by its title, date of publication, author, and publisher.

### 1. '187 Patent

- *GKM Building Block: Group Security Association (GSA) Definition*, Internet Research Task Force, September 2000 ("SMuG").
- *Securely Available Credentials – Requirements*, The Internet Society Network Working Group, August 2001 ("SACRED").
- *Internet Security Association and Key Management Protocol (ISAKMP)*, The Internet Society Network Working Group, November 1998 ("ISAKMP").
- *Extended Authentication within ISAKMP/Oakley (XAUTH) <draft-ietf-ipsec-isakmp-xauth-06.txt>*, Internet Engineering Task Force Internet Protocol Secure Remote Access Working Group, December 1999 ("XAUTH").
- *Nokia Proposal for DVB Content Protection & Copy Management Technologies Version 1.0*, Nokia Corporation, October 19, 2001 ("Nokia Proposal").
- *Call for Proposals for Content Protection & Copy Management Technologies*, Digital Video Broadcasting Technical Module Sub-Group on Copy Protection Technologies, July 5, 2001, available at http://web.archive.org/web/20011115034127/http://cptwg.org/Assets/DVB-CPT-CfP_rev1.2.PDF.

### 2. '206 Patent

- New eXpressDSP Reference Frameworks Provide Fast Ramp for DSP Application Development, Texas Instruments Application Note SPRV04a, May 2003 ("Sprv040a"), available at https://web.archive.org/web/20030407012115/http://www-s.ti.com/sc/psheets/sprv040a/sprv040a.pdf
- EDN magazine, October 3, 2002 ("EDN 2002").

- Complete Listing of eXpressDSP-Compliant Third-Party Algorithms Updated as of 10/02/02 ("Third-Party Listing"), available at https://web.archive.org/web/20030621230951/http://dspvillage.ti.com/pdfs/3p_algo_10-02_monthly.pdf.

- VAB Advanced Technology for Rapid DSP Development using eXpressDSP Technology from TI!, Hyperception Data Sheet, 2000 ("VAB Flyer")

- Reference Frameworks for eXpressDSP Software: RF1, A Compact Static System, Texas Instruments Application Report, May 2003 ("RF1").

- ACOUSTIC TECHNOLOGIES RAISES $13.8M IN FUNDING FOR SOUNDCLEAR FULL-DUPLEX VOICE CLARITY PRODUCTS USED IN CELLULAR HANDSETS AND HANDSFREE SPEAKERPHONE APPLICATIONS ("Acoustic Technologies Funding"), available at https://web.archive.org/web/20031005021226fw_/http://www.acoustictech.com/pr051603.htm.

- Martin, Rainer, *Small Microphone Arrays with Postfilters for Noise and Acoustic Echo Reduction,* in Brandstein, M. and Ward, D., Eds. *Microphone Arrays: Signal Processing Techniques and Applications,* Springer: 2001, pp. 255-279. ("Martin").

- Kellerman, Walter L, *Acoustic Echo Cancellation for Beamforming Microphone Arrays*, in Brandstein, M. and Ward, D., Eds. *Microphone Arrays: Signal Processing Techniques and Applications*, Springer: 2001, pp. 281-306. ("Kellerman").

- Martin, Rainer, and Vary, Peter, *Combined Acoustic Echo Cancellation, Dereverberation And Noise Reduction: A Two Microphone Approach*, Annals of Telecommuications, July 1994, pp. 428-438. ("Martin/Vary").

- Le Bouquin-Jeannes, Regine, Scalart, Pascal, Faucon, Pascal, and Beaugeant, Christophe, *Combined Noise and Echo Reduction in Hands-Free Systems: A Survey,* IEEE Transactions On Speech And Audio Processing, Vol. 9, No. 8, November 2001, pp. 808 – 820. ("Jeannes").

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-8-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

- Beaugeant, Christophe, Turbin, Valerie, Scalart, Pascal, and Gilloire, Andre, *New optimal filtering approaches for hands-free telecommunication terminals*, Signal Processing, Volume 64, Issue 1, 1998, pp. 33-47 ("Beaugeant").
- Ayad, Beghdad, Faucon, Gerard, and Le Bouquin-Jeannes, Regine, *Optimization Of A Noise Reduction Preprocessing In An Acoustic Echo And Noise Controller*, 1996 IEEE International Conference on Acoustics, Speech, and Signal Processing Conference Proceedings, May 1996 ("Ayad").
- Guelou, Yann, Benamar, Abdelkrim, and Scalart, Pascal, *Analysis of Two Structures for Combined Acoustic Echo Cancellation and Noise Reduction*, 1996 IEEE International Conference on Acoustics, Speech, and Signal Processing Conference Proceedings, May 1996 ("Guelou").
- Getting Started With CoCentric System Studio Version U-2003.03, March 2003, ("CoCentric") available at https://www.inf.pucrs.br/~calazans/research/BrazilIP_project/SystemC_synth_prot_course/cssgs.pdf.
- Van Compernolle, Dirk, *Switching Adaptive Filters for Enhancing Noisy and Reverberant Speech from Microphone Array Recordings*, Proceedings, International Conference on Acoustics, Speech, and Signal Processing, 3-6 April 1990 ("Van Compernolle").
- Vaseghi, Saeed, *Advanced Digital Signal Processing and Noise Reduction,* Second Edition. Wiley: 2000. ("Vaseghi").
- Angus, James, Kershaw, Simon, and Lewis, Alwyn, *An Adaptive Beam-Steering Microphone Array Implemented On The Motorola DSP56000 Digital Signal Processor*, Audio Engineering Society 95th Convention, October 7-10, 1993 ("Angus").
- Berkeman, Anders and Viktor Öwall, *Architectural tradeoffs for a custom implementation of an acoustic echo canceller*, NORSIG, 04 Oct 2002, Hurtigruten from Tromsø to Trondheim, Norway, Paper, 2002 ("Berkeman").
- Davis, G., Ed., *Noise Reduction in Speech Applications*, CRC Press: 2002 ("Davis").

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-9-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

- Elhossini, Ahmed, Areibi, Shawki, and Dony, Robert, *An FPGA Implementation of the LMS Adaptive Filter for Audio Processing*, 2006 IEEE International Conference on Reconfigurable Computing and FPGA's (ReConFig 2006), September 20-22, 2006 ("Elhossini").

- Kuo, Sen M., and Lee, Bob H., *Real-Time Digital Signal Processing*, Wiley: 2001 ("Kuo").

- Ohga, Juro; Fujii, Kensaku; Hoshino, Tsutomu; Sakaguchi, Jun'ichi, *Loudspeaking Dialog System by Small Acoustic Echo Canceller*, Audio Engineering Society 106th Convention, May 8-11, 1999 ("Ohga").

- Park, Sangil, *170 MIPS Real-Time Adaptive Digital Filter Board*, Audio Engineering Society 91st Convention, October 4-8, 1991 ("Park").

- Zoican, *Noise Reduction and Echo Cancellation System*, 2002 6th International Conference on Signal Processing, September 2002 ("Zoican").

- Kallinger, Markus, Bitzer, Joerg, and Kammeyer, Karl-Dirk, *Study on Combining Multi-Channel Echo Cancellers with Beamformers*, 2000 IEEE International Conference on Acoustics, Speech, and Signal Processing, February 2000 ("Kallinger").

- Sankaran, Sundar G., and Beex, A. A. (Louis), *Acoustic Echo and Noise Canceller Improvements for Hands-free Telephones*, Proceedings IEEE SOUTHEASTCON '97, 'Engineering the New Century', 12-14 April 1997 ("Sankaran").

- Zarlink Semiconductor ACOUSTIC ECHO CANCELLER WITH DUAL CODECS ZL38003, Product Preview, 2005 ("Zarlink").

### 3. '586 Patent

- *RFC 3561 - Ad hoc On-Demand Distance Vector (AODV) Routing*, The Internet Society, July 2003 ("AODV").

- *AirPort Express Setup Guide*, Apple Inc., 2004 ("AirPort Express Setup Guide").

- *Designing AirPort Networks*, Apple Inc., 2004 ("Designing AirPort Networks").

- *IEEE Std. 802.11-1997*, The Institute of Electrical and Electronics Engineers, Inc., June 26, 1997 ("802.11 Standard").

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-10-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

- *Apple Unveils AirPort Express for Mac & PC Users*, Newsroom, June 7, 2004 ("AirPort Press Release").

- *WRT54G User Guide*, Cisco Systems, Inc., 2003 ("WRT54G User Guide").

- *Routing in Ad hoc Mobile Networks: On-Demand and Hierarchical Strategies*, Elizabeth M. Royer, Ph.D. Dissertation, December 2000.

- *A Secure Routing Protocol for Ad Hoc Networks*, Kimaya Sanzgiri, Bridget Dahill, Brian N. Levine, Clay Shields, and Elizabeth M. Belding-Royer, International Conference on Network Protocols (ICNP), Paris, France, November 2002

- *Hierarchical routing in ad hoc mobile networks*, Elizabeth M. Belding-Royer, Wireless Communication & Mobile Computing, 2(5), pp. 515-532, 2002.

### C.   Prior Art Apparatuses and Systems

Sonos contends that the following systems and products are prior art under 35 U.S.C. §§ 102(a), (b), (f) and/or (g), and/or 103 (Pre-AIA).[3] Sonos's reference to any particular component, device, machine, or other product in these Invalidity Contentions should be interpreted as a reference to the product itself and any corresponding patents, publications, or product literature cited in Exhibits A-D that relate to the cited component, device, machine, or other product. Insofar as Sonos is relying on a system or product as prior art, rather than a publication, Sonos may use additional evidence to show the structure, function, operation and prior art status of that system or product insofar as that evidence is obtained during discovery and in a manner that is consistent with the invalidity theory disclosed in these Invalidity Contentions. At least some of the products were publicly disclosed, used, sold, or offered for sale in the United States before, and potentially more than a year before, the earliest priority date of the Asserted Claims of the Patents-in-Suit. Moreover, many of the inventive research, design, and development activities concerning these products and technologies occurred in the United States before the earliest priority date of the Asserted Claims of the Patents-in-Suit.

---

[3] A reference to a version of a commercial product or system is also a reference to any earlier or later version of the commercial product or system that qualifies as prior art to an Asserted Claim.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-11-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

Discovery is ongoing and many of the details of these prior art systems, including their dates of availability, are in the possession and control of third parties. As such, Sonos expressly reserves the right to amend these Invalidity Contentions under Patent L.R. 3-6 as additional information is discovered.

### 1. '375 Patent

- Microsoft NetMeeting (1999 or earlier).
- Brainfuse virtual tutoring room (2003 or earlier).
- Oracle Collaboration Suite / Oracle Web Conferencing (2003 or earlier).
- Jibble NetDraw, written by Paul Mutton (2003 or earlier).

### 2. '206 Patent

- Texas Instruments Reference Frameworks for Digital Signal Processor Application Development ("TI Reference Frameworks" or "Reference Frameworks") (2003 or earlier).

### 3. '586 Patent

- Sonos (February 2004 or earlier).
- Apple AirPort Express (2004).
- Cisco Systems Inc. Linksys WRT54G Wireless-G Broadband Router ("WRT54G") (2003).
- AFX Technology Group, Minion 701 transmitter (TM701V00) (2002).
- UTC Fire & Security Americas Corporation, Inc., Node Repeater (855-NODE) (2003).

### D. Prior Art Under 35 U.S.C. § 102(g)

To the extent the inventions identified in the patents, publications, systems, and other prior art to the Patents-in-Suit identified in these contentions were conceived by another and diligently reduced to practice before the alleged conception and reduction to practice of the Asserted Claims of the Patents-in-Suit by the named inventors of those patents, Sonos alleges that such prior art inventions invalidate the Plaintiff's Patent-in-Suit under 35 U.S.C. § 102(g).

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-12-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

## IV.        PATENT L.R. 3-3(B)

### A.        '187 Patent

#### 1.        Anticipatory References

Subject to Sonos's reservations of rights and in accordance with Patent L.R. 3-3(b) and 3-3(c), Sonos contends that each of the following prior art references anticipates one or more Asserted Claims of the '187 Patent in accordance with the claim charts attached hereto as Exhibit A. The claim charts are based on the constructions of the Asserted Claims of the '187 Patent as advanced by Google in its infringement contentions (insofar as any such claim constructions are evident and/or decipherable from Google's contentions) or in other cases, and not what Sonos contends the claims should mean. The following table lists, on a claim-by-claim basis, which prior art references Sonos contends anticipates which '187 Asserted Claim, as further detailed in Exhibits A-2, A-7, A-8.

|   | Claim 1 | Claim 3 | Claim 4 | Claim 10 | Claim 12 |
|---|---------|---------|---------|----------|----------|
| 1 | Kawamoto | Kawamoto | Kawamoto | Kawamoto | Kawamoto |
| 2 | Nokia Proposal | Nokia Proposal | Nokia Proposal | Nokia Proposal | Nokia Proposal |
| 3 | Lambert | Lambert | Lambert | Lambert | Lambert |

#### 2.        Obviousness Combinations

To the extent that Google contends that any of the references identified as anticipatory references fail to disclose one or more elements, those anticipatory references render the Asserted Claims obvious, either alone or in combination with other references. Sonos contends that one of skill in the art, at the time the alleged inventions were made, would have been motivated to combine the references disclosed herein in such a way as to reach the alleged inventions, as described in further detail below. Sonos presently believes a reasonable basis exists that each of the claims asserted against it would have been obvious to one of ordinary skill in the art at the time of the alleged invention.

Below, Sonos identifies its current bases for obviousness.  As seen below, Sonos presently asserts certain combinations of prior art reference(s) plus the knowledge of one of ordinary skill in the art in situations where Sonos reasonably anticipates Google may argue the reference(s) alone do not disclose every element.  (Sonos offers these combinations without conceding that the reference(s)

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-13-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

standing alone are insufficient to invalidate the relevant claims.) Sonos specifically reserves its rights to combine any of its anticipatory references or any combinations of references *with* the knowledge of ordinary skill in the art to rebut a contention of Google that such reference(s) standing alone do not disclose every element of the Asserted Claims.

Sonos lists below prior art references and combinations of prior art references now known to Sonos, which Sonos contends render at least obvious the '187 Asserted Claims. The corresponding charts in Exhibits A-1 - A-8 for each prior art reference identifies where and how each alleged item of prior art meets one or more limitations of the Asserted Claims. Pursuant to Patent Local Rule 3-6, Sonos expressly reserves the right to supplement these charts to provide additional details about obviousness should the Court's claim construction require, or should Google serve adequate Infringement Contentions that better serve to notify Sonos which elements of its products Google contends correspond with the claim elements. Sonos's contention that the references in this section in various combinations render obvious the '187 Asserted Claims under 35 U.S.C. § 103 are in no way an admission or suggestion that each reference does not independently anticipate or render obvious the '187 Asserted Claims under 35 U.S.C. § 102.

The following table sets forth which combinations Sonos contends renders obvious specific Asserted Claims of the '187 Patent. Following the table is a detailed explanation of each proposed combination.

| Claim 1 | Claim 3 | Claim 4 | Claim 10 | Claim 12 |
|---|---|---|---|---|
| Bel + Kawamoto | Bel + Kawamoto | Bel + Kawamoto | Bel + Kawamoto | Bel + Kawamoto |
| Nokia Proposal + Knowledge of a POSITA | Nokia Proposal + Knowledge of a POSITA | Nokia Proposal + Knowledge of a POSITA | Nokia Proposal + Knowledge of a POSITA | Nokia Proposal + Knowledge of a POSITA |
| SMuG + SACRED + ISAKMP + XAUTH | SMuG + SACRED + ISAKMP + XAUTH | SMuG + SACRED + ISAKMP + XAUTH | SMuG + SACRED + ISAKMP + XAUTH | SMuG + SACRED + ISAKMP + XAUTH |

### a.     Bel + Kawamoto

It would have been obvious for a POSITA to combine Bel and Kawamoto to achieve the claimed methods and systems of the '187 patent.  To the extent that Bel is deemed to lack sufficient disclosure of "receiving domain information corresponding to the domain of devices from a device existing within the domain of devices," "providing the domain information to a key issuer, which is separate from the domain of devices," or "receiving the domain information over a short range link" a POSITA would have understood it was obvious based on Bel's disclosures and would have otherwise been motivated to combine Bel with Kawamoto.  Bel discloses forming groups of playback devices using a registration module of the playback device, where the playback devices communicates with a Content Distribution Management System to complete registration into a group and to receive a secret key used in playing back protected content.  *See, e.g.*, Bel at Abstract, ¶¶8, 19, 50-51, 54-55, Fig. 4.  Kawamoto discloses a system to authorize a playback device such as to enable that playback device to play back protected content, where a second device facilitates communication between the playback device, second device, and remote servers to for the purposes of authorizing the playback device for playback.  *See, e.g.*, Kawamoto at Abstract, ¶¶2, 38, 62, 75-76, Figs. 1, 6, 8.  The second device provides an identifier to the playback device, which in turn then may provide this to a server to obtain a key.  *See, e.g.*, Kawamoto at ¶76.  Kawamoto also discloses that several playback devices, such as computers, may play back the protected content by connecting the computers to the second device (which may be, e.g., a cellular telephone).  *See, e.g.*, Kawamoto at ¶63.  Specifically, Kawamoto discloses transmitting identifier information over a physical cable connection between the playback device and the second device used to facilitate authorization of the playback device for playback of the protected content.  *See, e.g.*, Kawamoto at ¶41.

Clearly both Bel and Kawamoto are analogous prior art.  They are both directed to systems for the protection of content and the authorization of devices to play back the protected content.  Bel and Kawamoto provide complementary implementations of such a system that a POSITA would have understood may be readily combined.  A POSITA would understand that the method of authorizing a playback device disclosed by Kawamoto could be integrated with Bel's

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-15-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

disclosures of forming a group of playback devices to beneficial effect.  That is to say, the functionality of Kawamoto's second device could be used as a convenient and more flexible method by which a user could share information necessary to register a device into a group of devices as described in Bel.  A POSITA would be motivated to combine Kawamoto with Bel for several reasons, including Bel's explicitly stated objective of improving portability and flexibility of content playback across a variety of devices.  *See, e.g.*, Bel at ¶6.  Specifically, a POSITA would understand that integrating the authentication and authorization functionality of Kawamoto's second device—for example by integrating such functionality into a Bel playback device—would enable registration into a group of other devices that may not be equipped with Bel's registration module.  A POSITA would further understand that integrating this functionality of Kawamoto would improve the security of Bel's system because requiring a physical connection between a device being added to the group and a second device facilitating the registration would circumvent possible remote registration the user may not desire.

### b.        Nokia Proposal + Knowledge of a POSITA

To the extent that Nokia Proposal is deemed to lack sufficient disclosure of "causing the key issuer to issue a private key to the new device" or "receiving the private key from the key issuer" a POSITA would have understood it was obvious based on Nokia Proposal's disclosures and otherwise would have understood it was obvious in light of Nokia Proposal and the knowledge of a POSITA.  Nokia Proposal discloses a system for protecting content such that only authorized devices that have joined an authorized domain are authorized to play back the protected content.  *See, e.g.*, Nokia Proposal at pages 1, 9, 11-12, 14, 16, 18-19, 23-24, 26, 40-42, 48, 54-55, Figs. 1, 2, 14.  In Nokia Proposal, an authorized device is sent a content key as well as a domain symmetric key that are used by the authorized devices in order to access and play back protected content.  *See, e.g.*, Nokia Proposal at pages 26, 40-42, 54-55.

A POSITA would have found it obvious to use a private key from an asymmetric key pair in place of either or both of the content or domain symmetric keys.  Symmetric and asymmetric encryption methods were well known by a POSITA at the time of Nokia Proposal and both were well understood ways to accomplish the same goal of protecting information, including

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-16-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

1    multimedia content such as the content that is the subject of the Nokia Proposal.  Indeed, the '187

2    patent itself states that "[o]ne of ordinary skill in the art would recognize that alternate methods of

3    securing the DRM system are possible using symmetric key techniques or broadcast key

4    encryption techniques."  *See* '187 Patent at 7:54-58.

5                              c.       **SMuG + SACRED + ISAKMP + XAUTH**

6            To the extent that SMuG is deemed to lack sufficient disclosure of "receiving domain

7    information corresponding to the domain of devices from a device existing within the domain of

8    devices" or "receiving domain information for the device existing within a domain of devices" a

9    POSITA would have understood it was obvious based on SMuG's disclosures and would have

10   otherwise been motivated to combine SMuG with SACRED, ISAKMP, and XAUTH.  To the

11   extent that SMuG is deemed to lack sufficient disclosure of "providing the domain information to

12   a key issuer, which is separate from the domain of devices" a POSITA would have understood it

13   was obvious based on SMuG's disclosures and would have otherwise been motivated to combine

14   SMuG with ISAKMP.  To the extent that SMuG is deemed to lack sufficient disclosure of

15   "wherein the private key is based on the domain information" a POSITA would have understood

16   it was obvious based on SMuG's disclosures and would have otherwise been motivated to

17   combine SMuG with ISAKMP.  To the extent that SMuG is deemed to lack sufficient disclosure

18   of "receiving the domain information over a short range link" a POSITA would have understood

19   it was obvious based on SMuG's disclosures and would have otherwise been motivated to

20   combine SMuG with SACRED.  To the extent that SMuG is deemed to lack sufficient disclosure

21   of "storage for storing the domain information" a POSITA would have understood it was obvious

22   based on SMuG's disclosures and would have otherwise been motivated to combine SMuG with

23   SACRED.

24           A POSITA would have found it obvious to combine SMuG with SACRED, ISAKMP, and

25   XAUTH in the manner described above for at least the following reasons.  Each of SMuG,

26   SACRED, ISAKMP, and XAUTH are standards related to a standard called IPSec.  *See, e.g.*,

27   SMuG at Sections 2, 2.2; SACRED at Sections 1, 3.2; ISAKMP at Sections 1, 2.1, 3.3-3.5, 3.14-

28   3.16; XAUTH at Title, Abstract, Sections 1, 1.1, 1.2, 3, 3.1-3.5, 4.1, 4.2, 6-8, 10, Appendix A.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-17-                        SONOS'S PATENT L.R. 3-3
                           INVALIDITY CONTENTIONS
                           3:20-cv-03845

Specifically, SMuG states that its "[g]roup key management requires a protocol with [] five properties" and "[t]he protocol must be capable of establishing security relationships" of a certain type, where "these relationships might be built upon group security associations, which in turn build upon the security association concept of IPSec and ISAKMP/IKE." *See* SMuG at Section 2.2. SACRED states, in a section regarding protocol requirements, that "there are a number of requirements that must apply to the transfer of credentials if the ultimate goal of supporting the Internet security protocols (e.g., TLS, IPSec, S/MIME) is to be met." *See* SACRED at Section 3.2. Thus, it is clear that it was contemplated, as a POSITA would understand, that SACRED could be implemented in conjunction with SMuG.

SMuG also explicitly refers to ISAKMP (RFC2408) as a source of requirements presented in SMuG and that ISAKMP inspired elements of and can otherwise be implemented within the SMuG framework. *See* SMuG at Section 2, 2.1, 2.2. XAUTH is explicitly described as an extension to "IPSec's ISAKMP protocol." *See, e.g.* XAUTH at Title, Abstract, Sections 1, 1.2, 1.3, 2, 4-4.2, 5, 7, 8. This statement in XAUTH confirms the close relationship between IPSec and ISAKMP, in that IPSec was known to implement the ISAKMP protocol.

## B. **'375 Patent**

### 1. **Anticipatory References**

Subject to Sonos's reservations of rights and in accordance with Patent L.R. 3-3(b) and 3-3(c), Sonos contends that each of the following prior art references anticipates one or more Asserted Claims of the '375 Patent in accordance with the claim charts attached hereto as Exhibits B-7 - B-9. The claim charts are based on the constructions of the Asserted Claims of the '375 Patent as advanced by Google in its infringement contentions (insofar as any such claim constructions are evident and/or decipherable from Google's contentions) or in other cases, and not what Sonos contends the claims should mean. The following table lists, on a claim-by-claim basis, which prior art references Sonos contends anticipates which '375 Asserted Claim, as further detailed in Exhibits B-7 and B-9.

| | Claim 1 | Claim 2 | Claim 3 | Claim 4 | Claim 5 |
|---|---|---|---|---|---|
| 1 | Adar | Adar | Adar | Adar | Adar |

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| | Claim 1 | Claim 2 | Claim 3 | Claim 4 | Claim 5 |
|---|---|---|---|---|---|
| 2 | Lim | Lim | Lim | Lim | Lim |

| | Claim 6 | Claim 7 | Claim 8 | Claim 9 | Claim 10 |
|---|---|---|---|---|---|
| 1 | Adar | Adar | Adar | Adar | Adar |
| 2 | Lim | Lim | Lim | Lim | Lim |

| | Claim 11 | Claim 13 | Claim 14 | Claim 15 | Claim 16 |
|---|---|---|---|---|---|
| 1 | Adar | Adar | Adar | Adar | Adar |
| 2 | Lim | Lim | Lim | Lim | Lim |

| | Claim 17 | Claim 18 | Claim 19 | Claim 20 |
|---|---|---|---|---|
| 1 | Adar | Adar | Adar | Adar |
| 2 | Lim | Lim | Lim | Lim |

### 2.      Obviousness Combinations

To the extent that Google contends that any of the references identified as anticipatory references fail to disclose one or more elements, those anticipatory references render the Asserted Claims obvious, either alone or in combination with other references. Sonos contends that one of skill in the art, at the time the alleged inventions were made, would have been motivated to combine the references disclosed herein in such a way as to reach the alleged inventions, as described in further detail below. Sonos presently believes a reasonable basis exists that each of the claims asserted against it would have been obvious to one of ordinary skill in the art at the time of the alleged invention.

Below, Sonos identifies its current bases for obviousness.  As seen below, Sonos presently asserts certain combinations of prior art reference(s) plus the knowledge of one of ordinary skill in the art in situations where Sonos reasonably anticipates Google may argue the reference(s) alone do not disclose every element.  (Sonos offers these combinations without conceding that the reference(s) standing alone are insufficient to invalidate the relevant claims.)  Sonos specifically reserves its rights

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-19-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

to combine any of its anticipatory references or any combinations of references *with* the knowledge of ordinary skill in the art to rebut a contention of Google that such reference(s) standing alone do not disclose every element of the Asserted Claims.

Sonos lists below prior art references and combinations of prior art references now known to Sonos, which Sonos contends render at least obvious the '375 Asserted Claims. The corresponding charts in Exhibits B-1 - B-9 for each prior art reference identifies where and how each alleged item of prior art meets one or more limitations of the Asserted Claims. Pursuant to Patent Local Rule 3-6, Sonos expressly reserves the right to supplement these charts to provide additional details about obviousness should the Court's claim construction require, or should Google serve adequate Infringement Contentions that better serve to notify Sonos which elements of its products Google contends correspond with the claim elements. Sonos's contention that the references in this section in various combinations render obvious the '375 Asserted Claims under 35 U.S.C. § 103 are in no way an admission or suggestion that each reference does not independently anticipate or render obvious the '375 Asserted Claims under 35 U.S.C. § 102.

The following table sets forth which combinations Sonos contends renders obvious specific Asserted Claims of the '375 Patent. Following the table is a detailed explanation of each proposed combination.

| Claim 1 | Claim 2 | Claim 3 | Claim 4 | Claim 5 |
|---|---|---|---|---|
| Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa |
| Adar | Adar | Adar | Adar | Adar |
| Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa |
| Adar + Mendez | Adar + Mendez | Adar + Mendez | Adar + Mendez | Adar + Mendez |
| Adar + Kapoor | Adar + Kapoor | Adar + Kapoor | Adar + Kapoor | Adar + Kapoor |
| Lim | Lim | Lim | Lim | Lim |
| Lim + Adar | Lim + Adar | Lim + Adar | Lim + Adar | Lim + Adar |
| Lim + Jain | Lim + Jain | Lim + Jain | Lim + Jain | Lim + Jain |
| Horn | Horn | Horn | Horn | Horn |

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-20-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 1 | Claim 2 | Claim 3 | Claim 4 | Claim 5 |
|---|---|---|---|---|
| Horn + Mendez | Horn + Mendez | Horn + Mendez | Horn + Mendez | Horn + Mendez |
| Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa |
| Horn + Jain | Horn + Jain | Horn + Jain | Horn + Jain | Horn + Jain |
| Mendez + Jain | Mendez + Jain | Mendez + Jain | Mendez + Jain | Mendez + Jain |
| Mendez + Miller | Mendez + Miller | Mendez + Miller | Mendez + Miller | Mendez + Miller |
| Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain |
| Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller |
| Kapoor + Jain | Kapoor + Jain | Kapoor + Jain | Kapoor + Jain | Kapoor + Jain |
| Kapoor + Miller | Kapoor + Miller | Kapoor + Miller | Kapoor + Miller | Kapoor + Miller |

| Claim 6 | Claim 7 | Claim 8 | Claim 9 | Claim 10 |
|---|---|---|---|---|
| Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa |
| Adar | Adar | Adar | Adar | Adar |
| Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa |
| Adar + Mendez | Adar + Mendez | Adar + Mendez | Adar + Mendez | Adar + Mendez |
| Adar + Kapoor | Adar + Kapoor | Adar + Kapoor | Adar + Kapoor | Adar + Kapoor |
| Lim | Lim | Lim | Lim | Lim |
| Lim + Adar | Lim + Adar | Lim + Adar | Lim + Adar | Lim + Adar |
| Lim + Jain | Lim + Jain | Lim + Jain | Lim + Jain | Lim + Jain |
| Horn | Horn | Horn | Horn | Horn |
| Horn + Mendez | Horn + Mendez | Horn + Mendez | Horn + Mendez | Horn + Mendez |
| Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa |

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-21-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 6 | Claim 7 | Claim 8 | Claim 9 | Claim 10 |
|---|---|---|---|---|
| Horn + Jain | Horn + Jain | Horn + Jain | Horn + Jain | Horn + Jain |
| Mendez + Jain | Mendez + Jain | Mendez + Jain | Mendez + Jain | Mendez + Jain |
| Mendez + Miller | Mendez + Miller | Mendez + Miller | Mendez + Miller | Mendez + Miller |
| Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain |
| Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller |
| Kapoor + Jain | Kapoor + Jain | Kapoor + Jain | Kapoor + Jain | Kapoor + Jain |
| Kapoor + Miller | Kapoor + Miller | Kapoor + Miller | Kapoor + Miller | Kapoor + Miller |

| Claim 11 | Claim 13 | Claim 14 | Claim 15 | Claim 16 |
|---|---|---|---|---|
| Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa |
| Adar | Adar | Adar | Adar | Adar |
| Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa |
| Adar + Mendez | Adar + Mendez | Adar + Mendez | Adar + Mendez | Adar + Mendez |
| Adar + Kapoor | Adar + Kapoor | Adar + Kapoor | Adar + Kapoor | Adar + Kapoor |
| Lim | Lim | Lim | Lim | Lim |
| Lim + Adar | Lim + Adar | Lim + Adar | Lim + Adar | Lim + Adar |
| Lim + Jain | Lim + Jain | Lim + Jain | Lim + Jain | Lim + Jain |
| Horn | Horn | Horn | Horn | |
| Horn + Mendez | Horn + Mendez | Horn + Mendez | Horn + Mendez | Horn + Mendez |
| Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa |
| Horn + Jain | Horn + Jain | Horn + Jain | Horn + Jain | Horn + Jain |
| Mendez + Jain | Mendez + Jain | Mendez + Jain | Mendez + Jain | Mendez + Jain |
| Mendez + Miller | Mendez + Miller | Mendez + Miller | Mendez + Miller | Mendez + Miller |

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-22-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 11 | Claim 13 | Claim 14 | Claim 15 | Claim 16 |
|---|---|---|---|---|
| Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain |
| Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller |
| Kapoor + Jain | Kapoor + Jain | Kapoor + Jain | Kapoor + Jain | Kapoor + Jain |
| Kapoor + Miller | Kapoor + Miller | Kapoor + Miller | Kapoor + Miller | Kapoor + Miller |

| Claim 17 | Claim 18 | Claim 19 | Claim 20 |
|---|---|---|---|
| Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa | Ryan + Nakagawa |
| Adar | Adar | Adar | Adar |
| Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa | Adar + Nakagawa |
| Adar + Mendez | Adar + Mendez | Adar + Mendez | Adar + Mendez (+ Nakagawa) |
| Adar + Kapoor | Adar + Kapoor | Adar + Kapoor | Adar + Kapoor (+ Nakagawa) |
| Lim | Lim | Lim | Lim (+ Nakagawa) |
| Lim + Adar | Lim + Adar | Lim + Adar | Lim + Adar (+ Nakagawa) |
| Lim + Jain | Lim + Jain | Lim + Jain | Lim + Jain (+ Nakagawa) |
| Horn + Mendez | Horn + Mendez | Horn + Mendez | Horn + Mendez |
| Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa | Horn + Nakagawa |
| Horn + Jain | Horn + Jain | Horn + Jain | Horn + Jain |
| Mendez + Jain | Mendez + Jain | Mendez + Jain | Mendez + Jain (+ Nakagawa) |
| Mendez + Miller | Mendez + Miller | Mendez + Miller | Mendez + Miller (+ Nakagawa) |

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-23-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 17 | Claim 18 | Claim 19 | Claim 20 |
|---|---|---|---|
| Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain | Nakagawa + Jain |
| Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller | Nakagawa + Miller |
| Kapoor + Jain | Kapoor + Jain | Kapoor + Jain | Kapoor + Jain (+ Nakagawa) |
| Kapoor + Miller | Kapoor + Miller | Kapoor + Miller | Kapoor + Miller (+ Nakagawa) |

### a.     Ryan + Nakagawa

It would have been obvious for a POSITA to combine Ryan and Nakagawa to achieve the claimed methods and systems of the '375 patent.  Ryan teaches a method and system for enhanced database searching that includes generating a personal link table of webpages that the user has found useful.  *See generally* Exhibit B-6.  Ryan teaches its invention is implemented in a network environment that includes servers and computers.  *See, e.g.*, Ryan at 3:62-4:6.  Ryan further teaches that the personal link table could be stored at either the search engine site or on an individual's computer.  *See, e.g.*, *id.* at 15:25-31.  Nakagawa discloses a method and system for accessing data stored on a data server device from a client device that involves authentication procedures and synchronization of data between the server and multiple client devices.  *See generally* Exhibit B-4.  A POSITA would have been motivated to use Nakagawa's data access approach for Ryan's personal link table data because, for example, it involved applying Nakagawa's known technique to Ryan's known system to yield predictable results and use of Nakagawa's known technique to improve a similar client-server system in the same way.

### b.     Adar + Knowledge of a POSITA

To the extent Adar is deemed to lack sufficient disclosure of limitations relating to synchronization of favorite items between the client device and server and/or other client devices, such as claims [1.5], [9.3], and/or [17.5], those limitations would have been understood by, or at least obvious to, a POSITA from the cited disclosures.  Adar teaches a client-server architecture in which the primary copy of the user's bookmark data is maintained in a centralized database (i.e.,

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-24-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

server) and the user may access and manipulate the data from any terminal (i.e., client device) by authenticating to the server. *See, e.g.*, Adar at 11:4-16, 11:64-12:4. Synchronization techniques and various implementations of synchronization in a client-server system were known to a POSITA at the time of the alleged invention of the '375 patent as reflected in, for example, Mendez, Kapoor, Nakagawa, and Lim. For example, it was well known that multiple client devices may synchronize data with a server and, thereby, with each other. Through such synchronization, changes made at one client device are propagated to other client devices; for example, data that is added, changed, or deleted at one client device will in turn be added, changed, or deleted, respectively, from the server and other client devices. Further, it was known to a POSITA that synchronization can be initiated in different ways, for example in realtime (i.e., every time a change is made on any of the devices), upon specified events (e.g., startup or shutdown), or at regular time intervals. In particular, the knowledge of a POSITA of realtime synchronization is reflected in systems that provided a shared whiteboard over the internet (including, for example, Microsoft NetMeeting, Brainfuse, Oracle Collaboration Suite / Oracle Web Conferencing, nad Jibble NetDraw). Thus, modifying Adar's system to perform synchronization in the particular manner recited in the asserted claims would have been obvious to a POSITA because, for example, it would involve applying known methods of synchronization to yield predictable results and using known techniques of synchronization to improve a similar client-server system in the same way.

### c. <u>Adar + Nakagawa</u>

To the extent Adar is deemed to lack sufficient disclosure of limitations relating to synchronization of favorite items between the client device and server and/or other client devices, such as claims [1.5], [9.3], and/or [17.5], a POSITA would have been motivated to combine the teachings of Adar and Nakagawa. Adar teaches a client-server architecture in which the primary copy of the user's bookmark data is maintained in a centralized database (i.e., server) and the user may access and manipulate the data from any terminal (i.e., client device) by authenticating to the server. *See, e.g.*, Adar at 11:4-16, 11:64-12:4. Nakagawa discloses a data access system in which data is synchronized between a server and multiple client devices. *See, e.g.*, Nakagawa at ¶¶ 62-63, 148, Figs. 8-11; *see generally* Exhibit B-4. Using Nakagawa's teaching of synchronization

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-25-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

techniques with Adar's system would have been obvious to a POSITA because, for example, it would involve simple substitution of one known element (Adar's method of sharing data between client and server) with another (Nakagawa's method of synchronizing data) to yield predictable results and use of Nakagawa's known technique to improve a similar client-server system in the same way.

### d.   **Adar + Mendez**

To the extent Adar is deemed to lack sufficient disclosure of limitations relating to synchronization of favorite items between the client device and server and/or other client devices, such as claims [1.5], [9.3], and/or [17.5], a POSITA would have been motivated to combine the teachings of Adar and Mendez.  Adar teaches a client-server architecture in which the primary copy of the user's bookmark data is maintained in a centralized database (i.e., server) and the user may access and manipulate the data from any terminal (i.e., client device) by authenticating to the server.  *See, e.g.*, Adar at 11:4-16, 11:64-12:4.  Mendez discloses a system for synchronizing data between a global server, desktop computer, and remote terminals.  *See, e.g.*, Mendez at 2:18-23, 3:66-4:10, 4:23-30, 4:47-56; *see generally* Exhibit B-5.  Using Mendez's teaching of synchronization techniques with Adar's system would have been obvious to a POSITA because, for example, it would involve simple substitution of one known element (Adar's method of sharing data between client and server) with another (Mendez's method of synchronizing data) to yield predictable results and use of Mendez's known technique to improve a similar client-server system in the same way.

### e.   **Adar + Kapoor**

To the extent Adar is deemed to lack sufficient disclosure of limitations relating to synchronization of favorite items between the client device and server and/or other client devices, such as claims [1.5], [9.3], and/or [17.5], a POSITA would have been motivated to combine the teachings of Adar and Kapoor.  Adar teaches a client-server architecture in which the primary copy of the user's bookmark data is maintained in a centralized database (i.e., server) and the user may access and manipulate the data from any terminal (i.e., client device) by authenticating to the server.  *See, e.g.*, Adar at 11:4-16, 11:64-12:4.  Kapoor discloses a system for synchronizing data

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-26-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

among multiple computing devices, including embodiments in which one of the devices acts as a server. *See, e.g.*, Kapoor at 6:2-7, 4:3-24; *see generally* Exhibit B-1.  Using Kapoor's teaching of synchronization techniques with Adar's system would have been obvious to a POSITA because, for example, it would involve simple substitution of one known element (Adar's method of sharing data between client and server) with another (Kapoor's method of synchronizing data) to yield predictable results and use of Kapoor's known technique to improve a similar client-server system in the same way.

### f.   Lim + Adar

To the extent Lim or Adar is deemed to lack sufficient disclosure of any limitation, a POSITA would have been motivated to combine the teachings of Lim and Adar.  Lim and Adar each teach a system using a client-server architecture to enable users to manage and search bookmarks and to access those bookmarks from multiple client devices.  *See generally* Exhibits B-7 and B-9.  A POSITA would be motivated to combine the teachings of Lim and Adar to create a system incorporating implementation details from both because, for example, it would involve simple substitution of one known element for another to obtain predictable results and use of known techniques from one reference to improve a similar bookmark management system in the same way.

### g.   Lim + Jain

To the extent Lim is deemed to lack sufficient disclosure of "presenting through a single interface of the client device, in response to a query from the user, a combined search results set generated via one or more search sub-processes," a POSITA would have been motivated to combine the teachings of Lim and Jain.  Lim teaches that a user may perform a local search on the content of a particular user's bookmark sites or a remote search of all bookmarks in the database (i.e., including bookmarks collected from all users).  *See, e.g.*, Lim at 29:17-34.  Lim further teaches that the search results can be displayed "in different ways." *Id.*  Jain also teaches searching a user's bookmarks and searching other web pages on the internet.  *See, e.g.*, Jain at 7:13-36.  Jain further teaches that the results of the internet search may be displayed along with the user's bookmarks that satisfy the search request.  *Id.*  Using Jain's teaching of displaying the

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

results of the two searches together with Lim's local and remote searches would have been obvious to a POSITA because, for example, it would involve applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### h.   **Horn + Mendez**

It would have been obvious for a POSITA to combine Horn and Mendez to achieve the claimed methods and systems of the '375 patent.  Horn teaches a method and system for adding, managing, and distributing lists of stored URLs.  *See generally* Exhibit B-8.  Horn teaches that the stored URLs can be synchronized with other devices and that its system may be implemented with a client-server architecture.  *See, e.g.*, Horn ¶¶ 49, 102-103, 162-163.  Mendez discloses a method and system for synchronizing workspace elements, including bookmarks, in a secure network using authentication procedures.  *See generally* Exhibit B-5.  A POSITA would have been motivated to use Mendez's synchronization approach for Horn's stored URLs because, for example, it involved applying Mendez's known technique to Horn's known system to yield predictable results and use of Mendez's known technique to improve a similar client-server system in the same way.

### i.   **Horn + Nakagawa**

It would have been obvious for a POSITA to combine Horn and Nakagawa to achieve the claimed methods and systems of the '375 patent.  Horn teaches a method and system for adding, managing, and distributing lists of stored URLs.  *See generally* Exhibit B-8.  Horn teaches that the stored URLs can be synchronized with other devices and that its system may be implemented with a client-server architecture.  *See, e.g.*, Horn ¶¶ 49, 102-103, 162-163.  Nakagawa discloses a method and system for accessing data stored on a data server device from a client device that involves authentication procedures and synchronization of data between the server and multiple client devices.  *See generally* Exhibit B-4.  A POSITA would have been motivated to use Nakagawa's data access approach for Horn's stored URL data because, for example, it involved applying Nakagawa's known technique to Horn's known system to yield predictable results and use of Nakagawa's known technique to improve a similar client-server system in the same way.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-28-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

### j.      Horn + Jain

To the extent Horn (or Horn + Mendez or Horn + Nakagawa) is deemed to lack sufficient disclosure of "presenting through a single interface of the client device, in response to a query from the user, a combined search results set generated via one or more search sub-processes," a POSITA would have been motivated to combine the teachings of Horn and Jain.  Horn teaches a OneStep function that searches existing user favorites and retrieves search results from search engines and places both sets of results into a search results file.  *See, e.g.*, Horn at ¶¶ 135-137, 162-163, Fig. 31; *see generally* Exhibit B-8.  Jain also teaches searching a user's bookmarks and searching other web pages on the internet.  *See, e.g.*, Jain at 7:13-36.  Jain further teaches that the results of the internet search may be displayed along with the user's bookmarks that satisfy the search request.  *Id.*  Using Jain's teaching of displaying the results of the two searches together with Horn's search results file would have been obvious to a POSITA because, for example, it would involve applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### k.      Mendez + Jain

It would have been obvious for a POSITA to combine Mendez and Jain to achieve the claimed methods and systems of the '375 patent.  Mendez teaches a method and system for synchronizing workspace elements, including bookmarks, in a secure network.  *See* Exhibit B-5. Jain teaches that a user search request can be applied to both the user's bookmarks and to the internet, and the combined search results set displayed to the user in a single interface.  *See* Exhibit B-3.  A POSITA would have been motivated to make the combination because, for example, it involved combining prior art elements according to known methods to yield predictable results.

### l.      Mendez + Miller

It would have been obvious for a POSITA to combine Mendez and Miller to achieve the claimed methods and systems of the '375 patent.  Mendez teaches a method and system for synchronizing workspace elements, including bookmarks, in a secure network.  *See* Exhibit B-5. Miller teaches that multiple disparate databases (i.e., first and second global indexes) could be

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-29-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

searched simultaneously and the consolidated search results displayed in a single user interface. *See* Exhibit B-2.  A POSITA would have been motivated to make the combination because, for example, it involved combining prior art elements according to known methods to yield predictable results.

### m.    Nakagawa + Jain

It would have been obvious for a POSITA to combine Nakagawa and Jain to achieve the claimed methods and systems of the '375 patent.  Nakagawa teaches a method and system for synchronizing data, including bookmarks, between a server and client devices.  *See* Exhibit B-4. Jain teaches that a user search request can be applied to both the user's bookmarks and to the internet, and the combined search results set displayed to the user in a single interface.  *See* Exhibit B-3.  A POSITA would have been motivated to make the combination because, for example, it involved combining prior art elements according to known methods to yield predictable results.

### n.    Nakagawa + Miller

It would have been obvious for a POSITA to combine Nakagawa and Miller to achieve the claimed methods and systems of the '375 patent.  Nakagawa teaches a method and system for synchronizing data, including bookmarks, between a server and client devices.  *See* Exhibit B-4. Miller teaches that multiple disparate databases (i.e., first and second global indexes) could be searched simultaneously and the consolidated search results displayed in a single user interface. *See* Exhibit B-2.  A POSITA would have been motivated to make the combination because, for example, it involved combining prior art elements according to known methods to yield predictable results.

### o.    Kapoor + Jain

It would have been obvious for a POSITA to combine Nakagawa and Jain to achieve the claimed methods and systems of the '375 patent.  Kapoor teaches a method and system for synchronizing data, including bookmarks, among multiple computing devices.  *See* Exhibit B-1. Jain teaches that a user search request can be applied to both the user's bookmarks and to the internet, and the combined search results set displayed to the user in a single interface.  *See*

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-30-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

Exhibit B-3.  A POSITA would have been motivated to make the combination because, for example, it involved combining prior art elements according to known methods to yield predictable results.

### p.     <u>Kapoor + Miller</u>

It would have been obvious for a POSITA to combine Nakagawa and Miller to achieve the claimed methods and systems of the '375 patent.  Kapoor teaches a method and system for synchronizing data, including bookmarks, among multiple computing devices.  *See* Exhibit B-1. Miller teaches that multiple disparate databases (i.e., first and second global indexes) could be searched simultaneously and the consolidated search results displayed in a single user interface. *See* Exhibit B-2.  A POSITA would have been motivated to make the combination because, for example, it involved combining prior art elements according to known methods to yield predictable results.

### q.     <u>Audio Files</u>

To the extent any reference or combination is deemed to lack sufficient disclosure of the favorite items comprising "an identifier to an audio file," that requirement would have been understood by, or at least obvious to, a POSITA.  The identified references disclose systems relating to internet bookmarks, which are favorite locations on the internet specified by a uniform resource locator (URL).  It was well known to a POSITA at the time of the alleged invention of the '375 patent that URLs could identify audio files, which is also explicitly reflected in, for example, Adar, Horn, and Jain.  Thus, a POSITA would understand that the bookmark URLs could constitute "an identifier to an audio file."  In the alternative, modifying a disclosed system to handle URLs identifying audio files would have been obvious to a POSITA because, for example, it would involve applying the known bookmark management techniques to improve similar objects (URLs identifying audio files) and simple substitution of one known element (webpage URLs) for a another (audio file URLs) to obtain predictable results.

### r.     <u>Indication of Modification</u>

To the extent any reference or combination is deemed to lack sufficient disclosure of displaying "an indication of modification of bookmark information," a POSITA would have been

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-31-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

motivated to add that feature based on the teachings of Nakagawa.  Specifically, Nakagawa teaches that, once a client updates locally stored data through synchronization with the server, it is determined whether a notification is necessary and a notification of the update can be provided by, for example, changing an icon.  *See, e.g.*, Nakagawa ¶¶ 179-180.  The identified references and combinations disclose systems for synchronizing bookmarks.  Using Nakagawa's teaching of a notification of updated data with other synchronization systems would have been obvious to a POSITA because, for example, it would involve using a known technique to improve similar synchronization systems in the same way and applying a known technique to a known system ready for improvement to yield predictable results.

### C.    '206 Patent

#### 1.    Anticipatory References

Subject to Sonos's reservations of rights and in accordance with Patent L.R. 3-3(b) and 3-3(c), Sonos contends that each of the following prior art references anticipates one or more Asserted Claims of the '206 Patent in accordance with the claim charts attached hereto as Exhibit C-1 - C-7. The claim charts are based on the constructions of the Asserted Claims of the '206 Patent as advanced by Google in its infringement contentions (insofar as any such claim constructions are evident and/or decipherable from Google's contentions) or in other cases, and not what Sonos contends the claims should mean. The following table lists, on a claim-by-claim basis, which prior art references Sonos contends anticipates which '206 Asserted Claim, as further detailed in Exhibits C-1 through C-7.

|   | Claim 1 | Claim 2 | Claim 3 | Claim 9 | Claim 11 |
|---|---|---|---|---|---|
| 1 | Reuss | Reuss | Reuss | Reuss | Reuss |
| 2 | Domer | Domer | Domer | Domer | Domer |
| 3 | Beaugeant | Beaugeant | Beaugeant | Beaugeant | Beaugeant |
| 4 | Zhang | Zhang | Zhang | Zhang | Zhang |
| 5 | TI Reference Frameworks | TI Reference Frameworks | TI Reference Frameworks | TI Reference Frameworks | TI Reference Frameworks |

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

|   | Claim 12 | Claim 18 | Claim 19 |
|---|----------|----------|----------|
| 1 | Reuss | Reuss | Reuss |
| 2 | Domer | Domer | Domer |
| 3 | Beaugeant | Beaugeant | Beaugeant |
| 4 | Zhang | Zhang | Zhang |
| 5 | TI Reference Frameworks | TI Reference Frameworks | TI Reference Frameworks |

## 2.    Obviousness Combinations

To the extent that Google contends that any of the references identified as anticipatory references fail to disclose one or more elements, those anticipatory references render the Asserted Claims obvious, either alone or in combination with other references. Sonos contends that one of skill in the art, at the time the alleged inventions were made, would have been motivated to combine the references disclosed herein in such a way as to reach the alleged inventions, as described in further detail below. Sonos presently believes a reasonable basis exists that each of the claims asserted against it would have been obvious to one of ordinary skill in the art at the time of the alleged invention.

Below, Sonos identifies its current bases for obviousness.  As seen below, Sonos presently asserts certain combinations of prior art reference(s) plus the knowledge of one of ordinary skill in the art in situations where Sonos reasonably anticipates Google may argue the reference(s) alone do not disclose every element.  (Sonos offers these combinations without conceding that the reference(s) standing alone are insufficient to invalidate the relevant claims.)  Sonos specifically reserves its rights to combine any of its anticipatory references or any combinations of references *with* the knowledge of ordinary skill in the art to rebut a contention of Google that such reference(s) standing alone do not disclose every element of the Asserted Claims.

Sonos lists below prior art references and combinations of prior art references now known to Sonos, which Sonos contends render at least obvious the '206 Asserted Claims.  The corresponding charts in Exhibit C-1 - C-7 for each prior art reference identifies where and how each alleged item of prior art meets one or more limitations of the Asserted Claims.  Pursuant to Patent Local Rule 3-6, Sonos expressly reserves the right to supplement these charts to provide

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-33-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

additional details about obviousness should the Court's claim construction require, or should Google serve adequate Infringement Contentions that better serve to notify Sonos which elements of its products Google contends correspond with the claim elements. Sonos's contention that the references in this section in various combinations render obvious the '206 Asserted Claims under 35 U.S.C. § 103 are in no way an admission or suggestion that each reference does not independently anticipate or render obvious the '206 Asserted Claims under 35 U.S.C. § 102.

The following table sets forth which combinations Sonos contends renders obvious specific Asserted Claims of the '206 Patent. Following the table is a detailed explanation of each proposed combination.

| Claim 1 | Claim 2 | Claim 3 | Claim 9 | Claim 11 |
|---|---|---|---|---|
| Reuss | Reuss | Reuss | Reuss | Reuss |
| Reuss + Ayad | Reuss + Ayad | Reuss + Ayad | Reuss + Ayad | Reuss + Ayad |
| Reuss + Beaugeant | Reuss + Beaugeant | Reuss + Beaugeant | Reuss + Beaugeant | Reuss + Beaugeant |
| Reuss + Boyer (+ Ayad and/or Beaugeant | Reuss + Boyer (+ Ayad and/or Beaugeant | Reuss + Boyer (+ Ayad and/or Beaugeant | Reuss + Boyer (+ Ayad and/or Beaugeant | Reuss + Boyer (+ Ayad and/or Beaugeant |
| Reuss + Van Compernolle (+ Ayad and/or Beaugeant) | Reuss + Van Compernolle (+ Ayad and/or Beaugeant) | Reuss + Van Compernolle (+ Ayad and/or Beaugeant) | Reuss + Van Compernolle (+ Ayad and/or Beaugeant) | Reuss + Van Compernolle (+ Ayad and/or Beaugeant) |
| Reuss + Kellerman (+ Ayad and/or Beaugeant) | Reuss + Kellerman (+ Ayad and/or Beaugeant) | Reuss + Kellerman (+ Ayad and/or Beaugeant) | Reuss + Kellerman (+ Ayad and/or Beaugeant) | Reuss + Kellerman (+ Ayad and/or Beaugeant) |
| Reuss + Zhang | Reuss + Zhang | Reuss + Zhang | Reuss + Zhang | Reuss + Zhang |
| Domer | Domer | Domer | Domer | Domer |
| Domer + Beaugeant | Domer + Beaugeant | Domer + Beaugeant | Domer + Beaugeant | Domer + Beaugeant |
| Domer + Ayad | Domer + Ayad | Domer + Ayad | Domer + Ayad | Domer + Ayad |
| Domer + Boyer (+ Ayad and/or Beaugeant | Domer + Boyer (+ Ayad and/or Beaugeant | Domer + Boyer (+ Ayad and/or Beaugeant | Domer + Boyer (+ Ayad and/or Beaugeant | Domer + Boyer (+ Ayad and/or Beaugeant |

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-34-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 1 | Claim 2 | Claim 3 | Claim 9 | Claim 11 |
|---------|---------|---------|---------|----------|
| Domer + Van Compernolle (+ Ayad and/or Beaugeant) | Domer + Van Compernolle (+ Ayad and/or Beaugeant) | Domer + Van Compernolle (+ Ayad and/or Beaugeant) | Domer + Van Compernolle (+ Ayad and/or Beaugeant) | Domer + Van Compernolle (+ Ayad and/or Beaugeant) |
| Domer + Kellerman (+ Ayad and/or Beaugeant) | Domer + Kellerman (+ Ayad and/or Beaugeant) | Domer + Kellerman (+ Ayad and/or Beaugeant) | Domer + Kellerman (+ Ayad and/or Beaugeant) | Domer + Kellerman (+ Ayad and/or Beaugeant) |
| Domer + Zhang | Domer + Zhang | Domer + Zhang | Domer + Zhang | Domer + Zhang |
| Beaugeant | Beaugeant | Beaugeant | Beaugeant | Beaugeant |
| Beaugeant + Ayad | Beaugeant + Ayad | Beaugeant + Ayad | Beaugeant + Ayad | Beaugeant + Ayad |
| Beaugeant + Zhang (+ Domer and/or Reuss) | Beaugeant + Zhang (+ Domer and/or Reuss) | Beaugeant + Zhang (+ Domer and/or Reuss) | Beaugeant + Zhang (+ Domer and/or Reuss) | Beaugeant + Zhang (+ Domer and/or Reuss) |
| Beaugeant + Domer (+ Reuss and/or Zhang) | Beaugeant + Domer (+ Reuss and/or Zhang) | Beaugeant + Domer (+ Reuss and/or Zhang) | Beaugeant + Domer (+ Reuss and/or Zhang) | Beaugeant + Domer (+ Reuss and/or Zhang) |
| Beaugeant + Zhang | Beaugeant + Zhang | Beaugeant + Zhang | Beaugeant + Zhang | Beaugeant + Zhang |
| Zhang | Zhang | Zhang | Zhang | Zhang |
| Zhang + Beaugeant | Zhang + Beaugeant | Zhang + Beaugeant | Zhang + Beaugeant | Zhang + Beaugeant |
| Zhang + Ayad | Zhang + Ayad | Zhang + Ayad | Zhang + Ayad | Zhang + Ayad |
| Zhang + Boyer (+ Ayad and/or Beaugeant | Zhang + Boyer (+ Ayad and/or Beaugeant | Zhang + Boyer (+ Ayad and/or Beaugeant | Zhang + Boyer (+ Ayad and/or Beaugeant | Zhang + Boyer (+ Ayad and/or Beaugeant |
| Zhang + Van Compernolle (+ Ayad and/or Beaugeant) | Zhang + Van Compernolle (+ Ayad and/or Beaugeant) | Zhang + Van Compernolle (+ Ayad and/or Beaugeant) | Zhang + Van Compernolle (+ Ayad and/or Beaugeant) | Zhang + Van Compernolle (+ Ayad and/or Beaugeant) |
| Zhang + Kellerman (+ Ayad and/or Beaugeant) | Zhang + Kellerman (+ Ayad and/or Beaugeant) | Zhang + Kellerman (+ Ayad and/or Beaugeant) | Zhang + Kellerman (+ Ayad and/or Beaugeant) | Zhang + Kellerman (+ Ayad and/or Beaugeant) |

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-35-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 1 | Claim 2 | Claim 3 | Claim 9 | Claim 11 |
|---|---|---|---|---|
| Zhang + Domer (and/or Reuss) | Zhang + Domer (and/or Reuss) | Zhang + Domer (and/or Reuss) | Zhang + Domer (and/or Reuss) | Zhang + Domer (and/or Reuss) |
| TI Reference Frameworks | TI Reference Frameworks | TI Reference Frameworks | TI Reference Frameworks | TI Reference Frameworks |
| TI Reference Frameworks + Beaugeant | TI Reference Frameworks + Beaugeant | TI Reference Frameworks + Beaugeant | TI Reference Frameworks + Beaugeant | TI Reference Frameworks + Beaugeant |
| TI Reference Frameworks + Ayad | TI Reference Frameworks + Ayad | TI Reference Frameworks + Ayad | TI Reference Frameworks + Ayad | TI Reference Frameworks + Ayad |
| TI Reference Frameworks + Boyer (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Boyer (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Boyer (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Boyer (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Boyer (+ Ayad and/or Beaugeant) |
| TI Reference Frameworks + Van Compernolle (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Van Compernolle (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Van Compernolle (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Van Compernolle (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Van Compernolle (+ Ayad and/or Beaugeant) |
| TI Reference Frameworks + Kellerman (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Kellerman (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Kellerman (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Kellerman (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Kellerman (+ Ayad and/or Beaugeant) |
| TI Reference Frameworks + Zhang (+ Domer and/or Reuss) | TI Reference Frameworks + Zhang (+ Domer and/or Reuss) | TI Reference Frameworks + Zhang (+ Domer and/or Reuss) | TI Reference Frameworks + Zhang (+ Domer and/or Reuss) | TI Reference Frameworks + Zhang (+ Domer and/or Reuss) |
| TI Reference Frameworks + Beaugeant and/or Reuss and/or Zhang | TI Reference Frameworks + Beaugeant and/or Reuss and/or Zhang | TI Reference Frameworks + Beaugeant and/or Reuss and/or Zhang | TI Reference Frameworks + Beaugeant and/or Reuss and/or Zhang | TI Reference Frameworks + Beaugeant and/or Reuss and/or Zhang |
| TI Reference Frameworks + Zhang | TI Reference Frameworks + Zhang | TI Reference Frameworks + Zhang | TI Reference Frameworks + Zhang | TI Reference Frameworks + Zhang |

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 12 | Claim 18 | Claim 19 |
|---|---|---|
| Reuss | Reuss | Reuss |
| Reuss + Ayad | Reuss + Ayad | Reuss + Ayad |
| Reuss + Beaugeant | Reuss + Beaugeant | Reuss + Beaugeant |
| Reuss + Boyer (+ Ayad and/or Beaugeant | Reuss + Boyer (+ Ayad and/or Beaugeant | Reuss + Boyer (+ Ayad and/or Beaugeant |
| Reuss + Van Compernolle (+ Ayad and/or Beaugeant) | Reuss + Van Compernolle (+ Ayad and/or Beaugeant) | Reuss + Van Compernolle (+ Ayad and/or Beaugeant) |
| Reuss + Kellerman (+ Ayad and/or Beaugeant) | Reuss + Kellerman (+ Ayad and/or Beaugeant) | Reuss + Kellerman (+ Ayad and/or Beaugeant) |
| Reuss + Zhang | Reuss + Zhang | Reuss + Zhang |
| Domer | Domer | Domer |
| Domer + Beaugeant | Domer + Beaugeant | Domer + Beaugeant |
| Domer + Ayad | Domer + Ayad | Domer + Ayad |
| Domer + Boyer (+ Ayad and/or Beaugeant | Domer + Boyer (+ Ayad and/or Beaugeant | Domer + Boyer (+ Ayad and/or Beaugeant |
| Domer + Van Compernolle (+ Ayad and/or Beaugeant) | Domer + Van Compernolle (+ Ayad and/or Beaugeant) | Domer + Van Compernolle (+ Ayad and/or Beaugeant) |
| Domer + Kellerman (+ Ayad and/or Beaugeant) | Domer + Kellerman (+ Ayad and/or Beaugeant) | Domer + Kellerman (+ Ayad and/or Beaugeant) |
| Domer + Zhang | Domer + Zhang | Domer + Zhang |
| Beaugeant | Beaugeant | Beaugeant |

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

| Claim 12 | Claim 18 | Claim 19 |
|---|---|---|
| Beaugeant + Ayad | Beaugeant + Ayad | Beaugeant + Ayad |
| Beaugeant + Zhang (+ Domer and/or Reuss) | Beaugeant + Zhang (+ Domer and/or Reuss) | Beaugeant + Zhang (+ Domer and/or Reuss) |
| Beaugeant + Domer (+ Reuss and/or Zhang) | Beaugeant + Domer (+ Reuss and/or Zhang) | Beaugeant + Domer (+ Reuss and/or Zhang) |
| Beaugeant + Zhang | Beaugeant + Zhang | Beaugeant + Zhang |
| Zhang | Zhang | Zhang |
| Zhang + Beaugeant | Zhang + Beaugeant | Zhang + Beaugeant |
| Zhang + Ayad | Zhang + Ayad | Zhang + Ayad |
| Zhang + Boyer (+ Ayad and/or Beaugeant | Zhang + Boyer (+ Ayad and/or Beaugeant | Zhang + Boyer (+ Ayad and/or Beaugeant |
| Zhang + Van Compernolle (+ Ayad and/or Beaugeant) | Zhang + Van Compernolle (+ Ayad and/or Beaugeant) | Zhang + Van Compernolle (+ Ayad and/or Beaugeant) |
| Zhang + Kellerman (+ Ayad and/or Beaugeant) | Zhang + Kellerman (+ Ayad and/or Beaugeant) | Zhang + Kellerman (+ Ayad and/or Beaugeant) |
| Zhang + Domer (and/or Reuss) | Zhang + Domer (and/or Reuss) | Zhang + Domer (and/or Reuss) |
| TI Reference Frameworks | TI Reference Frameworks | TI Reference Frameworks |
| TI Reference Frameworks + Beaugeant | TI Reference Frameworks + Beaugeant | TI Reference Frameworks + Beaugeant |
| TI Reference Frameworks + Ayad | TI Reference Frameworks + Ayad | TI Reference Frameworks + Ayad |

-38-

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 12 | Claim 18 | Claim 19 |
|---|---|---|
| TI Reference Frameworks + Boyer (+ Ayad and/or Beaugeant | TI Reference Frameworks + Boyer (+ Ayad and/or Beaugeant | TI Reference Frameworks + Boyer (+ Ayad and/or Beaugeant |
| TI Reference Frameworks + Van Compernolle (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Van Compernolle (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Van Compernolle (+ Ayad and/or Beaugeant) |
| TI Reference Frameworks + Kellerman (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Kellerman (+ Ayad and/or Beaugeant) | TI Reference Frameworks + Kellerman (+ Ayad and/or Beaugeant) |
| TI Reference Frameworks + Zhang (+ Domer and/or Reuss) | TI Reference Frameworks + Zhang (+ Domer and/or Reuss) | TI Reference Frameworks + Zhang (+ Domer and/or Reuss) |
| TI Reference Frameworks + Beaugeant and/or Reuss and/or Zhang | TI Reference Frameworks + Beaugeant and/or Reuss and/or Zhang | TI Reference Frameworks + Beaugeant and/or Reuss and/or Zhang |
| TI Reference Frameworks + Zhang | TI Reference Frameworks + Zhang | TI Reference Frameworks + Zhang |

### a.   Reuss + Knowledge of a POSITA

To the extent Reuss is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, or performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have understood it was obvious based on Reuss's disclosures and otherwise would have understood it was obvious in light of Reuss and the knowledge of a POSITA. Reuss teaches a combined, adaptive system of echo

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-39-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

cancellation and noise control for use in speakerphones, cellular phones, and the like. *See, e.g.*, Reuss at Abstract, 1:5-8, 2:14-30, 2:31-49, 2:50-67, Fig. 1. 2, 4. That the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation was well known to a POSITA at the time of the alleged invention of the '206 patent as reflected in, for example, Beaugeant, Ayad, Guilou, and Kellerman. Extensive research was conducted on the ideal configuration of a combined echo cancellation and noise reduction system, and it was well known in the art to configure such systems in different ways depending on the context in which they were to be used. Further, it was well known to a POSITA at the time of the alleged invention of the '206 patent that digital signal processors could be configured to perform signal processing operations adaptively to respond to changing conditions such as background noise, as reflected in, for example, Reuss itself. Thus, modifying Reuss's system to perform echo cancellation and noise suppression in the particular manner recited in the asserted claims would have been obvious to a POSITA because, for example, it would involve applying known methods of signal processing to yield predictable results and using known techniques of signal processing to improve an echo cancellation and noise suppression system in the same way.

### b. <u>Reuss + Beaugeant</u>

To the extent Reuss is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, or performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Reuss and Beaugeant. Reuss teaches a combined, adaptive system of echo cancellation and noise control for use in speakerphones, cellular phones, and the like. *See, e.g.*, Reuss at Abstract, 1:5-8, 2:14-30, 2:31-49, 2:50-67, Fig. 1. 2, 4. Beaugeant discloses that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used,

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

1    and that typically in cases of high background noise suppression should precede echo cancellation.

2    *See, e.g.*, Beaugeant at 34-35, Fig. 1. Using Reuss's combined adaptive echo cancellation and noise

3    suppression system together with Beaugeant's teaching that better results may be obtained by

4    applying echo cancellation or noise suppression first depending on the level of background noise

5    would have been obvious to a POSITA because, for example, it would involve applying a known

6    technique to improve similar systems in the same way and simple substitution of one known

7    element for another to obtain predictable results.

8                          **c.      Reuss + Ayad**

9                  To the extent Reuss is deemed to lack sufficient disclosure of limitations relating to

10   adaptively determining an order of noise suppression and echo cancellation based on the

11   background noise in the signal, or performing echo cancellation before noise suppression or vice

12   versa based on whether the background noise is above or below a threshold, such as claims [1.4],

13   [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to

14   combine the teachings of Reuss and Ayad. Reuss teaches a combined, adaptive system of echo

15   cancellation and noise control for use in speakerphones, cellular phones, and the like. *See, e.g.*,

16   Reuss at Abstract, 1:5-8, 2:14-30, 2:31-49, 2:50-67, Fig. 1. 2, 4. Ayad discloses that the order in

17   which echo cancellation and noise suppression should be performed on a signal depends on the

18   level of background noise and the echo cancellation and noise suppression algorithms used, and

19   that typically in cases of high background noise suppression should precede echo cancellation.

20   *See, e.g.*, Ayad at 953-54. Using Reuss's combined adaptive echo cancellation and noise

21   suppression system together with Ayad's teaching that better results may be obtained by applying

22   echo cancellation or noise suppression first depending on the level of background noise would

23   have been obvious to a POSITA because, for example, it would involve applying a known

24   technique to improve similar systems in the same way and simple substitution of one known

25   element for another to obtain predictable results.

26                          **d.      Reuss + Boyer (+ Ayad and/or Beaugeant)**

27                  To the extent Reuss is deemed to lack sufficient disclosure of limitations relating to

28   adaptively switching the order of noise suppression and echo cancellation based on the background

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-41-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Reuss and Boyer. Reuss teaches a combined, adaptive system of echo cancellation and noise control for use in speakerphones, cellular phones, and the like. *See, e.g.*, Reuss at Abstract, 1:5-8, 2:14-30, 2:31-49, 2:50-67, Fig. 1. 2, 4. Boyer discloses an adaptive echo canceler arrangement that adaptively switches the relative positions of different adaptive echo cancelers to improve echo cancellation results. *See, e.g.*, Boyer at Abstract, 2:5-14, 3:13-37, 3:38-4:21, Claim 1, Fig. 1. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Boyer's adaptive switching between signal processing algorithms for Reuss in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Boyer's known technique to Reuss's known system to yield predictable results and use of Boyer's known technique to improve a signal processing system in the same way.

### e. <u>Reuss + Van Compernolle (+ Ayad and/or Beaugeant)</u>

To the extent Reuss is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Reuss and Van Compernolle. Reuss teaches a combined, adaptive system of echo cancellation and noise control for use in speakerphones, cellular phones, and the like. *See, e.g.*, Reuss at Abstract, 1:5-8, 2:14-30, 2:31-49, 2:50-67, Fig. 1. 2, 4. Van Compernolle discloses a technique of switching adaptive filters based on an adaptive energy threshold. *See, e.g.*, Van Compernolle at 1-3. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-42-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

have been motivated to use Van Compernolle's adaptive switching between signal processing algorithms for Reuss in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Van Compernolle's known technique to Reuss's known system to yield predictable results and use of Van Compernolle's known technique to improve a signal processing system in the same way.

### f. Reuss + Kellerman (+ Ayad and/or Beaugeant)

To the extent Reuss is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Reuss and Kellerman. Reuss teaches a combined, adaptive system of echo cancellation and noise control for use in speakerphones, cellular phones, and the like. *See, e.g.*, Reuss at Abstract, 1:5-8, 2:14-30, 2:31-49, 2:50-67, Fig. 1. 2, 4. Kellerman discloses a structure in which the order in which signal processing operations are applied is adaptively switched to either have adaptive echo cancellation or beamforming (noise suppression) occur before the other. *See, e.g.*, Kellerman at 293-94, Fig. 13.5. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Kellerman's adaptive switching between signal processing algorithms for Reuss in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Kellerman's known technique to Reuss's known system to yield predictable results and use of Kellerman's known technique to improve a signal processing system in the same way.

### g. Reuss + Zhang

To the extent Reuss is deemed to lack sufficient disclosure of limitations relating to a noise estimator or basing background noise on an estimated noise level when there is no desired input received at the input of the communication device, such as claims [3], [11.3], and/or [18], a

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

POSITA would have been motivated to combine the teachings of Reuss and Zhang. Reuss teaches a combined, adaptive system of echo cancellation and noise control for use in speakerphones, cellular phones, and the like. *See, e.g.*, Reuss at Abstract, 1:5-8, 2:14-30, 2:31-49, 2:50-67, Fig. 1. 2, 4. Zhang discloses a noise estimator (e.g., 812) and the use of an estimated noise level when no near-end speaker is detected—*i.e.*, no desired input is received at the input to the system. *See, e.g.*, Zhang at 12:47-13:26, Fig. 8. Using Reuss's combined adaptive echo cancellation and noise suppression system together with Zhang's disclosure of a noise estimator and the use of estimated background noise in the absence of a desired voice input signal would have been obvious to a POSITA because, for example, it would involve applying a known component and technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### h.  <u>Domer + Knowledge of a POSITA</u>

To the extent Domer is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have understood it was obvious based on Domer's disclosures and otherwise would have understood it was obvious in light of Reuss and the knowledge of a POSITA. Domer teaches a system and method for performing adaptive echo cancellation and noise reduction (suppression) on signals in a communication device such as a telephone, speakerphone, etc. *See, e.g.*, Domer at Abstract, 1:6-9, 3:15-40, 4:15-36, 4:37-49, 4:40-63, 5:1-12, 5:13-27, 5:28-45, 5:47-65, 7:39-45, 8:43-54, 8:63-9:8, 9:9-50, 9:65-10:17, 10:18-31, 10:55-64, 10:65-11:711:24-42, Figs, 1, 2, 6, 13. That the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation was well known to a POSITA at the time of the alleged invention of the '206 patent as reflected in, for example, Beaugeant, Ayad, Guilou, and Kellerman. Extensive research was conducted on the ideal configuration of a combined echo cancellation and noise reduction system, and it was well known in the art to configure such systems in different ways

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-44-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

depending on the context in which they were to be used. Further, it was well known to a POSITA at the time of the alleged invention of the '206 patent that digital signal processors could be configured to perform signal processing operations adaptively to respond to changing conditions such as background noise, as reflected in, for example, Domer itself. Thus, modifying Domer's system to perform echo cancellation and noise suppression in the particular manner recited in the asserted claims would have been obvious to a POSITA because, for example, it would involve applying known methods of signal processing to yield predictable results and using known techniques of signal processing to improve an echo cancellation and noise suppression system in the same way.

### i.  **Domer + Beaugeant**

To the extent Domer is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, or performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Domer and Beaugeant. Domer teaches a system and method for performing adaptive echo cancellation and noise reduction (suppression) on signals in a communication device such as a telephone, speakerphone, etc. *See, e.g.*, Domer at Abstract, 1:6-9, 3:15-40, 4:15-36, 4:37-49, 4:40-63, 5:1-12, 5:13-27, 5:28-45, 5:47-65, 7:39-45, 8:43-54, 8:63-9:8, 9:9-50, 9:65-10:17, 10:18-31, 10:55-64, 10:65-11:711:24-42, Figs, 1, 2, 6, 13. Beaugeant discloses that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See, e.g.*, Beaugeant at 34-35, Fig. 1. Using Domer's combined adaptive echo cancellation and noise suppression system together with Beaugeant's teaching that better results may be obtained by applying echo cancellation or noise suppression first depending on the level of background noise would have been obvious to a POSITA because, for example, it would involve

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-45-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### j. **Domer + Ayad**

To the extent Domer is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, or performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Domer and Ayad. Domer teaches a system and method for performing adaptive echo cancellation and noise reduction (suppression) on signals in a communication device such as a telephone, speakerphone, etc. *See, e.g.*, Domer at Abstract, 1:6-9, 3:15-40, 4:15-36, 4:37-49, 4:40-63, 5:1-12, 5:13-27, 5:28-45, 5:47-65, 7:39-45, 8:43-54, 8:63-9:8, 9:9-50, 9:65-10:17, 10:18-31, 10:55-64, 10:65-11:711:24-42, Figs, 1, 2, 6, 13. Ayad discloses that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See, e.g.*, Ayad at 953-54. Using Domer's combined adaptive echo cancellation and noise suppression system together with Ayad's teaching that better results may be obtained by applying echo cancellation or noise suppression first depending on the level of background noise would have been obvious to a POSITA because, for example, it would involve applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### k. **Domer + Boyer (+ Ayad and/or Beaugeant)**

To the extent Domer is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Domer and Boyer. Domer teaches a system and method for performing adaptive echo cancellation and noise reduction

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-46-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

(suppression) on signals in a communication device such as a telephone, speakerphone, etc. *See, e.g.*, Domer at Abstract, 1:6-9, 3:15-40, 4:15-36, 4:37-49, 4:40-63, 5:1-12, 5:13-27, 5:28-45, 5:47-65, 7:39-45, 8:43-54, 8:63-9:8, 9:9-50, 9:65-10:17, 10:18-31, 10:55-64, 10:65-11:711:24-42, Figs, 1, 2, 6, 13. Boyer discloses an adaptive echo canceler arrangement that adaptively switches the relative positions of different adaptive echo cancelers to improve echo cancellation results. *See, e.g.*, Boyer at Abstract, 2:5-14, 3:13-37, 3:38-4:21, Claim 1, Fig. 1. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Boyer's adaptive switching between signal processing algorithms for Domer in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Boyer's known technique to Domer's known system to yield predictable results and use of Boyer's known technique to improve a signal processing system in the same way.

### l.     Domer + Van Compernolle (+ Ayad and/or Beaugeant)

To the extent Domer is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Domer and Van Compernolle. Domer teaches a system and method for performing adaptive echo cancellation and noise reduction (suppression) on signals in a communication device such as a telephone, speakerphone, etc. *See, e.g.*, Domer at Abstract, 1:6-9, 3:15-40, 4:15-36, 4:37-49, 4:40-63, 5:1-12, 5:13-27, 5:28-45, 5:47-65, 7:39-45, 8:43-54, 8:63-9:8, 9:9-50, 9:65-10:17, 10:18-31, 10:55-64, 10:65-11:711:24-42, Figs, 1, 2, 6, 13. Van Compernolle discloses a technique of switching adaptive filters based on an adaptive energy threshold. *See, e.g.*, Van Compernolle at 1-3. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-47-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Van Compernolle's adaptive switching between signal processing algorithms for Domer in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Van Compernolle's known technique to Domer's known system to yield predictable results and use of Van Compernolle's known technique to improve a signal processing system in the same way.

### m.   Domer + Kellerman (+ Ayad and/or Beaugeant)

To the extent Domer is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Domer and Kellerman. Domer teaches a system and method for performing adaptive echo cancellation and noise reduction (suppression) on signals in a communication device such as a telephone, speakerphone, etc. *See, e.g.*, Domer at Abstract, 1:6-9, 3:15-40, 4:15-36, 4:37-49, 4:40-63, 5:1-12, 5:13-27, 5:28-45, 5:47-65, 7:39-45, 8:43-54, 8:63-9:8, 9:9-50, 9:65-10:17, 10:18-31, 10:55-64, 10:65-11:7,11:24-42, Figs, 1, 2, 6, 13. Kellerman discloses a structure in which the order in which signal processing operations are applied is adaptively switched to either have adaptive echo cancellation or beamforming (noise suppression) occur before the other. *See, e.g.*, Kellerman at 293-94, Fig. 13.5. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Kellerman's adaptive switching between signal processing algorithms for Domer in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Kellerman's known technique to Domer's known system to yield predictable results and use of Kellerman's known technique to improve a signal processing system in the same way.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-48-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

### n.       Domer + Zhang

To the extent Domer is deemed to lack sufficient disclosure of limitations relating to a noise estimator or basing background noise on an estimated noise level when there is no desired input received at the input of the communication device, such as claims [3], [11.3], and/or [18], a POSITA would have been motivated to combine the teachings of Domer and Zhang. Domer teaches a system and method for performing adaptive echo cancellation and noise reduction (suppression) on signals in a communication device such as a telephone, speakerphone, etc. *See, e.g.*, Domer at Abstract, 1:6-9, 3:15-40, 4:15-36, 4:37-49, 4:40-63, 5:1-12, 5:13-27, 5:28-45, 5:47-65, 7:39-45, 8:43-54, 8:63-9:8, 9:9-50, 9:65-10:17, 10:18-31, 10:55-64, 10:65-11:711:24-42, Figs, 1, 2, 6, 13. Zhang discloses a noise estimator (e.g., 812) and the use of an estimated noise level when no near-end speaker is detected—*i.e.*, no desired input is received at the input to the system. *See, e.g.*, Zhang at 12:47-13:26, Fig. 8. Using Domer's combined adaptive echo cancellation and noise suppression system together with Zhang's disclosure of a noise estimator and the use of estimated background noise in the absence of a desired voice input signal would have been obvious to a POSITA because, for example, it would involve applying a known component and technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### o.       Beaugeant + Knowledge of a POSITA

To the extent Beaugeant is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, or performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have understood it was obvious based on Beaugeant's disclosures and otherwise would have understood it was obvious in light of Reuss and the knowledge of a POSITA. Beaugeant discloses structures for echo cancellation and noise reduction (suppression) in telecommunications devices such as telephones and speakerphones. *See, e.g.*, Beaugeant at 34, Fig. 1, Fig 3. That the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of

background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation was well known to a POSITA at the time of the alleged invention of the '206 patent as reflected in, for example, Ayad, Guilou, and Kellerman. Extensive research was conducted on the ideal configuration of a combined echo cancellation and noise reduction system, and it was well known in the art to configure such systems in different ways depending on the context in which they were to be used. Further, it was well known to a POSITA at the time of the alleged invention of the '206 patent that digital signal processors could be configured to perform signal processing operations adaptively to respond to changing conditions such as background noise, as reflected in, for example, Beaugeant itself. Thus, modifying Beaugeant's system to perform echo cancellation and noise suppression in the particular manner recited in the asserted claims would have been obvious to a POSITA because, for example, it would involve applying known methods of signal processing to yield predictable results and using known techniques of signal processing to improve an echo cancellation and noise suppression system in the same way.

### p.    **Beaugeant + Ayad**

To the extent Beaugeant is deemed to lack sufficient disclosure of limitations relating to performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [2.3], [2.4], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Beaugeant and Ayad. Beaugeant discloses structures for echo cancellation and noise reduction (suppression) in telecommunications devices such as telephones and speakerphones. *See, e.g.*, Beaugeant at 34, Fig. 1, Fig 3. Ayad discloses that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See, e.g.*, Ayad at 953-54. Using Beaugeant's echo cancellation and noise suppression structures together with Ayad's teaching that better results may be obtained by applying echo cancellation or noise suppression first depending on the level of background noise would have been obvious to a POSITA because, for example, it would involve

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-50-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### q.    Beaugeant + Zhang (and/or Domer and/or Reuss)

To the extent Beaugeant is deemed to lack sufficient disclosure of limitations relating to determining background noise in a signal, such as claims [1.3] and/or [19.3], a POSITA would have been motivated to combine the teachings of Beaugeant and Zhang and/or Domer and/or Reuss. Beaugeant discloses structures for echo cancellation and noise reduction (suppression) in telecommunications devices such as telephones and speakerphones. *See, e.g*., Beaugeant at 34, Fig. 1, Fig 3. Zhang discloses a noise estimator which detects and measures background noise in the received signal, as well as the use of a reference signal based on the received far-end input and which constitutes background noise to be cancelled during the initial adaptive echo cancellation, if such a cancellation is performed. *See, e.g*., Zhang at Abstract, 3:37-40, 3:41-47, 5:14-31, 5:65-67, Fig. 1, 8, Claim 1. Similarly, Domer and Reuss disclose determining background noise in a signal. *See, e.g.*, Domer at 5:28-38; 10:5-17; Reuss at 2:31-49, Fig. 3, claim 12. A POSITA would have been motivated to use Zhang's determination of background noise in a signal (and/or that of Domer and/or Reuss) for Beaugeant because, for example, it involved applying Zhang's (and/or that of Domer and/or Reuss) known technique to Beaugeant's known system to yield predictable results and use of the known techniques in Zhang (and/or Domer and/or Reuss) to improve a signal processing system in the same way.

### r.    Beaugeant + Domer (and/or Reuss and/or Zhang)

To the extent Beaugeant is deemed to lack sufficient disclosure of limitations relating to comparing background noise to a threshold, such as claims [2.2], [12.2], and/or [19.4], a POSITA would have been motivated to combine the teachings of Beaugeant and Domer, Reuss, and/or Zhang. Beaugeant discloses structures for echo cancellation and noise reduction (suppression) in telecommunications devices such as telephones and speakerphones. *See, e.g*., Beaugeant at 34, Fig. 1, Fig 3. Domer discloses detecting background noise and classifying it according to certain noise levels, such as "low noise," "high noise," and "horrid noise," which constitute thresholds to which the measured background noise is compared and specific actions taken based on the level

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-51-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

of measured background noise relative to the thresholds. *See, e.g*., Domer at 10:5-17, 10:18-31, Fig. 8. Similarly, Reuss and Zhang disclose comparing background noise to a threshold. *See, e.g.,* Reuss at 7:24-43, Fig. 2, 3; Zhang at 3:37-40, 5:64-6:17, 11:32-47, 12:11-17, 12:25-36, Fig. 6, 7. A POSITA would have been motivated to use Domer's comparison of background noise in a signal to a threshold (and/or that of Reuss and/or Zhang) for Beaugeant because, for example, it involved applying Domer's (and/or that of Reuss and/or Zhang) known technique to Beaugeant's known system to yield predictable results and use of the known techniques in Domer (and/or Reuss and/or Zhang) to improve a signal processing system in the same way.

### s.   **Beaugeant + Zhang**

To the extent Beaugeant is deemed to lack sufficient disclosure of limitations relating to a noise estimator or basing background noise on an estimated noise level when there is no desired input received at the input of the communication device, such as claims [3], [11.3], and/or [18], a POSITA would have been motivated to combine the teachings of Beaugeant and Zhang. Beaugeant discloses structures for echo cancellation and noise reduction (suppression) in telecommunications devices such as telephones and speakerphones. *See, e.g*., Beaugeant at 34, Fig. 1, Fig 3. Zhang discloses a noise estimator (e.g., 812) and the use of an estimated noise level when no near-end speaker is detected—*i.e.*, no desired input is received at the input to the system. *See, e.g*., Zhang at 12:47-13:26, Fig. 8. Using Beaugeants's echo cancellation and noise suppression structures together with Zhang's disclosure of a noise estimator and the use of estimated background noise in the absence of a desired voice input signal would have been obvious to a POSITA because, for example, it would involve applying a known component and technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### t.   **Zhang + Knowledge of a POSITA**

To the extent Zhang is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, or performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [1.4],

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-52-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

[2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have understood it was obvious based on Zhang's disclosures and otherwise would have understood it was obvious in light of Reuss and the knowledge of a POSITA. Zhang teaches a method and system of performing echo cancellation and noise suppression in a communication device on a signal using an array microphone. *See, e.g.*, Zhang at 1:24-26, 1:27-42, 3:15-27, 12:47-13:26, Fig. 1, 8, 9. That the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation was well known to a POSITA at the time of the alleged invention of the '206 patent as reflected in, for example, Beaugeant, Ayad, Guilou, and Kellerman. Extensive research was conducted on the ideal configuration of a combined echo cancellation and noise reduction system, and it was well known in the art to configure such systems in different ways depending on the context in which they were to be used. Further, it was well known to a POSITA at the time of the alleged invention of the '206 patent that digital signal processors could be configured to perform signal processing operations adaptively to respond to changing conditions such as background noise, as reflected in, for example, Zhang itself. Thus, modifying Zhang's system to perform echo cancellation and noise suppression in the particular manner recited in the asserted claims would have been obvious to a POSITA because, for example, it would involve applying known methods of signal processing to yield predictable results and using known techniques of signal processing to improve an echo cancellation and noise suppression system in the same way.

### u.     Zhang + Beaugeant

To the extent Zhang is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, or performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Zhang and Beaugeant. Zhang teaches a method and system of performing echo cancellation and noise suppression in a communication device on a signal using an array

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-53-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

microphone. *See, e.g.*, Zhang at 1:24-26, 1:27-42, 3:15-27, 12:47-13:26, Fig. 1, 8, 9. Beaugeant discloses that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See, e.g.*, Beaugeant at 34-35, Fig. 1. Using Zhang's combined adaptive echo cancellation and noise suppression system together with Beaugeant's teaching that better results may be obtained by applying echo cancellation or noise suppression first depending on the level of background noise would have been obvious to a POSITA because, for example, it would involve applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### v.     Zhang + Ayad

To the extent Zhang is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, or performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Zhang and Ayad. Zhang teaches a method and system of performing echo cancellation and noise suppression in a communication device on a signal using an array microphone. *See, e.g.*, Zhang at 1:24-26, 1:27-42, 3:15-27, 12:47-13:26, Fig. 1, 8, 9. Ayad discloses that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See, e.g.*, Ayad at 953-54. Using Zhang's combined adaptive echo cancellation and noise suppression system together with Ayad's teaching that better results may be obtained by applying echo cancellation or noise suppression first depending on the level of background noise would have been obvious to a POSITA because, for example, it would involve applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-54-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

### w. Zhang + Boyer (+ Ayad and/or Beaugeant)

To the extent Zhang is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Zhang and Boyer. Zhang teaches method and system of performing echo cancellation and noise suppression in a communication device on a signal using an array microphone. *See, e.g.*, Zhang at 1:24-26, 1:27-42, 3:15-27, 12:47-13:26, Fig. 1, 8, 9. Boyer discloses an adaptive echo canceler arrangement that adaptively switches the relative positions of different adaptive echo cancelers to improve echo cancellation results. *See, e.g.*, Boyer at Abstract, 2:5-14, 3:13-37, 3:38-4:21, Claim 1, Fig. 1. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Boyer's adaptive switching between signal processing algorithms for Zhang in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Boyer's known technique to Zhang's known system to yield predictable results and use of Boyer's known technique to improve a signal processing system in the same way.

### x. Zhang + Van Compernolle (+ Ayad and/or Beaugeant)

To the extent Zhang is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Zhang and Van Compernolle. Zhang teaches a method and system of performing echo cancellation and noise suppression in a communication device on a signal using an array microphone. *See, e.g.*, Zhang at 1:24-26, 1:27-42, 3:15-27, 12:47-13:26, Fig. 1, 8, 9. Van Compernolle discloses a technique of switching adaptive filters based on an adaptive energy threshold. *See, e.g.*, Van Compernolle at 1-3. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise

suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Van Compernolle's adaptive switching between signal processing algorithms for Zhang in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Van Compernolle's known technique to Zhang's known system to yield predictable results and use of Van Compernolle's known technique to improve a signal processing system in the same way.

### y. <u>Zhang + Kellerman (+ Ayad and/or Beaugeant)</u>

To the extent Zhang is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of Zhang and Van Compernolle. Zhang teaches a method and system of performing echo cancellation and noise suppression in a communication device on a signal using an array microphone. *See, e.g.*, Zhang at 1:24-26, 1:27-42, 3:15-27, 12:47-13:26, Fig. 1, 8, 9. Kellerman discloses a structure in which the order in which signal processing operations are applied is adaptively switched to either have adaptive echo cancellation or beamforming (noise suppression) occur before the other. *See, e.g.*, Kellerman at 293-94, Fig. 13.5. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Kellerman's adaptive switching between signal processing algorithms for Zhang in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Kellerman's known technique to Zhang's known system to yield predictable results and use of Kellerman's known technique to improve a signal processing system in the same way.

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

z.       **Zhang + Domer (and/or Reuss)**

To the extent Zhang is deemed to lack sufficient disclosure of limitations relating to comparing background noise to a threshold, such as claims [2.2], [12.2], and/or [19.4], a POSITA would have been motivated to combine the teachings of Zhang and Domer and/or Reuss. Zhang teaches a method and system of performing echo cancellation and noise suppression in a communication device on a signal using an array microphone. *See, e.g.*, Zhang at 1:24-26, 1:27-42, 3:15-27, 12:47-13:26, Fig. 1, 8, 9. Domer discloses detecting background noise and classifying it according to certain noise levels, such as "low noise," "high noise," and "horrid noise," which constitute thresholds to which the measured background noise is compared and specific actions taken based on the level of measured background noise relative to the thresholds. *See, e.g.*, Domer at 10:5-17, 10:18-31, Fig. 8. Similarly, Reuss discloses comparing background noise to a threshold. *See, e.g.,* Reuss at 7:24-43, Fig. 2, 3. A POSITA would have been motivated to use Domer's comparison of background noise in a signal to a threshold (and/or that of Reuss) for Zhang because, for example, it involved applying Domer's (and/or that of Reuss) known technique to Zhang's known system to yield predictable results and use of the known techniques in Domer (and/or Reuss) to improve a signal processing system in the same way.

aa.      **TI Reference Frameworks + Knowledge of a POSITA**

To the extent TI Reference Frameworks is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have understood it was obvious based on TI Reference Frameworks's disclosures and otherwise would have understood it was obvious in light of Reuss and the knowledge of a POSITA. TI Reference Frameworks teaches a development and runtime environment for signal processing on TI signal processors, the signal processing including means of echo cancellation and noise reduction (suppression), and including signal processing in a variety of contexts, such as communication devices. *See generally* Sprv040a, Third-Party Listing, RF1, VAB Flyer, EDN 2002. That the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-57-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation was well known to a POSITA at the time of the alleged invention of the '206 patent as reflected in, for example, Beaugeant, Ayad, Guilou, and Kellerman. Extensive research was conducted on the ideal configuration of a combined echo cancellation and noise reduction system, and it was well known in the art to configure such systems in different ways depending on the context in which they were to be used. Further, it was well known to a POSITA at the time of the alleged invention of the '206 patent that digital signal processors could be configured to perform signal processing operations adaptively to respond to changing conditions such as background noise, as reflected in, for example, Beaugeant, Zhang, Reuess, and Domer. Thus, utilizing the system of TI Reference Frameworks to perform echo cancellation and noise suppression in the particular manner recited in the asserted claims would have been obvious to a POSITA because, for example, it would involve applying known methods of signal processing to yield predictable results and using known techniques of signal processing to improve an echo cancellation and noise suppression system in the same way.

### bb.  TI Reference Frameworks + Beaugeant

To the extent TI Reference Frameworks is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, or performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of TI Reference Frameworks and Beaugeant. TI Reference Frameworks teaches a development and runtime environment for signal processing on TI signal processors, the signal processing including means of echo cancellation and noise reduction (suppression), and including signal processing in a variety of contexts, such as communication devices. *See generally* Sprv040a, Third-Party Listing, RF1, VAB Flyer, EDN 2002. Beaugeant discloses that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-58-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

suppression should precede echo cancellation. *See, e.g.*, Beaugeant at 34-35, Fig. 1. Using TI Reference Frameworks's signal processing development environment together with Beaugeant's teaching that better results may be obtained by applying echo cancellation or noise suppression first depending on the level of background noise would have been obvious to a POSITA because, for example, it would involve applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### cc.     TI Reference Frameworks + Ayad

To the extent TI Reference Frameworks is deemed to lack sufficient disclosure of limitations relating to adaptively determining an order of noise suppression and echo cancellation based on the background noise in the signal, or performing echo cancellation before noise suppression or vice versa based on whether the background noise is above or below a threshold, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of TI Reference Frameworks and Ayad. TI Reference Frameworks teaches a development and runtime environment for signal processing on TI signal processors, the signal processing including means of echo cancellation and noise reduction (suppression), and including signal processing in a variety of contexts, such as communication devices. *See generally* Sprv040a, Third-Party Listing, RF1, VAB Flyer, EDN 2002. Ayad discloses that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See, e.g.*, Ayad at 953-54. Using TI Reference Frameworks's signal processing development environment together with Ayad's teaching that better results may be obtained by applying echo cancellation or noise suppression first depending on the level of background noise would have been obvious to a POSITA because, for example, it would involve applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-59-                    SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

### dd.     TI Reference Frameworks + Boyer (+ Ayad and/or Beaugeant)

To the extent TI Reference Frameworks is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of TI Reference Frameworks and Boyer. TI Reference Frameworks teaches a development and runtime environment for signal processing on TI signal processors, the signal processing including means of echo cancellation and noise reduction (suppression), and including signal processing in a variety of contexts, such as communication devices. *See generally* Sprv040a, Third-Party Listing, RF1, VAB Flyer, EDN 2002. Boyer discloses an adaptive echo canceler arrangement that adaptively switches the relative positions of different adaptive echo cancelers to improve echo cancellation results. *See, e.g.*, Boyer at Abstract, 2:5-14, 3:13-37, 3:38-4:21, Claim 1, Fig. 1. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Boyer's adaptive switching between signal processing algorithms for TI Reference Frameworks in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Boyer's known technique to TI Reference Frameworks's known system to yield predictable results and use of Boyer's known technique to improve a signal processing system in the same way.

### ee.     TI Reference Frameworks + Van Compernolle (+ Ayad and/or Beaugeant)

To the extent TI Reference Frameworks is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of TI Reference Frameworks and Van Compernolle. TI Reference Frameworks teaches a development

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-60-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

and runtime environment for signal processing on TI signal processors, the signal processing including means of echo cancellation and noise reduction (suppression), and including signal processing in a variety of contexts, such as communication devices. *See generally* Sprv040a, Third-Party Listing, RF1, VAB Flyer, EDN 2002. Van Compernolle discloses a technique of switching adaptive filters based on an adaptive energy threshold. *See, e.g.*, Van Compernolle at 1-3. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Van Compernolle's adaptive switching between signal processing algorithms for TI Reference Frameworks in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Van Compernolle's known technique to TI Reference Frameworks's known system to yield predictable results and use of Van Compernolle's known technique to improve a signal processing system in the same way.

### ff.    **TI Reference Frameworks + Kellerman (+ Ayad and/or Beaugeant)**

To the extent TI Reference Frameworks is deemed to lack sufficient disclosure of limitations relating to adaptively switching the order of noise suppression and echo cancellation based on the background noise in the signal, such as claims [1.4], [2.3], [2.4], [9.6], [12.3], [12.4], [19.5], and/or [19.6], a POSITA would have been motivated to combine the teachings of TI Reference Frameworks and Kellerman. TI Reference Frameworks teaches a development and runtime environment for signal processing on TI signal processors, the signal processing including means of echo cancellation and noise reduction (suppression), and including signal processing in a variety of contexts, such as communication devices. *See generally* Sprv040a, Third-Party Listing, RF1, VAB Flyer, EDN 2002. Kellerman discloses a structure in which the order in which signal processing operations are applied is adaptively switched to either have adaptive echo cancellation or beamforming (noise suppression) occur before the other. *See, e.g.*, Kellerman at 293-94, Fig. 13.5. As explained *infra*, Ayad and Beaugeant disclose that the order in which echo cancellation and noise suppression should be performed on a signal depends on the level of

background noise and the echo cancellation and noise suppression algorithms used, and that typically in cases of high background noise suppression should precede echo cancellation. *See infra* III(C)(2)(b) and (c). A POSITA would have been motivated to use Kellerman's adaptive switching between signal processing algorithms for TI Reference Frameworks in light of the disclosures of Ayad and/or Beaugeant because, for example, it involved applying Kellerman's known technique to TI Reference Frameworks's known system to yield predictable results and use of Kellerman's known technique to improve a signal processing system in the same way.

<div align="center">

**gg.**      **TI Reference Frameworks + Zhang (and/or Domer and/or Reuss)**

</div>

To the extent TI Reference Frameworks is deemed to lack sufficient disclosure of limitations relating to determining background noise in a signal, such as claims [1.3] and/or [19.3], a POSITA would have been motivated to combine the teachings of TI Reference Frameworks and Zhang and/or Domer and/or Reuss. TI Reference Frameworks teaches a development and runtime environment for signal processing on TI signal processors, the signal processing including means of echo cancellation and noise reduction (suppression), and including signal processing in a variety of contexts, such as communication devices. *See generally* Sprv040a, Third-Party Listing, RF1, VAB Flyer, EDN 2002. Zhang discloses a noise estimator which detects and measures background noise in the received signal, as well as the use of a reference signal based on the received far-end input and which constitutes background noise to be cancelled during the initial adaptive echo cancellation, if such a cancellation is performed. *See, e.g.*, Zhang at Abstract, 3:37-40, 3:41-47, 5:14-31, 5:65-67, Fig. 1, 8, Claim 1. Similarly, Domer and Reuss disclose determining background noise in a signal. *See, e.g.*, Domer at 5:28-38; 10:5-17; Reuss at 2:31-49, Fig. 3, claim 12. A POSITA would have been motivated to use Zhang's determination of background noise in a signal (and/or that of Domer and/or Reuss) for TI Reference Frameworks because, for example, it involved applying Zhang's (and/or that of Domer and/or Reuss) known technique to TI Reference Frameworks's known system to yield predictable results and use of the known techniques in Zhang (and/or Domer and/or Reuss) to improve a signal processing system in the same way.

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

### hh.   TI Reference Frameworks + Domer (and/or Reuss and/or Zhang)

To the extent TI Reference Frameworks is deemed to lack sufficient disclosure of limitations relating to comparing background noise to a threshold, such as claims [2.2], [12.2], and/or [19.4], a POSITA would have been motivated to combine the teachings of TI Reference Frameworks and Domer, Reuss, and/or Zhang. TI Reference Frameworks teaches a development and runtime environment for signal processing on TI signal processors, the signal processing including means of echo cancellation and noise reduction (suppression), and including signal processing in a variety of contexts, such as communication devices. *See generally* Sprv040a, Third-Party Listing, RF1, VAB Flyer, EDN 2002. Domer discloses detecting background noise and classifying it according to certain noise levels, such as "low noise," "high noise," and "horrid noise," which constitute thresholds to which the measured background noise is compared and specific actions taken based on the level of measured background noise relative to the thresholds. *See, e.g.*, Domer at 10:5-17, 10:18-31, Fig. 8. Similarly, Reuss and Zhang disclose comparing background noise to a threshold. *See, e.g.,* Reuss at 7:24-43, Fig. 2, 3; Zhang at 3:37-40, 5:64-6:17, 11:32-47, 12:11-17, 12:25-36, Fig. 6, 7. A POSITA would have been motivated to use Domer's comparison of background noise in a signal to a threshold (and/or that of Reuss and/or Zhang) for TI Reference Frameworks because, for example, it involved applying Domer's (and/or that of Reuss and/or Zhang) known technique to TI Reference Frameworks's known system to yield predictable results and use of the known techniques in Domer (and/or Reuss and/or Zhang) to improve a signal processing system in the same way.

### ii.   TI Reference Frameworks + Zhang

To the extent TI Reference Frameworks is deemed to lack sufficient disclosure of limitations relating to a noise estimator or basing background noise on an estimated noise level when there is no desired input received at the input of the communication device, such as claims [3], [11.3], and/or [18], a POSITA would have been motivated to combine the teachings of Beaugeant and Zhang. TI Reference Frameworks teaches a development and runtime environment for signal processing on TI signal processors, the signal processing including means of echo cancellation and noise reduction (suppression), and including signal processing in a variety of

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-63-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

contexts, such as communication devices. *See generally* Sprv040a, Third-Party Listing, RF1, VAB Flyer, EDN 2002. Zhang discloses a noise estimator (e.g., 812) and the use of an estimated noise level when no near-end speaker is detected—*i.e.*, no desired input is received at the input to the system. *See, e.g.*, Zhang at 12:47-13:26, Fig. 8. Using TI Reference Frameworks's echo cancellation and noise suppression structures together with Zhang's disclosure of a noise estimator and the use of estimated background noise in the absence of a desired voice input signal would have been obvious to a POSITA because, for example, it would involve applying a known component and technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### jj.    Transceiver

To the extent any reference or combination is deemed to lack sufficient disclosure of a transceiver, that requirement would have been understood by, or at least obvious to, a POSITA. The identified references disclose systems relating to electronic communication devices, which would have been well known to a POSITA at the time of the alleged invention of the '206 patent to conventionally incorporate a transceiver in the normal course, which is reflected in, for example, Reuss. *See, e.g.*, Reuss at 1:28-37, 8:39-45.12:18-24, Fig. 1, 4. Thus, a POSITA would understand that any reference or combination herein could and advantageously would employ a transceiver. In the alternative, modifying a disclosed system to use a transceiver would have been obvious to a POSITA because, for example, it would involve applying a well-known and common component to improve an electronic device or method and simple substitution of one known element for a another to obtain predictable results.

### kk.    Frequency and Time Domain Converters

To the extent any reference or combination is deemed to lack sufficient disclosure of a frequency and/or time domain converter, that requirement would have been understood by, or at least obvious to, a POSITA. The identified references disclose systems relating to electronic communication devices incorporating different forms of signal processing, which would have been well known to a POSITA at the time of the alleged invention of the '206 patent to conventionally incorporate frequency and time domain converters in the normal course, which is also explicitly

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-64-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

reflected in, for example, Zhang. *See, e.g.*, Zhang at 5:48-56, 6:27-35, Fig. 1. Thus, a POSITA would understand that any reference or combination herein could and advantageously would employ frequency and time domain converters. In the alternative, modifying a disclosed system to use a frequency and/or time domain converter would have been obvious to a POSITA because, for example, it would involve applying a well-known and common component to improve an electronic device or method and simple substitution of one known element for a another to obtain predictable results.

**ll.**  **Comparing Background Noise to Threshold**

To the extent any reference or combination is deemed to lack sufficient disclosure of a comparing a noise measurement (*e.g.*, background noise), that requirement would have been understood by, or at least obvious to, a POSITA. The identified references disclose systems relating to electronic communication devices incorporating different forms of signal processing, which would have been well known to a POSITA at the time of the alleged invention of the '206 patent to conventionally incorporate techniques for comparing background noise to thresholds, which is also explicitly reflected in, for example, Domer, Reuss, and Zhang. *See, e.g.*, Domer at 10:5-17, 10:18-31, Fig. 8; Reuss at 7:24-43, Fig. 2, 3; Zhang at 3:37-40, 5:64-6:17, 11:32-47, 12:11-17, 12:25-36, Fig. 6, 7. Thus, a POSITA would understand that any reference or combination herein could and advantageously would employ comparison of background noise to thresholds. In the alternative, modifying a disclosed system to compare background noise to thresholds would have been obvious to a POSITA because, for example, it would involve applying a well-known and common technique to improve an electronic device or method and simple substitution of one known element for a another to obtain predictable results.

**mm.**  **Multi-Channel Noise Suppression Point**

To the extent any reference or combination is deemed to lack sufficient disclosure of a multi-channel noise suppression point, that requirement would have been understood by, or at least obvious to, a POSITA. The identified references disclose systems relating to electronic communication devices incorporating different forms of signal processing, which would have been well known to a POSITA at the time of the alleged invention of the '206 patent to conventionally

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-65-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

incorporate a multi-channel noise suppression point in the normal course when operating in multiple channels, which is also explicitly reflected in, for example, Reuss, Zhang, and Domer. *See, e.g.*, Reuss at Fig. 4; Zhang at 6:5-17, 6:18-35, Fig. 1, Fig. 8; Domer at 4:67-12, Fig. 3, 4, 13. Thus, a POSITA would understand that any reference or combination herein could and advantageously would employ a multi-channel noise suppression point. In the alternative, modifying a disclosed system to use a multi-channel noise suppression point would have been obvious to a POSITA because, for example, it would involve applying a well-known and common technique to improve an electronic device or method and simple substitution of one known element for a another to obtain predictable results.

### D.   '586 Patent

#### 1.   Anticipatory References

Subject to Sonos's reservations of rights and in accordance with Patent L.R. 3-3(b) and 3-3(c), Sonos contends that each of the following prior art references anticipates one or more Asserted Claims of the '586 Patent in accordance with the claim charts attached hereto as Exhibits D-1, D-2, D-4, D-5, D-8, and D-9. The claim charts are based on the constructions of the Asserted Claims of the '586 Patent as advanced by Google in its infringement contentions (insofar as any such claim constructions are evident and/or decipherable from Google's contentions) or in other cases, and not what Sonos contends the claims should mean. The following table lists, on a claim-by-claim basis, which prior art references Sonos contends anticipates which '586 Asserted Claim, as further detailed in Exhibits D-1, D-2, D-4, D-5, D-8, and D-9.

|   | Claim 1 | Claim 2 | Claim 3 | Claim 4 | Claim 5 |
|---|---------|---------|---------|---------|---------|
| 1 | Marman | Marman | Marman | Marman | Marman |
| 2 | McMillin | McMillin | McMillin | McMillin | McMillin |
| 3 | Baker | Baker | Baker | Baker | Baker |
| 4 | Sonos | Sonos | Sonos | Sonos | Sonos |
| 5 | AirPort Express | AirPort Express | AirPort Express | AirPort Express | AirPort Express |
| 6 | WRT54G | WRT54G | WRT54G | WRT54G | WRT54G |

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-66-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| | Claim 7 | Claim 8 | Claim 9 | Claim 10 | Claim 11 |
|---|---|---|---|---|---|
| 1 | Marman | Marman | Marman | Marman | Marman |
| 2 | McMillin | McMillin | McMillin | McMillin | McMillin |
| 3 | Baker | Baker | Baker | Baker | Baker |
| 4 | Sonos | Sonos | Sonos | Sonos | Sonos |
| 5 | AirPort Express | AirPort Express | AirPort Express | AirPort Express | AirPort Express |
| 6 | WRT54G | WRT54G | WRT54G | WRT54G | WRT54G |

| | Claim 12 | Claim 14 | Claim 15 | Claim 16 | Claim 18 |
|---|---|---|---|---|---|
| 1 | Marman | Marman | Marman | Marman | Marman |
| 2 | McMillin | McMillin | McMillin | McMillin | McMillin |
| 3 | Baker | Baker | Baker | Baker | Baker |
| 4 | Sonos | Sonos | Sonos | Sonos | Sonos |
| 5 | AirPort Express | AirPort Express | AirPort Express | AirPort Express | AirPort Express |
| 6 | WRT54G | WRT54G | WRT54G | WRT54G | WRT54G |

| | Claim 20 |
|---|---|
| 1 | Marman |
| 2 | McMillin |
| 3 | Baker |
| 4 | Sonos |
| 5 | AirPort Express |
| 6 | WRT54G |

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-67-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

## 2.    Obviousness Combinations

To the extent that Google contends that any of the references identified as anticipatory references fail to disclose one or more elements, those anticipatory references render the Asserted Claims obvious, either alone or in combination with other references. Sonos contends that one of skill in the art, at the time the alleged inventions were made, would have been motivated to combine the references disclosed herein in such a way as to reach the alleged inventions, as described in further detail below. Sonos presently believes a reasonable basis exists that each of the claims asserted against it would have been obvious to one of ordinary skill in the art at the time of the alleged invention.

Below, Sonos identifies its current bases for obviousness.  As seen below, Sonos presently asserts certain combinations of prior art reference(s) plus the knowledge of one of ordinary skill in the art in situations where Sonos reasonably anticipates Google may argue the reference(s) alone do not disclose every element.  (Sonos offers these combinations without conceding that the reference(s) standing alone are insufficient to invalidate the relevant claims.)  Sonos specifically reserves its rights to combine any of its anticipatory references or any combinations of references *with* the knowledge of ordinary skill in the art to rebut a contention of Google that such reference(s) standing alone do not disclose every element of the Asserted Claims.

Sonos lists below prior art references and combinations of prior art references now known to Sonos, which Sonos contends render at least obvious the '586 Asserted Claims.   The corresponding charts in Exhibits D-1 – D-10 for each prior art reference identifies where and how each alleged item of prior art meets one or more limitations of the Asserted Claims.  Pursuant to Patent Local Rule 3-6, Sonos expressly reserves the right to supplement these charts to provide additional details about obviousness should the Court's claim construction require, or should Google serve adequate Infringement Contentions that better serve to notify Sonos which elements of its products Google contends correspond with the claim elements. Sonos's contention that the references in this section in various combinations render obvious the '586 Asserted Claims under 35 U.S.C. § 103 are in no way an admission or suggestion that each reference does not independently anticipate or render obvious the '586 Asserted Claims under 35 U.S.C. § 102.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-68-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

The following table sets forth which combinations Sonos contends renders obvious specific Asserted Claims of the '586 Patent.  Following the table is a detailed explanation of each proposed combination.

| Claim 1 | Claim 2 | Claim 3 | Claim 4 | Claim 5 |
|---------|---------|---------|---------|---------|
| Marman | Marman | Marman | Marman | Marman |
| Marman + McMillin | Marman + McMillin | Marman + McMillin | Marman + McMillin | Marman + McMillin |
| Marman + Baker | Marman + Baker | Marman + Baker | Marman + Baker | Marman + Baker |
| Marman + Elliot Family of References | Marman + Elliot Family of References | Marman + Elliot Family of References | Marman + Elliot Family of References | Marman + Elliot Family of References |
| Marman + AODV | Marman + AODV | Marman + AODV | Marman + AODV | Marman + AODV |
| Marman + 802.11 Standard | Marman + 802.11 Standard | Marman + 802.11 Standard | Marman + 802.11 Standard | Marman + 802.11 Standard |
| Marman + Garahi | Marman + Garahi | Marman + Garahi | Marman + Garahi | Marman + Garahi |
| McMillin | McMillin | McMillin | McMillin | McMillin |
| McMillin + Baker | McMillin + Baker | McMillin + Baker | McMillin + Baker | McMillin + Baker |
| McMillin + Elliot Family of References | McMillin + Elliot Family of References | McMillin + Elliot Family of References | McMillin + Elliot Family of References | McMillin + Elliot Family of References |
| McMillin + AODV | McMillin + AODV | McMillin + AODV | McMillin + AODV | McMillin + AODV |
| McMillin + Garahi | McMillin + Garahi | McMillin + Garahi | McMillin + Garahi | McMillin + Garahi |
| Baker | Baker | Baker | Baker | Baker |
| Baker + Marman | Baker + Marman | Baker + Marman | Baker + Marman | Baker + Marman |
| Baker + WRT54G | Baker + WRT54G | Baker + WRT54G | Baker + WRT54G | Baker + WRT54G |

| Claim 1 | Claim 2 | Claim 3 | Claim 4 | Claim 5 |
|---------|---------|---------|---------|---------|
| Baker + McMillin | Baker + McMillin | Baker + McMillin | Baker + McMillin | Baker + McMillin |
| Baker + 802.11 Standard | Baker + 802.11 Standard | Baker + 802.11 Standard | Baker + 802.11 Standard | Baker + 802.11 Standard |
| WRT54G | WRT54G | WRT54G | WRT54G | WRT54G |
| WRT54G + McMillin | WRT54G + McMillin | WRT54G + McMillin | WRT54G + McMillin | WRT54G + McMillin |
| WRT54G + Marman | WRT54G + Marman | WRT54G + Marman | WRT54G + Marman | WRT54G + Marman |

| Claim 7 | Claim 8 | Claim 9 | Claim 10 | Claim 11 |
|---------|---------|---------|----------|----------|
| Marman | Marman | Marman | Marman | Marman |
| Marman + McMillin | Marman + McMillin | Marman + McMillin | Marman + McMillin | Marman + McMillin |
| Marman + Baker | Marman + Baker | Marman + Baker | Marman + Baker | Marman + Baker |
| Marman + Elliot Family of References | Marman + Elliot Family of References | Marman + Elliot Family of References | Marman + Elliot Family of References | Marman + Elliot Family of References |
| Marman + AODV | Marman + AODV | Marman + AODV | Marman + AODV | Marman + AODV |
| Marman + 802.11 Standard | Marman + 802.11 Standard | Marman + 802.11 Standard | Marman + 802.11 Standard | Marman + 802.11 Standard |
| Marman + Garahi | Marman + Garahi | Marman + Garahi | Marman + Garahi | Marman + Garahi |
| McMillin | McMillin | McMillin | McMillin | McMillin |
| McMillin + Baker | McMillin + Baker | McMillin + Baker | McMillin + Baker | McMillin + Baker |
| McMillin + Elliot Family of References | McMillin + Elliot Family of References | McMillin + Elliot Family of References | McMillin + Elliot Family of References | McMillin + Elliot Family of References |
| McMillin + AODV | McMillin + AODV | McMillin + AODV | McMillin + AODV | McMillin + AODV |

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 7 | Claim 8 | Claim 9 | Claim 10 | Claim 11 |
|---|---|---|---|---|
| McMillin + Garahi | McMillin + Garahi | McMillin + Garahi | McMillin + Garahi | McMillin + Garahi |
| Baker | Baker | Baker | Baker | Baker |
| Baker + Marman | Baker + Marman | Baker + Marman | Baker + Marman | Baker + Marman |
| Baker + WRT54G | Baker + WRT54G | Baker + WRT54G | Baker + WRT54G | Baker + WRT54G |
| Baker + McMillin | Baker + McMillin | Baker + McMillin | Baker + McMillin | Baker + McMillin |
| Baker + 802.11 Standard | Baker + 802.11 Standard | Baker + 802.11 Standard | Baker + 802.11 Standard | Baker + 802.11 Standard |
| WRT54G | WRT54G | WRT54G | WRT54G | WRT54G |
| WRT54G + McMillin | WRT54G + McMillin | WRT54G + McMillin | WRT54G + McMillin | WRT54G + McMillin |
| WRT54G + Marman | WRT54G + Marman | WRT54G + Marman | WRT54G + Marman | WRT54G + Marman |

| Claim 12 | Claim 14 | Claim 15 | Claim 16 | Claim 18 |
|---|---|---|---|---|
| Marman | Marman | Marman | Marman | Marman |
| Marman + McMillin | Marman + McMillin | Marman + McMillin | Marman + McMillin | Marman + McMillin |
| Marman + Baker | Marman + Baker | Marman + Baker | Marman + Baker | Marman + Baker |
| Marman + Elliot Family of References | Marman + Elliot Family of References | Marman + Elliot Family of References | Marman + Elliot Family of References | Marman + Elliot Family of References |
| Marman + AODV | Marman + AODV | Marman + AODV | Marman + AODV | Marman + AODV |
| Marman + 802.11 Standard | Marman + 802.11 Standard | Marman + 802.11 Standard | Marman + 802.11 Standard | Marman + 802.11 Standard |
| Marman + Garahi | Marman + Garahi | Marman + Garahi | Marman + Garahi | Marman + Garahi |
| McMillin | McMillin | McMillin | McMillin | McMillin |

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-71-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 12 | Claim 14 | Claim 15 | Claim 16 | Claim 18 |
|---|---|---|---|---|
| McMillin + Baker | McMillin + Baker | McMillin + Baker | McMillin + Baker | McMillin + Baker |
| McMillin + Elliot Family of References | McMillin + Elliot Family of References | McMillin + Elliot Family of References | McMillin + Elliot Family of References | McMillin + Elliot Family of References |
| McMillin + AODV | McMillin + AODV | McMillin + AODV | McMillin + AODV | McMillin + AODV |
| McMillin + Garahi | McMillin + Garahi | McMillin + Garahi | McMillin + Garahi | McMillin + Garahi |
| Baker | Baker | Baker | Baker | Baker |
| Baker + Marman | Baker + Marman | Baker + Marman | Baker + Marman | Baker + Marman |
| Baker + WRT54G | Baker + WRT54G | Baker + WRT54G | Baker + WRT54G | Baker + WRT54G |
| Baker + McMillin | Baker + McMillin | Baker + McMillin | Baker + McMillin | Baker + McMillin |
| Baker + 802.11 Standard | Baker + 802.11 Standard | Baker + 802.11 Standard | Baker + 802.11 Standard | Baker + 802.11 Standard |
| WRT54G | WRT54G | WRT54G | WRT54G | WRT54G |
| WRT54G + McMillin | WRT54G + McMillin | WRT54G + McMillin | WRT54G + McMillin | WRT54G + McMillin |
| WRT54G + Marman | WRT54G + Marman | WRT54G + Marman | WRT54G + Marman | WRT54G + Marman |

| Claim 20 |
|---|
| Marman |
| Marman + McMillin |
| Marman + Baker |
| Marman + Elliot Family of References |

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-72-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

| Claim 20 |
|---|
| Marman + AODV |
| Marman + 802.11 Standard |
| Marman + Garahi |
| McMillin |
| McMillin + Baker |
| McMillin + Elliot Family of References |
| McMillin + AODV |
| McMillin + Garahi |
| Baker |
| Baker + Marman |
| Baker + WRT54G |
| Baker + McMillin |
| Baker + 802.11 Standard |
| WRT54G |
| WRT54G + McMillin |
| WRT54G + Marman |

### a.    Marman + Knowledge of a POSITA

To the extent Marman is deemed to lack sufficient disclosure of limitations relating to receiving and relaying communication packets with an integrity portion, or an audio-enabled

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-73-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

device having an Ethernet network connection for communicating via the Internet, such as claims [1.10], [7], [9.6], [15.9] and/or [16], those limitations would have been understood by, or at least obvious to, a POSITA from the cited disclosures.  Marman teaches a wireless alarm system that contains smoke detectors, base stations, and other sensors that communicate with one another via two-way transceivers.  *See, e.g.*, Marman at Abstract, 7:66-8:8; *see generally* Exhibit D-1. Including an integrity portion in a data packet was known to a POSITA at the time of the alleged invention of the '586 patent as reflected in, for example, McMillin, the Elliot Family of References, Baker, and the 802.11 Standard.  For example, it was well known that an integrity portion would be beneficial to add to a data packet for error detection and to insulate against packet tampering. Thus, modifying the data packets received and relayed by Marman to include an integrity portion would have been obvious to a POSITA because, for example, it would involve applying known methods of error and tamper detection to yield predictable results and using known techniques of error and tamper detection to improve the performance of Marman's system in the same way. Further, including an Ethernet network interface onto a wireless device was known to a POSITA at the time of the alleged invention of the '586 patent as reflected in, for example, Elliot, Baker, and Garahi.  For example, it was well known that an Ethernet network interface would provide access to a wired network to communicate via the Internet, which could increase the speed and reliability at which data packets are received and relayed.  Thus, modifying the smoke detectors and/or base station in Marman to include an Ethernet network interface would have been obvious to a POSITA because, for example, it would involve applying known methods of networking to yield predictable results and using known techniques of networking to improve the performance of Marman's system in the same way.

### b.     Marman + McMillin

To the extent Marman is deemed to lack sufficient disclosure of limitations relating to receiving and relaying communication packets with an integrity portion, or an audio-enabled device having an Ethernet network connection for communicating via the Internet, such as claims [1.10], [7], [9.6], [15.9] and/or [16], a POSITA would have been motivated to combine the teachings of Marman and McMillin.  Marman teaches a wireless alarm system that contains smoke

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-74-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

detectors, base stations, and other sensors that communicate with one another via two-way transceivers. *See, e.g.*, Marman at Abstract, 7:66-8:8; *see generally* Exhibit D-1. McMillin discloses a system of devices that receive and route data packets from one node to a subsequent node. *See, e.g.*, McMillin at Abstract; *see generally* Exhibit D-2. McMillin also discloses that the data packets include an integrity portion, in the form of a 2 byte cyclic redundancy cheque (CRC) for error detection. *See, e.g.*, McMillin at 63:29-64:59. McMillin further discloses that devices operating within the McMillin system are capable of providing gateway services via wired local area networks. *See, e.g.*, McMillin at 7:27-39. Using McMillin's teaching of error detection in Marman's system would have been obvious to a POSITA because, for example, it would involve applying a known technique (McMillin's error detection) to improve similar systems (Marman's system) to yield predictable results. Further, using McMillin's teaching of providing gateway services via wired local area networks in Marman's system would have been obvious to a POSITA because, for example, it would involve applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### c.   Marman + Baker

To the extent Marman is deemed to lack sufficient disclosure of limitations relating to receiving and relaying communication packets with an integrity portion, or an audio-enabled device having an Ethernet network connection for communicating via the Internet, such as claims claims [1.10], [7], [9.6], [15.9] and/or [16], a POSITA would have been motivated to combine the teachings of Marman and Baker. Marman teaches a wireless alarm system that contains smoke detectors, base stations, and other sensors that communicate with one another via two-way transceivers. *See, e.g.*, Marman at Abstract, 7:66-8:8; *see generally* Exhibit D-1. Baker discloses an ultra-wideband (UWB) network of devices, each of which form a node of the network and are capable of receiving and relaying data packets on the network. *See, e.g.*, Baker at Abstract, ¶60; *see generally* Exhibit D-5. Baker also discloses that the data packets include an integrity portion, in the form of a cyclic redundancy cheque (CRC) for error detection. *See, e.g.*, Baker at ¶60. Baker further discloses devices that include an Ethernet interface that facilitate communication

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-75-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

via the Internet.  *See, e.g.*, Baker at ¶41.  Using Baker's teaching of error detection in Marman's system would have been obvious to a POSITA because, for example, it would involve applying a known technique (Baker's error detection) to improve similar systems (Marman's system) to yield predictable results.  Further, using Baker's teaching of using an Ethernet interface in Marman's system would have been obvious to a POSITA because, for example, it would involve applying a known technique to improve similar systems in the same way and simple substitution of one known element for another to obtain predictable results.

### d.    Marman + Elliot Family of References

To the extent Marman is deemed to lack sufficient disclosure of limitations relating to receiving and relaying communication packets with an integrity portion, or an audio-enabled device having an Ethernet network connection for communicating via the Internet, such as claims [1.10], [7], [9.6], [15.9] and/or [16], a POSITA would have been motivated to combine the teachings of Marman and the Elliot Family of References.  Marman teaches a wireless alarm system that contains smoke detectors, base stations, and other sensors that communicate with one another via two-way transceivers.  *See, e.g.*, Marman at Abstract, 7:66-8:8; *see generally* Exhibit D-1.  The Elliot Family of References disclose an ad hoc network of devices ("nodes") that send and receive data packets.  *See, e.g.*, Elliot '501 at 4:18-26, Elliot '139 at 16:36-50, Elliot '257 at 4:34-45; *see generally* Exhibit D-3.  The Elliot Family of References also disclose that the data packets include an integrity portion in the form of an error correction field.  *See, e.g.*, Elliot '257 at 12:8-10, Elliot '139 at 11:60-12:2.  The Elliot Family of References further disclose that the devices can include interfaces that facilitate communication via wired networks.  *See, e.g.*, Elliot '257 at 5:50-59, Elliot '139 at 7:52-62.  Using the Elliot Family of References teaching of using an error correct field in Marman's system would have been obvious to a POSITA because, for example, it would involve applying a known technique (Elliot Family of References' error correction) to improve similar systems (Marman's system) to yield predictable results.  Further, using the Elliot Family of References' teaching of using a network interface that facilitates wired connections in Marman's system would have been obvious to a POSITA because, for example, it would involve applying a known technique to improve similar systems in the same way and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

1    simple substitution of one known element for another to obtain predictable results.

2    **e.      Marman + AODV**

3    To the extent Marman is deemed to lack sufficient disclosure of limitations relating to

4    receiving and relaying communication packets with an integrity portion, or an audio-enabled

5    device having an Ethernet network connection for communicating via the Internet, such as claims

6    [1.10], [7], [9.6], [15.9] and/or [16], a POSITA would have been motivated to combine the

7    teachings of Marman and AODV.  Marman teaches a wireless alarm system that contains smoke

8    detectors, base stations, and other sensors that communicate with one another via two-way

9    transceivers.  *See, e.g.*, Marman at Abstract, 7:66-8:8; *see generally* Exhibit D-1.  AODV

10   discloses dynamic, self-starting, multihop routing between participating mobile nodes of an ad

11   hoc network.  *See, e.g.*, AODV at pp. 2, 6, 23; *see generally* Exhibit D-7.  AODV also discloses

12   generating a route error message if a node determines no active route is available for which to

13   relay a data packet.  *See, e.g.*, AODV at p. 7.  AODV further discloses that AODV can be

14   implemented over wired networks via Ethernet.  *See, e.g.*, AODV at p. 28.  Using AODV's

15   teaching of error detection in Marman's system would have been obvious to a POSITA because,

16   for example, it would involve applying a known technique (AODV's error detection) to improve

17   similar systems (Marman's system) to yield predictable results.  Further, using AODV's teaching

18   of sending data packets over wired networks via Ethernet in Marman's system would have been

19   obvious to a POSITA because, for example, it would involve applying a known technique to

20   improve similar systems in the same way and simple substitution of one known element for

21   another to obtain predictable results.

22   **f.      Marman + 802.11 Standard**

23   To the extent Marman is deemed to lack sufficient disclosure of limitations relating to

24   receiving and relaying communication packets with an integrity portion, such as claims [1.10],

25   [9.6], and/or [15.9], a POSITA would have been motivated to combine the teachings of Marman

26   and the 802.11 Standard.  Marman teaches a wireless alarm system that contains smoke detectors,

27   base stations, and other sensors that communicate with one another via two-way transceivers.

28   *See, e.g.*, Marman at Abstract, 7:66-8:8; *see generally* Exhibit D-1.  The 802.11 Standard

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-77-                                    SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

discloses a set of local area network (LAN) protocols, and specifies the set of media access control (MAC) and physical layer (PHY) protocols for implementing wireless local area network (WLAN) Wi-Fi computer communication in various frequencies. *See, e.g.*, 802.11 Standard at p. 2; *see generally* Exhibit D-10. The 802.11 Standard also discloses data frame formats that include a cyclic redundancy code (CRC) for error detection. *See e.g.*, p. 34. Using the 802.11 Standard's teaching of using CRC for error detection Marman's system would have been obvious to a POSITA because, for example, it would involve applying a known technique (802.11 Standard's error detection) to improve similar systems (Marman's system) to yield predictable results.

### g.      **Marman + Garahi**

To the extent Marman is deemed to lack sufficient disclosure of limitations relating to an audio-enabled device having an Ethernet network connection for communicating via the Internet, such as claims [7] and/or [16], a POSITA would have been motivated to combine the teachings of Marman and Garahi. Marman teaches a wireless alarm system that contains smoke detectors, base stations, and other sensors that communicate with one another via two-way transceivers. *See, e.g.*, Marman at Abstract, 7:66-8:8; *see generally* Exhibit D-1. Garahi discloses a system and method for enabling a node in a wireless communications network to route data packets to other nodes in the network based on the information contained in the data packets. *See, e.g.*, Garahi at Abstract, 3:7-13; *see generally* Exhibit D-6. Garahi also discloses connecting wireless nodes to a fixed network to provide the nodes with access to the Internet. *See, e.g.*, Garahi at 3:27-40. Using Garahi's teaching of connecting wireless nodes to a fixed network in Marman's system would have been obvious to a POSITA because, for example, it would involve applying a known technique (Garahi's connection to a fixed network) to improve similar systems (Marman's system) to yield predictable results.

### h.      **McMillin + Knowledge of a POSITA**

To the extent McMillin is deemed to lack sufficient disclosure of limitations relating to an audio-enabled device having an Ethernet network connection for communicating via the Internet, and/or the audio-enabled device having a reset element that is a reset switch that is configured to

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-78-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

activate a reset function, such as claims [7], [8], [14], and [16], those limitations would have been understood by, or at least obvious to, a POSITA from the cited disclosures. McMillin discloses a system of devices that receive and route data packets from one node to a subsequent node. *See, e.g.*, McMillin at Abstract; *see generally* Exhibit D-2. Modifying an audio-enabled device to include an Ethernet network connection for communication via the Internet was known to a POSITA at the time of the alleged invention of the '586 patent as reflected in, for example, Elliot, Baker, Garahi. For example, it was well known that an Ethernet network connection could provide access to a wired network to communicate via the Internet, which could increase the speed and reliability at which data packets are received and relayed. Thus, modifying the devices in McMillin to include an Ethernet network connection to communicate via the Internet would have been obvious to a POSITA because, for example, it would involve applying known methods of networking to yield predictable results and using known techniques of networking to improve the performance of McMillin's system in the same way. Further, including a reset element that is a reset switch that is configured to activate a reset function in an audio-enabled wireless device was known to a POSITA at the time of the alleged invention of the '586 patent as reflected in, for example, Marman and WRT54G. For example, it was well known that implementing a reset switch configured to activate a reset function could facilitate resetting a device to improve functionality or user-friendliness by returning a device to default settings. Thus, modifying the devices in McMillin to include a reset switch configured to activate a reset function would have been obvious to a POSITA because, for example, it would involve applying known methods of reset functionality to yield predictable results and using known techniques of reset functionality to improve the performance of McMillin's system in the same way.

### i. McMillin + Baker

To the extent McMillin is deemed to lack sufficient disclosure of limitations relating to an audio-enabled device having an Ethernet network connection for communicating via the Internet, such as claims [7] and/or [16], a POSITA would have been motivated to combine the teachings of McMillin and Baker. McMillin discloses a system of devices that receive and route data packets

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-79-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

1   from one node to a subsequent node.  *See, e.g.*, McMillin at Abstract; *see generally* Exhibit D-2.

2   Baker discloses an ultra-wideband (UWB) network of devices, each of which form a node of the

3   network and are capable of receiving and relaying data packets on the network.  *See, e.g.*, Baker

4   at Abstract, ¶60; *see generally* Exhibit D-5.  Baker also discloses devices that include an Ethernet

5   interface that facilitate communication via the Internet.  *See, e.g.*, Baker at ¶41.  Using Baker's

6   teaching of using an Ethernet interface in Marman's system would have been obvious to a

7   POSITA because, for example, it would involve applying a known technique to improve similar

8   systems in the same way and simple substitution of one known element for another to obtain

9   predictable results.

10              **j.       McMillin + Elliot Family of References**

11          To the extent McMillin is deemed to lack sufficient disclosure of limitations relating to an

12   audio-enabled device having an Ethernet network connection for communicating via the Internet,

13   such as claims [7] and/or [16], a POSITA would have been motivated to combine the teachings of

14   McMillin and the Elliot Family of References.  McMillin discloses a system of devices that

15   receive and route data packets from one node to a subsequent node.  *See, e.g.*, McMillin at

16   Abstract; *see generally* Exhibit D-2.  The Elliot Family of References disclose an ad hoc network

17   of devices ("nodes") that send and receive data packets.  *See, e.g.*, Elliot '501 at 4:18-26, Elliot

18   '139 at 16:36-50, Elliot '257 at 4:34-45; *see generally* Exhibit D-3.  The Elliot Family of

19   References also disclose that the devices can include interfaces that facilitate communication via

20   wired networks.  *See, e.g.*, Elliot '257 at 5:50-59, Elliot '139 at 7:52-62.  Using the Elliot Family

21   of References' teaching of using a network interface that facilitates wired connections in

22   McMillin's system would have been obvious to a POSITA because, for example, it would involve

23   applying a known technique to improve similar systems in the same way and simple substitution

24   of one known element for another to obtain predictable results.

25              **k.       McMillin + AODV**

26          To the extent McMillin is deemed to lack sufficient disclosure of limitations relating to an

27   audio-enabled device having an Ethernet network connection for communicating via the Internet,

28   such as claims [7] and/or [16], a POSITA would have been motivated to combine the teachings of

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-80-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

1  McMillin and the AODV.  McMillin discloses a system of devices that receive and route data

2  packets from one node to a subsequent node.  *See, e.g.*, McMillin at Abstract; *see generally*

3  Exhibit D-2.  AODV discloses dynamic, self-starting, multihop routing between participating

4  mobile nodes of an ad hoc network.  *See, e.g.*, AODV at pp. 2, 6, 23; *see generally* Exhibit D-7.

5  AODV also discloses that AODV can be implemented over wired networks via Ethernet.  *See,*

6  *e.g.*, AODV at p. 28.  Using AODV's teaching of sending data packets over wired networks via

7  Ethernet in Marman's system would have been obvious to a POSITA because, for example, it

8  would involve applying a known technique to improve similar systems in the same way and

9  simple substitution of one known element for another to obtain predictable results.

10  <div align="center">**l.**     **McMillin + Garahi**</div>

11       To the extent McMillin is deemed to lack sufficient disclosure of limitations relating to an

12  audio-enabled device having an Ethernet network connection for communicating via the Internet,

13  such as claims [7] and/or [16], a POSITA would have been motivated to combine the teachings of

14  McMillin and Garahi.  McMillin discloses a system of devices that receive and route data packets

15  from one node to a subsequent node.  *See, e.g.*, McMillin at Abstract; *see generally* Exhibit D-2.

16  Garahi discloses a system and method for enabling a node in a wireless communications network

17  to route data packets to other nodes in the network based on the information contained in the data

18  packets.  *See, e.g.*, Garahi at Abstract, 3:7-13; *see generally* Exhibit D-6.  Garahi also discloses

19  connecting wireless nodes to a fixed network to provide the nodes with access to the Internet.

20  *See, e.g.*, Garahi at 3:27-40.  Using Garahi's teaching of connecting wireless nodes to a fixed

21  network in Marman's system would have been obvious to a POSITA because, for example, it

22  would involve applying a known technique (Garahi's connection to a fixed network) to improve

23  similar systems (Marman's system) to yield predictable results.

24  <div align="center">**m.**     **Baker + Knowledge of a POSITA**</div>

25       To the extent Baker is deemed to lack sufficient disclosure of limitations relating to an

26  audio-enabled device having a reset element, the audio-enabled device having a reset element that

27  is a reset switch that is configured to activate a reset function, an audio-enabled device having a

28  controller that is configured to, prior to the relay of the communication packet, (i) listen to a radio

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-81-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

frequency channel to determine the radio frequency channel is not in use by another device, (ii) determine a random delay value, and (iii) wait the determined random delay value before transmission of the communication packet, such as claims [1.4], [2], [3], [4], [8], [9.7], [10], [11], [12], [14], [15.3], [16], [18], and [20], those limitations would have been understood by, or at least obvious to, a POSITA from the cited disclosures.  Baker discloses an ultra-wideband (UWB) network of devices, each of which form a node of the network and are capable of receiving and relaying data packets on the network.  *See, e.g.*, Baker at Abstract, ¶60; *see generally* Exhibit D-5.  Including a reset element that is a reset switch that is configured to activate a reset function in an audio-enabled wireless device was known to a POSITA at the time of the alleged invention of the '586 patent as reflected in, for example, Marman and WRT54G.  For example, it was well known that implementing a reset switch configured to activate a reset function could facilitate resetting a device to improve functionality or user-friendliness by returning a device to default settings.  Thus, modifying the devices in Baker to include a reset switch configured to activate a reset function would have been obvious to a POSITA because, for example, it would involve applying known methods of reset functionality to yield predictable results and using known techniques of reset functionality to improve the performance of Baker's system in the same way.  Further, having a device (i) listen to a radio frequency channel to determine the radio frequency channel is not in use by another device, (ii) determine a random delay value, and (iii) wait the determined random delay value before transmission of the communication packet was known to a POSITA at the time of the alleged invention of the '586 patent as reflected in, for example, Marman, McMillin, and the 802.11 Standard.  For example, it was well known that (i) listening to a radio frequency channel to determine the radio frequency channel is not in use by another device, (ii) determining a random delay value, and (iii) waiting the determined random delay value before transmission of the communication packet could be used to avoid packet collision and therefore increase the success rate of packet transmissions.  Thus, modifying the devices in Baker to (i) listen to a radio frequency channel to determine the radio frequency channel is not in use by another device, (ii) determine a random delay value, and (iii) wait the determined random delay value before transmission of the communication packet would have been obvious to a

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

POSITA because, for example, it would involve applying known methods of message collision

avoidance to yield predictable results and using known techniques of message collision avoidance

to improve the performance of Baker's system in the same way.

### n.     **Baker + Marman**

To the extent Baker is deemed to lack sufficient disclosure of limitations relating to an

audio-enabled device having a reset element, the audio-enabled device having a reset element that

is a reset switch that is configured to activate a reset function, an audio-enabled device having a

controller that is configured to, prior to the relay of the communication packet, (i) listen to a radio

frequency channel to determine the radio frequency channel is not in use by another device, (ii)

determine a random delay value, and (iii) wait the determined random delay value before

transmission of the communication packet, such as claims [1.4], [2], [3], [4], [8], [9.7], [10], [11],

[12], [14], [15.3], [16], [18], and [20], a POSITA would have been motivated to combine the

teachings of Baker and Marman.  Baker discloses an ultra-wideband (UWB) network of devices,

each of which form a node of the network and are capable of receiving and relaying data packets

on the network.  *See, e.g.*, Baker at Abstract, ¶60; *see generally* Exhibit D-5.  Marman teaches a

wireless alarm system that contains smoke detectors, base stations, and other sensors that

communicate with one another via two-way transceivers.  *See, e.g.*, Marman at Abstract, 7:66-

8:8; *see generally* Exhibit D-1.  Marman also discloses an alarm/verification switch that is

configured to cause a restore/reset message to be sent to one or more of the smoke detectors in

Marman's system.  *See, e.g.*, Marman at 9:48-58.  Marman further discloses message collision

mitigation by verifying a channel is clear before transmitting a message and, if the channel is not

clear, waiting a random delay before transmitting the message.  *See, e.g.*, Marman at 21:60-22:2,

29:19-34.  Using Marman's teaching of a verification switch that sends a reset message in

Baker's system would have been obvious to a POSITA because, for example, it would involve

applying a known technique (Marman's reset functionality) to improve similar systems (Baker's

system) to yield predictable results.  Further, using Marman's teaching of message collision

avoidance in Baker's system would have been obvious to a POSITA because, for example, it

would involve applying a known technique to improve similar systems in the same way and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-83-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

1   simple substitution of one known element for another to obtain predictable results.

2   **o.**      **Baker + WRT54G**

3   To the extent Baker is deemed to lack sufficient disclosure of limitations relating to an

4   audio-enabled device having a reset element, the audio-enabled device having a reset element that

5   is a reset switch that is configured to activate a reset function, an audio-enabled device having a

6   controller that is configured to, prior to the relay of the communication packet, such as claims

7   [1.4], [8], [9.7], [14], and [15.3], a POSITA would have been motivated to combine the teachings

8   of Baker and WRT54G.  Baker discloses an ultra-wideband (UWB) network of devices, each of

9   which form a node of the network and are capable of receiving and relaying data packets on the

10  network.  *See, e.g.*, Baker at Abstract, ¶60; *see generally* Exhibit D-5.  WRT54G discloses a

11  broadband wireless router configured for bidirectional wireless communication in a wireless

12  network.  *See, e.g.,* WRT54G User Guide at p. 1.  WRT54G also discloses a wireless router that

13  includes a reset button configured to reset the router to factory default settings.  *See, e.g.*,

14  WRT54G User Guide at p. 6.  Using WRT54G's teaching of a reset button in Baker's system

15  would have been obvious to a POSITA because, for example, it would involve applying a known

16  technique (WRT54G's reset functionality) to improve similar systems (Baker's system) to yield

17  predictable results.

18  **p.**      **Baker + McMillin**

19  To the extent Baker is deemed to lack sufficient disclosure of limitations relating to an

20  audio-enabled device having a controller that is configured to, prior to the relay of the

21  communication packet, (i) listen to a radio frequency channel to determine the radio frequency

22  channel is not in use by another device, (ii) determine a random delay value, and (iii) wait the

23  determined random delay value before transmission of the communication packet, such as claims

24  [2], [3], [4], [10], [11], [12], [14], [18], and [20], a POSITA would have been motivated to

25  combine the teachings of Baker and McMillin.  Baker discloses an ultra-wideband (UWB)

26  network of devices, each of which form a node of the network and are capable of receiving and

27  relaying data packets on the network.  *See, e.g.*, Baker at Abstract, ¶60; *see generally* Exhibit D-

28  5.  McMillin discloses a system of devices that receive and route data packets from one node to a

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-84-                SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

1  subsequent node.  *See, e.g.*, McMillin at Abstract; *see generally* Exhibit D-2.  McMillin further

2  discloses message collision mitigation by verifying a channel is clear before transmitting a

3  message and, if the channel is not clear, waiting a random delay before transmitting the message.

4  *See, e.g.*, McMillin at 16:44-17:7.  Using McMillin's teaching of message collision avoidance in

5  Baker's system would have been obvious to a POSITA because, for example, it would involve

6  applying a known technique to improve similar systems in the same way and simple substitution

7  of one known element for another to obtain predictable results.

8  <div align="center">**q.**      **Baker + 802.11 Standard**</div>

9          To the extent Baker is deemed to lack sufficient disclosure of limitations relating to an

10  audio-enabled device having a controller that is configured to, prior to the relay of the

11  communication packet, (i) listen to a radio frequency channel to determine the radio frequency

12  channel is not in use by another device, (ii) determine a random delay value, and (iii) wait the

13  determined random delay value before transmission of the communication packet, such as claims

14  [2], [3], [4], [10], [11], [12], [14], [18], and [20], a POSITA would have been motivated to

15  combine the teachings of Baker and the 802.11 Standard.  Baker discloses an ultra-wideband

16  (UWB) network of devices, each of which form a node of the network and are capable of

17  receiving and relaying data packets on the network.  *See, e.g.*, Baker at Abstract, ¶60; *see*

18  *generally* Exhibit D-5.  The 802.11 Standard discloses a set of local area network (LAN)

19  protocols, and specifies the set of media access control (MAC) and physical layer (PHY)

20  protocols for implementing wireless local area network (WLAN) Wi-Fi computer communication

21  in various frequencies.  *See, e.g.*, 802.11 Standard at p. 2; *see generally* Exhibit D-10.  The

22  802.11 Standard also discloses using carrier sense multiple access (CSMA) for message collision

23  avoidance.  *See, e.g.*, 802.11 Standard at pp. 71, 77, and 78.  Using the 802.11 Standard's

24  teaching of CSMA in Baker's system would have been obvious to a POSITA because, for

25  example, it would involve applying a known technique to improve similar systems in the same

26  way and simple substitution of one known element for another to obtain predictable results.

27  <div align="center">**r.**      **WRT54G + Knowledge of a POSITA**</div>

28          To the extent the WRT54G is deemed to lack sufficient disclosure of limitations relating

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-85-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

1  to an audio-enabled device having an audio output element, such as claims [1.3], [9.7], and

2  [15.4], those limitations would have been understood by, or at least obvious to, a POSITA from

3  the cited disclosures.  WRT54G discloses a broadband wireless router configured for bidirectional

4  wireless communication in a wireless network.  *See, e.g.,* WRT54G User Guide at p. 1; *see*

5  *generally* Exhibit D-9.  Including an audio output element was known to a POSITA at the time of

6  the alleged invention of the '586 patent as reflected in, for example, Marman and McMillin.  For

7  example, it was well known that implementing an audio output element could facilitate a better

8  user experience by providing audible notifications.  Thus, modifying the WRT54G to include an

9  audio output element would have been obvious to a POSITA because, for example, it would

10  involve applying known methods of user notifications to yield predictable results and using

11  known techniques of user notifications to improve the performance of the WRT54G's system in

12  the same way.

13      **s.**  **WRT54G + McMillin**

14     To the extent the WRT54G is deemed to lack sufficient disclosure of limitations relating

15  to an audio-enabled device having an audio output element, such as claims [1.3], [9.7], and

16  [15.4], a POSITA would have been motivated to combine the teachings of the WRT54G and

17  McMillin.  WRT54G discloses a broadband wireless router configured for bidirectional wireless

18  communication in a wireless network.  *See, e.g.,* WRT54G User Guide at p. 1; *see generally*

19  Exhibit D-9.  McMillin discloses a system of devices that receive and route data packets from one

20  node to a subsequent node.  *See, e.g.*, McMillin at Abstract; *see generally* Exhibit D-2.  McMillin

21  further discloses devices having audio output elements that facilitate verbal announcements,

22  alarms, and buzzers.  *See, e.g.*, McMillin at 48:51-54, 49:12-15.  Using McMillin's teaching of an

23  audio output element in WRT54G's system would have been obvious to a POSITA because, for

24  example, it would involve applying a known technique (McMillin's announcement functionality)

25  to improve similar systems (WRT54G's system) to yield predictable results.

26      **t.**  **WRT54G + Marman**

27     To the extent the WRT54G is deemed to lack sufficient disclosure of limitations relating

28  to an audio-enabled device having an audio output element, such as claims [1.3], [9.7], and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-86-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

[15.4], a POSITA would have been motivated to combine the teachings of the WRT54G and Marman.  WRT54G discloses a broadband wireless router configured for bidirectional wireless communication in a wireless network.  *See, e.g.,* WRT54G User Guide at p. 1; *see generally* Exhibit D-9.  Marman teaches a wireless alarm system that contains smoke detectors, base stations, and other sensors that communicate with one another via two-way transceivers.  *See, e.g.*, Marman at Abstract, 7:66-8:8; *see generally* Exhibit D-1.  Marman also discloses sounders that are actuated when an alarm is activated, generating sound.  *See, e.g.,* Marman at 9:58-65, 10:29-32, and 11:53-57.  Using Marman's teaching of an audio output element in WRT54G's system would have been obvious to a POSITA because, for example, it would involve applying a known technique (McMillin's alarm functionality) to improve similar systems (WRT54G's system) to yield predictable results.

## V.   PATENT L.R. 3-3(C)

Sonos provides herewith as Exhibits A-D claim charts identifying where and how specifically in each prior art reference each element of each asserted claim is found, including for each element that Sonos contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function.  Where Sonos cites to a particular figure in a prior art reference, the citation should be understood to encompass, in addition to the figure itself, the caption and description of the figure as well as any text relating to the figure. Conversely, where a cited portion of text refers to a figure, the citation should be understood to include the figure as well.

Sonos has endeavored to identify portions of the charted prior art that disclose each element of the Asserted Claims of the Patents-in-Suit as required by Patent L.R. 3-3(C). However, the prior art may contain additional disclosure for a particular claim element. To avoid excessive, cumulative citations, Sonos identifies portions of prior art references sufficient to show how the reference discloses the claimed feature. However, Sonos may point to additional evidence from the reference to support its contention that the cited passage discloses the claimed limitation. Persons of ordinary skill in the art of the Patents-in-Suit would determine what is described, disclosed, suggested, and taught by these items of prior art based on the prior art reference as a

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-87-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

whole and in the context of relevant publications and literature in the art. Moreover, to understand and interpret any specific description, disclosure, or teaching of an item of prior art, such persons would rely on other information within the prior art item along with other prior art publications and their general scientific or engineering knowledge.

## VI.    PATENT L.R. 3-3(D)

### A.    Grounds Of Invalidity Under 35 U.S.C. § 112

Sonos lists below the grounds upon which it contends the Asserted Claims of the Patents-in-Suit are invalid for failure to meet one or more of the requirements of 35 U.S.C. § 112[4]. A more detailed basis for Sonos's written description, enablement, indefiniteness, and/or "best mode" defenses will be set forth in Sonos's expert reports on invalidity, to be served in accordance with the Court's Case Management Order. Sonos has not yet taken any depositions related to these issues. Sonos specifically reserves the right to amend and/or supplement these Invalidity Contentions based on subsequently discovered information.

Sonos contends that Plaintiff's apparent claim constructions in its infringement contentions render the Asserted Claims overly broad in scope and unreasonably uncertain, vague and ambiguous as specifically described below. Plaintiff is attempting to construe the Asserted Claims in a manner that is inconsistent with the claims themselves, written specifications, prosecution histories, understanding of one of ordinary skill in the art, and other extrinsic evidence.

As further described below, certain Asserted Claims are invalid because the specifications of the Patents-in-Suit do not include sufficient written description of the purported inventions allegedly claimed in the Patents-in-Suit, and the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use any of the allegedly claimed inventions, 35 U.S.C. § 112, ¶ 1. Moreover, the patent applications that issued as the Patents-in-Suit did not contain a written description of the purported invention sufficiently clear and complete to enable one of ordinary skill in the art to which the purported invention pertains to make and use the invention as claimed without undue experimentation. *Id.* Certain Asserted Claims are also

---

[4] Sonos is referencing to pre-AIA 35 U.S.C. §112.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-88-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

invalid under 35 U.S.C. § 112, ¶ 1 because their full scope is not enabled by the specifications of the relevant Patents-in-Suit. Certain Asserted Claims are also invalid under 35 U.S.C. § 112, ¶ 1 because there is insufficient written description of the invention to demonstrate that purported inventor(s) of the Asserted Claims possessed the inventions set forth in the Asserted Claims.

Certain Asserted Claims are also invalid because the claims do not particularly point out and distinctly claim the subject matter which the applicant(s) regard as the invention as required by 35 U.S.C. § 112, ¶ 2.

### 1.       '187 Patent

#### a.       Ground A

To the extent Google challenges the sufficiency of Sonos's anticipatory or obviousness grounds, independent claims 1 and 10, and the claims that depend thereon, are invalid under 35 U.S.C. § 112 ¶ 1 for lacking enablement and written description.  Specifically, independent claims 1 and 10 recite "the private key is based on the domain information."  To the extent Google contends that these claims require any implementation detail or specific algorithm as to *how* a private key relates to the domain information, the '187 Patent contains no disclosure describing or enabling such a requirement.

#### b.       Ground B

Independent claims 1—to the extent the preamble of claim 1 is determined to be limiting— and claim 10, and the claims that depend thereon, are invalid under 35 U.S.C. § 112 ¶ 1 for lacking enablement and written description.  Specifically, independent claims 1 and 10 recite "domain of devices, which share rights associated with a common account."  There is no disclosure in the '187 Patent that adequately describes nor enables such a functionality.

#### c.       Ground C

Independent claims 1 and 10, and the claims that depend thereon, are invalid under 35 U.S.C. § 112 ¶ 1 for lacking enablement and written description.  Specifically, claims 1 and 10 include the limitation "key issuer, which is separate from the domain of devices."  There is no disclosure in the '187 Patent that adequately describes nor enables such a functionality.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-89-                              SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

#### d.     Ground D

All claims are invalid under 35 U.S.C. § 112 ¶ 1 for lacking enablement and written description.  Specifically, claims 1 and 10 recite a private key "for use in accessing protected digital content."  Asserted claims 3, 4, and 12 depend from claims 1 or 10.  There is no disclosure in the '187 Patent of a private key that is used to access protected content.

#### e.     Ground E

To the extent the term "logic circuitry for providing the domain information" in claim 10 of the '187 Patent is determined to be governed by 35 U.S.C. § 112 ¶ 6, the claim, and the claims that depend thereon, are indefinite for failing to recite any corresponding structure.

#### f.     Ground F

To the extent the term "the private key is based on the domain information" in claims 1 and 10 of the '187 Patent is determined to require any implementation detail or specific algorithm as to *how* a private key relates to the domain information, these claims, and the claims that depend thereon, are indefinite under 35 U.S.C. § 112 ¶ 2 because no algorithm or process is recited or disclosed.

### 2.     '375 Patent

#### a.     Ground A

Independent claim 1 and the claims that depend thereon are invalid under 35 U.S.C. § 112 ¶ 1 for lacking enablement and written description.  Specifically, claim 1 includes the limitation "the modification to the set of favorite items initiating a synchronization process to synchronize the set of favorite items modified responsive to the user input with a server-side storage system configured to synchronize favorite items for the user with one or more other client devices."  There is no disclosure in the '375 Patent that adequately describes nor enables such a functionality.

#### b.     Ground B

Independent claim 17 and the claims that depend thereon are invalid under 35 U.S.C. § 112 ¶ 1 for lacking enablement and written description insofar as the limitation "receive, at the second client device from the server, an indication to modify a set of bookmarks stored in a client-side storage of the second client device" is neither disclosed nor enabled.  One of ordinary skill in the

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

1   could not reasonably conclude that the inventor had possession of the claimed invention at the time

2   of filing.

3           c.      **Ground C**

4           Independent claim 17 and the claims that depend thereon are invalid under 35 U.S.C. §

5   112 ¶ 1 for lacking enablement and written description insofar as the limitation "modify,

6   responsive to the indication to modify the set of bookmarks received from the server, the set of

7   bookmarks stored in the client-side storage of the second client device" is neither disclosed nor

8   enabled.  One of ordinary skill in the could not reasonably conclude that the inventor had

9   possession of the claimed invention at the time of filing.

10          d.      **Ground D**

11          The asserted claims of the '375 Patent are invalid as under 35 U.S.C. § 112 ¶¶ 1 and 2 insofar

12   as these claims recite the term "favorite item" but neither the claim language nor the specification

13   provides a person of ordinary skill in the art with reasonable certainty as to the scope of the

14   invention. In addition, the asserted claims lack enablement and written description insofar as the

15   limitation "favorite items" is neither disclosed nor enabled.  One of ordinary skill in the could not

16   reasonably conclude that the inventor had possession of the claimed invention at the time of filing.

17          e.      **Ground E**

18          Dependent claim 20 is invalid under 35 U.S.C. § 112 ¶ 1 for lacking enablement and

19   written description insofar as the limitation "display, via an interface of the second client device,

20   an indication of modification of bookmark information for at least one of the one or more audio

21   files" is neither disclosed nor enabled.  One of ordinary skill in the art could not reasonably

22   conclude that the inventor had possession of the claimed invention at the time of filing.

23          f.      **Ground F**

24          Claims 19 and 20 are invalid under 35 U.S.C. § 112 ¶¶ 1 and 2 for lacking enablement and

25   written description as well as being indefinite.  Claim 19 recites "identifiers of one or more audio

26   files."  Claim 20 depends from claim 19.  "Identifiers of one or more audio files" are neither

27   disclosed nor enabled, and likewise are indefinite.  One of ordinary skill in the could not reasonably

28   conclude that the inventor had possession of the claimed invention at the time of filing.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-91-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

### g.      Ground G

All claims are invalid under 35 U.S.C. § 112 ¶ 1 for lacking enablement and written description insofar as the limitation "combined search results," as recited in claims 1 and 17, is neither disclosed nor enabled.  One of ordinary skill in the could not reasonably conclude that the inventor had possession of the claimed invention at the time of filing.

### 3.      '206 Patent

### a.      Ground A

Claim 12 of the '206 Patent is invalid as indefinite under 35 U.S.C. § 112 ¶ 2 insofar as claim recites the term "the background noise" multiple times, but that term does not have any proper antecedent basis.  Due to the lack of antecedent basis, and in light of the specification, one of ordinary skill in the art would not understand what "background noise" claim 12 is referring to.

### b.      Ground B

To the extent Google challenges the sufficiency of Sonos's anticipatory or obviousness grounds, the asserted claims of the '206 Patent are invalid under 35 U.S.C. § 112 ¶ 1 for lacking enablement and written description.  Specifically, to the extent Google contends that these claims require any implementation detail as to *how* to perform echo cancellation prior to noise suppression (or vice versa), the '206 Patent contains no disclosure enabling or describing such a requirement.

### c.      Ground C

Claims 3 and 18 of the '206 Patent are invalid under 35 U.S.C. § 112 ¶ 2 insofar as these claims recite the term "desired input" but neither the claim language nor the specification provides a person of ordinary skill in the art with reasonable certainty as to the scope of the invention.

### d.      Ground D

Claims 1, 2, 3, 9, 11, 12, and 18 of the '206 are invalid under 35 U.S.C. § 112 ¶¶ 1 and 2 for lacking enablement and written description as well as being indefinite insofar as the limitation "adaptively determin[e]" is neither disclosed nor enabled and is likewise indefinite.  One of ordinary skill in the could not reasonably conclude that the inventor had possession of the claimed invention at the time of filing.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-92-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

### e. Ground E

Based on Google's apparent construction of the term "communication device" the asserted claims of the '206 Patent are invalid under 35 U.S.C. § 112 ¶¶ 1 and 2 for lacking written description as well as being indefinite. One of ordinary skill in the could not reasonably conclude that the inventor had possession of the claimed invention—in light of Google's apparent construction of that term—at the time of filing

### 4. '586 Patent

### a. Ground A

All asserted claims of the '586 Patent are invalid as indefinite under 35 U.S.C. § 112 ¶ 1 for failure to demonstrate that the applicant possessed the full scope of the invention as claimed. Specifically, the asserted claims are directed to the broad class of "audio-enabled wireless device[s]." At most, the specification of the '586 Patent describes a sensor device—like a smoke alarm—that includes "an optional audio output device." '586 Patent at 9:42. This narrow disclosure fails to adequately describe, nor show the applicant was in possession of, his alleged invention as it applies to the entire class of "audio-enabled wireless device[s]."

### b. Ground B

All asserted claims of the '586 Patent are invalid as indefinite under 35 U.S.C. § 112 ¶ 1 for failure to demonstrate that the applicant possessed the full scope of the invention as claimed. The specification of the '586 Patent discloses at least two classes of devices: sensors and repeaters. *See* '586 Patent at 1:38-42. "Sensors can be used to detect [] adverse ambient conditions." *Id.* at 1:54-55. Repeaters generally extend the range of the system by relaying between sensor units and/or a base unit. *Id.* at 2:8-3:35. The specification fails to adequately describe, nor demonstrate that the applicant was in possession of, end-points (or sensors or "audio enabled wireless device[s]") being repeaters. Nor does the specification describe repeaters that are audio enabled wireless devices or that include an audio output element.

### B. Grounds Of Invalidity Under 35 U.S.C. § 101

Section 101 of the Patent Act states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

thereof, may obtain a patent therefore, subject to the conditions and requirements of this title." Section 101 precludes the patenting of mental processes and abstract ideas. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 556 U.S. 66, 70 (2012) (citation omitted). The Supreme Court has set forth a two-step process for distinguishing patents that claim laws of nature, natural phenomenon, and abstract ideas from those that claim patent-eligible applications of those concepts. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2350 (2014). Step one is to determine whether the claims at issue are directed to a patent-ineligible concept. *Id.* at 2355. Step two is to "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357 (citing *Mayo*, 566 U.S. at 72, 78). To answer that question, the elements of each claim are considered both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. *Id.* at 2355. The Court has described step two of this analysis as a search for an "'inventive concept'"— i.e., an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (alteration in original).

As described below, and in light of the way Google appears to be construing and asserting its claims, Sonos reserves the right to assert that the Asserted Claims fail to satisfy the requirements of 35 U.S.C. § 101 due to their failure to claim patentable subject matter. To the extent an Asserted Claim is invalid for any reason under 35 U.S.C. § 101, all claims depending therefrom are invalid unless they add something to the claim that transforms it into patentable subject matter. Accordingly, each of the asserted dependent claims incorporates by reference all § 101 invalidity contentions of the parent claim(s).

Additionally, the Asserted Claims may be invalid for statutory and/or obviousness-type double patenting over other patents owned by Google.

### 1.   '187 Patent

All of the Asserted Claims of the '187 are directed to non-statutory subject matter, under 35 U.S.C. § 101 because the claims, at least as Google appears to be construing and asserting them,

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-94-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

are directed to an abstract idea of obtaining a private key based on domain information. In addition, the Asserted Claims, at least as Google appears to be construing and asserting them, fail to include any element or combination of elements sufficient to ensure that the patent amounts to significantly more than a patent on an ineligible concept, i.e., fails to contain an "inventive concept" sufficient to transform the claimed abstract idea into a patent-eligible application. Limiting use of an abstract idea to a particular technological environment is insufficient for eligibility, and, *inter alia*, the remainder of the claims, as apparently construed and asserted, add nothing specific other than what is well-understood, routine, conventional activity, previously engaged in by those in the field. The claims recite generic computer components that do not amount to significantly more than the abstract idea itself. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011). Therefore, the Asserted Claims of the '187 Patent are not directed to patent-eligible subject matter under 35 U.S.C. § 101 and are invalid.

### 2.   '375 Patent

All of the Asserted Claims of the '375 are directed to non-statutory subject matter, under 35 U.S.C. § 101 because the claims, at least as Google appears to be construing and asserting them, are directed to an abstract idea of processing data reflecting modifications made by a user and combining general search results with a search of the modified data. The Asserted Claims are also invalid under 35 U.S.C. § 101 because they fail to claim any element or combination of elements sufficient to ensure that the patent amounts to significantly more than a patent on an ineligible concept, *i.e.*, fails to contain an "inventive concept" sufficient to transform the claimed abstract idea into a patent-eligible application. Limiting use of an abstract idea to a particular technological environment is insufficient for eligibility, and, *inter alia*, the remainder of the claims add nothing specific other than what is well-understood, routine, conventional activity, previously engaged in by those in the field. The claims recite generic computer components that do not amount to significantly more than the abstract idea itself. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011). Therefore, the Asserted Claims of the '375 Patent are not directed to patent-eligible subject matter under 35 U.S.C. § 101 and are invalid.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-95-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

### 3. '586 Patent

All of the Asserted Claims of the '586 are directed to non-statutory subject matter, under 35 U.S.C. § 101 because the claims, at least as Google appears to be construing and asserting them, are directed to an abstract idea of processing data to determine an appropriate route for information. The Asserted Claims are also invalid under 35 U.S.C. § 101 because they fail to claim any element or combination of elements sufficient to ensure that the patent amounts to significantly more than a patent on an ineligible concept, *i.e.*, fails to contain an "inventive concept" sufficient to transform the claimed abstract idea into a patent-eligible application. Limiting use of an abstract idea to a particular technological environment is insufficient for eligibility, and, *inter alia*, the remainder of the claims add nothing specific other than what is well-understood, routine, conventional activity, previously engaged in by those in the field. The claims recite generic software components that does not amount to significantly more than the abstract idea itself. *See CyberSource Corp. v. Retail Decisions, Inc*., 654 F.3d 1366, 1370 (Fed. Cir. 2011). Therefore, the Asserted Claims of the '586 Patent are not directed to patent-eligible subject matter under 35 U.S.C. § 101 and are invalid.

## VII. DOCUMENT PRODUCTION ACCOMPANYING INVALIDITY CONTENTIONS

Sonos has already or is concurrently producing or making available for inspection documents required by Patent L.R. 3-4, as set forth below. These disclosures are based on Sonos's current understanding of Plaintiff's infringement allegations. These disclosures are made without the benefit of discovery. Sonos reserves the right to amend or supplement these disclosures and documents as this case proceeds and its investigation continues. Sonos further reserves the right to supplement these disclosures following the receipt of more fulsome and rules-compliant infringement contentions from Plaintiff, or as appropriate in response to the Court's claim construction or determination of other issues.

         **a.** **Source code, specifications, schematics, flow charts, artwork, formulas, or other documentation sufficient to show the operation of any aspects or elements of an Accused Instrumentality identified by the patent claimant in its Patent L.R. 3-1(c) chart.**

Sonos has already made its source code available for inspection by Plaintiff on a secured source code computer, which is the definitive documentation showing the operation of all aspects

Orrick, Herrington & Sutcliffe LLP
Attorneys at Law
Silicon Valley

-96-

Sonos's Patent L.R. 3-3
Invalidity Contentions
3:20-cv-03845

1   or elements of the accused instrumentalities identified by Plaintiff in its Patent L.R. 3-1(c) chart.  In

2   addition, Sonos is producing herewith non-source code technical documents to show the operation

3   of functionalities or aspects of the Accused Instrumentalities identified in Google's L.R. 3-1(c)

4   charts.   *See*   SONOS-GVS-00000001-5835;   SONOS-GVS-00005859-6095;   SONOS-GVS-

5   00007114-7115.

6                        **b.      A copy or sample of the prior art identified pursuant to**
                                   **Patent L.R. 3-3(a) which does not appear in the file history of**
7                                  **the patent(s) at issue.**

8           Sonos is producing a copy of, or making available for inspection on the secured source

9   code computer, the prior art identified herein.  Prior art documentation is produced at SONOS-

10  GVS-00005836-5858; SONOS-GVS-00007116-12395.  The source code for the Sonos prior art

11  (charted against the '586 Patent) is being made available on the source code computer.

12                       **c.      All agreements that the party opposing infringement**
                                   **contends are comparable to a license that would result from**
13                                 **a hypothetical reasonable royalty negotiation.**

14          Sonos currently is not aware of any documents specified by Patent L.R. 3-4(c). To the

15  extent any such document exists, however, Sonos will use its best efforts to obtain all responsive

16  documents and reserves its right to supplement its production as discovery in this case

17  progresses, under Patent L.R. 3-6, or as otherwise permitted by the Court.

18                       **d.      Documents sufficient to show the sales, revenue, cost, and**
                                   **profits for accused instrumentalities identified pursuant to**
19                                 **Patent L.R. 3-1(b) for any period of alleged infringement.**

20          Sonos is producing documents sufficient to show the sales, revenue, cost, and profits for

21  those accused instrumentalities, to the extent such information is maintained by Sonos. *See*

22  SONOS-GVS-00006096-7113.

23                       **e.      All agreements that may be used to support the party**
                                   **denying infringement's damages case.**

24          Sonos currently is not aware of any documents specified by Patent L.R. 3-4(e). To the

25  extent any such document exists, however, Sonos will use its best efforts to obtain all responsive

26  documents and reserves its right to supplement its production as discovery in this case

27  progresses, under Patent L.R. 3-6, or as otherwise permitted by the Court.

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

                                        -97-                              SONOS'S PATENT L.R. 3-3
                                                                         INVALIDITY CONTENTIONS
                                                                              3:20-cv-03845

Dated: December 14, 2020

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____ */s/ Alyssa Caridis*_____
Alyssa Caridis
Attorneys for Defendant
SONOS, INC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

-98-

SONOS'S PATENT L.R. 3-3
INVALIDITY CONTENTIONS
3:20-cv-03845

# EXHIBIT 3

# FILED UNDER SEAL

# HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 4

1  QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
2    Charles K. Verhoeven (Bar No. 170151)
     charlesverhoeven@quinnemanuel.com
3  50 California Street, 22nd Floor
   San Francisco, California 94111
4  Telephone:     (415) 875-6600
   Facsimile:     (415) 875-6700
5
     David A. Nelson (admitted *pro hac vice*)
6    davidnelson@quinnemanuel.com
   191 N. Wacker Drive, Suite 2700
7  Chicago, Illinois 60606
   Telephone:     (312) 705-7400
8  Facsimile:     (312) 705-7401

9
   Attorneys for GOOGLE LLC
10

11                 UNITED STATES DISTRICT COURT

12               NORTHERN DISTRICT OF CALIFORNIA

13  GOOGLE LLC                    | Case No. 3:20-cv-03845-EMC

14          Plaintiff,            | **PLAINTIFF GOOGLE LLC'S AMENDED
                                  | DISCLOSURE OF ASSERTED CLAIMS
15      vs.                       | AND INFRINGEMENT CONTENTIONS**

16  SONOS, INC.,                  | Honorable Edward M. Chen

17          Defendant.

18

19
        Pursuant to Patent Local Rules 3-1 and 3-2, Plaintiff Google, LLC ("Google") hereby
20
   submits this Amended Disclosure of Asserted Claims and Infringement Contentions for U.S.
21
   Patent Nos. 7,899,187 (the "'187 patent"); 10,140,375 (the "'375 patent"); 7,065,206 (the "'206
22
   patent"); and 10,229,586 (the "'586 patent") (collectively, the "Patents in Suit").
23
        Google's Infringement Contentions are based on information presently available to
24
   Google.  Defendant Sonos, Inc. ("Sonos") has offered to make source code available for review,
25
   and Google is in the process of arranging for review of that source code.  However, Google is
26
   awaiting Sonos' production of technical documents and other materials called for by N.D. Cal.
27
   Pat. L.R. 3-4 for use in relation to any prospective source code review.  Google will amend these
28

1   contentions, as appropriate, and in accordance with the Court-ordered schedule in this case, based

2   on review of technical documents and other materials, including source code, produced by Sonos

3   and other information disclosed by Sonos as discovery progresses, and Google reserves the right

4   to amend and/or supplement this Disclosure should discovery reveal additional, relevant

5   information.  *See* N.D. Cal. Pat. L.R. 3-6.

6   **I.     Disclosure Of Asserted Claims And Infringement Contentions**

7          **A.     Asserted Claims Pursuant to Patent L.R. 3-1(a)**

8          Based on information currently in its possession, Google asserts the following claims

9   (collectively, the "Asserted Claims"), literally and/or under the doctrine of equivalents.  Google

10  explicitly reserves the right to amend and/or supplement its identification of Asserted Claims

11  should discovery (including Sonos' technical documentation and source code) reveal additional,

12  relevant information.

| U.S. Patent No. | Asserted Claims |
| --- | --- |
| 7,899,187 | Claims 1, 3, 4, 10, and 12 |
| 10,140,375 | Claims 1-11 and 13-20 |
| 7,065,206 | Claims 1-3, 9, 11, 12, 18, and 19 |
| 10,229,586 | Claims 1-5, 7-12, 14-16, 18, 20 |

18

19         **B.     Accused Instrumentalities Pursuant to Patent L.R. 3-1(b)**

20         Based on the information presently known to Google, and without the benefit of relevant

21  discovery or the Court's claim construction, Google asserts that the following Sonos products (and

22  all substantially similar products) ("the Accused Instrumentalities") infringe the Asserted Claims.

| U.S. Patent No. | Accused Instrumentalities |
| --- | --- |
| 7,899,187 | Sonos One, One SL, Play:1, Play:3, Five, Play:5, Arc, Playbar, Playbase, Beam, Move, Connect:Amp, Amp, Connect, and Port devices, and all variants thereof (collectively, "'187 Accused Instrumentalities"). |

27

28

| 10,140,375 | Sonos S1 Controller App and S2 App, and all variants thereof, stored in a mobile device (collectively, "'375 Accused Instrumentalities"). |
|---|---|
| 7,065,206 | Sonos One, Beam, Arc, and Move devices, and all variants thereof (collectively, "'206 Accused Instrumentalities"). |
| 10,229,586 | Sonos One, One SL, Five, Play:1, Play:3, Play:5, Playbar, Playbase, Beam, Move, Arc, Connect:Amp, Amp, Connect, Port, and Sub devices, and all variants thereof (collectively, "'586 Accused Instrumentalities"). |

Google reserves the right to amend and/or supplement its Infringement Contentions based on Sonos' discovery responses and document production (including Sonos' source code), including Sonos's forthcoming production of technical documentation under Patent L.R. 3-4. Google further reserves the right to amend and/or modify its Infringement Contentions under Patent L.R. 3-6, or as otherwise permitted by the Court.

### C.      Infringement Claim Charts Pursuant to Patent L.R. 3-1(c)

Based upon Google's examination of the Accused Instrumentalities and the limited information available to Google as of the date of these contentions, Google provides the following exhibits attached hereto, which specify where each limitation of each asserted claim is found within each Accused Instrumentality (whether literally or under the doctrine of equivalents):

Exhibit A: Infringement of U.S. Patent No. 7,899,187 by the '187 Accused Instrumentalities.

Exhibit B: Infringement of U.S. Patent No. 7,065,206 by the '206 Accused Instrumentalities.

Exhibit C: Infringement of U.S. Patent No. 10,140,375 by the '375 Accused Instrumentalities.

Exhibit D: Infringement of U.S. Patent No. 10,229,586 by the '586 Accused Instrumentalities.

In this litigation, Google has not yet been provided with full discovery of Sonos' products, including non-public documentation and source code, or otherwise been given reasonable time to

fully evaluate such discovery.  Google reserves its right to amend and/or supplement these assertions or to assert additional claims for infringement under Patent P.R. 3-6 as discovery in this case progresses, or as otherwise permitted by the Court.

**D.      Indirect Infringement Claims Pursuant to Patent L.R. 3-1(d)**

Based on information currently in its possession, Google contends that Sonos is liable for indirect infringement under 35 U.S.C. §§ 271(b) and (c) as set forth in Google's First Amended Complaint for Patent Infringement, Docket No. 35, which is incorporated by reference as if fully set forth herein.

**E.      Type of Infringement Claims Pursuant to Patent L.R. 3-1(e)**

Based on information currently in its possession, Google contends that each element of the Asserted Claims is literally present within the Accused Instrumentalities.  To the extent it is determined that any accused feature of the Accused Instrumentalities does not literally meet an Asserted Claim element, Google contends that the claim element is present under the Doctrine of Equivalents because one or more components of the Accused Instrumentalities perform substantially the same function in substantially the same way to yield substantially the same result as the Asserted Claim element, or because there are insubstantial differences between the Asserted Claim element and the corresponding one or more components of the Accused Instrumentalities. Additional detail regarding Google's assertions under the Doctrine of Equivalents is provided in infringement claim charts Exhibits A - D.

**F.      Priority Date(s) Pursuant to Patent L.R. 3-1(f)**

All Asserted Claims of the '187 patent are entitled to a priority date no later than November 27, 2002.

All Asserted Claims of the '375 patent are entitled to a priority date no later than December 3, 2003.

All Asserted Claims of the '206 patent are entitled to a priority date no later than November 20, 2003.

All Asserted Claims of the '586 patent are entitled to a priority date no later than May 27, 2004.

### G.  Practicing Instrumentalities Pursuant to Patent L.R. 3-1(g)

The following Google products practice the claimed inventions of the Asserted Patents:

| U.S. Patent No. | Practicing Instrumentalities |
|---|---|
| 10,140,375 | Google Play Movies & TV Application and Google TV Application, running on iOS and Android, and all variants thereof practice the '375 patent. |
| 10,229,586 | Google Wifi, Google Nest Wifi, Google Pixel 5, Pixel 4a, and Pixel 4a (5G), and all variants thereof practice the '586 patent. |

Google may release a future version of one or more products that implement functionality practicing the '187 patent, or '206 patent.  If Google does release a future version implementing such functionality, Google reserves the right to claim and identify any such practicing product at that time, and to produce documents sufficient to show the operation of such product(s). Moreover, Google's investigation is ongoing, and therefore Google reserves the right to supplement these identifications as additional responsive information is learned, under Patent L.R. 3-6 or as otherwise permitted by the Court.

### H.  Timing of Infringement and Damages Period Pursuant to Patent L.R. 3-1(h)

Based on information currently in its possession, Google contends that the infringement of the Asserted Patents began at least as early as the following dates.  To Google's knowledge the infringement remains ongoing and the damages period likewise remains ongoing.

| U.S. Patent No. | Date of First Infringement and Start of Claimed Damages |
|---|---|
| 7,899,187 | At least as early as March 1, 2011 |
| 10,140,375 | At least as early as November 27, 2018 |
| 7,065,206 | At least as early as October 2017 |
| 10,229,586 | At least as early as March 12, 2019 |

1    Discovery is ongoing and Google will seek information that is in Sonos' possession,

2  custody, or control, regarding the designs of the Accused Instrumentalities and the timing of each

3  design.  Google reserves the right to supplement its Infringement Contentions based on Sonos'

4  proper discovery responses.  Google further reserves its right to amend and/or modify its

5  Infringement Contentions as discovery in this case progresses, under Patent L.R. 3-6, or as

6  otherwise permitted by the Court.

7    **I.    Willful Infringement Claims Pursuant to Patent L.R. 3-1(i)**

8    Google contends that Sonos has engaged in willful and deliberate infringement as set forth

9  in Google's First Amended Complaint for Patent Infringement, Docket No. 35, which is

10  incorporated by reference as if fully set forth herein.  On information and belief, and as explained

11  more fully in Google's First Amended Complaint, Sonos knew or should have known of the

12  Asserted Patents and that its acts would infringe these patents, but acted despite an objectively

13  high likelihood that such acts would infringe the patents.

14    Discovery that Sonos has not yet produced may provide additional evidence that shows

15  Sonos has willfully infringed the Asserted Claims.  Google therefore reserves its right to amend

16  and/or modify its willful infringement contentions as discovery in this case progresses, under

17  Patent L.R. 3-6, or as otherwise permitted by the Court.

18  **II.    Document Production And Accompanying Disclosure**

19    **A.    Documents Pursuant to Patent L.R. 3-2(a)**

20    Google currently is not aware of any documents specified by Patent L.R. 3-2(a).  To the

21  extent any such document exists, however, Google will use its best efforts to obtain all responsive

22  documents and reserves its right to supplement its production as discovery in this case progresses,

23  under Patent L.R. 3-6, or as otherwise permitted by the Court.

24    **B.    Documents Pursuant to Patent L.R. 3-2(b)**

25    Pursuant to Patent L.R. 3-2(b), Google has produced documents bearing production numbers

26  GOOG-GVS-00000001  through  GOOG-GVS-00000014  and  GOOG-GVS-00000123  through

27  GOOG-GVS-00000136.

28

1    All asserted claims of the '187 patent are entitled to an date of invention of no later than

2  November 27, 2002, based on a constructive reduction to practice on that date.

3    All asserted claims of the '375 patent are entitled to an date of invention of no later than

4  June 2, 2003, based on conception on that date and diligent reduction to practice.

5    All asserted claims of the '206 patent are entitled to an date of invention of no later than July

6  15, 2003, based on conception on that date and diligent reduction to practice.

7    All asserted claims of the '586 patent are entitled to an date of invention of no later than

8  May 27, 2004, based on a constructive reduction to practice on that date.

9    Google is continuing to investigate and reserves its right to supplement these productions as

10  discovery in this case progresses, under Patent L.R. 3-6, or as otherwise permitted by the Court.

11    **C.      Documents Pursuant to Patent L.R. 3-2(c)**

12    Pursuant to Patent L.R. 3-2(c), Google has produced documents bearing production numbers

13  GOOG-GVS-00000137 through GOOG-GVS-00001995, which are copies of the file histories for

14  each patent-in-suit.

15    **D.      Documents Pursuant to Patent L.R. 3-2(d)**

16    Pursuant to Patent L.R. 3-2(d), Google has produced documents bearing production numbers

17  GOOG-GVS-00005473 through GOOG-GVS-00006772.

18    **E.      Documents Pursuant to Patent L.R. 3.2(e)**

19    Pursuant to Patent L.R. 3-2(e), Google has produced documents bearing production numbers

20  GOOG-GVS-00003064 through GOOG-GVS-00005328.

21    **F.      Documents Pursuant to Patent L.R. 3-2(f)**

22    Pursuant to Patent L.R. 3-2(f), Google has produced documents bearing production numbers

23  GOOG-GVS-00005329 through GOOG-GVS-00006772.

24    **G.      Documents Pursuant to Patent L.R. 3-2(g)**

25    Pursuant to Patent L.R. 3-2(g), Google has produced a document bearing production

26  numbers  GOOG-GVS-00005329  through  GOOG-GVS-00005472,  which,  subject  to  expert

27

28

analysis, may be comparable to a license that would result from a hypothetical reasonable royalty negotiation.

**H.      Documents Pursuant to Patent L.R. 3-2(h)**

Google currently is not aware of any documents specified by Patent L.R. 3-2(h).  To the extent any such document exists, however, Google will use its best efforts to obtain all responsive documents and reserves its right to supplement its production as discovery in this case progresses, under Patent L.R. 3-6, or as otherwise permitted by the Court.

**I.      Documents Pursuant to Patent L.R. 3-2(i)**

Google currently is not aware of any documents specified by Patent L.R. 3-2(i).  To the extent any such document exists, however, Google will use its best efforts to obtain all responsive documents and reserves its right to supplement its production as discovery in this case progresses, under Patent L.R. 3-6, or as otherwise permitted by the Court.

**J.      Documents Pursuant to Patent L.R. 3-2(j)**

Google currently is not aware of any documents specified by Patent L.R. 3-2(j).  To the extent any such document exists, however, Google will use its best efforts to obtain all responsive documents and reserves its right to supplement its production as discovery in this case progresses, under Patent L.R. 3-6, or as otherwise permitted by the Court.

DATED: March 15, 2021                    QUINN EMANUEL URQUHART &
                                         SULLIVAN, LLP


                                         By:   */s/ Patrick Curran*
                                              Patrick Curran
                                              Attorneys for Plaintiff GOOGLE LLC.

## PROOF OF SERVICE

I, Sean Taheri, am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 865 S. Figueroa St., 10th Floor, Los Angeles, California 90017.

On March 15, 2021, I served true copies of the following document(s) described as "PLAINTIFF GOOGLE LLC'S AMENDED DISCLOSURE OF ASSERTED CLAIMS AND INFRINGEMENT CONTENTIONS" on the interested parties in this action as follows:

| Recipient | Email Address: |
|---|---|
| Clement Roberts<br>Bas De Blank<br>Alyssa Caridis<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA 94105-2669<br><br>*Attorneys for Defendant Sonos, Inc.* | croberts@orrick.com;<br>basdeblank@orrick.com;<br>acaridis@orrick.com;<br>amaruska@orrick.com;<br>Sonos-NDCA03845-service@orrick.com |
| George I. Lee<br>Sean M. Sullivan<br>Rory P. Shea<br>J. Dan Smith<br>LEE SULLIVAN SHEA & SMITH LLP<br>656 W Randolph St., Floor 5W<br>Chicago, IL 60661<br><br>*Attorneys for Defendant Sonos, Inc.* | lee@ls3ip.com;<br>sullivan@ls3ip.com;<br>shea@ls3ip.com;<br>smith@ls3ip.com;<br>sampson@ls3ip.com |

**BY ELECTRONIC MAIL TRANSMISSION:** by transmitting a PDF format copy of such document(s) to each such person at the e mail address listed above.  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

Executed on March 15, 2021, at Los Angeles, California.


_____*/s/ Sean Taheri*_____
Sean Taheri

# EXHIBIT 5

| | |
|---|---|
| **From:** | Patrick Schmidt <patrickschmidt@quinnemanuel.com> |
| **Sent:** | Wednesday, July 28, 2021 8:43 AM |
| **To:** | Cole Richter; Patrick Curran |
| **Cc:** | Sonos-NDCA03845-service; David Grosby; Brett Watkins; qe-google-sonos-ndca-3845 |
| **Subject:** | RE: Google v Sonos (Case No. 3:20-cv-03845 (NDCA)) -- Amended Invalidity Contention Chart re '586 Patent |

Cole,

We will not be taking any position as to whether Sonos can establish good cause to amend the invalidity contentions based on its own source code at this point.

-Patrick

**From:** Cole Richter [mailto:richter@ls3ip.com]
**Sent:** Monday, July 26, 2021 1:46 PM
**To:** Patrick Curran <patrickcurran@quinnemanuel.com>
**Cc:** Sonos-NDCA03845-service <Sonos-NDCA03845-service@orrick.com>; David Grosby <grosby@ls3ip.com>; Brett Watkins <brettwatkins@quinnemanuel.com>; qe-google-sonos-ndca-3845 <qe-google-sonos-ndca-3845@quinnemanuel.com>
**Subject:** RE: Google v Sonos (Case No. 3:20-cv-03845 (NDCA)) -- Amended Invalidity Contention Chart re '586 Patent

**[EXTERNAL EMAIL from richter@ls3ip.com]**

Patrick,

Can you let us know by Wednesday if Google opposes a motion for leave to amend the invalidity contentions in accordance with the below?

Best,
Cole

**From:** Cole Richter
**Sent:** Tuesday, July 20, 2021 3:52 PM
**To:** David Grosby <grosby@ls3ip.com>; Brett Watkins <brettwatkins@quinnemanuel.com>; qe-google-sonos-ndca-3845 <qe-google-sonos-ndca-3845@quinnemanuel.com>
**Cc:** Sonos-NDCA03845-service <Sonos-NDCA03845-service@orrick.com>
**Subject:** RE: Google v Sonos (Case No. 3:20-cv-03845 (NDCA)) -- Amended Invalidity Contention Chart re '586 Patent

Counsel,

On May 10 we provided amended invalidity contentions concerning the '586 Patent and asked if Google objected to Sonos's amendment.  On May 21, Google asked several substantive questions regarding the source code that was made available for inspection and cited in the amended invalidity contentions.  Sonos replied on June 14 addressing what questions it could understand and responding to Google's claims of prejudice.  Since then, Google has spent several weeks inspecting the source code cited in the amended invalidity contentions.

1

Given this, we assume that Google will not object to a motion for leave to amend the invalidity contentions and we plan to ask the Court for such leave by this Friday.  If this not accurate and Google plans to oppose a motion for leave, please let us know and please provide a few days and times this week so that we may confer.

Best,
Cole


**Cole B. Richter**

 Lee Sullivan
Shea & Smith LLP

Lee Sullivan Shea & Smith LLP
656 W Randolph St, Ste. 5W, Chicago, IL 60661
312.754.9602 *Main* | 312.757.4478 *Direct*
richter@ls3ip.com | www.ls3ip.com


**From:** David Grosby <grosby@ls3ip.com>
**Sent:** Monday, May 10, 2021 8:30 PM
**To:** Brett Watkins <brettwatkins@quinnemanuel.com>; qe-google-sonos-ndca-3845 <qe-google-sonos-ndca-3845@quinnemanuel.com>
**Cc:** Sonos-NDCA03845-service <Sonos-NDCA03845-service@orrick.com>
**Subject:** Google v Sonos (Case No. 3:20-cv-03845 (NDCA)) -- Amended Invalidity Contention Chart re '586 Patent

Counsel,

Sonos intends to amend its invalidity contentions relating to the '586 Patent, and Sonos's 102(g) defense.  Attached is our proposed amended claim chart (both in clean and redline).  Good cause exists for this amendment because in Google's March 30, 2021 Amended Infringement Contentions, Google for the first time disclosed what source code it believed evidences infringement of the asserted '586 claims.  Sonos has reviewed those code citations and accompanying discussions and determined that the same functionality set forth in those code citations were conceived prior to the '586's claimed priority date.  Of course, Google was already aware of Sonos's 102(g) defense—Sonos charted it in its original contentions (*see* Exhibit D-04).  This amendment simply adds detail to the previously-disclosed contentions in light of Google's Amended Infringement Contentions. Please let us know by May 19, 2021 if Google objects to Sonos's amendment, and if so, provide times for a meet and confer.

The password for the attached files will be sent separately.

Best regards,
David


**David R. Grosby**

Lee Sullivan
Shea & Smith LLP

Lee Sullivan Shea & Smith LLP
656 W. Randolph St., Floor 5W, Chicago, IL 60661
312.754.9423 *Direct* | 954.260.4583 *Mobile*
grosby@ls3ip.com | www.ls3ip.com

# EXHIBIT 6

# FILED UNDER SEAL

## HIGHLY CONFIDENTIAL – SOURCE CODE

# EXHIBIT 7

# REDACTED VERSION
# OF DOCUMENT SOUGHT
# TO BE SEALED

**HIGHLY CONFIDENTIAL – SOURCE CODE**

**quinn emanuel** trial lawyers | boston

865 S. Figueroa St., 10ᵗʰ Floor, Los Angeles, California 90017 | TEL (213) 443-3000; FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3000**

WRITER'S EMAIL ADDRESS
**patrickschmidt@quinnemanuel.com**

May 21, 2021

**VIA EMAIL**

Cole Richter
Lee Sullivan Shea & Smith LLP
656 W. Randolph St., Floor 5W
Chicago, IL 60661

  Re: *Google LLC v. Sonos, Inc.*, Case No. 3:20-cv-3845-EMC (N.D. Cal.)

Dear Cole:

I write concerning Sonos' recent amendment to its invalidity contentions.

On the evening May 10, 2021, literally the eve of the claim construction hearing, Sonos served an amended, and substantially revised invalidity claim chart in support of its Section 102(g) theory for the '586 Patent.  Moreover, this new claim chart cites what appears to be entirely new and previously unproduced source code.  There is no justification for these revised contentions and reliance on previously unproduced source code.  Sonos understands its own source code and should have produced all relevant versions and fulsome contentions long ago.  Sonos' failure to do so has prejudiced Google's ability to prepare its own infringement contentions and develop its claim construction positions.

Specifically, the first page of Sonos' newly amended claim chart cites to six source code repositories that Google does not recognize:

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

**HIGHLY CONFIDENTIAL – SOURCE CODE**

| Date | Source Code Identifier |
|---|---|
| ███████ | |

During Google's source code review and preparation of its infringement contentions, however, Google did not have access to all of these repositories.  Specifically, the only repositories previously provided that predated the '586 Patent priority date were denoted as ████████ ███████████████████████████████[1]  Chronologically, the next of the previously provided repositories ████████████████████████████████████ ██████████████████ repositories do not appear to have been previously made available.

So that Google can properly assess your new invalidity contentions, please provide answers to the following questions:

- ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

  If so, provide the date on which the code was supplemented, and confirm that it is currently loaded on the source code computer and available for inspection.

- ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

  so, provide the date on which the code was supplemented, and confirm that it is currently loaded on the source code computer and available for inspection.

- ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[1]   While it is unclear to Google, the previously provided ███████████████may have been a partial production of what Sonos now cites as ████████████████████may have been a partial production of what Sonos now cites as ████████████

**HIGHLY CONFIDENTIAL – SOURCE CODE**

confirm that these repositories are currently loaded onto the source code computer and available for inspection.

In addition, please confirm that Sonos has now produced or made available for inspection *all* documents and information (whether source code or non-source code) that it intends to rely upon in support of its 102(g) theory.

Google reserves all rights, including its right to ask the Court to strike Sonos' invalidity contentions in light of these prejudicial amendments and timing.


Best regards,

*/s/ Patrick Schmidt*
Patrick T. Schmidt

3

# EXHIBIT 8


# REDACTED VERSION
# OF DOCUMENT SOUGHT
# TO BE SEALED

| | |
|---|---|
| **From:** | Cole Richter <richter@ls3ip.com> |
| **Sent:** | Monday, June 14, 2021 5:32 PM |
| **To:** | Patrick Schmidt; Richard Lowry |
| **Cc:** | qe-google-sonos-ndca-3845; Sonos-NDCA03845-service; Caridis, Alyssa |
| **Subject:** | RE: Google v. Sonos -- Google's Letter Regarding Sonos' Amended Invalidity Contentions |

Patrick,

Below we address the questions you raise in your May 21 letter to the extent we are able to understand them. As an initial matter, however, some of statements require addressing. We disagree that Sonos's invalidity claim chart is "substantially revised." As laid out in Sonos's contentions served December 14, Sonos contended that it "conceived of and reduced to practice an audio-enabled wireless device configured for bidirectional wireless communication in a wireless mesh network prior to May 27, 2004." That contention remains the same today.

Sonos's clam chart was updated in view of Google's revised infringement contentions concerning the '586 Patent. We note that Google's infringement theories as laid out in its October 29 contentions for the '586 Patent (among the other patents) were undeveloped, if cognizable at all. Google substantially revised and further developed those theories in its March 15 "First Amended Infringement Contentions." Sonos's updated claim chart is responsive to these revised infringement theories.

We are unsure what prejudice Google could have possibly suffered as a result of this updated chart; your letter identifies none. Indeed, it is unclear how Sonos's source code from 2004 could possibly help Google "develop its claim construction positions." Thus, we disagree that Google has suffered prejudice in any respect.

We further disagree with the implication that this updated chart is in any way untimely. We note that Google's infringement contentions state "[d]iscovery is ongoing" and that Google reserved the right to amend and supplement your contentions as discovery progresses. Google Amended Disc., 3/15/21 , pp. 1-2, 6. Sonos made a similar reservation. Sonos Invalidity Contentions, p. 1.

Your substantive questions regarding the source code may best be answered by a knowledgeable witness. For instance, we are unsure what you are seeking when you ask ███████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

Finally, your request for **all** documents and information that Sonos intends to rely on is inappropriate. As you know, fact discovery is ongoing and depositions have not yet been taken. Thus, we obviously cannot represent now that the currently produced "information" is the universe on which Sonos will rely.

Best,
Cole

**From:** Patrick Schmidt <patrickschmidt@quinnemanuel.com>
**Sent:** Tuesday, June 8, 2021 6:44 PM
**To:** Richard Lowry <richardlowry@quinnemanuel.com>; Cole Richter <richter@ls3ip.com>
**Cc:** qe-google-sonos-ndca-3845 <qe-google-sonos-ndca-3845@quinnemanuel.com>; 'Sonos-NDCA03845-service@orrick.com' <Sonos-NDCA03845-service@orrick.com>; 'acaridis@orrick.com' <acaridis@orrick.com>
**Subject:** RE: Google v. Sonos -- Google's Letter Regarding Sonos' Amended Invalidity Contentions

Counsel—

Would you please provide answers to the questions in the May 21, 2021 letter referenced below?

Thank you,

-Patrick


**From:** Richard Lowry
**Sent:** Friday, May 21, 2021 2:08 PM
**To:** richter@ls3ip.com
**Cc:** qe-google-sonos-ndca-3845 <qe-google-sonos-ndca-3845@quinnemanuel.com>; 'Sonos-NDCA03845-service@orrick.com' <Sonos-NDCA03845-service@orrick.com>; 'acaridis@orrick.com' <acaridis@orrick.com>
**Subject:** RE: Google v. Sonos -- Google's Letter Regarding Sonos' Amended Invalidity Contentions

Counsel,

On behalf of Patrick Schmidt, please see attached correspondence from Google. Password to follow in a separate email.

Regards,
Rich

**Richard Lowry**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

1300 I Street, NW, Suite 900
Washington, D.C. 20005
202-538-8219 Direct
202.538.8000 Main Office Number
202.538.8100 FAX
richardlowry@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT 9

# FILED UNDER SEAL

# HIGHLY CONFIDENTIAL – SOURCE CODE (ATTORNEYS' EYES ONLY)

# EXHIBIT 10

EXHIBIT E
Infringement of '586 Patent

## U.S. Patent No. 10,229,586

## INFRINGEMENT CONTENTIONS PURSUANT TO PATENT L.R. 3-1

### Sonos Devices

Pursuant to Patent L.R. 3-1, Google provides the following Infringement Chart demonstrating examples of infringement of Claims 1-5, 7-12, 14-16, 18, 20 of U.S. Patent No. 10,229,586 by the Sonos One, One SL, Five, Play:1, Play:3, Play:5, Playbar, Playbase, Beam, Move, Arc, Connect:Amp, Amp, Connect, Port, and Sub (collectively "Sonos Devices").  On information and belief and unless otherwise noted, predecessors and previous versions of the Sonos Devices operate in the same way and are also accused.  These infringement contentions are based upon information available to Google as of the date of these contentions.  Google's investigation is ongoing and discovery has not yet commenced.  Google has served discovery requests upon Defendant to obtain additional product information that is in Defendant's possession, custody or control, and Google reserves the right to supplement its infringement contentions based on Defendant's proper discovery responses and document productions.  Google further reserves its right to amend and/or modify its Infringement Contentions as discovery in this case progresses, under Patent L.R. 3-6, and as permitted by the Court.

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| 1a. | An audio-enabled wireless device configured for bidirectional wireless communication in a wireless mesh network, the wireless device comprising: | To the extent the preamble is limiting, the Sonos Devices are audio-enabled wireless device configured for bidirectional wireless communication in a wireless mesh network.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>Each of the Sonos Devices are audio-enabled wireless devices configured for operating within a "SonosNet," which is defined as a wireless mesh network of Sonos Devices.  *See, e.g.*, Sonos System Overview, October 20, 2014 at 8: |

EXHIBIT E
Infringement of '586 Patent

| | | |
|---|---|---|
| | | **3.2    SonosNet™ Setup**<br><br>SonosNet is different because each Sonos product is both a network client and access point. Instead of merely accessing the network, each component also expands it. Sonos components communicate with every other Sonos component in wireless range, ensuring multiple, redundant paths for data to travel. While each component must be within range of at least one other component, they don't need to be within range of the central point.<br><br>*See, e.g.*, Sonos User Guide (June 2020) at 6: |

EXHIBIT E
Infringement of '586 Patent

# Explore our products

Sonos products work together seamlessly. It's easy to add speakers and expand your system as your home changes.

## Speakers for your music

The perfect wireless speaker for any room in your home. You can even stereo pair two speakers (same model) in a room—turn each one into separate left and right channels for wider, bigger, and deeper sound.

- **Move**: durable smart speaker for indoor and outdoor listening.
- **One**: smart speaker with built-in voice control.
- **One SL**: compact speaker to use as a stereo pair or as surrounds for your home theater.
- **Five**: biggest home speaker with boldest sound.

## Speakers for your TV

Sonos products for your TV provide full-theater sound and play music too. Enhance your home theater experience by adding a Sub, a pair of surrounds, or both.

- **Arc**: premium smart soundbar for TV, movies, music, gaming, and more. Place on furniture or wall mount.
- **Beam**: smart compact soundbar, perfect for small to medium-sized rooms. Place on furniture or wall mount.
- **Playbase**: widescreen sound and music streaming, created especially for TVs on stands or furniture. Low profile design practically disappears under your TV.
- **Playbar**: powerful soundbar, perfect for use above or below wall-mounted TVs, or lay it flat on a table or console.
- **Sub**: add dramatically deeper bass to any Sonos speaker, for home theater and music.

## Stereo upgrades

Convert existing speakers, stereos, and home theater into music streaming systems with an amplifier.

- **Amp**: versatile amplifier for powering all your entertainment.
- **Port**: flexible streaming component for your stereo or receiver.

## Accessories

Find the perfect **accessory** for your Sonos system on our website.

- If your existing WiFi isn't reliable enough for streaming music, you can purchase a Sonos **Boost**.
- Wall mount kits or stands tailored to perfectly fit your Sonos products.
- Turntables to bring vinyl to your Sonos system.
- Cables and more.

EXHIBIT E
Infringement of '586 Patent

| | | |
|---|---|---|
| | | *See, e.g.*, Sonos System Overview, October 20, 2014 at 4:<br><br>**2.1    Sonos Players**<br><br>A Sonos player is a Sonos component that can play audio on its own without being bonded to another Sonos product (to act as if they are a single player). For more information about bonding, see section 4, Group Management.<br>Sonos players include:<br><br>• **The SONOS PLAY:5** is a high-performance all-in-one wireless speaker that delivers crystal-clear, room-filling sound using a five-way speaker system driven by five digital amplifiers.<br>• **The SONOS PLAY:3** is an all-in-one wireless speaker that delivers pure, clear, room-filling sound using a three-driver system. Two PLAY:3s can be bonded as a stereo pair for stereo sound or as rear speakers for a SONOS PLAYBAR home theater system.<br>• **The SONOS PLAY:1** is the most compact Sonos speaker, with two custom-designed drivers, one for a 3.5 in (9 cm) mid-woofer and one for a tweeter, each with a dedicated amplifier. Two PLAY:1s can be paired for stereo sound or as rear speakers for a SONOS PLAYBAR in a home theater system.<br>• **The SONOS PLAYBAR** is a full-theater HiFi soundbar with a sophisticated nine speaker design that connects to HDTV with a single cable and plays all sources connected to the TV, including cable/SAT boxes, Blu-ray players, and game consoles. It is compatible with Dolby® Digital and PCM.<br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 6: |

4

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **Explore our products**<br>Sonos products work together seamlessly. It's easy to add speakers and expand your system as your home changes.<br><br>**Speakers for your music**<br>The perfect wireless speaker for any room in your home. You can even stereo pair two speakers (same model) in a room—turn each one into separate left and right channels for wider, bigger, and deeper sound.<br>• **Play:1**: mini home speaker with mighty sound.<br>• **Sonos One**: smart speaker with built-in voice control.<br>• **Play:3**: mid-size speaker with stereo sound.<br>• **Play:5**: biggest home speaker with boldest sound.<br>• **Move**: durable smart speaker for indoor and outdoor listening.<br>• **Sonos One SL**: compact speaker to use as a stereo pair or as surrounds for your home theater.<br><br>**Speakers for your TV**<br>Sonos products for your TV provide full-theater sound and play music too. Enhance your home theater experience by adding a Sub, a pair of surrounds, or both.<br>• **Beam**: compact soundbar with Amazon Alexa voice control, perfect for small to medium-sized rooms. Place on furniture or wall mount.<br>• **Playbase**: widescreen sound and music streaming, created especially for TVs on stands or furniture. Low profile design practically disappears under your TV.<br>• **Playbar**: powerful soundbar, perfect for use above or below wall-mounted TVs, or lay it flat on a table or console.<br>• **Sub**: add dramatically deeper bass to any Sonos speaker, for home theater and music.<br><br>See, e.g., Sonos Five Product Manual (https://www.sonos.com/support/en-us/sonos-user-guide/index.html#t=sonos-user-guide%2Ffive%2Ffive.htm): |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

*See, e.g.*, Sonos Arc Product Manual (https://www.sonos.com/en-us/shop/arc.html?utm_campaign=GGL_US_EN_SONOS_B_ARC_EXACT_360i&utm_medium=cpc&utm_source=google&utm_content=GGL_US_EN_SONOS_B_ARC_EXACT_360i&utm_term=sonos%20arc&gclid=EAIaIQobChMI6Pz2r4L06wIVhMDACh1qHA9WEAAYASABEgL1MvD_BwE&gclsrc=aw.ds):

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **Arc**<br><br>The premium smart soundbar for TV, movies, music, and more—<br><br>• 3D sound with Dolby Atmos.<br>• Eleven high-performance drivers, including custom elliptical woofers and angled side tweeters for rich bass and clear dialogue.<br>• Arc's advanced processing creates five phased-array channels that deliver sound to your ears from all directions.<br>• Quick and easy setup, with only one cable to connect to your TV. Elegant design discreetly mounts to the wall or sits on a credenza beneath the TV.<br>• Expandable. Add a Sub and a pair of Sonos speakers (Sonos One or Sonos Five), for 5.1 surround sound. For more information, see **Sonos home theater**.<br>• Compatible with [SONOS] only.<br>• See **Getting started** when you're ready to add Arc to your Sonos system. |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |   The Sonos Devices are configured for bi-directional wireless communication in the "SonosNet" wireless mesh network.  *See, e.g.*, Sonos Developer (https://developer.sonos.com/build/): |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **What is a player?**<br><br>A Sonos player can play music on its own, either with its own internal speaker drivers or when connected to external speakers. For example, a Sonos One can play music with its own speakers and a Sonos Amp can play music with connected speakers. The SYMFONISK table lamp with WiFi and SYMFONISK WiFi bookshelf speakers also function as Sonos players. By itself, a Sonos Sub is not a player as it can't play audio on its own. A Boost is not a player as it does not play audio.<br><br>**Sonos players communicate over Wi-Fi**<br><br>Sonos players communicate with one another using Wi-Fi to stay in sync. App developers should consider this when creating controls that quickly respond to user input. Network congestion can quickly occur in a household with many players and users.<br><br>**Sonos players can be bonded to act as one logical player**<br><br>You can bond players using the Sonos app. Once bonded, players act as if they are one logical player. For example, bond a Sonos Sub with another Sonos player so that it plays the bass channel. Bond two of the same types of players as a stereo pair so that one plays the left audio channel and another plays the right. Bond the same types of players as surrounds in a home theater setup to play the left and right surround channels. When not playing home theater audio, surrounds can play ambient sounds or full range sound as accompaniment.<br><br>In the diagram above, the light group on the third floor contains two players bonded in a stereo pair. The second floor includes a Sonos home theater speaker bonded with two surrounds.<br><br>**Sonos app**<br><br>The Sonos app is not smart, the player is. The Sonos app acts as a remote control. It sends browse and metadata requests to music and content services and transport control commands to the player.<br><br>**Sonos players work in groups**<br><br>Sonos players work in groups, even if it's a group of one. Groups control playback. Partner integrations must discover and display Sonos groups.<br><br>**Continuity of control**<br><br>You can start playing sound on Sonos in multiple ways. You can use the Sonos app, partner apps and devices, hardware controls on Sonos players, or voice commands. Because of this, a big part of the Sonos experience is continuity of control. This means that you can control sound throughout your home regardless of how you started it.<br><br>For example, you can ask Alexa to start playing your favorite track, turn the volume up with the Sonos app, skip the next song using a button on the speaker, and stop the music with a third-party hardware remote. Control of Sonos is seamless and integrated.<br><br>*See, e.g.*, Connect Sonos to a new router or WiFi network (Jan. 13, 2020), https://support.sonos.com/s/article/1061?language=en_US. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

*See, e.g.*, Sonos User Guide, September 29, 2019 at 30, 35:



*See, e.g.*, Sonos System Overview, October 20, 2014 at 4:

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

*See, e.g.,* Sonos System Overview, October 20, 2014 at 7-10:

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **3  Wireless Mesh Network**<br><br>Each Sonos product is network-enabled with Ethernet, wireless interfaces, or both and uses TCP/IP to communicate. You can set up the Sonos Wireless HiFi System wirelessly (standard setup), or by connecting a Sonos product to your router with an Ethernet cable (BRIDGE setup). If you connect a Sonos component to your router, the Sonos system establishes and uses SonosNet, a secure wireless mesh network to communicate and stream music throughout the household. (Connect a BRIDGE to your router if you won't listen to music in this location, or connect a player to have audio available.) If you set up Sonos wirelessly, Sonos components communicate using over the home's wireless network.<br><br>SonosNet is a secure, AES-encrypted, peer-to-peer wireless mesh network that provides stable, reliable audio playback.<br><br>Sonos components communicate directly with each other, so each component expands the network. Each Sonos product is network enabled with an Ethernet interface, a wireless interface, or both so you can choose to set up the Sonos system to use either SonosNet (by connecting one Sonos product to your router) or your wireless network. If you plug a Sonos product into your router, all of your Sonos components will use SonosNet to communicate with each other.<br><br>When the Sonos Wireless HiFi System is set up, a ***household*** is created. A household is limited to thirty-two components each of which must be on the same IP subnet. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **3.1    Standard Setup**<br><br>In a standard wireless network, coverage radiates outward from a central router or access point. The further a wireless client is from this central point, the weaker the signal between the two will be.<br><br><br><br>*Figure 2: Standard Wireless Network*<br><br>In Figure 2 above, each Sonos component talks to the wireless router. Therefore, for homes with wireless connectivity issues, or those with a large number of Sonos players, standard wireless setup may not be the best choice.<br><br>**3.2    SonosNet™ Setup**<br><br>SonosNet is different because each Sonos product is both a network client and access point. Instead of merely accessing the network, each component also expands it. Sonos components communicate with every other Sonos component in wireless range, ensuring multiple, redundant paths for data to travel. While each component must be within range of at least one other component, they don't need to be within range of the central point. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | | Infringement Contentions | |
|---|---|---|---|---|
| | | |  | |

Figure 3: SonosNet

In Figure 3 above, the green circles represent SonosNet. Since each Sonos component both uses and extends SonosNet, simply by communicating with another Sonos component SonosNet is expanded to provide whole-house coverage. Note that the Sonos component nearest to the router is connected via an Ethernet cable.

As a music distribution method, there are some advantages to setting up Sonos to communicate over SonosNet rather than the home's wireless network.

- *Reliability* – Because SonosNet is a separate high-performance wireless network exclusively for Sonos components, this setup is recommended when wireless connectivity issues are present in a home. SonosNet adapts to changing wireless conditions and uses multiple wireless connections between Sonos products to provide a stable system even under adverse conditions.

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <ul><li>**Ease and simplicity** – SonosNet requires no configuration other than the press of two buttons as part of the setup process.  Standard wireless setup, while also easy, requires entry of the wireless network's password.</li><li>**Security** – SonosNet protects the household without the need for special keys or pass-phrases.</li></ul><br>**4   Group Management**<br><br>The multi-room aspect of the Sonos Wireless HiFi System allows you to simultaneously play the same song, or different songs, in up to thirty-two rooms in a household (a household consists of Sonos components on the same IP subnet). The Sonos system is unique in that it allows you to dynamically group rooms to play the same song synchronously. The resulting multi-room **player group** can be controlled using any Sonos controller. For example, you can raise and lower the volume and control audio playback (for example, play or pause a track, go to the next track, and so on) of a group of players.<br><br>This requires that each Sonos component have access to the audio data. In the Sonos architecture, this is achieved by requiring that all Sonos components be members of a player group in order to play audio, and selecting a lead player, called the **group coordinator**, to distribute the audio data to the other group members. Group membership can be changed "on the fly" by linking and unlinking rooms without restriction. This flexibility is achieved by a dynamic handoff of the lead Sonos component role. To ensure the handoff is free from audio interruptions, both existing and new lead components access the same content simultaneously for a limited period of time.<br><br>Currently Sonos supports 32 rooms in a household. For best customer experience, we recommend all music partners support 32 different streams to these different groups.<br><br>Group management is a key benefit of owning a Sonos system. It allows you to play any music in any room of your house. In a typical home there will be several rooms that are set up to play music, for example, the living room, kitchen, master bedroom, and the patio. Each room (or group) can play different music, or any combination of rooms can be joined together to form a group that will play music in perfect synchronization. **Party Mode** refers to the situation when all the player groups in a house are combined to play music in synchrony.<br><br>**4.1   Bonded Components**<br><br>Sonos components can be **bonded** to act as if they are a single player. A bonded set of components, such as a SUB and a PLAYBAR, act as a single player with one volume level and display one player name on the controller menu. Bonded components also play music in synchrony, but separate out certain frequencies or channels. The table below shows the difference between grouped components and bonded sets of components.<br><br><table><tr><td>**Functionality**</td><td>**Grouped Components**</td><td>**Bonded Set of Components**</td></tr><tr><td>Volume Control</td><td>Individual volume controls per player</td><td>Single volume control for set</td></tr><tr><td>Product Name Display</td><td>Displays original (multiple) player names on menu</td><td>Displays as single player on menu</td></tr><tr><td>Audio Characteristics</td><td>Audio characteristics of player are always individually maintained</td><td>Audio characteristics adjusted based on role</td></tr></table> |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| 1b. | a wireless transceiver; | The Sonos Devices include a wireless transceiver.  The Sonos Devices, therefore, meet this claim limitation literally, or alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Sonos System Overview, October 20, 2014 at 4:<br><br><br><br>*See, e.g.*, Connect Sonos to a new router or WiFi network (Jan. 13, 2020), https://support.sonos.com/s/article/1061?language=en_US: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

*See, e.g.*, Sonos User Guide, September 29, 2019 at 30, 35:

**Specifications**

| Feature | Description |
|---|---|
| **Audio** | |
| **Amplifier** | Two Class-D digital amplifiers. |
| **Tweeter** | One tweeter creates a crisp and accurate high frequency response. |
| **Mid-Woofer** | One mid-woofer ensures the faithful playback of mid-range vocal frequencies plus deep, rich bass. |
| **Stereo Pair** | Turn two speakers into separate left and right channel speakers to create wider, deeper sound. |
| **Home Theater** | Add two speakers as surrounds for a true surround sound experience. |
| **Networking\*** | |
| **Wireless Connectivity** | Connects to your home WiFi network with any 802.11b/g/n router. 802.11n only network configurations are not supported—you can either change the router settings to 802.11b/g/n or connect a Sonos product to your router. |
| **Ethernet Port** | One 10/100Mbps Ethernet port. You can plug a Sonos product directly into your router if your WiFi is unstable. |

*See, e.g.*, Sonos System Overview, October 20, 2014 at 4:

**2.1    Sonos Players**

A Sonos player is a Sonos component that can play audio on its own without being bonded to another Sonos product (to act as if they are a single player). For more information about bonding, see section 4, Group Management.
Sonos players include:

- **The SONOS PLAY:5** is a high-performance all-in-one wireless speaker that delivers crystal-clear, room-filling sound using a five-way speaker system driven by five digital amplifiers.
- **The SONOS PLAY:3** is an all-in-one wireless speaker that delivers pure, clear, room-filling sound using a three-driver system. Two PLAY:3s can be bonded as a stereo pair for stereo sound or as rear speakers for a SONOS PLAYBAR home theater system.
- **The SONOS PLAY:1** is the most compact Sonos speaker, with two custom-designed drivers, one for a 3.5 in (9 cm) mid-woofer and one for a tweeter, each with a dedicated amplifier. Two PLAY:1s can be paired for stereo sound or as rear speakers for a SONOS PLAYBAR in a home theater system.
- **The SONOS PLAYBAR** is a full-theater HiFi soundbar with a sophisticated nine speaker design that connects to HDTV with a single cable and plays all sources connected to the TV, including cable/SAT boxes, Blu-ray players, and game consoles. It is compatible with Dolby® Digital and PCM.

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | See, e.g., Sonos Five Product Manual (https://www.sonos.com/support/en-us/sonos-user-guide/index.html#t=sonos-user-guide%2Ffive%2Ffive.htm): <br><br>  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.*, Sonos Arc Product Manual (https://www.sonos.com/en-us/shop/arc.html?utm_campaign=GGL_US_EN_SONOS_B_ARC_EXACT_360i&utm_mediu m=cpc&utm_source=google&utm_content=GGL_US_EN_SONOS_B_ARC_EXACT_360i&u tm_term=sonos%20arc&gclid=EAIaIQobChMI6Pz2r4L06wIVhMDACh1qHA9WEAAYASA BEgL1MvD_BwE&gclsrc=aw.ds): |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **Arc**<br><br>The premium smart soundbar for TV, movies, music, and more—<br><br>• 3D sound with Dolby Atmos.<br>• Eleven high-performance drivers, including custom elliptical woofers and angled side tweeters for rich bass and clear dialogue.<br>• Arc's advanced processing creates five phased-array channels that deliver sound to your ears from all directions.<br>• Quick and easy setup, with only one cable to connect to your TV. Elegant design discreetly mounts to the wall or sits on a credenza beneath the TV.<br>• Expandable. Add a Sub and a pair of Sonos speakers (Sonos One or Sonos Five), for 5.1 surround sound. For more information, see **Sonos home theater**.<br>• Compatible with [sonos] only.<br>• See **Getting started** when you're ready to add Arc to your Sonos system. |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent



|  |  |  |
|---|---|---|
|  |  |  |
|  |  | *See, e.g.*, Sonos Play:3 Teardown (February 26, 2013), https://www.ifixit.com/Teardown/Sonos+Play:3+Teardown/12475: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>• With the motherboard removed and stripped down, we finally get to see the control behind the music. The following prominent ICs power this device:<br><br>• MPC8314VRADDA low-power PowerQUICC II pro 266 MHz processor<br><br>• STMicroelectronics NAND 512W3A2SN6<br><br>• Nanya NT5TU32M16DG-3C 512 Mb DDR2 RAM<br><br>• STMicroelectronics STA339BW 2.1-channel high-efficiency digital audio system, capable of outputting 2 × 20 W into 8 Ω at 18 V (we assume these two chips make up the "three class-D digital amplifiers" listed on Sonos' website)<br><br>• Maxim 78Q2123 10/100 fast ethernet MicroPHY<br><br>• HanRun HY601680 10/100Base-T transformer module<br><br>• On the back: Texas Instruments TPS54226 4.5 V to 18 V input, 2 A synchronous step-down SWIFT converter |
| 1c. | an audio output element; | The Sonos Devices include an audio output element.  The Sonos Devices, therefore, meet this claim limitation literally, or alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Sonos System Overview, October 20, 2014 at 4: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **2.1   Sonos Players**<br><br>A Sonos player is a Sonos component that can play audio on its own without being bonded to another Sonos product (to act as if they are a single player). For more information about bonding, see section 4, Group Management. Sonos players include:<br><br>• **The SONOS PLAY:5** is a high-performance all-in-one wireless speaker that delivers crystal-clear, room-filling sound using a five-way speaker system driven by five digital amplifiers.<br>• **The SONOS PLAY:3** is an all-in-one wireless speaker that delivers pure, clear, room-filling sound using a three-driver system. Two PLAY:3s can be bonded as a stereo pair for stereo sound or as rear speakers for a SONOS PLAYBAR home theater system.<br>• **The SONOS PLAY:1** is the most compact Sonos speaker, with two custom-designed drivers, one for a 3.5 in (9 cm) mid-woofer and one for a tweeter, each with a dedicated amplifier. Two PLAY:1s can be paired for stereo sound or as rear speakers for a SONOS PLAYBAR in a home theater system.<br>• **The SONOS PLAYBAR** is a full-theater HiFi soundbar with a sophisticated nine speaker design that connects to HDTV with a single cable and plays all sources connected to the TV, including cable/SAT boxes, Blu-ray players, and game consoles. It is compatible with Dolby® Digital and PCM.<br>• **The amplified SONOS CONNECT:AMP** has a built-in 55W per channel digital amplifier. Just add speakers to bring superior audio quality to any room.<br>• **The non-amplified SONOS CONNECT** connects directly to a home theater receiver, stereo system, or other audio device, so customers can instantly integrate these devices into their Sonos system. |

32

EXHIBIT E
Infringement of '586 Patent

| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 10: |
| | |  |
| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 16: |

33

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 32: |
|---|---|---|
| | |  |
| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 27: |

35

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |
| | *See, e.g.*, Sonos User Guide, September 29, 2019 at 30: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |
| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 34: |

37

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **Beam**<br>The smart, compact soundbar for your TV—<br>• Play anything—music, TV, movies, podcasts, radio, audiobooks, and video games.<br>• Perfect size to wall-mount above or below your TV, or place on a credenza.<br>• Great for small to medium-sized rooms.<br>• **Microphone on/off** so you can use it hands-free.<br>• Quick and easy setup, with only one cable to connect to your TV.<br>• Expandable. Add a Sub and two Sonos speakers, like Play:1s, for 5.1 surround sound. For more information, see **Sonos home theater**.<br>• See **Getting started** when you're ready to add a Beam to your Sonos system.<br><br>**Controls and lights**<br>Swipe, touch, tap, or ask—with Beam you've got choices on how to control sound.<br>• Use the touch controls—touch or swipe across the controls.<br>• Voice control—set it up and use your voice to turn the TV on or off, adjust the volume, or play music.<br>• Use the app.<br>• Use your TV remote control.<br><br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 45: |

38

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |
| | *See, e.g.*, Sonos User Guide, September 29, 2019 at 54: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.*, Sonos Play:3 Teardown (February 26, 2013), https://www.ifixit.com/Teardown/Sonos+Play:3+Teardown/12475: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |
| 1d. | a reset element; and | The Sonos Devices include a reset element.  The Sonos Devices, therefore, meet this claim limitation literally, or alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 17, 2, 24, 35, 56, 60, 67, 81, 87:<br><br> |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | All of the Sonos Devices include a reset element, which for example, is the hardware or software that recognizes that the Sonos Device has been introduced into a new network, and enters into a receiving mode for receiving information necessary to join the network.<br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 10 (Move):<br><br> |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 16: <br><br>  <br><br> *See, e.g.*, Sonos User Guide, September 29, 2019 at 20: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 20:<br><br><br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 35: |

45

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.*, Sonos User Guide, June 2020 at 87 (Play:5):<br><br><br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 30: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  *See, e.g.*, Sonos User Guide, September 29, 2019 at 35 (Beam):  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 45:<br><br><br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 55-56 (Playbase): |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  *See, e.g.*, Sonos User Guide, September 29, 2019 at 71 (Amp): |

49

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | <br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 77-78 (Port): |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | **Port**<br>The versatile streaming component for your stereo or receiver.<br>• Plug in the audio equipment you already own and listen out loud.<br>• Stream everything you love using the Sonos app and AirPlay2.<br>• Use line-in to connect your turntable, or play music straight from a friend's phone on your stereo.<br>• 12V trigger automatically turns your amplifier on and off.<br>• See **Getting started** when you're ready to add Port to your Sonos system.<br><br> |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 82-83: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | 

**Connect:Amp**

The amplified music streaming upgrade for your favorite indoor or outdoor speakers—

- Plug in any audio device, like a turntable or a phone, and listen out loud.
- Built-in amplifier powers large or small speakers.
- RCA line-in for connecting a range of playback sources.
- Pairs with your Sonos home theater speaker for surround sound using your favorite non-Sonos speakers.
- See **Getting started** when you're ready to add a Connect:Amp to your Sonos system.

**Controls and lights**

| | Volume up (+) Volume down (-) | Press to adjust the volume. **Note:** You can also use the app. |
| ▶‖ | Play/Pause | • Press *once* to play or pause music. • Press *twice* to skip to the next song (if applicable to the selected music source). • Press *three times* to go back to the previous song. • Press and hold to add the music playing in another room. **Note:** You can't skip forward or go back when listening to a radio station. |
| | Status light | Indicates the status. **Learn more** If the light is distracting, you can turn it off in your room's settings. |
|

53

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | <br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 87-88: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
| --- | --- |
| |  *See, e.g.*, Sonos User Guide, September 29, 2019 at 93: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.*, Walter Galan, Sonos Play:3 Teardown (February 26, 2013), https://www.ifixit.com/Teardown/Sonos+Play:3+Teardown/12475: |

58

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.,* Sonos Play 1 Motherboard Replacement (Oct. 17, 2016), https://www.ifixit.com/Guide/Sonos+Play+1+Motherboard+Replacement/50818: |

59

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  Sonos U.S. Patent No. 8,326,951 is listed on Sonos's website as being practiced by Sonos's Amp, Arc, Beam, Boost, Five, Move, One, One SL, Playbase, Port, and Sub products.  See Sonos Patents (https://www.sonos.com/en-us/legal/patents).  Sonos U.S. Patent No. 8,326,951 explains that the Sonos Devices (*e.g.*, zone players or "ZP") include a "reset button" that is used to connect the Sonos Device with other Sonos Devices in a mesh network.<br><br>*See, e.g.*, U.S. Patent No. 8,326,951 at 6:16-33, 10:61-11:20, 11:50-59, 12:36-14:23, 16:1-20:<br><br>    "Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | Zone player 200 in accordance with the present invention. The Zone player 200 includes a network interface 202, a processor 204, a memory 206, an audio processing circuit 210, a digital signal processing module 212, and an audio amplifier 214. The network interface 202 facilitates a data flow between a data network (i.e., the data network 108 of FIG. 1) and the Zone player 200 and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols is TCP/IP (Transmission Control Protocol/Internet Protocol) commonly used in the Internet. In general, a network interface manages the conversion of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface 202 handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the Zone player 200." <br><br> "In one embodiment, packets of data are broadcasted among the members of the HOUSEHOLD. The packets of data comprise a mixture of "probe' datagrams and standard IP broadcast. For example, the 802.11 "probe' datagrams are used for the inherent ability to cross wireless network boundaries. In other words, the "probe' datagrams can be received by all listeners (i.e., other devices) on the channel, even those that are not configured with an SSID, because they are sent to the broadcast BSS (e.g., FF:FF:FF:FF:FF:FF) to which all devices may be configured to listen. A standard IP broadcast is used on the wired network segments and the HOUSEHOLD network infrastructure to enable a PC-based controller to participate while running with standard user privileges (which allow access only to IP-based network services). Used together as described below, the combination of the "probe' datagrams and IP broadcast provides for a broadcast datagram transport that allows even devices that have not had any networking parameters configured to communicate. <br> In general, the probe datagrams comprise a number of elements to facilitate the configuration of other devices to join the HOUSEHOLD. In one embodiment, each of the elements carries up to 255 bytes of data. An element contains data payload for each message used by the bootstrap procedure to invite others to join the HOUSEHOLD. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | This element is repeated as many times as necessary to carry the complete message. In one embodiment, the IP broadcast datagrams contain the same data payload as the normal IP data payload." "Using this method of broadcast communication, packets can be sent between any member of the HOUSEHOLD and a device to join the HOUSEHOLD on both Ethernet and wireless networks. The device to join the HOUSEHOLD may be brand new and previously configured with a different network (e.g., a device with a stale configuration in a different household). In addition, if used sparingly, these broadcast messages do not interfere with the normal operation of the network or attached devices. As a result, a communication path on an agreed channel has been established between two devices." "Device Discovery. To minimize impact on existing networks and to improve configuration security, the system requires a user to manually activate the auto-configuration process. This is accomplished by a specific action on each device that is being added to the network. For example, if the user is installing a brand new HOUSEHOLD, containing one CP and two ZP's, the activation process may be manually activated on each by, for example, powering off and on, pushing a reset button or pushing two or more specific buttons simultaneously. In one embodiment, the CP or ZP is simply powered up by the user, which activates the pre-installed module to start the bootstrap procedure. For a ZP: If the device is unconfigured (e.g., factory default settings), it will immediately go into a "sleep" mode where it is awaiting an activation command. If the device has been previously configured, it will attempt to contact other members of its HOUSEHOLD network. There are situations in which a ZP is orphaned, namely it is previously configured (e.g., perhaps, with another Ad-hoc network) and now is to be added to the HOUSEHOLD |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | (e.g., the ZP is obtained from a previous owner). In the case of an orphan scenario, the ZP may patiently attempt to contact its original network. It can be perceived that this operation will be unsuccessful but otherwise harmless. Even in this configured state, the device can participate in the rudimentary broadcast communication processes described above. <br> For the CP: <br><br> If the device is unconfigured (e.g., factory default settings), it will present the user with a description of how to start the configuration process. <br> If the device is configured, it will attempt to contact other members of its HOUSEHOLD network. <br> The CP may also be an orphaned device, in which case it performs similarly to that of the ZP. <br> In both cases, correctly configured devices will establish network communications and make themselves available for normal operation. All devices, including those previously configured, will enter an "activation state" when the user indicates that this is desired. At this point, the configuration process can begin. <br> Device Configuration. <br> The configuration is carried out by exchanging data between two devices that are not necessarily directly connected. This procedure is carried over a rudimentary communication path as described previously. The sequence of exchanging the data is initiated by the user or some other process, for example, activating a reset button, to trigger the "activation" or configuration mode on the involved devices. Each device executes this sequence, and then exits the activation mode. FIG. 3B shows an embodiment that involves a process of five exchanges of data. <br> Each of the data exchanges is referred to as a type of message: Alive, QueryNetParams, RespondNetParams, SetNetParams, and AckNetParams, each is explained as follows: <br> Alive—a message indicating that a named ZP is available for configuration. The message includes at least a zpUUID which is a globally unique identifier that identifies the ZP sending the message. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | QueryNetParams—a request from the CP to the ZP to respond with the ZP's current network configuration information. The request includes at least a zpUUID, cpPK (the RSA public key of the CP) and tid (a unique transaction identifier). RespondNetParams—a response to the QueryNetParams. It includes the ZP's network configuration information (HHID, WEP key and RSA public key). For security reasons, the WEP key is encrypted using the CP's public key that is only readable by the CP. The response includes at least a zpUUID, netConfig (the ZP's current network configuration parameters), zpPK, and tid. It should be noted that a new ZP, set to factory defaults, shall have well-known parameter values, allowing the CP to determine that it is unconfigured. SetNetParams—a command message from the CP to the ZP indicating that the ZP should reconfigure its network parameters. The WEP key is encrypted using the ZP's public key, and therefore only readable by the ZP. The command includes at least a zpUUID, netConfig and tid. It should be noted that netConfig includes the new configuration parameters for the ZP, as determined by the CP. The ZP should save this value in its network configuration, in some cases, these parameters may match the ZP's existing configuration. AckNetParams—a response to the SetNetParams messaging. The response indicates that the SetNetParams message was received and that the network configuration contained therein has been successfully applied. The response includes at least a zpUUID and a tid. In operation, after a user activates the configuration process (on both ZP and CP) at **351** in FIG. 3B. The CP enters a state where it is willing to accept an Alive message. The CP only remains in this state for a limited (finite) period of time. The ZP enters an activation state where it attempts rendezvous with a CP. The ZP only remains in this state for a limited (finite) period of time. The ZP will periodically transmit an Alive message until it either receives a QueryNetParams message, or exits the activation state. At **352**, the CP receives an Alive message. If the CP is in the configuration mode, it will generate a new tid, and send a QueryNetParams message and send to the ZP. It should be noted that the CP may or may not have been configured at this point. In either case, it |

64

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | sends the QueryNetParams. At **353**, if it is already in the activation state, the ZP responds to a QueryNetParams with its current network configuration. If the ZP is unconfigured (e.g., factory default settings), it will return an empty HHID and WEP key. If the ZP is previously configured, it will return its current configuration. The ZP also returns its public key such that the WEP key can be encrypted using the CP's public key. |

At **354**, upon receiving the ZP's current configuration information, the CP decides on a course of action. Most, but not all, of these options result in a SetNetParams message being sent to the ZP. The matrix of possible situations:

|  | CP already configured | CP not configured |
|---|---|---|
| ZP already configured | The CP sends a SetNetParams message to the ZP containing the CP's current net config. | The CP sets its own config to match the ZP config, and the config process is terminated. |
| ZP not configured | The CP sends a SetNetParams message to the ZP containing the CP's current net config. | The CP generates new config parameters. The parameters are sent to the ZP in a SetNetParams message. The CP sets its own config to these values as well. |

At **355**, when the ZP receives a SetNetParams message, it reconfigures its own HHID and WEP key to match those contained in the network packet. Accordingly, the CP determines that it generates new configuration parameters in accordance with the following:

HHID—this is provided by the user via the CP user interface or automatically generated by the CP.
SSID—this is automatically generated by the CP (e.g., set to the same value as the HHID).
WEP Key—this is automatically generated (e.g., using a pseudo-random number generator, seeded with entropy collected by the CP).

65

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | Channel—the CP probes the network looking for an acceptable channel (based on a variety of criteria, which may include traffic and interference from other sources).<br><br>Subsequent to the activation process, any devices that have been reconfigured will attempt to establish normal network communications using their new network configuration parameters. In all of the above steps, if the CP or ZP is not already in the activation state, receipt of any messages is ignored.<br>If there are multiple ZP's activated simultaneously, all of the devices could execute this same sequence, independently of each other (the CP is capable of multiple independent sessions). If multiple CP's are activated, each will respond to a ZP's Alive message and will execute the sequence—the first one to deliver the SetNetParams to the ZP will configure it. It should be noted that in this case, the second CP will never get an AckNetParams message (because the ZP has exited the activate state). This will cause a transaction timeout in the second CP, at which point it will typically inform the user of the error, or retry the entire sequence. Should it retry the entire sequence, it will not reprogram the ZP (as described above that the effect of an unconfigured CP talking to a configured ZP)."<br><br>"In one embodiment, a handheld controller is configured to facilitate a new Zone player to execute a household join process to join the HOUSEHOLD upon an appropriate channel. The channel may be agreed upon between the controller and the Zone player as follows:<br>1) when a reset or two buttons are pushed on the Zone Player to activate the household join process, it starts a Scan through the available wireless channels, sending the "Alive' datagram for each channel in turn. Sometimes, it cycles through the channels several times;<br>2) as soon as the ZonePlayer receives a QueryNetParams request address to itself, it stops the channel cycling; and<br>3) The ZonePlayer remains locked on whatever channel it has stopped cycling until a Successful sequence ending in the configuration of the ZonePlayer (at which point it |

66

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | uses the specified channel), or a timeout expires (at which point it returns to its original channel or resumes cycling through channels and sending alive messages if the overall timeout for the activation process has not expired)." |
| 1f. | a controller operatively coupled to the wireless transceiver, the audio output element, and the reset element, the controller being configured to: | The Sonos Devices include a controller operatively coupled to the wireless transceiver, the audio output element, and the reset element.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>For example, each of the Sonos Devices include a microprocessor that is operatively coupled to other hardware to enable the Device to operate in the "SonosNet" wireless mesh network.  For example, the microprocessor of each device is operatively coupled to the Device's wireless transceiver, audio output element, and the reset element.<br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 3:<br><br><br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 6:<br><br> |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.*, Sonos Blog (Jan. 21, 2020), https://blog.sonos.com/en/end-of-software-updates-for-legacy-products/: |

**Starting in May 2020, some of our oldest products will no longer receive software updates or new features. We want to explain why and your options.**

When we first set out almost 20 years ago to invent the technology to easily listen to any song in any room, most of the ways we listen to music today did not exist. In fact, the first Sonos products were introduced before the first iPhone was announced and when Myspace still ruled social media.

In order to invent multi-room music and smart speakers, we combined the worlds of high-fidelity audio and computing. Every Sonos product has a microprocessor, flash memory, and other hardware components typically found in computers and smartphones.

Since launching our first products, technology has advanced at an exponential rate; from streaming services and voice assistants to wireless networking and Bluetooth capabilities. Through all of this transformation, we have continued delivering new features via software updates. We're extremely proud of the fact that we build products that last a long time, and that listeners continue to enjoy them. In fact, 92% of the products we've ever shipped are still in use today. That is unheard of in the world of consumer electronics. However, we've now come to a point where some of the oldest products have been stretched to their technical limits in terms of memory and processing power.

This coming May, these legacy products—our original Zone Players, Connect, and Connect:Amp (launched in 2006; includes versions sold until 2015), first-generation Play:5 (launched 2009), CR200 (launched 2009), and Bridge (launched 2007)—will no longer receive software updates or new features.

Today the Sonos experience relies on an interconnected ecosystem, giving you access to more than 100 streaming services, voice assistants, and control options like Apple AirPlay 2. Without new software updates, access to services and overall functionality of your sound system will eventually be disrupted, particularly as partners evolve their technology.

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | *See, e.g.*, Walter Galan, Sonos Play:3 Teardown (Feb. 26, 2013), https://www.ifixit.com/Teardown/Sonos+Play:3+Teardown/12475:  *See, e.g.,* Warren Willingham, Sonos Play 5 Antenna Replacement (July 26, 2017), https://www.ifixit.com/Guide/Sonos+Play+5+Antenna+Replacement/87894: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.,* Sonos Play 1 Motherboard Replacement (Oct. 17, 2016), https://www.ifixit.com/Guide/Sonos+Play+1+Motherboard+Replacement/50818:<br><br> |

70

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.,* Sonos Play 1 Motherboard Replacement (Oct. 17, 2016), https://www.ifixit.com/Guide/Sonos+Play+1+Motherboard+Replacement/50818:<br><br> |
| 1g. | receive a communication packet using the wireless transceiver, the communication packet including a preamble portion, an identification code portion, a data payload portion, and an integrity portion; | The controller of the Sonos Devices is configured to receive a communication packet using the wireless transceiver, the communication packet including a preamble portion, an identification code portion, a data payload portion, and an integrity portion.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>The Sonos Devices receive communication packets using the wireless transceiver.  These packets are communicated using, for example, application level protocols, such as HTTP, HTTPS, MMS, RTSP, and NTP, operating over transport and network protocols, such as TCP/IP. These data packets include multiple portions, such as a preamble portion, an identification code portion, a data payload portion, and an integrity portion. |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | *See, e.g.*, Claim 1b and Claim 1f.<br><br>*See, e.g.,* Sonos Music API – Getting Started Guide (2014), https://musicpartners.sonos.com/node/464:<br><br><br><br>*See, e.g.*, Sonos System Overview, October 20, 2014 at 7-10: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | | Infringement Contentions |
|---|---|---|---|
| | | |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.,* Sonos Group Coordinator Question (https://en.community.sonos.com/controllers-software-228995/sonos-group-coordinator-question-6803946): |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

*See, e.g.*, Sonos Developer, Control, https://developer.sonos.com/build/direct-control/discover/:

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

*See, e.g.,* How to group rooms in the Sonos app (Jan. 7, 2020), support.sonos.com/s/article/3391:



The Sonos Devices receive a communication packet including a preamble portion, an identification code portion, a data payload portion, and an integrity portion.

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.,* Mullins, Exploring the anatomy of a data packet (July 2, 2001), https://www.techrepublic.com/article/exploring-the-anatomy-of-a-data-packet/: <br><br>  <br><br> *See, e.g.,* Lin, TCP/IP: The Protocol Bros and Family (Oct. 2, 2016), https://medium.com/@berto168/tcp-ip-the-protocol-bros-and-family-3c142e42416a: |

79

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

Sonos U.S. Patent No. 8,326,951 is listed on Sonos's website as being practiced by Sonos's Amp, Arc, Beam, Boost, Five, Move, One, One SL, Playbase, Port, and Sub products.  See Sonos Patents (https://www.sonos.com/en-us/legal/patents).  Sonos U.S. Patent No. 8,326,951 discloses that the Sonos Devices (*e.g.*, zone players or "ZP") transmit data packets within the mesh network that include identifiers for the originating Sonos product and destination Sonos product in addition to the data it is sending

*See, e.g.*, U.S. Patent No. 8,326,951 at 6:16-33, 10:61-11:20, 11:50-59, 12:36-14:23, 16:1-20:

"Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a Zone player 200 in accordance with the present invention. The Zone player 200 includes a network interface 202, a processor 204, a memory 206, an audio processing

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | circuit 210, a digital signal processing module 212, and an audio amplifier 214. The network interface 202 facilitates a data flow between a data network (i.e., the data network 108 of FIG. 1) and the Zone player 200 and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols is TCP/IP (Transmission Control Protocol/Internet Protocol) commonly used in the Internet. In general, a network interface manages the conversion of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface 202 handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the Zone player 200."<br><br>"In one embodiment, packets of data are broadcasted among the members of the HOUSEHOLD. The packets of data comprise a mixture of "probe' datagrams and standard IP broadcast. For example, the 802.11 "probe' datagrams are used for the inherent ability to cross wireless network boundaries. In other words, the "probe' datagrams can be received by all listeners (i.e., other devices) on the channel, even those that are not configured with an SSID, because they are sent to the broadcast BSS (e.g., FF:FF:FF:FF:FF:FF) to which all devices may be configured to listen. A standard IP broadcast is used on the wired network segments and the HOUSEHOLD network infrastructure to enable a PC-based controller to participate while running with standard user privileges (which allow access only to IP-based network services). Used together as described below, the combination of the "probe' datagrams and IP broadcast provides for a broadcast datagram transport that allows even devices that have not had any networking parameters configured to communicate.<br>In general, the probe datagrams comprise a number of elements to facilitate the configuration of other devices to join the HOUSEHOLD. In one embodiment, each of the elements carries up to 255 bytes of data. An element contains data payload for each message used by the bootstrap procedure to invite others to join the HOUSEHOLD. This element is repeated as many times as necessary to carry the complete message. In one embodiment, the IP broadcast datagrams contain the same data payload as the |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | normal IP data payload." "Using this method of broadcast communication, packets can be sent between any member of the HOUSEHOLD and a device to join the HOUSEHOLD on both Ethernet and wireless networks. The device to join the HOUSEHOLD may be brand new and previously configured with a different network (e.g., a device with a stale configuration in a different household). In addition, if used sparingly, these broadcast messages do not interfere with the normal operation of the network or attached devices. As a result, a communication path on an agreed channel has been established between two devices." "Device Discovery. To minimize impact on existing networks and to improve configuration security, the system requires a user to manually activate the auto-configuration process. This is accomplished by a specific action on each device that is being added to the network. For example, if the user is installing a brand new HOUSEHOLD, containing one CP and two ZP's, the activation process may be manually activated on each by, for example, powering off and on, pushing a reset button or pushing two or more specific buttons simultaneously. In one embodiment, the CP or ZP is simply powered up by the user, which activates the pre-installed module to start the bootstrap procedure. For a ZP: If the device is unconfigured (e.g., factory default settings), it will immediately go into a "sleep" mode where it is awaiting an activation command. If the device has been previously configured, it will attempt to contact other members of its HOUSEHOLD network. There are situations in which a ZP is orphaned, namely it is previously configured (e.g., perhaps, with another Ad-hoc network) and now is to be added to the HOUSEHOLD (e.g., the ZP is obtained from a previous owner). In the case of an orphan scenario, the ZP may patiently attempt to contact its original network. It can be perceived that this |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | operation will be unsuccessful but otherwise harmless. Even in this configured state, the device can participate in the rudimentary broadcast communication processes described above.<br>For the CP:<br><br>If the device is unconfigured (e.g., factory default settings), it will present the user with a description of how to start the configuration process.<br>If the device is configured, it will attempt to contact other members of its HOUSEHOLD network.<br>The CP may also be an orphaned device, in which case it performs similarly to that of the ZP.<br>In both cases, correctly configured devices will establish network communications and make themselves available for normal operation. All devices, including those previously configured, will enter an "activation state" when the user indicates that this is desired. At this point, the configuration process can begin.<br>Device Configuration.<br>The configuration is carried out by exchanging data between two devices that are not necessarily directly connected. This procedure is carried over a rudimentary communication path as described previously. The sequence of exchanging the data is initiated by the user or some other process, for example, activating a reset button, to trigger the "activation" or configuration mode on the involved devices. Each device executes this sequence, and then exits the activation mode. FIG. 3B shows an embodiment that involves a process of five exchanges of data.<br>Each of the data exchanges is referred to as a type of message: Alive, QueryNetParams, RespondNetParams, SetNetParams, and AckNetParams, each is explained as follows:<br>Alive—a message indicating that a named ZP is available for configuration. The message includes at least a zpUUID which is a globally unique identifier that identifies the ZP sending the message.<br>QueryNetParams—a request from the CP to the ZP to respond with the ZP's current network configuration information. The request includes at least a zpUUID, cpPK (the |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | RSA public key of the CP) and tid (a unique transaction identifier). RespondNetParams—a response to the QueryNetParams. It includes the ZP's network configuration information (HHID, WEP key and RSA public key). For security reasons, the WEP key is encrypted using the CP's public key that is only readable by the CP. The response includes at least a zpUUID, netConfig (the ZP's current network configuration parameters), zpPK, and tid. It is should be noted that a new ZP, set to factory defaults, shall have well-known parameter values, allowing the CP to determine that it is unconfigured. SetNetParams—a command message from the CP to the ZP indicating that the ZP should reconfigure its network parameters. The WEP key is encrypted using the ZP's public key, and therefore only readable by the ZP. The command includes at least a zpUUID, netConfig and tid. It should be noted that netConfig includes the new configuration parameters for the ZP, as determined by the CP. The ZP should save this value in its network configuration, in some cases, these parameters may match the ZP's existing configuration. AckNetParams—a response to the SetNetParams messaging. The response indicates that the SetNetParams message was received and that the network configuration contained therein has been successfully applied. The response includes at least a zpUUID and a tid. In operation, after a user activates the configuration process (on both ZP and CP) at **351** in FIG. 3B. The CP enters a state where it is willing to accept an Alive message. The CP only remains in this state for a limited (finite) period of time. The ZP enters an activation state where it attempts rendezvous with a CP. The ZP only remains in this state for a limited (finite) period of time. The ZP will periodically transmit an Alive message until it either receives a QueryNetParams message, or exits the activation state. At **352**, the CP receives an Alive message. If the CP is in the configuration mode, it will generate a new tid, and send a QueryNetParams message and send to the ZP. It should be noted that the CP may or may not have been configured at this point. In either case, it sends the QueryNetParams. At **353**, if it is already in the activation state, the ZP responds to a QueryNetParams with its current network configuration. If the ZP is |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | unconfigured (e.g., factory default settings), it will return an empty HHID and WEP key. If the ZP is previously configured, it will return its current configuration. The ZP also returns its public key such that the WEP key can be encrypted using the CP's public key.<br><br>At **354**, upon receiving the ZP's current configuration information, the CP decides on a course of action. Most, but not all, of these options result in a SetNetParams message being sent to the ZP. The matrix of possible situations:<br><br><br><br>At **355**, when the ZP receives a SetNetParams message, it reconfigures its own HHID and WEP key to match those contained in the network packet. Accordingly, the CP determines that it generates new configuration parameters in accordance with the following:<br><br>HHID—this is provided by the user via the CP user interface or automatically generated by the CP.<br>SSID—this is automatically generated by the CP (e.g., set to the same value as the HHID).<br>WEP Key—this is automatically generated (e.g., using a pseudo-random number generator, seeded with entropy collected by the CP).<br>Channel—the CP probes the network looking for an acceptable channel (based on a variety of criteria, which may include traffic and interference from other sources). |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | Subsequent to the activation process, any devices that have been reconfigured will attempt to establish normal network communications using their new network configuration parameters. In all of the above steps, if the CP or ZP is not already in the activation state, receipt of any messages is ignored.<br>If there are multiple ZP's activated simultaneously, all of the devices could execute this same sequence, independently of each other (the CP is capable of multiple independent sessions). If multiple CP's are activated, each will respond to a ZP's Alive message and will execute the sequence—the first one to deliver the SetNetParams to the ZP will configure it. It should be noted that in this case, the second CP will never get an AckNetParams message (because the ZP has exited the activate state). This will cause a transaction timeout in the second CP, at which point it will typically inform the user of the error, or retry the entire sequence. Should it retry the entire sequence, it will not reprogram the ZP (as described above that the effect of an unconfigured CP talking to a configured ZP)."<br><br>"In one embodiment, a handheld controller is configured to facilitate a new Zone player to execute a household join process to join the HOUSEHOLD upon an appropriate channel. The channel may be agreed upon between the controller and the Zone player as follows:<br>1) when a reset or two buttons are pushed on the Zone Player to activate the household join process, it starts a Scan through the available wireless channels, sending the "Alive' datagram for each channel in turn. Sometimes, it cycles through the channels several times;<br>2) as soon as the ZonePlayer receives a QueryNetParams request address to itself, it stops the channel cycling; and<br>3) The ZonePlayer remains locked on whatever channel it has stopped cycling until a Successful sequence ending in the configuration of the ZonePlayer (at which point it uses the specified channel), or a timeout expires (at which point it returns to its original channel or resumes cycling through channels and sending alive messages if the overall |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | timeout for the activation process has not expired)." |
| 1h. | compare at least the identification code portion of the received communication packet to a table of identifiers stored in the audio-enabled wireless device; | The controller of the Sonos Devices is configured to compare at least the identification code portion of the received communication packet to a table of identifiers stored in the audio-enabled wireless device.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>The Sonos Devices, operating within a "SonosNet" wireless mesh network, are configured to compare the identification code portion of received communication packets to a table of identifiers, corresponding for example to a list of devices within the same "household," and based on that comparison determine to relay the communication packet to another Sonos Device within the network.  *See, e.g.*, Sonos System Overview, October 20, 2014 at 7-10:<br><br> |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | 

### 3.1   Standard Setup

In a standard wireless network, coverage radiates outward from a central router or access point. The further a wireless client is from this central point, the weaker the signal between the two will be.

*Figure 2: Standard Wireless Network*

In Figure 2 above, each Sonos component talks to the wireless router. Therefore, for homes with wireless connectivity issues, or those with a large number of Sonos players, standard wireless setup may not be the best choice.

### 3.2   SonosNet™ Setup

SonosNet is different because each Sonos product is both a network client and access point. Instead of merely accessing the network, each component also expands it. Sonos components communicate with every other Sonos component in wireless range, ensuring multiple, redundant paths for data to travel. While each component must be within range of at least one other component, they don't need to be within range of the central point. |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.,* Sonos Group Coordinator Question (https://en.community.sonos.com/controllers-software-228995/sonos-group-coordinator-question-6803946): |

90

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.*, Sonos Developer, Control, https://developer.sonos.com/build/direct-control/discover/:  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | <br><br>*See, e.g.,* How to group rooms in the Sonos app (Jan. 7, 2020), support.sonos.com/s/article/3391:<br><br><br><br>The Sonos Devices use, for example, the NTP Protocol to send information amongst the Sonos Devices and the NTP Protocol uses identifiers to designate the proper devices for grouping. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.* Network Time Protocol, en.wikipedia.org/Network_Time_Protocol.<br><br> |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

*See, e.g.*, Sonos Developer, Discover (https://developer.sonos.com/build/direct-control/discover/):



The Sonos Devices also include a unique identifier associated with a user for sending information amongst the Sonos Devices and for grouping. *See, e.g.*, Sonos Developer, Authorize (https://developer.sonos.com/build/direct-control/authorize/):

EXHIBIT E
Infringement of '586 Patent

## Authorize

Use the Sonos login service to authenticate with a Sonos user's household. The login service uses the OAuth 2.0 authorization framework and three-legged authentication. Three-legged authentication includes three participants, the user, your integration, and Sonos. These participants interact in three stages:

1. **Your integration** sends **the user** to the **Sonos** login service with your client credentials and parameters.
2. **The user** authenticates with **Sonos** and **Sonos** sends an authorization code back to **your integration**.
3. **Your integration** uses the authorization code to get an access token and a refresh token from **Sonos**.

Your integration then sends your access token to Sonos in every API call. When the access token expires, your integration can use the refresh token to get a new one. See the Authorize Code Grant flow in the OAuth RFC for more information.

See Authorization API for a list of APIs.

## Send the user to the Sonos login service

Send the user to the Sonos login service with your key and parameters.  For example, with a button instructing the user to enable your integration to use Sonos. This button should use the create authentication code API to send your key and redirect URI to Sonos. Construct the request URI by following the instructions in the Authorization Request instructions in the OAuth 2.0 RFC (RFC 6749) to do this. Issue a GET request to https://api.sonos.com/login/v3/oauth with the following query string parameters:

- `client_id` — your client credential key.

- `response_type` — use "code" to signify authorization code.

- `state` —an opaque value that you can use to maintain state between the request and callback. Sonos adds this back to your redirect URL when it redirects the user back to your service after login.

- `scope` — Use `playback-control-all`.

- `redirect_uri` — URL encoded value of your Redirect URI. This must match one of the redirect URLs that you provided for your key in the integration manager. This must be a client-side request as the Sonos login service displays Web pages to the user to prompt them to login to their Sonos account and allow your integration to access and control their Sonos household.

See Create Authorization Code for details about these fields.

For example:

```
2  onclick="location.href='https://api.sonos.com/login/v3/oauth?client_id=YourAPIKeyGoesHere&response_type=code&st
3  type="button">
4  Sign in with Sonos
5  </button>
```

EXHIBIT E
Infringement of '586 Patent

## The user authenticates with Sonos

The login service asks the user to authorize your integration to use their Sonos system. The user authenticates with Sonos. Sonos sends an authorization code back to your integration.

## The user authorizes your integration with a scope

OAuth 2.0 scopes enable the resource owner to control what the client can do once they've given access. Scopes are tied to access tokens. Sonos currently has one scope, `playback-control-all`, which enables clients to do the following on the user's Sonos system:

- See what's playing
- Change playback and volume
- Change rooms and groups
- Play favorites and playlists

Sonos may add more granular scopes in the future.

### Sonos sends an authorization code to your integration

Once the user gives consent to your integration, Sonos sends an authorization code to the redirect URI you provided. See Create Authorization Code for a sample response.

## Get an access token

Once you've gotten an authorization code, use it to get an access token and refresh token. Use the access token to send API calls to the household through the Sonos cloud. This step uses your client secret, so it should be a server-side request rather than a client-side (browser-based) request.

Use the create token API to construct the access token request. Send a POST to https://api.sonos.com/login/v3/oauth/access.

See Access Token Request instructions in the OAuth 2.0 RFC (RFC 6749) for details.

Here's an example using curl:

```
1  curl -X POST -H "Content-Type: application/x-www-form-urlencoded;charset=utf-8" \
2  -H "Authorization: Basic {YourBase64EncodedClientId:SecretGoesHere}" \
3  "https://api.sonos.com/login/v3/oauth/access" \
4  -d "grant_type=authorization_code&code=93713fe8-33aa-460c-97bd-320d7ae8679f&redirect_uri=https%3A%2F%2FACME.exa
```

And an example response:

```
1  {
2    "access_token": "d7cdf58d-d43c-412c-8887-6d7f95b6557e",
3    "token_type": "Bearer",
4    "expires_in": 86400,
5    "refresh_token": "585fb433-359c-4419-ac53-946106e5bbab",
6    "scope": "playback-control-all"
7  }
```

EXHIBIT E
Infringement of '586 Patent



### Sonos sends an authorization code to your integration

Once the user gives consent to your integration, Sonos sends an authorization code to the redirect URI you provided. See Create Authorization Code for a sample response.

## Get an access token

Once you've gotten an authorization code, use it to get an access token and refresh token. Use the access token to send API calls to the household through the Sonos cloud. This step uses your client secret, so it should be a server-side request rather than a client-side (browser-based) request.

Use the create token API to construct the access token request. Send a POST to https://api.sonos.com/login/v3/oauth/access.

See Access Token Request instructions in the OAuth 2.0 RFC (RFC 6749) for details.

Here's an example using curl:

```
1  curl -X POST -H "Content-Type: application/x-www-form-urlencoded;charset=utf-8" \
2  -H "Authorization: Basic {YourBase64EncodedClientId:SecretGoesHere}" \
3  "https://api.sonos.com/login/v3/oauth/access" \
4  -d "grant_type=authorization_code&code=93713fe8-33aa-460c-97bd-320d7ae8679f&redirect_uri=https%3A%2F%2FACME.exa
```

And an example response:

```
1  {
2    "access_token": "d7cdf58d-d43c-412c-8887-6d7f95b6557e",
3    "token_type": "Bearer",
4    "expires_in": 86400,
5    "refresh_token": "585fb433-359c-4419-ac53-946106e5bbab",
6    "scope": "playback-control-all"
7  }
```

EXHIBIT E
Infringement of '586 Patent



Sonos U.S. Patent No. 8,326,951 is listed on Sonos's website as being practiced by Sonos's Amp, Arc, Beam, Boost, Five, Move, One, One SL, Playbase, Port, and Sub products.  See Sonos Patents (https://www.sonos.com/en-us/legal/patents).  Sonos U.S. Patent No. 8,326,951 discloses that the Sonos Devices (*e.g.*, zone players or "ZP") create and include a list of identified Sonos products that constitute the HOUSEHOLD and use this list to determine whether the Sonos products are part of the mesh network.

*See, e.g.*, U.S. Patent No. 8,326,951 at 6:16-33, 10:61-11:20, 11:50-59, 12:36-14:23, 16:1-20:

> "Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a Zone player 200 in accordance with the present invention. The Zone player 200 includes a network interface 202, a processor 204, a memory 206, an audio processing circuit 210, a digital signal processing module 212, and an audio amplifier 214. The network interface 202 facilitates a data flow between a data network (i.e., the data

100

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | network 108 of FIG. 1) and the Zone player 200 and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols is TCP/IP (Transmission Control Protocol/Internet Protocol) commonly used in the Internet. In general, a network interface manages the conversion of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface 202 handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the Zone player 200."<br><br>"In one embodiment, packets of data are broadcasted among the members of the HOUSEHOLD. The packets of data comprise a mixture of "probe' datagrams and standard IP broadcast. For example, the 802.11 "probe' datagrams are used for the inherent ability to cross wireless network boundaries. In other words, the "probe' datagrams can be received by all listeners (i.e., other devices) on the channel, even those that are not configured with an SSID, because they are sent to the broadcast BSS (e.g., FF:FF:FF:FF:FF:FF) to which all devices may be configured to listen. A standard IP broadcast is used on the wired network segments and the HOUSEHOLD network infrastructure to enable a PC-based controller to participate while running with standard user privileges (which allow access only to IP-based network services). Used together as described below, the combination of the "probe' datagrams and IP broadcast provides for a broadcast datagram transport that allows even devices that have not had any networking parameters configured to communicate.<br>In general, the probe datagrams comprise a number of elements to facilitate the configuration of other devices to join the HOUSEHOLD. In one embodiment, each of the elements carries up to 255 bytes of data. An element contains data payload for each message used by the bootstrap procedure to invite others to join the HOUSEHOLD. This element is repeated as many times as necessary to carry the complete message. In one embodiment, the IP broadcast datagrams contain the same data payload as the normal IP data payload." |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | "Using this method of broadcast communication, packets can be sent between any member of the HOUSEHOLD and a device to join the HOUSEHOLD on both Ethernet and wireless networks. The device to join the HOUSEHOLD may be brand new and previously configured with a different network (e.g., a device with a stale configuration in a different household). In addition, if used sparingly, these broadcast messages do not interfere with the normal operation of the network or attached devices. As a result, a communication path on an agreed channel has been established between two devices." "Device Discovery. To minimize impact on existing networks and to improve configuration security, the system requires a user to manually activate the auto-configuration process. This is accomplished by a specific action on each device that is being added to the network. For example, if the user is installing a brand new HOUSEHOLD, containing one CP and two ZP's, the activation process may be manually activated on each by, for example, powering off and on, pushing a reset button or pushing two or more specific buttons simultaneously. In one embodiment, the CP or ZP is simply powered up by the user, which activates the pre-installed module to start the bootstrap procedure. For a ZP: If the device is unconfigured (e.g., factory default settings), it will immediately go into a "sleep" mode where it is awaiting an activation command. If the device has been previously configured, it will attempt to contact other members of its HOUSEHOLD network. There are situations in which a ZP is orphaned, namely it is previously configured (e.g., perhaps, with another Ad-hoc network) and now is to be added to the HOUSEHOLD (e.g., the ZP is obtained from a previous owner). In the case of an orphan scenario, the ZP may patiently attempt to contact its original network. It can be perceived that this operation will be unsuccessful but otherwise harmless. Even in this configured state, the device can participate in the rudimentary broadcast communication processes described |

102

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | above.<br>For the CP:<br><br>If the device is unconfigured (e.g., factory default settings), it will present the user with a description of how to start the configuration process.<br>If the device is configured, it will attempt to contact other members of its HOUSEHOLD network.<br>The CP may also be an orphaned device, in which case it performs similarly to that of the ZP.<br>In both cases, correctly configured devices will establish network communications and make themselves available for normal operation. All devices, including those previously configured, will enter an "activation state" when the user indicates that this is desired. At this point, the configuration process can begin.<br>Device Configuration.<br>The configuration is carried out by exchanging data between two devices that are not necessarily directly connected. This procedure is carried over a rudimentary communication path as described previously. The sequence of exchanging the data is initiated by the user or some other process, for example, activating a reset button, to trigger the "activation" or configuration mode on the involved devices. Each device executes this sequence, and then exits the activation mode. FIG. 3B shows an embodiment that involves a process of five exchanges of data.<br>Each of the data exchanges is referred to as a type of message: Alive, QueryNetParams, RespondNetParams, SetNetParams, and AckNetParams, each is explained as follows:<br>Alive—a message indicating that a named ZP is available for configuration. The message includes at least a zpUUID which is a globally unique identifier that identifies the ZP sending the message.<br>QueryNetParams—a request from the CP to the ZP to respond with the ZP's current network configuration information. The request includes at least a zpUUID, cpPK (the RSA public key of the CP) and tid (a unique transaction identifier).<br>RespondNetParams—a response to the QueryNetParams. It includes the ZP's network |

103

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | configuration information (HHID, WEP key and RSA public key). For security reasons, the WEP key is encrypted using the CP's public key that is only readable by the CP. The response includes at least a zpUUID, netConfig (the ZP's current network configuration parameters), zpPK, and tid. It is should be noted that a new ZP, set to factory defaults, shall have well-known parameter values, allowing the CP to determine that it is unconfigured.<br><br>SetNetParams—a command message from the CP to the ZP indicating that the ZP should reconfigure its network parameters. The WEP key is encrypted using the ZP's public key, and therefore only readable by the ZP. The command includes at least a zpUUID, netConfig and tid. It should be noted that netConfig includes the new configuration parameters for the ZP, as determined by the CP. The ZP should save this value in its network configuration, in some cases, these parameters may match the ZP's existing configuration.<br><br>AckNetParams—a response to the SetNetParams messaging. The response indicates that the SetNetParams message was received and that the network configuration contained therein has been successfully applied. The response includes at least a zpUUID and a tid.<br><br>In operation, after a user activates the configuration process (on both ZP and CP) at **351** in FIG. 3B. The CP enters a state where it is willing to accept an Alive message. The CP only remains in this state for a limited (finite) period of time. The ZP enters an activation state where it attempts rendezvous with a CP. The ZP only remains in this state for a limited (finite) period of time. The ZP will periodically transmit an Alive message until it either receives a QueryNetParams message, or exits the activation state. At **352**, the CP receives an Alive message. If the CP is in the configuration mode, it will generate a new tid, and send a QueryNetParams message and send to the ZP. It should be noted that the CP may or may not have been configured at this point. In either case, it sends the QueryNetParams. At **353**, if it is already in the activation state, the ZP responds to a QueryNetParams with its current network configuration. If the ZP is unconfigured (e.g., factory default settings), it will return an empty HHID and WEP key. If the ZP is previously configured, it will return its current configuration. The ZP |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|

also returns its public key such that the WEP key can be encrypted using the CP's public key.

At **354**, upon receiving the ZP's current configuration information, the CP decides on a course of action. Most, but not all, of these options result in a SetNetParams message being sent to the ZP. The matrix of possible situations:

| | CP already configured | CP not configured |
|---|---|---|
| ZP already configured | The CP sends a SetNetParams message to the ZP containing the CP's current net config. | The CP sets its own config to match the ZP config, and the config process is terminated. |
| ZP not configured | The CP sends a SetNetParams message to the ZP containing the CP's current net config. | The CP generates new config parameters. The parameters are sent to the ZP in a SetNetParams message. The CP sets its own config to these values as well. |

At **355**, when the ZP receives a SetNetParams message, it reconfigures its own HHID and WEP key to match those contained in the network packet. Accordingly, the CP determines that it generates new configuration parameters in accordance with the following:

HHID—this is provided by the user via the CP user interface or automatically generated by the CP.
SSID—this is automatically generated by the CP (e.g., set to the same value as the HHID).
WEP Key—this is automatically generated (e.g., using a pseudo-random number generator, seeded with entropy collected by the CP).
Channel—the CP probes the network looking for an acceptable channel (based on a variety of criteria, which may include traffic and interference from other sources).

Subsequent to the activation process, any devices that have been reconfigured will

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | attempt to establish normal network communications using their new network configuration parameters. In all of the above steps, if the CP or ZP is not already in the activation state, receipt of any messages is ignored.<br>If there are multiple ZP's activated simultaneously, all of the devices could execute this same sequence, independently of each other (the CP is capable of multiple independent sessions). If multiple CP's are activated, each will respond to a ZP's Alive message and will execute the sequence—the first one to deliver the SetNetParams to the ZP will configure it. It should be noted that in this case, the second CP will never get an AckNetParams message (because the ZP has exited the activate state). This will cause a transaction timeout in the second CP, at which point it will typically inform the user of the error, or retry the entire sequence. Should it retry the entire sequence, it will not reprogram the ZP (as described above that the effect of an unconfigured CP talking to a configured ZP)."<br><br>"In one embodiment, a handheld controller is configured to facilitate a new Zone player to execute a household join process to join the HOUSEHOLD upon an appropriate channel. The channel may be agreed upon between the controller and the Zone player as follows:<br>1) when a reset or two buttons are pushed on the Zone Player to activate the household join process, it starts a Scan through the available wireless channels, sending the "Alive' datagram for each channel in turn. Sometimes, it cycles through the channels several times;<br>2) as soon as the ZonePlayer receives a QueryNetParams request address to itself, it stops the channel cycling; and<br>3) The ZonePlayer remains locked on whatever channel it has stopped cycling until a Successful sequence ending in the configuration of the ZonePlayer (at which point it uses the specified channel), or a timeout expires (at which point it returns to its original channel or resumes cycling through channels and sending alive messages if the overall timeout for the activation process has not expired)." |

106

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| 1i. | based on the comparison of the identification code portion of the received communication packet matching an entry in the table of identifiers stored in the audio-enabled wireless device, determine to relay the communication packet to another audio-enabled wireless device; and | The controller of the Sonos Devices is configured to, based on the comparison of the identification code portion of the received communication packet matching an entry in the table of identifiers stored in the audio-enabled wireless device, determine to relay the communication packet to another audio-enabled wireless device. The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>The Sonos Devices, operating within a "SonosNet" wireless mesh network, are configured to compare the identification code portion of received communication packets to a table of identifiers, corresponding for example to a list of devices within the same "household," and based on that comparison determine to relay the communication packet to another Sonos Device within the network. *See, e.g.*, Sonos System Overview, October 20, 2014 at 7-10:<br><br> |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |
| | *See, e.g.,* Sonos Group Coordinator Question (https://en.community.sonos.com/controllers-software-228995/sonos-group-coordinator-question-6803946): |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | *See, e.g.*, Sonos Developer, Control, https://developer.sonos.com/build/direct-control/discover/:  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

*See, e.g.,* How to group rooms in the Sonos app (Jan. 7, 2020), support.sonos.com/s/article/3391:



As the Sonos Devices use, for example, NTP, the NTP protocol includes identifiers that a device can compare to a list of identifiers to confirm that the device is a member of network. *See, e.g.* Network Time Protocol (en.wikipedia.org/Network_Time_Protocol):

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |
| | Sonos U.S. Patent No. 8,326,951 is listed on Sonos's website as being practiced by Sonos's Amp, Arc, Beam, Boost, Five, Move, One, One SL, Playbase, Port, and Sub products.  See Sonos Patents (https://www.sonos.com/en-us/legal/patents).  Sonos U.S. Patent No. 8,326,951 discloses that the Sonos Devices (*e.g.*, zone players or "ZP") include a list of identified Sonos products that constitute the HOUSEHOLD and use this list to determine whether the Sonos products are part of the mesh network and send data to other Sonos products within this mesh network using communication protocols defined by IEEE 802.11 where each node within the mesh network contains the table of identifiers for routing the data to its ultimate destination based on the address in the packet. |
| | *See, e.g.*, U.S. Patent No. 8,326,951 at 6:16-40, 10:61-11:20, 11:50-59, 12:36-14:23, 16:1-20: |
| | "Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | Zone player 200 in accordance with the present invention. The Zone player 200 includes a network interface 202, a processor 204, a memory 206, an audio processing circuit 210, a digital signal processing module 212, and an audio amplifier 214. The network interface 202 facilitates a data flow between a data network (i.e., the data network 108 of FIG. 1) and the Zone player 200 and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols is TCP/IP (Transmission Control Protocol/Internet Protocol) commonly used in the Internet. In general, a network interface manages the conversion of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface 202 handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the Zone player 200. The network interface 202 may include either one or both of a wireless interface 216 and a wired interface 217. The wireless interface 216, also referred to as a RF interface, provides network interface functions by a wireless means for the zone player 200 to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or 802.11g)." <br><br> "In one embodiment, packets of data are broadcasted among the members of the HOUSEHOLD. The packets of data comprise a mixture of "probe" datagrams and standard IP broadcast. For example, the 802.11 "probe" datagrams are used for the inherent ability to cross wireless network boundaries. In other words, the "probe" datagrams can be received by all listeners (i.e., other devices) on the channel, even those that are not configured with an SSID, because they are sent to the broadcast BSS (e.g., FF:FF:FF:FF:FF:FF) to which all devices may be configured to listen. A standard IP broadcast is used on the wired network segments and the HOUSEHOLD network infrastructure to enable a PC-based controller to participate while running with standard user privileges (which allow access only to IP-based network services). Used together as described below, the combination of the "probe" datagrams and IP broadcast provides for a broadcast datagram transport that allows even devices that have not had |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | any networking parameters configured to communicate.<br>In general, the probe datagrams comprise a number of elements to facilitate the configuration of other devices to join the HOUSEHOLD. In one embodiment, each of the elements carries up to 255 bytes of data. An element contains data payload for each message used by the bootstrap procedure to invite others to join the HOUSEHOLD. This element is repeated as many times as necessary to carry the complete message. In one embodiment, the IP broadcast datagrams contain the same data payload as the normal IP data payload."<br><br>"Using this method of broadcast communication, packets can be sent between any member of the HOUSEHOLD and a device to join the HOUSEHOLD on both Ethernet and wireless networks. The device to join the HOUSEHOLD may be brand new and previously configured with a different network (e.g., a device with a stale configuration in a different household). In addition, if used sparingly, these broadcast messages do not interfere with the normal operation of the network or attached devices. As a result, a communication path on an agreed channel has been established between two devices."<br><br>"Device Discovery.<br>To minimize impact on existing networks and to improve configuration security, the system requires a user to manually activate the auto-configuration process. This is accomplished by a specific action on each device that is being added to the network. For example, if the user is installing a brand new HOUSEHOLD, containing one CP and two ZP's, the activation process may be manually activated on each by, for example, powering off and on, pushing a reset button or pushing two or more specific buttons simultaneously. In one embodiment, the CP or ZP is simply powered up by the user, which activates the pre-installed module to start the bootstrap procedure.<br>For a ZP:<br><br>If the device is unconfigured (e.g., factory default settings), it will immediately go into a "sleep" mode where it is awaiting an activation command. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | If the device has been previously configured, it will attempt to contact other members of its HOUSEHOLD network.<br><br>There are situations in which a ZP is orphaned, namely it is previously configured (e.g., perhaps, with another Ad-hoc network) and now is to be added to the HOUSEHOLD (e.g., the ZP is obtained from a previous owner). In the case of an orphan scenario, the ZP may patiently attempt to contact its original network. It can be perceived that this operation will be unsuccessful but otherwise harmless. Even in this configured state, the device can participate in the rudimentary broadcast communication processes described above.<br><br>For the CP:<br><br>If the device is unconfigured (e.g., factory default settings), it will present the user with a description of how to start the configuration process.<br><br>If the device is configured, it will attempt to contact other members of its HOUSEHOLD network.<br><br>The CP may also be an orphaned device, in which case it performs similarly to that of the ZP.<br><br>In both cases, correctly configured devices will establish network communications and make themselves available for normal operation. All devices, including those previously configured, will enter an "activation state" when the user indicates that this is desired. At this point, the configuration process can begin.<br><br>Device Configuration.<br><br>The configuration is carried out by exchanging data between two devices that are not necessarily directly connected. This procedure is carried over a rudimentary communication path as described previously. The sequence of exchanging the data is initiated by the user or some other process, for example, activating a reset button, to trigger the "activation" or configuration mode on the involved devices. Each device executes this sequence, and then exits the activation mode. FIG. 3B shows an embodiment that involves a process of five exchanges of data.<br><br>Each of the data exchanges is referred to as a type of message: Alive, QueryNetParams, |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | RespondNetParams, SetNetParams, and AckNetParams, each is explained as follows: Alive—a message indicating that a named ZP is available for configuration. The message includes at least a zpUUID which is a globally unique identifier that identifies the ZP sending the message. QueryNetParams—a request from the CP to the ZP to respond with the ZP's current network configuration information. The request includes at least a zpUUID, cpPK (the RSA public key of the CP) and tid (a unique transaction identifier). RespondNetParams—a response to the QueryNetParams. It includes the ZP's network configuration information (HHID, WEP key and RSA public key). For security reasons, the WEP key is encrypted using the CP's public key that is only readable by the CP. The response includes at least a zpUUID, netConfig (the ZP's current network configuration parameters), zpPK, and tid. It should be noted that a new ZP, set to factory defaults, shall have well-known parameter values, allowing the CP to determine that it is unconfigured. SetNetParams—a command message from the CP to the ZP indicating that the ZP should reconfigure its network parameters. The WEP key is encrypted using the ZP's public key, and therefore only readable by the ZP. The command includes at least a zpUUID, netConfig and tid. It should be noted that netConfig includes the new configuration parameters for the ZP, as determined by the CP. The ZP should save this value in its network configuration, in some cases, these parameters may match the ZP's existing configuration. AckNetParams—a response to the SetNetParams messaging. The response indicates that the SetNetParams message was received and that the network configuration contained therein has been successfully applied. The response includes at least a zpUUID and a tid. In operation, after a user activates the configuration process (on both ZP and CP) at **351** in FIG. 3B. The CP enters a state where it is willing to accept an Alive message. The CP only remains in this state for a limited (finite) period of time. The ZP enters an activation state where it attempts rendezvous with a CP. The ZP only remains in this state for a limited (finite) period of time. The ZP will periodically transmit an Alive |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | message until it either receives a QueryNetParams message, or exits the activation state. At **352**, the CP receives an Alive message. If the CP is in the configuration mode, it will generate a new tid, and send a QueryNetParams message and send to the ZP. It should be noted that the CP may or may not have been configured at this point. In either case, it sends the QueryNetParams. At **353**, if it is already in the activation state, the ZP responds to a QueryNetParams with its current network configuration. If the ZP is unconfigured (e.g., factory default settings), it will return an empty HHID and WEP key. If the ZP is previously configured, it will return its current configuration. The ZP also returns its public key such that the WEP key can be encrypted using the CP's public key. At **354**, upon receiving the ZP's current configuration information, the CP decides on a course of action. Most, but not all, of these options result in a SetNetParams message being sent to the ZP. The matrix of possible situations: |



At **355**, when the ZP receives a SetNetParams message, it reconfigures its own HHID and WEP key to match those contained in the network packet. Accordingly, the CP determines that it generates new configuration parameters in accordance with the following:

HHID—this is provided by the user via the CP user interface or automatically generated by the CP.

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | SSID—this is automatically generated by the CP (e.g., set to the same value as the HHID). WEP Key—this is automatically generated (e.g., using a pseudo-random number generator, seeded with entropy collected by the CP). Channel—the CP probes the network looking for an acceptable channel (based on a variety of criteria, which may include traffic and interference from other sources). <br><br>Subsequent to the activation process, any devices that have been reconfigured will attempt to establish normal network communications using their new network configuration parameters. In all of the above steps, if the CP or ZP is not already in the activation state, receipt of any messages is ignored. If there are multiple ZP's activated simultaneously, all of the devices could execute this same sequence, independently of each other (the CP is capable of multiple independent sessions). If multiple CP's are activated, each will respond to a ZP's Alive message and will execute the sequence—the first one to deliver the SetNetParams to the ZP will configure it. It should be noted that in this case, the second CP will never get an AckNetParams message (because the ZP has exited the activate state). This will cause a transaction timeout in the second CP, at which point it will typically inform the user of the error, or retry the entire sequence. Should it retry the entire sequence, it will not reprogram the ZP (as described above that the effect of an unconfigured CP talking to a configured ZP)." <br><br>"In one embodiment, a handheld controller is configured to facilitate a new Zone player to execute a household join process to join the HOUSEHOLD upon an appropriate channel. The channel may be agreed upon between the controller and the Zone player as follows: 1) when a reset or two buttons are pushed on the Zone Player to activate the household join process, it starts a Scan through the available wireless channels, sending the "Alive' datagram for each channel in turn. Sometimes, it cycles through the channels several times; |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | 2) as soon as the ZonePlayer receives a QueryNetParams request address to itself, it stops the channel cycling; and<br>3) The ZonePlayer remains locked on whatever channel it has stopped cycling until a Successful sequence ending in the configuration of the ZonePlayer (at which point it uses the specified channel), or a timeout expires (at which point it returns to its original channel or resumes cycling through channels and sending alive messages if the overall timeout for the activation process has not expired)." |
| 1j. | relay the communication packet to the other audio-enabled wireless device. | The controller of the Sonos Devices is configured to relay the communication packet to the other audio-enabled wireless device.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>The Sonos Devices, operating within a "SonosNet" wireless mesh network, are configured to compare the identification code portion of received communication packets to a table of identifiers, corresponding for example to a list of devices within the same "household," and based on that comparison determine to relay the communication packet to another Sonos Device within the network.  *See, e.g.*, Sonos System Overview, October 20, 2014 at 7-10: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.,* Sonos Group Coordinator Question (https://en.community.sonos.com/controllers-software-228995/sonos-group-coordinator-question-6803946): |

126

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | *See, e.g.,* Sonos Developer, Control, https://developer.sonos.com/build/direct-control/discover/: <br><br>  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | <br><br>*See, e.g.,* How to group rooms in the Sonos app (Jan. 7, 2020), support.sonos.com/s/article/3391:<br><br> |

129

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| 2 | The audio-enabled wireless device of claim 1, the controller configured to: prior to the relay of the communication packet, listen to a radio frequency channel to determine the radio frequency channel is not in use by another device; and transmit, via the radio frequency channel, the communication packet. | The controller of the Sonos Devices is configured to prior to the relay of the communication packet, listen to a radio frequency channel to determine the radio frequency channel is not in use by another device and transmit, via the radio frequency channel, the communication packet. The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents. |

The Sonos Devices, operating within a "SonosNet" wireless mesh network, are configured to listen to a radio frequency channel to determine the radio frequency channel is not in use by another device and transmit, via the radio frequency channel, the communication packet to another Sonos Device within the network.

*See, e.g.*, Sonos System Overview, October 20, 2014 at 7-10:

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |



**3.1    Standard Setup**

In a standard wireless network, coverage radiates outward from a central router or access point. The further a wireless client is from this central point, the weaker the signal between the two will be.

*Figure 2: Standard Wireless Network*

In Figure 2 above, each Sonos component talks to the wireless router. Therefore, for homes with wireless connectivity issues, or those with a large number of Sonos players, standard wireless setup may not be the best choice.

**3.2    SonosNet™ Setup**

SonosNet is different because each Sonos product is both a network client and access point. Instead of merely accessing the network, each component also expands it. Sonos components communicate with every other Sonos component in wireless range, ensuring multiple, redundant paths for data to travel. While each component must be within range of at least one other component, they don't need to be within range of the central point.

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.,* Sonos Music API - Getting Started Guide (2014), https://musicpartners.sonos.com/node/464: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

See, e.g., Sonos Developer, Control, https://developer.sonos.com/build/direct-control/discover/:

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

*See, e.g.,* How to group rooms in the Sonos app (Jan. 7, 2020), support.sonos.com/s/article/3391:



As the Sonos Devices use NTP, the NTP protocol includes identifiers that a device can compare to a list of identifiers to confirm that the device is a member of network. *See, e.g.* Network Time Protocol (en.wikipedia.org/Network_Time_Protocol):

136

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
|  |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |
| | Sonos U.S. Patent No. 8,326,951 is listed on Sonos's website as being practiced by Sonos's Amp, Arc, Beam, Boost, Five, Move, One, One SL, Playbase, Port, and Sub products.  See Sonos Patents (https://www.sonos.com/en-us/legal/patents).  Sonos U.S. Patent No. 8,326,951 discloses that the Sonos Devices (zone players or "ZP") include a list of identified Sonos products that constitute the HOUSEHOLD and use this list to determine whether the Sonos products are part of the mesh network and send data to other Sonos products within this mesh network using the identifiers.  Additionally, each Sonos product includes a RF network interface that communicates with the other Sonos products within the mesh network using a communication protocol pursuant to the wireless standard IEEE 802.11a, 802.11b or 802.11g that senses if the network is busy before transmitting a data packet.<br><br>*See, e.g.*, U.S. Patent No. 8,326,951 at 6:16-40, 10:61-11:20, 11:50-59, 12:36-14:23, 16:1-20: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | "Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a Zone player 200 in accordance with the present invention. The Zone player 200 includes a network interface 202, a processor 204, a memory 206, an audio processing circuit 210, a digital signal processing module 212, and an audio amplifier 214. The network interface 202 facilitates a data flow between a data network (i.e., the data network 108 of FIG. 1) and the Zone player 200 and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols is TCP/IP (Transmission Control Protocol/Internet Protocol) commonly used in the Internet. In general, a network interface manages the conversion of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface 202 handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the Zone player 200. The network interface 202 may include either one or both of a wireless interface 216 and a wired interface 217. The wireless interface 216, also referred to as a RF interface, provides network interface functions by a wireless means for the zone player 200 to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or 802.11g)."<br><br>"In one embodiment, packets of data are broadcasted among the members of the HOUSEHOLD. The packets of data comprise a mixture of "probe' datagrams and standard IP broadcast. For example, the 802.11 "probe' datagrams are used for the inherent ability to cross wireless network boundaries. In other words, the "probe' datagrams can be received by all listeners (i.e., other devices) on the channel, even those that are not configured with an SSID, because they are sent to the broadcast BSS (e.g., FF:FF:FF:FF:FF:FF) to which all devices may be configured to listen. A standard IP broadcast is used on the wired network segments and the HOUSEHOLD network infrastructure to enable a PC-based controller to participate while running with standard user privileges (which allow access only to IP-based network services). Used together as described below, the combination of the "probe' datagrams and IP broadcast provides |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | for a broadcast datagram transport that allows even devices that have not had any networking parameters configured to communicate. In general, the probe datagrams comprise a number of elements to facilitate the configuration of other devices to join the HOUSEHOLD. In one embodiment, each of the elements carries up to 255 bytes of data. An element contains data payload for each message used by the bootstrap procedure to invite others to join the HOUSEHOLD. This element is repeated as many times as necessary to carry the complete message. In one embodiment, the IP broadcast datagrams contain the same data payload as the normal IP data payload." <br><br> "Using this method of broadcast communication, packets can be sent between any member of the HOUSEHOLD and a device to join the HOUSEHOLD on both Ethernet and wireless networks. The device to join the HOUSEHOLD may be brand new and previously configured with a different network (e.g., a device with a stale configuration in a different household). In addition, if used sparingly, these broadcast messages do not interfere with the normal operation of the network or attached devices. As a result, a communication path on an agreed channel has been established between two devices." <br><br> "Device Discovery. To minimize impact on existing networks and to improve configuration security, the system requires a user to manually activate the auto-configuration process. This is accomplished by a specific action on each device that is being added to the network. For example, if the user is installing a brand new HOUSEHOLD, containing one CP and two ZP's, the activation process may be manually activated on each by, for example, powering off and on, pushing a reset button or pushing two or more specific buttons simultaneously. In one embodiment, the CP or ZP is simply powered up by the user, which activates the pre-installed module to start the bootstrap procedure. For a ZP: |

140

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | If the device is unconfigured (e.g., factory default settings), it will immediately go into a "sleep" mode where it is awaiting an activation command. If the device has been previously configured, it will attempt to contact other members of its HOUSEHOLD network. There are situations in which a ZP is orphaned, namely it is previously configured (e.g., perhaps, with another Ad-hoc network) and now is to be added to the HOUSEHOLD (e.g., the ZP is obtained from a previous owner). In the case of an orphan scenario, the ZP may patiently attempt to contact its original network. It can be perceived that this operation will be unsuccessful but otherwise harmless. Even in this configured state, the device can participate in the rudimentary broadcast communication processes described above. For the CP: |
| | | If the device is unconfigured (e.g., factory default settings), it will present the user with a description of how to start the configuration process. If the device is configured, it will attempt to contact other members of its HOUSEHOLD network. The CP may also be an orphaned device, in which case it performs similarly to that of the ZP. In both cases, correctly configured devices will establish network communications and make themselves available for normal operation. All devices, including those previously configured, will enter an "activation state" when the user indicates that this is desired. At this point, the configuration process can begin. Device Configuration. The configuration is carried out by exchanging data between two devices that are not necessarily directly connected. This procedure is carried over a rudimentary communication path as described previously. The sequence of exchanging the data is initiated by the user or some other process, for example, activating a reset button, to trigger the "activation" or configuration mode on the involved devices. Each device executes this sequence, and then exits the activation mode. FIG. 3B shows an |

141

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | embodiment that involves a process of five exchanges of data. |
| | Each of the data exchanges is referred to as a type of message: Alive, QueryNetParams, RespondNetParams, SetNetParams, and AckNetParams, each is explained as follows: Alive—a message indicating that a named ZP is available for configuration. The message includes at least a zpUUID which is a globally unique identifier that identifies the ZP sending the message. |
| | QueryNetParams—a request from the CP to the ZP to respond with the ZP's current network configuration information. The request includes at least a zpUUID, cpPK (the RSA public key of the CP) and tid (a unique transaction identifier). |
| | RespondNetParams—a response to the QueryNetParams. It includes the ZP's network configuration information (HHID, WEP key and RSA public key). For security reasons, the WEP key is encrypted using the CP's public key that is only readable by the CP. The response includes at least a zpUUID, netConfig (the ZP's current network configuration parameters), zpPK, and tid. It is should be noted that a new ZP, set to factory defaults, shall have well-known parameter values, allowing the CP to determine that it is unconfigured. |
| | SetNetParams—a command message from the CP to the ZP indicating that the ZP should reconfigure its network parameters. The WEP key is encrypted using the ZP's public key, and therefore only readable by the ZP. The command includes at least a zpUUID, netConfig and tid. It should be noted that netConfig includes the new configuration parameters for the ZP, as determined by the CP. The ZP should save this value in its network configuration, in some cases, these parameters may match the ZP's existing configuration. |
| | AckNetParams—a response to the SetNetParams messaging. The response indicates that the SetNetParams message was received and that the network configuration contained therein has been successfully applied. The response includes at least a zpUUID and a tid. |
| | In operation, after a user activates the configuration process (on both ZP and CP) at **351** in FIG. 3B. The CP enters a state where it is willing to accept an Alive message. The CP only remains in this state for a limited (finite) period of time. The ZP enters an |

142

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | activation state where it attempts rendezvous with a CP. The ZP only remains in this state for a limited (finite) period of time. The ZP will periodically transmit an Alive message until it either receives a QueryNetParams message, or exits the activation state. At **352**, the CP receives an Alive message. If the CP is in the configuration mode, it will generate a new tid, and send a QueryNetParams message and send to the ZP. It should be noted that the CP may or may not have been configured at this point. In either case, it sends the QueryNetParams. At **353**, if it is already in the activation state, the ZP responds to a QueryNetParams with its current network configuration. If the ZP is unconfigured (e.g., factory default settings), it will return an empty HHID and WEP key. If the ZP is previously configured, it will return its current configuration. The ZP also returns its public key such that the WEP key can be encrypted using the CP's public key.<br><br>At **354**, upon receiving the ZP's current configuration information, the CP decides on a course of action. Most, but not all, of these options result in a SetNetParams message being sent to the ZP. The matrix of possible situations:<br><br><br><br>At **355**, when the ZP receives a SetNetParams message, it reconfigures its own HHID and WEP key to match those contained in the network packet. Accordingly, the CP determines that it generates new configuration parameters in accordance with the following: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | HHID—this is provided by the user via the CP user interface or automatically generated by the CP.<br>SSID—this is automatically generated by the CP (e.g., set to the same value as the HHID).<br>WEP Key—this is automatically generated (e.g., using a pseudo-random number generator, seeded with entropy collected by the CP).<br>Channel—the CP probes the network looking for an acceptable channel (based on a variety of criteria, which may include traffic and interference from other sources).<br><br>Subsequent to the activation process, any devices that have been reconfigured will attempt to establish normal network communications using their new network configuration parameters. In all of the above steps, if the CP or ZP is not already in the activation state, receipt of any messages is ignored.<br>If there are multiple ZP's activated simultaneously, all of the devices could execute this same sequence, independently of each other (the CP is capable of multiple independent sessions). If multiple CP's are activated, each will respond to a ZP's Alive message and will execute the sequence—the first one to deliver the SetNetParams to the ZP will configure it. It should be noted that in this case, the second CP will never get an AckNetParams message (because the ZP has exited the activate state). This will cause a transaction timeout in the second CP, at which point it will typically inform the user of the error, or retry the entire sequence. Should it retry the entire sequence, it will not reprogram the ZP (as described above that the effect of an unconfigured CP talking to a configured ZP)."<br><br>"In one embodiment, a handheld controller is configured to facilitate a new Zone player to execute a household join process to join the HOUSEHOLD upon an appropriate channel. The channel may be agreed upon between the controller and the Zone player as follows:<br>1) when a reset or two buttons are pushed on the Zone Player to activate the household join process, it starts a Scan through the available wireless channels, sending the "Alive' |

144

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | datagram for each channel in turn. Sometimes, it cycles through the channels several times;<br>2) as soon as the ZonePlayer receives a QueryNetParams request address to itself, it stops the channel cycling; and<br>3) The ZonePlayer remains locked on whatever channel it has stopped cycling until a Successful sequence ending in the configuration of the ZonePlayer (at which point it uses the specified channel), or a timeout expires (at which point it returns to its original channel or resumes cycling through channels and sending alive messages if the overall timeout for the activation process has not expired)."<br><br>For example, as the Sonos Devices use IEEE 802.11 to transmit communication packets within the mesh network, they would comply with the collision avoidance and protection mechanism associated therewith, such as CSMA/CA.  Implementing these mechanisms, prior to the relay of the communication packet, the Sonos Devices listen to a radio frequency channel to determine the radio frequency channel is not in use by another device; and transmit, via the radio frequency channel, the communication packet if it is determined that the channel is available.  *See, e.g.,* IEEE 802.11, Wireless LAN MAC and Physical Layer Specifications; IEEE Working Group, Welcome to IEEE 802.11 (available at http://grouper.ieee.org/groups/802/11/main.html). |
| 3 | The audio-enabled wireless device of claim 2, the controller configured to: prior to the transmission of the communication packet, determine a delay value; and wait the determined delay value before the transmission of the communication packet. | The controller of the Sonos Devices is configured to prior to the transmission of the communication packet, determine a delay value; and wait the determined delay value before the transmission of the communication packet.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>The Sonos Devices, operating within a "SonosNet" wireless mesh network, are configured to determine a delay value and wait the determined delay value before the transmission of the communication packet to another Sonos Device within the network. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.,* Sonos Music API - Getting Started Guide (2014), https://musicpartners.sonos.com/node/464: <br><br>  <br><br> *See, e.g.,* Sonos Developer, Control, https://developer.sonos.com/build/direct-control/discover/: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

*See, e.g.,* How to group rooms in the Sonos app (Jan. 7, 2020), support.sonos.com/s/article/3391:



As the Sonos Devices use NTP, the NTP protocol includes identifiers that a device can compare to a list of identifiers to confirm that the device is a member of network. *See, e.g.* Network Time Protocol (en.wikipedia.org/Network_Time_Protocol):

148

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

Sonos U.S. Patent No. 8,326,951 is listed on Sonos's website as being practiced by Sonos's Amp, Arc, Beam, Boost, Five, Move, One, One SL, Playbase, Port, and Sub products.  See Sonos Patents (https://www.sonos.com/en-us/legal/patents).  Sonos U.S. Patent No. 8,326,951 discloses that the Sonos Devices (zone players or "ZP") include a list of identified Sonos products that constitute the HOUSEHOLD and use this list to determine whether the Sonos products are part of the mesh network and send data to other Sonos products within this mesh network using the identifiers.  Additionally, each Sonos product includes a RF network interface that communicates with the other Sonos products within the mesh network using a communication protocol pursuant to the wireless standard IEEE 802.11a, 802.11b or 802.11g that senses if the network is busy before transmitting a data packet, and, if so, will introduce a random backoff, or delay, before again attempting transmission.

*See, e.g.*, U.S. Patent No. 8,326,951 at 6:16-40, 10:61-11:20, 11:50-59, 12:36-14:23, 16:1-20:

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | "Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a Zone player 200 in accordance with the present invention. The Zone player 200 includes a network interface 202, a processor 204, a memory 206, an audio processing circuit 210, a digital signal processing module 212, and an audio amplifier 214. The network interface 202 facilitates a data flow between a data network (i.e., the data network 108 of FIG. 1) and the Zone player 200 and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols is TCP/IP (Transmission Control Protocol/Internet Protocol) commonly used in the Internet. In general, a network interface manages the conversion of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface 202 handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the Zone player 200. The network interface 202 may include either one or both of a wireless interface 216 and a wired interface 217. The wireless interface 216, also referred to as a RF interface, provides network interface functions by a wireless means for the zone player 200 to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or 802.11g)." <br><br> "In one embodiment, packets of data are broadcasted among the members of the HOUSEHOLD. The packets of data comprise a mixture of "probe' datagrams and standard IP broadcast. For example, the 802.11 "probe' datagrams are used for the inherent ability to cross wireless network boundaries. In other words, the "probe' datagrams can be received by all listeners (i.e., other devices) on the channel, even those that are not configured with an SSID, because they are sent to the broadcast BSS (e.g., FF:FF:FF:FF:FF:FF) to which all devices may be configured to listen. A standard IP broadcast is used on the wired network segments and the HOUSEHOLD network infrastructure to enable a PC-based controller to participate while running with standard user privileges (which allow access only to IP-based network services). Used together |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | as described below, the combination of the "probe' datagrams and IP broadcast provides for a broadcast datagram transport that allows even devices that have not had any networking parameters configured to communicate. In general, the probe datagrams comprise a number of elements to facilitate the configuration of other devices to join the HOUSEHOLD. In one embodiment, each of the elements carries up to 255 bytes of data. An element contains data payload for each message used by the bootstrap procedure to invite others to join the HOUSEHOLD. This element is repeated as many times as necessary to carry the complete message. In one embodiment, the IP broadcast datagrams contain the same data payload as the normal IP data payload." <br><br> "Using this method of broadcast communication, packets can be sent between any member of the HOUSEHOLD and a device to join the HOUSEHOLD on both Ethernet and wireless networks. The device to join the HOUSEHOLD may be brand new and previously configured with a different network (e.g., a device with a stale configuration in a different household). In addition, if used sparingly, these broadcast messages do not interfere with the normal operation of the network or attached devices. As a result, a communication path on an agreed channel has been established between two devices." <br><br> "Device Discovery. To minimize impact on existing networks and to improve configuration security, the system requires a user to manually activate the auto-configuration process. This is accomplished by a specific action on each device that is being added to the network. For example, if the user is installing a brand new HOUSEHOLD, containing one CP and two ZP's, the activation process may by, for example, powering off and on, pushing a reset button or pushing two or more specific buttons simultaneously. In one embodiment, the CP or ZP is simply powered up by the user, which activates the pre-installed module to start the bootstrap procedure. For a ZP: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | If the device is unconfigured (e.g., factory default settings), it will immediately go into a "sleep" mode where it is awaiting an activation command. |
| | | If the device has been previously configured, it will attempt to contact other members of its HOUSEHOLD network. |
| | | There are situations in which a ZP is orphaned, namely it is previously configured (e.g., perhaps, with another Ad-hoc network) and now is to be added to the HOUSEHOLD (e.g., the ZP is obtained from a previous owner). In the case of an orphan scenario, the ZP may patiently attempt to contact its original network. It can be perceived that this operation will be unsuccessful but otherwise harmless. Even in this configured state, the device can participate in the rudimentary broadcast communication processes described above. |
| | | For the CP: |
| | | If the device is unconfigured (e.g., factory default settings), it will present the user with a description of how to start the configuration process. |
| | | If the device is configured, it will attempt to contact other members of its HOUSEHOLD network. |
| | | The CP may also be an orphaned device, in which case it performs similarly to that of the ZP. |
| | | In both cases, correctly configured devices will establish network communications and make themselves available for normal operation. All devices, including those previously configured, will enter an "activation state" when the user indicates that this is desired. At this point, the configuration process can begin. |
| | | Device Configuration. |
| | | The configuration is carried out by exchanging data between two devices that are not necessarily directly connected. This procedure is carried over a rudimentary communication path as described previously. The sequence of exchanging the data is initiated by the user or some other process, for example, activating a reset button, to trigger the "activation" or configuration mode on the involved devices. Each device |

153

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | executes this sequence, and then exits the activation mode. FIG. 3B shows an embodiment that involves a process of five exchanges of data. Each of the data exchanges is referred to as a type of message: Alive, QueryNetParams, RespondNetParams, SetNetParams, and AckNetParams, each is explained as follows: Alive—a message indicating that a named ZP is available for configuration. The message includes at least a zpUUID which is a globally unique identifier that identifies the ZP sending the message. QueryNetParams—a request from the CP to the ZP to respond with the ZP's current network configuration information. The request includes at least a zpUUID, cpPK (the RSA public key of the CP) and tid (a unique transaction identifier). RespondNetParams—a response to the QueryNetParams. It includes the ZP's network configuration information (HHID, WEP key and RSA public key). For security reasons, the WEP key is encrypted using the CP's public key that is only readable by the CP. The response includes at least a zpUUID, netConfig (the ZP's current network configuration parameters), zpPK, and tid. It is should be noted that a new ZP, set to factory defaults, shall have well-known parameter values, allowing the CP to determine that it is unconfigured. SetNetParams—a command message from the CP to the ZP indicating that the ZP should reconfigure its network parameters. The WEP key is encrypted using the ZP's public key, and therefore only readable by the ZP. The command includes at least a zpUUID, netConfig and tid. It should be noted that netConfig includes the new configuration parameters for the ZP, as determined by the CP. The ZP should save this value in its network configuration, in some cases, these parameters may match the ZP's existing configuration. AckNetParams—a response to the SetNetParams messaging. The response indicates that the SetNetParams message was received and that the network configuration contained therein has been successfully applied. The response includes at least a zpUUID and a tid. In operation, after a user activates the configuration process (on both ZP and CP) at **351** in FIG. 3B. The CP enters a state where it is willing to accept an Alive message. |

154

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | The CP only remains in this state for a limited (finite) period of time. The ZP enters an activation state where it attempts rendezvous with a CP. The ZP only remains in this state for a limited (finite) period of time. The ZP will periodically transmit an Alive message until it either receives a QueryNetParams message, or exits the activation state. At **352**, the CP receives an Alive message. If the CP is in the configuration mode, it will generate a new tid, and send a QueryNetParams message and send to the ZP. It should be noted that the CP may or may not have been configured at this point. In either case, it sends the QueryNetParams. At **353**, if it is already in the activation state, the ZP responds to a QueryNetParams with its current network configuration. If the ZP is unconfigured (e.g., factory default settings), it will return an empty HHID and WEP key. If the ZP is previously configured, it will return its current configuration. The ZP also returns its public key such that the WEP key can be encrypted using the CP's public key.<br><br>At **354**, upon receiving the ZP's current configuration information, the CP decides on a course of action. Most, but not all, of these options result in a SetNetParams message being sent to the ZP. The matrix of possible situations: |



|  | CP already configured | CP not configured |
|---|---|---|
| ZP already configured | The CP sends a SetNetParams message to the ZP containing the CP's current net config. | The CP sets its own config to match the ZP config, and the config process is terminated. |
| ZP not configured | The CP sends a SetNetParams message to the ZP containing the CP's current config. | The CP generates new config parameters. The parameters are sent to the ZP in a SetNetParams message. The CP sets its own config to these values as well. |

At **355**, when the ZP receives a SetNetParams message, it reconfigures its own HHID and WEP key to match those contained in the network packet. Accordingly, the CP determines that it generates new configuration parameters in accordance with the following:

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | HHID—this is provided by the user via the CP user interface or automatically generated by the CP.<br>SSID—this is automatically generated by the CP (e.g., set to the same value as the HHID).<br>WEP Key—this is automatically generated (e.g., using a pseudo-random number generator, seeded with entropy collected by the CP).<br>Channel—the CP probes the network looking for an acceptable channel (based on a variety of criteria, which may include traffic and interference from other sources).<br><br>Subsequent to the activation process, any devices that have been reconfigured will attempt to establish normal network communications using their new network configuration parameters. In all of the above steps, if the CP or ZP is not already in the activation state, receipt of any messages is ignored.<br>If there are multiple ZP's activated simultaneously, all of the devices could execute this same sequence, independently of each other (the CP is capable of multiple independent sessions). If multiple CP's are activated, each will respond to a ZP's Alive message and will execute the sequence—the first one to deliver the SetNetParams to the ZP will configure it. It should be noted that in this case, the second CP will never get an AckNetParams message (because the ZP has exited the activate state). This will cause a transaction timeout in the second CP, at which point it will typically inform the user of the error, or retry the entire sequence. Should it retry the entire sequence, it will not reprogram the ZP (as described above that the effect of an unconfigured CP talking to a configured ZP)."<br><br>"In one embodiment, a handheld controller is configured to facilitate a new Zone player to execute a household join process to join the HOUSEHOLD upon an appropriate channel. The channel may be agreed upon between the controller and the Zone player as follows:<br>1) when a reset or two buttons are pushed on the Zone Player to activate the household |

156

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | join process, it starts a Scan through the available wireless channels, sending the "Alive' datagram for each channel in turn. Sometimes, it cycles through the channels several times;<br><br>2) as soon as the ZonePlayer receives a QueryNetParams request address to itself, it stops the channel cycling; and<br><br>3) The ZonePlayer remains locked on whatever channel it has stopped cycling until a Successful sequence ending in the configuration of the ZonePlayer (at which point it uses the specified channel), or a timeout expires (at which point it returns to its original channel or resumes cycling through channels and sending alive messages if the overall timeout for the activation process has not expired)."<br><br>For example, as the Sonos Devices use IEEE 802.11 to transmit communication packets within the mesh network, the IEEE 802.11 protocol includes a collision avoidance and protection mechanism where, prior to the transmission of the communication packet, the Sonos Devices determine if a radio frequency channel is available.  If the channel is unavailable, or busy, the wireless transmitter will implement a random, determined delay value before again attempting transmission of the communication packet.  *See, e.g.,* IEEE 802.11, Wireless LAN MAC and Physical Layer Specifications; IEEE Working Group, Welcome to IEEE 802.11 (available at http://grouper.ieee.org/groups/802/11/main.html). |
| 4 | The audio-enabled wireless device of claim 3, wherein the delay value is a random delay value. | The Sonos Devices comprise the delay value is a random delay value.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>The Sonos Devices, operating within a "SonosNet" wireless mesh network, are configured to determine a random delay value and wait the determined delay value before the transmission of the communication packet to another Sonos Device within the network.<br><br>*See, e.g.,* Sonos Music API - Getting Started Guide (2014), https://musicpartners.sonos.com/node/464: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | 

**FILE FORMATS**

Your music service may support any or all of the following combinations of file formats, codecs, media types, sample rates, and transport methods:

| Codec | Formats | Media Types (mimeType) | Sample Rates | Transport Methods |
|---|---|---|---|---|
| AAC-LC, HE-AAC, HEv2-AAC | .m4a, .mp4, .aac | audio/mp4, audio/aac, application/x-mpegURL, application/vnd.apple.mpegURL, audio/x-mpegurl | 48 kHz, 44.1 kHz, 32 kHz, 24 kHz, 22.05 kHz, 16 kHz, 11.025 kHz, 8 kHz | HTTP, HTTPS |
| FLAC | .flac | audio/flac | 48 kHz, 44.1 kHz, 32 kHz, 24 kHz, 22.05 kHz, 16 kHz, 11.025 kHz, 8 kHz | HTTP, HTTPS |
| MP3 | .mp3 | audio/mp3, audio/mpeg3, audio/mpeg | 48 kHz, 44.1 kHz, 32 kHz, 24 kHz, 22.05 kHz, 16 kHz | HTTP, HTTPS |
| Ogg Vorbis | .ogg | application/ogg | 48 kHz, 44.1 kHz, 32 kHz, 24 kHz, 22.05 kHz, 16 kHz, 11.025 kHz, 8 kHz | HTTP, HTTPS |
| WMA | .asf, .wma | audio/wma, audio/x-ms-wma | 48 kHz, 44.1 kHz, 32 kHz, 24 kHz, 22.05 kHz, 16 kHz, 11.025 kHz, 8 kHz | HTTP, HTTPS, MMS, RTSP |

*See, e.g.*, Sonos Developer, Control, https://developer.sonos.com/build/direct-control/discover/: |

158

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | <br><br>*See, e.g.,* How to group rooms in the Sonos app (Jan. 7, 2020), support.sonos.com/s/article/3391:<br><br><br><br>As the Sonos Devices use NTP, the NTP protocol includes identifiers that a device can compare to a list of identifiers to confirm that the device is a member of network. *See, e.g.* Network Time Protocol (en.wikipedia.org/Network_Time_Protocol): |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

Sonos U.S. Patent No. 8,326,951 is listed on Sonos's website as being practiced by Sonos's Amp, Arc, Beam, Boost, Five, Move, One, One SL, Playbase, Port, and Sub products.  See Sonos Patents (https://www.sonos.com/en-us/legal/patents).  Sonos U.S. Patent No. 8,326,951 discloses that the Sonos Devices (zone players or "ZP") include a list of identified Sonos products that constitute the HOUSEHOLD and use this list to determine whether the Sonos products are part of the mesh network and send data to other Sonos products within this mesh network using the identifiers.  Additionally, each Sonos product includes a RF network interface that communicates with the other Sonos products within the mesh network using a communication protocol pursuant to the wireless standard IEEE 802.11a, 802.11b or 802.11g that senses if the network is busy before transmitting a data packet, and will implement a random backoff, or delay, before again attempting transmission.

*See, e.g.*, U.S. Patent No. 8,326,951 at 6:16-40, 10:61-11:20, 11:50-59, 12:36-14:23, 16:1-20:

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | "Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a Zone player 200 in accordance with the present invention. The Zone player 200 includes a network interface 202, a processor 204, a memory 206, an audio processing circuit 210, a digital signal processing module 212, and an audio amplifier 214. The network interface 202 facilitates a data flow between a data network (i.e., the data network 108 of FIG. 1) and the Zone player 200 and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols is TCP/IP (Transmission Control Protocol/Internet Protocol) commonly used in the Internet. In general, a network interface manages the conversion of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface 202 handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the Zone player 200. The network interface 202 may include either one or both of a wireless interface 216 and a wired interface 217. The wireless interface 216, also referred to as a RF interface, provides network interface functions by a wireless means for the zone player 200 to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or 802.11g)." "In one embodiment, packets of data are broadcasted among the members of the HOUSEHOLD. The packets of data comprise a mixture of "probe' datagrams and standard IP broadcast. For example, the 802.11 "probe' datagrams are used for the inherent ability to cross wireless network boundaries. In other words, the "probe' datagrams can be received by all listeners (i.e., other devices) on the channel, even those that are not configured with an SSID, because they are sent to the broadcast BSS (e.g., FF:FF:FF:FF:FF:FF) to which all devices may be configured to listen. A standard IP broadcast is used on the wired network segments and the HOUSEHOLD network infrastructure to enable a PC-based controller to participate while running with standard user privileges (which allow access only to IP-based network services). Used together |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | as described below, the combination of the "probe' datagrams and IP broadcast provides for a broadcast datagram transport that allows even devices that have not had any networking parameters configured to communicate.<br>In general, the probe datagrams comprise a number of elements to facilitate the configuration of other devices to join the HOUSEHOLD. In one embodiment, each of the elements carries up to 255 bytes of data. An element contains data payload for each message used by the bootstrap procedure to invite others to join the HOUSEHOLD. This element is repeated as many times as necessary to carry the complete message. In one embodiment, the IP broadcast datagrams contain the same data payload as the normal IP data payload."<br><br>"Using this method of broadcast communication, packets can be sent between any member of the HOUSEHOLD and a device to join the HOUSEHOLD on both Ethernet and wireless networks. The device to join the HOUSEHOLD may be brand new and previously configured with a different network (e.g., a device with a stale configuration in a different household). In addition, if used sparingly, these broadcast messages do not interfere with the normal operation of the network or attached devices. As a result, a communication path on an agreed channel has been established between two devices."<br><br>"Device Discovery.<br>To minimize impact on existing networks and to improve configuration security, the system requires a user to manually activate the auto-configuration process. This is accomplished by a specific action on each device that is being added to the network. For example, if the user is installing a brand new HOUSEHOLD, containing one CP and two ZP's, the activation process may by, for example, powering off and on, pushing a reset button or pushing two or more specific buttons simultaneously. In one embodiment, the CP or ZP is simply powered up by the user, which activates the pre-installed module to start the bootstrap procedure.<br>For a ZP: |

164

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | If the device is unconfigured (e.g., factory default settings), it will immediately go into a "sleep" mode where it is awaiting an activation command. |
| | | If the device has been previously configured, it will attempt to contact other members of its HOUSEHOLD network. |
| | | There are situations in which a ZP is orphaned, namely it is previously configured (e.g., perhaps, with another Ad-hoc network) and now is to be added to the HOUSEHOLD (e.g., the ZP is obtained from a previous owner). In the case of an orphan scenario, the ZP may patiently attempt to contact its original network. It can be perceived that this operation will be unsuccessful but otherwise harmless. Even in this configured state, the device can participate in the rudimentary broadcast communication processes described above. |
| | | For the CP: |
| | | If the device is unconfigured (e.g., factory default settings), it will present the user with a description of how to start the configuration process. |
| | | If the device is configured, it will attempt to contact other members of its HOUSEHOLD network. |
| | | The CP may also be an orphaned device, in which case it performs similarly to that of the ZP. |
| | | In both cases, correctly configured devices will establish network communications and make themselves available for normal operation. All devices, including those previously configured, will enter an "activation state" when the user indicates that this is desired. At this point, the configuration process can begin. |
| | | Device Configuration. |
| | | The configuration is carried out by exchanging data between two devices that are not necessarily directly connected. This procedure is carried over a rudimentary communication path as described previously. The sequence of exchanging the data is initiated by the user or some other process, for example, activating a reset button, to trigger the "activation" or configuration mode on the involved devices. Each device |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | executes this sequence, and then exits the activation mode. FIG. 3B shows an embodiment that involves a process of five exchanges of data. Each of the data exchanges is referred to as a type of message: Alive, QueryNetParams, RespondNetParams, SetNetParams, and AckNetParams, each is explained as follows: Alive—a message indicating that a named ZP is available for configuration. The message includes at least a zpUUID which is a globally unique identifier that identifies the ZP sending the message. QueryNetParams—a request from the CP to the ZP to respond with the ZP's current network configuration information. The request includes at least a zpUUID, cpPK (the RSA public key of the CP) and tid (a unique transaction identifier). RespondNetParams—a response to the QueryNetParams. It includes the ZP's network configuration information (HHID, WEP key and RSA public key). For security reasons, the WEP key is encrypted using the CP's public key that is only readable by the CP. The response includes at least a zpUUID, netConfig (the ZP's current network configuration parameters), zpPK, and tid. It is should be noted that a new ZP, set to factory defaults, shall have well-known parameter values, allowing the CP to determine that it is unconfigured. SetNetParams—a command message from the CP to the ZP indicating that the ZP should reconfigure its network parameters. The WEP key is encrypted using the ZP's public key, and therefore only readable by the ZP. The command includes at least a zpUUID, netConfig and tid. It should be noted that netConfig includes the new configuration parameters for the ZP, as determined by the CP. The ZP should save this value in its network configuration, in some cases, these parameters may match the ZP's existing configuration. AckNetParams—a response to the SetNetParams messaging. The response indicates that the SetNetParams message was received and that the network configuration contained therein has been successfully applied. The response includes at least a zpUUID and a tid. In operation, after a user activates the configuration process (on both ZP and CP) at **351** in FIG. 3B. The CP enters a state where it is willing to accept an Alive message. |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | The CP only remains in this state for a limited (finite) period of time. The ZP enters an activation state where it attempts rendezvous with a CP. The ZP only remains in this state for a limited (finite) period of time. The ZP will periodically transmit an Alive message until it either receives a QueryNetParams message, or exits the activation state. At **352**, the CP receives an Alive message. If the CP is in the configuration mode, it will generate a new tid, and send a QueryNetParams message and send to the ZP. It should be noted that the CP may or may not have been configured at this point. In either case, it sends the QueryNetParams. At **353**, if it is already in the activation state, the ZP responds to a QueryNetParams with its current network configuration. If the ZP is unconfigured (e.g., factory default settings), it will return an empty HHID and WEP key. If the ZP is previously configured, it will return its current configuration. The ZP also returns its public key such that the WEP key can be encrypted using the CP's public key.<br><br>At **354**, upon receiving the ZP's current configuration information, the CP decides on a course of action. Most, but not all, of these options result in a SetNetParams message being sent to the ZP. The matrix of possible situations: |

|  | CP already configured | CP not configured |
|---|---|---|
| ZP already configured | The CP sends a SetNetParams message to the ZP containing the CP's current net config. | The CP sets its own config to match the ZP config, and the config process is terminated. |
| ZP not configured | The CP sends a SetNetParams message to the ZP containing the CP's current net config. | The CP generates new config parameters. The parameters are sent to the ZP in a SetNetParams message. The CP sets its own config to these values as well. |

At **355**, when the ZP receives a SetNetParams message, it reconfigures its own HHID and WEP key to match those contained in the network packet. Accordingly, the CP determines that it generates new configuration parameters in accordance with the following:

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | HHID—this is provided by the user via the CP user interface or automatically generated by the CP.<br>SSID—this is automatically generated by the CP (e.g., set to the same value as the HHID).<br>WEP Key—this is automatically generated (e.g., using a pseudo-random number generator, seeded with entropy collected by the CP).<br>Channel—the CP probes the network looking for an acceptable channel (based on a variety of criteria, which may include traffic and interference from other sources).<br><br>Subsequent to the activation process, any devices that have been reconfigured will attempt to establish normal network communications using their new network configuration parameters. In all of the above steps, if the CP or ZP is not already in the activation state, receipt of any messages is ignored.<br>If there are multiple ZP's activated simultaneously, all of the devices could execute this same sequence, independently of each other (the CP is capable of multiple independent sessions). If multiple CP's are activated, each will respond to a ZP's Alive message and will execute the sequence—the first one to deliver the SetNetParams to the ZP will configure it. It should be noted that in this case, the second CP will never get an AckNetParams message (because the ZP has exited the activate state). This will cause a transaction timeout in the second CP, at which point it will typically inform the user of the error, or retry the entire sequence. Should it retry the entire sequence, it will not reprogram the ZP (as described above that the effect of an unconfigured CP talking to a configured ZP)."<br><br>"In one embodiment, a handheld controller is configured to facilitate a new Zone player to execute a household join process to join the HOUSEHOLD upon an appropriate channel. The channel may be agreed upon between the controller and the Zone player as follows:<br>1) when a reset or two buttons are pushed on the Zone Player to activate the household |

168

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | join process, it starts a Scan through the available wireless channels, sending the "Alive' datagram for each channel in turn. Sometimes, it cycles through the channels several times; 2) as soon as the ZonePlayer receives a QueryNetParams request address to itself, it stops the channel cycling; and 3) The ZonePlayer remains locked on whatever channel it has stopped cycling until a Successful sequence ending in the configuration of the ZonePlayer (at which point it uses the specified channel), or a timeout expires (at which point it returns to its original channel or resumes cycling through channels and sending alive messages if the overall timeout for the activation process has not expired)." |
| | | For example, as the Sonos Devices use IEEE 802.11 to transmit communication packets within the mesh network, the IEEE 802.11 protocol includes a collision avoidance and protection mechanism where, prior to the transmission of the communication packet, the Sonos Devices determine if a radio frequency channel is available.  If the channel is unavailable, or busy, the wireless transmitter will implement a random, determined delay value before again attempting transmission of the communication packet.  *See, e.g.,* IEEE 802.11, Wireless LAN MAC and Physical Layer Specifications; IEEE Working Group, Welcome to IEEE 802.11 (available at http://grouper.ieee.org/groups/802/11/main.html http://grouper.ieee.org/groups/802/11/main.html). |
| 5 | The audio-enabled wireless device of claim 1, wherein if the identification code portion of the received communication packet does not match an entry in the table of identifiers stored in the audio-enabled wireless device, the controller is | The Sonos Devices comprise  if the identification code portion of the received communication packet does not match an entry in the table of identifiers stored in the audio-enabled wireless device, the controller is configured to not relay the communication packet.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.  The Sonos Devices, operating within a "SonosNet" wireless mesh network, are configured to compare the identification code portion of received communication packets to a table of identifiers, corresponding for example to a list of devices within the same "household," and based on that comparison determine to relay the communication packet to another Sonos Device within the network.  If the identification code portion of the received communication |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| configured to not relay the communication packet. | packet does not, for example, correspond to a list of devices with the same "household," the Sonos Device can make the determination to not relay the communication packet. *See, e.g.*, Sonos System Overview, October 20, 2014 at 7-10:<br><br> |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | <br><br>*See, e.g.,* Sonos Music API - Getting Started Guide (2014), https://musicpartners.sonos.com/node/464: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.*, Sonos Developer, Control, https://developer.sonos.com/build/direct-control/discover/: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  *See, e.g.,* How to group rooms in the Sonos app (Jan. 7, 2020), support.sonos.com/s/article/3391:  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| 7 | The audio-enabled wireless device of claim 1, wherein the audio-enabled wireless device includes an Ethernet network connection, and wherein the controller is configured to communicate, using the Ethernet connection, via the Internet. | The Sonos Devices include an Ethernet network connection, and wherein the controller is configured to communicate, using the Ethernet connection, via the Internet.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Sonos System Overview, October 20, 2014 at 4:<br><br><br>Figure 1: Components of the Sonos Wireless HiFi System |

177

EXHIBIT E
Infringement of '586 Patent

| | | *See, e.g.,* Sonos Developers: Groups (2020), https://developer.sonos.com/reference/control-api/groups/groups/: |
|---|---|---|
| | |  |
| | | *See, e.g.,* Connect Sonos to a new router or WiFi network (Jan. 13, 2020), https://support.sonos.com/s/article/1061?language=en_US: |

178

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **Connect Sonos to a new router or WiFi network**<br><br>**Before you start**<br>Make sure you've updated the Sonos app on your iOS or Android device to the latest version.<br><br>Your Sonos system needs updated network information after you've changed your WiFi network name, password, or replaced your router. This article will help you connect your Sonos system to a new router or to a new WiFi network.<br><br>**If Sonos connects through your WiFi network**<br>These steps apply when your Sonos system is in a wireless setup and you have changed your WiFi password, WiFi network name, or have replaced your router.<br><br>If you have more than one Sonos product in your system, this process will require you to temporarily connect a Sonos speaker to your router with an Ethernet cable. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 30, 35:<br><br> |
| 8. | The wireless device of claim 1, wherein the reset element is a reset switch and wherein the reset switch is configured to activate a reset function. | The Sonos Devices include the reset element is a reset switch and wherein the reset switch is configured to activate a reset function.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 1a-d.<br><br>All of the Sonos Devices include a reset switch, which for example, is the hardware or software that activates the recognition mode for the Sonos Device to join and be introduced into a new network, and enters into a receiving mode for receiving information necessary to join the network.<br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 10 (Move): |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | <br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 16: |

181

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  *See, e.g.*, Sonos User Guide, September 29, 2019 at 20: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 20:<br><br><br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 35: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  *See, e.g.*, Sonos User Guide, June 2020 at 87 (Play:5):  *See, e.g.*, Sonos User Guide, September 29, 2019 at 30: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 35 (Beam): |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | *See, e.g.*, Sonos User Guide, September 29, 2019 at 45:<br><br><br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 55-56 (Playbase): |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | <br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 71 (Amp): |

187

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | <br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 77-78 (Port): |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |   *See, e.g.*, Sonos User Guide, September 29, 2019 at 82-83: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| | <br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 87-88: |

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | <br><br>*See, e.g.*, Sonos User Guide, September 29, 2019 at 93: |

194

EXHIBIT E
Infringement of '586 Patent

| Claim Limitation | Infringement Contentions |
|---|---|
| |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **Controls and lights**<br><br>Join button — Press to connect during setup.<br>Status light — Indicates the status. **Learn more** If the light is distracting, you can turn it off in your room's settings.<br><br>**Connector panel**<br><br>Ethernet port — Use an Ethernet cable to connect the Sub to your home network.<br>AC power (mains) input — Use only the supplied power cord to connect to a power outlet (using a third party power cord will void your warranty). Be sure to use the proper power adapter for your country. *Push the power cord firmly into the Sub until it is flush with the surface.* |
| 9a. | A method of forwarding a communication packet by an audio-enabled wireless device, the method comprising: | To the extent the preamble is limiting, the Sonos Devices perform the method of forwarding a communication packet by an audio-enabled wireless device.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 1a, Claim 1b, and Claim 1f. |

196

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| 9b. | receiving, by the audio-enabled wireless device using a wireless transceiver configured for bidirectional wireless communication, the communication packet, the communication packet including a preamble portion, an identification code portion, a data payload portion, and an integrity portion, the audio-enabled wireless device including an audio output element and a reset element; | The Sonos Devices receive, by the audio-enabled wireless device using a wireless transceiver configured for bidirectional wireless communication, the communication packet, the communication packet including a preamble portion, an identification code portion, a data payload portion, and an integrity portion, the audio-enabled wireless device including an audio output element and a reset element.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents. <br><br> *See, e.g.*, Claim 1a-f. |
| 9c. | comparing at least the identification code portion of the received communication packet to a table of identifiers stored in the audio-enabled wireless device; | The Sonos Devices compare at least the identification code portion of the received communication packet to a table of identifiers stored in the audio-enabled wireless device.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents. <br><br> *See, e.g.*, Claim 1g. |
| 9d. | based on the comparing indicating that the identification code portion of the received communication packet matches an entry in the table of identifiers stored in the audio-enabled wireless | The Sonos Devices, based on the comparing indicating that the identification code portion of the received communication packet matches an entry in the table of identifiers stored in the audio-enabled wireless device, determine to relay the communication packet to another audio-enabled wireless device.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents. <br><br> *See, e.g.*, Claim 1h. |

EXHIBIT E
Infringement of '586 Patent

|  | **Claim Limitation** | **Infringement Contentions** |
|---|---|---|
|  | device, determining to relay the communication packet to another audio-enabled wireless device; and |  |
| 9e. | relaying the communication packet to the other audio-enabled wireless device. | The Sonos Devices relay the communication packet to the other audio-enabled wireless device. The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 1i. |
| 10 | The method of claim 9, comprising: prior to the relaying the communication packet, listening to a radio frequency channel to determine the radio frequency channel is not in use by another device; and transmitting, via the radio frequency channel, the communication packet. | The Sonos Devices, prior to the relaying the communication packet, listen to a radio frequency channel to determine the radio frequency channel is not in use by another device; and transmitting, via the radio frequency channel, the communication packet.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 2. |
| 11 | The method of claim 10, comprising: prior to the transmitting the communication packet, determining a delay value; and waiting the determined delay value before the transmitting the communication packet. | The Sonos Devices, prior to the transmitting the communication packet, determine a delay value; and waiting the determined delay value before the transmitting the communication packet.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 3. |

EXHIBIT E
Infringement of '586 Patent

|   | **Claim Limitation** | **Infringement Contentions** |
|---|---|---|
| 12 | The method of claim 11, wherein the delay value is a random delay value. | The Sonos Devices comprise the delay value is a random delay value.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 4. |
| 14 | The method of claim 9, wherein the reset element is a reset switch, the method comprising: activating a reset function of the audio-enabled wireless device in response to an input to the reset switch. | The Sonos Devices comprise the reset element is a reset switch and activate a reset function of the audio-enabled wireless device in response to an input to the reset switch.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 8. |
| 15a. | A wireless mesh network system, comprising: | To the extent the preamble is limiting, the Sonos Devices are a wireless mesh network system.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 1a. |
| 15b. | multiple audio-enabled wireless devices, each of the multiple audio-enabled wireless devices comprising a wireless transceiver, a reset element, and an audio output element, each of the audio-enabled wireless devices being configured to: | The Sonos Devices are multiple audio-enabled wireless devices, each of Sonos Devices comprise a wireless transceiver, a reset element, and an audio output element, each of the audio-enabled wireless devices.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 1a-d. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| 15c. | receive, using the wireless transceiver a communication packet, the communication packet including a preamble portion, an identification code portion, a data payload portion, and an integrity portion; | The Sonos Devices receive, using the wireless transceiver a communication packet, the communication packet including a preamble portion, an identification code portion, a data payload portion, and an integrity portion.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 1f. |
| 15d. | compare at least the identification code portion of the received communication packet to a table of identifiers stored in the audio-enabled wireless device; | The Sonos Devices compare at least the identification code portion of the received communication packet to a table of identifiers stored in the audio-enabled wireless device.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 1g. |
| 15e. | based on the comparison of the identification code portion of the received communication packet matching an entry in the table of identifiers stored in the audio-enabled wireless device, determine to relay the communication packet to another of the multiple audio-enabled wireless devices; and | The Sonos Devices, based on the comparison of the identification code portion of the received communication packet matching an entry in the table of identifiers stored in the audio-enabled wireless device, determine to relay the communication packet to another of the multiple audio-enabled wireless devices.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 1h. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| 15f. | relay the communication packet to the other of the multiple audio-enabled wireless devices. | The Sonos Devices relay the communication packet to the other of the multiple audio-enabled wireless devices.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 1i. |
| 16 | The wireless mesh network system of claim 15, wherein one or more of the multiple audio-enabled wireless devices includes an Ethernet network connection, the one or more of the multiple audio-enabled wireless devices being configured to: communicate, using the Ethernet network connection, via the Internet; and transmit one or more commands to other of the multiple audio-enabled wireless devices. | The Sonos Devices include an Ethernet network connection, the one or more of the multiple audio-enabled wireless devices being configured to: communicate, using the Ethernet network connection, via the Internet; and transmit one or more commands to other of the multiple audio-enabled wireless devices.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 7.<br><br>Each of the Sonos Devices also transmit one or more commands to other Sonos Devices in the network.<br><br>*See, e.g.*, Sonos Developer (https://developer.sonos.com/build/): |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **What is a player?** A Sonos player can play music on its own, either with its own internal speaker drivers or when connected to external speakers. For example, a Sonos One can play music with its own speakers and a Sonos Amp can play music with connected speakers. The SYMFONISK table lamp with WiFi and SYMFONISK WiFi bookshelf speakers also function as Sonos players. By itself, a Sonos Sub is not a player as it can't play audio on its own. A Boost is not a player as it does not play audio. **Sonos players communicate over Wi-Fi** Sonos players communicate with one another using Wi-Fi to stay in sync. App developers should consider this when creating controls that quickly respond to user input. Network congestion can quickly occur in a household with many players and users. **Sonos players can be bonded to act as one logical player** You can bond players using the Sonos app. Once bonded, players act as if they are one logical player. For example, bond a Sonos Sub with another Sonos player so that it plays the bass channel. Bond two of the same types of players as a stereo pair so that one plays the left audio channel and another plays the right. Bond the same types of players as surrounds in a home theater setup to play the left and right surround channels. When not playing home theater audio, surrounds can play ambient sounds or full range sound as accompaniment. In the diagram above, the light group on the third floor contains two players bonded in a stereo pair. The second floor includes a Sonos home theater speaker bonded with two surrounds. **Sonos app** The Sonos app is not smart, the player is. The Sonos app acts as a remote control. It sends browse and metadata requests to music and content services and transport control commands to the player. **Sonos players work in groups** Sonos players work in groups, even if it's a group of one. Groups control playback. Partner integrations must discover and display Sonos groups. **Continuity of control** You can start playing sound on Sonos in multiple ways. You can use the Sonos app, partner apps and devices, hardware controls on Sonos players, or voice commands. Because of this, a big part of the Sonos experience is continuity of control. This means that you can control sound throughout your home regardless of how you started it. For example, you can ask Alexa to start playing your favorite track, turn the volume up with the Sonos app, skip the next song using a button on the speaker, and stop the music with a third-party hardware remote. Control of Sonos is seamless and integrated. *See, e.g.*, Connect Sonos to a new router or WiFi network (Jan. 13, 2020), https://support.sonos.com/s/article/1061?language=en_US. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | **Connect Sonos to a new router or WiFi network**<br><br>**Before you start**<br>Make sure you've updated the Sonos app on your iOS or Android device to the latest version.<br><br>Your Sonos system needs updated network information after you've changed your WiFi network name, password, or replaced your router. This article will help you connect your Sonos system to a new router or to a new WiFi network.<br><br>**If Sonos connects through your WiFi network**<br>These steps apply when your Sonos system is in a wireless setup and you have changed your WiFi password, WiFi network name, or have replaced your router.<br>If you have more than one Sonos product in your system, this process will require you to temporarily connect a Sonos speaker to your router with an Ethernet cable. |

204

EXHIBIT E
Infringement of '586 Patent

| | | *See, e.g.*, Sonos User Guide, September 29, 2019 at 30, 35:



*See, e.g.*, Sonos System Overview, October 20, 2014 at 4: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |
| | | *See, e.g.*, Sonos System Overview, October 20, 2014 at 7-10: |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | | *3   Wireless Mesh Network*<br><br>Each Sonos product is network-enabled with Ethernet, wireless interfaces, or both and uses TCP/IP to communicate. You can set up the Sonos Wireless HiFi System wirelessly (standard setup), or by connecting a Sonos product to your router with an Ethernet cable (BRIDGE setup). If you connect a Sonos component to your router, the Sonos system establishes and uses SonosNet, a secure wireless mesh network to communicate and stream music throughout the household. (Connect a BRIDGE to your router if you won't listen to music in this location, or connect a player to have audio available.) If you set up Sonos wirelessly, Sonos components communicate using over the home's wireless network.<br><br>SonosNet is a secure, AES-encrypted, peer-to-peer wireless mesh network that provides stable, reliable audio playback.<br><br>Sonos components communicate directly with each other, so each component expands the network. Each Sonos product is network enabled with an Ethernet interface, a wireless interface, or both so you can choose to set up the Sonos system to use either SonosNet (by connecting one Sonos product to your router) or your wireless network. If you plug a Sonos product into your router, all of your Sonos components will use SonosNet to communicate with each other.<br><br>When the Sonos Wireless HiFi System is set up, a ***household*** is created. A household is limited to thirty-two components each of which must be on the same IP subnet. |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

**3.1 Standard Setup**

In a standard wireless network, coverage radiates outward from a central router or access point. The further a wireless client is from this central point, the weaker the signal between the two will be.

*Figure 2: Standard Wireless Network*

In Figure 2 above, each Sonos component talks to the wireless router. Therefore, for homes with wireless connectivity issues, or those with a large number of Sonos players, standard wireless setup may not be the best choice.

**3.2 SonosNet™ Setup**

SonosNet is different because each Sonos product is both a network client and access point. Instead of merely accessing the network, each component also expands it. Sonos components communicate with every other Sonos component in wireless range, ensuring multiple, redundant paths for data to travel. While each component must be within range of at least one other component, they don't need to be within range of the central point.

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | | Infringement Contentions | |
|---|---|---|---|---|
| | | |  | |



*Figure 3: SonosNet*

In Figure 3 above, the green circles represent SonosNet. Since each Sonos component both uses and extends SonosNet, simply by communicating with another Sonos component SonosNet is expanded to provide whole-house coverage. Note that the Sonos component nearest to the router is connected via an Ethernet cable.

As a music distribution method, there are some advantages to setting up Sonos to communicate over SonosNet rather than the home's wireless network.

- *Reliability* – Because SonosNet is a separate high-performance wireless network exclusively for Sonos components, this setup is recommended when wireless connectivity issues are present in a home. SonosNet adapts to changing wireless conditions and uses multiple wireless connections between Sonos products to provide a stable system even under adverse conditions.

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| | |  |

EXHIBIT E
Infringement of '586 Patent

| | Claim Limitation | Infringement Contentions |
|---|---|---|
| 18 | The wireless mesh network system of claim 15, wherein each of the multiple audio-enabled wireless devices is configured to: prior to a transmission of one or more communication packets, listen to a radio frequency channel to determine the radio frequency channel is not in use by another device; and transmit, via the radio frequency channel, the one or more communication packets. | The Sonos Devices are configured to: prior to a transmission of one or more communication packets, listen to a radio frequency channel to determine the radio frequency channel is not in use by another device; and transmit, via the radio frequency channel, the one or more communication packets.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 2. |
| 20 | The wireless mesh network system of claim 15, wherein each of the multiple audio-enabled wireless devices is configured to: prior to a transmission of one or more communication packets, determine a delay value; and wait the determined delay value before the transmission of the one or more communication packets. | The Sonos Devices are configured to: prior to a transmission of one or more communication packets, determine a delay value; and wait the determined delay value before the transmission of the one or more communication packets.  The Sonos Devices, therefore, meet this claim limitation literally or, alternatively, under the doctrine of equivalents.<br><br>*See, e.g.*, Claim 3. |

# EXHIBIT 11

# FILED UNDER SEAL

# HIGHLY CONFIDENTIAL – SOURCE CODE (ATTORNEYS' EYES ONLY)