1  CLEMENT SETH ROBERTS (STATE BAR NO. 209203)
   croberts@orrick.com
2  BAS DE BLANK (STATE BAR NO. 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (STATE BAR NO. 260103)
   acaridis@orrick.com
4  EVAN D. BREWER (STATE BAR NO. 304411)
   ebrewer@orrick.com
5  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
6  405 Howard Street
   San Francisco, CA 94105-2669
7  Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759
8
   GEORGE I. LEE (*pro hac vice*)
9  lee@ls3ip.com
   SEAN M. SULLIVAN (*pro hac vice*)
10 sullivan@ls3ip.com
   RORY P. SHEA (*pro hac vice*)
11 shea@ls3ip.com
   J. DAN SMITH (*pro hac vice*)
12 smith@ls3ip.com
   LEE SULLIVAN SHEA & SMITH LLP
13 656 W Randolph St., Floor 5W
   Chicago, IL 60661
14 Telephone:    +1 312 754 0002
   Facsimile:    +1 312 754 0003
15
16 *Attorneys for Defendant Sonos, Inc.*

17                    UNITED STATES DISTRICT COURT

18                  NORTHERN DISTRICT OF CALIFORNIA

19                      SAN FRANCISCO DIVISION

20

21 GOOGLE LLC,                          Case No. 3:20-cv-03845-EMC

22                  Plaintiff,          **DECLARATION OF EVAN BREWER
                                        IN SUPPORT OF SONOS, INC.'S
23       v.                             MOTION TO STAY PENDING *INTER
                                        PARTES* REVIEW**
24 SONOS, INC.,
                                        Date: January 6, 2022
25                  Defendant.          Time: 1:30 p.m.
                                        Courtroom: 5, 17th Floor
26

27

28

1    I, Evan Brewer, hereby declare:

2    1.    I am an attorney with the law firm of Orrick, Herrington & Sutcliffe LLP, counsel

3    of record to Defendant Sonos, Inc. ("Sonos") in the above-captioned matter. I am a member in

4    good standing of the Bar of the State of California. I make this declaration based on my personal

5    knowledge, unless otherwise noted. If called, I can and will testify competently to the matter set

6    forth herein. I submit this declaration in support of Sonos's Motion to Stay Pending *Inter Partes*

7    Review.

8    2.    On October 29, 2021, Google served its infringement contentions. On March 15,

9    2021, Google served amended infringement contentions with source code-level detail. While

10   Sonos was in the process of reviewing the amended infringement contentions, on March 30, 2021,

11   Google subsequently served corrected amended infringement contentions. The corrected amended

12   infringement contentions are the operative infringement contentions in this case.

13   3.    Google's corrected amended infringement contentions asserts the following claims

14   against the following patents: U.S. Patent No. 7,899,187: claims 1, 3, 4, 10, and 12; U.S. Patent

15   No. 10,140,375: claims 1-11, 13-20, U.S. Patent No. 7,065,206: claims 1-3, 9, 11, 12, 18, and 19;

16   and U.S. Patent No. 10,229,586: claims 1-5, 7-12, 14-16, 18, and 20.

17   4.    On January 26, 2021 Google served damages contentions pursuant to Patent Local

18   Rule 3-8. Google's damages contentions identify a reasonable royalty as the measure of damages

19   Google is seeking to compensate for Sonos's alleged infringement. Google's damages

20   contentions do not identify lost profits damages.

21   5.    Attached hereto as **Exhibit A** is a true and correct copy of the Decision Granting

22   Institution of *Inter Partes* Review of U.S. Patent No. 10,229,586, entered on October 18, 2021.

23   6.    Attached hereto as **Exhibit B** is a true and correct copy of the Decision Granting

24   Institution of *Inter Partes* Review of U.S. Patent No. 10,140,375, entered on November 10, 2021.

25   7.    On June 23, 2021, the Landgericht München I (the First Regional Court in

26   Munich, Germany) issued an order dismissing an action brought by Google against Sonos in

27   Germany for alleged infringement of of EP1579621B1, the European patent version of U.S.

28   Patent No. 7,899,187, finding the accused Sonos products did not infringe EP1579621B1.

BREWER DECL. ISO SONOS'S MOTION TO STAY
PENDING *INTER PARTES* REVIEW
3:20-cv-03845-EMC

8.      Attached hereto as **Exhibit C** is a true and correct copy of the order issued by the Landgericht München I (First Regional Court in Munich, Germany) dismissing the case (case ID: 21 O 16260/20) brought by Google, LLC against Sonos Inc. in Germany for alleged infringement of of EP1579621B1 ("Munich dismissal").

9.      Attached herto as **Exhibit D** is an English translation of translated copy of the Munich dismissal.

10.      Attached hereto as **Exhibit E** is a Translation Certificate certifying that the English translated version of the Munich dismissal was completed in accordance with ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017, and that the translation, to the best knowledge and belief of all TransPerfect employees engaged on the project, constitutes a full and accurate translation of the source material.

11.      Attached hereto as **Exhibit F** is a true and correct copy of European Patent EP1579621B1, the European counterpart to U.S. Patent No. 7,899,187, asserted in this action.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 30th day of November, 2021 in Mercer Island, Washington.

By: _____
                        Evan Brewer

# EXHIBIT A

Trials@uspto.gov                         Paper 7
571-272-7822                    Date: October 18, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SONOS, INC.,
Petitioner,

v.

GOOGLE LLC,
Patent Owner.

————————

IPR2021-00964
Patent 10,229,586 B2

————————

Before KEVIN F. TURNER, TERRENCE W. MCMILLIN, and
SCOTT RAEVSKY, *Administrative Patent Judges*.

RAEVSKY, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2021-00964
Patent 10,229,586 B2

## I.   INTRODUCTION

Sonos, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–5, 7–12, 14–16, 18, and 20 of U.S. Patent No. 10,229,586 B2 (Ex. 1001, "the '586 patent").  Google LLC ("Patent Owner") filed a Preliminary Response (Paper 6, "Prelim. Resp.").

Under 35 U.S.C. § 314(a), an *inter partes* review may not be instituted unless it is determined that there is a reasonable likelihood that the petitioner would prevail with respect to at least one of the claims challenged in the petition.  Based on the information presented in the Petition and the supporting evidence, we are persuaded there is a reasonable likelihood Petitioner would prevail with respect to the challenged claims.  Accordingly, we institute an *inter partes* review of claims 1–5, 7–12, 14–16, 18, and 20 on all of the grounds set forth in the Petition.

Our factual findings and conclusions at this stage of the proceeding are based on the evidentiary record developed thus far.  This is not a final decision as to patentability of the challenged claim.

## II.   BACKGROUND

### A.  *Related Matter*

The parties identify the following related district court litigation: *Google LLC v. Sonos, Inc.*, No. 3:20-cv-03845 (N.D. Cal. June 11, 2020). Pet. 4; Paper 5, 2.

### B.  *The '586 patent*

The '586 patent describes "a wireless sensor system."  Ex. 1001, 2:8–10.  Figure 1, reproduced below, depicts an example of this system:

2

IPR2021-00964
Patent 10,229,586 B2



FIG. 1

*Id.* at 4:13–15.  Figure 1 shows a system that includes sensor units that communicate with a base unit through repeater units.  *Id.*  Sensors 102–106 measure conditions like smoke, temperature, moisture, and carbon monoxide.  *Id.* at 4:60–65.  The sensors wirelessly communicate with repeaters 110, 111.  *Id.* at 4:37–40.  The repeaters in turn communicate with base unit 112 and monitoring computer system 113.  *Id.* at 4:39–40.  When sensors 102–106 detect smoke, fire, water, or some other condition, they communicate with a repeater 110, 111, which forwards data to base unit 112 and computer 113.  *Id.* at 5:26–32.

Figure 5 depicts an example communication packet used by sensors 102–106, repeaters 110–111, and base unit 112:

IPR2021-00964
Patent 10,229,586 B2



# FIG. 5

*Id.* at 4:19–21.  The packet includes preamble portion 501, address (or ID) portion 502, data payload portion 503, and integrity portion 504 (which can include a checksum).  *Id.* at 11:1–6.

## C. Challenged Claims

Petitioner challenges claims 1–5, 7–12, 14–16, 18, and 20 of the '586 patent.  Pet. 1.  Claim 1 is illustrative:[1]

1. [1-p] An audio-enabled wireless device configured for bidirectional wireless communication in a wireless mesh network, the wireless device comprising:

[1-1] a wireless transceiver;

[1-2] an audio output element;

[1-3] a reset element; and

[1-4] a controller operatively coupled to the wireless transceiver, the audio output element, and the reset element, the controller being configured to:

[1-5] receive a communication packet using the wireless transceiver, the communication packet including a preamble portion, an identification code portion, a data payload portion, and an integrity portion;

[1-6][2] compare at least the identification code portion of the received communication packet to a table of identifiers stored in the audio-enabled wireless device;

---

[1] For convenience, we use Petitioner's element labeling.  *See* Pet. 34–44.
[2] Petitioner uses "[1-6]" to group multiple limitations.  Pet. at 44.

IPR2021-00964
Patent 10,229,586 B2

> based on the comparison of the identification code portion of
> the received communication packet matching an entry in the
> table of identifiers stored in the audio-enabled wireless device,
> determine to relay the communication packet to another audio-
> enabled wireless device; and

> relay the communication packet to the other audio-enabled
> wireless device.

### D. Asserted Grounds of Unpatentability

Petitioner asserts the following grounds of unpatentability (Pet. 7),
supported by the declaration of Dr. Stephen B. Wicker (Ex. 1003):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 5, 8–9, 14–15 | 103(a)[3] | Baker[4] alone[5] or Baker and Bruckert[6] |
| 2–4, 7, 10–12, 16, 18, 20 | 103(a) | Baker, Bruckert, and McMillin[7] |

---

[3] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. §§ 102, 103 effective March 16, 2013. Because the challenged patent claims priority to applications filed before March 16, 2013, we refer to the pre-AIA version of §§ 102, 103. Our opinions on this record would not change if the AIA versions of §§ 102, 103 were to apply.

[4] U.S. Patent Pub. No. 2006/0120433 A1 to Baker et al. ("Baker") (Ex. 1004).

[5] Petitioner's grounds summary refers only to obviousness over Baker and Bruckert, Pet. 6–7, but Petitioner also asserts obviousness over Baker alone (except for claims 8 and 14, which Petitioner argues over "Baker and Bruckert together"), *id.* at 34–47.

[6] European Patent No. 0416732 B1 to Bruckert et al. ("Bruckert") (Ex. 1009).

[7] U.S. Pub. No. 7,027,773 B1 to McMillin ("McMillin") (Ex. 1018).

IPR2021-00964
Patent 10,229,586 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–5, 7–12, 14–16, 18, 20 | 103(a) | Marman[8] alone[9] or Marman and Shoemake[10] |

## III.  ANALYSIS

### A.  Discretion Under 35 U.S.C. § 325(d)

Patent Owner contends that we should exercise our discretion under 35 U.S.C. § 325(d) to deny institution of *inter partes* review.  Prelim. Resp. 14–24.  Petitioner preemptively addressed § 325(d) discretion in the Petition, arguing that there is no basis for us to exercise discretion.  Pet. 11–13.  We disagree with Patent Owner and decline to exercise our discretion to deny institution.

Pursuant to 35 U.S.C. § 325(d), in determining whether to institute an *inter partes* review, "the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office."  In evaluating arguments under § 325(d), we use

> [a] two-part framework: (1) whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office; and (2) if either condition of first part of the framework is satisfied, whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims.

---

[8]  PCT Pub. No. WO 00/21053 to Marman et al. ("Marman") (Ex. 1006).
[9]  Petitioner's grounds summary refers only to obviousness over Marman and Shoemake, Pet. 6–7, but Petitioner also asserts obviousness over Marman alone, *id.* at 58–66.
[10]  U.S. Pub. No. 2002/0122413 A1 to Shoemake ("Shoemake") (Ex. 1010).

IPR2021-00964
Patent 10,229,586 B2

*Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) (precedential); *see also Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (precedential as to Section III.C.5, first paragraph) (listing factors to consider in evaluating the applicability of § 325(d)).

Under *Advanced Bionics*, *Becton Dickinson* factors (a), (b), and (d) are considered in the evaluation of whether the same or substantially the same art or arguments were previously presented to the Office. *Advanced Bionics*, Paper 6 at 10. *Becton, Dickinson* identifies these factors as (a) the similarities and material differences between the asserted art and the prior art involved during examination; (b) the cumulative nature of the asserted art and the prior art evaluated during examination; and (d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art. *Becton, Dickinson*, Paper 8 at 17–18.

Patent Owner argues that Marman is substantively identical to U.S. Patent No. 6,624,750 ("Marman '750"), which was cited on the face of the '586 patent and was therefore considered by the Examiner during prosecution of the '586 patent. Prelim. Resp. 16–17. Patent Owner also argues that Shoemake is cumulative of Marman because Petitioner "highlights the similarities between the communication packets in Marman and Shoemake." *Id.* at 17–18. Patent Owner views Petitioner as relying on Marman for all the independent claim limitations and as cumulatively relying on Shoemake for what a POSITA would have understood Marman to teach. *Id.* Thus, Patent Owner contends, "Petitioner admits that Shoemake is redundant of Marman." *Id.* at 17.

7

IPR2021-00964
Patent 10,229,586 B2

We agree with Patent Owner that the same or substantially the same art previously was presented to the Office with respect to Ground 3. Marman and Marman '750 are cumulative because Marman is a PCT publication related to Marman '750, the corresponding U.S. issued patent. *Compare* Ex. 2001, code (86), *with* Ex. 1006, code (21) (same PCT application number). As such, they appear to be substantively identical. And Shoemake is cumulative of Marman '750 because we determine below that Petitioner has shown a reasonable likelihood that both Marman alone and Marman and Shoemake disclose all the challenged claim limitations. In other words, because Marman is cumulative of Marman '750, and because Shoemake discloses claim limitations that Marman also discloses, Shoemake is also cumulative of Marman '750.

Although Patent Owner's § 325(d) arguments only apply to one of the three grounds raised by Petitioner and it is unclear whether § 325(d) is sufficiently implicated for the petition as a whole, we need not decide this issue because we find that Petitioner has demonstrated material error under the second prong of *Advanced Bionics*. Under the second part of the *Advanced Bionics* framework, *Becton Dickinson* factors (c), (e), and (f) are considered in the evaluation of whether the petitioner has made a case for reconsidering the art and arguments. *Becton, Dickinson* identifies these factors as (c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection; (e) whether petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and (f) the extent to which additional evidence and facts presented in the petition warrant reconsideration of the asserted prior art or arguments. *Becton, Dickinson*, Paper 8 at 17–18.

IPR2021-00964
Patent 10,229,586 B2

Petitioner asserts that the Examiner erred by not expressly assessing or applying Marman '750, only citing Marman '750 on the face of the '586 patent.  Pet. 11.  Patent Owner disagrees because the Examiner expressly applied Marman '750 in five other members of the '586 patent family.  Prelim. Resp. 19–20.  Consequently, in Patent Owner's view, we should "infer from these circumstances that the Examiner considered the substance of" Marman '750 during prosecution of the '586 patent.  *Id.* at 21 (quoting *Universal Imaging Indus., LLC v. Lexmark Int'l, Inc.*, IPR2019-01383, Paper 7 at 20 (PTAB Feb. 27, 2020)).  These arguments are less relevant to the second part of the framework because they address whether the same or substantially the same art or arguments were previously presented, not whether Petitioner has demonstrated Office error.

More to the point, Patent Owner asserts that the examiner explicitly found that Marman '750 was "***missing*** a feature"—the claimed "integrity portion."  *Id.*  Patent Owner argues that Petitioner does not show examiner error because Marman likewise does not disclose the claimed integrity portion.  *Id.* (citing Pet. 62).  Patent Owner faults Petitioner's reliance on Marman's "packet error control" disclosure as insufficient to establish that Marman discloses an "integrity portion."  *Id.* (citing Pet. 62).  But Patent Owner overlooks that Petitioner also relies on Marman as teaching that packets include an "end sync word" in addition to "packet error control."  Pet. 62.  As we explain below, on this record we agree with Petitioner that Marman's "end sync word" and "packet error control" likely disclose the claimed "integrity portion."  Thus, by showing how Marman teaches the claimed "integrity portion," Petitioner sufficiently points out how the

IPR2021-00964
Patent 10,229,586 B2

Examiner erred in a manner material to the patentability of the challenged claims.

We conclude that the circumstances presented here do not warrant exercising our discretion to deny institution based on § 325(d).

B. *Principles of Law*

Petitioner bears the burden to demonstrate unpatentability. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). At this preliminary stage, we determine whether the information presented in the Petition shows a reasonable likelihood that Petitioner would prevail in establishing that at least one of the challenged claims would have been obvious over the proposed combinations of prior art. *See* 35 U.S.C. § 314(a).

A claim is unpatentable as obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)). We resolve the question of obviousness based on underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the prior art and the claims; (3) the level of skill in the art; and (4) when in evidence, objective indicia of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

We apply these principles to the Petition's challenges.

10

IPR2021-00964
Patent 10,229,586 B2

## C. *Level of Ordinary Skill in the Art*

We review the grounds of unpatentability in view of the understanding of a person of ordinary skill in the art at the time of the invention. *Id.* at 13, 17. Petitioner asserts that

> [a] POSITA [person of ordinary skill in the art] . . . would have had a degree in computer engineering, computer science, or a similar discipline, along with two years of professional experience developing wireless sensor systems or an equivalent level of skill, knowledge, and experience. . . . This POSITA would be aware of and generally knowledgeable about the types of components found in wireless networks, communication protocols, packet structure, and industry standards and best practices that were known and available at the time the '586 patent was filed.

Pet. 33 (citing Ex. 1003 ¶¶ 39–41).

Patent Owner does not address the level of skill in the art at this stage. *See generally* Prelim. Resp. We are persuaded, on the present record, that Petitioner's proposal is consistent with the problems and solutions in the '586 patent and prior art of record. We adopt Petitioner's definition of the level of skill for the purposes of this Decision.

## D. *Claim Construction*

In *inter partes* review, we construe claims using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b) (2020).

Petitioner argues that the independent claim preambles are not limiting and proposes constructions for two terms: "reset element" and

11

IPR2021-00964
Patent 10,229,586 B2

"preamble portion."  Pet. 18–22.  Patent Owner asserts that, at least at this stage, no claim construction is necessary.  Prelim. Resp. 2 fn.1 ("None of the arguments in the present response depend on any of the claim constructions proposed by Petitioner.").

We address the term "preamble portion" in our merits analysis below. No other terms require construction at this stage.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms that are in controversy, and only to the extent necessary to resolve the controversy.") (internal quotation omitted).

### E.  Asserted Obviousness over Baker and Bruckert

Petitioner contends that claims 1, 5, 8–9, 14–15 are obvious over Baker alone or over Baker and Bruckert.  Pet. 33–52.  Patent Owner contends that Baker does not disclose the packet relaying functionality in the independent claims.  Prelim. Resp. 9–14.  For the reasons that follow, Petitioner has established a reasonable likelihood of prevailing on this ground.

#### 1.  Overview of Baker

Baker describes a wireless home network including consumer electronic devices like televisions, cable boxes, and audio systems, as shown below in Figure 3a.  Ex. 1004 ¶ 60.  Figure 3b, also shown below, depicts a "simplified schematic" of this network with four nodes 350, 352, 354, 356. *Id.* ¶ 61.

12

IPR2021-00964
Patent 10,229,586 B2



Figure 3a

Figure 3b

In Figure 3a above, example nodes in the network include laptop computer 302, printer 304, televisions 306, 308, and set top box 310, among others. *Id.* ¶ 60. Each node, as represented in Figure 3b, is in communication with each other node, except nodes 350 and 356, which are out of range of one another (as indicated by the dashed line). *Id.* ¶ 61. If nodes 350, 356 wish to communicate, the communication must be routed via either node 352 or node 354. *Id.*

This routing may be performed as follows. A node may receive a data packet from another node and determine whether the node is the final intended destination of the packet. *Id.* ¶ 84. If the node is not the final intended destination, an incoming channel number and destination address of the packet are used to look up an outgoing port and channel number in a locally stored connection table. *Id.* ¶ 85. If a table entry specifies a valid port and channel number, the node updates the packet channel number field and retransmits the packet, thus forwarding the packet. *Id.*

### 2. Overview of Bruckert

Bruckert describes a method and system of resetting a data processing system without altering the sequence of instructions of the steps executed by

13

IPR2021-00964
Patent 10,229,586 B2

the data processing system.  Ex. 1009, 2:11–14.  This system includes a "single reset" that always sets the processor back to some predetermined or initial state.  *Id.* at 35:21–23.  The reset can be used for standard functions, such as when power is initially applied to the system.  *Id.* at 35:17–21.

### 3. Independent Claim 1

Petitioner contends that Baker alone or Baker and Bruckert teach or suggest all the limitations of claim 1.  Pet. 34–47.  Patent Owner contends that Baker fails to teach or suggest the packet relaying functionality in limitation 1-6.  Prelim. Resp. 9–14.  For the reasons set forth below, we determine that Petitioner has shown a reasonable likelihood that Baker alone or Baker and Bruckert render claim 1 obvious.

### a. Preamble [1-p] and limitations 1-1 through 1-5

Petitioner contends that Baker alone or Baker and Bruckert disclose the preamble 1-p and limitations 1-1 through 1-5.  Pet. 34–44.  Patent Owner does not dispute these contentions at this stage.  *See generally* Prelim. Resp.

Petitioner supports its arguments with specific citations to Baker and Bruckert and Dr. Wicker's declaration.  Pet. 34–44 (citing, e.g., Ex. 1004, *passim*; Ex. 1009, 35:17–28; Ex. 1003 ¶¶ 234–302).  On this record, we agree with Petitioner that there is a reasonable likelihood that Baker alone or Baker and Bruckert disclose the preamble 1-p and limitations 1-1 through 1-5.  We thus need not discuss Petitioner's arguments on these limitations in detail.  *See LG Elecs., Inc. v. Conversant Wireless Licensing S.A.R.L.*, 759 F. App'x 917, 925 (Fed. Cir. 2019) (nonprecedential) ("The Board is 'not required to address undisputed matters' or arguments about limitations with which it was never presented.") (quoting *In re NuVasive, Inc.*, 841 F.3d 966, 974 (Fed. Cir. 2016)).  We also need not determine whether the

14

IPR2021-00964
Patent 10,229,586 B2

preamble is limiting because even if it were, we determine that Petitioner has shown that Baker likely discloses it.

> b. *[1-6] compare at least the identification code portion of the received communication packet to a table of identifiers stored in the audio-enabled wireless device; based on the comparison of the identification code portion of the received communication packet matching an entry in the table of identifiers stored in the audio-enabled wireless device, determine to relay the communication packet to another audio-enabled wireless device; and relay the communication packet to the other audio-enabled wireless device*

Petitioner contends that Baker discloses limitations 1-6 of claim 1. Pet. 44–47. According to Petitioner, Baker's communication packets are relayed from one audio-enabled device to another. *Id.* at 45 (citing Ex. 1003 ¶¶ 303–309). To perform this relaying, Petitioner asserts, Baker's approach is to employ "local routing tables." *Id.* at 45–46 (citing, e.g., Ex. 1004 ¶ 30). Petitioner contends that a packet's incoming channel number and destination address are used to look up an outgoing port and channel number in a table. *Id.* at 46 (citing Ex. 1004 ¶ 85). If a destination is identified, Petitioner asserts, the node relays the packet by retransmitting the packet. *Id.* (citing Ex. 1004 ¶ 85); *see also* Ex. 1003 ¶¶ 310–317.

Notwithstanding Patent Owner's arguments, discussed below, Petitioner persuades us that Baker discloses limitations 1-6 of the claim.

Patent Owner raises four main arguments. First, Patent Owner argues that Petitioner's analysis is perfunctory because Petitioner does not allege that Baker affirmatively discloses "'***determin[ing] to relay***' the communication packet '***based on*** the comparison of the identification code portion . . . ***matching*** an entry in the table of identifiers.'" Prelim. Resp. 10.

15

IPR2021-00964
Patent 10,229,586 B2

We disagree because, as we noted above, Petitioner argues that in Baker, a packet's incoming channel number and destination address are used to look up an outgoing port and channel number in a table, which if identified, causes the packet to be retransmitted. Pet. 46 (citing Ex. 1004 ¶ 85). Although Petitioner does not use the word "comparison" in this argument, we view Petitioner's reference to Baker's table lookup as sufficiently establishing that Baker discloses the disputed limitation at this stage.

Second, Patent Owner argues that Baker's teachings do not support Petitioner's arguments. Prelim. Resp. 11–12. Patent Owner contends that Baker conditions packet retransmission on a different basis than the claim, namely, "[w]here the table entry specifies a valid port and channel number." *Id.* at 11 (citing Ex. 1004 ¶ 85). Thus, Patent Owner views Baker as basing retransmission on the "existence of valid routing information," not "based on the comparison of the identification code portion . . . matching an entry in the table of identifiers," as claimed. *Id.* But this argument is also unavailing because Baker does not base retransmission on the mere existence of valid routing information. Rather, Baker teaches that "the incoming channel number and destination address are used to *look up* an outgoing port and channel number" and that "[w]here the table entry specifies a valid port and channel number the node . . . retransmits the packet." Ex. 1004 ¶ 85 (emphasis added). Thus, Baker not only determines that the table specifies a valid port and channel number, but also performs a lookup operation, which Patent Owner overlooks. *See id.* In our view at this stage, Baker's lookup operation discloses the claimed comparison.

Third, Patent Owner contends that Baker contemplates that port and channel numbers could exist in the routing table without any accompanying

16

IPR2021-00964
Patent 10,229,586 B2

identifiers.  Prelim. Resp. 11–12.  Patent Owner references Baker's disclosure that "[o]ptionally the routing table may further include, for each link defined by a pair of channels for incoming and outgoing data, an identifier for the intended end recipient, although in embodiments this is not necessary."  *Id.* at 12 (citing Ex. 1004 ¶ 30).  But Baker's disclosure of an embodiment that does not include an identifier in the routing table does not negate Baker's disclosure of embodiments that do contain identifiers.  Patent Owner similarly argues that in some embodiments, Baker forwards packets without determining to relay because, in those embodiments, the message is always forwarded unless the node is the recipient.  *Id.* at 13 (citing Ex. 1004 ¶ 30).  These embodiments also do not negate Baker's more relevant disclosure relied upon by Petitioner.

Finally, Patent Owner faults the Petitioner's declarant for conclusory explanations that are "nearly identical" to the Petition.  *Id.* at 12–13.  We do not view Dr. Wicker's testimony as defective.  While it is often helpful for an expert declaration to further explain or support a party's assertions, we find no requirement that it do so.  On this record, Petitioner's arguments, as supported by Dr. Wicker's testimony and the teachings of Baker, sufficiently persuade us that Baker likely discloses limitations 1-6 of claim 1.

### c.  Summary as to Claim 1

Based on the preliminary record before us, we find that Petitioner has shown a reasonable likelihood that claim 1 would have been obvious over Baker alone or Baker and Bruckert.

### 4.  Independent Claims 9 and 15

Petitioner asserts that independent claims 9 and 15 are similar to claim 1.  Pet. 49–52.  Petitioner's detailed analysis explaining where Baker alone

17

IPR2021-00964
Patent 10,229,586 B2

or Baker and Bruckert teaches the limitations in these claims is similar to the analysis discussed above with respect to claim 1.  *Id.*  Patent Owner relies on the same arguments for claims 9 and 15 as it does for claim 1.  *See* Prelim. Resp. 14.  For the reasons discussed above, based on the current record, we determine that Petitioner has demonstrated a reasonable likelihood that claims 9 and 15 are unpatentable as obvious over Baker alone or Baker and Bruckert.

### 5.  *Dependent Claims 5, 8, and 14*

Petitioner contends that dependent claims 5, 8, and 14 are unpatentable as obvious over Baker alone (for claim 5) or Baker and Bruckert (for claims 5, 8, and 14).  Pet. 47–51 (arguing claim 5 over Baker and arguing claims 8 and 14 are taught by "Baker and Bruckert together").  Petitioner provides a detailed analysis explaining where Baker or Baker and Bruckert disclose the limitations in dependent claims 5, 8, and 14.  *Id.*  Patent Owner does not offer separate arguments for these claims or contest Petitioner's analysis at this preliminary stage.  *See generally* Prelim. Resp.  Based on the current record, we determine that Petitioner has demonstrated a reasonable likelihood that claims 5, 8, and 14 are unpatentable as obvious over Baker alone (for claim 5) or Baker and Bruckert (for claims 5, 8, and 14).

### F.  *Asserted Obviousness over Baker, Bruckert, and McMillin*

Petitioner contends that claims 2–4, 7, 10–12, 16, 18, and 20 would have been obvious over the combination of Baker, Bruckert, and McMillin. Pet. 52–58.  Patent Owner does not address Petitioner's assertions.  *See generally* Prelim. Resp.

18

IPR2021-00964
Patent 10,229,586 B2

McMillin generally discloses delaying transmission of a message to avoid a collision with another message.  Ex. 1018, 16:44–17:7.

Petitioner supports its arguments with specific citations to Baker and McMillin[11] and Dr. Wicker's declaration.  Pet. 52–58 (citing, e.g., Ex. 1018, 16:53–60; Ex. 1004 ¶¶ 41, 60, 62, 67; Ex. 1003 ¶¶ 350–370).  On this record, we agree with Petitioner that there is a reasonable likelihood that Baker, Bruckert, and McMillin render obvious claims 2–4, 7, 10–12, 16, 18, and 20.  Accordingly, Petitioner has established a reasonable likelihood of prevailing on this ground.

### G. Asserted Obviousness over Marman and Shoemake

Petitioner contends that claims 1–5, 7–12, 14–16, 18, and 20 are obvious over Marman and Shoemake.  Pet. 58–73.  Patent Owner raises three main arguments: (1) this ground lacks particularity; (2) Marman alone does not disclose the communication packet of element 1-5 of claim 1; and (3) Petitioner does not articulate a proper motivation to combine Marman and Shoemake.  Prelim. Resp. 24–35.  For the reasons that follow, Petitioner has established a reasonable likelihood of prevailing on this ground.

#### 1. Overview of Marman

Marman describes a wireless residential fire and security alarm system.  Ex. 1006, 1:13–14.  The system includes two-way transceivers in smoke detectors, other sensors, and base stations.  *Id.* at 3:15–16.  Figure 1 depicts an example of this system:

---

[11] Petitioner does not apply Bruckert directly to these dependent claims, only to the underlying independent claims.  *See* Pet. 52–58.

IPR2021-00964
Patent 10,229,586 B2



*Id.* at 12:10–12.  The system includes smoke detectors 16, other sensors, and base station 12.  *Id.* at 12:11–13.  The system routes messages by relaying messages from a transmitting device, through at least one intervening device, to a receiving device.  *Id.* at 43:15–18.  The system performs this relaying by using routing tables in each sensor.  *Id.* at 44:11–13.

Communications in Marman's system are packet-based, which includes packet routing and packet error control.  *Id.* at 37:28–38:10, 40:2–7.  Packets include a start synch word, data message, and end sync word.  *Id.* at 40:4–5, 40:20–21.  Both a source address and destination address are also included.  *Id.* at 44:15–17.

### 2. Overview of Shoemake

Shoemake describes wireless transmission of data packets in an environment containing possible interfering communications.  Ex. 1010 ¶ 3. Shoemake describes existing packet-based standards.  *Id.* ¶ 5.  According to

20

IPR2021-00964
Patent 10,229,586 B2

one standard, IEEE 802.11b, each message packet typically includes a preamble and header portion that includes identifying information, as well as a payload portion and a checksum. *Id.*

### 3. Particularity

Before we address the parties' merits arguments, we first address Patent Owner's contention that this ground fails to comply with the particularity requirement. Prelim. Resp. 25 (citing 35 U.S.C § 312(a)(3)). Patent Owner points to the Petition's identification of this ground as "obvious over Marman and Shoemake" and faults the Petition for then arguing "obviousness and anticipation based on Marman alone," with or without the knowledge of one of ordinary skill in the art. *Id.* at 26 (citing Pet. 7, 58–61, 64–66). Thus, Patent Owner concludes, "Petitioner never identifies the substance of Ground 3 with any particularity, instead sowing confusion as to what its particular ground actually is." *Id.* at 27.

A petition for inter partes review ("IPR") must identify "with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." 35 U.S.C. § 312(a)(3); *see also* 37 C.F.R. § 42.104(b) (specifying necessary elements of a petition). The Federal Circuit has explained, "[i]n an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3)). The Board has previously denied petitions suffering from "a lack of particularity that results in voluminous and excessive grounds." *Adaptics Ltd. v. Perfect Co.*, IPR2018-01596, Paper 20 at 18 (PTAB Mar. 6, 2019) (informative). In *Adaptics*, for

21

IPR2021-00964
Patent 10,229,586 B2

example, the Board denied a petition that relied on ten references connected by the conjunction "and/or," which resulted in an "unduly burdensome number of combinations." *Id.* at 18–19.

Patent Owner cites to *Adaptics* but does not analogize to that decision. *See* Prelim. Resp. 25. Regardless, the Petition here is nothing like the *Adaptics* petition. Ground 3 involves only two or three separate grounds, not "hundreds of possible combinations" as in *Adaptics*. *See Adaptics*, Paper 20 at 19. That is, Petitioner merely argues unpatentability over Marman alone (with or without the knowledge of a POSITA) and over Marman in view of Shoemake. *See* Pet. 58–73. This is not an unduly burdensome number of combinations. We also disagree with Patent Owner that Petitioner's grounds are confusing. Prelim. Resp. 27. Although Petitioner's grounds summary asserts obviousness over Marman and Shoemake, it is plain from Petitioner's arguments that it also asserts obviousness over Marman alone. *E.g.*, Pet. 7, 61–62. Although it would have been preferable for Petitioner to summarize its grounds to represent its arguments more accurately, we do not view the Petition's inaccurate summary as fatally defective.

Also, contrary to Patent Owner's contention, we do not see any reference in the Petition to anticipation over Marman. *See* Prelim. Resp. 26. Rather, Petitioner contends that "Marman—either alone or when considered in view of the knowledge of a POSITA—also renders the 'communication packet' of the '586 patent obvious." Pet. 61. Arguing that Marman alone renders the claims obvious is not tantamount to arguing anticipation over Marman. *Cf. Game and Tech. Co. v. Activision Blizzard Inc.*, 926 F.3d 1370 (Fed. Cir. 2019) (determining that the "assertion that a single reference . . .

22

IPR2021-00964
Patent 10,229,586 B2

cannot support obviousness . . . is wrong as a matter of law.") (internal quotation omitted).  Yet even if Petitioner did make an anticipation argument, there would be no particularity problem in this instance.

We thus decline to deny the Petition for lack of particularity.

### 4. Independent Claim 1

Petitioner contends that Marman alone or Marman and Shoemake teach or suggest all the limitations of claim 1.  Pet. 58–66.  Patent Owner contends that Marman alone fails to teach or suggest the communication packet limitation 1-5.  Prelim. Resp. 28–31.  Patent Owner also contends that Petitioner articulates a deficient motivation to combine Marman and Shoemake.  *Id.* at 31–34.  For the reasons set forth below, we determine that Petitioner has shown a reasonable likelihood that Marman alone or Marman and Shoemake render claim 1 obvious.

### a. Preamble [1-p], limitations 1-1 through 1-4 and 1-6

Petitioner contends that Marman discloses the preamble 1-p and limitations 1-1 through 1-4 and 1-6.  Pet. 58–61, 64–66.  Patent Owner does not dispute these contentions at this stage.  *See generally* Prelim. Resp.

Petitioner supports its arguments with specific citations to Marman and Dr. Wicker's declaration.  Pet. 58–61, 64–66 (citing, e.g., Ex. 1006, *passim*; Ex. 1003 ¶¶ 400–428, 457–466).  On this record, we agree with Petitioner that there is a reasonable likelihood that Marman discloses the preamble 1-p and limitations 1-1 through 1-4 and 1-6.  We need not determine whether the preamble is limiting because even if it were, we determine that Petitioner has shown that Marman likely discloses it.

IPR2021-00964
Patent 10,229,586 B2

> b. *[1-5] receive a communication packet using the*
> *wireless transceiver, the communication packet*
> *including a preamble portion, an identification code*
> *portion, a data payload portion, and an integrity*
> *portion*

Petitioner first contends that Marman discloses this limitation. *Id.* at 61–62. Petitioner relies on the following teachings of Marman. Marman is "packet"-based. *Id.* at 61 (quoting Ex. 1006, 37:28–38:12, 40:2–7). These packets include the claimed "preamble portion" because they begin with a "start synch word," "synchronization sequence," or "frame synchronization preamble." *Id.* (quoting Ex. 1006, 39:11–15, 40:3–7, 40:20–21). As for the claimed "identification code portion," each sensor in Marman is assigned a "unique sensor address," and the packets include a "source address and destination address." *Id.* (quoting Ex. 1006, 32:15–19, 44:15–17). The packets also include the claimed "data payload portion" because they are part of a "data message." *Id.* at 62 (quoting Ex. 1006, 40:26–28). Finally, the packets have an "end sync word," and the sensors engage in "packet error control," so one of ordinary skill in the art would have understood that Marman's packet includes the claimed "integrity portion." *Id.* (quoting Ex. 1006, 40:3–4, 38:9–12; citing Ex. 1003 ¶¶ 440–441).

Petitioner next relies on Shoemake for two purposes: to show what a POSITA would have understood Marman's packet disclosures to teach, and in the alternative, to combine Shoemake's packet disclosures with Marman's. *Id.* at 62–64. On the first point, Petitioner asserts that a POSITA would have understood Marman to employ Shoemake's type of packet. *Id.* at 62–63 (citing Ex. 1003 ¶¶ 442–450). Shoemake employs an IEEE 802.11b standard wireless packet, which, according to Petitioner, "not only

24

IPR2021-00964
Patent 10,229,586 B2

performs the same function as Marman's packet, but has the very same component parts." *Id.* at 62–63 (citing Ex. 1010 ¶ 5; Ex. 1003 ¶¶ 451–452). These parts include a "preamble," a "header" that identifies "source and destination nodes," a "payload portion," and a "checksum." *Id.* (citing Ex. 1010 ¶ 5). On the second point, Petitioner contends that even if Marman did not already teach the use of Shoemake's standard packet, a POSITA would have considered it obvious to use such a packet given that it was "standard" and "typical" when the '586 patent was filed. *Id.* at 63 (citing Ex. 1010 ¶ 5; Ex. 1003 ¶ 453).

Notwithstanding Patent Owner's arguments, discussed below, Petitioner persuades us that Marman alone or Marman and Shoemake disclose limitation 1-5 of the claim.

Patent Owner contends that Marman alone fails to teach or suggest the communication packet limitation 1-5. Prelim. Resp. 28–31. Patent Owner also contends that Petitioner deficiently articulates a motivation to combine Marman and Shoemake. *Id.* at 31–34. We first address Patent Owner's arguments that Marman does not disclose the claimed communication packet, and then we address Patent Owner's arguments against Petitioner's motivation to combine in the next section.

Patent Owner charges Petitioner with admitting that Marman does not disclose the claimed packet. *Id.* at 28 (citing Pet. 58). Then Patent Owner faults the Petitioner for picking and choosing from disparate parts of Marman and then failing to explain how those disclosures teach the disputed limitation or render it obvious. *Id.* In doing so, Patent Owner contends, "Petitioner introduces internal inconsistencies and points to elements that are not a part of Marman's alleged packet." *Id.* For example, Patent Owner

25

IPR2021-00964
Patent 10,229,586 B2

asserts that the Petition's cited portions of Marman refer to "components of the sensors themselves or elements of different, higher-level messages," not packets. *Id.* at 29.

Regarding the claimed "preamble portion," Patent Owner states that Marman's start synch word, synchronization sequence, and frame synchronization preamble do not refer to a packet but rather "something sent after another, different message." *Id.* Along those lines, Patent Owner also argues that Marman's data message, which contains a frame synchronization preamble, is not the same thing as the link layer packets Petitioner points to as support for the "communication packet." *Id.* at 29–30 (citing Ex. 1006, 40:20–21). Regarding the claimed "identification code portion," Patent Owner argues that Marman's "source address and destination address" refer not to link layer packets but to larger "messages." *Id.* at 30. And for the claimed "data payload portion," Patent Owner contends that Marman's "data message" is not the same as a link-layer packet. *Id.* at 30–31.

We first note that Patent Owner does not challenge Petitioner's assertion that a POSITA would have understood from Shoemake that Marman teaches a packet as claimed. Patent Owner likewise does not challenge Petitioner's assertion that the combination of Marman and Shoemake teaches such a packet, but rather only challenges Petitioner's motivation to combine (which we address below). We agree with Petitioner on these two unchallenged points, and we also agree with Petitioner that Marman alone (with or without the knowledge of a POSITA) discloses the disputed limitation.

Patent Owner's arguments that Marman does not teach a packet as claimed are unavailing at this stage. First, Marman discloses a preamble

IPR2021-00964
Patent 10,229,586 B2

portion of a packet at least by teaching a "[p]acket start . . . synch word[]."
Ex. 1006, 40:4.  Relevant here, Petitioner's proposed construction for
"preamble portion" is "a series of bits that is used to initiate and synchronize
the receiving device."  Pet. 22 (citing Ex. 1013, 4 (IEEE dictionary
definition)).  If this is the correct construction, then we would agree with
Petitioner that a packet start synch word discloses a preamble portion.  We
now address this construction in more detail.

In the related district court litigation, Petitioner proposed this same
construction.  Ex. 2005, 27.  The district court's construction is relevant to
our interpretation of this term.  *See* 37 C.F.R. § 100(b).  The district court,
however, declined to adopt Petitioner's construction, instead giving
"preamble portion" its "plain and ordinary meaning."  Ex. 2005, 27.  Yet the
court did not exclude Petitioner's construction from the plain and ordinary
meaning.  Instead it found that Petitioner "has not met the burden of
showing that the preamble portion can *only* refer to a series of bits that is
used to initiate and synchronize the receiving device."  *See id.*  We thus
determine here that although "preamble portion" may not be as limited as
Petitioner proposes, it is as least broad enough to encompass Petitioner's
definition, as supported by extrinsic evidence.  *See* Pet. 22 (citing Ex. 1013,
4 (IEEE dictionary definition)).  We find Petitioner's extrinsic evidence
relevant here, as the Specification does not appear to define "preamble
portion."  Thus, we agree with Petitioner and Dr. Wicker's testimony that
Marman's packet start synch word likely refers to "a series of bits that is
used to initiate and synchronize the receiving device" and therefore reads on
the claimed "preamble portion."  *See* Ex. 1003 ¶¶ 436, 141–146.

IPR2021-00964
Patent 10,229,586 B2

Turning to the claimed "identification code portion," Marman describes that messages include a "source address and destination address," which a device uses to determine "whether the message requires routing." Ex. 1006, 44:15–20.  Because Marman discloses packetized communications, Ex. 1006, 38:9–10, we agree with Petitioner's implication that if Marman's messages include a "source address and destination address," then Marman's packets include a "source address and destination address," Pet. 62.  For similar reasons, we agree with Petitioner that Marman's "data message[s]" include a "data payload portion" as claimed. *See id.* (citing Ex. 1006, 40:26–28; Ex. 1003 ¶¶ 433–439).

Finally, we address Patent Owner's argument, raised in the § 325(d) discretionary denial section of its brief, that Marman does not disclose the claimed integrity portion.  *See* Prelim. Resp. 21–22.  Marman discloses a "packet . . . end sync word[]" and the use of "packet error control."  Ex. 1006, 40:3–4, 38:9–12.  We agree with Dr. Wicker's testimony, at this stage, that a POSITA would understand that these teachings point to Marman's packet including the claimed "integrity portion."  *See* Ex. 1003 ¶¶ 440–441.

Accordingly, we determine that Marman alone or Marman and Shoemake likely teach limitation 1-5.

### c.  Motivation to Combine Marman and Shoemake

Petitioner argues that one of ordinary skill in the art would have combined Marman and Shoemake because Shoemake's packet was "standard" and "typical" when the '586 patent was filed.  Pet. 63 (citing Ex. 1001 ¶ 5; Ex. 1003 ¶ 453).  Petitioner further supports the combination as follows:

28

IPR2021-00964
Patent 10,229,586 B2

> A POSITA would also have every reason to believe that this
> standard packet could be successfully used with Marman.
> Again, Marman's system already engages in packet-based
> communications with packets that include a preamble, address,
> and data.  They also facilitate the ability to engage in error
> correction.  The standard, typical 802.11 wireless packet
> exemplified by Shoemake has all these same components and
> properties.

*Id.* at 64 (citing Ex. 1003 ¶¶ 454–456, 46–68.).  We agree with Petitioner,
notwithstanding Patent Owner's arguments, which we address below.

Patent Owner contends that Petitioner does not articulate a reason why
a POSITA would have been motivated to modify Marman.  Prelim. Resp.
32.  In Patent Owner's view, because Petitioner argues that a POSITA would
have understood Marman to have already employed the Shoemake packet,
the proposed combination would render Shoemake superfluous.  *Id.* at 33.
Patent Owner also faults Petitioner's reference to what was "standard" and
"typical" when the '586 patent was filed, as Patent Owner believes this
statement is conclusory and merely states that the references "could be"
combined.  *Id.* (emphasis omitted).  Lastly, Patent Owner views Petitioner as
relying on circular logic by arguing that the combination would be
successful because Marman's packets already include "all these same
components and properties."  *Id.* at 34.

We find Patent Owner's arguments unavailing at this stage due to the
strong similarity between Shoemake's packets and Marman's packets, and
due to Shoemake employing the standard packet structure of the IEEE
802.11b wireless networking standard.  *See* Ex. 1010 ¶ 5.  We find
persuasive Dr. Wicker's testimony that Shoemake's packet was "standard"
and "typical" when the '586 patent was filed.  *See* Ex. 1003 ¶ 453, *cited in*
Pet. 63.  This testimony, far from being conclusory, reflects the reality that

29

IPR2021-00964
Patent 10,229,586 B2

Shoemake's packet is part of the "IEEE 802.11b standard." *See* Ex. 1010
¶ 5. Disclosing a packet structure as part of a standard would have
suggested to one of ordinary skill in the art to use it in another packet-based
system like Marman's. We also disagree with Patent Owner that it was
superfluous for Petitioner to argue for combining the references, as
Petitioner merely argues in the alternative. We thus agree with Petitioner's
reasoning that one of ordinary skill in the art would have combined
Shoemake's packet with Marman's packet. Pet. 63–64.

Further, we do not view the combination as being "uniquely
challenging or difficult for one of ordinary skill in the art" or "represent[ing]
an unobvious step over the prior art." *Leapfrog Enters. Inc. v. Fisher-Price,
Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (citing *KSR Int'l Co. v. Teleflex
Inc.*, 550 U.S. 398, 418–19 (2007)). Petitioner's arguments are reasonable
because the skilled artisan would "be able to fit the teachings of [these]
patents together like pieces of a puzzle" because the skilled artisan is "a
person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 420–21.
The claimed subject matter exemplifies the principle that "[t]he combination
of familiar elements according to known methods is likely to be obvious
when it does no more than yield predictable results." *Id.* at 416.

### d. Summary as to Claim 1

Based on the preliminary record before us, we find that Petitioner has
shown a reasonable likelihood that claim 1 would have been obvious over
Marman alone or Marman and Shoemake.

### 6. Independent Claims 9 and 15

Petitioner asserts that independent claims 9 and 15 are similar to claim
1. Pet. 69–72. Petitioner's detailed analysis explaining where Marman

30

IPR2021-00964
Patent 10,229,586 B2

alone or Marman and Shoemake teaches the limitations in these claims is similar to the analysis discussed above with respect to claim 1. *Id.* Patent Owner relies on the same arguments for claims 9 and 15 as it does for claim 1. *See* Prelim. Resp. 35. For the reasons discussed above, based on the current record, we determine that Petitioner has demonstrated a reasonable likelihood that claims 9 and 15 are unpatentable as anticipated and obvious over Marman alone or Marman and Shoemake.

### 7. Dependent Claims 2–5, 7, 8, 10–12, 14, 16, 18, and 20

Petitioner contends that dependent claims 2–5, 7, 8, 10–12, 14, 16, 18, and 20 are unpatentable as obvious over Marman alone or Marman and Shoemake. Pet. 66–73. Petitioner provides a detailed analysis explaining where Marman alone or Marman and Shoemake disclose the limitations in dependent claims 2–5, 7, 8, 10–12, 14, 16, 18, and 20. *Id.* Patent Owner does not offer separate arguments for these claims or contest Petitioner's analysis at this preliminary stage. *See generally* Prelim. Resp. Based on the current record, we determine that Petitioner has demonstrated a reasonable likelihood that claims 2–5, 7, 8, 10–12, 14, 16, 18, and 20 are unpatentable as obvious over Marman alone or Marman and Shoemake.

## IV.  CONCLUSION

At this stage of the proceeding, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing on its challenge to claims 1–5, 7–12, 14–16, 18, and 20. At this preliminary stage, we have not made a final determination as to the patentability of claims 1–5, 7–12, 14–16, 18, and 20 or any underlying factual and legal issues.

IPR2021-00964
Patent 10,229,586 B2

## V.   ORDER

It is, therefore,

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter pates* review of claims 1–5, 7–12, 14–16, 18, and 20 of the '586 patent is instituted with respect to all grounds of unpatentability set forth in the Petition; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial commencing on the entry date of this Decision.

IPR2021-00964
Patent 10,229,586 B2


For PETITIONER:

Alyssa Caradis
K. Patrick Herman
Bas De Blank
ORRICK, HERRINGTON & SUTCLIFFE LLP
A8cptabdocket@orrick.com
P52ptabdocket@orrick.com
M2bptabdocket@orrick.com

For PATENT OWNER:

Erika Arner
Cory Bell
Daniel Tucker
Kelly Horn
Alissa Green
FINNEGAN HENDERSON FARABOW GARRETT & DUNNER LLP
Erika.arner@finnegan.com
Cory.bell@finnegan.com
Daniel.tucker@finnegan.com
Kelly.horn@finnegan.com
Alissa.green@finnegan.com

# EXHIBIT B

Trials@uspto.gov
571-272-7822

Paper 11
Date: November 10, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SONOS, INC.,
Petitioner,

v.

GOOGLE, LLC,
Patent Owner.

———————————

IPR2021-00962
Patent 10,140,375 B2

———————————

Before KEVIN F. TURNER, TERRENCE W. McMILLIN, and
SCOTT RAEVSKY, *Administrative Patent Judges.*

McMILLIN, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2021-00962
Patent 10,140,375 B2

# I.   INTRODUCTION

## A.   *Background and Summary*

Sonos, Inc. ("Petitioner")[1] filed a Petition to institute an *inter partes* review of claims 1–11 and 13–20 of U.S. Patent No. 10,140,375 B2 (Ex. 1001, "the '375 patent") pursuant to 35 U.S.C. § 311 *et seq*.  Paper 1 ("Petition" or "Pet.").  Google, LLC ("Patent Owner")[2] filed a Preliminary Response.  Paper 9 ("Preliminary Response" or "Prelim. Resp.").

We have authority under 35 U.S.C. § 314, which provides that an *inter partes* review may not be instituted unless the information presented in the Petition and the Preliminary Response shows that "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  35 U.S.C. § 314(a) (2018).  After considering the Petition, the Preliminary Response, and the evidence of record, we institute an *inter partes* review as to the challenged claims of the '375 patent on the grounds of unpatentability presented.

## B.   *Related Proceedings*

The parties identify *Google LLC v. Sonos, Inc.*, No. 3:20-cv-03845 (N.D. Cal.) ("the District Court litigation") as a related proceeding in which the '375 patent is asserted.  Pet. 3; Paper 8, 2.  The parties further identify as related IPR2021-00963, which is another petition addressing the '375 patent.  *Id.*

---

[1] Petitioner identifies Sonos, Inc., as the real party-in-interest to this proceeding.  Pet. 2.
[2] Patent Owner identifies Google, LLC, as the real party-in-interest to this proceeding.  Paper 8, 2.

IPR2021-00962
Patent 10,140,375 B2

Petitioner also identifies other patents that Patent Owner asserts against Petitioner in the District Court litigation but states that none of the patents are related to the '375 patent.  Pet. 3.

### C.  The '375 Patent

The '375 patent is titled "Personalized Network Searching."  Ex. 1001, code (54).  The '375 patent explains that "bookmarks that the user continues to use are a valuable resource for the user," but "[a]n Internet user often has difficulty propagating bookmarks between the various machines on which the user depends."  *Id.* at 1:50–53.  According to the '375 patent, a user may need to manually synchronize the bookmark lists of two machines, and conventional methods for organizing bookmarks tend to be limited.  *Id.* at 1:56–60.

The '375 patent discloses that a commercial product has been used to allow a user to store bookmarks on a web server.  *Id.* at 1:61–63.  However, the '375 patent states that "[w]hile storing the bookmarks on-line addresses the propagation problem, such systems fail t[o] address the organizational problems inherent in conventional bookmarks."  *Id.* at 2:2–5.  The '375 patent also describes conventional bookmark-related software products to provide a user with functionality for using bookmarks but states that such tools "do not effectively leverage the user's preferences to provide personalized search results."  *Id.* at 2:6–8, 2:17–19.  In view of this, the '375 patent states that "a need exists to provide an improved system and method for providing personalized network searching."  *Id.* at 20–21.

Figure 1 of the '375 patent, reproduced below, shows an exemplary environment in which an embodiment of the '375 patent may operate.  *Id.* at 2:47–49.

3

IPR2021-00962
Patent 10,140,375 B2



FIG. 1

Figure 1 depicts a system 100 that includes multiple client devices 102a-n that communicate with a server device 104 over network 106.  *Id.* at 3:8–10. The '375 patent discloses that "[t]he server device 104 shown includes a server executing a search engine application program, such as the Google™ search engine" and that the search engine 120 is stored in memory 118.  *Id.* at 4:14–16, 4:27–28.

The '375 patent states that "the server device 104, or related device, has previously performed a crawl of the network 106 to locate articles, such as web pages, stored at other devices or systems connected to the network 106, and indexed the articles in memory 118 or on another data storage device."  *Id.* at 4:31–37.  Also, "[m]emory 126 contains the bookmark

manager application program, also known as a bookmark manager 128" that "provides a browser-based application that allows the user to create, modify, delete, and save bookmarks on the network." *Id.* at 4:65–66, 5:6–9. The '375 patent discloses that "bookmarks are saved in the bookmark database 140." *Id.* at 5:11–12. The '375 patent describes the making a user's bookmarks available "on all the various computers the user uses" and integrating the bookmarks with a browser. *Id.* at 5:34–38.

The '375 patent describes the search engine 120 performing a search in response to a search query by searching previously indexed articles and creating a bookmark request 136 that corresponds to a user 112a. *Id.* at 5:16–20. According to the '375 patent, "[t]he bookmark manager 128 responds by sending one or more bookmarks 138 to the search engine 120," the search engine 120 then uses the bookmarks 138 "to search sites previously identified by the user 112*a*," and "[t]he search engine then merges the results of the two searches to provide a result set 134 to the client 102*a*." *Id.* at 5:20–25.

### D.  Challenged Claims

Petitioner challenges claims 1–11 and 13–20 of the '375 patent.[3] Pet. 1. Of the challenged claims, claim 1 is an independent method claim and claim 17 is an independent system claim. Ex. 1001, 15:49–16:7, 17:18–18:21. Claim 1 recites:

> 1. A computer-implemented method performed by at least one processor, the computer-implemented method comprising:
>     identifying a user;

---

[3] The '375 patent has 20 claims. Ex. 1001, 15:49–18:45. Petitioner challenges all the claims of the '375 patent except claim 12. *See, e.g.*, Pet. 1.

IPR2021-00962
Patent 10,140,375 B2

> receiving user input from the user through an interface of a
> client device, the user input indicating a modification to
> a set of favorite items for the user;
>
> in response to receiving the user input:
>
>> modifying the set of favorite items stored for the user
>> in a client-side storage of the client device, the
>> modification to the set of favorite items initiating
>> a synchronization process to synchronize the set
>> of favorite items modified responsive to the user
>> input with a server-side storage system configured
>> to synchronize favorite items for the user with one
>> or more other client devices, the server-side
>> storage system remote from the client-side
>> storage;
>
> presenting through a single interface of the client device, in
> response to a query from the user, a combined search
> results set generated via one or more search
> subprocesses, the combined search results set including
> at least two of:
>
>> one or more favorite items from the set of favorite
>> items synchronized for the user;
>>
>> one or more search results from a first global index; or
>> one or more search results from a second global index.

*Id.* at 15:49–16:7.

## E.  The Asserted Grounds

Petitioner challenges claims 1–11 and 13–20 of the '375 patent based on the grounds set forth in the table below.

IPR2021-00962
Patent 10,140,375 B2

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–11, 13–19 | 103(a)[4] | Mendez[5], Jain[6] |
| 20 | 103(a) | Mendez, Jain, Nakagawa[7] |

Pet. 5.  Petitioner supports its showing of unpatentability of the challenged
claims of the '375 patent with the Declaration of Douglas C. Schmidt, Ph.D.
(Ex. 1003).  Patent Owner, at least at this stage, has not supported its
arguments with any testimonial evidence.  *See generally* Prelim. Resp.  As
such, the testimony of Dr. Schmidt is unrebutted by any contrary testimony.

## II.   ANALYSIS

Patent Owner's Preliminary Response is limited to arguing that
institution should be denied on the basis that Petitioner's stated motivations
to combine Mendez with Jain are deficient.  *See generally* Prelim. Resp.
Except for the arguments related to the motivations to combine Mendez with
Jain, at least at this stage, the factual and legal contentions in the Petition are
undisputed by Patent Owner.

### A.   *Claim Construction*

Petitioner asks us to construe the following claim terms: "favorite
items;" "stored . . . in a client-side storage;" "indication of modification;"
and "the combined search results set including at least two of."  Pet. 14–18.
Patent Owner does not address claim construction in its Preliminary

---

[4] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125
Stat. 284, 285–88 (2011), revised 35 U.S.C. §§ 102, 103 effective March 16,
2013.  Because the challenged patent claims priority to applications filed
before March 16, 2013, we refer to the pre-AIA version of §§ 102, 103.  Our
opinions on the present record would not change if the AIA versions of
§§ 102, 103 were to apply.

[5] US 6,023,708, issued Feb. 8, 2000 (Ex. 1004).

[6] US 6,480,853 B1, issued Nov. 12, 2002 (Ex. 1005).

[7] US 2004/0107236 A1, published June 3, 2004 (Ex. 1006).

IPR2021-00962
Patent 10,140,375 B2

Response.  *See* Prelim. Resp. 3 n.1 ("Patent Owner's Analysis does not depend on a construction of any claim.").

Claim construction in this proceeding is governed by 37 C.F.R. § 42.100(b), which provides:

> In an *inter partes* review proceeding, a claim of a patent, or a claim proposed in a motion to amend under §42.121, shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.

Under the standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–19 (Fed. Cir. 2005) (en banc), claim terms are given their ordinary and customary meaning, as would have been understood by a person of ordinary skill in the art at the time of the invention, in light of the language of the claims, the specification, and the prosecution history of record.  *See Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012). There is a "heavy presumption," however, that a claim term carries its ordinary and customary meaning.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted).

Although Petitioner's claim construction arguments are, at least at this stage of this proceeding, undisputed by Patent Owner, we prefer to hear from Patent Owner on this issue before engaging in claim construction.[8]  As

---

[8] If Patent Owner believes that explicit construction of any claim term is necessary in this proceeding, Patent Owner shall clearly and succinctly so indicate in its response filed pursuant to 37 C.F.R. § 42.120 and include in its response proposed, unambiguous constructions supported by reasoning and evidence.

noted previously, Patent Owner only argues motivation to combine Mendez and Jain in the Preliminary Response and Patent Owner's arguments do not raise any issues relating to claim construction. *See generally* Prelim. Resp. And, we determine that no terms require express construction for purposes of determining whether to institute a trial. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999). In this Decision, we give the claim terms their ordinary and customary meanings.

### B. *Legal Standards*

A patent claim is unpatentable as obvious if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic*, 815 F.3d at 1363 (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).

Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

## C.  Level of Ordinary Skill in the Art

With regard to the level of ordinary skill in the art, Petitioner contends that:

> A POSITA [person of ordinary skill in the art] in the technology field of the '375 patent would have had a degree in computer engineering, computer science, or a similar discipline, along with 2 years of professional experience in the fields of networking and network-based systems or applications, such as client-server and web-based systems, or an equivalent level of skill, knowledge, and experience

Pet. 28 (citing Ex. 1003 ¶¶ 37–39).  Petitioner further argues that "[t]his POSITA would be aware of and generally knowledgeable about web browser operation, including the use of bookmarks, systems for file synchronization, and the general search procedures employed by search engines available at the time the '375 patent was filed." *Id.* (citing Ex. 1003 (Schmidt Decl.) ¶ 39).  Patent Owner does not address the level of ordinary skill in the art.  *See generally* Prelim. Resp.

Petitioner's undisputed proposal is consistent with the technology described in the Specification and the cited prior art.  In order to determine whether Petitioner has demonstrated a reasonable likelihood of showing the unpatentability of at least one of the challenged claims, we adopt Petitioner's proposed level of skill in the art.

## D.  Claim 1: Consideration of Alleged Obviousness in View of Mendez and Jain

We begin our analysis with a consideration of Petitioner's allegation that the combination of Mendez and Jain would have rendered claim 1

IPR2021-00962
Patent 10,140,375 B2

obvious.  *See* Pet. 5, 29–41.  We start with a description of the disclosures of
Mendez and Jain and then consider the arguments and evidence presented by
the Petitioner relating to the limitations of claim 1.

### 1.  *Mendez (Ex. 1004)*

Mendez is titled "System and Method for Using a Global Translator to
Synchronize Workspace Elements Across a Network."  Ex. 1004, code (54).
Specifically, Mendez "relates generally to computer networks, and more
particularly to a system and method for using a global translator to
synchronize workspace elements such as files across a computer network."
*Id.* at 1:19–22.  Mendez describes data consistency problems that arise when
using application programs from different vendors, such as web browsers
from different vendors that store bookmarks.  *Id.* at 1:41–45.  Mendez
explains that "since each web browser uses different formats and stores
bookmarks in different files, the bookmarks are not interchangeable" and
"one web browser may store a needed bookmark, and the other may not,"
such as when one web browser is used at home and a different web browser
is used at work.  *Id.* at 1:45–52.

Mendez describes "a system and method for using a global translator
to synchronize multiple copies of a workspace element in a secure network
environment."  *Id.* at 1:59–61.  Mendez states that its system and method
permits clients to "automatically synchronize workspace elements across
different formats and can merge workspace element folders for cross use"
and between multiple sites.  *Id.* at 1:63–2:2.

Figure 1, reproduced below, shows a diagram of a computer network.

11

IPR2021-00962
Patent 10,140,375 B2



FIG. 1

Figure 1 depicts a computer network 100 that includes "a remote computer terminal 102 coupled via a communications channel 104 such as the Internet to a global server 106." *Id.* at 2:62–65.  Mendez discloses that "[t]he global server 106 is in turn coupled via a communications channel 108 such as the Internet to a second node such as a Local Area Network (LAN) 110." *Id.* at 2:65–3:1.  LAN 110 is coupled to "a desktop computer 134 having a web browser 152 and a bookmark folder 144 containing bookmarks." *Id.* at 3:4–10.

Mendez explains that "[t]he remote terminal 102 stores service engines 154 for maintaining workspace data 116, which may include information common with information in the workspace data 136." *Id.* at

IPR2021-00962
Patent 10,140,375 B2

3:42–45. Mendez further describes the global server 106 as acting "as a third party administrator" that "stores independently-modifiable copies of selected portions of the workspace data 136 and 116," which is collectively referred to as workspace data 120. *Id.* at 3:66–4:2. The network 100 also includes "synchronization means, which includes a base system 146 stored within the LAN 110 and for example on the desktop computer 134" and a synchronization agent 124, such as on the global server 106, that "cooperate to synchronize selected portions of the workspace data 136 with selected portions of the workspace data 120," such as a bookmark folder. *Id.* at 4:23–34.

### 2. *Jain (Ex. 1005)*

Jain is titled "Systems, Methods and Computer Program Products for Performing Internet Searches Utilizing Bookmarks." Ex. 1005, code (54). Jain "relates generally to information searching and, more particularly, to information searching on the Internet." *Id.* at 1:8–10. Jain explains that conventional web browsers have a bookmark function but "[f]or a typical user, a list of bookmarks can become quite large" and "a user may forget what is contained within a particular bookmarked Web page, or may forget the significance of the bookmark." *Id.* at 2:19–21, 2:25–29.

The object of Jain's invention is "to enhance searching for information on the Internet." *Id.* at 2:52–54. Specifically, Jain describes "allowing a Web server search engine to search a user's bookmarks stored within the user's browser on a client device." *Id.* at 2:55–59. For instance, "[a] user's search request to a search engine is accompanied by a list of bookmarks stored within the user's browser." *Id.* at 2:59–61. Jain explains that "[a] search engine receiving a search request and accompanying list of

IPR2021-00962
Patent 10,140,375 B2

bookmarks initially searches the list of bookmarks for URLs that satisfy the search request" and "[e]ach of the user's bookmarks that satisfies the search request is then displayed within the user's browser." *Id.* at 3:8–12.  Jain discloses that "[t]he search engine can then search the Internet for Web pages (or other files) that also satisfy the search request," and "[t]he results from this search may also be displayed within the user's browser." *Id.* at 3:12–15.

### 3.    *Element-by-Element Analysis of Claim 1[9]*

*A computer-implemented method performed by at least one processor, the computer-implemented method comprising:*

Petitioner does not take a position as to whether the preamble of claim 1 is limiting.  Pet. 29 ("To the extent the preamble is limiting, Mendez teaches a 'system and method … to synchronize workspace elements such as files across a computer network.'") (citing Ex. 1003 (Schmidt Decl.) ¶¶ 174–177; Ex. 1004, 1:19–22).  Petitioner contends that both Mendez and Jain teach multiple computers and processors.  *Id.* (citing Ex. 1004, 5:6–12, 5:63–67, 11:18–21, Figs. 1–3; Ex. 1005, 1:16–20, 4:33–36).  These contentions are supported by the cited art.

Our preliminary, non-binding, determination[10] is that the preamble of claim 1 is not limiting because a complete invention is recited in the body of

---

[9] We adopt the Petitioner's parsing of claim 1 in order to follow the presentation in the Petition.  *See* Pet. 29–41.

[10] Even where we do not explicitly indicate that our determinations at this stage are preliminary and non-binding, any determination, finding, or conclusion set forth within this document is preliminary and non-binding. At this early stage, we have not heard from Patent Owner with regard to any issue other than motivation to combine the relevant teachings and suggestions of Mendez and Jain and wish to have the record developed

IPR2021-00962
Patent 10,140,375 B2

claim 1; the preamble is not relied upon as providing the antecedent basis for any later-recited elements; and the preamble only states the purpose or intended use of the invention. *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997) ("where a patentee . . . uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation"). However, on the current record, we also determine that, for purposes of institution, Petitioner has shown sufficiently that the cited art teaches or suggests all the elements of the preamble of claim 1.

*identifying a user;*

Petitioner relies on Mendez as teaching this limitation.  Pet. 29–31 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 178–191).  Petitioner contends, "Mendez teaches an authentication process that includes the step of 'identifying a user.'"  *Id.* at 29.  In support of this contention, Petitioner argues:

> Mendez's system allows "a client user who maintains a work site, a home site, an off-site and the global server site" to "synchronize workspace data or portions thereof among all four sites."  (Ex. 1004, 2:20-23.)  As part of this synchronization process, a "secure communications channel" is "establish[ed]" between a "communications module 405" (part of the desktop computer and remote terminal) and a "communications module 505" (part of the global server).  (*See id.*, 9:23-25; Fig. 7; *see also* 4:23-28, 6:18-26, 8:16-22.)  "[T]o establish" this "secure communication channel," the communication modules run "routines for applying Secure Socket Layer (SSL) technology and user identification and authentication techniques (*i.e.*, digital certificates)...."  (*Id.*, 6:30-35.)  In other words, the identity of the user of a particular device (like the desktop computer) is confirmed and relayed to the server before synchronization can occur. (*See id.*)

---

before making any non-preliminary and binding determination other than whether to institute trial.

IPR2021-00962
Patent 10,140,375 B2

*Id.* at 29–30 (alteration in original).  Mendez supports this contention.

Petitioner also contends that Mendez teaches "stor[ing] bookmark data at the remote global server in association with the user's identification to allow the user's other devices to obtain copies of the synchronized bookmarks upon communication with the server."  *Id.* at 30.  In support, Petitioner argues Mendez "teaches that the data synchronized by its system can include 'workspace data' such as 'bookmarks.'  (*See* [Ex. 1004], 3:30-36.)  These synchronized bookmarks can be accompanied by, among other information, a 'user identification (ID).'  (*Id.*, 8:57-62; Fig. 6.)."  *Id.*  Mendez supports this contention.

We determine that, for purposes of institution, Petitioner has shown sufficiently that the cited art teaches this limitation.

> *receiving user input from the user through an interface of a client device, the user input indicating a modification to a set of favorite items for the user;*

Petitioner relies on Mendez as teaching this limitation.  Pet. 31–33 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 192–200).  Petitioner contends that "Mendez teaches using well-known, commercially available browsers with user[] interfaces that permitted users to create, edit, remove and otherwise modify a set of favorites/bookmarks that are then synchronized between multiple 'client devices.'"  *Id.* at 31.  With regard to teaching "receiving user input from the user through an interface of a client device," the Petition states:

> Mendez's system synchronizes devices like a "desktop computer 134" and a "remote terminal 102" such as a "smart telephone," "PDA," or "laptop computer."  (Ex. 1004, 3:4-10; 3:57-65.)  These devices run applications—like "web browser 152"—that include an interface.  (*See id.*, 3:33-36, 3:42-51; *see*

IPR2021-00962
Patent 10,140,375 B2

> *also* 6:18-25, 6:38-42 (client devices include a "user interface
> module 410" to present a user with "a conventional Graphical
> User Interface (GUI).").)  Further, each of these client devices
> includes an "input device . . . such as a keyboard and mouse" to
> facilitate user interaction with the interface.  (*Id.*, 5:6-14.)

*Id.* at 31–32.  Petitioner also contends, "Mendez's client devices also each include the claimed "set of favorite items" (i.e., bookmark URLs)."  *Id.* at 32 (citing Ex. 1004, 1:42–45, 3:4–10, 3:25–31, 8:57–62).  And, Petitioner further contends, Mendez teaches "the stored bookmarks are subject to 'modification' by users" by "[f]or instance, a set of bookmarks that includes 'elements 1, 2, and 3' can be modified such that it includes 'elements 2, 3, and 4 by 'deleting element 1 and adding element 4.'"  *Id.* at 32–33 (citing Ex. 1004, 5:29–54, 7:21–8:3).  Mendez supports these contentions.

We determine that, for purposes of institution, Petitioner has shown sufficiently that the cited art teaches this limitation.

> *in response to receiving the user input: modifying the set of favorite
> items stored for the user in a client-side storage of the client device,*

Petitioner relies on Mendez for teaching these elements of claim 1. Pet. 33–34 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 201–205).  The Petition states, "[a]s explained in connection with [the previous] limitation . . . each of the client devices in Mendez's system includes at least one user interface that accepts user input provided by a mouse, keyboard, *etc*.  This input can modify (for instance, adding or removing) bookmarked favorites residing on that device."  *Id.* at 33.  And, "Mendez also teaches that its 'set of favorite items' (the folder of bookmarks) is 'stored . . . in a client-side storage.'  In particular, 'bookmarks folder 144' may be 'stored in [a] data storage device 330' of a desktop computer."  *Id.* (citing Ex. 1004, 1:41–45).  Mendez supports this showing.

17

IPR2021-00962
Patent 10,140,375 B2

We determine that, for purposes of institution, Petitioner has shown sufficiently that the cited art teaches these elements of claim 1.

> *the modification to the set of favorite items initiating a synchronization process to synchronize the set of favorite items modified responsive to the user input with a server-side storage system configured to synchronize favorite items for the user with one or more other client devices, the server-side storage system remote from the client-side storage;*

Petitioner relies on Mendez for teaching these elements of claim 1. Pet. 34–38 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 206–226). Petitioner contends that "Mendez allows local client devices to 'automatically synchronize workspace elements,' including bookmarks, 'between multiple sites' connected to a remotely located server" and "[t]his synchronization can be automatically initiated when changes are made to the set of favorite items." *Id.* at 34 (citing Ex. 1004, 1:63-65). The Petition states:

> According to Mendez, the desktop computer, remote terminal, and global server "cooperate to synchronize selected portions of the workspace data 136" and "data 116" (the local, client stored bookmarks) "with selected portions of the workspace data 120" (the remote, server stored bookmarks). ([Ex. 1004,] 4:28-34.) Further, because this "synchronization means independently synchronizes the selected portions of workspace data 116 and 136 with the selected portions of the workspace data 120," "the synchronization means indirectly synchronizes workspace data 136 with workspace data 116." (*Id.*, 5:1-5.) Thus, Mendez's "server-side storage system" (its global server 106) is "configured" to synchronize with both a first "client device" with "client-side storage" (the desktop 134 with data 136) and "one or more other client devices" (the remote terminal 102 with data 116).

*Id.* at 36–37. Figure 7 of Mendez is reproduced below.

IPR2021-00962
Patent 10,140,375 B2



FIG. 7

Figure 7 depicts "a method for synchronizing multiple copies of a workspace element in a secure network." Ex. 1004, 2:56–58. With regard to the synchronization method of Figure 7, the Petition provides:

> Initiation of the synchronization process after modification of workspace data (like the bookmarks) by a user is also shown in Figure 7. More particularly, in steps 735 and 745, the remote terminal's, desktop computer's, and global server's "synchronization modules" all "determine whether any workspace elements have been modified" and what "changes [were] made." ([Ex. 1004], 9:26-33, 49-51.) If the "workspace data 136 or 116" (the locally stored bookmarks) has been modified, then the "workspace data 120" (the server stored bookmarks) is updated in step 755. (*Id.* at 9:62-10:1.) This then allows the server to synchronize the bookmarks with the user's other devices: once the "workspace data 120" is modified, "the outdated workspace element in the workspace data 136 or 116" is "update[ed]." (*Id.*, 9:55-62; *see also* Ex. 1003, ¶¶ 222-226.)

19

IPR2021-00962
Patent 10,140,375 B2

Pet. 38.

Mendez supports Petitioner's showing as to these elements of claim 1. We determine that, for purposes of institution, Petitioner has shown sufficiently that Mendez teaches all these elements of claim 1.

> *presenting through a single interface of the client device, in response to a query from the user, a combined search results set generated via one or more search subprocesses, the combined search results set including at least two of:*
>> *one or more favorite items from the set of favorite items synchronized for the user;*
>> *one or more search results from a first global index; or*
>> *one or more search results from a second global index.*

Petitioner relies on the combination of Mendez and Jain for teaching these elements of claim 1.  Pet. 38–41 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 227–245).  With regard to Mendez, the Petition states:

> Mendez explains that its "desktop computer 134" and "remote terminal 102" both include a "web browser" and store "bookmarks."  (Ex. 1004, 3:4-10, 42-51; *see also* 1:41-45.)  Mendez does not, however, specifically discuss the use of these browsers to facilitate user search "quer[ies]," or the presentation of the "combined search results" required by this limitation.  Regardless, this would have been obvious in view of Jain.

*Id.* at 38–39.  Thus, Petitioner primarily relies on Jain for teaching the use of browsers to facilitate user search queries and the presentation of combined search results.  With regard to Jain, the Petition states:

> [A]s claim 1 requires, Jain's system allows a user to enter a search query in a web browser interface.  This query—along with the user's bookmarks— are transmitted to a search engine. The search engine then returns a combined search result set for display to the user.  This combined result set includes both (1) the user's bookmarks that match the query and (2) matches found in the general Web index accessible to the search engine.

IPR2021-00962
Patent 10,140,375 B2

*Id.* at 41.  In support of the contention that Jain teaches these elements of claim 1, Petitioner provides a detailed description of the process taught by Jain.  *See id.* at 39–41 (citing Ex. 1005, 2:19–21, 2:30–31, 2:52–61, 3:8–15, 5:38–55, 5:58–6:3, 6:5–7, 7:27–37, Figs. 1, 3–5).

The cited art supports Petitioner's showing as to these elements of claim 1.  We determine that, for purposes of institution, Petitioner has shown sufficiently that the cited art teaches all these elements of claim 1.

In summary, Petitioner provides a showing that all the limitations of claim 1 of the '375 patent are taught by the combination of Mendez and Jain.  *See* Pet. 29–41.  At this stage of this proceeding, Patent Owner does not argue to the contrary.  *See generally* Prelim. Resp.

### 4.   *Motivation to Combine Mendez and Jain*

As shown above, Mendez generally teaches synchronizing sets of favorite items or bookmarks across user devices, and Jain generally teaches combining search results of bookmarks and the internet.  With regard to motivation to combine the relevant teachings and suggestions of Mendez and Jain, Petitioner contends (Pet. 57–62 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 364–396)):

(1)  "[A] POSITA would have been motivated to apply Jain to Mendez because they would have recognized that doing so would improve the ability of a user to access and search through the potentially large set of synchronized bookmarks created by Mendez's system."  Pet. 57 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 365–374; Ex. 1004 (Mendez)

1:49–56, 1:59–66, 2:18–23, 5:1-5, 10:36–42; Ex. 1005 (Jain), 2: 25–30, 3:2–7).

(2) "[A] POSITA would also have been motivated to apply Jain to Mendez because doing so would both improve the time efficiency and usability of Mendez's system." *Id.* at 58 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 375–385; Ex. 1005 (Jain), 3:16–20).

(3) "[A] POSITA would have been further motivated to apply Jain to Mendez because doing so would have increased the functionality of Mendez's system by providing users with another, alternate means to revisit previously visited sites." *Id.* at 59 (citing Ex. 1001 ('375 patent), 1:31–49; Ex. 1003 (Schmidt Decl.) ¶¶ 386–391; Ex. 1005 (Jain), 2:65–3:2).

(4) "A POSITA would also have been motivated to combine Mendez and Jain because both relate to functionality provided by web browsers: bookmarking and Web searching." *Id.* at 60 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 392–396; Ex. 1004 (Mendez), 1:41–56, 1:59–66, 2:18–25, 5:1–5; Ex. 1005 (Jain), 2:52–3:20).

Petitioner contends that "[o]ne of ordinary skill in the art would also have had a reasonable expectation of success when combining Mendez and Jain." *Id.* at 61 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 397–399; Ex. 1004 (Mendez), 1:40–56, 3:33–37, 3:42–51; Ex. 1005 (Jain), 1:58–65, 2:55–61). Petitioner supports these contentions with detailed argument and citations to the asserted art, Mendez and Jain, and the Declaration of Dr. Schmidt. *See id.* at 57–62.

Patent Owner argues that "Petitioner fails to meet its burden of showing why *inter partes* review should be instituted" because "[i]ts

IPR2021-00962
Patent 10,140,375 B2

asserted grounds are legally deficient and lack evidentiary support."  Prelim.

Resp. 18.  However, the only part of Petitioner's showing that Patent Owner

disputes is motivation to combine the relevant teachings of Mendez and Jain.

*See generally* Prelim. Resp.  We determine that Petitioner's showing is

neither legally deficient nor lacking in evidentiary support.

In contrast to Petitioner's relatively well-supported showing of

unpatentability including its supported showing on motivation to combine,

Patent Owner relies on unsupported attorney argument.[11]  *See generally*

Prelim. Resp.   Such unsupported attorney argument is entitled to little

probative value.  *See In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997); *In

re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984).  With regard to

motivation to combine, Petitioner's showing is supported by substantial,

unrebutted testimony of Dr. Schmidt (Ex. 1003 ¶¶ 364–396).[12]  *See id.* at

57–62.  Patent Owner's arguments to the contrary are not supported by any

testimonial evidence.  *See generally* Prelim. Resp.  The evidence at this

---

[11] Patent Owner submitted two exhibits with the Preliminary Response.
Prelim. Resp. v.  The first exhibit, Exhibit 2001, is the claim construction
order from the District Court litigation.  Patent Owner does not argue claim
construction and does not rely on this exhibit.  *Id.* at 3 n.1 ("Patent Owner's
Analysis does not depend on a construction of any claim.").  The second
exhibit, Exhibit 2002, is a copy of a slip opinion from an unrelated district
court case.  *Id.* at v, 2.

[12] Patent Owner argues that "Petitioner relies on . . . expert testimony
without supporting evidence to support its position" (Prelim. Resp. 8) and
that "such testimony is entitled to little or no weight" (*id.* at 8 n.2).
However, Patent Owner does not identify any expert testimony without
supporting evidence that Petitioner relies on.  Petitioner's expert declaration
(Declaration of Douglas C. Schmidt, Ph.D. (Ex. 1003)) is 114 pages and 429
paragraphs long, is highly detailed, and, in general, is well-supported with
cited evidence.

IPR2021-00962
Patent 10,140,375 B2

stage is one-sided in favor of Petitioner on the issue of motivation to combine.

Patent Owner contends that Petitioner's first motivation to combine is deficient.  Prelim Resp. 5–7 (citing Ex. 1001 ('375 patent), 2:6–15; Ex. 1005 (Jain), 2:48–50, 3:2–5).  Patent Owner states, "[a]t best, this argument only provides that a person of skill would be motivated to find a way to search a user's bookmarks." *Id.* at 5–6.  This appears to be an acknowledgment that Petitioner's first motivation to combine has, at least, some validity.  Petitioner contends, "a POSITA would have been motivated to apply Jain to Mendez because they would have recognized that doing so would improve the ability of a user to access and search through the potentially large set of synchronized bookmarks created by Mendez's system" (Pet. 57), and Patent Owner similarly acknowledges that "a person of skill would be motivated to find a way to search a user's bookmarks" (Prelim. Resp. 5–6).  Patent Owner's argument does not undermine Petitioner's first stated motivation to combine.

With regard to Petitioner's second motivation to combine, Petitioner argues that Petitioner's argument is "unsubstantiated by evidence," "untethered from the supporting evidence," and relies "on expert testimony without supporting evidence."  Prelim. Resp. 7–8.  Contrary to Patent Owner's argument, we find a comparative lack of evidentiary support for Patent Owner's argument but not for Petitioner's argument.  *Compare id.* at 7–12, *with* Pet. 58–59.  The second motivation to combine in the Petition is, "a POSITA would also have been motivated to apply Jain to Mendez because doing so would both improve the time efficiency and usability of Mendez's system."  Pet. 58.  In support, Petitioner cites this passage from

IPR2021-00962
Patent 10,140,375 B2

Jain: "[a]ccordingly, the present invention can help save both user time as well as server processing time by performing searches of a user's stored bookmarks before a search of Internet resources is conducted."  Ex. 1005, 3:16–20.   This express teaching supports finding a motivation to combine the relevant teachings of the cited references as set forth in Petitioner's second motivation to combine.   *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364–65 (Fed. Cir. 2008) (noting that the teaching-suggestion-motivation test, flexibly applied, remains an important tool in an obviousness analysis).  In further support, Petitioner argues:

> When using only Mendez's system, a user must perform two separate steps to search both bookmarks and the general Web. First, the user would need to manually peruse the bookmarks.  Then, the user would need to perform a standard Web search using a search engine. (*See id.*, ¶¶ 375-379)  . . . Consistent with this, a POSITA would have understood that Jain improves Mendez (and saves user time) by combining the two separate search steps Mendez by itself requires into one.  In other words, rather than separately perusing bookmarks and conducting a Web search, the user would only need to perform a single search that returns results both from the user's own bookmarks and the general Web.  (*See* Ex. 1003, ¶¶ 380-382.)

Pet. 58–59.  This argument is supported by unrebutted expert testimony that is detailed, well-reasoned, and persuasive.  *See* Ex. 1003 ¶¶ 375–385.  We do not find Patent Owner's argument with regard to Petitioner's second motivation to combine to be effective.

Petitioner's third motivation to combine is "a POSITA would have been further motivated to apply Jain to Mendez because doing so would have increased the functionality of Mendez's system by providing users with another, alternate means to revisit previously visited sites."  Pet. 59 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 386–391; Ex. 1005 (Jain), 2:65–3:2).  Patent

IPR2021-00962
Patent 10,140,375 B2

Owner argues, "[a]t best, Petitioner's motivation to combine only provides a rationale as to why a person of skill would have been motivated to search the bookmarks of Mendez but not why a person of skill would be motivated to search favorite items and a global index" (Prelim. Resp. 13), and "[t]here is no dispute that searching bookmarks was known at the time the '375 Patent was filed" (*id.* (citing Ex. 1001, 2:6–15). The Petition states:

> The '375 patent recognizes that "a common use of bookmarks is for navigation to sites that search engines … do not rank highly or that are otherwise hard to find via a search query." (Ex. 1001, 1:46-49.) Despite the fact that bookmarked sites may be hard to find using search engines, the '375 patent also recognizes that users often still attempt to employ "search engines" to "revisit[]" Web pages of interest. (*Id.*, 1:31-45.) Application of Jain to Mendez improves the usability of Mendez by ensuring that the user is able to re-access and revisit a bookmarked page even if the user employs a search engine— as users apparently oft do—instead of accessing the bookmark directly. (*See id.*, ¶¶ 390-391.) Indeed, Jain expressly notes that its "invention" is meant to increase the usefulness of results when a "user … conduct[s] a search of the Web … for a particular subject matter (or for a particular Web site) via a search engine even though the user may have relevant URLs stored as bookmarks within his or her browser." (Ex. 1005, 2:65-3:2.)

Pet. 59–60. We find this argument persuasive and to support the third motivation to combine. In contrast, we find Patent Owner's argument unavailing.

The fourth motivation to combine in the Petition is, "[a] POSITA would also have been motivated to combine Mendez and Jain because both relate to functionality provided by web browsers: bookmarking and Web searching." *Id.* at 60 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 392–396; Ex. 1004 (Mendez), 1:41–56, 1:59–66, 2:18–25, 5:1–5; Ex. 1005 (Jain), 2:52–3:20).

26

IPR2021-00962
Patent 10,140,375 B2

In response, Patent Owner argues, "it is well established that the mere or alleged existence of similarities in references is not sufficient to establish that a person of skill would have had reason to combine their teachings in the manner set forth in the claims." Prelim. Resp. 14 (citing *Johns Manville Corp. v. Knauf Insulation, Inc.*, IPR2018-00827, Paper 9, 10 (PTAB Oct. 16, 2018) (informative)). We accept this legal principle but find it inapplicable to Petitioner's showing with regard to motivation to combine. Petitioner provides much more in support of its fourth motivation to combine and its overall showing on combining the relevant teachings of the references than "the mere or alleged existence of similarities in [the cited] references." We find more applicable the passage from *KSR*, 550 U.S. at 406, that says, "when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious," which is cited by Petitioner in support of the fourth motivation to combine. *See* Pet. 61.

Finally, Patent Owner attacks Petitioner's showing relating to whether a skilled artisan would have had a reasonable expectation of success in combining the relevant teachings of the references. Prelim Resp. 14–17. Patent Owner argues that Petitioner fails to account for the differences in the data operated on by Mendez and Jain and, thus, ignores "a significant difference in the references." *Id.* at 15. With regard to whether "[o]ne of ordinary skill in the art would also have had a reasonable expectation of success when combining Mendez and Jain" (Pet. 61 (citing Ex. 1003 (Schmidt Decl.) ¶¶ 397-399.)), the Petition states:

> Both references discuss and are specifically designed to work not only with web browsers in general, but the very same

IPR2021-00962
Patent 10,140,375 B2

> browsers: Netscape Navigator and Internet Explorer. (*See, e.g.*,
> Ex. 1004, 1:40-56, 3:33-37, 3:42-51; Ex. 1005, 1:58-65.)
> Further, Jain's system operates on and use the same data that
> Mendez's system creates: a locally stored set of web browser
> bookmarks. (*See id.*, 2:55-61.)  In view of this subject matter
> and functionality similarity, a POSITA would have had every
> reason to believe, and no reason to doubt, that Mendez and Jain
> systems would be compatible and could be successfully
> combined.  (*See* Ex. 1003, ¶ 399.)

*Id.* at 61–62.  Petitioner's showing on reasonable expectation of success is
supported by citations to both cited references and by unrebutted testimony.
Patent Owner argues that "Petitioner does not address the distinction
between the workspace elements of Mendez and the bookmarks of Jain or
why a person of skill would have a reasonable expectation of success only
searching a portion of the workspace elements synchronized in Mendez."
Prelim. Resp. 17.  At least at this stage of this proceeding, we determine that
Petitioner's arguments are better supported and more persuasive.

We determine that Petitioner's showing with regard to the motivation
to combine the relevant teachings of Mendez and Jain to be supported and
reasonable.  In contrast, we determine that Patent Owner's contrary
arguments are relatively unsupported and unconvincing.  At least at this
stage of these proceedings, we determine that Petitioner provides sufficient
rationale for combining the relevant teachings of Mendez and Jain to support
institution.

### 5.   *Summary as to Claim 1*

We determine that Petitioner has shown a reasonable likelihood of
establishing the obviousness of claim 1 and, on that basis, institute *inter*

IPR2021-00962
Patent 10,140,375 B2

*partes* review of all the challenged claims.[13]  *See* 37 C.F.R. § 42.108(a) ("When instituting *inter partes* review, the Board will authorize the review to proceed on all the challenged claims.").

### E.  Additional Claims and Grounds

As noted above, Petitioner also challenges claims 2–11 and 13–19. *See* Pet. 5.  Petitioner directs us to where Mendez and Jain teach or suggest each of the limitations recited in these claims.  *See id.* at 41–57.  Similarly, Petitioner sets forth an additional ground challenging claim 20 based on Mendez, Jain, and Nakagawa that is supported by arguments and evidence. *See id.* at 5, 62–65.  As also noted above, Patent Owner does not challenge any of Petitioner's contentions relating to any of the claims or grounds except those related to the motivations to combine Mendez with Jain.  *See generally* Prelim. Resp.   Based on our preliminary consideration, we determine that for purposes of institution, Petitioner has shown sufficiently that the cited art teaches the additional limitations recited in claims 2–11 and 13–20.  We further determine that the information presented in the Petition demonstrates that it is more likely than not that claims 2–11 and 13–19 are unpatentable in view of Mendez and Jain and that it is more likely than not that claim 20 is unpatentable in view of Mendez, Jain, and Nakagawa.

---

[13] Thus, we determine that the information presented in the petition demonstrates that it is more likely than not that at least one of the claims challenged in the petition is unpatentable pursuant to 35 U.S.C. § 314 and that *inter partes* review should be instituted.  Accordingly, we institute as to all the challenged claims and all the challenges raised in the Petition. 37 C.F.R. § 42.108 (a) ("When instituting *inter partes* review, the Board will authorize the review to proceed on all of the challenged claims and on all grounds of unpatentability asserted for each claim.").

IPR2021-00962
Patent 10,140,375 B2

## III. CONCLUSION

For the reasons discussed above, we determine that Petitioner has demonstrated a reasonable likelihood of showing at least one of the claims challenged in the Petition would have been obvious.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of the '375 patent is instituted with respect to the challenged claims and the grounds set forth in the Petition; and

FURTHER ORDERED pursuant to 35 U.S.C. § 314(a) and 37 C.F.R. § 42.4(b), *inter partes* review of the '375 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.

IPR2021-00962
Patent 10,140,375 B2

FOR PETITIONER:

Alyssa Caridis
K. Patrick Herman
Bas de Blank
ORRICK, HERRINGTON & SUTCLIFFE LLP
a8cptabdocket@orrick.com
p52ptabdocket@orrick.com
m2bptabdocket@orrick.com

FOR PATENT OWNER:

Erika H. Arner
Cory C. Bell
Daniel C. Tucker
Kelly S. Horn
Alissa E. Green
FINNEGAN, HENDERSON, FARABOW,
GARRETT, & DUNNER LLP
erika.arner@finnegan.com
cory.bell@finnegan.com
daniel.tucker@finnegan.com
kelly.horn@finnegan.com
alissa.green@finnegan.com

# EXHIBIT C

Beglaubigte Abschrift

# Landgericht München I

Az.:    21 O 16260/20



**IM NAMEN DES VOLKES**


In dem Rechtsstreit

**Google LLC**, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA, vertreten durch ihren Chief Operating Officer Sundar Pichai,
- Klägerin -

Prozessbevollmächtigte:
**Quinn Emanuel Urquart & Sullivan, LLP**, Hermann-Sack-Straße 3, 80331 München, Gz.: 01980-00169 / 22367291.12


gegen

**Sonos Inc.**, 614 Chapala Street, Santa Barbara, CA 93101, USA, vertreten durch ihren Chief Operating Officer Patrick Spence,
- Beklagte -

Prozessbevollmächtigte:
**EIP Europe LLP**, Broadway Office, Breite Straße 29-31, 40213 Düsseldorf,
Gz.: 464.LM(DE)2


wegen Patentverletzung

- 2 -

erlässt das Landgericht München I - 21. Zivilkammer - durch den Vorsitzenden Richter am Landgericht Pichlmaier, den Richter am Landgericht Dr. Schacht, M.A., und den Richter am Landgericht Dr. Walz aufgrund der mündlichen Verhandlung vom 21.04.2021 folgendes

# Endurteil

1.  Die Klage wird abgewiesen.

2.  Die Klägerin trägt die Kosten des Rechtsstreits.

3.  Das Urteil ist gegen Zahlung einer Sicherheit in Höhe von 110% des zu vollstreckenden Betrages vorläufig vollstreckbar.

# Tatbestand

Die Klägerin nimmt die Beklagte wegen behaupteter wortsinngemäßer Verletzung des deutschen Teils des Europäischen Patents EP 1 579 621 B1 betreffend ein domain-gestütztes, digitales Rechtemanagementsystem mit leichter und sicherer Geräteregist-rierung auf Unterlassung und Rückruf aus den Vertriebswegen in Anspruch.

Die Klägerin ist ein US-amerikanischer, weltweit tätiger Technologiekonzern, der sich auf internetbezogene Dienstleistungen und Produkte spezialisiert hat. Über die be-kannte Suchmaschine „Google" und das von ihr für mobile Endgeräte entwickelte Be-triebssystem „Android" hinaus entwickelt und vermarktet die Klägerin insbesondere Online-Werbetechnologien, Dienstleistungen im Bereich Cloud-Computing und damit in Zusammenhang stehende Software und Hardware wie Smartphones, intelligente Lautsprecher und WLAN-Router.

Die Klägerin ist im Register des Deutschen Patent- und Markenamtes eingetragene Inhaberin des deutschen Teils des Europäischen Patents EP 1 579 621 B1 (im Fol-genden: EP'621 oder Klagepatent; Anlagen K-B 1 und K-B 2). Der Hinweis auf die Pa-tenterteilung wurde im europäischen Patentregister am 23.07.2014 veröffentlicht. Beim Deutschen Patent- und Markenamt wird der deutsche Teil des Klagepatents unter dem Aktenzeichen 603 46 535.8 geführt.

Der deutsche Teil des Klagepatents steht in Kraft. Über eine von der Beklagten mit Schriftsatz vom 06.11.2020 gegen den deutschen Teil des Klagepatents zum Bundes-patentgericht erhobene Nichtigkeitsklage (Anlage EIP B4) ist bislang noch nicht ent-schieden.

Seinem Gegenstand nach betrifft das Klagepatent im Wesentlichen die Verwaltung digitaler Rechte („digital rights management", DRM), insbesondere ein domainbasier-tes System zur Verwaltung digitaler Rechte für eine einfache und sichere Geräte-re-gistrierung.

Der mit der Klage allein geltend gemachte Vorrichtungsanspruch 9 lautet in der engli-schen Verfahrenssprache wie folgt:

An apparatus (101) comprising:

communication circuitry (213) for receiving, over a short range link (108), domain information (209) from a device (101) existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital rights management system (100);

storage (211) for storing the domain information (209); and

logic circuitry (210) for providing the domain information (209) to a key issuer (105) which is separate from the domain of devices, causing the key issuer (105) to issue a private key (206) for use in accessing protected digital content (204) to the apparatus, wherein the private key (206) is based on the domain information (209) and is utilized by all devices (101) within the domain of devices.

In deutscher Übersetzung lautet der geltend gemachte Vorrichtungsanspruch 9 wie folgt:

Gerät, das Folgendes umfasst:

einen Kommunikationskreis (213) zum Empfangen, über eine Kurzstrecken-Verbindung (108), von Domain-Informationen (209) von einer Vorrichtung (101), die innerhalb einer Domain aus Vorrichtungen besteht, die Rechte in Zusammenhang mit einem gemeinsamen Konto teilen, zur Verwendung bei Zugriff auf geschützten digitalen Inhalt innerhalb eines Verwaltungssystems für digitale Rechte (100);

einen Speicher (211) zum Speichern der Domain-Informationen (209); und

einen Logikkreis (210) zur Bereitstellung der Domain-Informationen (209) für einen Schlüsselaussteller (105), der unabhängig von der Vorrichtungsdomain ist, wodurch der Schlüsselaussteller (105) einen privaten Schlüssel (206) zur Verwendung bei Zugriff auf geschützten digitalen Inhalt (204) für das Gerät ausstellt, wobei der private Schlüssel (206) auf den Domain-Informationen (209) basiert und von allen Vorrichtungen (101) innerhalb der Vorrichtungsdomain verwendet wird.

Bei der Beklagten handelt es sich gleichfalls um einen US-amerikanischen Technologiekonzern, der auf die Entwicklung und Vermarktung drahtloser Audiosysteme und sogenannter Multi-Room-Audiosysteme spezialisiert ist, die eine gleichzeitige Wiedergabe von Audio-Inhalten in mehreren Räumen eines Haushalts ermöglichen.

Zu den von der Beklagten über ihre Tochtergesellschaft Sonos Europe B.V. in Deutschland angebotenen und vertriebenen Produkten zählen unter anderem die mit der vorliegenden Klage angegriffenen Lautsprecher der Marke „Sonos", die als sogenanntes „Sonos Home Sound System" zum drahtlosen Streamen von Musik in der Lage sind, insbesondere die Modelle „Move", „Sonos One", „Sonos One SL", „Play:5",

„Beam", „Playbase", „Playbar", „Amp", „Port", „Connect", „Connect:Amp", „Play:1",
„Play:3", „Sonos Arc" und „Sonos Five".

<u>Die Klägerin ist der Auffassung</u>, dass es sich bei den angegriffenen Lautsprechern des
„Sonos Home Sound Systems" um Musikabspielgeräte handelt, welche sämtliche
technischen Merkmale des geltend gemachten Vorrichtungsanspruchs 9 in wortsinn-
gemäßer Weise verwirklichen. Insbesondere verfügten die angegriffenen Lautspre-
cher über eine WLAN-Schnittstelle und seien damit in der Lage, über eine gemäß
Abs. [0013] der Klagepatentschrift patentgemäße Kurzstrecken-Verbindung Domain-
Informationen zu empfangen. Dass sich die in einer Domain zu verbindenden Geräte
in räumlicher Nähe darüber hinaus befinden müssten, die eine physische Kontrolle
durch den Nutzer erlaube, sei dem Anspruchswortlaut nicht zu entnehmen. Dies könne
in den geltend gemachten Hauptanspruch auch deswegen nicht in beschränkender
Weise hineingelesen werden, weil Unteranspruch 12 anderenfalls keinen eigenständi-
gen Anwendungsbereich mehr hätte.

Zu den anspruchsgemäß vorausgesetzten Domain-Informationen zähle die in einem
„Sonos Home Sound System" verwendete, sogenannte „Household-ID". Als „House-
hold" werde ein Satz von Wiedergabegeräten (sog. „players") innerhalb des gleichen
Netzwerks eines Sonos-Accounts bezeichnet. Die „Household-ID" diene dabei der In-
dividualisierung und Identifizierung eines Haushalts. Im Falle der Erweiterung eines
solchen Haushalts um weitere Geräte würde den Letzteren die identische „Household-
ID" von einem Gerät aus dem Haushalt zugeteilt.

Sobald neuer geschützter Inhalt wie etwa ein neuer Musikdienst über ein dem beste-
henden Geräteverbund neu hinzugefügtes Gerät erworben werde, würde die „House-
hold-ID" in patentgemäßer Weise als Teil eines Authentifizierungsprozesses bei einem
externen Inhalteanbieter verwendet. Der Schutzbereich des Klagepatents sei nicht auf
die Hinzufügung einer neuen Vorrichtung zu einem bestehenden Verbund an Vorrich-
tungen zur Nutzung bereits vorhandener Inhalte beschränkt. Die insoweit von der Be-
klagten vertretene, gegenteilige Ansicht schränke den Wortlaut des geltend gemach-
ten Vorrichtungsanspruchs unzulässig ein und beschränke den Schutzbereich des
Klagepatents zu Unrecht auf ein einzelnes Ausführungsbeispiel. Der angesprochene,
relevante Fachmann verstehe den geltend gemachten Patentanspruch vielmehr so,
dass alle Vorrichtungen auf ein gemeinsames Konto zugreifen können und an Rech-
ten, die mit diesem Konto verbunden sind, teilhaben. Weder der Umfang der Rechte

- 6 -

noch die Art des Zugriffs auf den geschützten digitalen Inhalt seien eingeschränkt. Daher dürfe das Teilmerkmal „Rechte" nicht auf den Begriff der „Rechteobjekte" beschränkt werden.

Patentgemäß sei nicht vorausgesetzt, dass Domain-Informationen von einer bereits in der Gruppe eingerichteten Vorrichtung und damit einem anderen Player empfangen würden. Entscheidend sei allein, dass die Domain-Informationen von einer Vorrichtung stammen, die innerhalb einer Domain aus Vorrichtungen besteht, ohne dass es aber diese Vorrichtung oder auch nur die Domain sein muss, die die Informationen versendet. Das Wort „von" („from") beziehe sich nicht auf das Empfangen, sondern auf die Domain-Informationen. Patentgemäß müsse es sich daher um Informationen handeln, welche die Domain aus Vorrichtungen und nicht nur ein individuelles Gerät identifizieren. Selbst wenn man der Auslegung der Beklagten folgte, wonach die „Household-ID" als Domaininformation von einem Gerät aus einer bestimmten Domain an den neu hinzuzufügenden Sonos-Player gesendet werden müsste, wäre eine Patentverletzung zu bejahen. Denn auch bei dem Sonos-Controller handele es sich um eine anspruchsgemäße Vorrichtung.

Ein anspruchsgemäß vorausgesetzter Speicher sei in den angegriffenen Ausführungsformen als Standard-Hardware-Komponente zudem in Form eines Flash-Speichers enthalten.

Weiter enthielten die angegriffenen Ausführungsformen einen patentgemäßen Logikschaltkreis. In den fraglichen Lautsprechern sei ein Mikroprozessor verbaut, der als Logikschaltung fungiere und dazu beitrage, dass Domain-Informationen in Gestalt der „Household-ID" externen Anbietern von Musikstreaming-Diensten wie „Spotify", „Apple Music" oder „Deezer" als anspruchsgemäßen Schlüsselausstellern bereitgestellt würden. Im Falle der als patentverletzend angegriffenen Aufnahme eines neuen Musikdienstes würde der Diensteanbieter den angegriffenen Ausführungsformen einen sogenannten „Authentifizierungs-Token" und einen sogenannten „Private Key" übermitteln, bei denen es sich um patentgemäße private Schlüssel handele. Ein solcher setze gerade nicht die Verwendung zum Entschlüsseln von digitalem Inhalt voraus. Der Anspruchswortlaut setze lediglich voraus, dass der private Schlüssel „zur Verwendung bei Zugriff auf geschützten digitalen Inhalt" ausgestellt werde. Insoweit genüge aber die Verwendung im Rahmen der Authentifizierung des Nutzers gegenüber dem externen Musikdienst.

Ein patentgemäßer privater Schlüssel sei nicht auf eine in der Beschreibung des Klagepatents genannte kryptographische Ausführungsform beschränkt. Die Beschreibung gemäß Abs. [0011] der Klagepatentschrift betreffe lediglich ein besonderes Ausführungsbeispiel. Entgegen der Beklagten definiere Abs. [0011] nicht den anspruchsgemäßen privaten Schlüssel, der beim Zugriff auf geschützten digitalen Inhalt verwendet wird. Entscheidend sei der Wortlaut des Anspruchs 9, der eine Beschränkung auf die Kryptographie-Technik nicht voraussetze. Ein privater Schlüssel sei daher jede Abfolge von Buchstaben/Ziffern, die geheim bleiben und nicht mit beliebigen externen Dritten geteilt werden soll. Bezugspunkt eines privaten Schlüssels seien überdies die Domaininformationen und nicht ein bestimmter digitaler Inhalt. Der private Schlüssel müsse nur „zur Verwendung bei Zugriff auf geschützten digitalen Inhalt" und nicht „zur Entschlüsselung" für das Gerät ausgestellt werden. Dagegen enthalte der Anspruchswortlaut keine Konkretisierung dahingehend, welchen Gegenstand die mit einem gemeinsamen Konto verbundenen Rechte haben.

Damit ein Nutzer, der bei einem externen Dienst registriert ist, seine jeweiligen Daten für diesen Dienst nicht bei jedem Aufruf erneut eingeben muss, würde der „Authentifizierungs-Token" (auch: „AuthToken") verwendet, der den von einem Nutzer gewünschten Musikdienst mit einem Sonos-Haushalt verbinde und bei Aufruf des Dienstes zur Authentifizierung verwendet werde. Im Rahmen der Registrierung würde ein Sonos-Gerät hierzu den Befehl *getDeviceAuthToken* an den externen Musikdienst senden, wobei die „Houshold-ID" mit übersandt werde. Sobald der externe Dienst den Befehl empfange, erstelle er den „AuthToken" sowie den „Private Key" und sende diese sodann als Antwort an das anfragende Sonos-Gerät. Der „Private Key" würde dabei dazu verwendet, über die Funktion „Refresh-Token" den „AuthToken" nach dessen zeitlichem Ablauf zu erneuern. Sowohl bei dem „AuthToken" als auch dem „Private Key" handele es sich um eine Reihe an Buchstaben/Ziffern in der Länge von bis zu 2048 Zeichen. Diese Zeichenfolge werde von den angegriffenen Ausführungsformen sowie von den externen Dienste-Anbietern vertraulich behandelt. Selbst wenn man daher einen kryptographischen Schlüssel für patentgemäß notwendig erachten sollte, müsste daher eine Verletzung bejaht werden. Denn bei dem „AuthToken" und dem „Private Key" handele es sich bereits deswegen um kryptographische Schlüssel, weil diese zum Zweck der Authentifizierung einer Vorrichtung und damit zu einem auch von der Kryptographie verfolgten Zweck verwendet würden.

- 8 -

Ob der private Schlüssel zum Zeitpunkt des Empfangs der Domaininformationen bereits existiere oder erst im Zuge des Erhalts der Domaininformationen erteilt wird, sei für eine patentgemäße Ausführungsform unerheblich. Daher falle auch die Erzeugung eines neuen privaten Schlüssels im Falle der Hinzufügung eines neuen Musikdienstes über ein einem bestehenden Geräteverbund neu hinzugefügtes Sonos-Gerät in den Anwendungsbereich des Klagepatents. Die Klage erfasse gerade die von der Klägerin als patentverletzend angegriffene Konstellation, in der bereits ein Musikdienst für den fraglichen Haushalt eingerichtet ist und von der neu hinzugefügten angegriffenen Ausführungsform ein weiterer Musikdienst eingerichtet wird. Wenn mittels eines neu hinzugefügten Sonos-Players ein neuer Musikdienst (z. B. Spotify) hinzugefügt werde und mit der fraglichen Domain bereits andere Musikdienste (z. B. Deezer, Amazon Music) verbunden sind, sei das Klagepatent verletzt. Denn in diesem Fall kontaktiere der neu hinzugefügte Sonos-Player, gesteuert durch den Sonos-Controller, den neu hinzuzufügenden, externen Musikdienst, der seinerseits den patentgemäßen privaten Schlüssel in Form des „Authentifizierungs-Tokens" sowie des „Private Key" ausstelle, die sodann von der angegriffenen Ausführungsform empfangen werde.

Auch beim Erneuern des „AuthToken" mittels des „Private key" (sogenannter „Refresh-Token") für einen bereits eingerichteten Musikdienst sende der Musikdienst als externer Schlüsselaussteller an die angegriffene Ausführungsform einen neuen „AuthToken" und damit einen klagepatentgemäßen privaten Schlüssel.

Eine Aussetzung ist nach Auffassung der Klägerin nicht angezeigt. Das Klagepatent sei rechtsbeständig. Von dem seitens der Beklagten vorgelegten Stand der Technik grenze sich die technische Lehre des Klagepatents insbesondere deswegen hinreichend ab, weil die dem Fachmann bekannten Dokumente keine erfindungsgemäße Domain an Vorrichtungen und lediglich gerätespezifische Kennungen, nicht aber domainspezifische Kennungen offenbaren.

Die Klägerin **b e a n t r a g t**:

I.      Die Beklagte wird verurteilt,

1.      es bei Meidung eines für jeden Fall der Zuwiderhandlung vom Gericht festzusetzenden Ordnungsgeldes bis zu 250.000,00 € – ersatzweise Ordnungshaft – oder einer Ordnungshaft bis zu sechs Monaten, im Falle wiederholter

- 9 -

Zuwiderhandlung bis zu insgesamt zwei Jahren, wobei die Ordnungshaft an den gesetzlichen Vertretern der Beklagten zu vollziehen ist, zu unterlassen:

Geräte

in der Bundesrepublik Deutschland anzubieten, in den Verkehr zu bringen, zu gebrauchen oder zu den genannten Zwecken einzuführen oder zu besitzen,

die Folgendes umfassen:

einen Kommunikationskreis zum Empfangen, über eine Kurzstrecken-Verbindung, von Domain-Informationen von einer Vorrichtung, die innerhalb einer Domain aus Vorrichtungen besteht, die Rechte in Zusammenhang mit einem gemeinsamen Konto teilen, zur Verwendung bei Zugriff auf geschützten digitalen Inhalt innerhalb eines Verwaltungssystems für digitale Rechte;

einen Speicher zum Speichern der Domain-Informationen; und

einen Logikkreis zur Bereitstellung der Domain-Informationen für einen Schlüsselaussteller, der unabhängig von der Vorrichtungsdomain ist, wodurch der Schlüsselaussteller einen privaten Schlüssel zur Verwendung bei Zugriff auf geschützten digitalen Inhalt für das Gerät ausstellt, wobei der private Schlüssel auf den Domain-Informationen basiert und von allen Vorrichtungen innerhalb der Vorrichtungsdomain verwendet wird.

(EP 1 579 621 B1, Anspruch 9, unmittelbare Verletzung)

2. die unter Ziffer I.1. bezeichneten, in Verkehr gebrachten und im Besitz Dritter befindlichen Erzeugnisse aus den Vertriebswegen zurückzurufen,

indem diejenigen Dritten, denen durch die Beklagte oder mit deren Zustimmung Besitz an den Erzeugnissen eingeräumt wurde, unter Hinweis darauf, dass die Kammer mit dem hiesigen Urteil auf eine Verletzung des Klagepatents erkannt hat, ernsthaft aufgefordert werden, die Erzeugnisse an die Beklagte zurückzugeben und den Dritten für den Fall der Rückgabe der Erzeugnisse eine Rückzahlung des gegebenenfalls bereits bezahlten Kaufpreises sowie die Übernahme der Kosten der Rückgabe zugesagt wird und endgültig zu entfernen,

indem die Beklagte die erfolgreich zurückgerufenen Erzeugnisse wieder an sich nimmt.

Die Beklagte **b e a n t r a g t:**

die Klage abzuweisen;

hilfsweise,

den Rechtsstreit bis zur rechtskräftigen Entscheidung über die gegen das Klage-patent vor dem Bundespatentgericht erhobene Nichtigkeitsklage der Sonos Eu-rope B.V. vom 6. November 2020 auszusetzen.

Die Beklagte ist der Meinung, dass die angegriffenen Ausführungsformen das Klage-patent nicht verletzen. In ihrer Verletzungsargumentation vermenge die Klägerin das Hinzufügen eines Sonos-Players zu einem Sonos-Haushalt und das Hinzufügen eines externen Musikdienstes. Hierbei handele es sich um zwei voneinander unabhängige Prozesse. Die beim erstmaligen Einrichten eines Musikdienstes stattfindende externe Kommunikation einer angegriffenen Ausführungsform mit dem fraglichen Dienstean-bieter falle gerade nicht in den Schutzbereich des Klagepatents. Das Klagepatent sei vielmehr beschränkt auf die Hinzufügung eines Sonos-Players zu einer bestehenden Gruppe von Sonos-Playern mit einem bereits eingerichteten Musikdienst. Denn nur in einem solchen Szenario würde eine patentgemäße Domain aus Vorrichtungen existie-ren. Würde indes ein Sonos-Player zu einem bestehenden Verbund an Sonos-Playern hinzugefügt, erhalte dieser den „AuthToken" und den „Private Key" nicht von dem ex-ternen Musikdienstanbieter, sondern von einem in dem Verbund bereits eingerichteten Player. Damit werde die patentgemäß in funktionaler Hinsicht vorausgesetzte Verbes-serung der Sicherheit eines DRM durch Einsatz eines externen Schlüsselausstellers bei der Geräteregistrierung nicht verwirklicht.

Eine Verletzung des Klagepatents sei auch deswegen ausgeschlossen, weil ein zu einem Sonos-Household hinzugefügter Sonos-Player die „Household-ID" von dem So-nos-Controller und nicht von einem anderen Player empfange. Patentgemäß sei vo-rausgesetzt, dass Domain-Informationen von einer bereits in der Gruppe eingerichte-ten Vorrichtung und damit einem anderen Player empfangen würden. Bei dem Sonos-Controller, von dem die Sonos-Player die „Household-ID" empfingen, handele es sich nicht um eine patentgemäße Vorrichtung.

Einem Sonos-System hinzugefügte Vorrichtungen würden die Authentifizierungsinformationen eines Musikdienstes von einem in dem Verbund bereits registrierten Player erhalten. In dem Moment, in dem ein Sonos-Player einer Domain hinzugefügt wird, habe dieser noch keine Rechte erhalten und könne daher nicht als Vorrichtung im Sinne des Klagepatents fungieren. Insoweit fehle es an der Existenz bzw. dem Teilen von Rechten im Zusammenhang mit einem gemeinsamen Konto, wobei es sich bei anspruchsgemäßen Rechten um die digitale Beschreibung der kryptografischen Berechtigungen und Befähigung zum Zugriff auf kryptografisch geschützten Inhalt handele.

Patentgemäß sei überdies weiter erforderlich, dass die Verbindungsmittel zwischen einem neu hinzugefügten Gerät und einem in der Domain bereits bestehenden Gerät über eine Kommunikationsverbindung realisiert wird, die den physischen Abstand zwischen den Geräten dahingehend beschränkt, dass der Nutzer die Geräte physisch kontrollieren kann. Die von den Sonos-Geräten vorgesehene WLAN-Verbindung erfülle diese Voraussetzung nicht.

Die angegriffenen Ausführungsformen verfügen nach Ansicht der Beklagten zudem nicht über einen patentgemäßen Logikkreis. Auch insoweit sei zu berücksichtigen, dass das Klagepatent auf das Szenario des Hinzufügens eines Geräts zu einer bestehenden Domain aus Vorrichtungen beschränkt sei. Die von der Klägerin als Verletzung vorgetragene manuelle Einrichtung eines Musikdienstes falle nicht in den Anwendungsbereich des geltend gemachten Anspruchs. In einem Sonos-Household würde der „AuthToken" zwischen den registrierten Sonos-Playern geteilt. Dies steht der Beklagten zu Folge in direktem Widerspruch zu der technischen Lehre des Klagepatents, die auf dem zentralen Gedanken eines von der Domain unabhängigen externen Schlüsselausstellers beruht und ein Teilen von Authentifizierungsinformationen durch Vorrichtungen innerhalb der Domain aus Vorrichtungen entsprechend der patentgemäßen Lösung gerade verhindern will.

Zudem müsse es sich bei dem patentgemäß vorausgesetzten privaten Schlüssel um einen kryptographischen Schlüssel handeln. Dieser müsse dem Zweck des Entschlüsselns von digitalem Inhalt dienen. Aus Abs. [0011] der Klagepatentschrift ergebe sich ausdrücklich, dass das Klagepatent die Verwendung eines privaten Schlüssels als Gegenstück zu einem öffentlichen Schlüssels betreffend den Bereich der public key-Kryptographie voraussetze. Auch der relevante Fachmann verstehe den Begriff des

privaten Schlüssels im kryptographischen Sinne. Dies werde der Beklagten zufolge über die von ihr vorgelegten Gutachten der Sachverständigen *Wicker* und *Fuchs* hinaus etwa durch in Auszügen vorgelegte Fachliteratur bestätigt. Dagegen würde der „AuthToken" ebenso wie der „Private Key" in einem Sonos-System nicht wie anspruchsgemäß vorausgesetzt zur Entschlüsselung von digitalem Inhalt verwendet. Bei dem „AuthToken" handele es sich vielmehr um eine Art „Mitgliedschaftskarte", die ein Musikdienst einem Sonos-Player ausstelle, nachdem sich der Nutzer zunächst unter Angabe seines Namens und Passworts über den Sonos-Controller bei dem Musikdienst angemeldet hat. Bei späterem Abruf des Musikdienstes müsse sich der Nutzer dann nicht mehr mit seinem Benutzernamen und Passwort anmelden, sondern könne sich schlicht mit dem „AuthToken" identifizieren. Der „AuthToken" werde daher lediglich wie ein Passwort zum Zwecke der Authentifizierung verwendet. Bei dem im Rahmen eines Sonos-Systems ausgestellten „Private Key" handele es sich ebenfalls nicht um einen patentgemäßen privaten Schlüssel. Der „Private Key" werde nur benötigt, um einen neuen „AuthToken", etwa im Falle dessen zeitlichen Ablaufs, anzufordern.

Auch ein patentgemäßer Logikkreis setze voraus, dass das angegriffene Gerät bei einem bereits eingerichteten Musikdienst einen privaten Schlüssel anfordere. Dies sei bei einem Sonos-System hinzugefügten Geräten nicht der Fall, weil diese den „AuthToken" von den im Verbund bereits registrierten Geräten erhielten.

Bei Hinzufügen eines neuen Musikdienstes würde der „AuthToken" zwar bei dem externen Diensteanbieter angefordert. Allerdings würde der Token zu diesem Zeitpunkt gerade noch nicht von den anderen Playern in dem bestehenden Sonos-System verwendet. Die Erzeugung eines neuen Schlüssels falle aber nicht in den Schutzbereich des Klagepatents. Dieses setze vielmehr voraus, dass einem neu zu registrierenden Gerät ein bereits existierender privater Schlüssel ausgestellt wird.

Die nach Behauptung der Klägerin in einem Sonos-Player vorgesehene Möglichkeit der Wiedergabe verschlüsselter Inhalte habe nichts mit der dem Klagepatent entsprechend vorgesehenen Verwendung eines privaten Schlüssels zu tun. Im Gegensatz zu der patentgemäßen Lösung verfügten Sonos-Player über einen individuellen, gerätespezifischen und damit nicht domain-bezogenen privaten Schlüssel. Jeder Sonos-Player erzeuge ein individuelles Geräte-Zertifikat, das einen mit dem privaten Schlüssel korrespondierenden, öffentlichen Schlüssel enthalte. Das Geräte-Zertifikat würde an einen Musikdienst gesendet, woraufhin der jeweilige Sonos-Player von dem

- 13 -

Musikdienst einen gerätespezifischen „Session-Token" erhalte, der für die jeweilige Wiedergabe gültig sei.

Soweit die Beklagte die Aussetzung des Verletzungsrechtsstreits hilfsweise begehrt, nimmt sie auf ihre im Rahmen der vor dem Bundespatentgericht anhängigen Nichtig-keitsklage vorgelegten, dem relevanten Fachmann nach ihrer Behauptung aus dem Stand der Technik bekannten Dokumente Bezug. Insbesondere das als Entgegenhal-tung D1 vorgelegte Dokument US 2002/0166047 A1 nehme die technische Lehre des Klagepatents in neuheitsschädlicher Weise vorweg. Dabei werde in dessen Abs. [0041] auch das Teilmerkmal des Empfangs von Domain-Informationen über eine Kurzstreckenverbindung offenbart. Zudem offenbare der als Entgegenhaltung D13 vorgelegte „Proposal for DVB Content Protection & Copy Management Technologies Version 1.0" des Unternehmens Nokia sämtliche Merkmale der klagepatentgemäßen Lehre.

Am 21.04.2021 hat die Kammer zur Sache verhandelt. Im Anschluss an die mündliche Verhandlung argumentierte die Klägerin in ihrem nicht nachgelassenen Schriftsatz vom 28.05.2021 erstmalig, dass die Kennungen „AuthToken" und „Private key" in ei-nen kryptographischen Algorithmus Eingang fänden. Die angegriffenen Ausführungs-formen würden diese Kennungen bei Anfragen nach geschütztem digitalen Inhalt an den Musikdienst in Kopfzeilen („Header") mitsenden. Dabei folge das Einfügen der Kennungen in den Header und die entsprechende Authentifizierung einer formal fest-gelegten Vorgehensweise, nach der eine definierte Aufgabe (Authentifizierung) gemäß einem strukturierten Schema (Einfügen der Schlüssel in den Header und Abgleich der Schlüssel beim Musikdienst) gelöst würde. Ohne die Kenntnis des Algorithmus könnte dessen Ergebnis in Form der Bestätigung, dass eine Nachricht von einem autorisierten Gerät gesendet wurde, nicht errechnet werden.

Zur Ergänzung des Tatbestandes wird auf die zwischen den Parteivertretern gewech-selten Schriftsätze nebst Anlagen sowie das Protokoll zur mündlichen Verhandlung vom 21.04.2021 verwiesen.

- 14 -

# Entscheidungsgründe

Die Klage ist zulässig, in der Sache jedoch unbegründet. Der Klägerin stehen die geltend gemachten Ansprüche nicht zu. Auf der Grundlage der Ausführungen der Klägerin vermag die Kammer eine Verletzung des Klagepatents letztlich nicht zu bejahen.

## I.

1. Das Klagepatent betrifft ein domaingestütztes digitales Rechtemanagementsystem mit leichter und sicherer Geräteregistrierung. Digitale Rechtemanagementsysteme waren im Prioritätszeitpunkt dem Grunde nach bereits bekannt. Diese basierten auf der Erkenntnis des Problems, dass digitale Inhalte wie Musik, Spiele, Filme, Bilder und Bücher auf einfache Weise kopiert werden können. Ihrem Sinn und Zweck nach dienen digitale Rechtemanagementsysteme daher gemäß Abs. [0002] der Klagepatentschrift dazu, Sicherheitsmaßnahmen zur Bekämpfung von Produktpiraterie vorzusehen, um so eine angemessene Vergütung von Inhabern digitaler Inhalte sicherzustellen. Entsprechende Sicherungsmaßnahmen sollten, wie dem Fachmann bereits im Prioritätszeitpunkt bekannt war, durch manipulationssichere elektronische Geräte umgesetzt werden.

Zu den im Prioritätszeitpunkt bekannten digitalen Rechtemanagementsystemen zählt das Klagepatent das Teilen digitaler Inhalte innerhalb einer Domain an Geräten. Ein solcher Geräteverbund kann beispielsweise eine einheitliche Zahlungsmethode oder eine übereinstimmende Kontonummer verwenden. Bezahlt sodann ein Nutzer für die einmalige Nutzung eines bestimmten Werkes wie etwa eines Films unter Verwendung der domainspezifischen Kontodaten, gilt das Gerät als zu der fraglichen Domain gehörig autorisiert und kann das gewünschte Werk sodann nutzen. Allerdings kann in einem solchen Fall nur ein Gerät auf die gewünschten Inhalte zugreifen. Sobald ein Zugriff über ein Gerät erfolgt, ist ein Zugriff über die weiteren Geräte aus der jeweiligen Domain ausgeschlossen (Abs. [0003] der Klagepatentschrift).

Das Klagepatent erkennt ein solches Vorgehen als prinzipiell vorteilhaft an, weist indes auf zwei sich hieraus ergebende Problemstellungen hin (Abs. [0004]

- 15 -

und [0021] der Klagepatentschrift): Zum einen mussten im Stand der Technik alle Geräte einzeln registriert werden, was das Klagepatent als für den Nutzer aufwändig kritisiert. Zum anderen ergibt sich ein Sicherheitsrisiko, wenn Nutzer Geräte per Fernzugriff über weite Distanz in einer Domain registrieren.

Als dem Fachmann aus dem Stand der Technik bekannte Lösungsansätze verweist das Klagepatent in dessen Abs. [0005] auf den Standardisierungsvorschlag „IBM Response to DVB-CPT Call for Proposal for Content Protection & Copy Management: xCP Cluster Protocol" vom 19.10.2001. Hierin wird ein Rechtemanagementsystem beschrieben, das Nutzern den nahtlosen Zugang zu digitalen Inhalten inner- und außerhalb ihres Zuhauses bei gleichzeitigem Schutz der Rechte der Inhalteanbieter ermöglicht. Dazu bilden die in einem solchen Heimnetzwerk verbundenen Geräte ein einheitliches Cluster innerhalb einer verschlüsselten Domain. In diesem Cluster gelten alle Geräte als gleichberechtigt, auch wenn diese jeweils spezifische Funktionen erfüllen. Dabei können bestimmte mit Authorisierungsfunktion ausgestattete Geräte einzelne Geräte in das Cluster aufnehmen, wobei sie entweder selbständig oder stellvertretend für ein externes Authorisierungszentrum agieren.

In dem dem Fachmann im Prioritätszeitpunkt ebenfalls bereits bekannten US-amerikanischen Anmeldedokument US 2002/157002 wird ein domainbasiertes digitales Rechtemanagementsystem beschrieben (Abs. [0006] der Klagepatentschrift). Einer Domain sind dabei ein oder mehrere Geräte zugeordnet, die einen von der Domain verwendeten, gemeinsamen kryptographischen Schlüssel teilen. Registrierung und Abmeldung eines Gerätes erfolgt über eine zuständige Domainstelle („*domain authority*") in Verbindung mit einem in dem Gerät verbauten DRM-Modul.

Entsprechende, aus dem Stand der Technik bekannte digitale Rechtemanagementsysteme stellen unter dem Gesichtspunkt der Nutzerfreundlichkeit eine vorteilhafte Weiterentwicklung dar. Denn sowohl die Cluster-basierte als auch die Domain-basierte Geräteregistrierung ermöglichen es dem Nutzer im Umfeld eines digitalen Rechtemanagementsystems, Geräte in vereinfachter Weise zu registrieren, da nutzerseitig anstelle der für jedes zu verwendende Gerät einzugebenden, gerätespezifischen Informationen lediglich eine domainspezifische Registrierung erfolgen muss. Als weiter nachteilhaft bezeichnet das

- 16 -

Klagepatent indes den nutzerseitig bestehenden Aufwand, jedes Gerät unter Eingabe der domainspezifischen Informationen in der jeweiligen Domain registrieren zu müssen (Abs. [0021] der Klagepatentschrift). Zudem kritisiert das Klagepatent den Stand der Technik unter Sicherheitsgesichtspunkten, weil so auch Geräte, über die der Nutzer keine unmittelbare physische Kontrolle hat, in einfacher Weise zur gemeinsamen Rechtenutzung registriert werden können (Abs. [0008] der Klagepatentschrift). Dahingehende Sicherheitsbedenken bestehen dem Klagepatent insbesondere bei einer über das Internet oder per E-Mail erfolgenden Geräteregistrierung (Abs. [0031] der Klagepatentschrift).

2. An diesen Stand der Technik knüpft das Klagepatent gemäß Abs. [0008] der Klagepatentschrift an, indem ein Verfahren sowie eine Vorrichtung für ein digitales Rechtemanagementsystem offenbart wird, welches eine zugleich einfache, weil domainbasierte, und sichere Registrierung von Geräten ermöglicht. Dabei ist es dem Klagepatent zufolge vorzugswürdig, wenn sich die zu registrierende Vorrichtung in unmittelbarer Nähe zu den in der Domain bereits vorhandenen Vorrichtungen befindet.

Eine weitere Vereinfachung der Geräteregistrierung will das Klagepatent vor dem Hintergrund erreichen, als es für Nutzer beschwerlich ist, einmal festgelegte Domaininformationen wie den Domainnamen und das Domainpasswort zu erinnern und erneut einzugeben, wenn neue Geräte zu einer bestehenden DRM-Domain hinzugefügt werden. Gemäß Abs. [0009] der Klagepatentschrift wird es in zwei Konstellationen als in besonderem Maße schwierig bezeichnet, Geräte zu registrieren: Zum einen, nachdem seit der Registrierung eines ersten Gerätes längere Zeit verstrichen ist und zum anderen, wenn es um die Registrierung von Geräten mit eingeschränkter Benutzeroberfläche geht. Eine vereinfachte Geräteregistrierung sieht gemäß Abs. [0010] daher vor, dass die relevanten DRM-Informationen von einem in der bestehenden Domain bereits registrierten Gerät empfangen werden.

An dieser vereinfachten Registrierung durch Empfang der DRM-Informationen von einem bereits in einer Domain registrierten Gerät kritisiert das Klagepatent indes, dass hierdurch digitale Inhalte nicht ausreichend geschützt sind (Abs. [0010]). Als Maßnahme zur Verbesserung der Sicherheit schlägt das Klagepatent daher den Einsatz eines Schlüsselausstellers vor, um die

Geräteregistrierung abschließen zu können. Dieser kann gemäß Abs. [0010] der Klagepatentschrift die Geräteregistrierung aktiv durchsetzen und so die Sicherheit erhöhen. Weiter soll die Sicherheit dadurch erhöht werden, dass das neu zu registrierende Geräte DRM-Informationen nur über eine Kurzstreckenverbindung von der bestehenden Domain empfangen kann (Abs. [0010]).

Der angesprochene Fachmann entnimmt der Klagepatentschrift den Abs. [0008] bis [0010] und gleichfalls den entsprechenden Beschreibungsstellen in Abs. [0022] und [0023] sowie Abs. [0031] und [0032] der Klagepatentschrift daher, dass die Sicherheit digitaler Inhalte zum einen dadurch geschützt werden soll, dass Domaininformationen über eine Kurzstreckenverbindung empfangen werden und zum anderen ein Schlüsselaussteller eingesetzt wird. Die Bedeutung des Einsatzes eines Schlüsselausstellers erkennt der Fachmann dabei darin, dass die Geräte anderenfalls – d.h. wenn ein Schlüsselaussteller nicht eingesetzt würde – private DRM-Schlüssel teilen und DRM-Zertifikate ausstellen müssten (Abs. [0032] des Klagepatentschrift).

3.   Vor diesem Hintergrund und unter Berücksichtigung des dem Klagepatent zu Grunde liegenden Standes der Technik stellt sich das Klagepatent die Aufgabe, ein domainbasiertes, digitales Rechtemanagementsystem anzubieten, welches die Hinzufügung neuer Geräte auf einfache und zugleich sichere Weise ermöglicht.

Zur Lösung dieser Aufgabe schlägt das Klagepatent gemäß dem mit der Klage geltend gemachten Vorrichtungsanspruch 9 ein Gerät vor, das mit einem Kommunikationsschaltkreis, einem Speicher und einem Logikschaltkreis über drei zentrale Bestandteile verfügt. Im Einzelnen lässt sich der geltend gemachte Vorrichtungsanspruch wie nachfolgend dargestellt gliedern. Die Kammer nimmt dabei Bezug auf die Merkmalsgliederung der Klägerin, da sich diese unmittelbar auf den für die Auslegung primär maßgeblichen Anspruchswortlaut stützt:

| 9 | Gerät, das Folgendes umfasst: |
|---|---|
| 9.1 | einen Kommunikationskreis (213) zum Empfangen, über eine Kurz-strecken-Verbindung (108), von Domain-Informationen (209) von ei-ner Vorrichtung (101), die innerhalb einer Domain aus Vorrichtungen besteht, die Rechte in Zusammenhang mit einem gemeinsamen |

|  | Konto teilen, zur Verwendung bei Zugriff auf geschützten digitalen Inhalt innerhalb eines Verwaltungssystems für digitale Rechte (100); |
|---|---|
| 9.2 | einen Speicher (211) zum Speichern der Domain-Informationen (209); und |
| 9.3 | einen Logikkreis (210) zur Bereitstellung der Domain-Informationen (209) für einen Schlüsselaussteller (105), der unabhängig von der Vorrichtungsdomain ist, wodurch der Schlüsselaussteller (105) einen privaten Schlüssel (206) zur Verwendung bei Zugriff auf geschützten digitalen Inhalt (204) für das Gerät ausstellt, |
| 9.3.1 | wobei der private Schlüssel (206) auf den Domain-Informationen (209) basiert und |
| 9.3.2 | von allen Vorrichtungen (101) innerhalb der Vorrichtungsdomain ver-wendet wird. |

4.  Der geltend gemachte Anspruch lehrt damit ein sich im Wesentlichen aus drei Bestandteilen zusammensetzendes Gerät, über welches im Rahmen eines digitalen Rechtemanagementsystems auf digitale Inhalte wie Musik, Filme, Bücher o.ä. zugegriffen wird. Die einzelnen Bestandteile einer anspruchsgemäßen Vorrichtung werden in funktionaler Hinsicht jeweils näher beschrieben. Figur 1 des Klagepatents veranschaulicht die Rolle einer anspruchsgemäßen Vorrichtung (101) im Rahmen eines klagepatentgemäßen digitalen Rechtemanagementsystems (100):



FIG. 1

- 19 -

Als anspruchsgemäße Vorrichtung (101) zur Nutzung digitaler Inhalte eines Rechteinhabers (103) kommen u.a. insbesondere Computer und Mobiltelefone in Betracht, die etwa über einen darin verbauten MP3-Player Musik abspielen können (Abs. [0012] der Klagepatentschrift). Weitere Bestandteile eines erfindungsgemäßen Rechtemanagementsystems sind ein Schlüsselaussteller (105), ein Netzwerk (107) sowie eine Kurzstrecken-Verbindung (108). Die Kommunikation zwischen einer anspruchsgemäßen Vorrichtung und dem Rechteinhaber (103) erfolgt dabei über das Netzwerk (107), bei dem es sich patentgemäß beispielsweise um ein Mobilfunknetz, ein lokales Netzwerk (LAN) oder ein Wide Area Network (WAN) handeln kann (Abs. [0016] der Klagepatentschrift). Die seitens des Nutzers verwendeten Vorrichtungen kommunizieren dagegen anspruchsgemäß über eine Kurzstrecken-Verbindung (108) miteinander, um auf Grund der damit verbundenen physischen Nähe der Geräte und der damit einhergehenden, besseren Kontrollierbarkeit die Gefahr von Hackerangriffen zu verringern (Abs. [0010], [0013] und [0022] der Klagepatentschrift).

Eine weitere Verbesserung der Sicherheit eines Rechtemanagementsystems soll dem Klagepatent zu Folge über den Einsatz des Schlüsselausstellers (105) erreicht werden. Gemäß Abs. [0014] der Klagepatentschrift handelt es sich bei dem Schlüsselaussteller um eine Anwendung, die eine authentifizierte Kommunikation mit Benutzergeräten ermöglicht und diesen ein DRM-Zertifikat sowie einen privaten DRM-Schlüssel zur Verfügung stellt. Eine authentifizierte Kommunikation erfolgt auf der Grundlage eines sogenannten Challenge-Response Protokolls, über das ein von dem Gerätehersteller installiertes Gerätezertifikat (207) und die Domaininformationen (209) ausgetauscht werden. Das auf dieser Grundlage sodann von dem Schlüsselaussteller ausgestellte DRM-Zertifikat (202) beinhaltet neben der gerätespezifischen Kennung wie etwa einer der Vorrichtung spezifisch zugewiesenen Serien- oder Modellnummer einen öffentlichen DRM-Schlüssel und eine von dem Schlüsselaussteller hergestellte, digitale Signatur (Abs. [0015] der Klagepatentschrift). Der dem öffentlichen DRM-Schlüssel entsprechende private DRM-Schlüssel (206) wird sicher in dem Speicher (211) der Vorrichtung (101) abgelegt. Figur 2 des Klagepatents illustriert die im geltend gemachten Patentanspruch beschriebenen drei Bestandteile einer patentgemäßen Vorrichtung (101) wie folgt:



**FIG. 2**

5.  Näher erläuterungsbedürftig sind die zwischen den Parteien umstrittenen Merkmalsgruppen 9.1 und 9.3. Von zentraler Bedeutung sind dabei aus Sicht der Kammer die folgenden, zwischen den Parteien streitig diskutierten Fragen:

- Zum Ersten die Frage, ob die in den angegriffenen Ausführungsformen vorhandene WLAN-Schnittstelle den Aufbau einer patentgemäßen Kurzstreckenverbindung ermöglicht (Merkmalsgruppe 9.1);

- Zum Zweiten die Frage, ob der geltend gemachte Patentanspruch auch das Ausstellen eines neuen Schlüssels für neue digitale Inhalte, die für eine bestehende Domain über ein dieser neu hinzugefügtes Gerät  hinzuerworben wurden, erfasst (Merkmalsgruppe 9.3); und

- Zum Dritten die Frage, wie ein patentgemäßer privater Schlüssel ausgestaltet sein muss, insbesondere, ob ein solcher kryptographischer Natur sein muss (Merkmalsgruppe 9.3).

a.  In rechtlicher Hinsicht gilt für die Auslegung folgender Maßstab:

aa.  Ziel der Auslegung des geltend gemachten Patentanspruchs ist es, dessen Sinngehalt aus Sicht des von dem streitgegenständlichen Patent angesprochenen Durchschnittsfachmanns im Prioritätszeitpunkt zu ermitteln. Nach Ansicht der Kammer ist relevanter Fachmann vorliegend ein Universitätsabsolvent (Diplom oder Master) der Fachrichtung Informatik mit Kenntnissen auf dem Gebiet der Kryptographie und mehrjähriger Berufserfahrung im Bereich der

- 21 -

Entwicklung digitaler Rechtemanagementsysteme (vgl. BPatG Beschl. v. 24.10.2017, Az. 23 W (pat) 24/17, BeckRS 2017, 133838).

Maßgeblich für die Bestimmung des relevanten Fachmanns ist der technische Gegenstand des streitgegenständlichen Patents. Das Klagepatent betrifft ein computergestütztes und damit typischerweise von Absolventen der Fachrichtung Informatik entwickeltes, digitales Rechtemanagementsystem (vgl. etwa Abs. [0012] und [0021] der Klagepatentschrift), das in einem – wie ausgeführt – zentralen Aspekt auf dem Einsatz eines Schlüsselausstellers beruht. Seinem Abs. [0011] zufolge ist die technische Lehre des Klagepatents vor dem Hintergrund bestimmter, ausdrücklich genannter Erkenntnissen aus dem Bereich der Kryptographie zu verstehen.

bb.   Grundlage der aus Sicht des Fachmanns vorzunehmenden Auslegung ist primär der Offenbarungsgehalt der Patentansprüche und ergänzend - im Sinne einer Auslegungshilfe - der Offenbarungsgehalt der Patentschrift, soweit dieser in den Patentansprüchen Niederschlag gefunden hat. Die Patentschrift ist dabei maßgebend für das Verstehen der Erfindung. Sie legt den Inhalt der darin verwendeten Begriffe fest und stellt damit gleichsam ihr eigenes Lexikon dar (st. Rspr.; statt vieler: BGH, GRUR 1999, 909, 912 – *Spannschraube*).

Die zur Ermittlung des Offenbarungsgehalts eines Patentanspruchs notwendige Auslegung dient dazu, die technische Lehre des Klagepatents zu erfassen, wie sie aus fachmännischer Sicht – d.h. unter Berücksichtigung des Vorverständnisses, das sich aus dem Fachwissen und Fachkönnen des von der Erfindung angesprochenen Fachmanns ergibt – mit dem Wortlaut des Anspruchs zum Ausdruck gebracht wird. Entscheidend ist damit eine funktionale Auslegung der Schutzansprüche und der darin verwendeten Begriffe, um deren technischen Sinn unter Berücksichtigung von Aufgabe und Lösung, wie sie sich objektiv aus dem Klagepatent ergeben, zu bestimmen (BGH, BeckRS 2015, 19864, Rn. 16 – *Luftkappensystem*). Maßgeblich sind insoweit der Sinngehalt eines Patentanspruchs in seiner Gesamtheit und der Beitrag, den die einzelnen Merkmale zum Leistungsergebnis der geschützten Erfindung beitragen. Aus der Funktion der einzelnen Merkmale im Kontext des Patentanspruchs ist abzuleiten, welches technische Problem diese Merkmale für sich und in ihrer Gesamtheit tatsächlich lösen (BGH, a.a.O.; GRUR 2012, 1124, 1126, Rn. 27 – *Polymerschaum*). Der

Patentanspruch bildet eine Einheit, so dass die technischen Merkmale nicht rein isoliert betrachtet und unabhängig voneinander ausgelegt werden dürfen (BGH, GRUR 2011, 129, 131, Rn. 29 – *Fentanyl-TTS*). Daher gilt es, im Rahmen der Auslegung die patentierte Erfindung einheitlich zu erfassen (BGH, GRUR 2004, 1023, 1025 – *Bodenseitige Vereinzelungseinrichtung*). Die Patentschrift ist folglich in einem sinnvollen Zusammenhang zu lesen und ihr Gesamtinhalt im Zweifel so zu verstehen, dass sich Widersprüche nicht ergeben (BGH, BeckRS 2015, 13347, Rn. 22 – *Kreuzgestänge*; GRUR 2015, 159, 161, Rn. 31 – Zugriffsrechte; GRUR 2011, 701, 703, Rn. 24 – *Okklusionsvorrichtung*).

Ergeben sich indes unauflösbare Widersprüche zwischen der technischen Lehre der Beschreibung und der technischen Lehre der Schutzansprüche, ist der Patentanspruch maßgeblich (BGH, BeckRS 2015, 13347, Rn. 22 – *Kreuzgestänge*; GRUR 2011, 701, 703, Rn. 23 a.E. – *Okklusionsvorrichtung*). Im Rahmen der Auslegung dürfen Beschreibung und Zeichnungen zudem weder zu einer inhaltlichen Erweiterung noch zu einer sachlichen Einengung des durch den Wortsinn des Patentanspruchs festgelegten Schutzgegenstandes führen (BGH, GRUR 2011, 701, 703, Rn. 23 a.E. – *Okklusionsvorrichtung*; GRUR 2010, 602, 605, Rn. 27 – *Gelenkanordnung*). Soweit sich indes die Beschreibung als Erläuterung des Gegenstands des Patentanspruchs lesen lässt, ist sie zur Bestimmung des Schutzbereichs eines Patents zu berücksichtigen (BGH, GRUR 2011, 701, 703, Rn. 23 a.E. – *Okklusionsvorrichtung*).

Als übergreifenden Gesichtspunkt hat die Auslegung schließlich neben dem Gesichtspunkt eines angemessenen Schutzes der erfinderischen Leistung das gleichgewichtig danebenstehende Gebot der Rechtssicherheit zu beachten (BGH, GRUR 2007, 1059, 1062, Rn. 25 – *Zerfallszeitmessgerät*; vgl. auch GRUR 2004, 1023, 1025 – *Bodenseitige Vereinzelungseinrichtung*).

b.   Vor diesem Hintergrund ist nach Auffassung der Kammer die Frage, ob eine WLAN-Schnittstelle den Aufbau einer anspruchsgemäßen Kurzstreckenverbindung im Sinne von Merkmalsgruppe 9.1 ermöglicht, im Ergebnis zu bejahen. Gemäß Abs. [0013] der Klagepatentschrift handelt es sich bei WLAN-Verbindungen um Kurzstreckenverbindungen im Sinne des Klagepatents. Dem angesprochenen Fachmann ist dabei bewusst, dass es sich bei dem Kürzel

„802.11" um die Bezeichnung der von der Standardisierungsorganisation IEEE verwalteten WLAN-Standardspezifikation handelt.

Die Argumentation der Beklagten, wonach der zuständige Patentprüfer im Erteilungsverfahren vor dem Europäischen Patentamt gemäß dem als Anlage EIP B4-NK6 vorgelegten E-Mail vom 06.03.2012 zu erkennen gegeben habe, dass WLAN als Kurzstreckenverbindung nicht in Betracht komme, greift aus Sicht der Kammer nicht durch. Dabei kann dahinstehen, ob die im Rahmen des Erteilungsverfahrens erfolgte Äußerung des Prüfers überhaupt als zulässiges Auslegungsmittel in Betracht kommt (für eine Berücksichtigung als einem technischen Fachlexikon vergleichbares Mittel etwa OLG Düsseldorf, GRUR-RS 2016, 11229; für eine indizielle Berücksichtigung zur Bestätigung der auf andere Gesichtspunkte gestützten Auslegung BGH, GRUR 2016, 921, Rn. 40 – *Pemetrexed*).

Das Schreiben des Prüfers vom 03.04.2012 lässt bereits seinem Inhalt nach keinen hinreichend sicheren Schluss zu, dass WLAN-Verbindungen explizit als Kurzstreckenverbindungen ausgeschlossen sind. Das Schreiben diente vielmehr als Hinweis darauf, dass die angemeldete, patentgemäße Lehre nach Ansicht des zuständigen Prüfers weder neu noch erfinderisch ist. Neuheit und erfinderische Tätigkeit könnten nur bejaht werden, wenn die Verwendung einer Kurzstreckenverbindung in den Anspruch aufgenommen würde. Lediglich am Rande wird in dem Schreiben zugleich erwähnt, dass mit dem Verwenden von „wireless LAN, Internet, etc." kein Beitrag zur Erhöhung der Sicherheit geleistet würde. Dennoch definiert das Klagepatent dann aber in Abs. [0013] seiner schlussendlich erteilten Fassung die Verwendung von WLAN als patentgemäße Kurzstreckenverbindung. Insoweit muss es nach Ansicht der Kammer daher für die Frage der Patentverletzung bei dem Grundsatz verbleiben, dass das Patent als sein eigenes Lexikon die Bedeutung der anspruchsgemäß vorausgesetzten technischen Merkmale festlegt (BGH, GRUR 1999, 909, 912 – *Spannschraube*).

c.   Die Frage, ob der geltend gemachte Patentanspruch auch das Ausstellen eines neuen Schlüssels für neue digitale Inhalte erfasst, die für eine bestehende Domain über ein dieser neu hinzugefügtes Gerät hinzuerworben wurden, ist hingegen nach Ansicht der Kammer zu verneinen. Merkmalsgruppe 9.3 setzt voraus, dass der externe Schlüsselaussteller dem zu einer bestehenden Domain

- 24 -

neu hinzutretenden Gerät einen privaten Schlüssel für bereits vorhandene digi-
tale Inhalte ausstellt. Die oben zusammengefassten Auslegungsmaßstäbe zu
Grunde gelegt ist der Schutzbereich des geltend gemachten Patentanspruchs
der Überzeugung der Kammer nach auf den Funktions- und Wirkungszusam-
menhang der Hinzufügung einer neuen Vorrichtung zu einer bestehenden Do-
main zur Nutzung bereits vorhandener Inhalte beschränkt. Ein anspruchsgemä-
ßes Gerät im Sinne des geltend gemachten Vorrichtungsanspruchs 9 muss
daher so eingerichtet und programmiert sein, dass die patentgemäß vorausge-
setzten Merkmale gerade auch in diesem spezifischen Funktions- und Wir-
kungszusammenhang verwirklicht werden. Der angesprochene Fachmann ver-
steht die dem Vorrichtungsanspruch 9 zu Grunde liegende technische Lehre
dahingehend, dass diesem eine einheitliche Erfindung zu Grunde liegt, deren
wesentlicher erfinderischer Gedanke darin besteht, für den Fall eines Hinzufü-
gens eines zusätzlichen Gerätes zu einem bestehenden Verbund an Geräten
eine einfache und zugleich sichere Möglichkeit der Geräteregistrierung bereit-
zustellen, um gerade auch über dieses neu hinzutretende Gerät bereits beste-
hende Inhalte nutzen zu können. Dieses Verständnis ist im Wortlaut des geltend
gemachten Vorrichtungsanspruchs 9 angelegt (nachfolgend lit. aa.), wird durch
die Beschreibung bestätigt (nachfolgend lit. bb.) und entspricht nicht zuletzt der
objektiven Aufgabe des Klagepatents (nachfolgend lit. cc.). Vor diesem Hinter-
grund machen die angegriffenen Ausführungsformen von der erfindungsgemä-
ßen Lehre keinen Gebrauch. Die Klägerin hat nicht dargelegt, dass die ange-
griffenen Ausführungsformen in dem patentgemäß vorausgesetzten Zweck-
und Wirkungszusammenhang der Verwendung einer neuen Vorrichtung  zur
Nutzung vorhandener digitaler Inhalte den privaten Schlüssel von dem externen
Schlüsselaussteller erhalten (nachfolgend lit. dd.).

aa.   Gemäß Merkmalsgruppe 9.3 setzt ein anspruchsgemäß ausgestaltetes Gerät
einen Logikkreis voraus, der aus Sicht des angesprochenen Fachmanns geeig-
net sein muss, die im Anspruchswortlaut ausdrücklich genannten Funktionen zu
erfüllen. Insbesondere muss der Logikkreis die über den Kommunikationskreis
gemäß Merkmalsgruppe 9.1 erhaltenen Domain-Informationen einem externen
Schlüsselaussteller weiterleiten, der sodann der neu zu registrierenden Vorrich-
tung einen in der entsprechenden Domain bereits verwendeten privaten Schlüs-
sel zur Nutzung vorhandener Inhalte ausstellt.

(1)    Im Ausgangspunkt zu Recht weist die Klägerin in diesem Zusammenhang darauf hin, dass bei einem wie hier geltend gemachten Sachpatent der Aufnahme von Zweck-, Wirkungs- und Funktionsangaben in den Patentanspruch im Regelfall keine schutzbereichsbeschränkende Wirkung zukommt, so dass es sich bei der Prüfung der Patentverletzung grundsätzlich erübrigt, Erwägungen darüber anzustellen, ob identisch vorhandene Merkmale demselben Zweck dienen und dieselbe Wirkung und Funktion haben wie diejenigen des Klagepatents, wenn eine Ausführungsform von den Merkmalen eines Vorrichtungsanspruchs in deren räumlich-körperlicher Ausgestaltung identisch Gebrauch macht (BGH, GRUR 2009, 837, 838, Rn. 15 – *Bauschalungsstütze*; BGH, GRUR 2006, 570, 573, Rn. 21 – *extracoronales Geschiebe*; BGH, GRUR 1991, 436, 441 – *Befestigungsvorrichtung II*). Gleiches gilt nach Ansicht der Kammer, wenn wie im Rahmen des vorliegenden Vorrichtungsanspruchs zugleich verfahrensbezogene Merkmale in Bezug genommen sind. Auf diesen Fall sind die zu Zweck-, Wirkungs- und Funktionsangaben entwickelten Rechtsprechungsgrundsätze entsprechend anzuwenden. Daher ist im Grundsatz davon auszugehen, dass eine in räumlich-körperlicher Hinsicht anspruchsgemäß gestaltete Vorrichtung unabhängig davon geschützt ist, in welchem Funktions- und Wirkungszusammenhang diese verwendet wird (vgl. *Loth* in Fitzner/Lutz/Bodewig, BeckOK Patentrecht, 19. Edition, Stand 15.01.2021, Rn. 290).

Keine hinlängliche Berücksichtigung findet in der von der Klägerin vertretenen Auslegung indes, dass – wie sich aus der zu Zweck-, Wirkungs- und Funktionsangaben entwickelten Rechtsprechung weiter ergibt – der durch das Klagepatent geschützte Gegenstand so ausgebildet sein muss, dass er für den im Anspruch angegebenen Zweck verwendbar ist bzw. die im Anspruch angegebene Funktion erfüllen kann (BGH, BeckRS 2008, 15268, Rn. 17 – *Tintenpatrone*; BGH, GRUR 2009, 837, 838, Rn. 15 – *Bauschalungsstütze*; BGH, BeckRS 2010, 00634, Rn. 12 – *Hundefutterbeutel*). Fordert der Patentanspruch die Eignung der geschützten Vorrichtung, einen bestimmten Vorgang ausführen zu können, und benennt er weiter ein Mittel, über das diese Eignung erreicht werden soll, ist der Patentanspruch im Zweifel dahin auszulegen, dass das Mittel dazu vorgesehen ist und dementsprechend geeignet sein muss, an dem Vorgang, wenn er ausgeführt wird, in erheblicher Weise mitzuwirken (BGH, GRUR 2020, 159, 161, Rn. 18 – *Lenkergetriebe*). Im Patentanspruch enthaltene

Zweck-, Wirkungs- oder Funktionsangaben sind daher nicht schlechthin bedeutungslos. Sie können vielmehr als Bestandteile des Patentanspruchs an dessen Aufgabe teilnehmen, den geschützten Gegenstand zu bestimmen und damit zugleich zu begrenzen, wenn sie das Vorrichtungselement, auf das sie sich beziehen, als ein solches definieren, das so ausgebildet sein muss, dass es die betreffende Funktion erfüllen kann (BGH, GRUR 2018, 395, 397, Rn. 18 – *Wasserdichter Lederschuh*; BGH, GRUR 2012, 475, 476 – *Elektronenstrahltherapiesystem*; BGH, GRUR 2006, 923, 925, Rn. 15 – *Luftabscheider für Milchsammelanlage*). Übertragen auf einen Vorrichtungsanspruch, der einen bestimmten Funktions- und Wirkungszusammenhang voraussetzende Verfahrensschritte beinhaltet, bedeutet dies, dass die Vorrichtung gerade in dem definierten Funktions- und Wirkungszusammenhang geeignet sein muss, die patentgemäß vorausgesetzten Verfahrensschritte auch in entsprechend funktionsgemäßer Weise durchzuführen.

Die Kammer vermag der Klägerin vor diesem Hintergrund nicht zu folgen, wenn sie maßgeblich aus der Eigenart des geltend gemachten Anspruchs als Vorrichtungsanspruch ableiten möchte, dass es für eine patentgemäße Ausführungsform nicht darauf ankommen soll, ob diese so gestaltet, d.h. im vorliegenden technischen Kontext so programmiert ist, im Falle der Verwendung zur Nutzung bereits erworbener digitaler Inhalte den in der bestehenden Vorrichtungsdomain des Nutzers bereits genutzten privaten Schlüssel von dem externen Schlüsselaussteller zu erhalten. Vielmehr ergibt die Auslegung, dass die Reichweite des Schutzanspruchs durch den Zweck- und Wirkungszusammenhang der Hinzufügung einer neuen Vorrichtung zur Nutzung auch von bestehenden Inhalten begrenzt ist.

(2)     Ausgehend vom Anspruchswortlaut gibt die Merkmalsgruppe 9.3 in funktionaler Hinsicht vor, dass der vorausgesetzte Logikkreis dazu dient, einem unabhängig von der Vorrichtungsdomain bestehenden, externen Schlüsselaussteller Domain-Informationen bereitzustellen. Die Bereitstellung der Domain-Informationen ist weiter durch eine dahingehende Wirkungsangabe definiert, dass hierdurch der Schlüsselaussteller dazu veranlasst wird, einen privaten Schlüssel zur Verwendung bei Zugriff auf geschützten digitalen Inhalt für das Gerät auszustellen. Dabei muss der von dem externen Schlüsselaussteller dem Gerät

ausgestellte private Schlüssel gerade auf den Domain-Informationen, die das Gerät gemäß Merkmalsgruppe 9.1 von einem in der Domain bereits vorhandenen Vorrichtung erhalten hat, basieren und von allen Vorrichtungen innerhalb der Vorrichtungsdomain verwendet werden.

Die höchstrichterlichen Vorgaben zufolge gebotene, einheitliche Betrachtung der patentgemäßen Lehre bedingt hierbei, dass vorliegend im Rahmen der Merkmalsgruppe 9.3 kein anderes Szenario als in Merkmalsgruppe 9.1 beansprucht sein kann. In beiden Merkmalsgruppen ist vorausgesetzt, dass die jeweils entscheidenden Informationen und Daten (gemäß Merkmal 9.1 die Domain-Informationen und gemäß Merkmal 9.3 der auf Grund dieser Domain-Informationen ausgestellte private Schlüssel) der Zwecksetzung der Verwendung bei Zugriff auf geschützten digitalen Inhalt dienen. Setzt aber Merkmalsgruppe 9.1 sowohl eine bestehende Domain, auf welche sich die Domain-Informationen beziehen müssen, als auch ein in der Domain erfolgendes Teilen von Rechten in Zusammenhang mit einem gemeinsamen Konto voraus, kann im Rahmen von Merkmalsgruppe 9.3 nichts anderes gelten.

Merkmalsgruppe 9.1 setzt dem Anspruchswortlaut nach ausdrücklich voraus, dass das anspruchsgemäße Gerät einen Kommunikationskreis aufweist, der dazu dient, Domain-Informationen zu empfangen, die sich auf eine Vorrichtung beziehen, die innerhalb einer Domain aus Vorrichtungen und damit einer Mehrzahl an Vorrichtungen besteht. Unabhängig von der zwischen den Parteien streitig diskutierten Frage, ob das Klagepatent zwingend einen unmittelbar von einer Vorrichtung aus der fraglichen Domain ausgehenden Sendvorgang voraussetzt, ist dem Anspruchswortlaut nach daher jedenfalls entscheidend, dass bereits eine Vorrichtungsdomain besteht. Damit geht das Klagepatent in Anspruch 9 aber davon aus, dass das patentgemäße Gerät einer bestehenden Vorrichtungsdomain hinzugefügt wird und dementsprechend für eben dieses Szenario so programmiert sein muss, um die anspruchsgemäß vorausgesetzten Funktionen erfüllen zu können.

Darüber hinaus setzt Merkmalsgruppe 9.1 voraus, dass die bereits vorhandenen Vorrichtungen Rechte in Zusammenhang mit einem gemeinsamen Konto teilen. Dies versteht der Fachmann in dem Sinne, dass bereits gemeinsam genutzte Inhalte in der Domain vorhanden sind. Denn klagepatentgemäße

- 28 -

„Rechte" beziehen sich gerade auf die in einem digitalen Rechtemanagement-system verwalteten digitalen Inhalte. Das in Zusammenhang mit einem gemein-samen Konto verlangte Teilen von Rechten ist dabei in der deutschen ebenso wie in der als Verfahrenssprache maßgeblichen englischen Sprachfassung nicht als Funktionsvorgabe formuliert, sondern wird vielmehr – wie die auch in-soweit im Indikativ erfolgte Formulierung zeigt – als bestehend vorausgesetzt.

Was damit letztlich von einem patentgemäßen Gerät zunächst empfangen und sodann dem externen Schlüsselaussteller als Grundlage der Ausstellung eines patentgemäßen privaten Schlüssels zur Verfügung gestellt werden muss, ist in den für die Zwecke der Auslegung einheitlich zu lesenden Merkmalsgruppen 9.3 und 9.1 bereits im Anspruchswortlaut definiert. In beiden Fällen geht es um Domain-Informationen betreffend eine bestehende Domain, in der bereits be-stimmte digitale Inhalte genutzt werden.

bb.    Dass hingegen der Hinzuerwerb neuer digitaler Inhalte und ein hierfür neu aus-gestellter privater Schlüssel nicht patentgemäß ist, ergibt sich für den angespro-chenen Fachmann aus der aus der Beschreibung ersichtlichen funktionalen Zielsetzung der patentgemäßen, technischen Lehre.

(1)     Abs. [0010] der Klagepatentschrift weist darauf hin, dass die Erholung von Do-main-Informationen von einer bereits in der Vorrichtungsdomain existierenden Vorrichtung unter Sicherheitsgesichtspunkten nicht ausreicht, das neue Gerät in der entsprechenden Domain zu registrieren. Vielmehr heißt es dort ausdrück-lich:

> **[0010]** (…) Security is greatly enhanced if the new device then needs to send this DRM information to a trusted server (i.e., a key issuer) to complete its enrollment into the domain. **With this approach, the key issuer can actively enforce domain enrollment and help improve security**. (…)

Zu Deutsch:

> **[0010]** (…) Die Sicherheit wird signifikant erhöht, wenn die neue Vorrichtung die DRM-Information dann an einen vertrauenswürdigen Server (d.h. einem Schlüsselaussteller) sendet, um ihre Registrierung in der Domain abzuschlie-ßen. **Auf diese Weise kann der Schlüsselaussteller die Registrierung in**

**einer Domain aktiv durchsetzen und dazu beitragen, die Sicherheit zu verbessern**. (…)

Diese funktionale Zielsetzung der erfindungsgemäßen Lehre setzt gerade voraus, dass ein digitales Rechtemanagementsystem eine Absicherung über den externen Schlüsselaussteller hinsichtlich sämtlicher Geräteregistrierungen, d.h. sowohl bei der Erstregistrierung als auch bei Folgeregistrierungen, ermöglicht. Der Zweck einer Erhöhung der Sicherheit würde hingegen nicht, jedenfalls nicht in patentgemäßer Weise erfüllt, wenn lediglich bei der Erstregistrierung eines Gerätes für einen neuen Musikdienst ein externer Schlüsselaussteller eingesetzt würde. Anderenfalls würde gerade der mit Blick auf die Rechtenutzung kritische Bereich des Hinzufügens zusätzlicher Geräte angesichts des hierdurch erweiterten Risikos unerlaubter Zugriffe auf geschützte Inhalte nicht erfasst.

(2)   Dass patentgemäß ein neues Gerät einen privaten Schlüssel für bestehende Inhalte von dem externen Schlüsselaussteller und gerade nicht im Wege des Teilens von bereits in der Domain registrierten Geräten erhalten muss, verdeutlicht überdies Abs. [0032] der Klagepatentschrift, der ausdrücklich wie folgt lautet:

> [0032] (…) If all subsequent enrollments into the family of devices are forced to use short-range communication for enrollment, the newly added device are forced to be in direct physical control of the user, resulting in more secure DRM system. Additionally, the use of the key issuer 105 greatly improves security. **For example, if a key issuer were not used then devices would need to share their DRM private keys and issue DRM certificates.** Hackers would have an easier time breaching the security of such a system since they have physical access to their devices and can tamper with the hardware to try and create false DRM certificates. (…)

Zu Deutsch:

> [0032] (…) Wenn alle nachfolgenden Registrierungen in die Familie an Geräten für die Registrierung zwingend eine Kurzstreckenverbindung nutzen, befindet sich das neu hinzugefügte Gerät gezwungenermaßen unter der physischen Kontrolle des Nutzers, was ein sichereres DRM-System zur Folge hat. Weiter erhöht der Einsatz eines Schlüsselausstellers 105 signifikant die Sicherheit. **Würde, beispielsweise, ein Schlüsselaussteller nicht eingesetzt, dann müssten die Geräte ihre privaten DRM-Schlüssel teilen und DRM-Zertifikate ausstellen.** Hacker hätten so leichteres Spiel, die Sicherheit

eines solchen Systems zu brechen, da sie physischen Zugang zu ihren Gerä-
ten haben und versuchen können, die Hardware zu manipulieren und ge-
fälschte DRM-Zertifikate zu erstellen. (…)

*[Schriftbildliche Hervorhebungen hinzugefügt.]*

Aus dieser Beschreibungsstelle erkennt der angesprochene Fachmann, dass
das Teilen der privaten Schlüssel durch die Geräte innerhalb einer Domain ge-
rade vermieden werden soll. Gerade um dies zu vermeiden, sieht das Klagepa-
tent den Einsatz eines externen Schlüsselausstellers als wortlautgemäß zwin-
genden Bestandteil eines anspruchsgemäß ausgestalteten Gerätes vor. Daher
kann eine neue Vorrichtung, die nur bei der Erstregistrierung eines neuen Mu-
sikdienstes den privaten Schlüssel von einem externen Schlüsselaussteller er-
hält, nicht aber im Falle der Registrierung in einer bestehenden Domain zur Nut-
zung der dort bereits vorhandenen Inhalte auch nicht als bloß schlechtere und
nur in geringerem Maße zur Sicherheit digitaler Inhalte beitragende Ausfüh-
rungsform eines anspruchsgemäßen Gerätes betrachtet werden. Vielmehr han-
delt es sich bei einer neu hinzugefügten Vorrichtung, die so eingerichtet ist, dass
sie die notwendigen Kennungen für bestehende Inhalte von den bereits im Do-
mainverbund registrierten Geräten und nicht von dem externen Schlüsselaus-
steller erhält, um ein außerhalb des Schutzbereichs des Klagepatents liegendes
Aliud.

(3)   Dieses Verständnis sieht der Fachmann in Abs. [0008], [0009] und [0010] des
Klagepatents bestätigt. Denn hiernach geht es der technischen Lehre des Kla-
gepatents gerade darum, einem Nutzer eine vereinfachte und zugleich sichere
Geräteregistrierung zu ermöglichen, nachdem zumindest für ein erstes Gerät
Domaininformationen bestimmt worden sind. Der Fachmann erkennt überdies
aus der Systematik der Patentbeschreibung, dass in Abs. [0008] bis [0011] die
grundlegende Funktionsweise der streitgegenständlichen technischen Lehre
dargestellt wird, bevor ab Abs. [0012] eine Beschreibung anhand der Figuren 1
bis 4 des Klagepatents erfolgt.

Dabei verkennt die Kammer nicht, dass Abs. [0008] in dessen Satz 2 von einer
bevorzugten Ausführungsform spricht und dem Grunde nach – worauf die Klä-
gerin insoweit zutreffend hinweist – gilt, dass die Auslegung eines Patents des-
sen Schutzbereich nicht auf ein bestimmtes Ausführungsbeispiel beschränken

und dadurch hinter dem Wortlaut des geltend gemachten Anspruchs zurückbleiben darf (BGH, GRUR 2004, 1023, 1024 – *Bodenseitige Vereinzelungsvorrichtung*). Denn wie ausgeführt bleibt die Auslegung bereits nicht hinter dem Anspruchswortlaut zurück. Vielmehr entspricht die Festlegung des von der Klägerin geltend gemachten Anspruchs auf den Funktions- und Wirkungszusammenhang der Nutzung bestehender digitaler Inhalte über das zu einem Verbund an Vorrichtungen neu hinzutretendes Gerät dem Wortsinn des Anspruchs ebenso wie dem funktionalen Sinn und Zweck der technischen Lehre des Klagepatents sowie dessen Beschreibung.

Dazu kommt, dass die Beschreibung in Abs. [0008] zwar im Zusammenhang mit dem Hinzufügen neuer Geräte zu einer bestehenden Domain von einer bevorzugten Ausführungsform spricht. Tatsächlich versteht der angesprochene Fachmann jedoch das Hinzufügen neuer Geräte zu einer bestehenden Domain nicht als bevorzugte Ausführungsform einer im Übrigen weiter zu verstehenden allgemeineren technischen Lehre, sondern erkennt hierin die eigentliche, dem Klagepatent zu Grunde liegende, objektive Aufgabenstellung. Soweit Abs. [0008] von einer bevorzugten Ausführungsform spricht, entnimmt der Fachmann bereits der Formulierung „*by obtaining domain information (…) from devices already in the domain that **preferably** are in close proximity*“, zu Deutsch: „*indem Domain-Informationen (…) von bereits in der Domain befindlichen Geräten empfangen werden, die sich **bevorzugter Weise** in unmittelbarer Nähe befinden*“, dass sich die als bevorzugt bezeichnete Ausgestaltung einer erfindungsgemäßen Vorrichtung gerade nicht auf das Hinzufügen eines neuen Gerätes zu einem bestehenden Domainverbund, sondern auf die unmittelbare Nähe zu einem anderen, in dem Domainverbund bereits befindlichen Gerät bezieht. Die Erholung des privaten Schlüssels von dem externen Schlüsselaussteller seitens der zu einem bestehenden Domainverbund neu hinzugefügten Vorrichtung lehrt Abs. [0008] der Klagepatentschrift dagegen als unabdingbare Voraussetzung, um die Geräteregistrierung als solche abschließen und digitale Inhalte nutzen zu können. Abs. [0009] der Klagepatentschrift bestätigt die dem Klagepatent zu Grunde liegende Aufgabenstellung, indem auf die Schwierigkeiten bei der Geräteregistrierung zusätzlicher Vorrichtungen hingewiesen wird, nachdem bereits eine Domain geschaffen wurde. Für eben dieses in Abs. [0009] nochmals ausdrücklich bestätigte Szenario der Hinzufügung einer

neuen Vorrichtung zu einem bestehenden Domainverbund, lehrt Abs. [0010] sodann, dass die Sicherheit digitaler Inhalte erheblich verbessert werden kann, wenn die neu hinzukommende Vorrichtung vor der Registrierung in der bestehenden Domain den externen Schlüsselaussteller kontaktiert.

Gleiches gilt mit Blick auf Abs. [0022] der Klagepatentschrift. Nachdem zunächst in Abs. [0021] die im Stand der Technik bestehenden technischen Probleme einer möglicherweise beschwerlichen Geräteregistrierung sowie möglicher Sicherheitsbedenken im Falle einer via Fernzugriff erfolgenden Geräteregistrierung wiederholt wurden, zeigen Zeilen 50/53 der Spalte 6 des Klagepatents als vorteilhafte Lösung auf, Geräte nur über eine Kurzstreckenverbindung in einer bereits bestehenden Domain zu registrieren. Zur Begründung verweist die Patentschrift darauf, dass eine mit einem bereits registrierten Gerät aufgebaute Kurzstreckenverbindung Gelegenheiten für mögliche Eindringlinge in die fragliche Domain verringern könnte. Vor diesem Hintergrund schlägt Abs. [0022] der Klagepatentschrift sodann vor, dass in der bevorzugten Ausführungsform neue Geräte einer bestehenden Domain hinzugefügt werden, indem Domain-Informationen von bereits in der Domain registrierten Vorrichtungen empfangen werden, welche sich bevorzugterweise in unmittelbarer Nähe befinden. Auch insoweit gilt daher, dass die grundlegende Aufgabenstellung darin liegt, ein neues Gerät einer bestehenden Domain hinzuzufügen, was in bevorzugter Weise dadurch geschieht, dass entsprechende Domain-Informationen über eine Kurzstreckenverbindung empfangen werden.

(4)  Nichts anderes ergibt sich entgegen der Klägerin aus Abs. [0019] der Klagepatentschrift. Demzufolge kann der Schlüsselaussteller aus den von dem neuen Gerät erhaltenen Domain-Informationen erkennen, ob dieses einer neuen oder einer bereits bestehenden Domain hinzugefügt wird. Für beide Konstellationen lehrt die Beschreibung sodann Folgendes:

> **[0019]** (…) Key issuer then creates a DRM certificate that contains all necessary information (e.g., the DRM public key, serial number, model number etc.) for equipment 101 to obtain rights to digital content from rights issuer 103. Key issuer 105 then send equipment 101 the DRM certificat and the DRM private key utilized by the domain.

Zu Deutsch:

- 33 -

> **[0019]** (…) Der Schlüsselaussteller erstellt dann ein DRM-Zertifikat, das alle notwendigen Informationen (z.B. den öffentlichen DRM-Schlüssel, Seriennummer, Modellnummer usw.) für die Vorrichtung 101 enthält, um die Rechte an digitalem Inhalt von dem Rechteinhaber 103 zu erhalten. Der Schlüsselaussteller 105 sendet der Vorrichtung 101 dann das DRM-Zertifikat und den von der Domain verwendeten, öffentlichen DRM-Schlüssel.

Die Lesart der Klägerin, dass diese Passage der Beschreibung ausschließlich auf die Begründung einer neuen Domain zu beziehen sei, ist nach Ansicht der Kammer nicht zutreffend. Der angesprochene Fachmann wird die Beschreibung vielmehr dahin verstehen, dass der Schlüsselaussteller in Abhängigkeit von der jeweiligen Domainaktion (Hinzufügung des Geräts zu einer neuen oder zu einer bestehenden Domain) entweder ein neues Paar an öffentlichem/privatem DRM-Schlüssel erstellt oder – im Falle der Hinzufügung zu einer bestehenden Domain – das in einer Datenbank bereits hinterlegte Schlüsselpaar heranzieht. Für beide Fälle und damit gerade auch für den Fall des Hinzufügens zu einer bestehenden Domain lehrt Abs. [0019], dass der nächste Schritt seitens des externen Schlüsselaussteller darin besteht, ein für das neu hinzugefügte Gerät spezifisches DRM-Zertifikat herzustellen und diesem zuzusenden.

Dies bedeutet indes nicht, dass der Erhalt eines neuen privaten Schlüssels von dem externen Schlüsselaussteller im Falle der Hinzufügung neuer digitaler Inhalte die Voraussetzungen der Merkmalsgruppe 9.3 des Klagepatents verwirklicht. Denn wie die im Lichte der funktionalen Zielsetzung des Klagepatents gebotene Auslegung ergeben hat, muss das neu hinzugefügte Geräte gerade für die Nutzung bereits vorhandener Inhalte den entsprechenden privaten Schlüssel von einem externen Schlüsselaussteller erhalten. Dass dies auch im Falle des Hinzufügens neuer digitaler Inhalte zu erfolgen hat, steht dem nicht entgegen, sondern entspricht allein der Tatsache, dass erfindungsgemäß ein einheitliches digitales Rechtemanagement offenbart ist, in dem über die aktive Rolle des externen Schlüsselausstellers bei der Geräteregistrierung ein einheitlicher Schutzstandard gewährleistet und ein bloßes Teilen der Rechte unter den in der Domain vorhandenen Vorrichtungen als nicht hinreichend sicher vermieden werden soll.

cc. Dass ein patentgemäßes Gerät bei dessen Registrierung in einem digitalen Rechtemanagementsystem einen privaten Schlüssel auch für bestehende

digitale Inhalte von dem externen Schlüsselaussteller erhalten muss, ergibt sich darüber hinaus in Abgrenzung zu dem in der Patentschrift in Abs. [0005] genannten Stand der Technik. Demzufolge war auf der Grundlage des von IBM im Rahmen der DVB-CPT Standardisierungsdiskussion vorgeschlagenen „xCP Cluster"-Protokolls ein digitales Rechtemanagementsystem vorgesehen, in dessen Rahmen innerhalb eines Geräteclusters vorhandene Geräte in gleichberechtigter Weise andere, hinzutretende Geräte autorisieren und diesen so Zugang zu bestehenden Rechten erlauben können. Eine solche Informationsgewinnung von Geräten aus dem Kreise der eigenen Domain bezeichnet Abs. [0010] der Klagepatentschrift indes als nicht hinreichend sicher, um ein neues Gerät in der Domain zu registrieren. Vielmehr ist es das ausdrückliche, technisch-funktionale Ziel der erfindungsgemäßen Lehre, einen externen Schlüsselaussteller einzuschalten, über den ein neu hinzutretendes Gerät einen privaten Schlüssel erhält, um sich in der bestehenden Domain zu registrieren. Ein Teilen des privaten Schlüssels innerhalb einer Domain erachtet die erfindungsgemäße Lehre gemäß Abs. [0032] der Klagepatentschrift dagegen explizit als nachteilig.

Letztlich entspricht es daher gerade der objektiven Aufgabe des Klagepatents, ein zur Nutzung bereits vorhandener digitaler Inhalte neu erworbenes Gerät so auszugestalten, dass über den Einsatz eines externen Schlüsselausstellers für sämtliche Inhalte eine hinreichende Kontrolle erfolgt, ob in der fraglichen Domain die notwendigen Nutzungsrechte tatsächlich vorhanden sind.

Im Falle des erstmaligen Hinzufügens digitaler Inhalte liegt es hingegen in der Natur der Sache, dass das fragliche Gerät die zur Nutzung notwendigen Informationen und Schlüssel von dem Musikdienstanbieter als aus Sicht der Klägerin patentgemäßem Schlüsselaussteller erhält. Der Erhalt eines privaten Schlüssels von einem externen Schlüsselaussteller zur Nutzung neuer digitaler Inhalte entsprach damit im Prioritätszeitpunkt dem Stand der Technik.

dd.   Diese Auslegung zu Grunde gelegt, kann eine Verwirklichung der Merkmalsgruppe 9.3 durch die angegriffenen Ausführungsformen im Ergebnis nicht bejaht werden. Die Klägerin hat für ihre Verletzungsargumentation die Funktionsweise der angegriffenen Ausführungsformen nicht in dem patentgemäßen

- 35 -

Funktions- und Wirkungszusammenhang der Hinzufügung einer neuen Vorrich-
tung zur Nutzung in einer Domain vorhandener digitaler Inhalte dargelegt.

(1)    Die Klägerin geht – insoweit im Einklang mit der seitens der Kammer vertrete-
nen Auslegung – davon aus, dass eine patentgemäße Ausführungsform ein neu
zu einer bestehenden Vorrichtungsdomain hinzutretendes Gerät voraussetzt
(Seite 32 der Klageschrift vom 12.06.2020 sowie Seiten 14 und 21 der Replik
vom 19.02.2021, Bl. 212, 219 d. Akte). Letztlich entspricht dies im Wege der
Auslegung gefundene Ergebnis auch der von der ursprünglichen Patentanmel-
derin Motorola LLC im Rahmen des Erteilungsverfahrens vertretenen Sicht-
weise, die damit das im Wege der Auslegung gefundene Ergebnis letztlich be-
stätigt (vgl. BGH, GRUR 2016, 921, Rn. 40 – *Pemetrexed*). In dem Schreiben
an das Europäische Patentamt vom 22.12.2011 (Anlage EIP B4-NK7) hat die
Anmelderin ausdrücklich darauf abgestellt, dass die zentralen patentgemäßen
Schritte des Empfangs von Domain-Informationen, der Bereitstellung dieser Do-
main-Informationen an einen externen Schlüsselaussteller und dem Erhalt ei-
nes privaten Schlüssels von dem Schlüsselaussteller seitens eines neuen Ge-
räts ausgeführt werden müssen („Thus, the claimed invention performs the
following steps at a new device (…) By requiring the new device to send the
domain information to a trusted key issuer (…)").

(2)    Setzt eine patentgemäße Ausführungsform aber voraus, die anspruchsgemäß
vorausgesetzten Schritte als neu zu einer Domain an Vorrichtungen hinzuge-
fügtes Gerät ausführen zu können, kann – soweit die Klägerin die Funktion
Refresh-Token gleichfalls als patentverletzend angreift – das Erneuern des „Au-
thToken" über den „Private Key" bereits im Ansatz die Voraussetzungen der
Merkmalsgruppen 9.3 und 9.1 nicht erfüllen (so aber die Klägerin auf Seite 24
der Replik vom 19.02.2021, Bl. 222 d. Akte). Denn die Erneuerung des „AuthTo-
ken" dient gerade nicht dem auch der Klägerin zufolge als patentgemäßer Funk-
tions- und Wirkungszusammenhang vorausgesetzten Hinzufügen eines neuen
Geräts zu einer bestehenden Vorrichtungsdomain. Vielmehr wird lediglich für
ein bereits registriertes Gerät ein neuer „AuthToken" erholt.

(3)    Im Übrigen hat die Klägerin den ihrer Verletzungssubsumtion zu Grunde geleg-
ten Sachvortrag auf den Funktions- und Wirkungszusammenhang beschränkt,
bei dem über einen zusätzlich zu bereits bei dem Nutzer vorhandenen Geräten

- 36 -

erworbenen Sonos-Lautsprecher ein neuer Musikdienst freigeschaltet wird (siehe etwa Seite 43 der Klage vom 12.06.2020 sowie Seite 23/24 der Replik vom 19.02.2021, Bl. 221/222 d. Akte). Nur für diesen Fall der Hinzufügung eines neuen Musikdienstes führt die Klägerin aus, dass die angegriffenen Sonos-Geräte eine Zugangskennung in Gestalt des „AuthToken" und des „Private Key" von einem externen Schlüsselaussteller erhalten.

In dem hingegen maßgeblichen, patentgemäßen Funktions- und Wirkungszusammenhang der Hinzufügung einer neuen Vorrichtung zur Nutzung vorhandener Inhalte erhält die neu hinzugefügte Vorrichtung die zur Nutzung entsprechender Inhalte erforderlichen Kennungen von den im Domainverbund bereits registrierten Geräten und gerade nicht – was patentgemäß notwendig wäre – von dem externen Schlüsselaussteller. Vielmehr – und dies stellt auch die Klägerin selbst nicht in Frage – erhalten die angegriffenen Ausführungsformen ihre Zugangskennung bei Hinzufügung einer bestehenden Vorrichtungsdomain zur Nutzung bereits vorhandener Inhalte von anderen Geräten aus dem Sonos-Haushalt. Ein solches Teilen von Zugangskennungen will das Klagepatent jedoch, wie insbesondere Abs. [0032] zeigt, gerade vermeiden. Stattdessen sieht das Klagepatent gemäß dessen Abs. [0010] eine aktive Rolle des externen Schlüsselausstellers bei der Geräteregistrierung vor.

Dem kann die Klägerin nicht mit Erfolg entgegenhalten, dass mit Blick auf die Eigenart des geltend gemachten Anspruchs als Vorrichtungsanspruch die Eignung der angegriffenen Ausführungsformen genüge, im Rahmen eines patentgemäßen Funktions- und Wirkungszusammenhangs verwendet zu werden (vgl. BGH, GRUR 2006, 570, 573, Rn. 21 – *extracoronales Geschiebe*), was nach Ansicht der Klägerin dadurch belegt sei, dass ja im Falle der Hinzufügung eines neuen Musikdienstes die Kennungen „AuthToken" und „Private Key" von dem externen Schlüsselaussteller erhalten würden. Zwar steht damit fest, dass die angegriffenen Ausführungsformen in dem Funktions- und Wirkungszusammenhang der Hinzufügung neuer Inhalte (etwa eines neuen Musikdienstes wie „Spotify" zusätzlich zu dem bereits genutzten Dienst „Apple Music") die vermeintlichen privaten Schlüssel bezüglich des neu hinzugefügten Dienstes (im hier gewählten Beispiel: „Spotify") von dem externen Schlüsselaussteller erhalten. Allerdings handelt es sich hierbei nicht um den wie dargelegten, zwingend

vorausgesetzten patentgemäßen Funktions- und Wirkungszusammenhang, der – wie ausgeführt – gerade eine neue Vorrichtung zur Nutzung vorhandener Inhalte betrifft. Für den patentgemäß vorausgesetzten Funktions- und Wirkungszusammenhang fehlt es aber bereits an einem entsprechenden Tatsachenvortrag der Klägerseite, so dass eine Verletzung hier nicht bejaht werden kann. Auf Grund des insoweit unwidersprochen gebliebenen Vortrags der Beklagten ist vielmehr davon auszugehen, dass die einem Domainverbund hinzugefügten, angegriffenen Sonos-Geräte die zur Nutzung bereits vorhandenen Inhalte erforderlichen Kennungen von den bereits in dem jeweiligen Geräteverbund vorhandenen Geräten erhalten. Daher fehlt es bei dieser, von den angegriffenen Ausführungsformen gewählten Lösung jedoch an dem patentgemäß als wesentlicher Schritt zur Verbesserung der Sicherheit digitaler Inhalte vorgesehenen Einsatz eines externen Schlüsselausstellers.

Nichts anderes ergibt sich entgegen der auf Seiten der Beklagten im Rahmen der mündlichen Verhandlung geäußerten Ansicht aus dem Urteil der Kammer vom 23.10.2020, Az. 21 O 11384/20. Die Kammer kam hier unter Anwendung der zu Wirkungs- und Funktionsangaben entwickelten und der Auslegung auch im vorliegenden Verfahren zu Grunde gelegten Rechtsprechungsgrundsätze zu dem Ergebnis, dass ein patentgemäßes Benutzerendgerät in der Lage sein musste, einen Kernnetzwerkelementbezeichner zu speichern und in anspruchsgemäßer Weise zu senden, wohingegen die Auswahl und Verbindung nach der Lehre des dortigen Klagepatents netzwerkseitig unter Auswertung des von dem Benutzerendgerät übersandten Kernnetzwerkelementbezeichners erfolgen sollte. Insoweit unterscheiden sich die Sachverhaltskonstellationen grundlegend. Denn anders als in der dem Urteil vom 23.10.2020 zu Grunde liegenden Konstellation kommt es dem hiesigen Klagepatent dessen funktionellen Vorgaben nach gerade darauf an, dass die Übermittlung des hier patentgemäßen Informationselements von einem bestimmten Sender (hier: dem externen Schlüsselaussteller) zu einem bestimmten Zweck (hier: der Nutzung vorhandener digitaler Inhalte) erfolgt.

d.      Darüber hinaus kommt die Kammer bei Anwendung der oben dargelegten Auslegungsgrundsätze zu dem Ergebnis, dass ein gemäß Merkmalsgruppe 9.3 vorausgesetzter privater Schlüssel kryptographischer Natur sein muss. Der

- 38 -

angesprochene Fachmann erkennt aus der Klagepatentschrift, dass ein patent-gemäßer privater Schlüssel von einer technischen Lehre aus dem Bereich der Kryptographie Gebrauch machen muss (nachfolgend lit. aa.). Dass es sich bei den von den angegriffenen Sonos-Geräten empfangenen Kennungen „AuthTo-ken" und „Private Key" um einen kryptographischen Schlüssel handelt, kann auf der Grundlage des von der Klägerin erfolgten Sachvortrages nicht bejaht wer-den (nachfolgend lit. bb.).

aa.    Ausgehend vom Anspruchswortlaut der Merkmalsgruppe 9.3 muss der patent-gemäß vorgesehene Logikkreis den Schlüsselaussteller dazu veranlassen, dem fraglichen Gerät, welches die Domain-Informationen an den Schlüsselaus-steller gesendet hat, einen privaten Schlüssel zur Verwendung bei Zugriff auf geschützten digitalen Inhalt auszustellen.

(1)    Ausgehend vom Anspruchswortlaut unter Berücksichtigung des in ständiger höchstrichterlicher Rechtsprechung bestätigten Grundsatzes, wonach eine Pa-tentschrift ihr eigenes Lexikon darstellt (BGH, GRUR 1999, 909, 912 – *Spann-schraube*) steht aus Sicht der Kammer fest, dass es sich bei einem patentge-mäßen privaten Schlüssel um einen kryptographischen Schlüssel handeln muss.

Dabei ist im vorliegenden Fall im besonderen Maße zu bedenken, dass die schlichte, begriffliche Übereinstimmung hinsichtlich der in den angegriffenen Ausführungsformen verwendeten Kennungen (insbesondere mit Blick auf den in Sonos-Geräten neben dem „AuthToken" verwendeten „Private Key") nicht zu der voreiligen Annahme eines patentgemäßen privaten Schlüssels (in der eng-lischen Sprachfassung: „private key") verleiten darf. Entscheidend ist vielmehr, wie der angesprochene Fachmann das patentgemäß vorgesehene Merkmal „privater Schlüssel" versteht. Die insoweit entscheidende Antwort ergibt sich aus Abs. [0011] der Klagepatentschrift. Demzufolge ist der private Schlüssel als Gegenstück zu einem im Rahmen der Public-Key Kryptographie verwendeten öffentlichen Schlüssel definiert. Dort heißt es ausdrücklich:

> **[0011]** Prior to describing the DRM system in accordance with the preferred embodiment of the present invention the following definitions are provided to set the necessary background.

> - *Public-Key Cryptography* - Cryptographic technique that uses a pair of keys, a public and a private key. The *private key* is used for either decrypting data or generating digital signatures and the *public key* is used for either encrypting data or verifying digital signatures. (…)

Zu Deutsch:

> [0011] Bevor das DRM-System in Übereinstimmung mit der bevorzugten Ausführungsform der vorliegenden Erfindung beschrieben wird, werden die nachfolgenden Definitionen dargelegt, um den notwendigen Hintergrund darzustellen.
>
> - *Public-Key Kryptographie* – Kryptographische Technik, die ein Schlüsselpaar verwendet, einen öffentlichen und einen privaten Schlüssel. Der *private Schlüssel* wird verwendet, um entweder Daten zu entschlüsseln oder digitale Signaturen zu generieren und der *öffentliche Schlüssel* wird verwendet, um entweder Daten zu verschlüsseln oder digitale Signaturen zu verifizieren. (…)

Die Argumentation der Klägerin, dass hier nicht der anspruchsgemäß vorausgesetzte private Schlüssel, sondern die Public-Key Kryptographie erläutert werde, kann bereits dem klaren Wortlaut der vorgenannten Beschreibungsstelle nach keinen Erfolg haben. Der – im Rahmen der Beschreibung durch Kursivdruck gesondert hervorgehobene – Terminus „private key" wird seiner Funktion nach explizit dahingehend beschrieben, dass es sich um ein Mittel zur Entschlüsselung von Daten oder der Erstellung einer digitalen Signatur handelt.

Gleichfalls als nicht durchgreifend erachtet die Kammer das Argument der Klägerin, wonach sich die Definition in Abs. [0011] nur auf ein besonderes Ausführungsbeispiel beziehe. Auch insoweit steht bereits der Beschreibungswortlaut entgegen. Ausdrücklich heißt es dort, dass der notwendige Hintergrund dargestellt wird. Dem angesprochenen Fachmann ist damit klar, dass den hier erläuterten Begrifflichkeiten allgemeine Bedeutung für die patentgemäße technische Lehre zukommt.

(2)   Die gebotene einheitliche Betrachtung der klagepatentgemäßen technischen Lehre zeigt vielmehr, dass die Verwendung des anspruchsgemäß vorausgesetzten privaten Schlüssels ausgehend von der in Abs. [0011] vorgegebenen allgemeinen Begriffsdefinition ausschließlich zur Entschlüsselung von Daten oder der Erstellung digitaler Signaturen gelehrt wird. So sieht etwa Abs. [0029]

- 40 -

der Klagepatentschrift vor, dass eine Vorrichtung zur Nutzung digitalen Inhalts auf den privaten Schlüssel zugreifen muss und diesen zum Entschlüsseln des zur Verschlüsselung des Inhalts verwendeten Schlüssels verwendet („*(…) and uses it [DRM private key 206] to decrypt the content encryption key from rights object 205*"). Gleiches folgt aus Abs. [0020] der Klagepatentschrift. Dagegen können nicht kryptographische Ausgestaltung des privaten Schlüssels der Beschreibung gerade nicht entnommen werden.

Dem kann die Klägerin nicht mit Erfolg entgegenhalten, dass Abs. [0020] nur ein in Unteranspruch 13 gesondert unter Schutz gestelltes Ausführungsbeispiel betreffe. Abs. [0020] der Klagepatentschrift illustriert vielmehr die kryptographische Absicherung patentgemäßer digitaler Rechtemanagementsysteme. Der Fachmann entnimmt Abs. [0020], dass die in einem klagepatentgemäßen digitalen Rechtemanagementsystem vorhandenen Rechteobjekte diesem nach Erhalt eines DRM-Zertifikats zur Verfügung gestellt worden sein mussten, auf dessen Grundlage der Rechteinhaber einer an einem digitalen Rechtemanagement beteiligten Vorrichtung das digital signierte und einen den digitalen Inhalt verschlüsselnden Verschlüsselungsschlüssel beinhaltende Rechteobjekt übersendet haben muss. Dabei weiß der Fachmann aus Abs. [0015] des Klagepatents, dass es sich bei den Rechteobjekten um die Lizenzen zur Nutzung digitaler Inhalte handelt. Die Rechteobjekte im Sinne des Klagepatents stellen damit die eigentliche, rechtliche Grundlage für digitale Rechtemanagementsysteme dar, aus denen sich Umfang und Reichweite der einem Nutzer zustehenden Befugnisse ergeben. Unter dem Gesichtspunkt der Sicherheit dem zu Grunde liegender digitaler Inhalte lehrt das Klagepatent in Abs. [0020] die als besonders vorteilhaft erachtete Lösung, einen privaten Schlüssel zur Entschlüsselung eines zweiten Verschlüsselungsschlüssels zu verwenden, um so den gewünschten digitalen Inhalt zu entschlüsseln. Folglich wird hier aus Sicht des angesprochenen Fachmanns eine zusätzliche Verschlüsselungsmöglichkeit gelehrt.

Die Kammer teilt vor diesem Hintergrund zwar die Auffassung der Klägerin insoweit, als Abs. [0020] der Klagepatentschrift die gemäß Unteranspruch 13 gesondert beanspruchte Verwendung eines Verschlüsselungsschlüssels zur Entschlüsselung digitalen Inhalts zum Gegenstand hat. Allerdings belegt dies mit Blick auf die relevante Auslegung des technischen Merkmals „privater

Schlüssel" gerade weiter, dass es sich bei einem solchen um einen kryptographischen Schlüssel handeln muss. Denn gemäß Unteranspruch 13 kann der private Schlüssel – so dessen ausdrücklicher Anspruchswortlaut – zur Entschlüsselung eines „zweiten Verschlüsselungsschlüssel" verwendet werden. Wird aber – wie ausgeführt – der private Schlüssel explizit im Sinne einer zusätzlichen Verschlüsselungsmöglichkeit ausdrücklich „zur Entschlüsselung" und damit auf kryptographische Art und Weise eingesetzt, steht für den angesprochenen Fachmann fest, dass es sich bei einem privaten Schlüssel im Sinne der patentgemäßen Lehre um einen kryptographischen Schlüssel handeln muss.

Mit Blick auf das in dem zu Grunde liegenden Hauptanspruch wortlautgleich beinhaltete Merkmal kann nichts anderes gelten. Vielmehr widerspräche es der gebotenen einheitlichen Betrachtung der patentgemäßen Lehre, wenn man einen privaten Schlüssel gemäß Unteranspruch 13 im Sinne eines kryptographischen Schlüssels verstehen, zugleich aber das jeweils mit derselben Bezugsziffer 206 gekennzeichnete, identische Merkmal des privaten Schlüssel gemäß Hauptanspruch 9 dem allgemein-sprachlichen Begriffsverständnis folgend im Sinne einer beliebig wählbaren, geheim zu haltenden alphanumerischen Zeichenfolge auslegen wollte. Dies führt auch nicht zu einer hinter dem Wortlaut des Hauptanspruchs zurückbleibenden, diesen lediglich um in einem Unteranspruch enthaltene Merkmale ergänzenden und deswegen unzulässigen Auslegung (vgl. BGH, Urt. v. 29.07.2014, Az. X ZR 5/13, BeckRS 2014, 17436, Rn. 18; OLG Düsseldorf, GRUR-RS 2021, 12120, Rn. 55 - *Behandlungsmaschine*). Vielmehr kann – wie der BGH bereits ausdrücklich entschieden hat – die Ermittlung des Sinngehalts eines Unteranspruchs grundsätzlich zur richtigen Auslegung des Hauptanspruchs beitragen (BGH, GRUR 2016, 1031, 1033, Rn. 15 – *Wärmetauscher*). Dies gilt insbesondere, wenn wie vorliegend kein additives Merkmal, sondern ein in sämtlichen Ansprüchen genanntes und als solches einheitlich bezeichnetes Merkmal auszulegen ist. Dagegen würde die Interpretation der Klägerin unter Berücksichtigung von Unteranspruch 13 im Ergebnis zu einem unzulässigen, gespaltenen Merkmalsverständnis führen.

(3)   Darüber hinaus erkennt der Fachmann aus Abs. [0033] der Klagepatentschrift, dass ein patentgemäßer privater Schlüssel kryptographischer Natur sein muss.

Dem Fachmann wird in Abs. [0033] der Klagepatentschrift offenbart, dass zur Absicherung von digitalen Rechtemanagementsystemen als Alternative zur Verwendung öffentlicher und privater Schlüssel in Public Key-Verschlüsselungssystemen auch symmetrische Schlüsseltechniken oder Broadcast Key-Verschlüsselungstechniken verwendet werden können. Insofern ist der Klägerin zuzugeben, dass die patentgemäße Lehre vor dem Hintergrund des Abs. [0033] der Klagepatentschrift nicht auf die Verwendung eines privaten Schlüssels im Rahmen eines Public Key-Verschlüsselungssystems festgelegt ist. Dem Fachmann ist aber auf Grund seines allgemeinen Fachwissens bekannt, dass es sich sowohl bei symmetrischen Schlüsseltechniken als auch Broadcast Key-Verschlüsselungstechniken um kryptographische Techniken handelt.

Hierauf hat die Beklagte in der mündlichen Verhandlung hingewiesen. Die Klägerin ist dem weder in ihrem mündlichen Vortrag noch schriftsätzlich entgegengetreten. Darüber hinaus entspricht der Vortrag der Beklagten in der mündlichen Verhandlung dem fachmännischen Begriffsverständnis. Broadcast Key-Verschlüsselungstechniken beschäftigen sich demzufolge mit der Nutzung kryptographischer Schlüssel zum Schutz bestimmter Inhalte und/oder um auf bestimmte Dienste durch eine Gruppe an Nutzern im Gegensatz zu rein bilateralen Punkt-zu-Punkt-Kommunikationsverbindungen (vgl. hierzu die Aussage des von der Klägerin im parallelen US-amerikanischen Patentverletzungsverfahren benannten Sachverständigen *Sherman* vom 08.03.2021, United States District Court Northern District of California, Az. 3:20-cv-3845, Anlage K-B 07, Seite 25). Bei symmetrischen Schlüsseltechniken wird eine bestimmte Zeichenfolge mit Hilfe eines zwischen Sender und Empfänger vereinbarten Schlüssels verschlüsselt, so dass nur der Sender und der Empfänger den Inhalt der Nachricht zur Kenntnis nehmen können. Ein insoweit einfaches Beispiel illustriert das dem Fachmann im Prioritätszeitpunkt bekannte Handbuch zur angewandten Kryptographie (*Menezes/van Oorschot/Vanstone*, „Handbook of Applied Cryptography", Juni 1996, Anlage B4). Vereinbaren Sender und Empfänger etwa einen Schlüssel „e", der die in einer Kennung oder Nachricht verwendeten Buchstaben in Gruppen zu jeweils fünf Zeichen aufteilt und die einzelnen Buchstaben in den jeweils drittnächsten Buchstaben des Alphabets umwandelt,

$$e = \begin{pmatrix} A\ B\ C\ D\ E\ F\ G\ H\ I\ J\ K\ L\ M\ N\ O\ P\ Q\ R\ S\ T\ U\ V\ W\ X\ Y\ Z \\ D\ E\ F\ G\ H\ I\ J\ K\ L\ M\ N\ O\ P\ Q\ R\ S\ T\ U\ V\ W\ X\ Y\ Z\ A\ B\ C \end{pmatrix}$$

wird beispielsweise die Nachricht „THIS CIPHER IS CERTAINLY NOT SECURE" verschlüsselt in die Zeichenfolge „WKLVF LSKHU LVFHU WDLQO BQRWV HFXUH", so dass ein Dritter ohne Kenntnis des Schlüssels zwar die Nachricht als solche sehen, inhaltlich aber ohne den entsprechenden Schlüssel nicht verstehen kann (*Menezes/van Oorschot/Vanstone*, a.a.O., Seiten 15/16). Dieses Beispiel veranschaulicht zugleich ein Grundprinzip kryptographischer Technik, der es im Wesenskern darum geht, den Inhalt einer Nachricht oder eines Kennwortes für Dritte mittels einer bestimmten Funktion (dem eigentlichen Schlüssel) unkenntlich zu machen und so sicherzustellen, dass nur autorisierte Personen Zugriff auf bestimmte Daten haben.

(4) Dass ein anspruchsgemäßer privater Schlüssel nur ein kryptographischer Schlüssel sein kann, entspricht überdies dem Verständnis des relevanten Fachmanns.

Das Klagepatent selbst (vgl. etwa Abs. [0011] der Klagepatentschrift) ebenso wie der in Abs. [0005] und Abs. [0006] der Klagepatentschrift zitierte, dem Fachmann im Prioritätszeitpunkt bekannte Stand der Technik basieren auf dem Grundkonzept der Sicherung digitaler Inhalte durch kryptographische Methoden. Überdies zählte die Verwendung kryptographischer Techniken, um digitale Inhalte gegen unerlaubte Nutzungen zu schützen, bereits im Prioritätszeitpunkt zu den insoweit bekannten und üblichen technischen Methoden (vgl. *Rosenblatt/Trippe/Mooney*, Digital Rights Management, 2002, Anlage EIP B5, Seite 89, wonach zwar nicht alle digitalen Rechtemanagementsysteme Kryptographie nutzen, es sich hierbei aber um die am nächsten mit dem digitalen Rechtemanagement assoziierte Kerntechnologie handelt). Berücksichtigt man dabei, dass der Fachmann gemäß Abs. [0002] der Klagepatentschrift dem grundlegenden Sinn und Zweck eines digitalen Rechtemanagementsystems nach dazu angehalten ist, die Sicherheit der jeweiligen digitalen Inhalte zu verbessern und das Risiko möglicher Produktpiraterie zu verringern, ist davon auszugehen, dass der Fachmann den ihm aus der Kryptographie geläufigen Fachterminus „privater Schlüssel" gerade im Zusammenhang mit der technischen Lehre des Klagepatents im technischen und nicht lediglich im

allgemeinsprachlichen Sinne versteht. Ein gegenteiliges Verständnis stünde nicht zuletzt in Widerspruch zu der patentgemäßen Aufgabe, eine zugleich einfache und sichere Geräteregistrierung in einer bestehenden Domain zu ermöglichen.

Dieses vor dem funktionalen Hintergrund der klagepatentgemäßen technischen Lehre ermittele, fachmännische Begriffsverständnis wird sowohl von dem von der Klägerin in dem vor dem US District Court Northern District of California geführten, parallelen US-amerikanischen Patentverletzungsverfahren benannten Sachverständigen *Sherman*, als auch den von der Beklagten benannten Sachverständigen *Wicker* und *Fuchs* bestätigt. Auch diesen zufolge setzt das Klagepatent einen kryptographischen Schlüssel voraus. So beantwortete der parteibenannte Sachverständige *Sherman* die Frage, ob ein privater Schlüssel im Zusammenhang des dem hiesigen Klagepatent entsprechenden Patents US 7,899,187 B2 (US'187) ein kryptographischer Schlüssel ist, mit „Ja" (Anlage K-B 07, Seite 20, Z. 11). Dagegen verneinte der Sachverständige *Sherman* die Frage, ob ein privater Schlüssel klagepatentgemäß ausschließlich zum Entschlüsseln von Daten eingesetzt werden kann, und verwies darauf, dass ein privater Schlüssel beispielsweise auch im Rahmen einer Signatursystems verwendet werden könne. Dies entspricht letztlich dem – wie ausgeführten – Verständnis aus Abs. [0011] der Klagepatentschrift, wonach private Schlüssel neben der Entschlüsselung von Daten auch zur Erstellung digitaler Signaturen verwendet werden können. Dem von der Beklagten benannten Sachverständige *Wicker* zufolge handelt es sich bei dem Begriff „privater Schlüssel" um einen im Bereich der Kryptographie geläufigen Fachterminus, das mit Blick auf das dem Klagepatent entsprechende Patent US'187 ausdrücklich aufgegriffen werde, indem die Verwendung des privaten Schlüssels gerade im Zusammenhang mit der Entschlüsselung von Daten oder der Erstellung digitaler Signaturen verwendet werde (*Wickers*, Anlage EIP B7, Seiten 40/41). Nach Ansicht des Sachverständigen *Fuchs* muss ein patentgemäßer privater Schlüssel nicht nur allgemein kryptographischer Natur sein, sondern das Gegenstück zu einem im Rahmen eines Public-Key Kryptographiesystems verwendeten öffentlichen Schlüssels darstellen (*Fuchs*, Anlage EIP B6, Seite 5).

Ein Dissens ist daher seitens der im Zusammenhang mit der Auslegung des Klagepatents konsultierten Sachverständigen nur hinsichtlich der konkreten Art der als patentgemäß in Betracht kommenden kryptographischen Techniken auszumachen. Hinsichtlich des fachmännischen Verständnisses, dass ein privater Schlüssel im Sinne des Klagepatents kryptographischer Natur sein muss, besteht indes Einigkeit.

bb.    Dieses Merkmalsverständnis zu Grunde gelegt machen die angegriffenen Ausführungsformen von dem patentgemäß vorgesehenen Merkmal eines „privaten Schlüssels" keinen Gebrauch. Die in einem Sonos-System verwendeten Kennungen „AuthToken" und „Private Key" stellen keine privaten Schlüssel im Sinne des Klagepatents dar. Die Klägerin hat nicht hinreichend dargelegt, dass von ihr als vermeintliche private Schlüssel angegriffenen Kennungen kryptographischer Natur sind. Der Vortrag, dass es sich bei den Kennungen „AuthToken" und „Private Key" jeweils um eine Reihe von Buchstaben/Ziffern in der Länge von bis zu 2048 Zeichen handele, die geheim bleiben und nicht mit Dritten geteilt werden soll, lässt die Verwendung kryptographischer Techniken nicht erkennen. Vielmehr basiert die von den angegriffenen Ausführungsformen praktizierte Authentifizierung einer Vorrichtung bei dem externen Schlüsselanbieter auf einem reinen, letztlich einem herkömmlichen Passwortsystem vergleichbaren Referenzwerteabgleich.

(1)    Die Kennungen „AuthToken" und „Private Key" können entgegen der Klägerin auch nicht allein aus dem Grund als kryptographische Schlüssel bezeichnet werden, weil diese der Authentifizierung eines Nutzers und damit einem von kryptographischen Techniken verfolgten Zweck dienen. Zwar ist es richtig, dass die Kryptographie als Technikbereich neben der Sicherstellung von Vertraulichkeit und Datenintegrität auch dem Zweck der Authentifizierung dient (vgl. *Sherman*, Anlage K-B 07; *Menezes/van Oorschot/Vanstone*, Anlage EIP B4-D11, Seite 4). Allerdings kann nicht per se jede Technik, die auch einem oder mehreren dieser Zielrichtungen dient, allein auf Grund einer gleichgerichteten Zweckrichtung als dieser Technik zugehörig betrachtet werden. Entscheidend ist vielmehr die funktionale Art und Weise, wie dieses Ziel technisch umgesetzt wird. Die hierbei eingesetzten technischen Mittel müssen daher kryptographischer Natur sein. Dies ist vorliegend indes nicht der Fall.

(2)     Die Beklagte hat – insoweit unwidersprochen – ausgeführt, dass es bei krypto-
graphischen Techniken darum geht, Klartext in Geheimtext umzuwandeln
(siehe etwa der im Stand der Technik bekannte und öffentlich verfügbare Auf-
satz von *Mäki* vom 25.05.2000 zum Thema „Security Fundamentals in Ad-hoc
Networking, Anlage EIP B4-D12, Seite 3; *Wicker*, Anlage EIP B7, Seite 27,
Rn. 86), was über das Handbuch von *Menezes/van Oorschot/Vanstone* hinaus
auch in der Stellungnahme des von der Beklagten im US-amerikanischen Pa-
rallelverfahren benannten Sachverständigen *Wicker* bestätigt wird. Dieser weist
auf Seite 26, Rn. 83, als Beispiel gerade auf das unter Ziff. I.4.d.aa.(3) bereits
erläuterte und dem Fachmann im Prioritätszeitpunkt aus dem Handbuch von
*Menezes/van Oorschot/Vanstone* geläufige Kryptographiesystem hin. In techni-
scher Hinsicht ist dabei die Verwendung einer mathematischen Funktion von
zentraler Bedeutung, welche in digitalen Rechtemanagementsystemen in Form
entsprechender Algorithmen umgesetzt werden (*Menezes/van Oorschot/Vans-
tone*, Anlage EIP B4-D11, Seite 6; *Rosenblatt/Trippe/Mooney*, Digital Rights
Management, Anlage EIP B5, Seite 90). Dies bestätigt der von der Beklagten
benannte Sachverständige *Wicker* (Anlage EIP B7, Seite 26, Rn. 85) wie folgt:

> „But the principle remained the same – the system would take plain text as an
> input, apply an algorithm, and output cryptographically secure text. The only
> way for a recipient of the secure text to discern its true meaning was to utilize
> a private key."

Zu Deutsch:

> „Das Prinzip aber blieb gleich – das System würde Klartext als Input aufneh-
> men, einen Algorithmus anwenden und kryptographisch sicheren Text ausge-
> ben. Der allein mögliche Weg für einen Empfänger des sicheren Texts, des-
> sen wahre Bedeutung zu erkennen, liegt in der Verwendung eines privaten
> Schlüssels."

Dass die Authentifizierung der angegriffenen Ausführungsformen über die Ken-
nungen „AuthToken" und „Private Key" auf der Grundlage kryptographischer
Techniken erfolgt, hat die Klägerin indes nicht dargelegt. Insbesondere ist dem
Vortrag der Klägerin keinerlei Anhaltspunkt dafür zu entnehmen, ob und gege-
benenfalls mit welcher technischen Methode diese Kennungen für Dritte mittels
einer bestimmten Funktion unkenntlich gemacht würden, um so sicherzustellen,
dass nur autorisierte Personen den gewünschten Zugriff erhalten. Ebenso

wenig ist vorgetragen, dass und gegebenenfalls wie in den angegriffenen Aus-
führungsformen ein kryptographischer Algorithmus Verwendung findet, um in
Zusammenhang mit den relevanten Kennungen Klartext in für Dritte nicht er-
kennbaren Geheimtext umzuwandeln.

(3)     Soweit die Klägerin in ihrem nicht nachgelassenen Schriftsatz vom 28.05.2021
versucht hat, substantiiert vorzutragen, dass die von den angegriffenen Ausfüh-
rungsformen verwendeten Kennungen „AuthToken" und „Private key" von ei-
nem Zufallsgenerator erzeugt würden und Eingang in einen kryptographischen
Algorithmus fänden, ist der insoweit nach Schluss der mündlichen Verhandlung
erfolgte Vortrag gemäß § 296a Satz 1 ZPO zurückzuweisen.

Die Beklagte hat bereits in der Klageerwiderung vom 03.02.2021 (dort: Seiten
24 ff.) darauf hingewiesen, dass ein patentgemäßer privater Schlüssel krypto-
graphischer Natur sein muss. Dazugehörige Nachweise und Unterlagen hat die
Beklagte bereits mit der Klageerwiderung vorgelegt (insbesondere Anlagen EIP
B3 sowie EIP B4-D11) und mit der Duplik sowie weiterer Fachliteratur und zwei
dieser anliegenden Sachverständigengutachten vertieft (insbesondere Anlagen
EIP B5, EIP B6 und EIP B7). Die Klägerin hat sich hingegen bis zur mündlichen
Verhandlung auf die Argumentation zurückgezogen, dass ein patentgemäßer
Schlüssel nicht zwingend kryptographischer Natur sein müsse. Den Vortrag,
wonach für die Authentifizierung einer Vorrichtung bei einem externen Schlüs-
seldienst die Kennungen „AuthToken" und „Private Key" vorgeblich von einem
kryptographischen Algorithmus verarbeitet würden, hätte die Klägerin ohne
Weiteres bereits im Vorfeld der mündlichen Verhandlung ausführen können,
umso mehr, als selbst der nicht nachgelassene Vortrag mit keinerlei detaillierten
technischen Erläuterungen einhergeht. Auf Grund des Bestreitens auf Seiten
der Beklagten hätte hierzu bereits vorab der mündlichen Verhandlung erkenn-
barer Anlass bestanden. Selbst im Rahmen der mündlichen Verhandlung be-
schränkte sich die Klägerin weiterhin auf ihre Auffassung, wonach es genüge,
zur Auslegung des Klagepatents zu argumentieren, dass dieses keinen krypto-
graphischen Schlüssel voraussetze. Einen Antrag auf Schriftsatznachlass hat
sie nicht gestellt.

Selbst wenn man den nachgeschobenen Vortrag zu Gunsten der Klägerin der
Sache nach berücksichtigt, ist dieser zumindest in der Sache nicht geeignet, die

- 48 -

Behauptung der Verwendung eines kryptographischen Schlüssels darzulegen. Weder die Erzeugung der Kennungen durch einen Zufallsgenerator noch der Hinweis auf die Verarbeitung der Kennungen in einem Algorithmus zur Authentifizierung einer Vorrichtung lässt einen Rückschluss auf einen kryptographischen Algorithmus zu. Dies gilt umso mehr, als sich die verspäteten Ausführungen der Klägerin auf die unsubstantiierte Behauptung beschränken, dass die Kennungen in einer nicht näher bezeichneten Art und Weise in einen nicht näher bezeichneten Header eingefügt werden. Inwieweit hierbei kryptographische Techniken angewendet werden und ein Algorithmus die zur Geräteregistrierung verwendeten Kennungen verschlüsselt, d.h. Klartext in Geheimtext umwandelt, ist nicht ersichtlich.

Wie die Auslegung zudem gezeigt hat, müsste der private Schlüssel, um als kryptographisch im Sinne des Klagepatents qualifiziert werden zu können, verwendet werden, um Daten zu entschlüsseln oder digitale Signaturen zu erzeugen (Abs. [0011] der Klagepatentschrift). Auch hierzu enthält der nachgeschobene Vortrag der Klägerin keinerlei Anhaltspunkte.

(4)   Dem kann die Klägerin nicht unter Verweis auf Seite 46 der Klage entgegenhalten, bereits an dieser Stelle dazu vorgetragen zu haben, dass die von den angegriffenen Ausführungsformen verwendeten Kennungen „AuthToken" und „Private key" kryptographische Schlüssel darstellten. Auf Seite 46 der Klage hat die Klägerin auf die von den angegriffenen Ausführungsformen verwendete Funktion „Encrypt content" hingewiesen. Nachdem der Beklagtenvertreter jedoch in der mündlichen Verhandlung erläutert hatte, dass es hierbei um eine Funktionalität gehe, die es in einem Verbund an Sonos-Geräten ermögliche, digitale Inhalte zu verschlüsseln und die nichts mit der Verwendung patentgemäßer privater Schlüssel zu tun habe, hat der Klägervertreter ausdrücklich den in der Klage erfolgten Vortrag als missverständlich eingeräumt und sich hiervon distanziert.

Ungeachtet dieses widersprüchlichen Vortrages hat die Klägerin die substantiierten Ausführungen der Beklagten zu der auf Seite 46 der Klage angeführten „Encrypt content"-Funktion jedenfalls nicht bestritten. Den Beklagtenvortrag zu Grunde gelegt ist die „Encrypt content"-Funktion somit dahingehend zu verstehen, dass diese gerade nicht den patentgemäßen privaten Schlüssel betrifft,

- 49 -

sondern eine gerätespezifische Verschlüsselung mit Blick auf einen bestimmten Mediastream ermöglicht.

(5)   Wenn die Klägerin schließlich in ihrem Schriftsatz vom 02.06.2021 aus dem von der Beklagten gemäß Anlage EIP B6 vorgelegten Gutachten des Sachverständigen *Fuchs* herleiten möchte, dass dieser in seinem Gutachten die – vermeintlich patentgemäße – Funktionsweise entsprechender Token zur Authentifizierung (Abgleich mit Referenzwert) erläutert habe, übersieht die Klägerin, dass der Sachverständige einen dahingehenden, Token-basierten Vergleich eines Wertefeldes mit einem Referenzwertefeld ausdrücklich als Beispiel einer nicht-kryptographischen Form der Authentifizierung aufführt (siehe Anlage EIP B6, Seiten 3/4, Brückenabsatz).

cc.   Auf die Frage, ob die von den angegriffenen Ausführungsformen zur Authentifizierung bei Musikdiensteanbietern verwendeten, nicht-kryptographischen Kennungen „AuthToken" und „Private Key" unter dem Gesichtspunkt der äquivalenten Benutzung eine Patentverletzung darstellen können, ist nicht näher einzugehen. Hierzu hat die Klägerin weder vorgetragen noch einen entsprechenden Antrag gestellt.

## II.

Die Nebenentscheidungen über die Kosten sowie die vorläufige Vollstreckbarkeit folgen aus §§ 91 Abs. 1 Satz 1, 709 Satz 1 ZPO.

gez.

| Pichlmaier | Dr. Schacht, M.A. | Dr. Walz |
|:---:|:---:|:---:|
| Vorsitzender Richter | Richter | Richter |
| am Landgericht | am Landgericht | am Landgericht |

Verkündet am 23.06.2021

gez.
Hofbauer, JSekr´in
Urkundsbeamtin der Geschäftsstelle



Für die Richtigkeit der Abschrift
München, 28.06.2021

Hofbauer, JSekr´in
Urkundsbeamtin der Geschäftsstelle
Durch maschinelle Bearbeitung beglaubigt
- ohne Unterschrift gültig

# EXHIBIT D

Certified Copy

## District Court Munich I

Docket No.:    21 O 16260/20

[emblem]

## IN THE NAME OF THE PEOPLE

In the legal dispute

**Google LLC**, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA,
represented by its Chief Operating Officer Sundar Pichai,

- Plaintiff -

Attorneys of Record:

**Quinn Emanuel Urquart & Sullivan, LLP**, Hermann-Sack-Straße 3, 80331 Munich,
Reference No.: 01980-00169 / 22367291.12

versus

**Sonos Inc.**, 614 Chapala Street, Santa Barbara, CA 93101, USA, represented by its
Chief Operating Officer Patrick Spence,

- Respondent -

Attorneys of Record:

**EIP Europe LLP**, Broadway Office, Breite Straße 29-31, 40213 Düsseldorf,
Reference No.: 464.LM(DE)2

for Patent Infringement,

the District Court Munich I - 21st Civil Chamber - acting through the Presiding Judge at the District Court, Pichlmaier, the Judge at the District Court, Dr. Schacht, M.A., and the Judge at the District Court, Dr. Walz, and based on the oral hearing on 04/21/2021 - pronounces the following

# Final Ruling

1.   The complaint is rejected.

2.   The Plaintiff shall cover the costs of the legal dispute.

3.   The ruling is provisionally enforceable against payment of a security in the amount of 110% of the enforceable amount.

# Case facts

The Plaintiff has sued the Respondent for cease and desist and recall from distribution channels in connection with an alleged literal infringement of the German part of the European Patent EP 1 579 621 B1 concerning a domain-based, digital rights management system with straight-forward and secure device registration.

The Plaintiff is a US-based technology corporation with a worldwide presence that has specialized in internet-related products and services. Based on the known "Google" search engine and beyond the "Android" operating system developed by the Plaintiff for end-user devices, the Plaintiff develops and markets in particular online advertising technologies, cloud computing services, and related software and hardware, such as smartphones, intelligent loudspeakers, and Wifi routers.

The Plaintiff is the owner of the German part of the European Patent EP 1 579 621 B1 as entered in the register of the German Patent and Trademark Office (hereinafter: EP'621 or patent in suit; Exhibits K-B 1 and K-B 2). The patent award annotation was published in the European patent register on 07/23/2014. The German Patent and Trademark Office lists the German part of the patent in suit under the registration number 603 46 535.8.

The German part of the patent in suit is in effect. A nullity suit filed by the Respondent in a brief dated 11/06/2020 against the German part of the patent in suit before the Federal Patent Court (Exhibit EIP B4) has not yet been decided.

Based on its subject-matter, the patent in suit substantially relates to digital rights management (DRM), in particular to a domain-based system for managing digital rights for straight-forward and secure device registration.

The only device claim 9 asserted in the complaint is worded as follows is English:

An apparatus (101) comprising:

communication circuitry (213) for receiving, over a short range link (108), domain information (209) from a device (101) existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital rights management system (100);

storage (211) for storing the domain information (209); and

logic circuitry (210) for providing the domain information (209) to a key issuer (105) which is separate from the domain of devices, causing the key issuer (105) to issue a private key (206) for use in accessing protected digital content (204) to the apparatus, wherein the private key (206) is based on the domain information (209) and is utilized by all devices (101) within the domain of devices.

The asserted device claim 9 is worded as follows in the German translation:

[bilingual]

The Respondent is likewise a US-based technology corporation specializing in the development and marketing of wireless audio systems and so-called multi-room audio systems that permit audio content to be reproduced simultaneously in several rooms of a household.

The products offered and distributed in Germany by the Respondent through its subsidiary Sonos Europe B.V. without limitation include the loudspeakers of the "Sonos" brand contested in the present complaint. As a so-called "Sonos Home Sound System", said loudspeakers have the ablty to wirelessly stream music, in particular the models "Move", "Sonos One", "Sonos One SL", "Play:5", "Beam", "Playbase", "Playbar", "Amp", "Port", "Connect", "Connect:Amp", "Play:1", "Play:3", "Sonos Arc" and "Sonos Five".

The Plaintiff believes that the contested loudspeakers of the "Sonos Home Sound Systems" are music replay devices that literally realize all technical features of the asserted device claim 9. The contested loudspeakers in particular are equipped with a Wifi interface and are therefore allegedly able to receive domain information through a short-distance connection as specified according to the patent in paragraph [0013] of the patent in suit document. The claim wording does not show that the devices linked in a domain must also be in close physical proximity, which would permit physical control by the user. The asserted main claim also does not permit a restricted interpretation of the above because dependent claim 12 would otherwise no longer have an independent scope of application.

The domain information required according to the claim includes the so-called "Household ID" used by a "Sonos Home Sound System". A "Household" is defined as a set of replay devices (or "players") within the same network of a Sonos account. The "Household ID" is in this case used to individualize and identify a household. When such a household is expanded by additional devices, the latter are allegedly assigned the identical "Household ID" from a device in the household.

As soon as new protected content, such as a new music service, is acquired through a new device added to the existing device network, the "Household ID" is allegedly used by an external content provider as part of an authentication process as specified according to the patent. The protected scope of the patent in suit is allegedly not limited to adding a new device to an existing network of devices for using already available content. The opposing view represented by the Respondent allegedly inadmissibly restricts the wording of the asserted device claims and inadmissibly restricts the protected scope of the patent in suit to a single exemplary embodiment. The referenced, relevant person skilled in the art instead understands the asserted patent claim to mean that all devices can access a joint account and can share rights associated with this account. Neither the scope of the rights nor the manner of access to protected digital content are allegedly restricted. The partial feature "rights" can therefore not be restricted to the term "rights objects".

The patent allegedly does not require that domain information is received by a device already installed in the group, and therefore by another player. The decisive aspect allegedly is that the domain information originates from a device consisting in the domain of devices, but without the information being sent by said device or also only by the domain. The word "from" allegedly does not refer to "receiving" but instead to the domain information. According to the patent, the information must then identify the domain of devices and not only an individual device. A patent infringement would have to be affirmed even if one were to follow Respondent's interpretation, whereupon the "Household ID" would need to be sent as domain information from a device from a certain domain to the newly added Sonos player. This is the case because the Sonos controller is allegedly likewise a device according to the claim.

A memory as required by the claim is allegedly contained in the contested embodiments as a standard hardware component, and moreover in the form of flash memory.

- 6 -

The contested embodiments allegedly also contain a logic circuit according to the invention. The loudspeakers in question allegedly are equipped with a microprocessor acting as a logic circuit, the latter being a contributing element that provides domain information in the form of the "Household-ID" to external providers of music streaming services such as "Spotify", "Apple Music" or "Deezer" as key issuers according to the claim. In the event of the contested - because patent-infringing - addition of a new music service, the service provider allegedly transfers a so-called "authentication token" and a so-called "private key" to the contested embodiments, the latter representing private keys according to the patent. Such private keys specifically do not require the use for encryption of digital content. The claim wording merely requires that the private key is issued "for use when accessing protected digital content". But in this regard, the use for purposes of authenticating allegedly suffices in relation to the external music service.

A private key according to the invention is allegedly not restricted to a cryptographic embodiment as cited in the specification of the patent in suit. The specification according to para. [0011] of the patent in suit document allegedly merely relates to a special exemplary embodiment. Contrary to Respondent's view, para. [0011] does not define the private key according to the claim that is used when accessing protected digital content. The wording of claim 9 is allegedly decisive in that it does not require a restriction to cryptographic technology. A private key is then allegedly a sequence of letters/figures that remain secret and are not shared with arbitrary external third parties. Moreover, the reference point for a private key is the domain information and not a specific digital content. The private key would only need to be issued "for use when accessing protected digital content" and not "for decryption" for the device. By contrast, the claim wording contains no details specifying the subject matter of the rights associated with a common account.

So that a user registered at an external service does not have to reenter his respective data for this service with every retrieval, the "authentication token" (also: "authtoken") is used, which connects the music service requested by a user to a Sonos household, and is also used for authentication when the service is retrieved. As part of the registration, the Sonos device for this purpose allegedly sends the command *getDeviceAuthToken* to the external music service, in which case the "Houshold-ID" is also sent. As soon as the external music service receives the command, the latter generates the "AuthToken" and the "Private Key" and then sends these to the

requesting Sonos device as a response. The "Private Key" is then allegedly used to to trigger the "Refresh Token" function to refresh the "AuthToken" when the latter has expired. The "AuthToken" and also the "Private Key" both represent a sequence of letters/figures having a length of up to 2048 characters. The contested embodiments and the external service providers both treat this character sequence confidentially. An infringement must therefore be affirmed even if one were to regard a cryptographic key as required according to the patent. This is the case because the "AuthToken" and the "Private Key" already represent cryptographic keys because the latter are allegedly used to authenticate a device and therefore also for a purpose intended by cryptography.

It is allegedly of no consequence for an embodiment according to the patent whether the private key already exists at the time the domain information is received or is only issued while the domain information is received. The generation of a new private key when a new music service is added by a Sonos device newly added to an existing device network is therefore allegedly included in the applicable scope of the patent in suit. The suit specifically captures the constellation contested as patent infringing by the Plaintiff, wherein a music service is already set up for the household in question and a further music service is set up by the newly added contested embodiment. The patent in suit is allegedly infringed when a new music service (e.g. Spotify) is added by a newly added Sonos player, and other music services (e.g. Deezer, Amazon Music) are already connected to the domain in question In this case, the newly added Sonos player - controlled by the Sonos controller - contacts the newly added external music service, which in turn issues the private key according to the patent in the form of the "authentication token" and the "private key", which are then received by the contested embodiment.

Even when the "AuthToken" is refreshed using the "Private key" (so-called "Refresh Token") for an already installed music service, the music service - as external key issuer - sends a new "AuthToken" to the contested embodiment, and therefore a private key according to the patent in suit.

A suspension is not indicated in the opinion of the Plaintiff. The patent in suit has legal effect. The technical teaching of patent in suit is already sufficiently differentiated from the prior art presented by the Respondent, in particular because the documents known to the person skilled in the art do not disclose of domain of devices according to the invention, and merely device-specific identifiers but not domain-specific identifiers.

The Plaintiff **moves as follows**:

I.      The Respondent is ordered

1.      for each case on an infraction, on pain of an administrative penalty to be determined by the court up to EUR 250,000.00 - alternatively administrative incarceration - or administrative incarceration up to six months, and up to a total of two years for repeat infractions, wherein the administrative incarceration shall

be enforced against the legal representatives of the Respondent, to cease and desist:

from

offering, distributing, using, or introducing or possessing devices in the Federal Republic of Germany

that comprise the following:

communication circuitry for receiving, over a short range link, domain information from a device existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital rights management system;

storage for storing the domain information; and

logic circuitry for providing the domain information to a key issuer which is separate from the domain of devices, causing the key issuer to issue a private key for use in accessing protected digital content to the apparatus, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices.

(EP 1 579 621 B1, Claim 9, direct infringement)

2. to recall from the distribution channels the products specified under Clause 1 having been distributed and in the possession of third parties,

in that those third parties who were granted possession of the products by the Respondent or with consent of the third parties, with reference to the fact that the chamber has by its ruling recognized an infringement of the patent in suit, are duly instructed to return the products to the Respondent, and in that the third parties - should they return the products - are reimbursed for any already paid purchase price along with an assumption of the return costs, and to permanently remove the aforementioned devices in that the Respondent reclaims possession of the successfully recalled products.

The Respondent **moves as follows**:

that the complaint be rejected;

alternatively,

to suspend the legal dispute until the nullity suit against the patent in suit lodged by Sonos Europe B.V. with date of November 6, 2020 before the Federal Patent Court has been decided with legal effect.

<u>The Respondent believes</u> that the contested embodiments do not infringe the patent in suit. In its infringement reasoning, the Plaintiff allegedly merges adding a Sonos player to a Sonos household and adding an external music service. These represent two processes that are independent of each other. The external communication that occurs between a contested embodiment and the service provider in question when a music service is initially installed is specifically not included in the protected scope of the patent in suit. The patent in suit is instead allegedly restricted to adding a Sonos player to an existing group of Sonos players with an already installed music service. Only in such a scenario would a domain of devices according to the patent exist. When a Sonos player is instead added to an existing network of Sonos players, said network allegedly does not receive the "AuthToken" and the "Private Key" from an external music service provider, but instead from a player already installed in the network. The above then does not realize the improved security of a DRM as functionally required according to the patent by using an external key issuer when the device is registered.

An infringement of the patent in suit is also ruled out because a Sonos player added to a Sonos household receives the "Household ID" from the Sonos controller and not from another player. According to the patent, it is required that domain information is received by a device already installed in the group, and therefore by another player. The Sonos controller from which the Sonos players receive the "Household ID" allegedly does not present a device according to the patent.

Devices added to a Sonos system allegedly receive the authentication information of a music service from a player already registered in the network. At the moment when a Sonos player is added to a domain, the latter allegedly has not yet received any rights, and is therefore unable to act as a device in the sense of the patent in suit. In this respect there is then an absence of the existence and/or parts of rights in connection with a common account, wherein rights according to the claim represent the digital description of cryptographic rights and the enabling of access to cryptographically protected content.

According to the patent it is further required that the connecting means between a newly added device and a device already installed in the domain are realized through a communications link that restricts the physical distance between the devices such that the user can physically control the devices. The Wifi connection specified by Sonos devices allegedly does not fulfill this requirement.

In the opinion of the Respondent, the contested embodiments also do not have a logic circuit according to the patent. In this respect, it must likewise be taken into account that the patent in suit is restricted to the scenario of adding a device to an existing domain of devices. The manual installation of a music service submitted by the Plaintiff as an infringement is not included in the applicable scope of the asserted claim. In a Sonos household, the "AuthToken" is allegedly shared between the registered Sonos players. Following the Respondent's reasoning, this is directly inconsistent with the technical teaching of the patent in suit, which is based on the central idea of an external key issuer independent from the domain and that specifically intends to prevent sharing authentication information between devices within a domain of devices as per the solution according to the patent.

Moreover, the private key required according to the patent would need to be a cryptographic key. The latter would need to serve the purpose of encrypting digital content. Para. [0011] of the patent in suit document expressly states that the patent in suit requires use of a private key as a counterpart to a public key for the area of public key cryptography. The relevant person skilled in the art likewise understands the term of "private key" in the cryptographic sense. Following the Respondent's reasoning, this is confirmed in the opinion of the expert witnesses *Wicker* and *Fuchs* and additionally by excerpts in the submitted industry literature. By contrast, a Sonos systems uses neither the "AuthToken" nor the "Private Key" to decrypt digital content, as required according

to the claim. Instead, the "AuthToken" is allegedly a type of "membership card" issued by a music service to a Sonos player after the user initially registered with the music service by entering their name and password using the Sonos controller. When subsequently retrieving the music service, the user is then no longer required to log in with his username and password, but can simply identify themselves with the "AuthToken". The "AuthToken" is therefore merely used like a password for authentication purposes. The "Private Key" issued under the scope of a Sonos system likewise does not represent a private key according to the patent. The "Private Key" is only required to request a new "AuthToken", for example in the event the latter expires.

Likewise, a logic circuit according to the patent requires that the contested device requests a private key for an already installed music service. This is allegedly not the case for devices added to a Sonos system because said devices receive the "AuthToken" from devices already registered in the network.

Although the "AuthToken" is requested from the external service provider when a new music service is added, the token is at this point in time specifically not yet used by the other players in the existing Sonos system. But generating a new key is not covered by the protected scope of the patent in suit. This instead requires that an already existing private key is issued to a newly registered device.

The option to replay encrypted content, as Plaintiff claims is specified in a Sonos player, has nothing to do with the use of a private key as specified in the patent in suit. In contrast to the solution according to the patent, Sonos players have an individual, device-specific private key that is therefore not domain-related. Every Sonos player generates an individual device certificate that contains a public key corresponding to the private key. The device certificate is allegedly sent to a music service, whereupon the respective Sonos player receives a device specific "Session Token" from the music service that is valid for the respective replay.

Where the Respondent alternatively moves to suspend the infringement legal dispute, the Respondent refers to the documents submitted to the Federal Patent Court in connection with the pending nullity suit, and – as claimed by the Respondent – known from the prior art to the relevant person skilled in the art. In particular the document US 2002/0166047 A1 presented as opposition D1 reportedly invalidates the technical teaching of the patent in suit as prejudicial to novelty. Para. [0041] of the latter also

discloses the partial feature of receiving domain information over a short range link. Moreover, the "Proposal for DVB Content Protection & Copy Management Technologies Version 1.0" from Nokia and presented as opposition D13 contains all features of the teaching according to the patent in suit.

The chamber held a hearing in the matter on 04/21/2021. Following the oral hearing, the Plaintiff for the first time argued in its not retroactively submitted brief dated 05/28/2021 that the identifiers "AuthToken" and "Private Key" are also used in a cryptographic algorithm. The contested embodiments are alleged to send along these identifiers to the music service in "Headers" when requesting protected digital content. In this case, the insertion into the header and corresponding authentication allegedly follows a formally specified procedure, based on which a defined task (authentication) is solved by a structured approach (inserting the key into the header and matching the key at the music service). Without knowledge of the algorithm, the result of the latter in the form of the confirmation that a message was sent by an authorized device, could not have been computed.

As amendment to the case facts, reference is made to the briefs exchanged between the party counsels and to the written record of the oral hearing on 04/21/2021.

- 14 -

# Decision reasoning

The complaint is admissible but unjustified based on the merits. The Plaintiff is not entitled to the asserted claims. Based on Plaintiff's pleadings, the chamber is ultimately unable to affirm an infringement of the patent in suit.

## I.

1.   The patent in suit relates to a domain-based digital rights management system with straight-forward and secure device registration. Digital rights management system were already fundamentally known on the priority date. These were based on recognizing the problem that digital content such as music, games, videos, images, and books can be easily copied. Pursuant to para. [0002] of the patent in suit document, the purpose and intent of digital rights management systems is to specify security measures to combat product piracy, and to protect an appropriate remuneration for owners of such digital rights. As was already known to persons skilled in the art on the priority date, corresponding security measures were to be implemented by tamper-proof electronic devices.

The patent in suit includes sharing digital contents within a domain of devices among the digital rights management systems known on the priority date. Such a device network for example uses a standardized payment method or a matching account number. When a user then pays for the one-time use of a certain work, such as a movie, by using the domain specific account data, the device is deemed to be duly authorized for the domain in question, and can subsequently make use of the desired work. However, only one device can in such a case access the desired content. As soon as one device accesses the content, access by additional devices from the respective domain is blocked (para. [0003] of the patent in suit document).

Although the patent in suit recognizes such an approach as principally advantageous, it nevertheless points out two resulting issues (para. [0004] and [0021] of the patent in suit document): Firstly, the prior art requires that all devices must be individually registered, which the patent in suit criticizes as cumbersome for the user. And secondly, a security risk is created when users

register devices in a domain by remote access over a greater distance.

The patent in suit refers to para. [0005] of the standardization proposal "IBM Response to DVB-CPT Call for Proposal for Content Protection & Copy Management: xCP Cluster Protocol" dated 10/19/2001 as proposed solutions known to persons skilled in the art from the prior art. A rights management system is described herein that gives users seamless access to digital content within and outside of their household while at the same time protecting the rights of content providers. For this purpose, the devices connected in such a home network form a standardized cluster within an encrypted domain. All devices in this cluster are equally authorized, even when these perform respectively specific functions. In this case, certain devices equipped with authorization functions can admit individual devices into the cluster, wherein they either act independently or as a representative for an external authorization center.

The US filing document US 2002/157002 likewise already known to persons skilled in the art on the priority date describes a domain-based digital rights management system (para. [0006] of the patent in suit document). One or several devices are in this case assigned to a domain, and share a common cryptographic key used by the domain. A device is registered and deregistered by a designated domain authority ("*domain authority*") in conjunction with a DRM module installed in the device.

Corresponding digital rights management systems known from the prior art represent an advantageous enhancement from the aspect of user-friendliness. This is the case because the cluster-based and also the domain-based device registrations give users the ability to register devices in a simplified manner in the environment of a digital rights management system, since users are only required to enter a domain-specific registration instead of having to enter device-specific information for each device used. The patent in suit further identifies as disadvantageous the effort users are required to expend to register each device by entering the domain-specific information into the respective domain (para. [0021] of the patent in suit document). The patent in suit likewise criticizes the prior art based on security aspects because devices over which the user does not have immediate physical control can in this manner also be easily registered for common rights usage (para. [0008] of the patent in suit document). The patent in

- 16 -

suit expresses related security concerns in particular when devices are registered over the Internet or by email (para. [0031] of the patent in suit document).

2. The patent in suit moves beyond this prior art pursuant to para. [0008] of the patent in suit document in that a method and a device for a digital rights management system is disclosed that provides a simple – because it is domain-based – and at the same time secure registration of devices. According to the patent in suit, it is in this case preferable when the device to be registered is in the immediate proximity of the devices already installed in the domain.

The patent in suit intends to achieve a further simplification of the device registration given the background that users find it cumbersome to remember and yet again enter previously determined domain information such as the domain name and the domain password when new devices are added to an existing DRM domain. Pursuant to para. [0009] of the patent in suit document, there are two constellations deemed to be particularly difficult for registering devices: Firstly, after an extended time has expired since the first device was registered, and secondly when registering devices with limited user interfaces. A simplified device registration pursuant to para. [0010] therefore specifies that the relevant DRM information is received by a device already registered in the existing domain.

But the patent in suit's criticism of this simplified registration by receiving the DRM information from a device already registered in the domain is that this method does not sufficiently protect digital content (para. [0010]). As a measure to improve security, the patent in suit therefore proposes employing a key issuer to complete the device registration. According to para. [0010] of the patent in suit document, the key issuer can actively enforce the device registration, thus increasing security. Security is to be further increased in that the newly registered device can only see DRM information from the existing domain over a short range link (para. [0010]).

The referenced person skilled in the art therefore reads para. [0008] to [0010] of the patent in suit document and likewise reads para. [0022] and [0023] along with para. [0031] and [0032] of the patent in suit document to the effect that the security of digital content is firstly protected in that domain

information is received over a short range link, and secondly in that a key issuer is used. The person skilled in the art in this case recognizes the significance of using a key issuer in that the devices would otherwise – that is to say when a key issuer is not used – be required to share private DRM keys and would need to issue DRM certificates (para. [0032] of the patent in suit document).

3.  Given this background, and taking into account the prior art underlying the patent in suit, the patent in suit intends to provide a domain-based, digital rights management system that allows adding new devices in a simple yet secure manner.

As a solution for this task, the patent in suit proposes a device with the device claim 9 asserted in the complaint, said device having three central elements in the form of a communication circuit, a storage device, and a logic circuit. In detail, the asserted device claim can be structured as follows. The chamber in this case refers to the Plaintiff's feature breakdown since the latter is directly based on the claim wording primarily decisive for the interpretation:

| 9 | An apparatus comprising: |
|---|---|
| 9.1 | communication circuitry (213) for receiving, over a short range link (108), domain information (209) from a device (101) existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital rights management system (100); |
| 9.2 | storage (211) for storing the domain information (209); and |
| 9.3 | logic circuitry (210) for providing the domain information (209) to a key issuer (105) which is separate from the domain of devices, causing the key issuer (105) to issue a private key (206) for use in accessing protected digital content (204) to the apparatus, |
| 9.3.1 | wherein the private key (206) is based on the domain information (209) and |
| 9.3.2 | is utilized by all devices (101) within the domain of devices. |

4.  The asserted claim therefore teaches a device substantially composed of three elements, by which digital content such as music, movies, books, etc. can be

- 18 -

accessed through a digital rights management system. The individual elements of a device according to the claim are each described in detail in functional terms. Figure 1 of the patent in suit illustrates the role of a device (101) according to the claim under the scope of a digital rights management system (100) according to the patent in suit:



**FIG. 1**

- 19 -

Devices (101) according to the claim for using digital contents of a right owner (103) without limitation in particular include computers and telephones, that can for example play music using an MP3 player installed therein (para. [0012] of the patent in suit document). Other elements of a rights management system according to the invention include a key issuer (105), a network (107), and a short range link (108). The communication between a device according to the claim and the rights owner (103) in this case occurs over the network (107), which according to the patent can for example be a mobile network, a Local Area Network (LAN) or a Wide Area Network (WAN) (para. [0016] of the patent in suit document). According to the claim, the devices used by the user by contrast communicate with each other over a short range link (108), in order to reduce the risk of hacker attacks based on the associated physical proximity of the devices and the resulting better controllability (para. [0010], [0013] and [0022] of the patent in suit document).

According to the patent in suit, the security of a rights management system is to be further improved by using a key issuer (105). According to para. [0014] of the patent in suit document, the key issuer is an application that facilitates authenticated communication with user devices and makes a DRM certificate and a private DRM key available to said user devices. Authenticated communication occurs on the basis of a so-called challenge-response protocol based on which a device certificate (207) installed by the device manufacturer and the domain information (209) are exchanged. The DRM certificate (202) then issued on this basis by the key issuer includes the device specific identifier, such as a serial or model number specifically assigned to the device along with a public DRM key and a digital signature generated by the key issuer (para. [0015] of the patent in suit document). The private DRM key (206) corresponding to the public DRM key is securely stored in the storage (211) of the device (101). Figure 2 of the patent in suit illustrates the three elements described in the asserted patent claim of a device (101) according to the patent as follows:



# FIG. 2

5.     The features groups 9.1 and 9.3 contested between the parties require a more detailed review. From the chamber's vantage point, the following issues disputed between the parties are of central significance in this case:

-   Firstly, the issue of whether the Wifi interface present in the contested embodiments permits establishing a short range link according to the patent (feature group 9.1);

-   Secondly, the issue of whether the asserted patent claim also captures issuing a new key for new digital content that was additionally acquired for an existing domain through a device newly added to said domain (feature group 9.3); and

-   Thirdly, the issue of whether a private key according to the patent must be formed, in particular whether such a private key must be of cryptographic nature (feature group 9.3).

a.     The following legal test applies for the interpretation:

aa.    The objective of interpreting the asserted patent claim is to determine its content meaning from the vantage point of the average person skilled in the art on the priority date, as referenced by the patent in the present dispute. In the opinion of the chamber, a relevant person skilled in the art in the present case is a university graduate (Diplom or Master's Degree) with subject-matter focus on information technology, having knowledge in the field of cryptography and

multi-year experience in the area of developing digital rights management systems (see BPatG, ruling dated 10/24/2017, docket no. 23 W (pat) 24/17, BeckRS 2017, 133838).

The technical subject-matter of the patent in this dispute is decisive for determining the relevant person skilled in the art. The patent in suit relates to a computer-based digital rights management system that is therefore typically developed by graduates with subject-matter focus on information technology (see e.g. para. [0012] and [0021] of the patent in suit document), which - as stated - is based in a central aspect on the use of a key issuer. Based on its para. [0011], the technical teaching of the patent in suit must be interpreted against the background of certain expressly referenced knowledge related to the field of cryptography.

bb.   The basis for the interpretation to be performed from the vantage point of a person skilled in the art is primarily the disclosed content of the patent claims, and additionally - in the sense of an interpretation aid - the disclosed content of the patent document, to the extent such content is reflected in the patent claims. The patent document is in this case decisive for understanding the invention. It determines the contents of the terms used therein, and therefore also represents its own glossary (consistently corroborated precedent; representative for many: BGH, GRUR 1999, 909, 912 – *Tensioning Screw*).

The interpretation required to determine the disclosed content of a patent claim is intended to capture the technical teaching of the patent in suit, as expressed by the wording of the claim from the vantage point of a person skilled in the art - e.g. by taking into account prior knowledge that results from the subject matter knowledge and the subject matter skills of the person skilled in the art referenced by the invention. The key is then a functional interpretation of the protected claims and the terminology used therein with the intent of determining their technical meaning, taking into account the task and solution, as objectively defined in the patent in suit (BGH, BeckRS 2015, 19864, MN 16 – *Air Damper System*). In this regard, the content meaning of a patent claim in its entirety and the contribution made by the individual features to the performance result of the protected invention are then decisive. What technical problem these features actually solve by themselves and in their totality is derived from the function of the individual

- 22 -

features in the context of the patent claim (BGH, location cited; GRUR 2012, 1124, 1126, MN 27 – *Polymer Foam*). The patent claim forms a unit; as a result, the technical features cannot be seen strictly in isolation and must not be interpreted independently from each other (BGH, GRUR 2011, 129, 131, MN 29 – *Fentanyl-TTS*). It is therefore imperative that the patented invention is captured in a consistent manner (BGH, GRUR 2004, 1023, 1025 – *Floorside Isolation Device*). The patent document must consequently be read in a meaningful context, and its total content must in doubt be understood such that inconsistencies do not arise (BGH, BeckRS 2015, 13347, MN 22 – *Cross Rods*; GRUR 2015, 159, 161, MN 31 – *Access Rights*; GRUR 2011, 701, 703, MN 24 – *Occlusion Device*).

But if unresolvable inconsistencies result between the technical teaching of the specification and the technical teaching in the protected claims, the patent claim has priority (BGH, BeckRS 2015, 13347, MN 22 – *Cross Rods*; GRUR 2011, 701, 703, MN 23 opposing view – *Occlusion Device*). For purposes of the interpretation, the specification and drawings must also neither result in a content expansion nor in a subject matter restriction of the protected scope determined by the literal meaning of the patent claim (BGH, GRUR 2011, 701, 703, MN 23 opposing view – *Occlusion Device*; GRUR 2010, 602, 605, MN 27 – *Articulated Joint Arrangement*). However, where the specification can be read as an annotation of the subject matter of the patent claim, it must be taken into consideration when determining the protected scope of a patent (BGH, GRUR 2011, 701, 703, MN 23 opposing view – *Occlusion Device*).

As an overarching aspect, the interpretation must finally - in addition to the aspect of appropriate protection of the inventive step - also observe the equally weighted mandate of legal certainty (BGH, GRUR 2007, 1059, 1062, MN 25 – *Decomposition Time Measurement Device*; also refer to GRUR 2004, 1023, 1025 – *Floorside Isolation Device*).

b.  Given this background, the issue of whether a Wifi interface allows establishing a short range link according to the invention in the sense of feature group 9.1 must be affirmed in the opinion of the chamber. Pursuant to para. [0013] of the patent in suit document, Wifi links are short range links in the sense of the patent in suit. The referenced person skilled in the art is in this case aware that the abbreviation

"802.11" is an identifier of the Wifi standard specification managed by the IEEE standardization organization.

In the opinion of the chamber, the Respondent's reasoning whereupon the designated patent reviewer during the award proceedings before the European Patent Office stated in the email dated 03/06/2012 (submitted as Exhibit EIP B4-NK6) that Wifis are not classified as short range links fails to compel. It can in this case be disregarded whether the reviewer's statement made during the award proceedings is even an admissible means for interpretation (see e.g. OLG Düsseldorf, GRUR-RS 2016, 11229 for consideration as means comparable to a technical dictionary; see BGH, GRUR 2016, 921, MN40 – *Pemetrexed* for an indicative consideration to confirm an interpretation based on other aspects).

Already based on its content, the reviewer's letter dated 04/03/2012 does not permit a sufficiently reliable conclusion that Wifi connections are explicitly ruled out as short range links. Instead, the letter is more readily an indication that the teaching according to the patent is neither new nor inventive in the opinion of the designated reviewer. Novelty and an inventive step can only be affirmed when use of a short range link were to be incorporated into the claim. The letter at the same time only mentions peripherally that the use of "wireless, Internet, etc." makes no contribution towards increasing security. But then in para. [0013], the patent in suit nevertheless defines in its final, awarded version the use of Wifi as a short range link according to the patent. In the opinion of the chamber, the patent infringement test must in this regard remain true to the principle that the patent – as its own glossary – determines the meaning of the technical features required according to the claim (BGH, GRUR 1999, 909, 912 – *Tensioning Screw*).

c.     By contrast, the test of whether the asserted patent claim also captures issuing a new key for new digital content additionally acquired for an existing domain using a device newly added to said domain must fail in the opinion of the chamber. Feature group 9.3 requires that the external key issuer issues a private key for already existing digital content to a device newly added to an existing domain. Referencing the interpretation standards summarized above, the protected scope of the asserted patent claim is in the opinion of the chamber based on the functional and causal context limited to adding a new device to an existing

domain for use of already existing content. A device according to the claim in the sense of the asserted device claim 9 must therefore be installed and programmed such that the features required according to the patent are in particular also realized in this specific functional and causal context. The referenced person skilled in the art understands the technical teaching underlying the device claim 9 to the effect that the technical teaching is based on a consistent invention whose significant inventive step is that when an additional device is added to an existing device network, a simple yet secure option for device registration is provided for the purpose of using already existing content in particular also using this newly added device. This understanding is embedded in the wording of the asserted device claim 9 (letter aa. below), is confirmed by the specification (letter bb. below), and last but not least corresponds to the objective task of the patent in suit (letter cc. below). Given this background, the contested embodiments make no use of the teaching according to the invention. The Plaintiff failed to show that the contested embodiments receive the private key from the external key issuer in the functional and causal context of using a new device for using existing digital content, as required according to the patent (letter dd. below).

aa.  Based on feature group 9.3, a device formed according to the claim requires a logic circuit that in the opinion of the referenced person skilled in the art must be suited to fulfill the functions expressly cited in the claim wording. In particular, the logic circuit must forward the domain information received according to feature group 9.1 over the communication circuit to an external key issuer, which then issues to the device to be newly registered a private key already used in the corresponding domain for use of existing content.

- 25 -

(1)    From its point of origin, the Plaintiff rightly points out in this context that for a product patent - as asserted here - including details on purpose, effect, and function into the patent claim generally does not restrict the protected scope. As a result, the patent infringement test can principally waive any review about whether identically present features serve the same purpose and have the same effect and function as those of the patent in suit when an embodiment of the features of a device claim makes identical use in its spatial-physical embodiment (BGH, GRUR 2009, 837, 838, MN 15 – *Construction Form Brace*; BGH, GRUR 2006, 570, 573, MN 21 – *Extracoroneal Sliding Arrangement*; BGH, GRUR 1991, 436, 441 – *Mounting Device II*). In the opinion of the chamber, the same applies when the device claim in question here at the same time references method-related features. The principles developed in the precedent must in this case be applied accordingly to details on purpose, effect, and function. It is therefore principally assumed that a device formed in spatial-physical terms according to the claim is protected regardless of the functional and causal context in which it is used (see *Loth* in Fitzner/Lutz/Bodewig, BeckOK Patent Law, 19th Edition, Rev. date: 01/15/2021, MN 290).

By contrast, no due consideration is given to the interpretation advanced by the Plaintiff that - as is further corroborated in the precedent developed in regards to details on purpose, effect, and function - the subject matter protected by the patent in suit must be formed such that it can be used for the purpose stated in the claim and/or can fulfill the purpose stated in the claim (BGH, BeckRS 2008, 15268, MN 17 – *Ink Cartridge*; BGH, GRUR 2009, 837, 838, MN 15 – *Construction Form Brace*; BGH, BeckRS 2010, 00634, MN 12 – *Dog Food Bag*). If the patent claim requires the capacity of the protected device to perform a certain action, and the claim specifies further means by which this capacity is to be achieved, the patent claim must in case of doubt be interpreted to the effect that the means is specified for this purpose and must be appropriately suited to substantially contribute toward the action when it is performed (BGH, GRUR 2020, 159, 161, MN 18 – *Steering Box*). Details on purpose, effect, and function stated in the patent claim are therefore not meaningless per se. They can instead participate as elements in the task of the patent claim to determine, and at the same time limit, the protected subject matter when they define the device element to which they refer as such, the device element having to be formed such that it can perform the

relevant function (BGH, GRUR 2018, 395, 397, MN 18 – *Water-tight Leather Shoe*; BGH, GRUR 2012, 475, 476 – *Electron Ray Therapy System*; BGH, GRUR 2006, 923, 925, MN 15 – *Air Separator for Milk Collection Plant*). Applied to a device claim that includes method steps requiring a certain functional and causal context, this means that the device must be specifically suited in the defined functional and causal context to also perform the methods steps required according to the patent in the manner according to the function.

Given this background, the chamber is unable to follow the Plaintiff when it intends to derive from the nature of the asserted claims as a device claim that it is of no consequence for an embodiment according to the patent whether the latter is formed - e.g. is programmed in the technical context here - to receive from the external key issuer the private key already used in the user's existing device domain when using digital content already acquired for use. The interpretation instead concludes that the reach of the protected claim is limited by the functional and causal context of adding a new device for the purpose of also using existing content.

(2)    Starting with the claim wording, the feature group 9.3 functionally specifies that the required logic circuit is intended to provide domain information to an external key issuer independent of the device domain. The provision of domain information is further defined by a specified effect that causes the key issuer to issue a private key for the device for use when accessing protected digital content. In this case, the private key issued to the device by the external key issuer must in particular be based on the domain information the equipment received according to feature group 9.1 from a device already existing in the domain, and must be used by all devices within the device domain.

In keeping with the consistent analysis of the teaching according to the patent as imposed by Supreme Court mandate, it is in the present case necessary that the scope of feature group 9.3 cannot claim a different scenario than that in feature group 9.1. Both feature groups require that the respectively decisive information and data (the domain information pursuant to feature 9.1 and the private key issued based on this domain information pursuant to feature 9.3) are designated for the purpose of using these when accessing protected digital content. But when feature group 9.1 requires both an existing domain to which

the domain information must relate, and also sharing of rights in the domain in the context of a common account, nothing else can apply under the scope of feature group 9.3.

According to the claim wording, feature group 9.1 expressly requires that the device according to the claim has a communication circuit for the purpose of receiving domain information that relates to a device, the device existing within a domain comprised of devices, and therefore of a plurality of devices. Irrespective of the issue disputed between the party as to whether the patent in suit necessarily requires a transmission action immediately originating from a device of the domain in question, it is therefore in any case decisive according to the claim wording that a device domain already exists. But in claim 9, the patent in suit therefore assumes that the device according to the patent is added to an existing device domain and must be programmed precisely for this scenario such that it can fulfill the functions required according to the claim.

Moreover, feature group 9.1 requires that the already existing devices share rights in connection with a common account. The person skilled in the art understands this in the sense that the domain already contains content available for shared use. This is the case because "rights" according to the patent in suit specifically relate to digital content managed in a digital rights management system. The sharing of rights required in connection with a common account is in this case – both in the German and likewise also in the English language version decisive as the filing language – not formulated as a functional specification, but is instead presumed as a prerequisite, as also shown in the indicative formulation.

What must then ultimately be firstly received by a device according to the patent and subsequently provided to the external key issuer as a basis for issuing a private key according to the patent is already defined in the claim wording for purposes of interpreting the feature groups 9.3 and 9.1, which need to be read consistently. Both cases concern domain information related to an existing domain, wherein already determined digital content is used.

bb.    The referenced person skilled in the art by contrast determines that the additional acquisition of new digital content and a new private key issued for

this purpose is not in accordance with the patent from the functional objective of the technical teaching according to the patent, as seen in the specification.

(1)   Para. [0010] of the patent in suit document notes that obtaining domain information from a device already existing in the device domain is inadequate from a security aspect to register the new device in the corresponding domain. It is instead expressly stated therein:

> [0010] (…) Security is greatly enhanced if the new device then needs to send this DRM information to a trusted server (i.e., a key issuer) to complete its enrollment into the domain. **With this approach, the key issuer can actively enforce domain enrollment and help improve security**. (…)

In German:

> [bilingual]

This functional objective of the teaching according to the invention specifically requires that a digital rights management system facilitates safeguarding through the external key issuer in regards to all device registrations, that is to say for the initial registration and also for subsequent registrations. The purpose of improving security would by contrast not be achieved – at least not in a manner according to the patent – when an external key issuer were only to be used for the initial registration of a device for a new music service. The functionality of adding additional devices critical with regard to rights usage - given the resulting elevated risk of unauthorized access to protected content - would otherwise specifically not be captured.

(2)   That according to the patent, a new device must receive a private key for existing content from the external key issuer and specifically not by way of sharing by devices already registered in the domain is additionally emphasized in para. [0032] of the patent in suit document, which expressly states as follows:

> [0032] (…) If all subsequent enrollments into the family of devices are forced to use short-range communication for enrollment, the newly added device are forced to be in direct physical control of the user, resulting in more secure DRM system. Additionally, the use of the key issuer 105 greatly improves security. **For example, if a key issuer were not used then devices would need to share their DRM private keys and issue DRM certificates.** Hackers

would have an easier time breaching the security of such a system since they have physical access to their devices and can tamper with the hardware to try and create false DRM certificates. (…)

In German:

**[bilingual]**

*[highlights in the text font added]*

From this location in the specification, the referenced person skilled in the art recognizes that sharing the private key between devices within the domain is to be specifically avoided. Specifically in order to avoid this, the patent in suit specifies the use of an external key issuer as a mandatory element according to the wording of a device formed according to the claim. A new device that only receives the private key from an external key issuer when a new music service is initially registered, but not for a registration in an existing domain for use of contents already existing therein, can therefore not also be regarded as a merely inferior embodiment of a device according to the claim that only makes a minor contribution toward the security of digital content. Instead, a newly added device that is formed such that it receives the identifiers required for existing content from devices already registered in the domain network and not from the external key issuer therefore represents a product outside of the protected scope of the patent in suit.

(3)    The person skilled in the art sees this understanding confirmed in para. [0008], [0009] and [0010] of the patent in suit. This is the case because the technical teaching of the patent in suit in the above specifically intends to give users a simplified yet secure option for device registration, after domain information is determined for at least one first device. The person skilled in the art also determines from the purposeful approach in the patent specification that para. [0008] to [0011] show the basic functionality of the technical teaching in the present dispute, before being followed by a specification based on Figures 1 to 4 of the patent in suit starting at para. [0012].

The chamber in this case does not fail to acknowledge that para. [0008] speaks of a preferred embodiment in its sentence 2, and it is valid per se - as accurately pointed out by the Plaintiff - that the interpretation of a patent cannot restrict

the protected scope of the patent to a certain embodiment, and as a result cannot fall short of the wording of the asserted claim (BGH, GRUR 2004, 1023, 1024 – *Floorside Isolation Device*). This is the case because as stated, the interpretation already does not fall short of the claim wording. Instead, the determination made by the claim asserted by the Plaintiff for the functional and causal context of using existing digital content for a new device added to a network of devices corresponds to the meaning of the claim wording and matches the functional intent and purpose of the technical teaching of the patent in suit and its specification.

Moreover, although the specification in para. [0008] speaks of a preferred embodiment in connection with adding new devices to an existing domain, the referenced person skilled in the art however does not understand adding new devices to an existing domain as a preferred embodiment of an otherwise expanded understanding of a general technical teaching, but instead herein recognizes the objective task underlying the patent in suit. Where para. [0008] speaks of a preferred embodiment, the person skilled in the art already determines from the formulation "*by obtaining domain information (…) from devices already in the domain that **preferably** are in close proximity*", in German: *[bilingual]*, that the embodiment of a device according to the invention labeled as preferred specifically does not refer to adding a new device to an existing domain network, but to the immediate proximity to another device already installed in the domain network. Obtaining the private key from the external key issuer by the new device added to an existing domain network is by contrast taught in para. [0008] of the patent in suit document as a mandatory condition for completing the device registration as such and to make use of digital content. Para. [0009] of the patent in suit document confirms the task underlying the patent in suit in that reference is made to the difficulties of additional apparatuses for device registration after a domain was already created. For this scenario yet again expressly confirmed in para. [0009] of adding a new device to an existing domain network, para. [0010] then teaches that the security of digital content can be significantly improved when the newly added device contacts the external key issuer prior to registering in the existing domain.

The same applies in view of para. [0022] of the patent in suit document. After

first repeating in para. [0021] the technical problems presented in the prior art of a potentially cumbersome device registration and potential security concerns when a device is registered by remote access, lines 50/53 in column 6 of the patent in suit then present as an advantageous solution to only register devices in an already existing domain over a short range link. The patent document cites as reasoning that a short range link established to an already registered device can reduce opportunities for unauthorized access into the domain in question. Given this background, para. [0022] of the patent in suit document then proposes that the preferred embodiment allows new devices to be added to an existing domain in that domain information is received from devices already registered in the domain that are also preferably in the immediate proximity. Also in this regard, the underlying task is then to add a new device to an existing domain, which is preferably accomplished by receiving the corresponding domain information over a short range link.

(4)     Contrary to Plaintiff, nothing else is derived from para. [0019] of the patent in suit document. Accordingly, the key issuer can determine from the domain information received from the new device whether the latter is added to a new, or already existing, domain. The specification then teaches as follows for both constellations:

> **[0019]** (…) Key issuer then creates a DRM certificate that contains all necessary information (e.g., the DRM public key, serial number, model number etc.) for equipment 101 to obtain rights to digital content from rights issuer 103. Key issuer 105 then send equipment 101 the DRM certificate and the DRM private key utilized by the domain.

In German:
     **[bilingual]**

The Plaintiff's manner of interpretation that this passage of the specification exclusively relates to the origination of a new domain does not apply in the opinion of the chamber. The referenced person skilled in the art will instead understand the specification to the effect that the key issuer will - depending on the respective domain action (adding the device to a new or to an existing domain) - either generate a new pair of public/private DRM keys, or reference the key pair already stored in a database when adding to an existing domain. In

both cases, and therefore specifically also for the case of adding to an existing domain, para. [0019] teaches that the next step by the external key issuer is to generate a DRM certificate specific for the newly added device, and return said DRM certificate to the latter.

But this does not mean that receiving the new private key from the external key issuer meets the conditions of the feature group 9.3 of the patent in suit when new digital content is added. As shown by the interpretation expedient in light of the functional objective of the patent in suit, the newly added device must receive the corresponding private key from an external key issuer, specifically for using already existing content. That this must also happen when adding new digital content does not override the above, but instead only corresponds to the fact that the invention discloses a consistent digital rights management system, wherein the active role of the key issuer ensures a consistent protection standard for device registration, and merely sharing the rights among the devices present in the domain is to be avoided as being insufficiently secure.

cc.   That a device according to the patent must - when it is registered in a digital rights management system - receive a private key from the external key issuer also for existing digital content is likewise derived from the differentiation to the prior art cited in the patent document in para. [0005]. According to the above, a digital rights management system was specified on the basis of the "xCP CLuster" protocol proposed by IBM during the DVB-CPT standardization discussion, wherein devices present within a device cluster are equally eligible to authorize joining devices and to give these access to existing rights in this manner. But para. [0010] of the patent in suit document labels such a manner of obtaining information from devices within the group of the own domain as insufficiently secure to register a new device in the domain. It is instead the express technical-functional objective of the teaching according to the invention to involve an external key issuer through which a newly added device obtains a private key to register in the existing domain. By contrast, the teaching according to the invention pursuant to para. [0032] of the patent in suit document regards sharing the private key within the domain as explicitly disadvantageous.

Lastly, it is therefore specifically the objective task of the patent in suit to equip

a newly acquired device for use of already existing digital content such that sufficient control is established for all content by involving an external key issuer as to whether the required usage rights are in fact present in the domain in question.

However, when digital content is initially added, it is the nature of things that the device in question receives the information and the key required for use from the music service provider, which the Plaintiff regards as the key issuer according to the patent. Receipt of a private key from an external key issuer for using new digital content therefore corresponded to the prior art at the priority date.

dd.   Based on this interpretation, a realization of the feature group 9.3 by the contested embodiments can ultimately not be affirmed. In support of its infringement reasoning, the Plaintiff failed to show the functionality of the contested embodiments in the functional and causal context according to the patent of adding a new device for use of digital content available in a domain.

(1)   The Plaintiff assumes - in this respect matching the interpretation by the chamber - that an embodiment according to the patent requires a new device to join an existing device domain (page 32 of the complaint brief dated 06/12/2020 and pages 14 and 21 of the response dated 02/19/2021, pages 212, 219 of the file). Lastly, this result found by way of interpretation also matches the view represented by the original patent applicant, Motorola LLC, during the award proceedings, which therefore ultimately confirms the result determined by way of interpretation (see BGH, GRUR 2016, 921, MN 40 – *Pemetrexed*). In the letter to the European Patent Office dated 12/22/2011 (Exhibit EIP B4-NK7), the applicant explicitly referenced that the central steps according to the patent of receiving domain information, providing this domain information to an external key issuer, and receiving the private key from the key issuer must be performed by a new device ("Thus, the claimed invention performs the following steps <u>at a new device</u> (…) By <u>requiring the new device</u> to send the domain information to a trusted key issuer (…)").

(2)   But when an embodiment according to the invention requires that the steps required according to the invention can be performed as a new device added to a

domain of devices, the refresh of the "AuthToken" using the "Private Key" cannot - to the extent the Plaintiff likewise attacks the "refresh token" function as patent infringing - even remotely fulfill the conditions of the feature groups 9.3 and 9.1 (but Plaintiff argues to this effect on page 24 of the response dated 02/19/2021, page 222 of the file). This is the case because the refresh of the "AuthToken" is specifically not intended to add a new device to an existing domain device, as also required by the Plaintiff as the functional and causal context according to the patent. A new "AuthToken" is instead merely obtained for an already registered device.

(3)     The Plaintiff otherwise limited its evidence presentation underlying the infringement assumption to the functional and causal context wherein a new music service is installed using a Sonos loudspeaker acquired in addition to devices already present at the user (see e.g. page 43 of the complaint dated 06/12/2020 and page 23/24 of the response dated 02/19/2021, page. 221/222 of the file). Only for this case of adding a new music service does the Plaintiff state that the contested Sonos devices receive an access identifier in the form of the "AuthToken" and the "Private Key" from an external key issuer.

By contrast, in the decisive functional and causal context according to the patent of adding a new device for using existing content, the newly added device receives the identifiers required to use the corresponding content from the devices already registered in the domain network and specifically not from the external key issuer - as required according to the patent. The contested embodiments instead – and even the Plaintiff itself does not challenge this – receive their access identifiers when adding an existing device domain for use of already available content from other devices within the Sonos household. But, as in particular shown in para. [0032], the patent in suit intends to specifically avoid such sharing of access identifiers. Instead, the patent in suit specifies in its para. [0010] an active role of the external key issuer for the device registration.

The Plaintiff cannot successfully present as a counter-argument to the above that – given the nature of the asserted claim as a device claim – the suitability of the contested embodiments is sufficient to be used for purposes of a functional and causal context according to the patent (see BGH, GRUR 2006, 570, 573, MN 21 – *Extracoroneal Sliding Arrangement*), which in the opinion of the Plaintiff is

demonstrated in that the "AuthToken" and "Private Key" identifiers are received by the external key issuer when a new music service is added. While this establishes that the contested embodiments receive the ostensible private key for the newly added service ("Spotify" in the example chosen here) from the external key issuer in the functional and causal context of adding new content (for example a new music service such as "Spotify" in addition to the already used service "Apple Music"), this does not represent the – as demonstrated – mandatorily required functional and causal context according to the patent, which – as shown – specifically relates to a new device for use of available content. But regarding the functional and causal context required according to the patent, there is an absence of Plaintiff's corresponding presentation of case facts, so that an infringement cannot be affirmed in this case. Because the Respondent's related presentation remained uncontested in this regard, it is instead assumed that the contested Sonos devices added to a domain network receive the identifiers required to use already available content from the devices already present in the respective device network. However, this particular solution selected by the contested embodiments then does not employ an external key issuer as specified according to the patent as a key step for improving the security of digital content.

Contrary to the Respondent's opinion asserted during the oral hearing, nothing else is derived from the chamber's ruling dated 10/23/2020, docket number 21 O 11384/20. By applying the precedent principles developed in regards to details on effect and function and by interpreting the precedent principles also underlying the present proceedings, the chamber in the case referenced above concluded that an end-user device according to the patent must have the capacity to store and transmit a core network element identifier in a manner according to the claim, whereas the selection and connection according to the teaching of the patent in suit in that case was to be performed by the network based on an analysis of the core network element identifier transmitted by the end-user device. The case fact constellations then fundamentally differ in this regard  because in contrast to the constellation underlying the ruling dated 10/23/2020, the patent in suit in the present case specifically requires based on its functional specifications that the information element according to patent in question here must be transmitted by a specific sender (here: the external key issuer) for a specific purpose (here: use of available digital content).

- 36 -

d.    When applying the interpretation principles shown above, the chamber also concludes that a private key required according to feature group 9.3 must be of a cryptographic nature. The referenced person skilled in the art recognizes from the patent in suit document that a private key according to the patent must rely on technical teaching from the area of cryptography (letter aa. below). On the basis of the case facts presented by the Plaintiff, it cannot be affirmed that the identifiers "AuthToken" and "Private Key" received by the contested Sonos devices represent cryptographic keys (letter bb. below).

aa.    Referencing the claim wording of feature group 9.3, the logic circuit specified according to the patent must instruct the key issuer to issue a private key for use when accessing protected digital content to the device in question that sent the domain information to the key issuer.

(1)    Referencing the claim wording, and based on the principle confirmed in consistently corroborated Supreme Court precedent, whereupon a patent document represents its own glossary (BGH, GRUR 1999, 909, 912 – *Tensioning Screw*), it is in the chamber's opinion established that a private key according to the patent must be a cryptographic key.

In the present case, it is particularly worth noting that the mere use of matching terminology for the identifiers used in the contested embodiments (in particular regarding the term "Private Key" used by the Sonos devices in addition to the term "AuthToken") must not lead to the temptation of prematurely assuming a private key according to the patent ("private key" in the English version). It is instead decisive as to how the referenced person skilled in the art interprets the "private key" feature specified according to the patent. The related decisive answer is derived from para. [0011] of the patent in suit document. Based on the latter, the private key is defined as a counterpart to a public key used under the scope of public key cryptography. The referenced paragraph expressly states:

> **[0011]** Prior to describing the DRM system in accordance with the preferred embodiment of the present invention the following definitions are provided to set the necessary background.

- *Public-Key Cryptography* - Cryptographic technique that uses a pair of keys, a public and a private key. The *private key* is used for either decrypting data or generating digital signatures and the *public key* is used for either encrypting data or verifying digital signatures. (…)

In German:

[bilingual]

The Plaintiff's reasoning that the above referenced passage does not discuss the private key required according to the claim, but public key cryptography itself already does not hold up based on the clear wording of the aforementioned passage in the specification. The function of the term "Private Key" – as specifically highlighted in italics in the specification – is explicitly described to the effect that it is a means for encrypting data or for generating a digital signature.

The chamber likewise rejects the Plaintiff's reasoning whereupon the definition in para. [0011] only relates to a special exemplary embodiment. This reasoning is likewise invalidated by the specification wording. It expressly states therein that the required background will be shown. The referenced person skilled in the art therefore clearly concludes that the terminology described herein invokes the general definition for the technical teaching according to the patent.

(2)   The required consistent analysis of the technical teaching according to the patent in suit instead demonstrates that the use of the private key as required according to the claim – based on the general terminology definition stipulated in para. [0011] – is exclusively taught for encrypting data or to generate digital signatures. For example, para. [0029] of the patent in suit document specifies that a device for using digital content must retrieve the private key and must use the latter to decrypt the key used for encrypting the content ("*(…) and uses it [DRM private key 206] to decrypt the content encryption key from rights object 205"*). The same follows from para. [0020] of the patent in suit document. By contrast, non-cryptographic embodiments of the private key can specifically not be derived from the specification.

The Plaintiff unsuccessfully counter-argues that para. [0020] only relates to an exemplary embodiment separately protected by dependent claim 13. Para. [0020]

of the patent in suit document instead illustrates the cryptographic protection of digital rights management systems according to the patent. The person skilled in the art derives from para. [0020] that the rights objects present in a digital rights management system according to the patent in suit must have been made available to the rights management system after receiving a DRM certificate, on the basis of which the rights owner must have transmitted to a device participating in a digital rights management system the digitally signed rights object that must also contain the encryption key encrypting the digital content. In this case, the person skilled in the art knows from para. [0015] of the patent in suit that the rights objects are the licenses for using digital content. The rights objects in the sense of the patent in suit therefore represent the actual legal basis for digital rights management systems, from which the scope and reach of the authorizations to which a user is entitled are derived. Based on the aspect of the security of underlying digital content, the patent in suit teaches in para. [0020] the solution deemed to be particularly advantageous of using a private key to decrypt a second encryption key, in order to decrypt the desired digital content in this manner. From the vantage point of the referenced person skilled in the art, the above then teaches an additional encryption option.

Although – given this background – the chamber shares the Plaintiff's opinion to the extent para. [0020] of the patent in suit document stipulates the use of an encryption key to decrypt digital content, as separately claimed independent claim 13, the above - given the relevant interpretation of the technical feature "private key" - specifically further corroborates that such a "private key" must be a cryptographic key. As expressly shown in the claim wording, this is the case because dependent claim 13 states that the private key can be used to decrypt a "second encryption key". But when – as argued – the private key is explicitly in the sense of an additional encryption option expressly used "for decrypting", and therefore in a cryptographic manner, the referenced person skilled in the art concludes that a private key in the sense of the teaching according to the patent must be a cryptographic key.

Nothing else can apply given the equally worded feature contained in the underlying main claim. It would instead be contrary to the required consistent analysis of the teaching according to the patent if one were to regard a private key

pursuant to dependent claim 13 in the sense of a cryptographic key, while at the same time interpreting the identical feature of the private key according to main claim 9 (in each case labeled with the same reference symbol 206) in the sense of an arbitrarily selected, alphanumeric character sequence to be kept confidential, by invoking the generally-held linguistic understanding. Likewise, this also does not result in an interpretation that falls short of the wording in the main claim as merely supplemented by features contained in a dependent claim, which would render the interpretation invalid (see BGH, ruling dated 07/29/2014, docket no. X ZR 5/13, BeckRS 2014, 17436, MN 18; OLG Düsseldorf, GRUR-RS 2021, 12120, MN 55 - *Treatment Machine*). As already expressly decided by the BGH (Bundesgerichtshof [Federal Supreme Court]), the determination of the content meaning of a dependent claim can instead be categorically used to correctly interpret the main claim (BGH, GRUR 2016, 1031, 1033, MN 15 – *Heat Exchanger*). This applies in particular when - as is the case here - not an additive feature, but a feature cited in all claims and labeled consistently as such, is to be interpreted. By contrast, the Plaintiff's interpretation - taking into account dependent claim 13 - would result in an inadmissible, split understanding of the feature.

(3)     Moreover, the person skilled in the art concludes from para. [0033] of the patent in suit document that a private key according to the patent must be of a cryptographic nature. Para. [0033] of the patent in suit document discloses to the person skilled in the art that digital rights management systems can be protected by using symmetrical encryption techniques or broadcast key encryption techniques as an alternative to using public and private keys in public key encryption systems. The Plaintiff is in this regard granted that the teaching according to the patent on the basis of para. [0033] of the patent in suit document is not limited to use of a private key within the scope of a public key encryption system. But based on his general subject matter knowledge, the person skilled in the art knows that symmetrical encryption techniques and also broadcast key encryption techniques are both cryptographic techniques.

The Respondent noted as much during the oral hearing. The Plaintiff offered nothing to the contrary, neither in its oral presentation nor in its briefs. Moreover, the Respondent's presentation during the oral hearing corresponds to

the terminology understanding of the person skilled in the art, based on which broadcast key encryption techniques deal with using cryptographic keys to protect certain contents and/or to [….] certain services by a group of users, in contrast to strictly bilateral point-to-point communication links (in this regard, see the testimony in the parallel US patent infringement proceedings by Plaintiff's expert witness *Sherman* dated 03/08/2021, United States District Court Northern District of California, docket number 3:20-cv-3845, Exhibit K-B 07, page 25). Symmetrical encryption techniques encrypt a certain character sequence using a key agreed between a sender and recipient, so that only the sender and the recipient have the ability to read the contents of the message. A related simplified example is illustrated in the "Handbook of Applied Cryptography" (known to the person skilled in the art on the priority date) (*Menezes/van Oorschot/Vanstone*, "Handbook of Applied Cryptography", June 1996, Exhibit B4). For example, when the sender and recipient agreed on a key "e" that respectively splits the letters used in an identifier or message into groups of five characters, and converts the individual letters into the respectively third letter following in the alphabet,

$$e = \begin{pmatrix} \text{A B C D E F G H I J K L M N O P Q R S T U V W X Y Z} \\ \text{D E F G H I J K L M N O P Q R S T U V W X Y Z A B C} \end{pmatrix}$$

the message "THIS CIPHER IS CERTAINLY NOT SECURE" is for example encrypted into the character sequence "WKLVF LSKHU LVFHU WDLQO BQRWV HFXUH". Although a third-party can see the message without knowing the key, they can then not understand its content without the corresponding key (*Menezes/van Oorschot/Vanstone*, location cited, pages 15/16). This example likewise illustrates a fundamental principle of cryptographic techniques, which by their core nature are intended to render the content of a message or a password meaningless for third parties using a certain function (the actual key), thus ensuring that only authorized persons have access to certain data.

(4)     That a private key according to the claim can only be a cryptographic key also corresponds to the understanding of the relevant person skilled in the art.

The patent in suit itself (see for example para. [0011] of the patent in suit document) along with the prior art cited in para. [0005] and para. [0006] of the patent in suit document (both known to the person skilled in the art on the priority date) are based on the fundamental concept of safeguarding digital contents using cryptographic methods. Moreover, use of cryptographic techniques to protect digital content against unauthorized use includes the related technical methods, already known and generally used at the time of the priority date (see *Rosenblatt/Trippe/Mooney*, Digital Rights Management, 2002, Exhibit EIP B5, page 89, whereupon not all digital rights management systems make use of cryptography, but these represent the core technology most closely associated with digital rights management). If one then takes into account that para. [0002] of the patent in suit document – based on the fundamental intent and purpose of a digital rights management system – requires the person skilled in the art to improve the security of the respective digital contents and to reduce the risk of potential product piracy, the assumption must be made that the person skilled in the art interprets the technical term "private key" known to him from cryptography specifically in connection with the technical teaching of the patent in suit in technical terms, and not merely in the general linguistic sense. A contrarian understanding would ultimately be inconsistent with the task according to the patent to permit a simple yet secure device registration in an

existing domain.

This understanding of the person skilled in the art determined given the functional background of the technical teaching according to the patent in suit is confirmed by Plaintiff's designated expert witness *Sherman* in the parallel US patent infringement proceedings contested before the US District Court Northern District of California and also by Respondent's designated expert witnesses *Wicker* and *Fuchs*. Following the above expert witnesses, the patent in suit likewise assumes a cryptographic key. The expert witness *Sherman* designated by the party then responds "yes" to the question as to whether a private key in connection with the patent (US 7,899,187 B2 (US'187)) corresponding to the patent in suit in the present case is a cryptographic key (Exhibit K- B 07, page 20, line 11). Conversely, the expert witness *Sherman* responds "no" to the question as to whether a private key according to the patent in suit can be exclusively used to decrypt data, and subsequently noted that a private key can for example also be used for purposes of a signature system. Ultimately, this corresponds to the – as described – understanding from para. [0011] of the patent in suit document, whereupon private keys can not only be used for encrypting data but also to generate digital signatures. Following Respondent's designated expert witness *Wicker,* the term "private key" is a technical term commonly used by cryptography, and is expressly referenced by the patent US'187 corresponding to the patent in suit, in that use of the private key is specifically used in connection with the encryption of data or to generate digital signatures (*Wickers*, Exhibit EIP B7, pages 40/41). In the opinion of the expert witness *Fuchs*, a private key according to the patent must not only be of a general cryptographic nature, but must also be the counterpart to a public key used by a public key cryptography system (*Fuchs*, Exhibit EIP B6, page 5).

A dissent between the expert witnesses consulting in connection with the interpretation of the patent in suit can therefore only be found in regards to the concrete nature of the cryptographic techniques regarded as in accordance with the patent. However, there is agreement with respect to the understanding of a person skilled in the art that a private key in the sense of the patent in suit must be of a cryptographic nature.

bb.   Based on this understanding of the feature, the contested embodiments make no use of the "private key" feature as specified according to the patent. The "AuthToken" and "Private Key" identifiers used by a Sonos system do not represent a private key in the sense of the patent in suit. The Plaintiff failed to sufficiently show that the identifiers contested by the Plaintiff as ostensible private keys are of a cryptographic nature. The pleadings that the "AuthToken" and "Private Key" identifiers each represent a sequence of letters/numbers having a length of up to 2048 characters that remains secret and is not shared with third parties does not corroborate the use of cryptographic techniques. The authentication enacted by the contested embodiments on an apparatus at the external key issuer is instead based strictly on an ultimately conventional password system comparable to a reference value match.

(1)   Contrary to Plaintiff, the "AuthToken" and "Private Key" identifiers can also not be referred to as cryptographic keys simply because these are used to authenticate a user and therefore for the purposes pursued by cryptographic techniques. While it is correct that cryptography is an area of technology that is not only used to ensure confidentiality and data integrity but also for authentication purposes (see *Sherman*, Exhibit K-B 07; *Menezes/van Oorschot/Vanstone*, Exhibit EIP B4-D11, page 4), not every technique used for one or several of these intended purposes can per se be deemed to be part of this technique solely on the basis of pursuing the same intent. The functional manner by which this objective is technologically implemented is instead decisive. The technical means employed for this purpose must therefore be of a cryptographic nature. However, this is not so in the present case.

(2)   Without related objections, the Respondent asserts that the purpose of cryptographic techniques is to convert plain text into secret text (see for example the paper (known to the prior art and publicly available) by *Mäki* dated *05/25/*2000

on the topic "Security Fundamentals in Ad-hoc Networking", Exhibit EIP B4-D12, page 3; *Wicker*, Exhibit EIP B7, page 27, MN 86), which above and beyond the handbook by *Menezes/van Oorschot/Vanstone* is also confirmed in the statement by Respondent's designated expert witness *Wicker* in the parallel US proceedings. The latter specifically points to page 26, MN 83, as an example of the cryptography system specifically discussed under Clause I.4.d.aa.(3) and already known to the person skilled in the art on the priority date from the handbook by *Menezes/van Oorschot/Vanstone*. In technological terms, the use of a mathematical function is of central importance in this case, the latter being implemented in digital rights management systems in the form of corresponding algorithms (*Menezes/van Oorschot/Vanstone*, Exhibit EIP B4-D11, page 6; *Rosenblatt/Trippe/Mooney*, Digital Rights Management, Exhibit EIP B5, page 90). This is confirmed by the Respondent's designated expert witness *Wicker* (Exhibit EIP B7, page 26, MN 85) as follows:

> "But the principle remained the same – the system would take plain text as an input, apply an algorithm, and output cryptographically secure text. The only way for a recipient of the secure text to discern its true meaning was to utilize a private key."

In German:

> [bilingual]

The Plaintiff however failed to show that the authentication of the contested embodiments is performed by the "AuthToken" and "Private Key" identifiers on the basis of cryptographic techniques. The Plaintiff's pleadings in particular contain no indications of any kind whether - and if applicable by what technical method - these identifiers are rendered meaningless for third parties using a particular function to ensure that only authorized persons have access to the requested content. Likewise, the pleadings also do not show that - and if applicable how - the contested embodiments make use of a cryptographic algorithm for the purpose of converting the plain text into secret text not recognizable for third parties in connection with the relevant identifiers.

(3)     Where the Plaintiff in its not retroactively submitted brief dated 05/28/2021 attempts to present substantiated evidence that the "AuthToken" and "Private Key"

identifiers used by the contested embodiments are claimed to be generated by a random number generator and are then used by a cryptographic algorithm, the related submission presented after the oral hearing closed must be rejected pursuant to Section 296a Sentence 1 ZPO (Zivilprozessordnung [Code of Civil Procedure]).

The Respondent already noted in the complaint response dated 02/03/2021 (pp. 24 therein) that a private key according to the invention must be of a cryptographic nature. The Respondent already submitted associated records and documents together with the complaint response (in particular Exhibits EIP B3 and EIP B4-D11) and likewise provided an in-depth analysis together with the rejoinder and other industry literature and two expert witness reports enclosed to the latter (in particular Exhibits EIP B5, EIP B6 and EIP B7). The Plaintiff by contrast continued to maintain up to the oral hearing that a key according to the patent does not necessarily have to be of a cryptographic nature. The pleadings whereupon the "AuthToken" and "Private Key" identifiers are allegedly processed by a cryptographic algorithm for purposes of authenticating a device for an external key issuer could have been readily forwarded by the Plaintiff in advance of the oral hearing, all the more so since even the not retroactively submitted submission is accompanied by no detailed technical discussion of any kind. The Respondent's denials presented evident cause to do so already ahead of the oral hearing. Even during the oral hearing, the Plaintiff continued to argue that it would be sufficient for interpreting the patent in suit that the latter does not require a cryptographic key. The Plaintiff failed to present a motion to retroactively submit briefs.

Even if one were to allow the substance of the retroactive submission in favor of the Plaintiff, the substance of the latter is unsuited to support the claimed use of a cryptographic key. Neither the generation of identifiers using a random number generator nor the reference to the processing of the identifiers in an algorithm for authenticating a device allows a conclusion for a cryptographic algorithm. This is more so the case when the late pleadings of the Plaintiff are limited to the unsubstantiated assertion that the identifiers are inserted in a not specified manner into a not specified header. To what extent this involves use of cryptographic techniques and an algorithm that encrypts the identifiers used

- 46 -

for device registration, e.g. converts plain text into secret text, is not evident.

As shown by the interpretation, the private key would – in order to be qualified as cryptographic in the sense of the patent in suit – need to be used to encrypt data or to generate digital signatures (para. [0011] of the patent in suit document). Plaintiff's retroactively submitted presentation likewise provides no indications of any kind about this.

(4)     The Plaintiff cannot argue against this by referring to page 46 of the complaint, claiming to have already shown at this point that the "AuthToken" and "Private Key" identifiers used in the contested embodiments represent cryptographic keys. On page 46 of the complaint, the Plaintiff referred to the "Encrypt content" function used by the contested embodiments. However, after the Respondent's counsel explained during the oral hearing that this functionality enables Sonos devices in the network to encrypt digital content and has nothing to do with using private keys according to the patent, the Plaintiff's counsel expressly admitted the presentation in the complaint as a misunderstanding and withdrew the point.

Notwithstanding these inconsistent pleadings, the Plaintiff in any case failed to contest Respondent's substantiated presentation regarding the "Encrypt content" function cited on page 46 of the complaint. Based on Respondent's presentation, the "Encrypt content" function is then understood to mean that the latter specifically does not relate to the private key according to the patent, but instead enables a device-specific encryption for a given media stream.

(5)     When the Plaintiff in conclusion intends to derive in its brief dated 06/02/2021 from the expert witness report of the expert witness *Fuchs* (submitted by Respondent as Exhibit EIP B6) that the expert witness had explained in his expert witness report the functionality – allegedly according to the patent – of corresponding tokens for authentication (matching with reference value), the Plaintiff overlooks that the expert witness expressly cites a related token-based comparison of a value field with a reference value field as an example of a non-cryptographic form of authentication (see Exhibit EIP B6, pages 3/4, bridge paragraph).

cc.     No further review is necessary concerning the issue of whether the non-

cryptographic "AuthToken" and "Private Key" identifiers used by the contested embodiments for authentication with music service providers can represent a patent infringement under the aspect of equivalent use. The Plaintiff neither submitted related pleadings nor a corresponding motion.

## II.

The ancillary decision concerning costs and provisional enforceability are based on Sections 91 para. 1 Sentence 1, 709 Sentence 1 ZPO.

signed

|  |  |  |
|---|---|---|
| Pichlmaier | Dr. Schacht, M.A. | Dr. Walz |
| Presiding Judge at the District Court | Judge at the District Court | Judge at the District Court |

Pronounced on 06/23/2021

signed
Hofbauer, Justice Secretary and
Legal Document Clerk at the Court

- 48 -

[logo:] BAVARIA
DISTRICT COURT

For the accuracy of the copy Munich,
06/28/2021

Hofbauer, Justice Secretary
Legal Document Clerk at the Court
Certified by machine processing
- valid without signature

# EXHIBIT E



**DATE OF TRANSLATION:**                29-Nov-21

**ELECTRONIC FILE NAME:**           21_O_16260_20_Google_vs_Sonos_begl._Abschrift

**SOURCE LANGUAGE:**                 German

**TARGET LANGUAGE:**                 English

**TRANSPERFECT JOB ID:**             US1040539

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

<div align="center">

TRANSPERFECT TRANSLATIONS INTERNATIONAL, INC.
TRANSPERFECT GLOBAL HQ
1250 BROADWAY, 7TH FLOOR, NEW YORK, NY 10001

</div>

TCert v. 4.0

# EXHIBIT F

(19)    Europäisches
Patentamt
European
Patent Office
Office européen
des brevets



(11)   **EP 1 579 621 B1**

(12)   **EUROPEAN PATENT SPECIFICATION**

(45) Date of publication and mention
of the grant of the patent:
**23.07.2014   Bulletin 2014/30**

(21) Application number: **03786705.8**

(22) Date of filing: **12.11.2003**

(51) Int Cl.:
**H04L 29/06** (2006.01)

(86) International application number:
**PCT/US2003/036273**

(87) International publication number:
**WO 2004/051916 (17.06.2004 Gazette 2004/25)**

(54) **DOMAIN-BASED DIGITAL-RIGHTS MANAGEMENT SYSTEM WITH EASY AND SECURE DEVICE ENROLLMENT**

DOMÄNENGESTÜTZTES VERWALTUNGSSYSTEM FÜR DIGITALE RECHTE MIT LEICHTER UND SICHERER EINRICHTUNGSREGISTRATION

SYSTEME DE GESTION DE DROITS ELECTRONIQUEFONDE SUR LE DOMAINE AVEC ADMISSION DES DISPOSITIFS FACILE ET SURE

(84) Designated Contracting States:
**DE FI FR GB IT**

(30) Priority: **27.11.2002   US 306494**

(43) Date of publication of application:
**28.09.2005   Bulletin 2005/39**

(73) Proprietor: **Motorola Mobility LLC
Libertyville, IL 60048 (US)**

(72) Inventors:
• **MESSERGES, Thomas**
Schaumburg, IL 60173 (US)
• **DABBISH, Ezzat A.**
Cary, IL 60013 (US)
• **PUHL, Larry**
Dundee, IL 60118 (US)
• **VOGLER, Dean**
Algonquin, IL 60102 (US)

(74) Representative: **Boult Wade Tennant
Verulam Gardens
70 Gray's Inn Road
London WC1X 8BT (GB)**

(56) References cited:
**US-A1- 2002 157 002     US-A1- 2003 076 955
US-A1- 2004 003 251     US-B1- 6 463 534
US-B1- 6 694 025**

• "IBM RESPONSE TO DVB-CPT CALL FOR PROPOSALS FOR CONTENT PROTECTION & COPY MANAGEMENT:XCP CLUSTER PROTOCOL" , [Online] 19 October 2001 (2001-10-19), XP001148193 Retrieved from the Internet: URL:HTTP: //WWW.ALMADEN.IBM.COM/SOFTWARE/DS /CONTENTASSURANCE/PAPERS/XCP_DVB.P> [retrieved on 2001-10-19]
• HEUVEL VAN DEN S A F A ET AL: "Secure Content Management in Authorised Domains" INTERNATIONAL BROADCASTING CONVENTION, XX, XX, 15 September 2002 (2002-09-15), pages 467-474, XP002273504

**EP 1 579 621 B1**

Note: Within nine months of the publication of the mention of the grant of the European patent in the European Patent Bulletin, any person may give notice to the European Patent Office of opposition to that patent, in accordance with the Implementing Regulations. Notice of opposition shall not be deemed to have been filed until the opposition fee has been paid. (Art. 99(1) European Patent Convention).

1                                        EP 1 579 621 B1                                        2

**Description**

Field of the Invention

[0001]   The present invention relates generally to digital-rights management and in particular, to a method and apparatus for performing domain-based digital-rights management with easy and secure device enrollment.

Background of the Invention

[0002]   The ease at which valuable digital content (e.g., music, games, video, pictures, and books) can be copied and shared is worrisome to content owners. It is critical that content owners are fairly reimbursed. Because of this, it is a requirement that content distributors implement secure measures that help prevent piracy. Digital-Rights Management (DRM) is a popular phrase used to describe such protection of rights and the management of rules related to accessing and processing digital items. Content owners hope to protect their valuable digital content using a DRM system that is implemented by secure, tamper-resistant electronic devices.

[0003]   One method of DRM protection allows content sharing among a domain of devices. Such a domain of devices, may for example share the same payment method/account information (e.g., share the same credit card number, account number, ... , etc.), as well as sharing access to digital works. For example, a user may pay to access a certain digital work (e.g., a movie) a single time. Since all devices that are part of a domain share account information, any device may access the digital work. However, after any device accesses the work, all other devices will be prevented from accessing the work. Similarly, a user may choose to pay each time a digital work is accessed. Accessing the digital work by any device within the domain will cause the user's account to be charged accordingly.

[0004]   While such a DRM system enables a user-friendly method for content sharing, such a system presents two problems. The first problem is that a user faces the potentially cumbersome task of registering all of his devices into a domain. The second problem is that the security of content in a domain is potentially threatened if users can remotely register devices into a domain over a long distance. Therefore a need exists for domain-based digital-rights management with easy and secure device enrollment that increases the security of content.

[0005]   An online article entitled 'IBM Response to DVB-CPT Call for Proposal for Content Protection & Copy Management: xCP Cluster Protocol' 19 October 2001 retrieved from URL:HTTP://WWW.AL-MADEN.IBM.COM/SOFTWARE/DS/CONTENTAS-SURANCE/ PAPERS/XCP DVB.P describes a system for protecting content stored on portable media that allows consumers to seamlessly access content within their home and beyond, while at the same time protecting the rights of content owners. IBM's 'xCP Cluster Protocol'

binds protected content to a dynamic cluster of networked recording and playback devices, such that the content can be managed on those devices under a single protection scheme independent of particular storage or transmission interfaces and protocols. Within a home network devices form a cluster in an encrypted domain. All devices in a cluster are considered peers, although they may have specialised functions. Peers that are authorisers can authorise individual devices to join the cluster, either autonomously or by acting as a proxy for an external authorization center.

[0006]   US patent application publication no. US 2002/157002 describes a domain-based DRM system in which a domain has one or more communication devices that share a common cryptographic key of the domain. There may be a plurality of domains in a DRM environment and the domains may overlap. A domain authority, in combination with a DRM module of the communication device, operates to selectively register and unregister the communication device to the one or more domains and to control access to encrypted digital content information.

Brief Description of the Drawings

[0007]

    FIG. 1 is a block diagram of a digital-rights management system in accordance with the preferred embodiment of the present invention.
    FIG. 2 is a block diagram of the user equipment of FIG. 1 in accordance with the preferred embodiment of the present invention.
    FIG. 3 is a flow chart showing operation of the digital-rights management system of FIG. 1 in accordance with the preferred embodiment of the present invention.
    FIG. 4 is a flow chart showing operation of the user equipment of FIG. 2 in accordance with the preferred embodiment of the present invention.

Detailed Description of the Drawings

[0008]   To address the above-mentioned need, a method and apparatus for performing domain-based digital-rights management with easy and secure device enrollment is provided herein. In accordance with the preferred embodiment of the present invention new devices are added to an existing domain by obtaining domain information (e.g., domain name and private domain password) from devices already in the domain that preferably are in close proximity. Once the domain information has been transferred from the device already in the domain to the device being added to the domain, the device being added to the domain contacts a key issuer to complete its registration into the domain. The key issuer returns the DRM domain private key as well as a DRM certificate. Both are utilized by the device to obtain and render digital

content.

**[0009]**   Both the use of a key issuer and the forced-short-range communication greatly improve ease of use, as well as security. Once domain information has already been established (such as domain name, password, etc.) for an initial device, it is cumbersome for users to remember and reenter the same information when they want to add new devices to their DRM domain. It is especially difficult to enroll devices after a long period of time has elapsed since the initial device was added to the domain or to enroll devices that may have limited user interfaces, such as a cellular phone, car radio, or set-top box.

**[0010]**   It is much easier for a user if this DRM information can be obtained directly from a device that is already in the domain. However, merely allowing a new device to obtain domain information from an existing device is not sufficiently secure for enrolling the new device into the domain. Security is greatly enhanced if the new device then needs to send this DRM information to a trusted server (i.e., a key issuer) to complete its enrollment into the domain. With this approach, the key issuer can actively enforce domain enrollment and help improve security. A further security improvement over this approach is to force the DRM information to be transferred over a short-range-communication channel, rather than make it optional. Forcing short-range transfer of DRM information helps ensure that devices in the same domain were at one time physically near each other, which is one way to help enforce a security policy that devices cannot be added to a domain over large distances (e.g., using stolen DRM information propagated over the Internet).

**[0011]**   Prior to describing the DRM system in accordance with the preferred embodiment of the present invention the following definitions are provided to set the necessary background.

- *Public-Key Cryptography* - Cryptographic technique that uses a pair of keys, a public and a private key. The *private key* is used for either decrypting data or generating digital signatures and the *public key* is used for either encrypting data or verifying digital signatures.
- *Certificate* - A digital certificate is block of data issued by a trusted certification authority. It contains expiration dates and a copy of the certificate holder's public key and identification data (e.g., address or serial number). The certificate-issuing authority signs the digital certificate so that a recipient can verify that the certificate is valid and thereby authenticate the certificate holder. Some digital certificates conform to a standard, X.509.
- *Digital signature* - A digital signature (not to be confused with a digital certificate) is an electronic signature that can be used to authenticate the identity of the sender of a message or the signer of a document, and simply to ensure that the original content of the message or document that has been sent is unchanged.

- *Digitally-signed object* - a digital object comprised of data that is digitally signed. The digital signature is attached to the object.
- *Authentication* - The process of determining whether someone or something is, in fact, who or what it is declared to be. Authentication of a device or user can entail the use of a digital certificate and a challenge response protocol that involves the use of public-key cryptography. Authentication of a certificate entails verification of the digital signature of the certificate.

**[0012]**   Turning now to the drawings, wherein like numerals designate like components, FIG. 1 is a block diagram of DRM system 100 in accordance with the preferred embodiment of the present invention. As shown, DRM system 100 comprises user equipment 101, key issuer 105, rights issuer 105, and network 107. User equipment 101 comprises those devices such as computers, cellular telephones, personal digital assistants, ... , etc. that are capable of running an application that renders digital content. For example, user equipment 101 may be a personal computer equipped with an application to "play" an MPEG Audio Layer 3 (MP3) file, with an application such as a standard MP3 player. Similarly, user equipment 101 may comprise a cellular telephone equipped to play an MPEG Video Layer 4 file with a standard MPEG video codec. Other possible embodiments for user equipment 101 include, but are not limited to, set-top boxes, car radios, networked MP3 players, Personal Digital Assistants, ... , etc. Other possible embodiments for digital content include, but are not limited to music, games, video, pictures, books, maps, software, .. ., etc.

**[0013]**   Regardless of the form that user equipment 101 takes, user equipment 101 is configured so that short-range communication between various user devices 101 can take place. In the preferred embodiment of the present invention short-range communication can utilize any physical connection (e.g., a cable, docking connector, etc.) or a number of over-the-air communication system protocols such as, but not limited to Bluetooth, 802.11, 802.15, infrared, ... , etc. As shown in FIG. 1, short-range communication takes place over short-range communication link 108.

**[0014]**   Key issuer 105 comprises an application that establishes authenticated communications with user equipment 101 and then provides user equipment 101 with a DRM certificate and a DRM private key. The authenticated communications between key issuer 105 and user equipment 101 comprise a challenge-response protocol whereby a unit certificate and domain information are exchanged. The manufacturer of equipment 101 installs the unit certificate into equipment 101. This certificate identifies user equipment 101 as a trusted DRM-enabled device. The domain information includes information such as the domain home, private domain password, and desired domain action (e.g., creates a new domain, register into an existing domain, leave a domain,

etc).

[0015]   The DRM certificate, which is obtained via the authenticated communications with key issuer 105, is utilized by user equipment 101 when obtaining rights objects (i.e., licenses to digital content) from rights issuer 103. Rights issuer 103 utilizes the DRM certificate to authenticate equipment 101 and pass rights objects (licenses) associated with digital content to user equipment 101. Particularly, the DRM certificate comprises a DRM public key (the corresponding DRM private key is securely stored in user equipment 101), identification information (e.g., the unique serial number or model number belonging to the user equipment 101), and a digital signature generated by key issuer 105.

[0016]   In accordance with the preferred embodiment of the present invention all long-range communication between devices takes place over network 107. Network 107 may take various forms such as but not limited to a cellular network, a local-area network, a wide-area network, ... , etc. For example, user equipment 101 may comprise a standard cellular telephone, with network 107 comprising a cellular network such as a code-division, multiple-access communication system.

[0017]   Regardless of the form of user equipment 101, key issuer 105, short-range communication link 108, network 107, and rights issuer 103, it is contemplated that these elements within DRM system 100 are configured in well known manners with processors, memories, instruction sets, and the like, which operate in any suitable manner to perform the function set forth herein.

[0018]   As discussed above, it is necessary that content distributors implement secure measures that help prevent piracy. Therefore, in the preferred embodiment of the present invention when a user purchases equipment 101 the user must first register equipment 101 with key issuer 105. After executing a secure authentication protocol, key issuer 105 will grant equipment 101 a DRM certificate and a DRM private key, allowing equipment 101 to obtain rights to digital content from rights issuer 103. In order to obtain the DRM certificate and the DRM private key, user equipment 101 and key issuer 105 must first execute a secure authentication protocol utilizing a unit certificate and unit private key that was installed on the equipment by the manufacturer. Domain information, such as the domain name, private domain password and desired domain action (e.g., create a new domain, register into an existing domain, leave a domain, etc), is also exchanged during the protocol.

[0019]   Key issuer 105 authenticates the unit certificate (belonging to equipment 101) and then checks the domain information. If the domain information indicates that equipment 101 is being added to a new domain, key issuer 105 creates a new DRM public/private key pair. If equipment 101 is being added to an existing domain, key issuer 105 looks up that domain's DRM public/private key pair in a database. Key issuer 105 then creates a DRM certificate that contains all necessary information (e.g., the DRM public key, serial number, model number,

etc.) for equipment 101 to obtain rights to digital content from rights issuer 103. Key issuer 105 then sends equipment 101 the DRM certificate and the DRM private key utilized by the domain.

[0020]   When a user wishes to purchase rights to digital content from rights issuer 103, it provides rights issuer 103 with a DRM certificate. Thus in accordance with the preferred embodiment of the present invention, a DRM certificate (which contains the DRM public key) must be provided to rights issuer 103 before any rights to digital content will be transferred to the user. Rights issuer 103 will verify the authenticity of the DRM certificate and then generate a rights object based on information (e.g. the DRM public key) in the DRM certificate. Rights issuer 103 will then digitally sign the rights object and provide it to equipment 101. The rights object contains an encrypted encryption key (content encryption key) needed to render (execute) the digital content. The content encryption key is encrypted with the DRM public key so it can be decrypted only using the DRM private key.

[0021]   As discussed above many customers prefer to access their digital content with several devices 101 (domain of devices) they may own. For example, a user may own a cellular telephone and a personal computer, both equipped with an MP3 player. The user may wish to utilize the same account to purchase digital content for both devices. Prior art solutions have attempted to solve this problem by allowing users to register their devices into a domain where digital content can be freely shared. While such a domain-based DRM system enables a user-friendly method for content sharing, such a system presents two problems. The first problem is that the user faces the potentially cumbersome task of registering all of his devices into a domain. For example, the domain information (such as domain name and private domain password, credit card information, ... , etc.), exchanged with key issuer 105, needs to be manually entered into user equipment 101 before it can be added to an existing domain. The second problem is that the security of content in a domain is potentially threatened if users can remotely register devices into a domain over a long distance. For example, if domain information (e.g. domain name and private domain password) was public information (e.g. perhaps stolen and then propagated on the Internet), then anyone could register their device in the domain and have access to digital content bought for that domain. The key issuer can revoke the DRM domain certificate to minimize damage, but the ability to remotely register devices into an existing domain will always make this a vulnerability. If the only method to register devices into an existing domain was done via a close proximity channel with another device already in the domain, the opportunity for intruders to breach the domain is reduced.

[0022]   In order to address these issues, in the preferred embodiment of the present invention new devices are added to an existing domain by obtaining domain information (e.g., domain name and private domain password) from devices already in the domain that preferably

are in close proximity. In order to assure that devices are in close proximity, the domain information may be allowed to be shared only over a physical connection or a short-range connection, where the user has physical control over both the device being added to the domain and the device already in the domain. In a first embodiment, a touch pad is utilized as an interface between devices. The transfer of domain information from one device to another is automatically initiated when contact between the two touch pads is made. In another embodiment, each device can have a button that initiates the setup of the "close proximity" channel. Allowing the transfer of domain information only over a "close proximity" link creates added security since the two devices must be physically nearby and under the direct physical control of the owner of the devices.

[0023]   Regardless of the transmission means, once the domain information has been transferred from the device already in the domain to the device being added to the domain, the device being added to the domain contacts key issuer 105 to complete its registration into the domain. For example, the device being added to the domain (i.e., equipment 101) provides its unit certificate and the domain information (acquired from equipment 101 already in the domain) to key issuer 105 and executes the previously mentioned authentication protocol.

[0024]   FIG. 2 is a block diagram of user equipment 101 of FIG. 1 in accordance with the preferred embodiment of the present invention. As shown, user equipment 101 comprises storage 211 for storing DRM certificate 202, application 203, digital content 204, rights object 205, DRM private key 206, unit certificate 207, unit private key 208, and domain information 209. As known in the art, storage 211 may comprise any number of storage means, including, but not limited to hard disk storage, random-access memory (RAM), and smart card storage (e.g., Wireless Identity Module used in cellular telephones), ... , etc. User equipment 101 additionally includes logic circuitry 210, which in the preferred embodiment of the present invention comprises a microprocessor controller such as but not limited to a Motorola MC68328 DragonBall integrated microprocessor or a TI OMAP1510 processor. Finally, user equipment 101 comprises short-range communication unit 213.

[0025]   FIG. 3 is a flow chart showing operation of the digital-rights management system of FIG. 1 in accordance with the preferred embodiment of the present invention. The description that follows assumes that a first device is already registered with an existing domain. That is, it has domain information (e.g., domain name and private domain password) and has already obtained a DRM certificate that enables it to acquire rights to digital content from rights issuer 103.

[0026]   The logic flow begins at step 301 where a user decides to enroll a second device into an existing DRM domain. At step 303 the user initiates the transfer of domain information 209 from the first device, which is already enrolled in the domain, to the second device. Al-

though data may be transferred among devices in many ways (e.g., via floppy discs, via email, ... , etc.), in the preferred embodiment of the present invention, domain information 209 will only be accepted by a device if it is transferred via a short-range communication link, however in alternate embodiments the transfer of domain information 209 can take place utilizing any method (short/long range) for transferring data between devices.

[0027]   At step 305 the first and second devices establish a secure authenticated channel over a short-range communication link. This link may be authenticated by various means. For example authentication can be established by the fact that the user has physical control over each device (perhaps by pressing a button), or by entering a temporary PIN or password into each device. The security of the link is established using known protocols, such as the Wireless Transport Layer Security (WTLS) or Secure Sockets Layer (SSL). Once secure short-range link 108 is established, the first device communicates its domain information 209 to the second device at step 307. At step 309, the second device uses the network link 107 (e.g., the cellular network or Internet) to contact key issuer 105. The second device follows the same protocol with key issuer 105 as the first device did when establishing the domain, as already described above.

[0028]   At step 311, the second device communicates its unit certificate 207 to key issuer 105 and may use its unit private key 208 to respond to a challenge. Once the channel is established it sends the domain information 209 to key issuer 105. At step 313, the key issuer receives the domain information 209, validates it (e.g., determines if domain name and domain password are valid), and if valid, registers the second device into the same domain as the first device. Finally, at step 315, key issuer 105 completes the registration of the second device into the existing domain by using the secure network channel 107 to communicate the DRM private key 206 (utilized by every device within the domain) and a newly created DRM certificate 202 to the second device.

[0029]   As discussed above, once a DRM certificate 202 has been obtained, rights object 205 to digital content 204 can now be obtained from rights issuer 103. This process begins with DRM certificate 202 being provided to rights issuer 103 along with a request for digital content. In response, user equipment 101 receives rights object 205, which enables access to digital content 204. Both are stored in memory 211. In order to execute digital content 204, user equipment 101 must access DRM private key 206 and uses it to decrypt the content encryption key from rights object 205. Content 204 is decrypted, and is rendered by application 203. Logic circuitry 210 controls these functions.

[0030]   FIG. 4 is a flow chart showing operation of user equipment 101 of FIG. 3 in accordance with the preferred embodiment of the present invention. In particular, the following steps show those necessary to obtain domain information 209 from another device 101 over a short-

9                    EP 1 579 621 B1                    10

range communication link. The logic flow begins at step 401 where logic unit 210 determines that domain information 209 is being transferred to device 101. As discussed above, domain information 209 may be transferred among devices in many different ways. For example, domain information 209 may be received as an attachment to an email application (not shown), or may be received by a floppy disk drive (not shown). In this embodiment of the present invention logic circuitry 210 determines the transmission means for domain information 209 (step 403), and at step 405 determines if the transmission means is a short-range transmission means. If at step 405 it is determined that the transmission means is a short-range transmission means, then the logic flow continues to step 409 where domain information 209 is accepted and stored in storage 211, otherwise the logic flow continues to step 407 where domain information is not accepted.

[0031]   As discussed above, prior art domain-based DRM systems allow devices to be enrolled into a domain by simply obtaining a user's domain information. This is potentially insecure if devices are allowed to enroll that may not be in physical possession of the same individual. For example, a user may add a new device into a domain by simply typing in the domain information, which could be obtained via email or the Internet. The above procedures would not allow new devices to be enrolled into a domain unless the steps of FIG. 3 and FIG. 4 were followed.

[0032]   If all subsequent enrollments into the family of devices are forced to use short-range communication for enrollment, the newly added device are forced to be in direct physical control of the user, resulting in a more secure DRM system. Additionally, the use of key issuer 105 greatly improves security. For example, if a key issuer were not used then devices would need to share their DRM private keys and issue DRM certificates. Hackers would have an easier time breaching the security of such a system since they have physical access to their devices and can tamper with the hardware to try and create false DRM certificates. In the preferred embodiment of this invention, the key issuer is a trusted entity that is not physically accessible to the users to the DRM system. Hackers may attempt to breach the security of the key issuer, but since it cannot be physically attacked, security is improved.

[0033]   While the invention has been particularly shown and described with reference to a particular embodiment, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the scope of the invention as defined by the appended claims. For example, although the above description was given with respect to receiving/transmitting domain information consisting of a domain name and domain password among devices, one of ordinary skill in the art will recognize that any data may be substituted for the domain information without varying from the scope of the invention. Also, for example, the above description

was given with respect to using public and private keys. One of ordinary skill in the art would recognize that alternate methods of securing the DRM system are possible using symmetric key techniques or broadcast key encryption techniques. It is intended that such changes come within the scope of the following claims.

**Claims**

1.   A method for registering a new device (101) as part of a domain of devices (101), which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system (100), the method comprising the steps of:

> receiving, over a short range link (108), domain information corresponding to the domain of devices from a device (101) existing within the domain of devices;
> providing the domain information to a key issuer (105), which is separate from the domain of devices, causing the key issuer (105) to issue a private key (206) to the new device, wherein the private (206) key is based on the domain information and is utilized by all devices (101) within the domain of devices; and
> receiving the private key (206) from the key issuer (105) for use in accessing the protected digital content within the digital rights management system (100).

2.   The method of claim 1 wherein the step of receiving the domain information for the device (101) existing within the domain of devices comprises the step of receiving a domain name and a domain password from the device (101).

3.   The method of claim 1 wherein the domain of devices share account information.

4.   The method of claim 1 further comprising the steps of:

> determining (403, 405) if the domain information was received over a short-range link (108); and not accepting (407) the domain information if the domain information was not received over the short-range link (108).

5.   The method of claim 1 further comprising the step of:

> utilizing the private key (206) to decrypt a second encryption key, the second encryption key utilized to decrypt digital content (204).

6.   The method of claim 1 further comprising:

6

11                        EP 1 579 621 B1                        12

determining (403, 405) if the information was received over a short-range communication link (108);

accepting (409) the domain information only if the information was received over the short-range communication link (108) from another device (101) within the domain of devices,

wherein providing comprises providing the domain information to the key issuer (105) causing the key issuer (105) to issue the private key (206) and a certificate (202) to the device (101), wherein the private key (206) and the certificate (202) are based on the domain information; and wherein receiving the private key (206) comprises receiving the private key (206) and the certificate (202) from the key issuer (105).

7. The method of claim 6 further comprising the steps of:

providing the certificate (202) to a rights issuer (103);

receiving an encrypted encryption key from the rights issuer (103); and

utilizing the private key (206) to decrypt the encrypted encryption key.

8. The method of claim 7 further comprising the step of:

utilizing the encryption key to decrypt digital content (204).

9. An apparatus (101) comprising:

communication circuitry (213) for receiving, over a short range link (108), domain information (209) from a device (101) existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital rights management system (100);

storage (211) for storing the domain information (209); and

logic circuitry (210) for providing the domain information (209) to a key issuer (105) which is separate from the domain of devices, causing the key issuer (105) to issue a private key (206) for use in accessing protected digital content (204) to the apparatus, wherein the private key (206) is based on the domain information (209) and is utilized by all devices (101) within the domain of devices.

10. The apparatus of claim 9 wherein the domain information comprises a domain name and a domain password.

11. The apparatus of claim 9 wherein the domain of de-

vices share account information.

12. The apparatus of claim 9 wherein the logic circuitry (210) is configured to determine if the domain information (209) was received via short-range communication, and accept the domain information only if the domain information was received via short-range communication from a device (101) within the domain of devices.

13. The apparatus of claim 9 wherein the private key (206) is utilize to decrypt a second encryption key, and the second encryption key is utilized to decrypt digital content (204).

**Patentansprüche**

1. Verfahren zur Eintragung einer neuen Vorrichtung (101) als Teil einer Domain aus Vorrichtungen (101), die Rechte in Zusammenhang mit einem gemeinsamen Konto teilen, zur Verwendung bei Zugriff auf geschützten digitalen Inhalt innerhalb eines Verwaltungssystems für digitale Rechte (100), wobei das Verfahren die folgenden Schritte aufweist:

Empfangen, über eine Kurzstrecken-Verbindung (108), von Domain-Informationen, die der Vorrichtungsdomain entsprechen, von einer Vorrichtung (101) die innerhalb der Vorrichtungsdomain besteht;

Bereitstellen der Domain-Informationen für einen Schlüsselaussteller (105), der unabhängig von der Vorrichtungsdomain ist, wodurch der Schlüsselaussteller (105) einen privaten Schlüssel (206) für die neue Vorrichtung ausstellt, wobei der private (206) Schlüssel auf den Domain-Informationen basiert und von allen Vorrichtungen (101) innerhalb der Vorrichtungsdomain verwendet wird; und

Empfangen des privaten Schlüssels (206) vom Schlüsselaussteller (105) zur Verwendung bei Zugriff auf den geschützten digitalen Inhalt innerhalb des Verwaltungssystems für digitale Rechte (100).

2. Verfahren nach Anspruch 1, wobei der Schritt des Empfangens der Domain-Informationen für die Vorrichtung (101), die innerhalb der Vorrichtungsdomain besteht, den Schritt des Empfangens eines Domain-Namens und eines Domain-Passworts von der Vorrichtung (101) aufweist.

3. Verfahren nach Anspruch 1, wobei die Vorrichtungsdomain Kontoinformationen teilt.

4. Verfahren nach Anspruch 1, das des Weiteren die folgenden Schritte aufweist:

13   EP 1 579 621 B1   14

Bestimmen (403, 405), ob die Domain-Informationen über eine Kurzstrecken-Verbindung (108) empfangen wurden; und
kein Annehmen (407) wenn die Domain-Informationen nicht über die Kurzstrecken-Verbindung (108) empfangen wurden.

5. Verfahren nach Anspruch 1, das des Weiteren den folgenden Schritt aufweist:

Verwenden des privaten Schlüssels (206) zum Entschlüsseln eines zweiten Verschlüsselungsschlüssels, wobei der zweite Verschlüsselungsschlüssel zum Entschlüsseln von digitalem Inhalt (204) verwendet wird.

6. Verfahren nach Anspruch 1, das des Weiteren Folgendes aufweist:

Bestimmen (403, 405), ob die Informationen über eine Kurzstrecken-Kommunikationsverbindung (108) empfangen wurden;
Annehmen (409) der Domain-Informationen lediglich dann, wenn die Informationen über die Kurzstrecken-Kommunikationsverbindung (108) von einer anderen Vorrichtung (101) innerhalb der Vorrichtungsdomain empfangen wurden,
wobei das Bereitstellen ein Bereitstellen der Domain-Informationen für den Schlüsselaussteller (105) aufweist, wodurch der Schlüsselaussteller (105) den privaten Schlüssel (206) und ein Zertifikat (202) für die Vorrichtung (101) ausstellt, wobei der private Schlüssel (206) und das Zertifikat (202) auf den Domain-Informationen basieren; und
wobei das Empfangen des privaten Schlüssels (206) ein Empfangen des privaten Schlüssels (206) und des Zertifikats (202) von dem Schlüsselaussteller (105) aufweist.

7. Verfahren nach Anspruch 6, das des Weiteren die folgenden Schritte aufweist:

Bereitstellen des Zertifikats (202) für einen Rechteaussteller (103);
Empfangen eines verschlüsselten Verschlüsselungsschlüssels von dem Rechteaussteller (103); und
Verwenden des privaten Schlüssels (206) zur Entschlüsselung des verschlüsselten Verschlüsselungsschlüssels.

8. Verfahren nach Anspruch 7, das des Weiteren den folgenden Schritt aufweist:

Verwenden des Verschlüsselungsschlüssels

zur Entschlüsselung von digitalem Inhalt (204).

9. Gerät (101), das Folgendes aufweist:

einen Kommunikationskreis (213) zum Empfangen, über eine Kurzstrecken-Verbindung (108), von Domain-Informationen (209) von einer Vorrichtung (101), die innerhalb einer Domain aus Vorrichtungen besteht, die Rechte in Zusammenhang mit einem gemeinsamen Konto teilen, zur Verwendung bei Zugriff auf geschützten digitalen Inhalt innerhalb eines Verwaltungssystems für digitale Rechte (100);
einen Speicher (211) zum Speichern der Domain-Informationen (209); und
einen Logikkreis (210) zur Bereitstellung der Domain-Informationen (209) für einen Schlüsselaussteller (105), der unabhängig von der Vorrichtungsdomain ist, wodurch der Schlüsselaussteller (105) einen privaten Schlüssel (206) zur Verwendung bei Zugriff auf geschützten digitalen Inhalt (204) für das Gerät ausstellt, wobei der private Schlüssel (206) auf den Domain-Informationen (209) basiert und von allen Vorrichtungen (101) innerhalb der Vorrichtungsdomain verwendet wird.

10. Gerät nach Anspruch 9, wobei die Domain-Informationen einen Domain-Namen und ein Domain-Passwort aufweisen.

11. Gerät nach Anspruch 9, wobei die Vorrichtungsdomain Kontoinformationen teilt.

12. Gerät nach Anspruch 9, wobei der Logikkreis (210) dazu ausgelegt ist, zu bestimmen, ob die Domain-Informationen (209) über eine Kurzstrecken-Kommunikation empfangen wurden, und die Domain-Informationen lediglich dann anzunehmen, wenn die Domain-Informationen über Kurzstrecken-Kommunikation von einer Vorrichtung (101) innerhalb der Vorrichtungsdomain empfangen wurden.

13. Gerät nach Anspruch 9, wobei der private Schlüssel (206) zur Entschlüsselung eines zweiten Verschlüsselungsschlüssels verwendet wird, und der zweite Verschlüsselungsschlüssel zur Entschlüsselung von digitalem Inhalt (204) verwendet wird.

**Revendications**

1. Procédé d'enregistrement d'un nouveau dispositif (101) dans le cadre d'un domaine de dispositifs (101), lequel partage des droits associés à un compte commun, à utiliser en vue d'accéder à un contenu numérique protégé au sein d'un système de gestion de droits numériques (100), le procédé comprenant

8

15                        EP 1 579 621 B1                        16

les étapes ci-dessous consistant à :

recevoir, sur une liaison à courte portée (108), des informations de domaine correspondant au domaine de dispositifs, en provenance d'un dispositif (101) présent au sein du domaine de dispositifs ;

fournir les informations de domaine à un émetteur de clés (105), lequel est distinct du domaine de dispositifs, ce qui amène ainsi l'émetteur de clés (105) à émettre une clé privée (206) à destination du nouveau dispositif, dans lequel la clé privée (206) est basée sur les informations de domaine et est utilisée par la totalité des dispositifs (101) au sein du domaine de dispositifs ; et

recevoir la clé privée (206), en provenance de l'émetteur de clés (105), à utiliser en vue d'accéder au contenu numérique protégé au sein du système de gestion de droits numériques (100).

2.  Procédé selon la revendication 1, dans lequel l'étape de réception des informations de domaine pour le dispositif (101) présent au sein du domaine de dispositifs comprend l'étape consistant à recevoir un nom de domaine et un mot de passe de domaine à partir du dispositif (101).

3.  Procédé selon la revendication 1, dans lequel le domaine de dispositifs partage des informations de compte.

4.  Procédé selon la revendication 1, comprenant en outre les étapes ci-dessous consistant à :

déterminer (403, 405) si les informations de domaine ont été reçues sur une liaison à courte portée (108) ; et

ne pas accepter (407) les informations de domaine si les informations de domaine n'ont pas été reçues sur la liaison à courte portée (108).

5.  Procédé selon la revendication 1, comprenant en outre l'étape ci-dessous consistant à :

utiliser la clé privée (206) en vue de déchiffrer une seconde clé de chiffrement, la seconde clé de chiffrement étant utilisée afin de déchiffrer du contenu numérique (204).

6.  Procédé selon la revendication 1, consistant en outre à :

déterminer (403, 405) si les informations ont été reçues sur une liaison de communication à courte portée (108) ;

accepter (409) les informations de domaine uniquement dès lors que les informations ont été reçues sur la liaison de communication à courte

portée (108) à partir d'un autre dispositif (101) au sein du domaine de dispositifs ;

dans lequel la fourniture consiste à fournir les informations de domaine à l'émetteur de clés (105), amenant l'émetteur de clés (105) à émettre la clé privée (206) et un certificat (202) à destination du dispositif (101), dans lequel la clé privée (206) et le certificat (202) sont basés sur les informations de domaine ; et

dans lequel la réception de la clé privée (206) consiste à recevoir la clé privée (206) et le certificat (202) en provenance de l'émetteur de clés (105).

7.  Procédé selon la revendication 6, comprenant en outre les étapes ci-dessous consistant à :

fournir le certificat (202) à un émetteur de droits (103) ;

recevoir une clé de chiffrement chiffrée en provenance de l'émetteur de droits (103) ; et

utiliser la clé privée (206) en vue de déchiffrer la clé de chiffrement chiffrée.

8.  Procédé selon la revendication 7, comprenant en outre l'étape ci-dessous consistant à :

utilisant la clé de chiffrement en vue de déchiffrer du contenu numérique (204).

9.  Appareil (101) comprenant :

un montage de circuits de communication (213) destiné à recevoir, sur une liaison à courte portée (108), des informations de domaine (209) en provenance d'un dispositif (101) présent au sein d'un domaine de dispositifs, lequel partage des droits associés à un compte commun, à utiliser en vue d'accéder à un contenu numérique protégé au sein d'un système de gestion de droits numériques (100) ;

un magasin de stockage (211) destiné à stocker les informations de domaine (209) ; et

un montage de circuits logiques (210) destiné à fournir les informations de domaine (209) à un émetteur de clés (105), lequel est distinct du domaine de dispositifs, ce qui amène ainsi l'émetteur de clés (105) à émettre une clé privée (206), destinée à être utilisée en vue d'accéder à du contenu numérique protégé (204), à destination de l'appareil, dans lequel la clé privée (206) est basée sur les informations de domaine (209) et est utilisée par la totalité des dispositifs (101) au sein du domaine de dispositifs.

10. Appareil selon la revendication 9, dans lequel les informations de domaine comportent un nom de domaine et un mot de passe de domaine.

9

**11.** Appareil selon la revendication 9, dans lequel le domaine de dispositifs partage des informations de compte.

**12.** Appareil selon la revendication 9, dans lequel le montage de circuits logiques (210) est configuré de manière à déterminer si les informations de domaine (209) ont été reçues par l'intermédiaire d'une communication à courte portée, et à n'accepter les informations de domaine que si les informations de domaine ont été reçues, par l'intermédiaire d'une communication à courte portée (101), à partir d'un dispositif situé au sein du domaine de dispositifs.

**13.** Appareil selon la revendication 9, dans lequel la clé privée (206) est utilisée en vue de déchiffrer une seconde clé de chiffrement, et la seconde clé de chiffrement est utilisée en vue de déchiffrer du contenu numérique (204).

5

10

15

20

25

30

35

40

45

50

55

EP 1 579 621 B1



FIG. 1



FIG. 2

301
USER DECIDES TO ENROLL A SECOND DEVICE INTO AN EXISTING DRM DOMAIN
303
USER INITIATES THE TRANSFER OF DOMAIN INFORMATION FROM A FIRST DEVICE, WHICH IS ALREADY IN THE DOMAIN, TO THE SECOND DEVICE
305
THE FIRST AND SECOND DEVICES ESTABLISH A SECURE AUTHENTICATED CHANNEL OVER A SHORT-RANGE LINK
307
THE FIRST DEVICE USES THE SHORT-RANGE LINK TO COMMUNICATE ITS DOMAIN INFORMATION TO THE SECIND DEVICE
309
THE SECOND DEVICE AND THE KEY ISSUER ESTABLISH A SECURE AUTHENTICATED CHANNEL OVER THE NETWORK
311
THE SECOND DEVICE USES THE SECURE NETWORK CHANNEL TO COMMUNICATE ITS UNIT CERTIFICATE AND DOMAIN INFORMATION(OBTAINED FROM THE FIRST DEVICE) TO THE KEY ISSUER
313
THE KEY ISSUER USES THE RECEIVED DOMAIN INFORMATION TO REGISTER THE SECOND DEVICE INTO THE SAME DOMAIN AS THE FIRST DEVICE
315
THE KEY ISSUER COMPLETES THE REGISTRATION OF THE SECOND DEVICE INTO THE EXSISTING DOMAIN BY USING THE SECURE NETWORK CHANNEL TO COMMUNICATE A DRM PRIVATE KEY AND DRM CERTIFICATE TO THE SECOND DEVICE

FIG. 3

401
DETERMINE THAT DOMAIN INFORMATION IS BEING TRANSFERRED TO DEVICE
DETERMINE TRANSMISSION MEANS
403
407
DO NOT ACCEPT DOMAIN INFORMATION
NO
SHORT-RANGE LINK UTILIXED ?
405
YES
409
ACCEPT DOMAIN INFORMATION

FIG. 4

EP 1 579 621 B1

## REFERENCES CITED IN THE DESCRIPTION

*This list of references cited by the applicant is for the reader's convenience only. It does not form part of the European patent document. Even though great care has been taken in compiling the references, errors or omissions cannot be excluded and the EPO disclaims all liability in this regard.*

**Patent documents cited in the description**

- US 2002157002 A **[0006]**

**Non-patent literature cited in the description**

- *IBM Response to DVB-CPT Call for Proposal for Content Protection & Copy Management: xCP Cluster Protocol,* 19 October 2001, HTTP://WWW.AL-MADEN.IBM.COM/SOFTWARE/DS/CONTENTAS-SURANCE/ PAPERS/XCP DVB.P **[0005]**