1  CLEMENT SETH ROBERTS (SBN 209203)
   croberts@orrick.com
2  BAS DE BLANK (SBN 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (SBN 260103)
   acaridis@orrick.com
4  WILL MELEHANI (SBN 285916)
   wmelehani@orrick.com
5  EVAN D. BREWER (SBN 301411)
   ebrewer@orrick.com
6  SHANE D. ANDERSON (SBN 313145)
   sdanderson@orrick.com
7  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
8  405 Howard Street
   San Francisco, CA 94105-2669
9  Telephone:     +1 415 773 5700
   Facsimile:     +1 415 773 5759
10
   GEORGE I. LEE (*pro hac vice*)
11 lee@ls3ip.com
   SEAN M. SULLIVAN (*pro hac vice*)
12 sullivan@ls3ip.com
   RORY P. SHEA (*pro hac vice*)
13 shea@ls3ip.com
   J. DAN SMITH (*pro hac vice*)
14 smith@ls3ip.com
   LEE SULLIVAN SHEA & SMITH LLP
15 656 W Randolph St., Floor 5W
   Chicago, IL 60661
16 Telephone:     +1 312 754 0002
   Facsimile:     +1 312 754 0003
17
   *Attorneys for Defendant Sonos, Inc.*
18

19                    UNITED STATES DISTRICT COURT

20                 NORTHERN DISTRICT OF CALIFORNIA,

21                      SAN FRANCISCO DIVISION

22 GOOGLE LLC,                          Case No. 3:20-cv-03845-EMC

23              Plaintiff,              **SONOS, INC.'S MOTION FOR SUMMARY
                                        JUDGMENT OF NON-INFRINGEMENT
24      v.                              OF '187 PATENT ASSERTED CLAIMS**

25 SONOS, INC.,                         Date: October 5, 2023
                                        Time: 1:30 p.m.
26              Defendant.              Place: Courtroom 5, 17th Floor

27

28                                      **PUBLIC REDACTED VERSION**

# TABLE OF CONTENTS

**Page(s)**

NOTICE OF MOTION ................................................................................................................ IV

STATEMENT OF THE RELIEF REQUESTED ..................................................................... IV

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I.     INTRODUCTION .......................................................................................................... 1

II.    BACKGROUND ............................................................................................................. 1

     A.     Google's '187 Patent Claims Methods Of Adding A New Device To A
           Group Of Devices In A Domain. ............................................................................ 1

     B.     Sonos makes multiroom wireless audio products that can play music from
           third-party streaming services. ............................................................................ 2

III.   LEGAL STANDARD ..................................................................................................... 3

IV.    ARGUMENT ................................................................................................................... 3

     A.     The Sonos Players Do Not Infringe Under Google's Authentication
           Theory. .................................................................................................................. 3

           1.     Sonos's System Does Not Perform The Preamble Of Claim 1 .................. 5

           2.     The Accused AuthToken Is Not The Claimed "Private Key." .................. 7

           3.     Google Cannot And Has Not Shown AuthTokens Are "Based On
               The Domain Information." ........................................................................ 10

     B.     The Accused Sonos Players Do Not Infringe Under Google's Strong
           Encryption Theory. ............................................................................................ 13

           1.     Sonos Does Not Infringe Because The Accused Private Device Key
               Is Not "Utilized By All Devices Within The Domain of Devices." ......... 14

           2.     Sonos Does Not Infringe Because The Private Device Key Is Not
               "Based On" The Household ID. ................................................................. 21

V.     CONCLUSION ............................................................................................................. 25

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

*AquaTex Indus., Inc. v. Techniche Sols.*,
   479 F.3d 1320 (Fed. Cir. 2007)................................................................. 18, 19

4

*Automed Techs., Inc. v. Microfil, LLC*,
   244 F. App'x 354 (Fed. Cir. 2007) ................................................................. 11

5

6

*Bayer AG v. Elan Pharm. Rsch. Corp.*,
   212 F.3d 1241 (Fed. Cir. 2000)........................................................................ 3

7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................... 9

8

9

*E-Pass Tech., Inc. v. 3Com Corp.*,
   473 F.3d 1213 (Fed. Cir. 2007) ..................................................................... 20

10

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
   815 F.3d 1314 (Fed. Cir. 2016)................................................................. 17, 18

11

12

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012)........................................................................ 20

13

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 801 (Fed. Cir. 2021)................................................................... 12, 24

14

15

*Invitrogen Corp. v. Clontech Labs., Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005)........................................................................ 8

16

17

*Quintal Research Grp., Inc. v. Nintendo of Am., Inc.*,
   No. C 13-00888 SBA, 2015 U.S. Dist. LEXIS 93488 (N.D. Cal. July 17, 2015) ................ 19

18

19

*Ricoh Co., Ltd. v. Quanta Comput. Inc.*,
   550 F.3d 1325 (Fed. Cir. 2008)...................................................................... 19

20

21

*TechSearch, L.L.C. v. Intel Corp.*,
   286 F.3d 1360 (Fed. Cir. 2002)........................................................................ 3

22

*VirnetX, Inc. v. Cisco Sys. Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014)...................................................................... 19

23

24

**Other Authorities**

25

Fed. R. Civ. P. 56(a)............................................................................................. 3

26

27

28

Sonos's MSJ of Non-Infringement
of '187 Patent Asserted Claims
3:20-cv-03845-EMC

## APPENDIX OF CLAIMS

1. A method for registering a new device as part of a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system, the method comprising the steps of:

receiving domain information corresponding to the domain of devices from a device existing within the domain of devices;

providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices; and

receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

3. The method of claim 1 wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving domain information for the device existing within a domain of devices, all devices within the domain sharing account information.

4. The method of claim 1 wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving the domain information over a short range link.

10. An apparatus comprising:

communication circuitry receiving domain information from a device existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system;

storage for storing the domain information; and

logic circuitry for providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key for use in accessing protected digital content to the apparatus, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices.

12. The apparatus of claim 10 wherein the domain of devices share account information.

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that on October 5, 2023, or as soon thereafter may be heard in Courtroom 5 on the 17th Floor of the San Francisco Courthouse, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Sonos, Inc. ("Sonos") will, and hereby does, move this Court for an order granting summary judgment of non-infringement in favor of Sonos that Sonos has not and does not infringe any of claims 1, 3, 4, 10, and 12 of U.S. Patent No. 7,899,187 ("the '187 patent").  This motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the Declaration of Alyssa Caridis ("Caridis Decl."), and exhibits thereto, all documents in the Court's file, and such other written or oral argument as may be presented at or before the time this motion is heard by the Court.

## STATEMENT OF THE RELIEF REQUESTED

Sonos moves under Fed. R. Civ. P. 56(a) for an Order finding that Sonos does not infringe Claims 1, 3, 4, 10, and 12 of the '187 Patent ("the Asserted Claims") because Plaintiff Google LLC ("Google") has failed to show that the accused Sonos instrumentalities infringe any Asserted Claim.

