1  CLEMENT SETH ROBERTS (SBN 209203)
   croberts@orrick.com
2  BAS DE BLANK (SBN 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (SBN 260103)
   acaridis@orrick.com
4  WILL MELEHANI (SBN 285916)
   wmelehani@orrick.com
5  EVAN D. BREWER (SBN 301411)
   ebrewer@orrick.com
6  SHANE D. ANDERSON (SBN 313145)
   sdanderson@orrick.com
7  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
8  405 Howard Street
   San Francisco, CA 94105-2669
9  Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759
10
   GEORGE I. LEE (*pro hac vice*)
11 lee@ls3ip.com
   SEAN M. SULLIVAN (*pro hac vice*)
12 sullivan@ls3ip.com
   RORY P. SHEA (*pro hac vice*)
13 shea@ls3ip.com
   J. DAN SMITH (*pro hac vice*)
14 smith@ls3ip.com
   LEE SULLIVAN SHEA & SMITH LLP
15 656 W Randolph St., Floor 5W
   Chicago, IL 60661
16 Telephone:    +1 312 754 0002
   Facsimile:    +1 312 754 0003
17
   *Attorneys for Defendant Sonos, Inc.*
18

19              UNITED STATES DISTRICT COURT

20            NORTHERN DISTRICT OF CALIFORNIA,

21                SAN FRANCISCO DIVISION

22 GOOGLE LLC,                        Case No. 3:20-cv-03845-EMC

23              Plaintiff,            **SONOS, INC.'S SUPPLEMENTAL BRIEF
                                      IN SUPPORT OF SUMMARY JUDGMENT
24        v.                          OF NON-INFRINGEMENT OF '187
                                      PATENT ASSERTED CLAIMS**
25 SONOS, INC.,
                                      Date: July 18, 2024
26              Defendant.            Time: 1:30 p.m.
                                      Place: Courtroom 5, 17th Floor
27

28

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND .......................................................................................................... 1

III.    THE CLAIMED "PRIVATE KEY" MUST BE A CRYPTOGRAPHIC KEY
        DESIGNED TO SERVE AS THE KEY INPUT IN A CRYPTOGRAPHIC
        ALGORITHM. ............................................................................................................. 2

        A.      The Plain and Ordinary Meaning of "Private Key" Refers To A
                Cryptographic Key Input, Rather Than A Data Input. ............................. 3

        B.      The '187 Patent Uses "Private Key" To Refer To A Cryptographic Key
                Input. ........................................................................................................ 7

IV.     THERE IS NO EVIDENCE IN THE RECORD UPON WHICH A JURY COULD
        FIND THAT THE AUTHTOKENS ARE "BASED ON" THE HOUSEHOLD ID. ......... 9

# TABLE OF AUTHORITIES

**Page(s)**

*McSherry v. City of Long Beach*,
    584 F.3d 1129 (9th Cir. 2009) ................................................................................................ 11

# APPENDIX OF CLAIMS

1. A method for registering a new device as part of a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system, the method comprising the steps of:

receiving domain information corresponding to the domain of devices from a device existing within the domain of devices;

providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices; and

receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

3. The method of claim 1 wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving domain information for the device existing within a domain of devices, all devices within the domain sharing account information.

4. The method of claim 1 wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving the domain information over a short range link.

10. An apparatus comprising:

communication circuitry receiving domain information from a device existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system;

storage for storing the domain information; and

logic circuitry for providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key for use in accessing protected digital content to the apparatus, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices.

12. The apparatus of claim 10 wherein the domain of devices share account information.

1

**I.     INTRODUCTION**

The Court requested additional briefing on two issues, both of which Google must prevail on to overcome a summary judgment finding of non-infringement:

First, the Court requested briefing on whether the claim term "private key" must refer to "the [key] input that prompts the modification to occur," or whether it can also refer to "the [data] input that is modified by the algorithm."  Dkt. No. 206 at 24.  The answer is that the term "private key" only refers to the key input and not to the data that is modified by the cryptographic algorithm.  Indeed, to answer this question the Court need look no further than *Google's own statement* during claim construction where it explained that:

> [T]he term "private key" would have been understood by a person of ordinary skill in the art to mean **a cryptographic key** used in relation to a cryptographic algorithm.

