1  CLEMENT SETH ROBERTS (SBN 209203)
   croberts@orrick.com
2  BAS DE BLANK (SBN 191487)
   basdeblank@orrick.com
3  ALYSSA CARIDIS (SBN 260103)
   acaridis@orrick.com
4  WILL MELEHANI (SBN 285916)
   wmelehani@orrick.com
5  EVAN D. BREWER (SBN 301411)
   ebrewer@orrick.com
6  SHANE D. ANDERSON (SBN 313145)
   sdanderson@orrick.com
7  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
8  405 Howard Street
   San Francisco, CA 94105-2669
9  Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759
10
   GEORGE I. LEE (*pro hac vice*)
11 lee@ls3ip.com
   SEAN M. SULLIVAN (*pro hac vice*)
12 sullivan@ls3ip.com
   RORY P. SHEA (*pro hac vice*)
13 shea@ls3ip.com
   J. DAN SMITH (*pro hac vice*)
14 smith@ls3ip.com
   LEE SULLIVAN SHEA & SMITH LLP
15 656 W Randolph St., Floor 5W
   Chicago, IL 60661
16 Telephone:    +1 312 754 0002
   Facsimile:    +1 312 754 0003
17
   *Attorneys for Defendant Sonos, Inc.*
18

19                 UNITED STATES DISTRICT COURT

20               NORTHERN DISTRICT OF CALIFORNIA,

21                    SAN FRANCISCO DIVISION

22 GOOGLE LLC,                        | Case No. 3:20-cv-03845-EMC

23            Plaintiff,              | **SONOS, INC.'S SUPPLEMENTAL REPLY
                                      | IN SUPPORT OF SUMMARY JUDGMENT
24       v.                          | OF NON-INFRINGEMENT OF '187
                                      | PATENT ASSERTED CLAIMS**
25 SONOS, INC.,
                                      | Date: July 18, 2024
26            Defendant.             | Time: 1:30 p.m.
                                      | Place: Courtroom 5, 17th Floor
27
                                                              REDACTED
28

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ............................................................................................. 1

II.   A "PRIVATE KEY" MUST SERVE AS THE KEY FOR THE
CRYPTOGRAPHIC ALGORITHIM TO WHICH IT IS INPUT. ..................................... 1

    A.    Google's Proposed Construction Has No Intrinsic Support. ................................ 2

    B.    Dr. Sherman's Opinions Are Nonsensical and Unsupported.................................. 4

    C.    Google's Proposed Construction Has No Extrinsic Support. ................................ 7

III.   GOOGLE'S ASSERTIONS THAT THIRD PARTIES ISSUE AUTHTOKENS
"BASED ON" THE HOUSEHOLD ID IS PURE SPECULATION............................... 10

    A.    The Operation of the Accused Products Is Not Disputed. ................................. 11

    B.    Google's Supplemental Brief Rests on Bare Speculation.................................. 12

    C.    Dr. Sherman's Opinions, Revealed in Deposition, Fail. ...................................... 13

1

**TABLE OF AUTHORITIES**

2
**Page(s)**

3
**Cases**

4
*Droplets, Inc. v. Yahoo! Inc.*,
No. 12-CV-03733-JST, 2021 WL 9038354 (N.D. Cal. July 27, 2021) ................................ 13

5

*JVC Kenwood Corp. v. Nero, Inc.*,
6
797 F.3d 1039 (Fed. Cir. 2015)........................................................................................ 10

7
*Kennedy v. Allied Mut. Ins. Co.*,
952 F.2d 262 (9th Cir. 1991)............................................................................................ 10

8

9
*Mariscal v. Graco, Inc.*,
52 F. Supp. 3d 973 (N.D. Cal. 2014) ................................................................................ 13

10
*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007)............................................................................................ 13

11

12
*Stephens v. Union Pac. R.R. Co.*,
935 F.3d 852 (9th Cir. 2019)............................................................................................ 13

13
*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012).......................................................................................... 4

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>APPENDIX OF CLAIMS</u>

2

1. A method for registering a new device as part of a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system, the method comprising the steps of:

3

4

receiving domain information corresponding to the domain of devices from a device existing within the domain of devices;

5

6

providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices; and

7

8

receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

9

10

3. The method of claim 1 wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving domain information for the device existing within a domain of devices, all devices within the domain sharing account information.

11

12

13

4. The method of claim 1 wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving the domain information over a short range link.

14

15

10. An apparatus comprising:

16

communication circuitry receiving domain information from a device existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system;

17

18

storage for storing the domain information; and

19

logic circuitry for providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key for use in accessing protected digital content to the apparatus, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices.