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.      INTRODUCTION**

3          The Court should grant Sonos summary judgment of noninfringement as to the '187 patent

4    because neither of Google's two infringement theories raise any disputes of fact.

5          In its "Authentication Theory," Google accuses a process in which Sonos players receive

6    from third-party music services (e.g., Spotify) information that permits the players to access the

7    third-party's digital content.  But the '187 patent claims a process for "registering a new device as

8    part of a domain of devices," and (as multiple European courts have already found) the process that

9    Google accuses is about adding a new *service* to devices within a domain, not registering a new

10   device into that domain.

11         Google's second infringement theory—the "Strong Encryption Theory"—is no better.  The

12   Asserted Claims call for and require a private key that is used by all devices within a domain.  But

13   ████████████████████████████████████████████████████████████████████████████

14   ████████████████    As such, Google cannot show that a common device key is "utilized by all devices

15   within the domain," or that it is "based on" "domain information," as the claims require.

16         There are no disputed facts regarding the relevant functions of Sonos's products, and

17   Google cannot prove infringement under either theory.  The Court should, therefore, grant summary

18   judgment of non-infringement.

19   **II.     BACKGROUND**

20         **A.      Google's '187 Patent Claims Methods Of Adding A New Device To A Group
                     Of Devices In A Domain.**

21         Many consumers have multiple speakers in their homes.  And they often use these speakers

22   to play music from and through streaming services like Pandora and Spotify.  The '187 patent

23   provides a way for users with multiple media players to obtain access to Digital-Rights

24   Management ("DRM")-protected content—like songs provided by streaming services—while

25   ensuring that the content remains protected from copying or unauthorized access.  Ex. A[1], '187

26   patent, 1:14-37.  To that end, the patent describes arranging media players and devices into a

27   _____

28   [1] All exhibits referenced in this Motion are submitted with the Caridis Decl. filed concurrently
     herewith.

SONOS'S MSJ OF NON-INFRINGEMENT
OF '187 PATENT ASSERTED CLAIMS
3:20-CV-03845-EMC

"domain," and providing the devices in that domain with a ***shared*** private key that the devices can use to access DRM-protected content.  *Id.* 1:38-47; *see also id.* Abstract.

More specifically, the '187 patent describes and claims methods and apparatuses that allow a device joining an existing "domain of devices" to obtain a shared private key that is used by each device in the domain to access protected content.  *See* '187 patent, Abstract.  The patent explains that a domain of devices is a set of devices that share a common user account.  *Id.* 1:26-29.  The patent teaches that a new device joining the domain obtains domain information from an existing device within the domain, (*id.* 2:2-6) and then provides that domain information to a key issuer that is *not* within the domain.  The external key issuer, in response, provides the new device with the shared private key of the domain (*id.* 2:6-12)  The patent explains that the new device must obtain the private key from an *external* key issuer because allowing devices within a domain to share the private key among and between themselves is "not sufficiently secure." *Id.* 2:24-28.  The asserted independent claims of the '187 patent, namely claims 1 and 10, recite a method and device directed to this process.  *See* Appendix of claims.

**B.    Sonos makes multiroom wireless audio products that can play music from third-party streaming services.**

Sonos's products allow users to play music throughout their homes, and to control the speakers through a user interface displayed on a smartphone or other computer.  The accused products are Sonos speakers, referred to as "players."[2]  Player(s) that are part of a common subnet (*e.g.*, a given WiFi network) may be placed into what Sonos refers to as a "household."  Ex. B, Opening Expert Report of Alan T. Sherman Regarding Infringement of U.S. Patent No. 7,899,187 ("Sherman Rpt.") ¶108.  Sonos assigns each household a unique household ID (or "HHID").  *Id.* In a household with multiple Sonos players, the players can be grouped together to play music in synchrony—for example, speakers located in a consumer's kitchen, patio, and dining room can play the same song in a synchronized manner.  *Id.* ¶¶110-12.  Players are controlled by a Sonos

---

[2] The particular accused players are the Sonos One, One SL, Play:1, Play:3, Five, Play:5, Arc, Playbar, Playbase, Beam, Move, Connect:Amp, Amp, Connect, and Port.  Sherman Rpt. ¶73.

SONOS'S MSJ OF NON-INFRINGEMENT
OF '187 PATENT ASSERTED CLAIMS
3:20-CV-03845-EMC

1   App installed on a smartphone, tablet, or computer.  *Id.* ¶105.  A phone or computer with the Sonos

2   App installed is often called a Controller, because it can be used to control the players.  *Id.*

3       Players must be connected to the Internet to stream music from third-party streaming

4   services (because third party streaming services stream music *from* an internet-based location at

5   which the music is stored).  *Id.* ¶138.  Google's "Authentication Theory" relates to the process by

6   which a user adds third-party music service accounts (like Spotify) to their Sonos system so that

7   the players can stream music from those services.  Ex. C, 6/16/2023 Deposition of Dr. Alan T.

8   Sherman ("Sherman Dep.") at 45:21-46:8.  And Google's "Strong Encryption Theory" relates to a

9   different, unrelated process that Sonos players use to obtain a private device key for decrypting

10  music streams.  *Id.* at 46:9-12.  These processes are explained in more detail below.

11  **III.   LEGAL STANDARD**

12      Summary judgment is proper where the pleadings, discovery, and affidavits show that there

13  is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a

14  matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when it is apparent that

15  only one conclusion as to infringement could be reached by a reasonable jury."  *TechSearch, L.L.C.*

16  *v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) (citations omitted).  "If any claim limitation is

17  absent from the accused device, there is no literal infringement as a matter of law."  *Bayer AG v.*

18  *Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000) (citations omitted).

19  **IV.   ARGUMENT**

20      Google's Authentication Theory and Strong Encryption Theory are expressed primarily

21  through the expert report of Google's infringement expert, Dr. Alan Sherman.  *See, generally*,

22  Sherman Rpt.  As explained below, each theory has multiple fatal deficiencies.

23      **A.    The Sonos Players Do Not Infringe Under Google's Authentication Theory.**

24      Google's Authentication Theory relates to how Sonos players interact with a third-party

25  music streaming service, like Pandora or Spotify.  When a user first adds a music service to a Sonos

26  household, a Sonos device will send a getDeviceAuthToken request to the third-party music

27  service.  Sherman Rpt. ¶¶153, 155.  The request is a message, and the message includes the Sonos

28  household ID, among other information.  *See, e.g., id.* ¶¶238, 246.  As mentioned above, the

"household ID" is an identifier for the household to which the device belongs.  *Id.* ¶108.  A third-party music service receives the request.  Notably, Sonos does not control or know how the third-party music service processes these requests or generates its responses because it is entirely up to them.  Google, likewise, has ***no*** information about how any third-party music service processes or responds to the requests they get from Sonos, because Google took *no* discovery from any third party music service.  In any event, in response to receiving a getDeviceAuthToken request, the third-party music service sends a value that Sonos refers to as an "authToken."  *Id.* ¶¶153, 155.  The music providers are responsible for defining their *own* process for issuing their *own* authTokens; the only requirement Sonos places on an authToken is a maximum size (i.e. they can be any series of characters, but can be a maximum of 2048 characters long). Ex. D, SONOS-GVS-00000706.  When a Sonos player later communicates with the third-party music service, it sends a message to the service that includes a copy of the authToken that the service previously provided.  *See, e.g., id.* ¶¶239, 469.