Dkt. No. 67 (Google CC Brief) at 13 (emphasis added); *see also id*. at 11 (Google acknowledging that "the parties and their experts agree that this 'private key' is a 'cryptographic key.'").  Conversely, there is no support in either the intrinsic or extrinsic evidence to suggest that a piece of data that is, *e.g.*, *encrypted, decrypted, or signed* by the cryptographic algorithm can be the claimed "private key."

Second, the Court requested additional briefing on whether there is evidence to support Google's assertion that the authTokens issued by third-party music providers are "based on" the Sonos household ID.  There is not.  In fact, there is no evidence in the record showing either how third parties determine which authToken to issue or send or how they create authTokens.  And the Sonos documents setting out high-level requirements for the use of an authToken do not suggest or require third-party content providers to do so in a way that would meet this claim limitation.

**II.     BACKGROUND**

Google asserts that several Sonos players infringe independent claims 1 and 10, and dependent claims 3, 4, and 12 of the '187 patent (collectively, the "Asserted Claims"). The '187 patent provides a way for users with multiple media players to obtain access to Digital-Rights Management ("DRM")-protected content.  Dkt. No. 185-3, Ex. A ('187 patent) at 1:14-37.  The Asserted Claims require that an accused player provide "domain information" to a third-party key

1   issuer, thereby causing that third-party key issuer to issue to the accused player a "private key" that

2   is "based on the domain information." *See* Appendix of Claims.  For its only surviving infringement

3   theory, the "Authentication" theory, Google asserts that the authTokens third-party music providers

4   deliver to Sonos players are the claimed "private key."  Dkt. No. 189-3 (Google's Opp. Br.) at 3-4,

5   8.

6        Sonos moved for summary judgment of non-infringement, arguing (among other things)

7   that Google has no evidence with which: (1) to dispute the fact that the authTokens are not "private

8   keys" and (2) to show that the authTokens are "based on" the accused domain information.  In its

9   order, the Court requested additional briefing on two issues.  One, the Court asked that the parties

10  submit claim construction argument on the "narrow issue" of "*which* input in the cryptographic

11  algorithm the purported key must be."  Dkt. No. 206 at 17.  Two, the Court construed the "based

12  on" limitation to require that "the domain information must be somehow used to determine which

13  key is issued in the first instance," and asked the parties to address "whether there is sufficient

14  evidence in the record to support a jury finding the domain information informs which key is issued,

15  i.e., is the key 'based on' the domain information."  *Id*. at 14, 24.

16  **III.    THE CLAIMED "PRIVATE KEY" MUST BE A CRYPTOGRAPHIC KEY**
17  **DESIGNED TO SERVE AS THE KEY INPUT IN A CRYPTOGRAPHIC**
    **ALGORITHM.**

18       The "private key" recited in the independent Asserted Claims—claims 1 and 10—is a

19  cryptographic key that is used as the key input (rather than as the data input) to a cryptographic

20  algorithm.

21       As Google's expert, Dr. Sherman, has explained, cryptographic algorithms generally

22  require two inputs: the **data** (to be, *e.g.*, encrypted, decrypted, or signed) and a **key**.  Dkt. No. 189-

23  4, Ex. 1 (Sherman Rpt.) at ¶¶51-54.  For example, in a diagram from Dr. Sherman's report

24  (reproduced below), the encryption algorithm (on the left) takes two inputs: a **data** input (the

25  "Plaintext") and a **key** input (the "Recipient's Public Key").  The decryption algorithm also takes

26  two inputs:  The "ciphertext" (*i.e.*, the encrypted version of the plaint text) is the **data** input to the

27  decryption algorithm, and the "Recipients Private key" is the **key** input.