20

21

12. The apparatus of claim 10 wherein the domain of devices share account information.

22

23

24

25

26

27

28

1    **I.      INTRODUCTION**

2           Google's brief provides no basis to deny Sonos's motion for summary judgment.

3           First, on the issue of claim construction, the parties agree that the claimed "private key" is

4    a "cryptographic key."  Dkt. No. 67 (Google Opening CC Brief), 11 ("The parties and their experts

5    agree that this 'private key' is a 'cryptographic key.'"); Dkt. No. 70 (Sonos Responsive CC Brief),

6    9.  Google asserts that information that only serves as the ***data*** input (rather than as the key input)

7    to a cryptographic algorithm can satisfy this requirement.  But Google identifies no intrinsic or

8    contemporaneous extrinsic evidence for its position.  Instead, Google attempts to support its

9    position using the testimony of its expert, Dr. Sherman.  But, as shown by his answers in deposition,

10   Dr. Sherman's opinions are based on sweeping tautological definitions that have no intrinsic

11   support and are contradicted by the technical literature.

12          The Court should also reject Google's assertion that third-party authTokens are "based on"

13   Sonos household IDs because Google has (quite literally) ***no*** evidence about how any third parties

14   determine which authTokens to issue.  ████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████████████████

16   █████████████████████████████████   But its bases for this assertion are purely speculative, and

17   contradict Dr. Sherman's prior testimony.

18   **II.     A "PRIVATE KEY" MUST SERVE AS THE KEY FOR THE CRYPTOGRAPHIC
19           ALGORITHIM TO WHICH IT IS INPUT.**

20          During claim construction, Google and its expert acknowledged that the claimed "private

21   key" must be "[a] cryptographic key," which "is a key sequence of characters that is an input to a

22   cryptographic algorithm **where the algorithm is designed such that if you don't know the key**,

23   you cannot compute its output."  Ex. U (Sherman 3/8/21 Dep.) at 16:5-9 (emphasis added).  Because

24   there is no evidence in the record suggesting that the accused authTokens are such a key, Google

25   subsequently sought to take advantage of a perceived ambiguity in the construction to suggest that

26   the *data input* would suffice.  Google Br. at 7.  As best we understand it, Google's argument is

27   predicated on two assertions: (a) that any data used in an authentication process (including, e.g. a

28   simple lookup table) qualifies as a "key" and (b) that such a "key" becomes a "cryptographic key"

if it is used as a ***data*** input to a cryptographic algorithm. Google's theory is wrong because it is inconsistent with the Court's construction, the intrinsic record, the experts' prior statements and the cited technical literature.

### A.    Google's Proposed Construction Has No Intrinsic Support.

Google's brief identifies no intrinsic support for its position that the claimed "private key" can refer to authentication or access information that is only ever used as the *data input* to a cryptographic algorithm.  Instead, Google quotes various passages in the '187 Patent's specification and then declares that they support its position, without explaining how.

Google first asserts that the '187 Patent "allows private keys to be authentication or authorization keys" and cites, without explanation, three passages from the '187 Patent's specification.  Google Br. at 7 (citing Dkt. No. 185-3 (Ex. A) ('187 Patent) at 4:20-24, 6:38-40, 7:54-57).  Google never explains what it means by "authentication key," but to the extent Google is suggesting that all information used in an authentication process (i.e., a PIN, password, or authToken) is a *key*, there is no support for that position in the evidence.  Indeed, none of the passages that Google cites say anything about authentication or authorization ***keys***.

Google then points to disclosures relating to digital signatures and how they can, among other things, be used to authenticate the identity of the sender of a message. Google Br. at 7-8 (citing Dkt. No. 185-3 (Ex. A) ('187 Patent) at 2:45-50, 2:59-64, 3:1-6).  We agree: you can use a digital signature to authenticate someone's identity.  But that fact, and these passages, provide no support for the idea that the claimed "private key" could refer to authentication information that is used as the *data* input to a cryptographic algorithm.  To put it differently, the fact that cryptographic algorithms *can be used* to sign authentication information does not mean the signed information constitutes a "cryptographic key."  It is not.  It's the *object* of a cryptographic process—not the key that facilitates that process.

Google cites these passages in connection with its observation that the patent "does not limit private keys to encryption keys."  Google Br. at 7.  But that point is irrelevant, as Sonos's position is not based on whether the algorithm is an *encryption* algorithm – rather it is based on the fact that (as confirmed by all of the technical literature) a cryptographic key must be and act as the ***key*** to a

1    cryptographic algorithm.   And these passages neither say nor suggest that *all* inputs to

2    authentication algorithms are cryptographic keys, or that any *data* input to a cryptographic

3    algorithm qualifies as a cryptographic key.