Google's Authentication Theory attempts to read the '187 patent on this process for requesting authTokens as part of the process of adding a music service to a Sonos household.  In particular, the '187 patent claims "A method for registering a new device as part of a domain of devices," wherein a "key issuer" provides "a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices." '187 patent, claim 1.  Google alleges that Sonos's concept of a "household" corresponds to the claimed concept of a "domain."  Sherman Rpt. ¶170.  Google identifies the Sonos household ID as the claimed "domain information."  *Id.*  Google claims that the authToken provided by third-party music providers is the "private key."  Sherman Rpt. ¶229.  And Google contends that the third party music providers are the "key issuer."  *Id.*

Sonos is entitled to summary judgment of no infringement under Google's Authentication Theory for three independent reasons, although not all reasons apply to all claims.

1          **1.       Sonos's System Does Not Perform The Preamble Of Claim 1.**

2          The preamble of claim 1 recites "[a] method for registering a new device as part of a domain

3   of devices."   The parties agree that the preamble is limiting.   Dkt. 66 at 1.   Under Google's

4   Authentication Theory, the accused Sonos players do not meet the preamble of claim 1.

5          By its terms, claim 1's preamble limits the claim to new device registration.  That means

6   that, to infringe, a process must register a new device into a "domain of devices"—i.e. under

7   Google's theory a process that adds a new player to an accused household.  Sherman Rpt. ¶170.

8   But Google's Authentication Theory targets the process by which devices *that are already part of*

9   *a household* add a new third-party music *service*.  *See* Sherman Dep. at 143:5-8 (admitting that the

10  accused DeviceLink and AppLink processes are "methods one would use to add a music account

11  to a Sonos system"). That process is different from (and unrelated to) the process of registering a

12  new device into an *already-existing household* (which is what Google has contended is the

13  "domain").  Sherman Rpt. ¶170.



21  is exactly the technique that the '187 patent *disparages* as

22  "not sufficiently secure" and from which it purports to distinguish the claimed invention.  '187

23  patent, 2:24-28; *see also id.* 7:32-37 (warning that "if a key issuer were not used then devices would

24  need to share their DRM private keys" and risk "[h]ackers…breaching the security of such a

25  system").

26          There is simply no dispute that, during the initial set up process,

27          .  Indeed, Google's expert admits that

28          .  Sherman Dep. at

96:18-97:10. And he admits that ███████████████████████████████████████

█████████████████████████████████████████████████. *Id.* 96:10-17.  Thus, Google has nowhere to turn: (1) Sonos's process for adding a new streaming service does not infringe because that process is for adding a ***new service*** to the devices in an existing domain, not for adding a "new device" to such a domain and (2) Sonos's process for adding a new device to an existing domain (or household) does not infringe (and Google hasn't accused it) because that process doesn't involve obtaining authTokens from an external source.

Other courts have already found that Sonos's method of adding a new music service to the devices in an existing domain does not satisfy the limitations found in the '187 patent.  For example, Google has asserted counterpart European Patent No. 1,579,621 ("EP '621") in foreign proceedings.  *See, generally,* Ex. E, Final Ruling by the First Regional Court in Munich dated June 23, 2021 ("Munich Ruling"); and Ex. F, Judgment by the First Instance Court of Paris, 3rd Chamber, dated March 8, 2022 ("Paris Judgment").  Claims 1 and 9 of EP '621 are substantively identical to claims 1 and 10, respectively, of the '187 Patent at issue here.  Ex. J, EP '621.  The Munich court dismissed Google's allegations under EP '621 for several reasons, including because EP '621 required that "a new device must receive a private key for existing content from the external key issuer and specifically not by way of sharing by devices already registered in the domain."  Munich Ruling at 28.  The Munich court likewise found no infringement because "[a] new 'AuthToken' is instead merely obtained for [sic][3] an already registered device."  *Id.* at 34.  The Paris court likewise determined (regarding the same claims) that "none of the elements submitted to the proceedings by GOOGLE concerns the addition of a device" and instead found Google's infringement theory failed because it "concern[ed] the enrollment of the device with the music supplier."  Paris Judgment at 17.

Because the processes of adding a new music service to a household does not meet the claim limitation or add a new device to an existing domain of devices, Sonos does not infringe claim 1

---

[3] From context, and given how Sonos's system undisputedly operates, Sonos believes this "for" was intended to be "from."

1   and its dependents under Google's Authentication Theory.[4]

2   **2.   The Accused AuthToken Is Not The Claimed "Private Key."**

3   Summary judgment of no infringement of all Asserted Claims is also warranted because

4   Google has not shown that the accused authToken is the claimed "private key" as that term was

5   construed by this Court.  This Court construed "private key" as "[a] non-public **key** that is used as

6   an **input to a cryptographic algorithm** designed such that, without the key, the output of the

7   algorithm cannot be computed."  Dkt. 108 at 11 (emphasis added).  But there is no evidence that

8   the accused authToken is ever used in this way.

9   Google has already failed to convince another court that an authToken is the claimed private

10  key.  In European proceedings, the Munich court dismissed Google's infringement allegations

11  because Google could not adduce any evidence that the authToken was used in conjunction with

12  "a cryptographic algorithm."  *See* Munich Ruling at 45.  Google has the same problem here.

13  Google provides three arguments as to how authTokens are allegedly "key[s] that are used

14  as an input to a cryptographic algorithm."  But each argument fails as a matter of law.

15  **a.   Google has no evidence to support its first and second**
16  **"cryptographic algorithm" theories.**

17  Google's first two theories purporting to identify the required "cryptographic algorithm"

18  fail because they are based on speculation, not evidence.  In particular, Dr. Sherman contends that

19  authTokens are used as an input to a cryptographic algorithm (1) "when" a third party verifies them

20  using a cryptographic algorithm or (2) "when" a third party uses a cryptographic algorithm to sign[5]

21  data within the authTokens.  Sherman Rpt. ¶¶229, 234, 384, 389, 662, 667.  In other words, Dr.

22  Sherman speculates that third-party music services might use cryptographic algorithms to either

23  verify an authToken when a Sonos player sends it back to the music service or in the course of

24  issuing authTokens (*i.e.*, by "signing" data within the authTokens).  But both theories depend on

---

25  [4] Sonos reserves the right to make a parallel argument as to claim 10 but is not advancing that
26  argument in this motion.