28

1

2

3

4

5

6

7



8   *Id.* at ¶52.  Signing algorithms also use these two inputs: the **data** to be signed and the **key** used to

9   sign the data.  *Id.* at ¶53.

10          During claim construction, the Court construed the term "private key" as "[a] non-public

11   key that is used as an input to a cryptographic algorithm designed such that, without the key, the

12   output of the algorithm cannot be computed."  Dkt. No. 108 at 11.  Google now argues—based on

13   an ambiguity in its own proposed construction—that a mere data input into a cryptographic

14   algorithm can be the claimed "private key."  Google's position is frivolous.  The extrinsic evidence

15   shows there is no dispute regarding the plain and ordinary meaning of "private key," and there is

16   nothing in the claims or specification of the '187 patent that changes the plain and ordinary

17   meaning.  In fact, as explained below, during claim construction Google acknowledged that the

18   claimed "private key" must be the "cryptographic key" to a cryptographic algorithm.

19          **A.      The Plain and Ordinary Meaning of "Private Key" Refers To A
                        Cryptographic Key Input, Rather Than A Data Input.**

20

21          As Google's expert opined, the term "private key" was well-known in the art to refer to the

22   key input, rather than the data input, of a cryptographic algorithm.  Dkt. No. 69-5, Ex. 5 (Sherman

23   CC Decl.) at ¶56 ("In my opinion, the term 'private key' had a well-known meaning to those of

24   ordinary skill in the art in the November 2002 time frame. It is a cryptographic key, or string of

25   characters, that is kept private and can be used in asymmetric encryption systems, symmetric

26   encryption systems or for some other purpose, such as for computing a digital signature.").  Indeed,

27   there is no evidence indicating that anyone of ordinary skill in the art has used the term "private

28   key" to refer (interchangeably) to either the **data** input or **key** input of a cryptographic algorithm.

1   Rather, the extrinsic evidence confirms that the term "private key" refers specifically to the

2   cryptographic key input used in modifying (*e.g.*, encrypting, decrypting, signing) the data input.

3       Throughout this case, Google has repeatedly acknowledged that the claim term "private

4   key" refers to such a "cryptographic key." During claim construction proceedings, the parties

5   disputed whether the "private key" could be used for more than encryption and decryption (*see* Dkt.

6   No. 108 at 11-15), but both Google and its expert repeatedly acknowledged that the claimed

7   "private key" is a cryptographic key that is used as the key input to a cryptographic algorithm.  In

8   its claim construction brief, Google explained that "the parties and their experts agree that th[e

9   claimed] 'private key' is a 'cryptographic key.'" Dkt. No. 67 (Google CC Brief) at 11.  Google's

10  expert likewise admitted "that a private key in the context of the '187 patent … refers to a

11  **cryptographic key**." Ex. L[1] (Sherman 3/8/21 Dep. Tr.) at 20:7-11 (emphasis added).  And Google

12  further explained that its proposed construction, which was ultimately adopted by the Court, was

13  meant to "reflect[] the common understanding in the art of what a '**cryptographic key**' is."  Dkt.

14  No. 67 (Google CC Brief) at 11 (emphasis added). Google likewise explained that "the term

15  'private key' would have been understood by a person of ordinary skill in the art to mean **a**

16  **cryptographic key** used in relation to a cryptographic algorithm." *Id.* at 13.