4           Google also tries to support its argument by repeatedly citing a sentence in the '187 Patent

5    that states that the invention could also be implemented "using symmetric key techniques or

6    broadcast key encryption techniques."  Google Br. at 7-8 (thrice citing the language of '187 Patent

7    at 7:54-57).   But, again, neither Google nor its expert explain how this sentence supports its

8    argument. *See* Ex. V (Sherman 6/14/24 Dep.) at 57:13-59:6[1].  Google appears to cite these passages

9    to support its contention that a "private key" is not limited to the public-key cryptography

10   embodiment disclosed in the specification.  Google Br. at 7.  But, again, so what?  This Court did

11   not ask whether the private key must be a key for a particular *type* of cryptographic algorithm,

12   instead the Court asked whether the private key must be the ***key*** input to a cryptographic algorithm.

13   The answer to that question is yes – and that answer is not impacted by the fact that (as these

14   passages recognize) there are multiple kinds of key-based cryptography.

15          Google also mentions disclosures in the '187 Patent relating to the "unit private key that

16   was installed on the equipment by the manufacturer" and which may be used to "respond to a[n]

17   [authentication] challenge."  Google Br. at 8 (citing to '187 Patent at 4:20-24, 6:38-40).   Again,

18   Google cites these passages to argue that "there are non-public … keys for use in cryptographic

19   algorithms that perform functions other than encryption or decryption."  *Id.*  But this discussion of

20   the "unit private key" provides no support for Google's claim construction position.  Indeed, Dr.

21   Sherman agreed that these passages provide no evidence that would allow one to conclude that the

22   "unit private key" is used as a data input to any cryptographic algorithm.  Ex. V (Sherman 6/14/24

23   Dep.) at 53:4-55:24.[2]  In any event, as the '187 Patent states and as Dr. Sherman recognized, this

24   ───────────────

[1] All exhibits are submitted with the Caridis Decl. filed concurrently herewith.

25   [2] Rather, the "challenge" process described in these passages refers to the authentication

26   "challenge response protocol" discussed earlier in the '187 Patent.  *See* Dkt. No. 185-3 (Ex. A)
     ('187 Patent) at 3:1-7; *see also* Ex. V (Sherman 6/14/24 Dep.) at 56:5-57:9 (agreeing that this

27   passage discussed the type of challenge process discussed in relation to the "unit private key").
     This "challenge response protocol that involves the use of public-key cryptography," and so there

28   is no reason to assume that the "unit private key" is anything other than the private ***key*** input to
     such a public-key cryptography algorithm.  Dkt. No. 185-3 (Ex. A) ('187 Patent) at 3:1-7.

SONOS'S SUPP. REPLY ISO
MSJ OF NON-INFRINGEMENT
3:20-CV-03845-EMC

"unit private key" comes *preinstalled* on the device and therefore cannot be the "private key" recited in the claims, because the claims require the "key issuer" to provide the private key.  Dkt. No. 185-3 (Ex. A) ('187 Patent) at 4:20-24; Ex. V (Sherman 6/14/24 Dep.) at 53:13-20.

Because Google cannot marshal any intrinsic evidence that addresses the Court's question, it devotes pages of its brief to the irrelevant issue of whether the "private key" must be used in an encryption or decryption algorithm, and implies that its position somehow avoids improperly limiting the meaning of the term based on a disclosed public-key cryptography embodiment.  *See* Google Br. at 7-8 (citing *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).  In *Thorner*, the Federal Circuit refused to depart from the plain and ordinary meaning of the term "attached" based on a particular disclosed embodiment because it found no disavowal or lexicography.  *See Thorner*, 669 F.3d at 1365-66. The case has no application here, as Sonos is not asserting that the '187 Patent is limited to any embodiment, nor is Sonos relying on disavowal or lexicography.[3]  Rather, the problem is that Google is trying to make two assertions that have no support whatsoever: (i) that all inputs to authentication algorithms are *keys*, and (ii) that such a *key* becomes a "cryptographic key" if it is used as the data input to a cryptographic algorithm.[4]

### B.     Dr. Sherman's Opinions Are Nonsensical and Unsupported.

Google has likewise failed to provide any credible extrinsic support for its position.  Indeed, the only evidence Google provides is Dr. Sherman's unsupported, conclusory statement that one of ordinary skill in the art would understand that the term "private key" could be either the key input or a mere data input that does not itself serve as a cryptographic key.  Google Br. at 2.  Yet neither Google nor Dr. Sherman could locate a single example of any other person in the field of

---

[3] To the extent Google is suggesting otherwise, Sonos is not asserting that the "private key" must be limited to use for encrypting or decrypting, just that it must be the specified key input to a cryptographic algorithm.