27  [5] When data is cryptographically "signed" or used to form a "digital signature," it is encrypted
    using a private key.  The signed data can then be provided to a receiving party with the same
28  signature key for use as part of an authentication process (*e.g.*, by confirming the signature
    matches the receiving party's records).  *See, e.g.*, Sherman Rpt. ¶53.

SONOS'S MSJ OF NON-INFRINGEMENT
OF '187 PATENT ASSERTED CLAIMS
3:20-CV-03845-EMC

1   whether and how third-party providers use cryptographic algorithms, and Google has no evidence

2   about any third-party algorithms, and it did not take discovery from any third party.  Google's

3   speculation cannot create a material dispute of fact or defeat summary judgment.  *See Invitrogen*

4   *Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005) (holding expert speculation

5   insufficient to defeat summary judgment).

6          As for Google's first theory (that authTokens are verified using a cryptographic algorithm),

7   Dr. Sherman has no evidence that third parties even verify authTokens in the first place, because

8   he has "not reviewed third-party software that actually performs that step."  Sherman Dep. at 113:1-

9   6 (response to "Q. But you don't have any evidence demonstrating that the third parties do verify

10  the authToken?").  But even assuming *arguendo* that third parties do "verify" the authTokens, he

11  has no evidence that they do so using a cryptographic algorithm.  Instead, third parties can verify

12  authTokens using plenty of non-cryptographic means, like seeing whether or not the token has a

13  match in a look-up table. *Id*. 117:4-20, 118:23-119:8.[6]

14         Likewise, Google has no evidence to support Dr. Sherman's second contention—that

15  authTokens are used as an input to a cryptographic algorithm "when" a third party uses them to

16  sign data or verify signed data.  Sherman Rpt. ¶¶234, 389, 667.  Put differently, Dr. Sherman is

17  simply assuming that some third parties use cryptographic signing algorithms to "sign" data in the

18  authTokens when those tokens are produced, and then further assumes that they may check that

19  "signed" data to later verify the authTokens.  But this too is pure speculation—Dr. Sherman does

20  not know "[w]hich third-party music services provide tokens with signed data within them."

21  Sherman Dep. at 123:12-14.  And Dr. Sherman has not "seen any third-party code," and thus has

22  no evidence that *any* third parties sign or verify authTokens using a cryptographic algorithm.  *Id*.

23  127:24-128:3.

24         Dr. Sherman repeatedly attempts to justify his lack of knowledge regarding third-party

25  algorithms by suggesting that Sonos's authToken "specifications" fill in the gap, but he has not

26  shown how Sonos's specifications map onto the claim limitations.  *See, e.g., id*. 111:24-112:13

27  [6] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Sherman Dep. at 125:9-127:23.

1   (arguing that Sonos provides specification requirements with "certain implications").  They do not.

2   Sonos's specifications require only that the authToken must be a string of characters no longer than

3   2048 characters.  Ex. D, SONOS-GVS-00000706.  The specifications say nothing about how third

4   parties must generate or use authTokens, nor do they say whether third parties must verify

5   authTokens, or what algorithms or techniques they are to employ.  The only way to learn those

6   details would be from the third-party music providers, but neither Google nor Dr. Sherman bothered

7   to ask.  Because Google has no evidence to support an essential element on which it bears the

8   burden of proof, summary judgment is appropriate.  *See Celotex Corp. v. Catrett*, 477 U.S. 317

9   (1986) (holding that summary judgment is warranted against "a party who fails to make a showing

10  sufficient to establish the existence of an element essential to that party's case").

11          **b.      Google's third theory does not demonstrate that AuthToken is
12                    a "non-public key… used as an input to a cryptographic
                      algorithm."**

13          Google's third argument is that the authToken constitutes a "non-public **key** that is used as

14  an **input to a cryptographic algorithm.**"  Dkt. 108 at 11 (emphasis added).  Dr. Sherman asserts

15  that ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████.  Sherman

17  Rpt. ¶¶232-234, 387-389, 665-667.  But the Court's claim construction requires more—it requires

18  that the authToken be a "**key** that is used as an input to a cryptographic algorithm."

19          By way of background, cryptographic algorithms that use keys (including cryptographic

20  signing algorithms) require two inputs: the **data** (to be encrypted) and a **key**.  Sherman Rpt. ¶¶51-

21  54.  This is illustrated in the below diagram from Dr. Sherman's report (Sherman Rpt. ¶52) which

22  shows two cryptographic algorithms (illustrated in purple):

Sonos's MSJ of Non-Infringement
of '187 Patent Asserted Claims
3:20-cv-03845-EMC

The **data**—the information that is to be protected (here, "Plaintext")—is input into an encryption algorithm along with a **key** ("Recipient's Public Key").  The output is an encrypted version of the data, illustrated above as encrypted Ciphertext, which can be securely transmitted to another computer.  At the recipient computer, the Ciphertext is input into a decryption algorithm along with a **key** ("Recipient's Private Key") to recover the Plaintext **data**.  Sherman Rpt. ¶52.  Accordingly, both encrypting and decrypting algorithms require two inputs: the data (to be encrypted or decrypted) and a key.  This is also true of signing algorithms, which take a data input (the data to be signed) and a key input (the signature key).  *Id.* ¶53.

Here, Dr. Sherman's theory regarding ███████████████ fails to demonstrate that the authToken is a "**key** that is used as an input to a cryptographic algorithm" as required by the Court's claim construction.  Rather, as Dr. Sherman admits, ████████████████████████████████████████████████████████████████████.  Sherman Dep. at 132:24-133:15.  In other words, Dr. Sherman fails to show that the authToken is a "key" – ████████████████████.  Accordingly, Dr. Sherman has ignored aspects of the Court's construction and has provided no evidence that the authToken is a "**key**" at all, let alone a "**key that is used as an input** to a cryptographic algorithm" as the Court's claim construction requires.  Because Dr. Sherman's theory fails to satisfy the claims under the Court's claim construction, Sonos's signing functionality does not infringe the '187 patent.

### 3. Google Cannot And Has Not Shown AuthTokens Are "Based On The Domain Information."

Sonos is entitled to summary judgment under Google's Authentication Theory for a third independent reason.  Claims 1 and 10, from which all asserted claims depend, recite usage of a "private key … wherein the private key is based on the domain information … ."  '187 patent, claims 1, 10.  Google has no evidence that the accused authToken is "based on" the household ID.

Google has no evidence showing how third parties generate and provide the authTokens and Google did not take discovery from any third parties.  Dr. Sherman confirmed that "the authToken that [he] contend[s] to be the private key is generated by the third-party music provider."