17      To be clear, the difference between the "key" and "data" inputs extends beyond semantics.

18  As Dr. Sherman explained during deposition, "[a] cryptographic key is a key sequence of characters

19  that is an input to a cryptographic algorithm **where the algorithm is designed such that if you**

20  **don't know the key**, you cannot compute its output."  Ex. L (Sherman 3/8/21 Dep. Tr.) at 16:5-9

21  (emphasis added).  In other words, the cryptographic algorithm is <u>specifically designed to require</u>

22  <u>use of a specific kind of cryptographic key</u>.  Indeed, when asked "how would you be able to tell if

23  [a] string of characters … is a cryptographic key?" Dr. Sherman explained that one would need to

24  know "[i]f it was used as an input to a cryptographic algorithm where it was designed such that

25  without this - without a key you cannot compute the output of **that algorithm**."  Ex. L (Sherman

26  3/8/21 Dep. Tr.) at 34:5-11 (emphasis added).  Dr. Sherman also drew a distinction between the

27

28  ---
[1] All exhibits referenced in this Motion are submitted with the Caridis Decl. filed concurrently herewith.

key input and data input in his prior claim construction declaration—explaining, for example, that "a 'private **key**' can be used not only to decrypt **data** or generate digital signatures, but also to encrypt it, depending on the cryptographic system being used." Dkt. No. 69-5, Ex. 5 (Sherman CC Decl.) at ¶54 (emphasis added). This is also consistent with how Sonos's technical expert, Dr. Wicker, explained "private keys." According to Dr. Wicker, "the algorithm that a cryptosystem uses to map **plaintext** to ciphertext is controlled by a **key**, which may take the form of a relatively short string of letter and/or numbers" and which "is often called a 'private key.'" Ex. M (Wicker Rpt.) at ¶57 (emphasis added). Thus, like Dr. Sherman, Dr. Wicker understands that a cryptographic algorithm is designed to work specifically with *a particular, corresponding* **kind of** cryptographic key.

By contrast, a cryptographic algorithm is not designed to work only with a particular data input. Rather, such algorithms can be used with virtually any data input, allowing the algorithm to, *e.g.*, encrypt, decrypt, or digitally sign whichever data or message is input.[2]

The use of the term "private key" in the art reflects this functional distinction, as the extrinsic evidence repeatedly confirms that the term "private key" is used to refer to the key input, and not to the data input, of a cryptographic algorithm.[3] For example, in Dr. Sherman's expert report, discussed above, Dr. Sherman uses the term "private key" to refer to the particular key input of a cryptographic algorithm, and uses other generic terms, like "message," "plaintext," "ciphertext" or "data" to refer to the kinds of data upon which the cryptographic algorithm acts. *See* Dkt. No. 189-4, Ex. 1 (Sherman Rpt.) at ¶¶51-53 (showing "private keys" as the key input). The websites that Dr. Sherman cites in his infringement report as support employ substantially the same terminology. *See* Ex. N (https://www.geeksforgeeks.org/digital-signatures-certificates/) (referring to the key input as a "key" and the data input as, *e.g.*, "message," "original text," and

---

[2] For example, in ████████████████████████████████████████████████████████ *See* Ex. M (Wicker Rpt.) at ¶¶199-201; Dkt. No. 189-4, Ex. 1 (Sherman Rpt.) at ¶¶232, 387, 403, 439, 665.

[3] As explained more in Section III.B below, it is possible that one could, for example, attempt to encrypt a private key and thereby use that private key as the data input to a cryptographic algorithm that makes use of a different key. But that "private key" it not a cryptographic key simply because it can be encrypted. It only qualifies as a private key if there is a cryptographic algorithm designed to use it as the key.

"original data").  And, notably, Dr. Sherman never suggests that the term "private key" could interchangeably also refer to this data input.  Dr. Wicker likewise reinforced this difference, and explained how in digital signature algorithms, there is a clear difference between the cryptographic "key" and "the data (to be encrypted/decrypted/signed/verified)."  Ex. M (Wicker Rpt.) at ¶¶199-201.

This distinction is also reflected in multiple dictionary definitions from the time of the alleged invention, each of which use the term "key" to refer to the key input and other terms (like "data or "message") to refer to the data upon which the cryptographic algorithm is acting.  For example:

- Microsoft Computer Dictionary, 5th Ed. (2002) (Ex. O) at 135 defines "cryptography" as "The use of codes to convert **data** so that only a specific recipient will be able to read it using a **key**."