[4] To be sure, *actual* cryptographic keys may be used as the data input to a cryptographic algorithm.  For example, it is sometimes desirable to encrypt a key prior to its transmission.  In that situation a cryptographic key may be used as the data input into an encryption algorithm. But in that case (i) the encrypting algorithm has its own key and (ii) the key being encrypted is acting like any other piece of data with respect to the encrypting algorithm—it is not acting as the key for that algorithm.

SONOS'S SUPP. REPLY ISO
MSJ OF NON-INFRINGEMENT
3:20-CV-03845-EMC

1  cryptography referring to authentication or access information that only ever serves as the data

2  input to a cryptographic algorithm as a "private key" or a "cryptographic key."

3        During his deposition, it became evident that Dr. Sherman has warped the meaning of

4  commonly used terms in the field of cryptography to justify Google's position.  And his opinion

5  regarding the plain and ordinary meaning of "private key" is premised on shifting (and sometimes

6  circular) positions that find no support outside of his say-so.  His logic appears to work as follows:

7        First, Dr. Sherman defines a "cryptographic algorithm" as being "one of many different

8  things that achieves some of the objectives of cryptography, which deals in part with

9  confidentiality, authentication, and integrity" and which "typically uses secret information, such as

10  a key." Ex. V (Sherman 6/14/24 Dep.) at 6:23-7:8; 27:21-28:12.  When asked to explain whether

11  certain simplistic authentication processes (i.e., checking if a password is correct) would qualify as

12  "cryptographic algorithms," Dr. Sherman's answers varied. *Compare* Ex. V (Sherman 6/14/24

13  Dep.) at 10:21-11:7 *with id.* at 22:5-23:17.  Ultimately, he appeared to settle on a three "element"

14  test to identify a cryptographic algorithm.[5] *Id.* at 36:11-38:23; 64:2-67:9. That test (which is found

15  nowhere in the technical literature or the patent) consists of analyzing (1) whether the algorithm

16  achieves an objective of cryptography, (2) whether it involves some secret information, and (3)

17  tautologically, whether *it involves a cryptographic algorithm*.[6] *Id.* Dr. Sherman identified no

18  support for his definition or his test other than his say so.  And it contradicts his prior testimony

19  that looking up and matching data (*i.e.*, checking if a password is correct) would **not** qualify as a

20  "cryptographic algorithm."  *See* Dkt. No. 184-5 (Ex. C) (Sherman 6/16/23 Dep.) at 117:4-20.

21        Second, Dr. Sherman defines a "cryptographic key" as "something that enables an action"

22  and that can be input into a cryptographic algorithm … using his circular definition of

23  "cryptographic algorithm" (which is just something that "achieves some of the objectives of

24

_____

25  [5] Dr. Sherman did not include this three-element test in his supplemental expert report, nor can it be found in Google's brief.

26  [6] This tautology proves that Dr. Sherman has some other criteria that he is employing to

27  determine if an algorithm actually is a cryptographic algorithm, but he refused to articulate what those criteria were, and instead repeatedly insisted that he would need to know more "details" to

28  tell if the third requirement was satisfied (i.e., through the use of an actual cryptographic algorithm).  Ex. V (Sherman 6/14/24 Dep.) at 22:15-25:15; 37:13-39:13; 64:5-68:12.

cryptography"). Ex. V (Sherman 6/14/24 Dep.) at 11:9-12:23; 7:10-21. This is, of course, circular and arbitrary because he defines "cryptographic algorithm" by asking whether the algorithm achieves a cryptograph purpose and "involves a cryptographic algorithm", and then defines cryptographic key in terms of whether it is an input to a cryptographic algorithm. Moreover, because *any* data can be the **data input** into a cryptographic algorithm (e.g., to be signed, verified, or encrypted), Dr. Sherman's opinion amounts to the position that everything that can be put into any authentication or authorization process qualifies as a "cryptographic key" – including a simple password. *Id*. at 12:25-13:10. Similarly, in Dr. Sherman's view, even a PIN for accessing an ATM is a "cryptographic key." *Id*. at 45:17-21. And while Dr. Sherman contends that there is "literature in the field of cryptography that would refer to passwords and PINs as 'cryptographic keys'" (*id*. at 46:4-7), he did not cite any in his report or identify any during his deposition.