1   Sherman Dep. at 109:23-110:1.  Thus, to understand whether the accused authToken is "based on

2   the domain information," Google and Dr. Sherman would need evidence as to what (if anything)

3   the third-party systems do with the accused domain information (Sonos's household IDs) in

4   connection with issuing authTokens.  As explained above, Google did not seek any such third-party

5   discovery, and Dr. Sherman admits both that third-party "code was not provided to [him]" and that

6   he did not have any discussions with anyone, whether at Sonos or at a third-party, to inform his

7   opinions as to third-party operations.  *Id.* 25:7-24, 111:9-18, 139:21-140:1.  As such, Google has

8   no evidence as to what, if anything, third parties do with the household ID, and any argument

9   Googles makes as to how the Authentication Theory satisfies the "based on" limitation is pure

10  speculation.  As outlined below, Google's speculation is not evidence of a material fact sufficient

11  to survive summary judgment.  *Automed Techs., Inc. v. Microfil, LLC,* 244 F. App'x 354, 360 (Fed.

12  Cir. 2007) (affirming summary judgment when expert "offered little more than speculation

13  regarding the capability of the system").

14        Dr. Sherman contends that authTokens are based on the household ID for three reasons.

15  **First**, Dr. Sherman speculates that the authToken is based on the household ID because the

16  authToken "represents both the household as well as the user."  Sherman Rpt. ¶292.  At most, this

17  describes a *relationship* between the *household* and authToken, but it does not mean the authToken

18  is "based on" the household ID.  As explained above, there is no evidence how any third-party

19  music provider generates authTokens, or what parameters it uses in issuing them.  It may be, for

20  example, that third parties simply make up authTokens using a random number generator and then

21  hand them out as requests for authTokens come in.

22        **Second**, Google argues that an authToken is based on the household ID because a "digital

23  content provider … generates the authToken … in response to receiving the getDeviceAuthToken

24  message, which includes the household ID as an input parameter."  Sherman Rpt. ¶293.  Once

25  again, neither Google nor Dr. Sherman present evidence regarding what third parties do in response

26  to receiving the getDeviceAuthToken message, or whether they use the household ID in any way.

27  Indeed, as the hypothetical example provided above shows, there is no reason to think that third

28  parties generate tokens *in response* to receiving the household ID as opposed to, *e.g.*, making them

SONOS'S MSJ OF NON-INFRINGEMENT
OF '187 PATENT ASSERTED CLAIMS
3:20-CV-03845-EMC

up in batches ahead of time and then handing them out as requests come in.  While there is no dispute that the household ID is provided to the alleged key issuer, that does not show (one way or the other) whether the authToken is then ***based on*** the household ID that has been provided.

Dr. Sherman's attempt to assert otherwise misconstrues the "based on" claim term (as explained in more detail in Section IV.B.2.b. below).  Dr. Sherman explained during his deposition that, to him, "[t]he idea of 'based on' is produced in consequence of" or "producing a number as a consequence of considering [an input]."  Sherman Dep. at 54:10-24, 61:5-17.  But the asserted claims already require that the private key be "produced in consequence of" the domain information—they recite that the *issuing* of the private key be "caused by" "providing the domain information to a key issuer." '187 patent, claims 1, 10.  Thus, just because the household ID is provided along with the request to provide an authToken does not mean that the authToken is "based on" the household ID.  *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021) (explaining that claim terms should not be construed "in a way that renders them void, meaningless or superfluous") (citations omitted).

**Third**, Google argues the authToken is "based on" the household ID because the third-party can "use the household ID to validate the authToken."  Sherman Rpt. ¶294.  This too is pure speculation—because (once again) Google has no evidence of any third-party operations.  Dr. Sherman admitted that he never reviewed any third-party software, and Google has no evidence that any third party uses the household ID to validate the authToken.  Sherman Dep. at 113:1-6 ("Q. But you don't have any evidence demonstrating that the third parties do verify the authToken? … THE WITNESS: I have not reviewed third-party software that actually performs that step.").  And even if a third party did validate authTokens using the household ID, this still would not demonstrate that the authToken is ***based on*** the household ID.  Rather, it could simply mean that the third-party keeps a record of household IDs that correspond to issued authTokens—e.g., that the authToken is (after creation) ***associated with*** the Household ID, rather than *based on* it.

**B.   The Accused Sonos Players Do Not Infringe Under Google's Strong Encryption Theory.**

Dr. Sherman's Strong Encryption Theory relates to aspects of Sonos's product registration process that enable Sonos players to decrypt media streams.

When a user buys a new Sonos player, they have to set up the player onto a network and register the player using the Sonos App. ████████████████████████████████████ ██████   Sherman Rpt. ¶113.  As explained above, the Sonos App is installed on a computing device that acts as a Controller.  To register a new Sonos player, ███████████████

As discussed above, Sonos's players can also be formed into groups to allow them to play media across different rooms in a synchronized manner.  A group of players has one player designated as a "group coordinator" (████████████████████████████████████████ ████████████). *Id.* ¶112.  The group coordinator distributes audio data to other players, which are referred to as "group members." *Id.* ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████. *Id.* ¶¶149-151; Sherman Dep. at 81:25-83:24.

Sonos does not infringe the '187 patent under Dr. Sherman's Strong Encryption Theory because Sonos does not meet two separate limitations of the asserted independent claims.  First, the accused "private key" is not "utilized by all devices within the domain of devices."  Instead, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.  Second, the accused "private key" is not "based on the domain information."

### 1. Sonos Does Not Infringe Because The Accused Private Device Key Is Not "Utilized By All Devices Within The Domain Of Devices."

Sonos does not infringe the '187 patent under Dr. Sherman's Strong Encryption Theory because the Sonos private device key that Google contends is the claimed "private key" is not "utilized by all devices within the domain of devices."  Dr. Sherman admits that ████████████ ████████████████████████████████.  Sherman Dep. at 71:16-72:1.  But Dr. Sherman contends that this limitation is nevertheless met *if* all Sonos players in a given household are set up in the same "group" and *if* that group of all players is playing encrypted audio content.  Sherman Rpt. ¶327.[7] When set up in this way, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ which, if set up in the particular way Dr. Sherman

---

[7] Dr. Sherman likewise contends this limitation can be met when all of the players in a household are, over a period of time, included in a group with a particular channel source device, even if all of the household players are not in the group at the same time.  Sherman Rpt. ¶327.

1   suggests, includes all players in the household.  *Id.*  In this way, Dr. Sherman contends that these

2   other players "utilize"—*i.e.*, "benefit from"—the channel source device's private device key.

3   Sherman Dep. at 85:23-86:15.

4        Dr. Sherman also contends that the "utilized" limitation is met under the Doctrine of

5   Equivalents.  His report, however, includes no explanation as to what this theory is, and instead

6   describes how the group functionality at the core of his literal infringement theory works in practice.

7   *See* Sherman Rpt. ¶¶376-381.