- Microsoft Computer Dictionary, 5th Ed. (2002) (Ex. P) at 300 defines "**key**" as "In encryption and digital signatures, a string of bits used for encrypting and decrypting **information** to be transmitted."

- Dictionary of Computer Science, Engineering, and Technology (2001) (Ex. Q) at 266 defines "**key**" as "in encryption, a value used to encrypt or decrypt a **message** according to the algorithm decrypt(key,encrypt(key,message))=message."

- Newton's Telecom Dictionary (2001) (Ex. R) at 389 defines "**key**" as "In encryption, a **key** is a data string which, when combined with **the source data** according to an algorithm, produces output that is unreadable until decrypted.  A **key** can also be used to decrypt a **data** string."

- The New Penguin Dictionary of Computing (2001) (Ex. S) at 267 defines "**key**" as "In cryptography, a piece of secret additional information that must be known in order to decode an encrypted **message**."

- Webster's New World Dictionary of Computer Terms, 8th Ed. (2000) (Ex. T) at 306 defines key as "In cryptography, the procedure that is used to encipher the **message** so that it appears to be just nonsense.  The key also is required for decryption. Public

key cryptography uses two keys: a private **key** and a public **key**.  A user makes the public key known to others, who use it to encrypt **messages**; these **messages** can be decrypted only by the intended recipient of a **message**, who uses the private **key** to do so."

These definitions confirm that, in the context of a cryptographic algorithm, the term "key" is not understood to refer generally to either the data or the key input—instead it refers specifically to the key input.  In other words, the "key" is not "the input that is modified by the algorithm" but is instead "the input that prompts the modification to occur." Dkt. No. 206 at 24.

**B.      The '187 Patent Uses "Private Key" To Refer To A Cryptographic Key Input.**

In light of the well-known distinction between the cryptographic keys that control cryptographic algorithms and the data upon which those cryptographic algorithms act, it is not surprising that the '187 patent uses the term "private key" exclusively to refer to the cryptographic key input, and not to the data input into the cryptographic algorithm.  In particular, when describing certain cryptographic techniques, the specification explains that "The **private key** is used for either decrypting **data** or generating **digital signatures** and the public key is used for either encrypting **data** or verifying **digital signatures**."  Dkt. No. 185-3, Ex. A ('187 patent) at 2:45-49.  As such, the patent—like the parties' experts, industry definitions, and literature—use the term "key" to refer to the key input and employ different terms—"data" and "digital signatures"—to describe the data input upon which the cryptographic algorithm is acting.

While the '187 patent does include some description of cryptographic algorithms acting on data inputs that happen to also be cryptographic keys, these disclosures do not indicate that data may be deemed a "private key" simply because it is used as the *data* input into a cryptographic algorithm.  In particular, the patent explains how a rights object can include "an encrypted encryption key (content encryption key)" which was "encrypted with the DRM public key so it can be decrypted only using the DRM private key."  *Id.* at 4:52-56.  This concept is also recited in unasserted claims 6 and 14.  This material explains only that a cryptographic key (in this case, the content encryption key) *can* be used as the data input to a cryptographic algorithm, but that does not somehow transform the content encryption key into the claimed "private key."  Rather, the

1   content encryption key is a cryptographic key because there is *another* cryptographic algorithm

2   designed to use that content encryption key to decrypt content.[4] *See id.* at 6:60-62 ("Content 204

3   is decrypted, and is rendered by application 203. Logic circuitry 210 controls these functions.").