This notion that *all* methods of authenticating someone's identity are cryptographic algorithms, or that all inputs to authentication algorithms are cryptographic **keys** defies common sense. For example, when undersigned counsel comes to the courthouse to argue this motion, she will show her driver's license to the security officer. That driver's license is not a cryptographic key, even if the deputy applies some sort of authentication and authorization process (e.g., confirming the photo matches my appearance) while reviewing the license. But under Dr. Sherman's approach, counsel's license *is* a cryptographic key, because (i) it is an input to an algorithm and (ii) that algorithm accomplishes a cryptographic purpose (*i.e.*, authentication).

Third, to reach his definition of "*private* key," Dr. Sherman adds that this "key" must be "non-public." Through these unsupported definitions, Dr. Sherman has essentially adopted a construction under which **any** secret information that is used for authentication qualifies as a "private key" – which is why he opines that passwords and pin numbers are private cryptographic keys. This cannot be correct.

Indeed, taken at face value, Dr. Sherman's opinions would render the second half of the Court's construction meaningless. That construction reads: "a non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be computed." Dkt. No. 108 (Claim Const. Order) at 11, 27. In one sense, of course, Dr.

SONOS'S SUPP. REPLY ISO
MSJ OF NON-INFRINGEMENT
3:20-CV-03845-EMC

1    Sherman is correct that *all* cryptographic algorithms (indeed all algorithms) must have a data input

2    to calculate an output.  Ex. U (Sherman 3/8/21 Dep.) at 16:13-17:2.  But that is true because the

3    *purpose* of a cryptographic algorithm is to transform (e.g., to encode or decode) a data input.  Under

4    Dr. Sherman's approach, the red passage is superfluous because the blue passage *already* specifies

5    that the private key must be an input to a cryptographic algorithm and because *all* algorithms

6    (including simple ones like __ + __ = ___) must have a data input in order to create an output.  Put

7    differently, for the passage in red to have meaning, the phrase "cannot be computed" must be read

8    in connection with the earlier word "***designed***."  The key to a cryptographic algorithm is the key

9    that is *designed* to enable the algorithm to function, not the data which the algorithm acts on.

10    **C.    Google's Proposed Construction Has No Extrinsic Support.**

11         The sources Dr. Sherman chose to cite in his supplemental report contradict his efforts to

12    broadly define any secret authentication information as a private (cryptographic) key.[7]  For

13    example, Dr. Sherman cites a textbook entitled "Cryptography: A New Dimension in Computer

14    Data Security – A Guide for the Design and implementation of Secure Systems ("Cryptography

15    Textbook")."[8]  Dkt No. 213-4 (Sherman Supp. Rep.) ¶¶ 20, 25.  He contends this textbook is an

16    "authoritative source[ ] on cryptography."  Ex. V (Sherman 6/14/24 Dep.) at 32:25-33:7. The

17    textbook, however, does not provide Dr. Sherman's three-element definition of "cryptographic

18    algorithm."  Instead, it defines a "cryptographic algorithm" as a large set of transformations where

19    "the particular transformation in effect depend[s] on the cryptographic key being used" and where

20    "each transformation changes sequences of intelligible data (plaintext) into sequences of apparently

21    random data (ciphertext)."  Ex. W (Cryptography Textbook) at 14.  And nowhere does this textbook

22    suggest that a PIN or a password would constitute a "cryptographic key."  *See, e.g.*, *id.* at 430-433,

23    484-488 (discussing PINs while not referring to them as a "key").  Instead, when it discusses

24    various cryptographic algorithms that act ***on*** PINs or other authentication information, it uses the

25

---

26    [7] Instead, each of these references is consistent with the extrinsic evidence that Sonos cited in its
      supplemental brief, which draw a clear delineation between the data input and key input of a

27    cryptographic algorithm.  *See* Sonos Br. at 5-7.

28    [8] Tellingly, neither Google nor Dr. Sherman provided the Court (or Sonos) with a copy of or way
      to access this textbook.

term "key" only to refer to the key that is *designed to* control the cryptographic algorithms.  *See, e.g.*, *id.* at 488-489 (showing a cryptographic algorithm involving PINs and cryptographic keys, i.e., KP and KA).

The same is true with the other textbook that Dr. Sherman cites.  Dkt No. 213-4 (Sherman Supp. Rep.) ¶ 20.  It never defines "cryptographic algorithm" or "cryptographic key" like Dr. Sherman does, nor does it refer to basic authentication information as a "cryptographic key." Instead, for example, when it discusses encrypted authentication tokens and other authentication information like, e.g., serial numbers, it does not call them "keys," and instead reserves that term for the cryptographic key used to cryptographically transform the token (which is the data being acted upon in this example).  *See, e.g.*, Ex. X (https://www.cl.cam.ac.uk/~rja14/ musicfiles/manuscripts/SEv1.pdf) at page 15 (discussing an authentication protocol for verifying whether a car can access a parking garage using an access token *T* and a cryptographic key, *KT*).