8        Dr. Sherman's "utilized" theory fails for four independent reasons.  **First**, Dr. Sherman

9   offers no theory as to how the private device key is utilized by the Sonos Controller, which he

10  admits is a device within the domain of devices.  **Second**, even if the Controller is excluded from

11  the set of devices within the domain, ███████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████.  **Third**, Dr.

13  Sherman's Doctrine of Equivalents theory is entirely unexplained.  **Fourth**, for the asserted method

14  claims, Dr. Sherman and Google have no evidence that the hypothetical configuration Dr. Sherman

15  accuses has ever *actually* been used, and thus no evidence that the claimed method has ever actually

16  been performed.

17          **a.**     **Sonos does not infringe because Dr. Sherman provides no**

18                  **evidence or theory that the private device key is "utilized" by**
                **the Sonos Controller.**

19       The claims require that the private device key is "utilized" by "*all* devices" in the domain.

20  Dr. Sherman contends that the Sonos Controller is one such device within the accused domain.

21  Sherman Dep. at 39:12-15.  Therefore, for Google's theory to work, the Sonos Controller must

22  utilize the private device key.  *See, e.g.*, Sherman Rpt. ¶¶206-211 (arguing that the Controller is "a

23  device existing with[in] the domain of devices" and discussing "the process by which a controller

24  joins the household").   However, Dr. Sherman's infringement theory fails because ████████

25  ████████████████████████████████████████████.  And it is undisputed that the Sonos Controller

26  never plays or even receives music (encrypted or otherwise).

27       In fact, Dr. Sherman has no opinion, let alone evidence, that the Controller "utilize[s]" the

28  alleged private key.  His report merely describes the process by which Sonos *players* receive

content decrypted using the channel source player's private device key.  *See, e.g.*, Sherman Rpt. ¶¶327-329 (explaining his theory that "all '187 Accused Instrumentalities" utilize the channel source device's private device key).[8]  But he fails to even allege that the Controller receives or "utilizes" the private device key, and indeed, doesn't mention the Controller at all in his discussion of this limitation.  *See id.* ¶¶327-381.

Moreover, Dr. Sherman's admissions make clear that his theory as to how Sonos *players* "utilize" the channel source device's private device key does not apply to a Sonos Controller.  In particular, Dr. Sherman admits that a Controller "cannot be part of a channel source group." Sherman Dep. at 83:21-24.  And Dr. Sherman admits that a Controller does not "receive the decrypted music content from a channel source like the other players in the group."  *Id.* at 85:2-6. Thus, even accepting everything else about his theory, the Controller does not "utilize" the private device key because it is not part of the channel source group, does not receive decrypted music from the channel source and therefore does not "benefit" from the channel source's use of *its* private device key.  Because Google has no expert testimony or other evidence with which to show that the Controller utilizes the alleged "private key," the Court should grant summary judgment of no infringement of all asserted claims.

### b.   The private device keys is not "utilized by all the devices."

Google also has no evidence that the alleged "private key" is utilized by all the players in a household.  Dr. Sherman admits that ███████████████████████████████████████████. Sherman Dep. at 71:16-72:1.  He also admits that ████████████████████████████████████ █████████████████████████.  *Id.* 72:2-10, 82:8-11.  And he admits that the ██████████████ ████████████████████████████████████████r.  *Id.* at 82:12-15.  In other words, he admits that the ██████████████████████████████████████.

Faced with these undisputed facts, Google tries to stretch the meaning of "utilized" far beyond its plain and ordinary meaning to a person of ordinary skill in the art.  Google contends that when other players in a group receive ████████████████████████████████████████

---

[8] Dr. Sherman defined "'187 Accused Instrumentalities" to not include the Sonos Controller device.  *See* Sherman Rpt. ¶4; Sherman Dep. at 34:3-8 (admitting Controller is not accused).

1    ███████████████████, those other players are "utilizing" the █████████████████████

2    █. Sherman Rpt. ¶327. Put differently, Dr. Sherman contends that "utilize" means "benefit from

3    the use of." Sherman Dep. at 85:23-86:2.

4         Dr. Sherman offers no support for this strained reading of the claims, which is unsupported

5    by, and is at odds with, the '187 patent's specification. The '187 patent teaches a system in which

6    a private key is shared by every device in the domain. So when the '187 patent's specification

7    explains that the private key is "utilized by every device," it describes each device in the domain

8    having its own copy of the (same) private domain key and each device individually employing that

9    private domain key to gain access to the received media content. '187 patent at 6:45-60. Dr.

10   Sherman's construction of "utilize" to broadly encompass merely "benefit[ing] from" the upstream

11   use of a key is thus divorced from the specification. Indeed, the specification nowhere describes a

12   device using its own private key to gain access to content and then sharing unencrypted content

13   with another device. '187 patent, 2:24-28, 7:32-37. Likewise, the specification does not use the

14   term "utilize" to mean "benefiting from" in any context.

15        Dr. Sherman's construction is also at odds with the plain and ordinary meaning of the term

16   "utilized," which means to actively "make use of" rather than to passively "benefit from." *See* Ex.

17   G, https://www.oed.com/search/dictionary/?scope=Entries&q=utilize (defining "utilize" as "to

18   make or render useful"). Under Dr. Sherman's definition of "utilized," passengers on a bus

19   "utilize" the driver's keys and, e.g., the pump he used to fill the gas tank. *See* Sherman Dep. at

20   85:11-87:2.

21        Further, even if "utilized" ***could*** be stretched to encompass the idea of passively "benefiting

22   from" something used by another entity, that is not its "plain and ordinary" meaning, and there is

23   no hint in the specification to support such a peculiar usage. In *Eon Corp. IP Holdings LLC v.*

24   *Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016), the Federal Circuit rejected an

25   argument that the term "portable" could refer to a meter that was physically capable of being moved

26   but was, in reality, mounted to buildings. In rejecting the patentee's interpretation, the court

27   explained that the question was not whether the term "portable" had some "settled ordinary

28   meaning of the terms in some abstract sense of the word" but instead must be based on "the meaning

1    in the context of the patent." *Id.* at 1321 (citation omitted).  That guidance requires rejecting Dr.

2    Sherman's position here, as the only meaning of "utilized" that makes sense in the context of the

3    '187 patent is that each device makes use of the shared private key (i.e. by interacting with it) to

4    obtain access to the encrypted content.

5         In sum, the undisputed facts confirm that the ███████████████████████

6    ████████████████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████.  There is no infringement.

8                   **c.     Dr. Sherman's Doctrine of Equivalents argument fails.**

9         Dr. Sherman opines that Sonos infringes the "utilize" limitation under the doctrine of

10   equivalents.  Sherman Rpt. ¶376.  His opinion fails to "provide particularized testimony and linking

11   argument on a limitation-by-limitation basis that created a genuine issue of material fact as to

12   equivalents."  *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1328-29 (Fed. Cir. 2007)

13   (citations omitted).  (And Google's infringement contentions similarly failed to articulate a

14   cognizable equivalents theory.   Ex. H, Google's Corrected First Amended Infringement

15   Contentions Pursuant to L.R. 3-1, Exhibit A re '187 patent, at 83-110). The Court should therefore

16   grant summary judgment of no infringement under the doctrine of equivalents.