4        Specifically, in one embodiment there are two different cryptographic algorithms, each with

5   their own cryptographic key.  The DRM key is the key to a **first cryptographic algorithm** that

6   decrypts the encrypted content encryption key.  The content encryption key is the key to a **second**

7   **cryptographic algorithm** that decrypts the, e.g., music content.  It is because the "content

8   encryption key" is used with this second cryptographic algorithm, and not the fact that the "content

9   encryption key" can be data that is encrypted and decrypted, that makes it a cryptographic key.  To

10  put it differently, you can use a cryptographic key as a data input to a cryptographic algorithm (that

11  encrypts using a separate key) to produce an *encrypted* key, but that does not mean that all data

12  inputs to cryptographic algorithms *are* cryptographic keys, much less that they are cryptographic

13  keys *because* they are data inputs to a cryptographic algorithm.  Or, to provide a more concrete

14  analogy, one can lock objects (data)—including a key—inside of a safe (cryptographic algorithm)

15  but that does not mean that any object becomes a safe key (cryptographic key) whenever locked

16  inside of a safe.

17       Accordingly, nothing about this disclosure or the unasserted claims supports the idea that

18  Google can prove a piece of data is a "private key" by showing that it serves as the data input to a

19  cryptographic algorithm with its own separate key.  Because that is what Google is attempting, the

20  Court should grant summary judgment of non-infringement.

21

22

23

---

24  [4] Further, this "content encryption key" is irrelevant to the claimed "private key" at issue in the
    Asserted Claims, because it is not "based on the domain information."  Specifically, the '187

25  Patent discloses that the "content encryption key" is contained in "[t]he rights object."  Dkt. No.
    185-3, Ex. A ('187 Patent) at 4:52-54.  The "rights object" is generated "based on information

26  (e.g. the DRM public key) in the DRM certificate."  *Id.* at 4:48-51.  The '187 Patent discloses that
    the "DRM certificate" does not comprise or contain the "domain information," rather it

27  "comprises a DRM public key (the corresponding DRM private key is securely stored in user
    equipment 101), identification information (e.g., the unique serial number or model number

28  belonging to the user equipment 101), and a digital signature generated by the key issuer 105."
    *Id.* at 3:57-62.

SONOS'S SUPP. BRIEF ISO
MSJ OF NON-INFRINGEMENT
3:20-CV-03845-EMC

## IV. THERE IS NO EVIDENCE IN THE RECORD UPON WHICH A JURY COULD FIND THAT THE AUTHTOKENS ARE "BASED ON" THE HOUSEHOLD ID.

Google and its expert, Dr. Sherman, have adduced no evidence demonstrating that the authTokens supplied by third-party content service providers are based on the Sonos household ID. The Court construed the "based on" limitation to require that "the domain information must be somehow used to determine which key is issued in the first instance." Dkt. No. 206 at 11, 14. But, as explained below, the party that "determine[s] which key is issued" is a third-party content service, and Google has not obtained any evidence demonstrating how those third-party music services generate or select the authTokens that they supply to Sonos devices.

The evidence in the record shows that when a Sonos user *first* adds a music service to a Sonos household, a Sonos device will send a getDeviceAuthToken request message to the third-party music service, and that message will include the "household ID" that identified the household to which the device belongs. Dkt. No. 189-4, Ex. 1 (Sherman Rpt.) at ¶¶153, 155, 238, 246. The third-party music service sends an "authToken" in response to the getDeviceAuthToken request. *Id.* at ¶¶153, 155. The music providers are responsible for defining their *own* process for issuing their *own* authTokens, and there is no evidence in the record relating to how third parties create or determine which authToken to send in response.

As explained in Sonos's previous briefs (Dkt. No. 184-3 (Sonos Op. Br.) at 10-12; Dkt. No. 195-3 (Sonos Reply Br.) at 5-6), this lack of evidence regarding how the authToken issuers generate or select the authToken to send in response to a getDeviceAuthToken is fatal to Google's "Authentication" infringement theory. Google's evidence shows, at most, that the third-party content service receives the household ID and can associate the authToken with that household ID after the fact. Dkt. No. 206 at 14-15. But without evidence regarding the third-party issuance process itself, Google cannot show that the authToken is "based on" the household ID.