Dr. Sherman also cites https://cyberpedia.reasonlabs.com/EN/key%20wrapping.html to make the point that it's possible to use one cryptographic key to encrypt another.  That is not in dispute, but in that case, the second key is *acting as* a data input with respect to the relevant cryptographic algorithm.  With respect to that algorithm, it is a data input, not a key.  In fact, the website Dr. Sherman cites says nothing to support his contention that the term "cryptographic key" could refer to a data input that is not the algorithm's designated key.  Dkt No. 213-4 (Sherman Supp. Rep.) ¶ 25.  Moreover, that same source includes an entry on "cryptographic keys" which explains, consistent with Sonos's argument, that those keys are the "variables used in algorithms to encrypt or decode ciphered data" through coding.[9]  Nowhere does this source teach or suggest that data that is used to access resources qualifies as a "cryptographic key" whenever that data itself may at some point be cryptographically encoded.

As another example, Dr. Sherman cites the OAuth 2.0 Authorization Framework for Bearer Tokens to support his view that a token that is not used as the key for a particular cryptographic algorithm can still be the claimed "private key."  Dkt No. 213-4 (Sherman Supp. Rep.) ¶ 34.  While this document says that the "bearer token" is used to "get access to the associated resources," it

---

[9] Ex. Y (https://cyberpedia.reasonlabs.com/EN/cryptographic%20keys.html).

1  never once refers to bearer tokens as keys, let alone cryptographic keys.  Instead, it explains that a

2  purpose of the bearer token is to permit the user to access the resources "***without demonstrating***

3  ***possession of a cryptographic key.***"  Ex. Z (https://www.rfc-editor.org/rfc/pdfrfc/rfc6750.txt.pdf)

4  at p. 1 (Abstract).  Dr. Sherman's sweeping definitions (and his infringement theory as whole)

5  would suggest that a bearer token is a cryptographic key, when the very reference on which he

6  relies expressly says it is not.

7      Interestingly, when Dr. Sherman wrote his dissertation in 1986, he described keys as the

8  result of "random selection" and explained that "the message and the key are thoroughly mixed in

9  a complicated way" such that "only someone who knows the key can unscramble the message."

10  *See* Ex. AA (https://people.csail.mit.edu/rivest/student-theses/phd-1987-sherman.pdf) at 18.  And

11  his writing acknowledges that the "key" is the variable used to transform the data to be encrypted

12  (i.e., they key controls the cryptographic algorithm's transformation of the data input).  As he

13  expressed it: "[a] cryptosystem is faithful if and only if every key represents a distinct

14  transformation."  *Id.* at 38.  Similarly, during claim construction in this case, Dr. Sherman never

15  revealed any belief that all information used to access resources or authenticate oneself constituted

16  a "private key."  Instead, he repeatedly used the word "key" in a way consistent with Sonos's

17  position and its actual meaning.  For example, he testified that a private key is the key to a

18  cryptographic algorithm that "was *designed* for the purpose of using a key that was kept private."

19  Ex. U (Sherman 3/8/21 Dep.) at 40:25-41:15 (emphasis added); *see also id.*, 40:18-24 (private refers

20  "to the fact that … the algorithm in which it is used is *designed* for the key to be kept private")

21  (emphasis added); *id.*, 52:13-24 (explaining that a private key is one where a cryptographic

22  algorithm "is designed for the key to be private").  Algorithms can take a wide variety of inputs as

23  *data*, but they are *designed* to use a particular key input to facilitate the transformation of the data

24  input.  Ex. V (Sherman 6/14/24 Dep.) at 47:4-24; *id.*, 12:8-23, 20:8-20.

25      In sum, the extrinsic evidence shows that Dr. Sherman is not construing the term "private

26  key" in a manner consistent with how it is used in the field of cryptography or how he has used it

27  in the past.  There is no evidence to support Google's and Dr. Sherman's suggestion that a piece of

28  data that is not a designated key to a cryptographic algorithm can be a "private key," and all the

available intrinsic and extrinsic evidence suggests otherwise.  *See JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1047-48 (Fed. Cir. 2015) (finding a district court correctly struck opinions of JVC's technical expert in the expert's declaration because those opinions were "inconsistent with JVC's statements on claim construction"); *see also Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991) (permitting a district court to discount a declaration in an affidavit that contradicts prior deposition testimony if the court "make[s] a factual determination that the contradiction was actually a 'sham'").  The Court should therefore construe the term "private key" in connection with its plain and ordinary meaning to require that it be the cryptographic key input that controls a cryptographic algorithm, as explained in Sonos's brief.  Sonos Br. 2-8.[10]