17        Dr. Sherman asserts that "[t]o the extent Sonos asserts that the accused devices do not

18   literally meet the limitation requiring that the private key be 'utilized by all devices within the

19   domain of devices,' that limitation is met under the doctrine of equivalents."  Sherman Rpt. ¶376.

20   But he offers no explanation of the differences between Sonos's system and the claim, how those

21   differences are insubstantial, or how they are nonetheless equivalent.  Instead, Dr. Sherman follows

22   his bald "equivalents" assertion with a repeat of his *literal* infringement theory.  *See id.* ¶¶377-390.

23   In deposition, Dr. Sherman admitted that this portion of his report does not identify any alleged

24   equivalent and does not include any function/way/result analysis.  Sherman Dep. at 89:19-91:3.

25        Dr. Sherman's supposed doctrine of equivalents opinion includes no analysis or argument,

26   only a context-free discussion of how he believes Sonos's products operate.  *See* Sherman Rpt.

27   ¶¶377-390.  This falls far short of the required "particularized testimony" that "explain[s] the

28   insubstantiality of the differences between the patented method and the accused product; or

1    discussed the function, way, result test." *AquaTex Indus.,* 479 F.3d at 1329.   His proposed

2    testimony is, at best, "entirely conclusory and [] insufficient to create a question of fact under the

3    doctrine of equivalents."   *See Quintal Research Grp., Inc. v. Nintendo of Am., Inc.*, No. C 13-00888

4    SBA, 2015 U.S. Dist. LEXIS 93488, at *37, n.10 (N.D. Cal. July 17, 2015) (granting summary

5    judgment where witness testified that despite the difference, the accused device "perform[ed]

6    substantially the same function in substantially the same way to obtain the same result.").

7         In any event, Sonos's accused devices do not infringe under the Doctrine of Equivalents.

8    Sonos devices operate in a fundamentally different way than the system described in the '187

9    patent.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which is a core feature of the patented

10   alleged invention.  *See* '187 patent, Abstract, 2:10-13 (describing the alleged invention's "DRM

11   domain private key").   For this reason,  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮—is, at the very least, a different "way" of allowing multiple devices to access encrypted

14   music. *See VirnetX, Inc. v. Cisco Sys. Inc.*, 767 F.3d 1308, 1323 (Fed. Cir. 2014) (reversing a jury

15   finding that transmitting over a private channel was the same "way" as transmitting encrypted

16   channel when the claims and specification described using encryption rather than other methods of

17   secure communication).   To hold otherwise would vitiate the claim requirement that the private

18   device key be "utilized by all the devices."

19              **d.      Google has no evidence that the asserted method claims have
                          ever been infringed.**

20        Finally, Google has no evidence that the asserted method claims (claim 1 and its

21   dependents) have ever been infringed under Dr. Sherman's Strong Encryption Theory.

22   Infringement of a method claims occurs only when a "party performs all of the steps of the process."

23   *Ricoh Co., Ltd. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1333 (Fed. Cir. 2008) (citations omitted).

24   Merely selling a device that is capable of performing the claimed method is not infringement.  *Id.*

25   at 1335 (holding that "a party that sells or offers to sell software containing instructions to perform

26   a patented method does not infringe").

27        Here, Dr. Sherman's Strong Encryption Theory requires that Sonos's products be

28   configured and used in a particular way:

1

- The user must have a system with multiple Sonos players in their Sonos household.

2  *See, e.g.*, Sherman Rpt. ¶¶206, 209 (explaining how the "receiving domain

3  information" step requires receiving domain information from another device in the

4  domain); and

5

- The user must configure a playback group such that it contains all the Sonos players

6  in the household. *Id.* ¶327; and

7

- The group must play encrypted content such that the ███████████████████

8  ████████████████████████████████████████████████████████████████

9  ███████. *Id.*[9]

10  Dr. Sherman does not contest that all three things are required for his Strong Encryption Theory.

11  Sherman Rpt. ¶¶206, 209; Sherman Dep. at 78:22-79:3, 79:4-16.

12  Google has no evidence that any Sonos user configured their system in this way and then

13  played encrypted audio streams.  Dr. Sherman's report purports to describe the *capabilities* of

14  Sonos products, but includes no evidence that any user has ever *used* their Sonos products in the

15  way he alleges infringes.  *See id.* 81:17-23 (admitting that the Sherman report contains no evidence

16  that any customer has actually configured their Sonos system in an allegedly infringing manner).

17  Instead, Google's evidence shows, at most, the Sonos's system is capable of performing the accused

18  steps, which is not sufficient to defeat summary judgment.  *ePlus, Inc. v. Lawson Software, Inc.,*

19  700 F.3d 509, 521-22 (Fed. Cir. 2012); *E-Pass Tech., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222

20  (Fed. Cir. 2007) (finding no infringement because it "requires too speculative a leap to conclude

21  that any customer actually performed the claimed method").  That is especially true where, as here,

22  there are *many* uses and configurations of Sonos devices which would not infringe.

23  Sherman Dep. at 78:22-79:3, 79:4-16 (admitting that there is no infringement unless Dr. Sherman's

24  particular use scenario occurs).

25

26

27  _____

[9] Notably, Sonos's 30(b)(6) witness testified that a majority of music services do **not** supply
28  encrypted audio streams to Sonos players, and that he was aware of only one that does.  Ex. I,
Vovk Dep. at 93:16-94:21.

SONOS'S MSJ OF NON-INFRINGEMENT
OF '187 PATENT ASSERTED CLAIMS
3:20-CV-03845-EMC

2.      **Sonos Does Not Infringe Because The Private Device Key Is Not "Based On" The Household ID.**

Sonos does not meet a second limitation of both asserted independent claims of the '187 patent under Dr. Sherman's Strong Encryption Theory.  Both independent claims 1 and 10 require that "the private key is based on the domain information."  But the Sonos private device key—which Dr. Sherman contends is the claimed "private key"—is not "based on the domain information."

Dr. Sherman contends that Sonos's private device keys are "based on" Sonos's household ID (which he contends to be the domain information) because ███████████████████████ ██████████████████████████████████.  Sherman Rpt. ¶¶295-309.  But the fact that ████████████████████████████████████████ does not mean that the key is "based on" the household ID.  Rather, as Dr. Sherman admits, ██████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████.  Sherman Dep. at 51:19-52:21, 93:4-10.

a.      **Sonos's system does not issue private device keys that are "based on" the provided household ID information.**

The accused Sonos private device keys are not based on the provided household ID information.  The '187 patent explains that when a device is added to a domain of devices, the device needs to obtain a "private key."  The device obtains the private key from a "key issuer."  As part of that process, the key issuer receives "domain information corresponding to the domain of devices."  After receipt, the key issuer "issue[s] a private key to the new device, wherein the private key is based on the domain information."  '187 patent, claims 1, 10.