In its order requesting additional briefing, the Court suggested that a specific Sonos document "*might*" provide evidence that the authTokens are based on the household ID. Dkt. No. 206 at 15. That document, from Sonos's developer page for third-party content services says "If a user connect[s] to more than one Sonos household, your service must use a different token to represent that user-household combination." *See* Dkt. No. 189-4, Ex. 1 (Sherman Rpt.) at ¶292.

1    This document fails to show that any third party bases any authToken on the household ID for two

2    reasons.

3            **First**, nothing about the quoted sentence demonstrates that any third-party content provider

4    uses a system that consults the household ID to determine which authToken to send in response.

5    Again, there is no evidence regarding how any third-party content providers makes that

6    determination. █████████████████████████████████████████████████████

7    █████████████████████████████████████████████████████████████████

8    ████████████████████████████

9            Specifically, ███████████████████████████████████████████████

10   █████████████████████████████████████████████████████████████████

11   █████████████████████████████████████████████████████████████████

12   █████████████████████████████████████████████████████████████████

13   █████████████████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████████████████

15   █████████████████████████████████████████████████████████████████

16   █████████████████████████████████████████████████████████████████

17   Dkt. No. 189-4, Ex. 1 (Sherman Rpt.) at ¶109 ██████████████████████

18   █████████████████████████████████████████████████████████████████

19   Dkt. No. 184-5, Ex. C (Sherman 6/16/23 Dep. Tr.) at 96:10-17 ████████████

20   █████████████████████████████████████████████████████████████████

21   ████████    In other words, a third-party music service can ensure that a user connecting to more

22   than one Sonos household will receive different authTokens—without using the household ID at

23   all—by simply tracking which authTokens it has already issued and not issuing duplicates (or by

24   employing a method of assigning authTokens that guarantees their uniqueness).

25           Accordingly, the Sonos developer's website does not instruct or require (or otherwise

26   indicate) a third-party music service to use the household ID in determining *which* authToken to

27   issue in the first instance.  While it is theoretically possible that a third-party music service could

28   take (unnecessary) steps to double check that issued authTokens were unique by somehow

1    considering the household ID, there is no evidence that any third party does that, and without such

2    evidence, Google can only ask the jury to speculate in its favor.  That is not sufficient to withstand

3    summary judgment.  *See McSherry v. City of Long Beach*, 584 F.3d 1129, 1136 (9th Cir. 2009)

4    ("Surmise, conjecture, theory, speculation and an advocate's suppositions cannot do duty for

5    probative facts and valid inferences." (citations and internal quotation marks omitted)).

6        **Second**, even if there were evidence that third-party music services consult the household

7    ID to ensure that they do not issue a duplicative authToken, that would still not show that the

8    household ID is used to "determine which [authToken] is issued in the first instance."  Dkt. No.

9    206 at 15.  This check would, at best, eliminate a few of the potentially infinite authTokens that

10   might issue, but still does not "*determine*" which authToken issues.  Instead, it determines which

11   of a handful of authTokens (those that are already used) will not issue.  It is akin to suggesting a

12   child's name is "based on" her older sibling's name because her parents eliminated that name from

13   contention to avoid having two children with same name.

14       The '187 patent does not indicate that a private key is "based on" the domain information

15   where the domain information merely rules out a couple of the potentially infinite possibilities for

16   the private key.  Rather, as the Court recognized in its order, the '187 patent describes the domain

17   information dictating precisely which private key will be issued, where "the former is used to 'look

18   up' the latter."  Dkt. No. 206 at 13.  Here, there is no evidence that the household ID is used at all,

19   let alone that it determines which key will issue.  The Court should therefore grant summary

20   judgment of non-infringement.

21

22   Dated:  June 5, 2024                    ORRICK HERRINGTON & SUTCLIFFE LLP
                                                      *and*
23                                                  LEE SULLIVAN SHEA & SMITH LLP

24                                             By: */s/ Alyssa Caridis*
25                                                      Alyssa Caridis

26                                                  *Attorneys for Sonos, Inc.*

27

28