## III.  GOOGLE'S ASSERTIONS THAT THIRD PARTIES ISSUE AUTHTOKENS "BASED ON" THE HOUSEHOLD ID IS PURE SPECULATION.

The Court's construction of "based on" did nothing to remedy the fundamental problem with Google's case—that it has no *evidence* showing how any third-party determines which authToken to provide as part of the accused AppLink and DeviceLink processes, and no evidence as to how or whether that process involves the accused "domain information."  Because the Court rejected Google's prior theory that it was sufficient for the authToken to be "associated with" the accused "domain information," Google instead resorts to rank, unsupported speculation about what third party music service providers *might* do.

Perhaps understanding the vulnerabilities in Google's position, during deposition Dr. Sherman concocted "five facts" that he purports lead him to a "deduction" as to what third parties supposedly *must* do, but his "facts" bear no logical relationship to his conclusion—and they are naked speculation.  Worse, several of these "facts" misrepresent the functionality of Sonos's accused AppLink and DeviceLink processes, which have been undisputed.  Indeed, Dr. Sherman's misrepresentations as to how Sonos's system works contradict his own expert report and prior

_____

[10] ███████████████████████████████████████████

1    testimony.   For these reasons, Google's and Dr. Sherman's speculation cannot save Google's

2    evidence-free infringement theory from summary judgment.

3    **A.    The Operation of the Accused Products Is Not Disputed.**

4    Google's "Authentication Theory" relates to the process by which a user adds third-party

5    music service accounts (like Spotify) to their Sonos system so that the players can stream music

6    from those services.  Dkt. No. 184-5 (Ex. C) (Sherman 6/16/23 Dep.) at 45:21-46:8.  Relevant to

7    this case, Sonos offers two different methods of authentication "[w]hen users add [a music] service

8    to their household."  Ex. AB (SONOS-GVS-00001152).   These methods are referred to as

9    "AppLink" ("App authentication") and "DeviceLink" ("Browser authentication").  *Id.*; *see also*

10   Dkt. No. 189-4 (Ex. 1) (Sherman Opening Rep.) at ¶¶ 152-156.  In *both* methods, Sonos makes an

11   API call to the music service called "getDeviceAuthToken."  Ex. AC (GOOG-GVS-00002331);

12   Ex. AD (GOOG-GVS-00002339); *see also* Dkt. No. 189-4 (Ex. 1) (Sherman Opening Rep.) at

13   ¶¶ 153, 155.  That request includes as a parameter the device's household ID.  Ex. AE (SONOS-

14   GVS-00000713); *see also* Dkt. No. 189-4 (Ex. 1) (Sherman Opening Rep.) at ¶¶ 153, 155.  In

15   response to the request, the music service provider returns an AuthToken (Ex. AE (SONOS-GVS-

16   00000713); *see also* Dkt. No. 189-4 (Ex. 1) (Sherman Opening Rep.) at ¶¶ 153, 155), which Google

17   alleges is the claimed "private key."  Google offers no evidence that getDeviceAuthToken is ever

18   called outside of when a music service is being added to a household *for the first time*.

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 ████████████████

6    **B.    Google's Supplemental Brief Rests on Bare Speculation.**

7         In its supplemental brief, Google contends that "the key issuer (third party music provider)

8 performs a check to determine whether the domain information (household ID) has a private key

9 (AuthToken) assigned to it, and, if not, issues a new key (AuthToken) determined by the result of

10 the household ID check."   Google Br. at 5.   Google suggests that this "check" involves a

11 (unidentified) "database lookup." Google Br. at 6.  Google likewise contends (with no citation at

12 all) that the "API call 'getDeviceAuthToken' uses 'householdID' as an input and checks whether

13 there is an existing AuthToken for that householdID."   Google Br. at 6.  Google has no evidence

14 for any of these assertions.  Google did not obtain any evidence from third-party music services

15 that describe the existence of this so-called "check" or reveals the existence of Google's

16 hypothetical database, nor do any Sonos documents describe these third-party systems.  *See* Ex. V

17 (Sherman 6/14/24 Dep.) at 71:16-25 (admitting that he still has not reviewed source code or

18 documentation for third party systems).