Sonos's system operates in a fundamentally different way than the '187 patent.  In Sonos's system, players on the same network do have common a household ID (the accused "domain information"), ███████████████████████████.  As Dr. Sherman recognizes, ██████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10



11    . Nor does Dr. Sherman identify any

12 other way that the household ID is used to generate or determine the private key that issues.

13 Accordingly, Sonos does not "issue a private key to the new device, wherein the private key is

14 based on the domain information," as required by claim 1.

15          b.      **Dr. Sherman's "based on" theory is inconsistent with the**

16                  **claims.**

17          Google has no evidence that the private device key is "based on" the household ID.  Instead,

18 Dr. Sherman points to various ways



19

20    Sherman Rpt. ¶¶295-309.

21          **First**, without ever explaining why, Dr. Sherman contends that

22

23          In particular, Dr. Sherman asserts that

24

25          *Id.* ¶297.  Similarly, Dr. Sherman contends that

26

27

28



1  " *Id.* ¶301.[10]  Dr. Sherman likewise points to

2  

3  . Sherman Rpt. ¶¶301, 308.  But the claims require that the *private key*

4  be based on the domain information—not merely that

5  .  As such, the fact that

6  is irrelevant to whether the private key is *based on* that information.  And,

7  as noted in the section above,

8  *See id.* ¶¶298, 301.  To give an analogy,

9  if I buy a vanilla ice cream and—during the transaction—provide my credit card number, that in

10  no way suggests that the ice cream is "based on" my credit card number.  Why?  Because the ice

11  cream wasn't *made with* or *selected using* my credit card number.  Instead that number played an

12  entirely different role in the transaction.

13  Moreover, these arguments reflect the fact that Dr. Sherman's argument is predicated on an

14  effort to warp the meaning of the claim language.  In deposition, Dr. Sherman explained that he

15  interprets the term "based on" to mean something like "produced as a consequence of."  *See*

16  Sherman Dep. at 54:2-24 (testifying that "[t]he idea of 'based on' is produced in consequence of");

17  60:25-61:18 (testifying that the supposed plain and ordinary meaning of "based on" includes

18  "producing a number as a consequence of considering" the parameter).  But the asserted claims do

19  not simply require that the private key be provided as a "consequence" of receiving the household

20  ID—they require that the *private key itself* be "based on" the domain information.  *See e.g.*, '187

21  patent, claims 1 and 10 ("wherein the private key is based on the domain information").

22  The specification makes this clear.  In particular the '187 patent contemplates that all the

23  devices in a domain will *share a single domain-wide private key.*  As the patent explains, when the

24  key issuer receives domain information and recognizes that the domain information corresponds to

25  a domain of devices that was already issued a private key, it responds to that request by issuing the

26  *same existing private key* shared by devices within the domain.  '187 patent at 4:33-41.  In this way,

27  ---
   [10] To be clear,

28

the key itself is "based on" the provided domain information because the domain information is used as an input to decide *which* key gets issued—*i.e.*, the domain information is used as an input to the key *selection* process.

Dr. Sherman's theory that the private key need only be somehow a "consequence of" the domain information is also incorrect because it would vitiate the "based on" limitation.  The claims of the '187 patent *already require* that the alleged private key be issued "as a consequence" of the domain information because all asserted claims recite "providing the domain information to a key issuer, which is separate from the domain of devices, *causing the key issuer to issue a private key to the new device*." *See, e.g.*, '187 patent, claims 1 and 10 (emphasis added).  Put differently, the claims *already* require that ███████████████████████████████████████—so that cannot be what the claims mean when they (separately) require the key itself to be based on the domain information.  As a result, Dr. Sherman's infringement theory reads the limitation out of the claim and cannot be correct.  *See Intel Corp.*, 21 F.4th at 810 (collecting cases regarding the axiom that courts should not construe claims "in a way that renders them void, meaningless or superfluous") (citations omitted).  And Dr. Sherman's report provides no support for this strained understanding of the claims—which he articulated for the first time at his deposition.

Dr. Sherman's "consequence" definition is also not the plain and ordinary meaning of "based on."  If a plaintiff asks the Court for a trial date and receives one in response, the trial date *itself* was not "based on" the request.  The date might have been provided *in response* to the request, but the date was not *based on* the request unless, *e.g.*, the request asks for a date in a particular month and the Court *uses* that information to select a trial date.  Dr. Sherman's attempts to assert otherwise strain credulity.  *See* Sherman Dep. at 57:21-59:18 (arguing that a person's phone number would be considered to be "based on" their name).  Nor is data "based on" other information simply because that information is used as a label or means of delivering the data to its destination.  A credit card number is not "based on" the member's address simply because the credit card company stores new credit card numbers in a database along with member addresses and uses that address to deliver (*i.e.*, mail) credit cards to the member.

**Second**, Dr. Sherman contends that the private device key is "based on" the household ID because ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████. *See* Sherman Rpt. ¶¶295-296. This too, is an irrelevant observation. All that this shows is that ██████████████████████ ███████████████████████████████████████████████████████████ ██. It reveals nothing to suggest that the private device key is somehow based on the household ID. At most, this demonstrates that the ███████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████.

In sum, Sonos's system is not at all like the way that the '187 patent describes issuing shared domain private keys based on the provided domain information. Dr. Sherman's attempts to show otherwise suggest only that the household ID is involved in the process of obtaining a private device key, not that the private device key is "based on" it as the claims require.

## V.    CONCLUSION

For the reasons stated herein, Sonos respectfully requests that the Court find that Sonos does not infringe Claims 1, 3, 4, 10, and 12 of the '187 patent.

|  | **Method Claims (1, 3, 4)** | **Apparatus Claims (10, 12)** |
|---|---|---|
| **Authentication Theory** | - Preamble not met<br>- AuthToken not claimed private key<br>- AuthToken not based on domain information | - AuthToken not claimed private key<br>- AuthToken not based on domain information |
| **Strong Encryption Theory** | - No evidence of use<br>- Accused private key not utilized by all devices in domain<br>- Accused private key not based on domain information | - Accused private key not utilized by all devices in domain<br>- Accused private key not based on domain information |

---

[11] ███████████████████████████████████████████████████████████████. Sherman Rpt. ¶¶50-52.

1    Dated: August 11, 2023

2

ORRICK HERRINGTON & SUTCLIFFE LLP
*and*
LEE SULLIVAN SHEA & SMITH LLP

3

By: */s/ Alyssa Caridis*
                Alyssa Caridis

4

5                      *Attorneys for Sonos, Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SONOS'S MSJ OF NON-INFRINGEMENT
OF '187 PATENT ASSERTED CLAIMS
3:20-CV-03845-EMC