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████

28 ██████████████████████████████████████████████

1

2

3

4

5

6

7

8

9                  That is illogical, and (more importantly) unsupported speculation that

10 cannot provide a basis to resist summary judgment. *See Soremekun v. Thrifty Payless, Inc.*, 509

11 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers

12 is insufficient to raise genuine issues of fact to defeat summary judgment."); *Stephens v. Union*

13 *Pac. R.R. Co.*, 935 F.3d 852, 856-57 (9th Cir. 2019) ("A party's own speculation is insufficient to

14 create a genuine issue of material fact … and a party cannot make it sufficient simply by finding

15 an expert who is willing to assume its correctness.").

16       **C.**      **Dr. Sherman's Opinions, Revealed in Deposition, Fail.**

17             After acknowledging that he's never actually seen the source code or documentation for

18 any third-party music services, Dr. Sherman revealed, for the first time in deposition that there are

19 five facts that allow him to deduce that the authTokens provided by third-party content providers

20 must be "based on" the household ID. Ex. V (Sherman 6/14/24 Dep.) at 73:20-74:20. This opinion

21 is not found in his supplemental expert report. To the extent Google attempts to introduce and rely

22 on it in its responsive brief, this argument also fails.[11] As explained below, Dr. Sherman's so-called

23 logical "deductions" are merely speculation.

24

25         ——————————————

[11] When an expert provides new opinions for the first time on reply, a Court may disregard those

26 new opinions. *See, e.g., Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 981, 983-84 (N.D. Cal.
2014) (excluding an expert declaration submitted by Plaintiff with Plaintiff's opposition briefing

27 where the declaration "did not merely revisit opinions previously stated, but it included new
previously undisclosed opinions"); *Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733-JST, 2021

28 WL 9038354, at *4 (N.D. Cal. July 27, 2021) (disregarding an expert's "new theories provided
in" the "expert['s] declaration … in opposition to summary judgment").

1        The first two facts that Dr. Sherman identifies are (1) the getDeviceAuthToken request

2   includes, as a parameter, the household ID, and (2) the AuthToken represents the household.  Ex.

3   V (Sherman 6/14/24 Dep.) at 74:21-75:22.  These are the same facts that Google raised in its

4   opposition (Dkt. No. 189-3 at 9-10), and the Court already found that they do not provide any

5   evidence that the authToken is "based on" the household ID.  Dkt. No. 206 at 14-15.  These facts

6   do nothing to show that the authToken is generated or selected based on the household ID.  They

7   are just as consistent with a scenario where the authToken is selected through some other process

8   (e.g., at random) and associated with the household ID after issuance.

9        The third and fourth fact that Dr. Sherman identifies misrepresent the functionality of

10  Sonos's system and contradict Dr. Sherman's prior admissions.  Specifically, Dr. Sherman asserts

11  that the facts that (3) a different authToken must be issued to different user-household combinations

12  and ██████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  █████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████

27  ████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████████

8 ████████████████████████████████   But it is Google's burden to show infringement, and it is Dr.

9 Sherman's burden to explain how his so-called logical deductions are logical and not speculative.

10 Neither burden has been met here.

11       Finally, Dr. Sherman's fifth fact contradicts his own prior statements.  In particular, Dr.

12 Sherman contends that a "refresh token" request includes the household ID and prompts the third-

13 party to return **_the existing authToken_** for the household.  Ex. V (Sherman 6/14/24 Dep.) at 79:16-

14 80:6; ████████████████████████████████████████████████████████████

15 ████████████████████████████   Dr. Sherman's deposition testimony is simply wrong about the use

16 of "refresh token."  As he previously recognized, the refresh token request returns a *new* authToken,

17 not an existing one.  *See* Dkt. No. 189-4 (Ex. 1) (Sherman Opening Rep.) ¶ 253 ("In response to

18 receiving the refreshAuthToken request, the digital content provider generates and returns ***a new***

19 ***authToken*** (private key) to the '187 Accused Instrumentality in a refreshAuthToken response.")

20 (emphasis added).  As such, there is no need to use the household ID to check for the existing

21 authToken, as a new one is being issued and associated with the provided household ID.

22       The reality is that any evidence as to how authTokens are generated and selected, and

23 whether and how that process involves the household ID (if at all), rests in the hands of the third-

24 party music providers from whom Google obtained no evidence.  Google and Dr. Sherman's efforts

25 to suggest that Sonos's documentation allows one to logically infer what process these third-parties

26 use is meritless.  Because Google's asserted dispute of material fact is just speculation, the Court

27 should grant summary judgement of non-infringement.

28

Dated:  July 3, 2024

ORRICK HERRINGTON & SUTCLIFFE LLP
*and*
LEE SULLIVAN SHEA & SMITH LLP

By: */s/ Alyssa Caridis*
Alyssa Caridis

*Attorneys for Sonos, Inc.*